**Nos. 24-2044, 24-2045**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE, NORTH CAROLINA REPUBLICAN PARTY,
*Plaintiffs-Appellees*,

*v.*

NORTH CAROLINA STATE BOARD OF ELECTIONS, KAREN BRINSON BELL,
ALAN HIRSCH, JEFF CARMON, STACY EGGERS IV, KEVIN N. LEWIS,
SIOBHAN O'DUFFY MILLEN,
*Defendants-Appellants*,

DEMOCRATIC NATIONAL COMMITTEE,
*Intervenor-Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of North Carolina, No. 5:24-cv-00547 (Myers, C.J.)

## JOINT APPENDIX (JA1-JA679)

PHILLIP J. STRACH
JORDAN A. KOONTS
NELSON MULLINS RILEY
   & SCARBOROUGH LLP
301 Hillsborough Street, Suite 1400
Raleigh, N.C. 27603
(919) 329-3800
phil.strach@nelsonmullins.com

JOHN E. BRANCH, III
THOMAS G. HOOPER
BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, PC
2235 Gateway Access Point, Suite 220
Raleigh, N.C. 27607
(984) 844-7900
jbranch@bakerdonelson.com

*Counsel for Plaintiffs-Appellees
Republican National Committee and
North Carolina Republican Party*

SARAH G. BOYCE
*Deputy Attorney General and
   General Counsel*
NORTH CAROLINA DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, N.C. 27602
(919) 716-6900
SBoyce@ncdoj.gov

*Counsel for Defendants-Appellants North
Carolina State Board of Elections, et al.*

SETH P. WAXMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Counsel for Intervenor-Defendant-Appellant
Democratic National Committee*

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

MARY CARLA BABB
*Special Deputy Attorney General*
TERENCE STEED
*Special Deputy Attorney General*
SOUTH A. MOORE
*Deputy General Counsel*
MARC DAVID BRUNTON
NORTH CAROLINA DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, N.C. 27602
(919) 716-6900

*Counsel for Defendants-Appellants North Carolina State Board of Elections, et al.*

DANIEL S. VOLCHOK
CHRISTOPHER E. BABBITT
GARY M. FOX
JOSEPH M. MEYER
JANE E. KESSNER
NITISHA BARONIA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
(202) 663-6000

JIM W. PHILLIPS, JR.
SHANA L. FULTON
ERIC M. DAVID
WILLIAM A. ROBERTSON
JAMES W. WHALEN
BROOKS, PIERCE, MCLENDON
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300

*Counsel for Intervenor-Defendant-Appellant Democratic National Committee*

# TABLE OF CONTENTS

Page

Docket Listing for E.D.N.C. No. 5:24-cv-00547-M-RJ ....................................... JA1

Notice of Removal, filed September 23, 2024 (Dkt. 1) ....................................... JA7

    Attachment # 1 Civil Cover Sheet and Supplemental Cover
    Sheet (Dkt. 1-1) ................................................................ JA14

    Attachment # 2 Index Index to Exhibits (Dkt. 1-2) ................................. JA20

    Attachment # 3 Exhibit A. Verified Complaint (Dkt. 1-3) ...................... JA21

    Attachment # 4 Exhibit B. Civil Action Cover Sheet (Dkt. 1-4) ............ JA44

    Attachment # 5 Exhibit C. Summons for North Carolina State
    Board of Elections (Dkt. 1-5) ......................................... JA48

    Attachment # 6 Exhibit D. Summons for Karen Brinson Bell
    (Dkt. 1-6) ........................................................................ JA51

    Attachment # 7 Exhibit E Summons for Alan Hirsch (Dkt. 1-7) ............ JA54

    Attachment # 8 Exhibit F. Summons for Jeff Carmon (Dkt. 1-8) ........... JA57

    Attachment # 9 Exhibit G. Summons for Stacy Eggers IV
    (Dkt. 1-9) ........................................................................ JA60

    Attachment # 10 Exhibit H. Summons for Kevin N. Lewis
    (Dkt. 1-10) ...................................................................... JA63

    Attachment # 11 Exhibit I. Summons for Siobhan ODuffy
    Millen (Dkt. 1-11) .......................................................... JA66

    Attachment # 12 Exhibit J. Acceptance of Service for all State
    Board Defendants (Dkt. 1-12) ........................................ JA69

    Attachment # 13 Exhibit K. Notice of Appearance by Babb for
    Defendants (Dkt. 1-13) ................................................... JA72

    Attachment # 14 Exhibit L. Motion to Expedite Discovery by
    Plaintiffs (Dkt. 1-14) ...................................................... JA75

    Attachment # 15 Exhibit M. Exhibit A to Motion to Expedite
    (Dkt. 1-15) ...................................................................... JA81

    Attachment # 16 Exhibit N. Motion to Intervene by Democratic
    National Committee (Dkt. 1-16) ..................................... JA96

- i -

Attachment # 17 Exhibit O. Notice of Appearance by Terence
P. Steed for State Board Defendants (Dkt. 1-17) ................................... JA118

Attachment # 18 Exhibit P. Order Granting Democratic
National Committees Motion to Intervene (Dkt. 1-18) .......................... JA122

Attachment # 19 Exhibit Q. Motion to Dismiss, Answer and
Affirmative Defenses by Democratic National Committee (Dkt.
1-19) ................................................................................................... JA125

Attachment # 20 Exhibit R. Motion to Intervene by North
Carolina State Conference of the NAACP and Jackson Sailor
Jones (Dkt. 1-20) ................................................................................ JA139

Amended Motion to Intervene, filed September 27, 2024 (Dkt. 19) ............... JA208

Attachment # 1 Exhibit A: Proposed Answer (Dkt. 19-1) ..................... JA214

Attachment # 2 Exhibit B: Maxwell Declaration (NC NAACP)
(Dkt. 19-2) .......................................................................................... JA255

Attachment # 3 Exhibit C: Jones Declaration (Dkt. 19-3) ..................... JA260

Attachment # 4 Exhibit D: Leverette Declaration (Dkt. 19-4).............. JA269

Attachment # 5 Text of Proposed Order (Dkt. 19-5) ............................. JA273

Memorandum in Support of Amended Motion to Intervene, filed
September 27, 2024 (Dkt. 20) ............................................................. JA275

Motion to Expedite Consideration of Amended Motion to Intervene,
filed September 27, 2024 (Dkt. 21) ..................................................... JA288

Attachment # 1 Proposed Order (Dkt. 21-1) ........................................ JA292

Memorandum in Support of Motion to Expedite Consideration of
Amended Motion to Intervene, filed September 27, 2024
(Dkt. 22) .............................................................................................. JA294

Order Granting Motion to Expedite and Denying Motion to Intervene,
filed September 30, 2024 (Dkt. 29) ..................................................... JA299

Motion to Dismiss for Failure to State a Claim, filed September 30,
2024 (Dkt. 30) ..................................................................................... JA307

Memorandum in Support of Motion to Dismiss for Failure to State a
Claim, filed September 30, 2024 (Dkt. 31) ......................................... JA310

Motion to Expedite Briefing and Consideration of State Board
      Defendants' Motion to Dismiss, filed September 30, 2024
      (Dkt. 32) ................................................................................. JA338

      Attachment # 1 Proposed Order (Dkt. 32-1) ......................... JA341

Memorandum in Support of Motion to Expedite Briefing and
      Consideration of State Board Defendants' Motion to Dismiss,
      filed September 30, 2024 (Dkt. 33) ......................................... JA343

Order Granting Motion to Expedite Briefing and Consideration of
      State Board Defendants' Motion to Dismiss, filed October 1,
      2024 (Dkt. 36) ......................................................................... JA350

Emergency Motion to Remand, filed October 1, 2024 (Dkt. 37) .................... JA352

      Attachment # 1: Proposed Order ......................................... JA355

Memorandum in Support of Emergency Motion to Remand, filed
      October 1, 2024 (Dkt. 38) ........................................................ JA357

Order Granting in Part Emergency Motion to Remand, filed October
      1, 2024 (Dkt. 39) ..................................................................... JA372

Response in Support of Motion to Dismiss for Failure to State a
      Claim, filed October 7, 2024 (Dkt. 48) .................................. JA374

      Attachment # 1 Index of Exhibits (Dkt. 48-1) ....................... JA405

      Attachment # 2 Exhibit 1 − Republican National Committee v.
      Schmidt, No. 108 MM 2004 (Pa. Oct. 5, 2024) (Dkt. 48-2) ................. JA407

      Attachment # 3 Exhibit 2 − North Carolina Official Election
      Manual (Sections 5.7.3 and 8.3.1) (Dkt. 48-3) ....................... JA411

      Attachment # 4 Exhibit 3 − Current North Carolina
      Voter−Registration Form (Dkt. 48-4) ..................................... JA414

      Attachment # 5 Exhibit 4 − Administrative Complaint Filed by
      Carol Snow (Dkt. 48-5) .......................................................... JA417

      Attachment # 6 Exhibit 5 − Prior North Carolina
      Voter−Registration Form (Dkt. 48-6) ..................................... JA425

      Attachment # 7 Exhibit 6 − Governor Cooper, Disaster
      Declaration Request (Sept. 27, 2024) (Dkt. 48-7) ................. JA429

      Attachment # 8 Exhibit 7 − President Joseph R. Biden, Jr.
      Approves North Carolina Disaster Declaration, White House
      (Sept. 28, 2024) (Dkt. 48-8) ................................................... JA437

Attachment # 9 Exhibit 8 − Non−Party Brief of the Republican National Committee et al., *Priorities USA v. Evers*, No. 2024AP164 (Wis. May 3, 2024) (Dkt. 48-9)..........................................JA440

Attachment # 10 Exhibit 9 – Brief of Arizona Republican Party as Amicus Curiae in Support of Respondent, *Richer v. Fontes*, No. CV−24−0221−SA (Ariz. Sept. 18, 2024) (Dkt. 48-10)..................JA459

Response in Opposition to Emergency Motion to Remand, filed October 7, 2024 (Dkt. 49)..........................................................JA472

Attachment # 1 Exhibit 1 − RNC Press Release (Dkt. 49-1) ................JA482

Memorandum in Opposition to Motion to Dismiss for Failure to State a Claim, filed October 7, 2024 (Dkt. 50)...................................JA485

Response in Opposition to Emergency Motion to Remand, filed October 7, 2024 (Dkt. 51)..........................................................JA501

Reply to Response to Motion re Emergency Motion to Remand, filed October 11, 2024 (Dkt. 52)........................................................JA525

Reply to Response to Motion re Motion to Dismiss for Failure to State a Claim, filed October 11, 2024 (Dkt. 53)................................JA538

Notice of Removal, filed October 15, 2024 (Dkt. 55) .....................JA554

Order Granting in Part Motion to Dismiss for Failure to State a Claim and Denying Emergency Motion to Remand, filed October 17, 2024 (Dkt. 58).........................................................................JA559

Judgment, filed October 17, 2024 (Dkt. 59) ....................................JA603

Transcript of Proceedings held on October 17, 2024 (Dkt. 63).......................JA604

Notice of Appeal, filed October 18, 2024 (Dkt. 60)..........................JA675

Notice of Appeal, filed October 18, 2024 (Dkt. 61)..........................JA678

CERTIFICATE OF SERVICE

APPEAL,MEDIATION

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:24–cv–00547–M–RJ

Republican National Committee et al v. North Carolina State
Board of Elections et al
Assigned to: Chief Judge Richard E. Myers, II
Referred to: Magistrate Judge Robert B. Jones, Jr
 Case in other court:  USCA, 24–02044
                    USCA, 24–02045
Cause: 28:1446 Notice of Removal

Date Filed: 09/23/2024
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 09/23/2024 | 1 | NOTICE OF REMOVAL by Jeff Carmon, North Carolina State Board of Elections, Stacy Eggers, IV, Siobhan O'Duffy Millen, Kevin N. Lewis, Karen Brinson Bell, Alan Hirsch from Wake County Superior Court, case number 24CV026995–910. ( Filing fee $ 405 receipt number ANCEDC–7783502), filed by Jeff Carmon, North Carolina State Board of Elections, Stacy Eggers, IV, Siobhan O'Duffy Millen, Kevin N. Lewis, Karen Brinson Bell, Alan Hirsch. (Attachments: # 1 Civil Cover Sheet and Supplemental Cover Sheet, # 2 Index Index to Exhibits, # 3 Exhibit A. Verified Complaint, # 4 Exhibit B. Civil Action Cover Sheet, # 5 Exhibit C. Summons for North Carolina State Board of Elections, # 6 Exhibit D. Summons for Karen Brinson Bell, # 7 Exhibit E Summons for Alan Hirsch, # 8 Exhibit F. Summons for Jeff Carmon, # 9 Exhibit G. Summons for Stacy Eggers IV, # 10 Exhibit H. Summons for Kevin N. Lewis, # 11 Exhibit I. Summons for Siobhan ODuffy Millen, # 12 Exhibit J. Acceptance of Service for all State Board Defendants, # 13 Exhibit K. Notice of Appearance by Babb for Defendants, # 14 Exhibit L. Motion to Expedite Discovery by Plaintiffs, # 15 Exhibit M. Exhibit A to Motion to Expedite, # 16 Exhibit N. Motion to Intervene by Democratic National Committee, # 17 Exhibit O. Notice of Appearance by Terence P. Steed for State Board Defendants, # 18 Exhibit P. Order Granting Democratic National Committees Motion to Intervene, # 19 Exhibit Q. Motion to Dismiss, Answer and Affirmative Defenses by Democratic National Committee, # 20 Exhibit R. Motion to Intervene by North Carolina State Conference of the NAACP and Jackson Sailor Jones) (Boyce, Sarah) Modified on 9/30/2024 to correct document descriptions in docket text for Exhibits P, Q, and R. (McNally, Kimberly). Modified on 9/30/2024 (McNally, Kimberly). (Entered: 09/23/2024) |
| 09/23/2024 | 2 | Notice of Appearance filed by William A Robertson on behalf of Democratic National Committee. (Robertson, William) (Entered: 09/23/2024) |
| 09/23/2024 | 3 | Financial Disclosure Statement by Democratic National Committee (Robertson, William) (Entered: 09/23/2024) |
| 09/24/2024 | 4 | Notice of Appearance filed by South A. Moore on behalf of Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Moore, South) (Entered: 09/24/2024) |
| 09/24/2024 | 5 | AMENDED DOCUMENT by Democratic National Committee. Amendment to 2 Notice of Appearance *Amended Notice of Appearance of William A. Robertson* (Robertson, William) (Entered: 09/24/2024) |
| 09/24/2024 | 6 | Notice of Appearance filed by Jim W. Phillips, Jr on behalf of Democratic National Committee. (Phillips, Jim) (Entered: 09/24/2024) |
| 09/24/2024 | 7 | Notice of Appearance filed by Shana L. Fulton on behalf of Democratic National Committee. (Fulton, Shana) (Entered: 09/24/2024) |
| 09/24/2024 | 8 | Notice of Appearance filed by Mary Carla Babb on behalf of Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Babb, Mary) (Entered: 09/24/2024) |

## JA1

| | | |
|---|---|---|
| 09/24/2024 | 9 | Notice of Appearance filed by Terence Steed on behalf of Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Steed, Terence) (Entered: 09/24/2024) |
| 09/24/2024 | 10 | Notice of Appearance filed by James Weldon Whalen on behalf of Democratic National Committee. (Whalen, James) (Entered: 09/24/2024) |
| 09/24/2024 | 11 | Financial Disclosure Statement by Alan Hirsch (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 12 | Financial Disclosure Statement by Karen Brinson Bell (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 13 | Financial Disclosure Statement by Jeff Carmon (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 14 | Financial Disclosure Statement by Kevin N. Lewis (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 15 | Financial Disclosure Statement by North Carolina State Board of Elections (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 16 | Financial Disclosure Statement by Siobhan O'Duffy Millen (Babb, Mary) (Entered: 09/24/2024) |
| 09/24/2024 | 17 | Financial Disclosure Statement by Stacy Eggers, IV (Babb, Mary) (Entered: 09/24/2024) |
| 09/26/2024 | 18 | Notice of Appearance filed by Eric M. David on behalf of Democratic National Committee. (David, Eric) (Entered: 09/26/2024) |
| 09/26/2024 | | **TEXT ORDER REASSIGNING CASE. At the direction of the Court and for the continued efficient administration of justice, this case is reassigned to Chief United States District Judge Richard E. Myers II for all further proceedings. United States District Judge Terrence W. Boyle is no longer assigned to the case. All future filings should reflect the revised case number of 5:24−CV−547−M−RJ. Signed by Peter A. Moore, Jr., Clerk of Court on 9/26/2024.** (Copy of order mailed to counsel for Plaintiffs.) (Hockaday, A.) (Entered: 09/26/2024) |
| 09/27/2024 | 19 | Amended MOTION to Intervene *as Defendants* filed by North Carolina NAACP, Jackson Sailor Jones, Bertha Leverette. (Attachments: # 1 Exhibit A: Proposed Answer, # 2 Exhibit B: Maxwell Declaration (NC NAACP), # 3 Exhibit C: Jones Declaration, # 4 Exhibit D: Leverette Declaration, # 5 Text of Proposed Order) (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 20 | Memorandum in Support regarding 19 Amended MOTION to Intervene *as Defendants* filed by Jackson Sailor Jones, Bertha Leverette, North Carolina NAACP. (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 21 | MOTION to Expedite *Consideration of Amended Motion to Intervene* filed by Jackson Sailor Jones, Bertha Leverette, North Carolina NAACP. (Attachments: # 1 Text of Proposed Order) (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 22 | Memorandum in Support regarding 21 MOTION to Expedite *Consideration of Amended Motion to Intervene* filed by Jackson Sailor Jones, Bertha Leverette, North Carolina NAACP. (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 23 | Financial Disclosure Statement by North Carolina NAACP (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 24 | Financial Disclosure Statement by Jackson Sailor Jones (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 25 | Financial Disclosure Statement by Bertha Leverette (Klein, Hilary) (Entered: 09/27/2024) |
| 09/27/2024 | 26 | Notice of Appearance filed by Hilary Harris Klein on behalf of Jackson Sailor Jones, Bertha Leverette, North Carolina NAACP. (Klein, Hilary) (Entered: 09/27/2024) |
| 09/30/2024 | | Motion Submitted to Chief U.S. District Judge Richard E. Myers II regarding 21 MOTION to Expedite *Consideration of Amended Motion to Intervene*. (McNally, Kimberly) (Entered: 09/30/2024) |

| 09/30/2024 | | Case Selected for Mediation – A printable list of certified mediators for the Eastern District of North Carolina and the Selection of Mediator form are available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (McNally, Kimberly) (Entered: 09/30/2024) |
|---|---|---|
| 09/30/2024 | 27 | Notice regarding 1 Notice of Removal. (McNally, Kimberly) (Entered: 09/30/2024) |
| 09/30/2024 | 28 | Notice of Appearance filed by Jeffrey Loperfido on behalf of Jackson Sailor Jones, Bertha Leverette, North Carolina NAACP. (Loperfido, Jeffrey) (Entered: 09/30/2024) |
| 09/30/2024 | 29 | **ORDER granting 21 Motion to Expedite and denying 19 Motion to Intervene. Signed by Chief Judge Richard E. Myers, II on 9/30/2024.** (Stouch, L.) (Entered: 09/30/2024) |
| 09/30/2024 | 30 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Boyce, Sarah) (Entered: 09/30/2024) |
| 09/30/2024 | 31 | Memorandum in Support regarding 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Boyce, Sarah) (Entered: 09/30/2024) |
| 09/30/2024 | 32 | MOTION to Expedite *Briefing and Consideration of State Board Defendants' Motion to Dismiss (DE 30)* filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Motion to Expedite) (Boyce, Sarah) (Entered: 09/30/2024) |
| 09/30/2024 | 33 | Memorandum in Support regarding 32 MOTION to Expedite *Briefing and Consideration of State Board Defendants' Motion to Dismiss (DE 30)* filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Boyce, Sarah) (Entered: 09/30/2024) |
| 10/01/2024 | | Motion Submitted to Chief Judge Richard E. Myers, II regarding 32 MOTION to Expedite *Briefing and Consideration of State Board Defendants' Motion to Dismiss (DE 30)*. (Collins, S) (Entered: 10/01/2024) |
| 10/01/2024 | 34 | Notice of Appearance filed by Phillip J. Strach on behalf of All Plaintiffs. (Strach, Phillip) (Entered: 10/01/2024) |
| 10/01/2024 | 35 | Notice of Appearance filed by Jordan Alexander Koonts on behalf of All Plaintiffs. (Koonts, Jordan) (Entered: 10/01/2024) |
| 10/01/2024 | 36 | **ORDER granting 32 MOTION to Expedite *Briefing and Consideration of State Board Defendants' Motion to Dismiss (DE 30).* Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by Chief Judge Richard E. Myers, II on 10/1/2024.** (Collins, S) (Entered: 10/01/2024) |
| 10/01/2024 | | NOTICE of Hearing on Motion 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM: Motion Hearing set for 10/17/2024 at 10:00 AM in Wilmington – Courtroom 1 before Chief Judge Richard E. Myers II. (Collins, S) (Entered: 10/01/2024) |
| 10/01/2024 | 37 | Emergency MOTION to Remand *and For Expedited Consideration of the Same* filed by North Carolina Republican Party, Republican National Committee. (Attachments: # 1 Text of Proposed Order) (Strach, Phillip) (Entered: 10/01/2024) |
| 10/01/2024 | 38 | Memorandum in Support regarding 37 Emergency MOTION to Remand *and For Expedited Consideration of the Same* filed by North Carolina Republican Party, Republican National Committee. (Strach, Phillip) (Entered: 10/01/2024) |
| 10/01/2024 | 39 | **ORDER granting in part on 37 Emergency MOTION to Remand and *For Expedited Consideration of the Same.* For good cause shown and in the interest of justice, the court finds expedited consideration of the motion to remand is warranted. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by Chief Judge Richard E. Myers II on** |

**JA3**

| | | |
|---|---|---|
| | | 10/1/2024. (Collins, S) (Entered: 10/01/2024) |
| 10/01/2024 | | NOTICE of Hearing on Motion 37 Emergency MOTION to Remand: Motion Hearing set for 10/17/2024 at 10:00 AM in Wilmington – Courtroom 1 before Chief Judge Richard E. Myers II. (Collins, S) (Entered: 10/01/2024) |
| 10/02/2024 | 40 | Notice of Appearance filed by John Ellison Branch, III on behalf of All Plaintiffs. (Branch, John) (Entered: 10/02/2024) |
| 10/07/2024 | 41 | Notice of Special Appearance for non–district by Christopher Babbitt on behalf of Democratic National Committee. (Babbitt, Christopher) (Entered: 10/07/2024) |
| 10/07/2024 | 42 | Notice of Special Appearance for non–district by Nitisha Baronia on behalf of Democratic National Committee. (Baronia, Nitisha) (Entered: 10/07/2024) |
| 10/07/2024 | 43 | Notice of Special Appearance for non–district by Gary M. Fox on behalf of Democratic National Committee. (Fox, Gary) (Entered: 10/07/2024) |
| 10/07/2024 | 44 | Notice of Special Appearance for non–district by Jane E. Kessner on behalf of Democratic National Committee. (Kessner, Jane) (Entered: 10/07/2024) |
| 10/07/2024 | 45 | Notice of Special Appearance for non–district by Joseph Meyer on behalf of Democratic National Committee. (Meyer, Joseph) (Entered: 10/07/2024) |
| 10/07/2024 | 46 | Notice of Special Appearance for non–district by Daniel Volchok on behalf of Democratic National Committee. (Volchok, Daniel) (Entered: 10/07/2024) |
| 10/07/2024 | 47 | Notice of Special Appearance for non–district by Seth P. Waxman on behalf of Democratic National Committee. (Waxman, Seth) (Entered: 10/07/2024) |
| 10/07/2024 | 48 | RESPONSE in Support regarding 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Democratic National Committee. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1 – Republican National Committee v. Schmidt, No. 108 MM 2004 (Pa. Oct. 5, 2024), # 3 Exhibit 2 – North Carolina Official Election Manual (Sections 5.7.3 and 8.3.1), # 4 Exhibit 3 – Current North Carolina Voter–Registration Form, # 5 Exhibit 4 – Administrative Complaint Filed by Carol Snow, # 6 Exhibit 5 – Prior North Carolina Voter–Registration Form, # 7 Exhibit 6 – Governor Cooper, Disaster Declaration Request (Sept. 27, 2024), # 8 Exhibit 7 – President Joseph R. Biden, Jr. Approves North Carolina Disaster Declaration, White House (Sept. 28, 2024), # 9 Exhibit 8 – Non–Party Brief of the Republican National Committee et al., Priorities USA v. Evers, No. 2024AP164 (Wis. May 3, 2024), # 10 Exhibit 9 – Brief of Arizona Republican Party as Amicus Curiae in Support of Respondent, Richer v. Fontes, No. CV–24–0221–SA (Ariz. Sept. 18, 2024)) (Phillips, Jim) (Entered: 10/07/2024) |
| 10/07/2024 | 49 | RESPONSE in Opposition regarding 37 Emergency MOTION to Remand *and For Expedited Consideration of the Same* filed by Democratic National Committee. (Attachments: # 1 Exhibit 1 – RNC Press Release) (Phillips, Jim) (Entered: 10/07/2024) |
| 10/07/2024 | 50 | Memorandum in Opposition regarding 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by North Carolina Republican Party, Republican National Committee. (Strach, Phillip) (Entered: 10/07/2024) |
| 10/07/2024 | 51 | RESPONSE in Opposition regarding 37 Emergency MOTION to Remand *and For Expedited Consideration of the Same* filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Moore, South) (Entered: 10/07/2024) |
| 10/11/2024 | 52 | REPLY to Response to Motion regarding 37 Emergency MOTION to Remand *and For Expedited Consideration of the Same* filed by North Carolina Republican Party, Republican National Committee. (Strach, Phillip) (Entered: 10/11/2024) |
| 10/11/2024 | 53 | REPLY to Response to Motion regarding 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections. (Boyce, Sarah) (Entered: 10/11/2024) |

| | | |
|---|---|---|
| 10/14/2024 | 54 | **PLEASE DISREGARD. ENTERED IN WRONG CASE.** Notice filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections *State Court Notice of Filing*. (McHenry, Laura) Modified on 10/15/2024 (McNally, Kimberly). (Entered: 10/14/2024) |
| 10/15/2024 | | Motions Submitted to Chief U.S. District Judge Richard E. Myers II 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 37 Emergency MOTION to Remand *and For Expedited Consideration of the Same*. (McNally, Kimberly) (Entered: 10/15/2024) |
| 10/15/2024 | 55 | Notice filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections *to State Court of Removal to Federal Court pursuant to L. R. 5.3(a)(2) and 27 USC 1446(d)*. (Moore, South) (Entered: 10/15/2024) |
| 10/16/2024 | 56 | Notice of Appearance filed by Thomas G. Hooper on behalf of All Plaintiffs. (Hooper, Thomas) (Entered: 10/16/2024) |
| 10/17/2024 | 57 | Minute Entry for proceedings held in Wilmington before Chief U.S. District Judge Richard E. Myers II: Motion Hearing held on 10/17/2024 regarding 30 Motion to Dismiss and 37 Emergency MOTION to Remand. Counsel for all parties present. The court hears from the parties and takes the matter under advisement. (Court Reporter Risa Kramer) (McNally, Kimberly) (Entered: 10/17/2024) |
| 10/17/2024 | 58 | **ORDER granting in part 30 Motion to Dismiss for Failure to State a Claim and denying 37 Emergency Motion to Remand. Count One is DISMISSED WITH PREJUDICE, and the court exercises its inherent authority to REMAND Count Two to state court. The court's remand order is STAYED until October 22, 2024. Signed by Chief U.S. District Judge Richard E. Myers II on 10/17/2024.** (McNally, Kimberly) (Entered: 10/17/2024) |
| 10/17/2024 | 59 | **JUDGMENT. Signed by Peter A. Moore, Jr., Clerk of Court on 10/17/2024.** (McNally, Kimberly) (Entered: 10/17/2024) |
| 10/18/2024 | 60 | Notice of Appeal filed by Karen Brinson Bell, Jeff Carmon, Stacy Eggers, IV, Alan Hirsch, Kevin N. Lewis, Siobhan O'Duffy Millen, North Carolina State Board of Elections as to 59 Judgment, 58 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Remand,. Filing fee, receipt number BNCEDC–7818437. (Boyce, Sarah) (Entered: 10/18/2024) |
| 10/18/2024 | 61 | Notice of Appeal filed by Democratic National Committee as to 59 Judgment, 58 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Remand,. Filing fee, receipt number 500013253. (Phillips, Jim) (Entered: 10/18/2024) |
| 10/18/2024 | | US Court of Appeals Appeal Fees received $ 605.00 receipt number 500013253 regarding 61 Notice of Appeal filed by Democratic National Committee. (McNally, Kimberly) (Entered: 10/18/2024) |
| 10/18/2024 | 62 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 60 Notice of Appeal, 61 Notice of Appeal. (Foell, S.) (Entered: 10/18/2024) |
| 10/18/2024 | 64 | US Court of Appeals Case Number **24–2044** (Taylor Barton, Case Manager) as to 60 Notice of Appeal, filed by Defendants Siobhan O'Duffy Millen, Karen Brinson Bell, Stacy Eggers, IV, North Carolina State Board of Elections, Alan Hirsch, Jeff Carmon, Kevin N. Lewis. (Foell, S.) (Entered: 10/21/2024) |
| 10/18/2024 | 65 | US Court of Appeals Case Number **24–2045** (Taylor Barton, Case Manager) as to 61 Notice of Appeal filed by Democratic National Committee, Intervenor Defendant. (Foell, S.) (Entered: 10/21/2024) |
| 10/18/2024 | 66 | ORDER of US Court of Appeals consolidating cases on appeal as to 60 Notice of Appeal, filed by Siobhan O'Duffy Millen, Karen Brinson Bell, Stacy Eggers, IV, North Carolina State Board of Elections, Alan Hirsch, Jeff Carmon, Kevin N. Lewis and 61 Notice of Appeal filed by Democratic National Committee. (Foell, S.) (Entered: 10/21/2024) |

**JA5**

| 10/20/2024 | 63 | OFFICIAL TRANSCRIPT of Proceedings held on 10/17/2024, Motion Hearing, before Chief Judge Richard E. Myers II. Court Reporter Risa Kramer. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website Redaction Request due 11/13/2024. Redacted Transcript Deadline set for 11/23/2024. Release of Transcript Restriction set for 1/21/2025. (Kramer, R.) (Entered: 10/20/2024) |
| 10/20/2024 |  | NOTICE of Filing of Official Transcript 63 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Kramer, R.) (Entered: 10/20/2024) |
| 10/22/2024 | 67 | ORDER of US Court of Appeals as to 60 , 61 Notice of Appeal. Upon consideration of the submissions relative to the motions for an immediate administrative stay, the court grants the motions. The administrative stay shall continue through 12:00 p.m. on October 25, 2024, to allow the court to rule on the pending motions to stay the remand order pending appeal. (Foell, S.) (Entered: 10/22/2024) |

**JA6**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. _____**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | |
| Plaintiffs, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS' KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | **NOTICE OF REMOVAL OF CIVIL ACTION No. 24-CVS-26955-910 FROM WAKE COUNTY SUPERIOR COURT** |
| Defendants, | |
| and | |
| THE DEMOCRATIC NATIONAL COMMITTEE, | |
| Intervenor-Defendant. | |

TO:     The United States District Court for the Eastern District of North Carolina

PLEASE TAKE NOTICE THAT Defendants remove Civil Action No. 24-CVS-26955-910 from the North Carolina Superior Court for Wake County to this Honorable

**JA7**

Court, pursuant to 28 U.S.C. §§ 1331, 1441(a), 1443(2), and 1367(a). In support of this notice, Defendants state the following:

1.    On August 23, 2024, Plaintiffs filed a complaint in North Carolina Superior Court for Wake County. Plaintiffs served their complaint on Defendants on August 27, 2024.

2.    The complaint purports to allege violations of the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002) *codified at* 52 U.S.C. § 20901, *et seq*.

3.    Because Plaintiffs bring claims arising under the laws of the United States, this Court has original jurisdiction over Plaintiffs' claims. 28 U.S.C. § 1331.

4.    The complaint further alleges that Defendants have refused to take certain actions. To the extent Defendants have indeed refused to take certain actions, their refusal was based on their obligation to comply with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A).

5.    Because Plaintiffs seek relief for Defendants' refusal to do an "act on the ground that [the act] would be inconsistent" with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A), removal is proper. 28 U.S.C. § 1443(2).

6.    The consent of the other defendants in this case is not required because removal does not proceed "solely under 28 U.S.C. § 1441." 28 U.S.C. § 1446(b)(2)(A). Nevertheless, Intervenor-Defendant the Democratic National Committee has informed Defendants that it consents to their removal of this action to this Court.

7.    Because Plaintiffs served their complaint on Defendants on August 27, 2024, this removal petition is timely. 28 U.S.C. § 1446(b).

8.    Pursuant to Local Rule 5.3(a)(1), copies of all process and pleadings in Defendants' possession are attached to this petition as separate distinctly titled exhibits. Defendants are also filing in the North Carolina Superior Court for Wake County notice of removal, as required by 28 U.S.C. § 1446(d), and has requested a complete copy of the state court file to be filed in this Court. A copy of that notice is included below

Wherefore, Defendants remove to this Court Civil Action No. 24-CVS-26955-910 from the North Carolina Superior Court for Wake County to the United States District Court for the Eastern District of North Carolina.

Respectfully submitted, this 23rd day of September 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**JA10**

## CERIFICATE OF SERVICE

I certify that the foregoing Notice of Removal was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys for Plaintiff, if registered, and I have served the document upon opposing counsel by mailing via the US Mail, first class, postage prepaid, addressed as follows:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com

JA11

5

wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

Lee Rubin
Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real Palo Alto, CA 94306-2112 (650) 331-2000
lrubin@mayerbrown.com

Rachel J. Lamorte
Catherine Medvene
Mayer Brown LLP
1999 Street, NW
Washington, DC 20006-1101
(202) 263-3000
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton
Mayer Brown LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111

**JA12**
6

(801) 907-2717
jhilton@mayerbrown.com

Harsha Tolappa
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
htolappa@mayerbrown.com

Hilary H. Klein
Jeffrey Loperfido
Christopher Shenton
Southern Coalition for Social Justice
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
(919) 794-4213
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org

Ezra D. Rosenberg
Jennifer Nwachukwu
Pooja Chaudhuri
Javon Davis
Lawyers' Committee for Civil Rights Under Law
1500 Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
Jowachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

*Counsel for Proposed Intervenor Defendants North Carolina State Conference of
the NAACP and Jackson Sailor Jones*

This the 23rd day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA13**

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY | NORTH CAROLINA STATE BOARD OF ELECTIONS' KAREN BRINSON BELL, in her official capacity as |

**(b)** County of Residence of First Listed Plaintiff   Washington, D.C.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Wake County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(See attachment)

Attorneys *(If Known)*

(See attachment)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☒ 220 Foreclosure | ☒ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1446

Brief description of cause:
Removal of civil action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/23/2024 | /s/ Sarah G. Boyce |

**JA14**

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## <u>ATTACHMENT</u>

Attorney for Plaintiffs:

>Philip J. Strach
>Jordan A. Koonts
>Nelson Mullins Riley & Scarborough LLP
>301 Hillsborough Street, Suite 1400
>Raleigh, NC 27603
>Phone: (919) 329-3800

>John E. Branch, III
>Thomas G. Hooper
>Baker Donelson Bearman, Caldwell & Berkowitz, PC
>2235 Gateway Access Point, Suite 220
>Raleigh, NC 27607
>Phone: (984) 844-7900

Attorneys for State Board Defendants:

>Sarah G. Boyce
>Deputy Attorney General and General Counsel

>Mary Carla Babb
>Special Deputy Attorney General

>Terence Steed
>Special Deputy Attorney General

>South A. Moore
>Deputy General Counsel
>North Carolina Department of Justice
>P.O. Box 629
>Raleigh, NC 27602
>Phone: (919) 716-6900

**JA15**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN            DIVISION
No. _____

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and <br> NORTH CAROLINA REPUBLICAN PARTY, <br><br>     Plaintiff(s), <br><br><br>       v. <br><br> NORTH CAROLINA STATE BOARD OF <br> ELECTIONS; KAREN BRINSON BELL, in her <br> official capacity as Executive Director of the North <br> ~~Carolina State Board of Elections; ALAN HIRSCH, in~~ <br>     Defendant(s). | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

( **SUPPLEMENTAL REMOVAL COVER SHEET** appears to the right of "v." )

**SUPPLEMENTAL REMOVAL COVER
SHEET**

      **The removing party must complete this Supplemental Removal Cover Sheet and comply with Local Civil Rule 5.3. Attach separate sheets as necessary to provide complete responses.**

**Section A—Plaintiffs**

List the full name of each plaintiff from the state court action and indicate whether the plaintiff is pending (i.e., in case currently), dismissed, or otherwise terminated at the time of removal.  If dismissed or terminated, indicate the date of dismissal/termination

| Full Name of Plaintiff | Pending at time of removal – Yes/No? | Dismissed or terminated? Yes/No? | Date of Dismissal or Termination |
|---|---|---|---|
| Republican National Committee | Yes | No | |
| North Carolina Republican Party | Yes | No | |
| | | | |
| | | | |
| | | | |

**JA16**

## Section B—Defendants

List the full name of each defendant from the state court action and indicate whether the defendant is pending, dismissed or otherwise terminated at the time of removal.  If dismissed or terminated, indicate the date of dismissal/termination.  If known, indicate if and when each defendant was served with process and whether the defendant joins in the removal.

| Full Name of Defendant | Pending at time of removal? Yes/No? | Dismissed or terminated? Yes/No? (If yes, state date of termination) | Has defendant been served with process? Yes/No/Unknown? | If served with process, date of service? | Does the defendant join in removal? Yes/No? |
|---|---|---|---|---|---|
| North Carolina State Board of Elections | Yes | No | Yes | 08/27/2024 | Yes |
| Karen Brinson Bell, in her official capacity as Executive Director of the | Yes | No | Yes | 08/27/2024 | Yes |
| Alan Hirsch, in his official capacity as Chair of the North Carolina State | Yes | No | Yes | 08/27/2024 | Yes |
| Jeff Carmon, in his official capacity as Secretary of the North Carolina State | Yes | No | Yes | 08/27/2024 | Yes |
| Stacy Eggers IV, Kevin N. Lewis, Siobhan O'Duffy Millen, in their | Yes | No | Yes | 08/27/2024 | Yes |
| Democratic National Committee | Yes | No | Yes | 09/12/2024 | Yes |

## Section C—Removal pursuant to 28 U.S.C. § 1442(d)(1)

Is only part of the state court action being removed pursuant to 28 U.S.C. § 1442(d)(1)?
Yes ☐        No ☑

If "Yes," specify what portion of the state court action is being removed, and then proceed to the signature page.  If "No," proceed to Section D.

_____

_____

_____

**JA17**

2

**Section D—Pending State Court Motions as of Date of Removal**

Is there currently a temporary restraining order or preliminary injunction in place in this action from state court?  Yes ☐        No ☑

List every known motion pending at the time of removal.  Indicate the name of the filer, the date of filing, whether the motion has a supporting memorandum, and whether the motion is time sensitive, such as a motion for preliminary injunction.

| Title of Pending Motion | Name of Filer | Date of Filing | Memorandum-- Yes/No? | Time sensitive? Yes/No? |
|---|---|---|---|---|
| Motion to Expedite Discovery | Plaintiffs | 08/29/2024 | No | Yes |
| Motion to Intervene | N.C. State Conf. NAACP and Jackson Sailor Jones | 09/04/2024 | No | Yes |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Section E—Scheduled State Court Hearings as of Date of Removal**

| Date and Time of Hearing | Hearing Type | Assigned State Court Judge |
|---|---|---|
| 10/01/2024 at 2:30 p.m. ET | Hearing on motion to intervene | To be determined |
| | | |
| | | |

**JA18**

3

Date: _____09/23/2024_____

/s/ Sarah G. Boyce
_____
Signature of Attorney for Removing Party or
Unrepresented Removing Party

Printed Name_____Sarah G. Boyce_____

Law Firm___North Carolina Department of Justice___

Address___P.O. Box 629_____

_____

Telephone Number ___(919) 716-6900_____

Fax Number ___(919) 716-6758_____

Email Address: ___sboyce@ncdoj.gov_____

State Bar No. ___56896_____

**JA19**

4

<u>INDEX TO EXHIBITS</u>

Exhibit A      Verified Complaint

Exhibit B      Civil Action Cover Sheet

Exhibit C      Summons for North Carolina State Board of Elections

Exhibit D      Summons for Karen Brinson Bell

Exhibit E      Summons for Alan Hirsch

Exhibit F      Summons for Jeff Carmon

Exhibit G      Summons for Stacy Eggers IV

Exhibit H      Summons for Kevin N. Lewis

Exhibit I      Summons for Siobhan O'Duffy Millen

Exhibit J      Acceptance of Service for all State Board Defendants

Exhibit K      Notice of Appearance by Babb for Defendants

Exhibit L      Motion to Expedite Discovery by Plaintiffs

Exhibit M      Exhibit A to Motion to Expedite

Exhibit N      Motion to Intervene by Democratic National Committee

Exhibit O      Notice of Appearance by Terence P. Steed for State Board Defendants

Exhibit P      Motion to Intervene by North Carolina State Conference of the NAACP
               and Jackson Sailor Jones

Exhibit Q      Order Granting Democratic National Committee's Motion to Intervene

Exhibit R      Motion to Dismiss, Answer and Affirmative Defenses by Democratic
               National Committee

**JA20**

EXHIBIT A

**JA21**

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
NO. 24CV026995-910

REPUBLICAN NATIONAL COMMITTEE;
and NORTH CAROLINA REPUBLICAN
PARTY,

*Plaintiffs*,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL, in
her official capacity as Executive Director of
the North Carolina State Board of Elections;
ALAN HIRSCH, in his official capacity as
Chair of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North Carolina
State Board of Elections; STACY EGGERS
IV, KEVIN N. LEWIS, and SIOBHAN
O'DUFFY MILLEN, in their official
capacities as members of the North Carolina
State Board of Elections,

*Defendants*.

**VERIFIED COMPLAINT**

NOW COMES Plaintiffs the Republican National Committee ("RNC") and the North

Carolina Republican Party ("NCGOP"), by and through undersigned counsel and, pursuant to Rule

7 of the North Carolina Rules of Civil Procedure file this Verified Complaint seeking a Writ of

Mandamus compelling the North Carolina State Board of Elections ("NCSBE") and its members,

Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis in their respective

official capacities, and the NCSBE's Executive Director Karen Brinson Bell (collectively

"Defendants") to fulfill their duties set forth in N.C. Gen. Stat. § 163-82.11 *et seq.* In support,

Plaintiffs allege as follows:

JA22

## INTRODUCTION

1.    "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4, 166 L. Ed. 2d 1, 7 (2006).

2.    Free and fair elections are the bulwark of the citizenry's trust in their government. Ensuring that qualified voters—and only qualified voters—are able to vote in elections is the cornerstone of that compact between the state and its citizens. But trust must be earned.

3.    The North Carolina State Board of Elections ("NCSBE") betrayed that trust when it allowed over 225,000 people to register to vote with registration forms that failed to collect certain required identification information before the registration forms were processed, a plain violation of Section 303 of the Help America Vote Act ("HAVA"). Because of these errors, the North Carolina voter rolls, which both HAVA and state law mandates that Defendants regularly maintain, are potentially replete with ineligible voters—including possible non-citizens—all of whom are now registered to vote.

4.    By failing to collect certain statutorily required information prior to registering these applicants to vote, Defendants placed the integrity of the state's elections into jeopardy.

5.    Defendants admit they violated HAVA and, as a result, state law. Yet, even when concerned citizens brought these issues to their attention, Defendants inexplicably refused to correct their wrongs. All Defendants offer as a solution is a half-hearted promise that those who were ineligible to register but were allowed to anyway will naturally filter themselves out from the state's voter rolls when they conduct other election-related activities.

6.     This inaction misses the mark. Not only does this "solution" fail to remedy the ongoing violations of state and federal law or account for Defendants' responsibilities under the same, but it leaves North Carolinians to wonder how they can trust in the security of their elections, especially when those tasked with protecting their rights cannot be bothered to do what is required by law.

7.     Even worse, this "solution" sends the message to the millions of duly qualified and registered voters in North Carolina that their chief elections officials will shirk their responsibilities and refuse to verify whether those who vote in the state's elections are entitled to do so in the first place.

8.     This ominous message eviscerates confidence in North Carolina's elections and it ensures that *Purcell*'s warning of distrust and disenfranchisement may soon come true.

9.     By failing to do the required work to determine if Defendants' violation of HAVA has resulted in the registration of ineligible voters, and thereby allowing unlawfully registered persons to vote in the state's elections, Defendants' actions further jeopardize the individual right to vote that is guaranteed to every qualified voter in North Carolina. *See,* N.C. Const. art. VI § I; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

10.     With the November 2024 election fast approaching, North Carolinians cannot afford to simply wait and see. Defendants admit they violated federal law. Now, they must be required to remedy their actions before these failures impact the results of the 2024 elections.

## **PARTIES**

11.     The Republican National Committee  is the national committee for the Republican Party; representing all registered Republicans across both the state and nation, as well as the values

**JA24**
3

they stand for. The RNC serves as the collective voice for the Republican Party's platform. It is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14) and a political party as defined by N.C. Gen. Stat. § 163-96. The RNC's principal place of business is 310 First Street SE, Washington, D.C.

12.     The RNC's core mission involves organizing lawful voters and encouraging them to support Republican candidates at all levels of government, including throughout North Carolina. The RNC expends significant time and resources fighting for election security and voting integrity across the nation, including in North Carolina. These efforts are intended to ensure that the votes and voices of its members, its candidates, and the party are not silenced or diluted in any way. Recent rises in non-citizens and other unqualified persons voting or seeking to vote in elections has forced the RNC to divert its efforts and funds in order to hold elections officials accountable to what both federal and state laws require.

13.     The North Carolina Republican Party is a state committee of the Republican Party, as defined by 52 U.S.C. § 30101(15), and a political party as defined by N.C. Gen. Stat. § 163-96. The NCGOP represents the interests of registered Republicans across North Carolina. Its headquarters and principal place of business is 1506 Hillsborough St, Raleigh, NC 27605.  The NCGOP represents the interests of registered Republican voters, residing across all one hundred counties in the state. The NCGOP also advocates for the interests of tens of thousands of non-affiliated voters who align with various aspects of the Republican Party platform.

14.     The NCGOP's mission and platform largely mirror that of the RNC, including an emphasis on election integrity and security. The NCGOP's core mission includes counseling interested voters and volunteers on election participation including hosting candidate and voter registration events, staffing voting protection hotlines, investigating reports of voter fraud and

**JA25**
4

disenfranchisement, and providing election day volunteers in all one hundred counties across North Carolina. The NCGOP spends tremendous time and effort advocating for its members throughout all levels of state government, working to make sure they are heard both at the ballot box and beyond.

15.     Plaintiffs have organizational standing to bring this action. Defendants' actions and inaction directly impact Plaintiffs' core organizational missions of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates for office. Defendants' violations of HAVA and the subsequent refusal to remedy their wrongdoing, in accordance with what state law requires, has forced Plaintiffs to divert significantly more of their resources into combatting election fraud in North Carolina. Plaintiffs' organizational and voter outreach efforts have been and will continue to be significantly stymied due to Defendants' ongoing failures. As a result, Plaintiffs will have no choice but to expend increased amounts of time and money, beyond what they would have already spent, in order to combat this unwarranted interference with their central activities. For example, because of Defendants' violations of state law, Plaintiffs will need to commit added time and resources into monitoring North Carolina's voter rolls, voter activity, and responding to instances of potential voter fraud in upcoming elections, tasks required of Defendants under state and federal law.

16.     Additionally, NCGOP has associational standing because its members have standing in their own right to challenge Defendants' actions here. NCGOP represents millions of registered Republican voters across the state of North Carolina, including at least one registered Republican voter in every one of the state's one hundred counties, which is a matter of public record. NCGOP's members are harmed by these inaccurate voter rolls as well as Defendants' ongoing HAVA and state law violations. These members' votes are undoubtedly diluted due to

ineligible voters participating in elections due to Defendants' statutory violations. Additionally, these members' rights to participate in a fair and secure electoral process, free from voter fraud, will be significantly hindered. Ensuring such freedom and security in all elections throughout North Carolina is germane to the NCGOP's organizational mission.

17.     Plaintiffs are further harmed in their ability to effectively compete in elections across the state as Defendants' refusal to maintain accurate and updated voter rolls risks opening the door to potentially fraudulent votes and inaccurate election results. This harm is especially palpable considering North Carolina's party-based primary system which makes verifying the accuracy of each voter registration form that much more crucial.

18.     The North Carolina State Board of Elections is the state agency tasked with "general supervision over primaries and elections of the state." *See* N.C. Gen. Stat. § 163-22. NCSBE is tasked with ensuring that elections in North Carolina comply with all relevant state and federal laws and, in NCSBE's own words, "ensur[ing] that elections are conducted lawfully and fairly."[1]

19.     Karen Brinson Bell is the Executive Director of NCSBE and the state's "Chief Election Official" as defined by N.C. Gen. Stat. § 163-82.2. In this capacity, Ms. Brinson Bell oversees elections in all one hundred counties in North Carolina and administering all elections occurring therein. *See* N.C. Gen. Stat. § 163-27(d). Ms. Brinson Bell is sued in her official capacity.

20.     Alan Hirsch is the Chair of NCSBE. He resides in Chapel Hill, North Carolina. Mr. Hirsch is sued in his official capacity.

21.     Jeff Carmon is the Secretary of NCSBE. He resides in Snow Hill, North Carolina. Mr. Carmon is sued in his official capacity.

---

[1] https://www.ncsbe.gov/about

22.     Stacy Eggers, IV is a member of NCSBE. He resides in Boone, North Carolina. Mr. Eggers, IV is sued in his official capacity.

23.     Kevin N. Lewis is a member of NCSBE. He resides in Rocky Mount, North Carolina. Mr. Lewis is sued in his official capacity.

24.     Siobhan O'Duffy Millen is a member of NCSBE. She resides in Raleigh, North Carolina. Ms. Millen is sued in her official capacity.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the claims asserted herein pursuant to N.C. Gen. Stat. § 7A-245.

26.     This Court has personal jurisdiction over NCSBE as it is a state agency in North Carolina.

27.     This Court has personal jurisdiction over Executive Director Karen Brinson Bell, Chair Alan Hirsch, Secretary Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen as each is sued in their official capacities as appointed officials in North Carolina. Each is a citizen of North Carolina and each resides in the state.

28.     Venue is proper in this court pursuant to N.C. Gen. Stat. § 1-82.

## FACTUAL ALLEGATIONS

29.     Defendants are required to maintain accurate and updated statewide voter registration lists ("voter rolls"). N.C. Gen. Stat. § 163-82.11.

30.     In addition to other standards, Defendants must ensure that the voter rolls are in full compliance with the requirements of Section 303 of HAVA. *Id*. at § 163-82.11(c) ("The State Board of Elections *shall* update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA].") (emphasis added).

31.     Due to this express mandate that North Carolina's voter rolls must be maintained in a manner compliant with section 303(a) of HAVA, it is important to review what that section requires of Defendants. This, in turn, illustrates Defendants' failure to fulfill their statutory duties under state law.

32.     Congress, through HAVA, set requirements for how states must implement and maintain their voter rolls. *See*, *e.g.*, 52 U.S.C. § 21081, 21082, and 21083.

33.     Among other standards, HAVA mandates that states must implement computerized statewide voter rolls to serve as the "single system for storing and managing the official list of registered voters throughout the State." *Id.* at § 21083(a)(1)(A)(i).

34.     HAVA goes on to require that the rolls will "be coordinated with other agency databases within the state" and that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* at § 21083(a)(1)(A)(iv), (vi).

35.     HAVA further provides that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* at (viii).

36.     Once a state has established the computerized voter registration list required by HAVA, 52 U.S.C. § 21083(a)(2) provides certain actions the state must take to ensure the list is accurately maintained "on a regular basis." *Id.*

37.     Importantly, these maintenance instructions include processes and procedures for removing the names of ineligible voters from the state's voter rolls. *Id.* at § 21083(a)(2)(A). HAVA also sets the standard of conduct for voter roll maintenance, requiring the state to ensure that: "(i) the name of each registered voter appears in the computerized list; (ii) only voters who are not

**JA29**
8

registered or who are not eligible to vote are removed from the computerized list; and (iii) duplicate names are eliminated from the computerized list." *Id.* at § 21083(a)(2)(B).

38.    Next, HAVA mandates that states maintain the technological security of their voter rolls, requiring the states to implement provisions making "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(3)(4).

39.    In addition to setting the standards for establishing and maintaining accurate state voter rolls, HAVA has a clearly described process for verifying the identification of applicants registering to vote. *See id.* at § 21083(a)(5)(A)(i).

40.    First, it requires that applicants provide either a driver's license number or the last four digits of their social security number. Providing this information is a necessary prerequisite **before** the registration form can be processed by the state. *Id.* at § 21083 (viii). In fact, § 21083(a)(5) prevents a state from accepting a voter registration form for an election for Federal office unless the form includes the listed information. *Id.*

41.    Only if a registrant affirmatively confirms they do not have either form of identification, the state must "assign the applicant a number which will serve to identify the applicant for voter registration purposes . . . [which] shall be the unique identifying number assigned under the list." *Id.* at § 21083(a)(5)(A)(ii).

42.    Prior to December 2023, NCSBE used voter registration forms that failed to collect this required information. Specifically, NCSBE collected, processed, and accepted voter registration applications that lacked **both** the driver's license number and social security number because NCSBE's form did not tell the voter the information was required.

**JA30**

43.     As a result of these errors, voters did not utilize the catchall provision of § 21083(a)(5)(A)(ii) as the registration forms failed to make registrants aware that the driver's license or social security number identifying information was necessary for the application to be processed. Thus, any affirmative attestation regarding one's lack of those relevant documents was impossible.

44.     Defendants ignored HAVA's requirement that the identifying information be collected before an application can be accepted and processed. As a result, NCSBE accepted hundreds of thousands of voter registration applications without applying the HAVA identifying information requirement, resulting in approximately 225,000 applicants being registered to vote in a manner out-of-compliance with HAVA.

I.     ***Defendants Admit They Used Voter Registration Forms Which Were HAVA Non-Compliant***

45.     In North Carolina, an individual must register to vote prior to voting. *See* N.C. Gen. Stat. §§163-54, 163-82.1(a); *see also* N.C. Const. art. VI § 3(1).

46.     The state's registration form asks certain information, seeking to ascertain whether the applicant is qualified to vote under applicable state and federal laws. N.C. Gen. Stat. §163-82.4(e). In addition to the information on the form, an elections official may ask an applicant for other "information [that is] necessary to enable officials of the county where the person resides to satisfactorily process the application." *Id.* at § 163-82.4(a).

47.     Despite the informational requirements mandated by both state and federal law—along with the processes and procedures under state law for obtaining the same information—Defendants wholly failed to uphold their statutory duties.

48.     Defendants' noncompliance with HAVA was first raised when a concerned citizen, Carol Snow, filed a complaint with NCSBE on October 6, 2023. (hereinafter, "Snow Amended HAVA Complaint").[2]

49.     In her complaint, Ms. Snow alleged that NCSBE's voter registration form, which was still in use at the time of her filing, failed to indicate that "the applicant's qualifying identification of the applicant's driver's license number or last 4 digits of the applicant's social security number, are required if one or the other have been issued to the applicant." *See* Snow Amended HAVA Complaint, p. 1.

50.     As Ms. Snow's complaint pointed out, the relevant portion of NCSBE's voter registration form then in use identified certain categories of **required** information by denoting them in text blocks with red background. This is contrasted by the white background used for **optional** categories of information on the form. Despite HAVA requiring either a driver's license number or the last four digits of a social security number be provided by the applicant, the registration form had a white text box background for this information, not red. *See* Fig. 1, below; *see also* Snow Amended HAVA Complaint, p. 2.  The applicant had no way to know from the form that the driver's license number or the social security number were required for their form to be accepted and processed by NCSBE.

---

[2]  Publicly available at: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20Complaint.pdf

**JA32**

**Fig. 1 – NCSBE Voter Registration Form Prior to NCSBE's December 6, 2023 Order**



51.     At its meeting on November 28, 2023, NCSBE considered Ms. Snow's complaint. At the meeting[3] and in its December 6, 2023 Order,[4] NCSBE acknowledged that its voter registration forms did not sufficiently notify applicants that their driver's license number or last four digits of their social security number were required in order for their registration to be processed and accepted.

52.     Defendants further acknowledged that they used the voter registration form which failed to comply with HAVA for approximately 225,000 voters throughout North Carolina.[5]

53.     It follows then, that by failing to comply with HAVA, Defendants admittedly violated their duties under N.C. Gen. Stat. § 163-82.11(c).

54.     Ultimately, Defendants granted Ms. Snow's request to change the voter registration form **moving forward**.

---

[3] Meeting documents and a recording of NCSBE's November 28, 2023 meeting is available here: dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2023-11-28/

[4] The December 6, 2023 Order from NCSBE is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf

[5] Given that NCSBE could approximate the number of voters registered in this manner, Defendants, upon information and belief, have the ability to track which voters were registered using the non-compliant form and thus, can contact those voters and request the missing information from them.

**JA33**

12

55. In contrast, Defendants denied Ms. Snow's request to identify and contact voters whose registrations were improperly accepted due to their forms lacking the necessary identification information. Specifically, Defendants took the position that:

    a. HAVA does not authorize NCSBE to contact registered voters (as opposed to applicants)[6]; and

    b. Even if those registered voters did not provide the required identification information as part of their application, they would have to provide other identifying information in connection with other features of the voting process, such as requesting an absentee ballot.

56. Recognizing the inadequacy of Defendants'' "solution," Ms. Snow raised the need to actually remedy these improper registrations during NCSBE's March 11, 2024 and April 11, 2024 meetings. Both times NCSBE denied Ms. Snow's requests.

57. Under the plain text of HAVA, NCSBE should not have accepted or processed these registration forms since they lacked either the required identification or an affirmative attestation that the registrant did not have the necessary information. *See* 52 U.S.C. §21083(a)(5).

58. Similarly, Defendants should have taken immediate action to correct the accuracy of the state's voter rolls, a task mandated by HAVA and, in turn, state law. *See id.* at §21083(a)(2); *see also* N.C. Gen. Stat. § 163-82.11(c).

---

[6] Curiously, this position is not supported by the plain language of HAVA which provides, among other things, processes for identifying and removing the names of "ineligible **voters**" from the state's voter rolls. *See* 52 U.S.C. § 21083(a)(2)(A)(B). To the extent Defendants believe HAVA only allows them to notify applicants of issues with their registration forms, *see id.* at § 21083(4), Defendants failed to do so on the front end and instead, improperly processed and accepted their registration forms. Thus, NCSBE's logic is self-defeating; it cannot violate the statute by allowing these invalid applicants to become registered voters, only to then say they cannot contact them because those registrants are not "applicants."

59.     Nevertheless, public records provided by Defendants reveal that 225,000 voter registrations were processed and accepted despite missing both the applicant's driver's license number and the last four digits of the registrant's social security number.

60.     Thus, Defendants' refusal to correct their violations is unjustifiable.

61.     Defendants' dismissal of Ms. Snow's straightforward solution is irreconcilable with their duties, and it damages lawfully-registered North Carolina voters and candidates, including Republican voters who are members of Plaintiffs, and Republican candidates whom Plaintiffs and their members support.

## II.     *Despite Their Errors, Defendants Refuse to Identify Unqualified Voters or Remove Them From The State's Voter Rolls*

62.     HAVA places the burden on the state to "determine whether the information provided by an individual is sufficient to meet the requirements of [the statute]." *See* 52 U.S.C. § 21083(a)(5)(A)(iii). Similarly, N.C. Gen. Stat. § 163-82.11(c) mandates that the state maintain its voter rolls in accordance with what HAVA requires.

63.     Through this affirmative directive—along with the other enumerated requirements throughout the statute—Defendants either knew or should have known that they were tasked with ensuring that only properly completed registration forms were accepted and processed. Even still, Defendants permitted hundreds of thousands of people to register without providing the basic information HAVA requires.

64.     After this failure, Defendants should have immediately taken action to remedy this mistake, including confirming that ineligible voters were not on the state's voter rolls. *See* 52 U.S.C. § 21803(a)(2)(A)(B); *see also* N.C. Gen. Stat. § 163-82.11(c).

65.     By declining to uphold their statutory duties, Defendants violated both state and federal law, irreparably damaged North Carolina voters, the NCGOP, the RNC, and their

**JA35**

14

organizational missions, and most importantly, their members. Defendants opened the door to insecure elections in North Carolina, marred by potentially fraudulent votes.

III.  ***By Failing to Correct Their HAVA Violations, Defendants Place Foundational Election Principles Into Jeopardy***

66.    Many states, including North Carolina, have recently confronted issues relating to non-citizens and other ineligible persons attempting to register to vote. *See, e.g.,* N.C. Gen. Stat. § 163-82.14(c1).[7]

67.    North Carolina's statutory requirements notwithstanding, Defendants' failure to require necessary HAVA identification information before processing and accepting hundreds of thousands of voter registration forms allowed untold numbers of ineligible voters to register. Now, those ineligible voters could vote in the upcoming November 5, 2024 election and beyond.

68.    Upon information and belief, Defendants' violations of HAVA allowed non-citizens to register to vote in North Carolina, in direct contravention of both federal and state law. *See, e.g.,* N.C. Const. art. VI §I.

69.    By allowing ineligible voters to register and then remain on the North Carolina voter rolls, Defendants have brought the security and validity of the state's elections into question.

70.    Even worse, by refusing to correct their errors, Defendants are willfully ignoring their statutory responsibilities.

71.    If Defendants do not remove ineligible voters from the state's voter rolls, then the legitimate votes of qualified voters will be diluted and disenfranchised in upcoming elections. This

---

[7] On Wednesday, August 21, 2024, Ohio announced that it had identified at least 597 non-citizens who registered and/or voted in recent elections. This finding was precipitated by a comprehensive statewide audit which identified 154,995 ineligible registrants on the state's voter rolls. *See* https://apnews.com/article/ohio-voters-citizenship-referrals-42799a379bdda8bca7201d6c42f99c65 [last accessed 08.22.2024].

reality will, in turn, have a substantial chilling effect on North Carolinians' right to vote in free and fair elections. *See* N.C. Const. art. I §10.

IV.     *Remedying These Errors Will Not Burden NCSBE*

72.     Defendants already maintain processes for seeking out additional information from voters who fail to provide necessary information.

73.     For example, the county boards of elections regularly contact voters who vote with a provisional ballot on election day, seeking additional identifying information from these voters as part of post-election day processes.

74.     Notably, accurate voter roll maintenance, including removing the names of ineligible voters from voting rolls, is already required by HAVA and state law. *See* 52 U.S.C. § 21083(a)(2)(A)(B); N.C. Gen. Stat. § 163-82.11(c). Thus, any burden on Defendants in terms of time required to correct the state's voter rolls is mitigated by the fact that federal law mandates the same.

75.     Unlike the minimal burden Defendants would face if required to correct the state's voter rolls in compliance with federal law, the burden placed on Plaintiffs is palpable. Absent immediate corrective action by Defendants, the significant harm faced by Plaintiffs will only increase. Not only will Plaintiffs' members be disenfranchised, but Plaintiffs' mission of advocating for Republican voters, causes, and candidates will be impeded by contrary votes of potentially ineligible voters.

76.     With the November 5, 2024 election now three months away, early voting starting in less than two months, and ballots being mailed starting September 6, 2024, it is exceedingly important that Defendants take immediate actions to correct their wrongs, guaranteeing that qualified voters are able to vote, while preventing ineligible persons from trying to do the same.

## CLAIMS FOR RELIEF

**COUNT ONE: VIOLATION OF N.C.G.S. § 163-82.11(c) – WRIT OF MANDAMUS**

77.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

78.     North Carolina law unambiguously requires Defendants to maintain the state's voter rolls in a manner compliant with Section 303 of HAVA. N.C. Gen. Stat. § 163-82.11(c).

79.     Section 303 of HAVA requires that North Carolina create a computerized statewide voter registration list containing the names and registration information of every legally registered voter. 52 U.S.C. § 21083(a)(1)(A).

80.     HAVA similarly mandates that North Carolina verify the accuracy of a prospective voter's registration information, **_prior_** to accepting the registration. Specifically, the state must collect the registrant's driver's license number or last four digits of their social security number or, alternatively, the registrant must affirmatively attest that they have neither. _Id._ at § 21083(a)(5)(A).

81.     HAVA also requires that Defendants regularly review and maintain the accuracy of the state's voter registration list, including, if applicable, removing ineligible persons from the voter roll. _Id._ at § 21083(a)(2)(4).

82.     North Carolina law similarly mandates the collection of certain identification information from applicants, creating certain tools for verification of the same. _See_ N.C. Gen. Stat. §§163-54, 163-82.1(a); 163-82.4 (a)(e).

83.     Upon information and belief, Defendants failed to collect the statutorily required information from at least 225,000 registrants whose registrations were, in turn, processed and accepted despite lacking this necessary information.

84.     Upon information and belief, even once this error was identified and corrected on a forward-looking basis, NCSBE refused, and continues to refuse, to contact these registrants or

verify if they have the necessary information in order to correct the accuracy of the state's voter registration list.

85.    Not only does the language of N.C. Gen. Stat. § 163-82.11(c) create a duty for Defendants to maintain accurate voter rolls in compliance with HAVA, but Defendants have no discretion or permissible freedom to deviate from this mandate.

86.    It is without dispute that, even when this was brought to their attention, Defendants failed to act. In fact, Defendants affirmatively refused to act and correct the accuracy of the state's voter rolls as to be compliant with HAVA.

87.    Due to Defendants' unambiguous refusal to act, even after acknowledging their own violation of the law, Plaintiffs have no other adequate remedy than to seek relief from this Court.

88.    Unless enjoined and ordered to comply with their statutory duties, Defendants will continue to violate state law by refusing to maintain accurate voter rolls and declining to remedy the 225,000 voter registrations that should have never been processed or accepted in the first place.

**COUNT TWO: VIOLATION OF N.C. CONST. ART. I § 19 – MANDATORY INJUNCTION**

89.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

90.    As described more fully above, Defendants have a non-discretionary, statutory duty to maintain the state's voter rolls in a manner compliant with Section 303(a) of HAVA.

91.    N.C. Gen. Stat. § 163-82.11(c) is an affirmative command, creating a duty imposed by law.

92.    Defendants admit they failed to uphold this duty when they accepted hundreds of thousands of voter registrations which were plainly non-compliant with Section 303(a) of HAVA.

93.    Despite this admission, Defendants refuse to take any action to remedy their violations.

94.    Defendants' actions directly interfere with North Carolinian's fundamental right to vote. By allowing potentially ineligible persons to vote in the state's elections and remain on the state's voter rolls, Defendants have ignored their statutory and constitutional duties while simultaneously opening the door to potential widespread dilution of legitimate votes in upcoming elections.

95.    Defendants cannot offer any legitimate justification, let alone a compelling interest, for this dereliction of duty.

96.    Defendants must be ordered to immediately and permanently rectify this harm in order to protect the integrity of North Carolina's elections .

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a writ of mandamus and a mandatory injunction ordering Defendants to develop, implement, and enforce practices and policies to ensure compliance with HAVA and, in turn, N.C. Gen. Stat. § 163-82.11(c);

2. Direct Defendants, under a court-approved plan to be completed no later than September 6, 2024, including mandatory reporting and monitoring requirements, to take all actions necessary to remedy their violations of state law and HAVA, specifically, identifying all ineligible registrants and removing them from the state's voter registration lists in a manner consistent with state and federal law, and to the extent such removal is not feasible prior to the date set forth herein, then direct Defendants to require all individuals who failed to provide necessary HAVA identification information but were still registered to vote under

**JA40**

19

the state's prior registration form, to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation of the required HAVA information;

3. Direct Defendants, under a court-approved plan including mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with state law and HAVA, specifically, registering only eligible, qualified voters in a manner consistent with both statutes and maintaining the state's voter registration lists in accordance therewith;

4. Award Plaintiffs their reasonable attorney's fees, litigation expenses, and associated costs incurred in connection with this action, as otherwise permitted by law;

5. Retain jurisdiction over this matter to ensure Defendants comply with any orders issued by this Court; and

6. Grant such additional relief deemed just and proper.

This, the 23rd day of August, 2024.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: /s/  Philip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**JA41**
20

**BAKER DONELSON BEARMAN,**
**CALDWELL & BERKOWITZ, PC**

By: /s/   John E. Branch, III
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

**JA42**
21

## VERIFICATION

I, _Matthew Judge_____, affirm under the penalty of perjury, that the foregoing representations in this Verified Complaint are true to my own knowledge, except as to matters stated upon information and belief, and as to those matters, I believe them to be true.

By: _____

_Executive Director, NCGOP_

Date: _08/23/2024_____

_____Wake_____ County

STATE OF NORTH CAROLINA

Sworn and subscribed to me on this, the _23_ day of _August_____, 2024

_Brooke Peterson_____
Notary Public
My commission expires: _07-19-27_____

# EXHIBIT B

**JA44**

# EXHIBIT B

| | |
|---|---|
| | *File No.* **24CV026995-910** |

# STATE OF NORTH CAROLINA

_____WAKE_____ County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

*Name And Address Of Plaintiff 1*
NORTH CAROLINA REPUBLICAN PARTY

*Name And Address Of Plaintiff 2*
REPUBLICAN NATIONAL COMMITTEE

## GENERAL
## CIVIL ACTION COVER SHEET

☒ INITIAL FILING     ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

### VERSUS

*Name And Address Of Defendant 1*
NORTH CAROLINA STATE BOARD OF ELECTIONS

*Name And Address Of Attorney Or Party, If Not Represented*
*(complete for initial appearance or change of address)*
Phillip J. Strach; Jordan A. Koonts; John E. Branch, III;
Thomas G. Hooper
301 Hillsborough St., Suite 1400
Raleigh, NC                                    27603

*Summons Submitted*
☒ Yes     ☐ No

| *Telephone No.* 919-329-3800 | *Cellular Telephone No.* |
|---|---|
| *NC Attorney Bar No.* 29456 | *Attorney Email Address* phil.strach@nelsonmullins.com |

*Name And Address Of Defendant 2*
ALAN HIRSCH, in his official capacity as Chair of the
North Carolina State Board of Elections

☒ Initial Appearance in Case     ☐ Change of Address

| *Name Of Firm* NELSON MULLINS RILEY AND SCARBOR | *Fax No.* 919-329-3799 |
|---|---|

*Summons Submitted*
☒ Yes     ☐ No

*Counsel For*
☒ All Plaintiffs     ☐ All Defendants     ☐ Only: *(list party(ies) represented)*

☐ Jury Demanded In Pleading     ☐ Complex Litigation     ☐ Stipulate to Arbitration

### TYPE OF PLEADING

*(check all that apply)*

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) Assess Court Costs
☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other *(specify and list each separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

*(Over)*

| CLAIMS FOR RELIEF | | |
|---|---|---|
| ☐ Administrative Appeal (ADMA) | ☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP) | ☐ Product Liability (PROD) |
| ☐ Appointment Of Receiver (APRC) | | ☐ Real Property (RLPR) |
| ☐ Attachment/Garnishment (ATTC) | ☐ Medical Malpractice (MDML) | ☐ Specific Performance (SPPR) |
| ☐ Claim And Delivery (CLMD) | ☐ Minor Settlement (MSTL) | ☒ Other *(specify and list each separately)* Writ of Mandamus |
| ☐ Collection On Account (ACCT) | ☐ Money Owed (MNYO) | |
| ☐ Condemnation (CNDM) | ☐ Negligence - Motor Vehicle (MVNG) | |
| ☐ Contract (CNTR) | ☐ Negligence - Other (NEGO) | |
| ☐ Discovery Scheduling Order (DSCH) | ☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN) | |
| ☒ Injunction (INJU) | ☐ Possession Of Personal Property (POPP) | |

| Date | Signature Of Attorney/Party |
|---|---|
| 08/23/2024 | |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ Additional Defendant(s)    ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

**JA47**

AOC-CV-751, Side Two, Rev. 3/19
© 2019 Administrative Office of the Courts

EXHIBIT C

# STATE OF NORTH CAROLINA

**File No.** 24CV026995-910

_____ WAKE _____ County

**In The General Court Of Justice**
☐ District ☐ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>North Carolina Republican Party, et al. | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| *Address* | |
| *City, State, Zip* | G.S. 1A-1, Rules 3 and 4 |

| | |
|---|---|
| **VERSUS** | |
| *Name Of Defendant(s)*<br>North Carolina State Board of Elections, et al. | *Date Original Summons Issued* |
| | *Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>North Carolina State Board of Elections<br>c/o Paul Cox. General Counsel<br>Dobbs Building, 3rd Floor, 430 N. Salisbury Street<br>6400 Mail Service Center, Raleigh, NC     27603-1362 | *Name And Address Of Defendant 2* |
|---|---|

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles! Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Phillip J. Strach & Jordan A. Koonts<br>Nelson Mullins Riley & Scarborough LLP<br>301 Hillsborough Street, Suite 1400<br>Raleigh, NC 27603 | *Date Issued* 8/23/2024 | *Time* 4:06:06 pm ☐ AM ☐ PM |
|---|---|---|
| | *Signature* /s/ Linda Ngweno | |
| | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

**JA49**

(Over)

**RETURN OF SERVICE**

I certify that this Summons and a copy of the complaint were received and served as follows:

**DEFENDANT 1**

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

**DEFENDANT 2**

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

**JA50**

# EXHIBIT D

**JA51**

# STATE OF NORTH CAROLINA

_____ WAKE _____ County

File No. **24CV026995-910**

In The General Court Of Justice
☐ District ☐ Superior Court Division

Name Of Plaintiff
North Carolina Republican Party, et al.

Address

City, State, Zip

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

**VERSUS**

G.S. 1A-1, Rules 3 and 4

Name Of Defendant(s)
North Carolina State Board of Elections, et al.

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Karen Brinson Bell, in her official capacity as Executive Director of the North Carolina State Board of Elections Dobbs Building, 3rd Floor, 430 N. Salisbury Street 6400 Mail Service Center, Raleigh, NC          27603-1362 | |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| Phillip J. Strach & Jordan A. Koonts Nelson Mullins Riley & Scarborough LLP 301 Hillsborough Street, Suite 1400 Raleigh, NC 27603 | **8/23/2024** | **4:06:06 pm** ☐ AM ☐ PM |
| | Signature /s/ Linda Ngweno | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time ☐ AM ☐ PM |
|---|---|---|
| | Signature | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

## JA52
(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

## JA53

# EXHIBIT E

# STATE OF NORTH CAROLINA

_____ WAKE _____ County

File No. **24CV026995-910**

In The General Court Of Justice
☐ District ☐ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>North Carolina Republican Party, et al. | |
| *Address* | **CIVIL SUMMONS** |
| *City, State, Zip* | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

*Name Of Defendant(s)*
North Carolina State Board of Elections, et al.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

### To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Alan Hirsch, in his official capacity as Chair of the North Carolina State Board of Elections<br>Dobbs Building, 3rd Floor, 430 N. Salisbury Street<br>6400 Mail Service Center, Raleigh, NC     27603-1362 | |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles! Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Phillip J. Strach & Jordan A. Koonts<br>Nelson Mullins Riley & Scarborough LLP<br>301 Hillsborough Street, Suite 1400<br>Raleigh, NC 27603 | *Date Issued*<br>8/23/2024 | *Time*<br>4:06:06 pm ☐ AM ☐ PM |
|---|---|---|
| | *Signature*<br>/s/ Linda Ngweno | |
| | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

### JA55
(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

## JA56

EXHIBIT F

**JA57**

# STATE OF NORTH CAROLINA

WAKE _____ County

File No. **24CV026995-910**

In The General Court Of Justice
☐ District   ☐ Superior Court Division

Name Of Plaintiff
North Carolina Republican Party, et al.

Address

City, State, Zip

**VERSUS**

Name Of Defendant(s)
North Carolina State Board of Elections, et al.

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

## To Each Of The Defendant(s) Named Below:

Name And Address Of Defendant 1
Jeff Carmon, in his official capacity as the Secretary of the North
Carolina State Board of Elections
Dobbs Building, 3rd Floor, 430 N. Salisbury Street
6400 Mail Service Center, Raleigh, NC          27603-1362

Name And Address Of Defendant 2

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as
possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible
acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos
documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been
    served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)
Phillip J. Strach & Jordan A. Koonts
Nelson Mullins Riley & Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603

Date Issued   **8/23/2024**   Time **4:06:06 pm**   ☐ AM  ☐ PM

Signature   **/s/ Linda Ngweno**

☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated
above and returned not served. At the request of the plaintiff,
the time within which this Summons must be served is
extended sixty (60) days.

Date Of Endorsement      Time
☐ AM  ☐ PM

Signature

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or
less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if
so, what procedure is to be followed.*

**JA58**
(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 1.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 2.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

## JA59

EXHIBIT G

# STATE OF NORTH CAROLINA

_____ WAKE _____ County

*File No.* **24CV026995-910**

In The General Court Of Justice
☐ District ☐ Superior Court Division

*Name Of Plaintiff*
North Carolina Republican Party, et al.

*Address*

*City, State, Zip*

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

**VERSUS**

*Name Of Defendant(s)*
North Carolina State Board of Elections, et al.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Stacy Eggers IV, in his official capacity as a Member of the North Carolina State Board of Elections<br>Dobbs Building, 3rd Floor, 430 N. Salisbury Street<br>6400 Mail Service Center, Raleigh, NC     27603-1362 | |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* | *Time* | |
|---|---|---|---|
| Phillip J. Strach & Jordan A. Koonts<br>Nelson Mullins Riley & Scarborough LLP<br>301 Hillsborough Street, Suite 1400<br>Raleigh, NC 27603 | 8/23/2024 | 4:06:06 pm ☐ AM ☐ PM | |
| | *Signature* /s/ Linda Ngweno | | |
| | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

**JA61**
(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

**JA62**

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

# EXHIBIT H

**JA63**

# STATE OF NORTH CAROLINA

_____ WAKE _____ County

| File No. |
| 24CV026995-910 |

In The General Court Of Justice
☐ District ☐ Superior Court Division

| Name Of Plaintiff |
| North Carolina Republican Party, et al. |

| Address |

| City, State, Zip |

**CIVIL SUMMONS**

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

**VERSUS**

| Name Of Defendant(s) |
| North Carolina State Board of Elections, et al. |

| Date Original Summons Issued |

| Date(s) Subsequent Summons(es) Issued |

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| Kevin Lewis, in his official capacity as a Member of the North Carolina State Board of Elections Dobbs Building, 3rd Floor, 430 N. Salisbury Street 6400 Mail Service Center, Raleigh, NC        27603-1362 | |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
| Phillip J. Strach & Jordan A. Koonts Nelson Mullins Riley & Scarborough LLP 301 Hillsborough Street, Suite 1400 Raleigh, NC 27603 | 8/23/2024 | 4:06:06 pm ☐ AM ☐ PM |
| | Signature /s/ Linda Ngweno | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time |
| | | ☐ AM ☐ PM |
| | Signature | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

**JA64**

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

**RETURN OF SERVICE**

I certify that this Summons and a copy of the complaint were received and served as follows:

**DEFENDANT 1**

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

**DEFENDANT 2**

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| | |
| Date Of Return | County Of Sheriff |
| | |

**JA65**

EXHIBIT I

**JA66**

# STATE OF NORTH CAROLINA

*File No.* 24CV026995-910

_____ WAKE _____ County

In The General Court Of Justice
☐ District ☐ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff* <br> North Carolina Republican Party, et al. | **CIVIL SUMMONS** |
| *Address* | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| *City, State, Zip* | G.S. 1A-1, Rules 3 and 4 |

**VERSUS**

| | |
|---|---|
| *Name Of Defendant(s)* <br> North Carolina State Board of Elections, et al. | *Date Original Summons Issued* |
| | *Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Siobhan O'Duffy, Millen, in her official capacity as a Member of the North Carolina State Board of Elections <br> Dobbs Building, 3rd Floor, 430 N. Salisbury Street <br> 6400 Mail Service Center, Raleigh, NC        27603-1362 | |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles! Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* 8/23/2024 | *Time* 4:06:06 pm ☐ AM ☐ PM |
|---|---|---|
| Phillip J. Strach & Jordan A. Koonts <br> Nelson Mullins Riley & Scarborough LLP <br> 301 Hillsborough Street, Suite 1400 <br> Raleigh, NC 27603 | *Signature* /s/ Linda Ngweno | |
| | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)** <br> This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

**JA67**
(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service.<br>Summons and complaint received by: ☐ Defendant 1.<br>☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service.<br>Summons and complaint received by: ☐ Defendant 2.<br>☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid<br>$ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

**JA68**

EXHIBIT J

**JA69**

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
NO. 24CVS026995-910

REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,

*Plaintiffs*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*,

*Defendants*.

**ACCEPTANCE OF SERVICE**

The undersigned hereby acknowledges the receipt of the complaint and summons issued in this action to the Defendants. The undersigned further acknowledges and represents that they are authorized by said Defendants to receive service of process on their behalf, and further acknowledges that this service of process and their acceptance of same complies with Rule 4 of the North Carolina Rules of Civil Procedure.

This the 27th day of August, 2024

NORTH CAROLINA
DEPARTMENT OF JUSTICE

By: _____
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
mcbabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
tsteed@ncdoj.gov

**JA70**

1

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
T: (919) 716-6567
F: (919) 716-6761

*Attorneys for State Board Defendants*

**JA71**

2

EXHIBIT K

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV026995-910

REPUBLICAN NATIONAL COMMITTEE and
NORTH CAROLINA REPUBLICAN PARTY

Plaintiffs,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

Defendants.

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Mary Carla Babb, Special Deputy Attorney General, enters her Notice of Appearance on behalf of Defendants North Carolina State Board of Elections, Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers, IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, reserving all rights to raise jurisdictional defenses at a later date. By this Notice of Appearance, the undersigned requests that she receive all notices from the Court and all papers served by the parties hereto.

Respectfully submitted this the 28th day of August, 2024.

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
Email: mcbabb@ncdoj.gov
North Carolina Dept. of Justice
Post Office Box 629
Raleigh, N.C. 27602
Tele No.: (919) 716-6573
Fax No.: (919) 716-6763
*Counsel for State Board Defendants*

**JA73**

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this day served the foregoing NOTICE OF

APPEARANCE in the above-titled action upon all parties to this cause by electronic mail as

follows:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley & Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

This the 28th day of August, 2024.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General

**JA_2_74**

EXHIBIT L

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
NO. 24CVS26995-910

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*, <br><br> *Defendants*. | **PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY** <br><br> **N.C. R. Civ. P. 33(a); 34(b)** |

NOW COMES Plaintiffs the Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP"), by and through undersigned counsel, pursuant to Rules 33(a) and 34(b) of the North Carolina Rules of Civil Procedure, hereby moves the Court for an Order granting an expedited timeline for the completion of discovery as against Defendants the North Carolina State Board of Elections ("NCSBE") and its members, Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis, each in their respective official capacities, and the NCSBE's Executive Director Karen Brinson Bell (collectively "Defendants"). In support of this Motion, Plaintiffs show the Court the following:

1.     On August 23, 2024, Plaintiffs brought this action arising from Defendants' admitted failure to collect certain statutorily-required identification information from persons registering to vote prior to processing and accepting their registration applications and adding them to North Carolina's voter registration lists ("voter rolls").

**JA76**

1

2.    In their complaint Plaintiffs request a writ of mandamus and a permanent injunction, requiring Defendants to comply with their statutory duties regarding voter roll maintenance, as set forth in North Carolina General Statute §163-82.11, *et seq.*

3.    By failing to collect this required information prior to placing these persons on the state's voter rolls, Defendants violated their statutory duties under both state law and Section 303(a) of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083, *et seq.*

4.    Importantly, Defendants admit they failed to collect this necessary information for some time up to at least December 06, 2023. Despite their plain statutory violations, Defendants refuse to take any actions to remedy their actions or ensure the accuracy of the state's voter rolls. *See* N.C. Gen. Stat. §163-82.11, *et seq.*

5.    By declining to act even when these ongoing violations were repeatedly brought to their attention, Defendants have made clear that, absent an order from this Court, they will not comply with their unambiguous, non-discretionary, statutory duties to maintain accurate voter rolls.

6.    With the November 05, 2024 election fast approaching[1], Defendants must be required to take all actions necessary to ensure the North Carolina voter rolls are in full compliance with state and federal law, including but not limited to identifying and removing any non-qualified voters from the voter rolls and implementing prophylactic efforts to ensure only qualified North Carolinians are able to vote in the state's elections.

7.    On August 29, 2024, Plaintiffs caused a narrow set of discovery requests to be served on Defendants. A true and accurate copy of these requests is attached hereto as **Exhibit A**.

---

[1] NCSBE begins mailing absentee ballots on September 6, 2024 and early voting begins across the state on October 17, 2024.

These requests are sufficiently tailored to focus on foundational information which will assist the parties and the Court in identifying both the extent of Defendants' statutory violations and the necessary remedy for timely correcting the same.

8.      Due to the exigencies of the matter presented, Plaintiffs respectfully request that the Court order Defendants to comply with these discovery requests to the fullest extent allowed by law by no later than **Monday, September 16, 2024**.

9.      Good cause exists for this expedited timeline as, among other things, absentee ballots begin being mailed by NCSBE on Monday, September 6, 2024. By ordering compliance by this date, the parties will have sufficient time to review and analyze whether additional immediate relief is required from this Court.

10.     Further, any burden faced by Defendants by the relief sought through this Motion is outweighed by the significant and severe burden Plaintiffs, their members, and the entire state of North Carolina would face, should ineligible voters be allowed to remain on the state's voter rolls and potentially cast ballots in upcoming elections.

WHEREFORE, Plaintiffs respectfully request that the Court grant the Motion and enter an Order:

(1) Allowing expedited discovery, ordering that Defendants must respond to Plaintiffs' discover requests to the fullest extent allowed by law by no later than Monday, September 16, 2024.

Respectfully submitted, this the 29th  day of August, 2024.

*[Signatures on following page]*

**JA78**

3

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com


**BAKER DONELSON BEARMAN,
CALDWELL & BERKOWITZ, PC**

By: /s/    John E. Branch, III
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 29th day of August, 2024, I caused a true and accurate copy of the same to be served via Odyssey's file and serve feature, which will provide the same to all counsel of record, as well as to email to the addresses listed below.

Terrence Steed
Mary Carla Babb
Tsteed@ncdoj.gov
MCBabb@ncdoj.gov
*Counsel for Defendants*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

EXHIBIT M

**JA81**

EXHIBIT

A

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
NO. 24CVS026995-910

REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,

*Plaintiffs*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,

*Defendants*.

**PLAINTIFFS' FIRST SET OF
DISCOVERY REQUESTS**

NOW COMES Plaintiffs the Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP"), pursuant to Rules 26, 33, and 34 of the North Carolina Rules of Civil Procedure hereby serves these Interrogatories and Requests for Production (collectively, the "Requests") on the North Carolina State Board of Elections ("NCSBE") and its members, Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis in their respective official capacities, and the NCSBE's Executive Director Karen Brinson Bell (collectively "Defendants"). Defendants are requested to answer each of the Requests, and to provide those answers to the offices of Nelson Mullins Riley & Scarborough LLP, 301 Hillsborough Street, Suite 1400, Raleigh, NC 27603.

**JA82**

## DEFINITIONS

1.      For the purposes of responding to these Requests, the common usage of a word or term will apply unless the word or term is otherwise defined in this section. The following definitions are operative unless a request specifically states that a different meaning is intended.

2.      "You" or "your," or "Defendants" means the North Carolina State Board of Elections and its members, Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis in their respective official capacities, and the NCSBE's Executive Director Karen Brinson Bell, in her official capacity. Unless otherwise stated, this definition means each of the aforementioned collectively, and includes any of their respective present or former agents, representatives, or any other person acting on their behalf in the same capacity, including their attorneys.

3.      "NCSBE" means the North Carolina State Board of Elections and includes any of its respective present or former agents, representatives, or any other person acting on its behalf in, including its attorneys.

4.      "Complaint" shall refer to the complaint filed in Wake County, NC Superior Court bearing the caption 24 CVS 026995-910, and shall be interpreted to include all claims, allegations, and defenses set forth therein.

5.      "HAVA" shall refer to the Help America Vote Act and, unless identified otherwise, specifically, Section 303(a) – 52 U.S.C. § 21083 *et seq*.

6.      "Statewide computerized voter registration list" shall have the same meaning as defined by N.C. Gen. Stat. § 163-82.11.

7.      "Person" means any natural person, corporation, partnership, trust, trustee, unincorporated association, business association, trade or professional organization, group, public

**JA83**

2

or governmental body, agency, department, division, company, or any other individual or collection of individuals organized or associated for any purpose.

8.      "And" and "or" shall be construed disjunctively or conjunctively as necessary to include all information and documents that might otherwise be construed as outside the scope of each of the individual Requests. Singular and plural, as well as masculine and feminine, language shall be considered interchangeable as necessary to include all information and documents that might otherwise be construed as outside the scope of each of the individual Requests.

9.      "Document" shall have its customary, broad sense to include written or graphic matter of every kind and description, whether printed or reproduced by any process, written, or produced by hand; draft or final; original or reproduction; including but not limited to the following categories: letters, correspondence, emails, text messages, memoranda of telephone or personal conversations, microfilm, microfiche, telegrams, books, magazines, newspapers, advertisements, periodicals, bulletins, circulars, brochures, pamphlets, statements, notices, advertising layouts, trade letters, press releases, reports, rules, regulations, directives, discs, video tapes, audio tapes, movie tapes, records, digital audio or video files, teletype or telefax messages, minutes or records of meetings, interoffice communications, memoranda, financial statements, ledgers, books of account, proposals, prospectuses, offers, orders, receipts, working papers, desk calendars, appointment books, diaries, routing slips, time sheets, logs, drawings, blueprints, sketches, plans, guidelines, graphics, charts, photographs, data processing printouts and computation (both in existence and stored in memory), .pdf files, notes, transcripts of oral statements or testimony, tangible things, and any and all other data compilations or information resources from which information can be obtained or translated, if necessary, through detection devices into a reasonably

usable form. "Document" includes the original of any document, in its native form and in whatever medium it may exist, and any copy of such original differing in any way from the original.

10.     "Document" also includes all metadata of any kind and all electronic documents, which is all information about a particular electronic document or data set that is available electronically, including information relating to how, when, and by whom it was collected, created, sent, copied, received, accessed, or modified; and how it is formatted, including data demographics such as size, location, storage requirements, and media information.

11.     "Concerning" means any fact, document, information, or communication that supports, evidences, refutes, contradicts, relates, or refers to any fact or allegation.

12.     "Relating," "regarding," "referencing," and "referring" mean to consist of, pertain to, reflect, arise out of, or be in any manner factually, logically, or legally connected with the matter being inquired about.

13.     The term "identify" means:

a.     When used with respect to a natural person, to state his or her: (1) full name; (2) present or last known address and home or personal telephone number; (3) present or last known business address and telephone number; (4) business affiliation at the date at issue in the Requests; and (5) title and business duties during that time.

b.     When used with respect to a person other than a natural person, to state: (1) the type of person (i.e., corporation, partnership, etc.); (2) its full name; (3) its state or county of incorporation; (4) the complete address of its principal place of business; and (5) the address of its place of business as of the date at issue in the Requests.

**JA85**

4

    c.      When used with respect to a document, to: (1) state the document's date (or if not dated, the date it was prepared or received); (2) state the type of document (from the categories provided supra); (3) identify the author and addressee, including the addressee of each copy; (4) state the document's present location; (5) identify the person or persons that are currently its custodian or custodians; (6) state a general description of its content; and (7) identify each person whose testimony could be used to authenticate the document and lay the foundation for its introduction into evidence.

    d.      When used with respect to an act or acts, to: (1) describe the facts constituting the act or acts; (2) state the geographic location or locations where the act or acts occurred; (3) state the calendar date or dates of the act or acts; (4) identify each person participating in the act or acts; including each person's involvement in the act or acts; and (5) with respect to a face-to-face or telephone conversation between persons, identify the persons who participated in the conversation or heard any part of it, state the location of each person involved in the conversation, and state what each participant said and what each non-participant heard.

14.    "Describe" and "describe in detail" mean to state fully all facts, beliefs, opinions, or contentions, including those concerning the application of law to fact, that provide the basis for the subject matter, allegation, claim, or answer being inquired about.

**JA86**

5

## **INSTRUCTIONS**

1.     In responding to these Requests, you are required to obtain and provide all responsive information, data, and documents known by and available to you or any of your representatives, agents, or attorneys.

2.     Documents should be produced to the extent they are in the possession or under the control of you, your representatives, and all other persons acting, appearing, or purporting to act on your behalf. Documents generated by or formerly in the custody of any predecessors in interest of you should be produced to the extent that they are now in the possession or under the control of you.

3.     Each of the Requests seeking information or data relating to communications to, from, or within a business or corporate entity shall be construed to include all communications by or between representatives, employees, agents, brokers, or servants of the business or corporate entity at issue.

4.     If a document responsive to any of the Requests existed at one time but has since been discarded, lost, or destroyed, you should: (1) identify and describe the document as completely as possible; (2) identify which paragraph it corresponds to consistent with Instruction ¶ 5 below; (3) identify any person with knowledge of the circumstances of the document's discarder, loss, or destruction; and (4) state the date on which the document was discarded, lost, or destroyed.

5.     If your response to any of the Requests refers to your response to, or documents produced in response to, another paragraph in the Requests, you should identify the paragraph to which your response refers.

**JA87**
6

6.      You must produce such documents as they are kept in the normal course of business or must organize and label them to correspond to the categories in the Requests to which they primarily respond. Where required, documents produced shall be further segregated and identified as indicated by particular Requests. If Requests do not specify a form for producing electronically stored information, you must produce it in a reasonably usable form. You need not produce the same electronically stored information in more than one form.

7.      Whenever these Requests request information, data, or documents that is not available to you in the form requested but is available in another form or can be obtained elsewhere, you should either: (1) so state; (2) supply the information or data requested in the form in which it is available; or (3) supply information or data from which the requested information or data can be obtained.

8.      Where you cannot provide exact information or data, you should estimate such information to the extent possible. If estimation is used, you should so indicate and explain why you used estimation and why you cannot provide exact information or data.

9.      If you object to part of any Requests, you shall provide information and data that responds to the parts of the Requests that are not objected to.

10.      If you assert that a privilege, immunity, or confidentiality or protective order precludes them from producing any information or document, you must provide a comprehensive log detailing the following:

> a.      The nature of the information or document (e.g., whether it is an oral communication, letter, memo, etc.);

b.    The nature of the privilege claimed, including the legal and factual basis upon which the information or document is considered to be privileged or protected from discovery;

c.    The date of the document, and its subject matter; and

d.    All authors or recipients of the document, and any person with knowledge of the circumstances of the document's preparation.

11.    Any documents you provide in response to the Requests should be segregated and identified according to paragraph to which they primarily respond. Where required by a particular paragraph, documents produced should be further segregated and identified as indicated in the paragraph. Any documents stored or maintained as files in the normal course of business should be produced in such files or in such a manner as to preserve the identity of the files from which the documents were taken.

12.    You are under a continuing duty to timely supplement your responses to these Requests with any responsive information or data discovered, learned, or discerned after it prepares and files its initial responses.

13.    In connection with the production of documents, you are to deliver physical copies of this production to Nelson, Mullins, Riley & Scarborough LLP, 301 Hillsborough Street, Suite 1400, Raleigh, North Carolina 27603, during business hours and by appointment prior to the deadline under N.C. R. Civ. P. 34.

14.    At your option, you can opt to produce the documents electronically by secure link, email, or USB drive.

15.    All documents should be produced in their native format as they are kept on the device or account from which they are obtained.

**JA89**

8

16.     All documents should be produced with all metadata intact and present. To the extent any metadata is removed prior to production, you must specifically identify which category or categories of metadata have been removed and the reason for their removal. Acceptance of the production shall not be construed as a waiver of any objections to the metadata's removal. Plaintiff specifically reserves all rights to seek additional categories of metadata, should the same become necessary.

17.     For each Request where you either produce documents or cite or refer to your document production, specifically identify, by Bates number, the documents you contend are responsive to that Request.

18.     Unless otherwise stated, the relevant time period for these Requests is from the date identified in your response to Interrogatory number 8, to present.

19.     The above definitions and instructions are hereby incorporated into each and every one of the Requests, by reference.


## **INTERROGATORIES**

1.      Identify the exact number of persons who are currently on the North Carolina Statewide computerized voter registration list but whose registrations are missing both a driver's license number and the last four digits of a social security number. For the sake of clarity, this Request is intended to encompass all persons who successfully registered to vote and are currently on the State's computerized registration list without providing the identification information specified in Section 303(a)(5)(A) of HAVA.

**RESPONSE:**

2.     Identify all septs or actions you have taken to determine if those persons identified in Interrogatory Number 1 have either a social security number or driver's license number.

**RESPONSE:**

3.     Identify all steps or actions you have taken to determine if those persons identified in Interrogatory Number 1 are in fact eligible to vote under all relevant North Carolina and Federal laws.

**RESPONSE:**

4.     Identify all steps or actions you will take if any of those persons identified in Interrogatory Number 1 attempt to vote in a future election.

**RESPONSE:**

**JA91**

10

5.      Is it your contention that you are unable or somehow prohibited from contacting those persons identified in Interrogatory Number 1 and requesting they provide either the last four digits of their social security number or their driver's license number? If so, explain the complete basis for your contention therein.

**RESPONSE:**

6.      Identify exactly how long you used the voter registration form identified in both the Complaint and in Carol Snow's amended complaint as described further therein.

**RESPONSE:**

7.      Identify all steps or actions you have taken to maintain the state's computerized voter registration list in accordance with N.C. Gen. Stat. §163-82.11 *et seq.*

**RESPONSE:**

**JA92**

11

8.      Describe all directives, actions, instructions, or other guidance you provide to County Boards of Election on what steps or actions they should take when they receive a voter registration application which lacks both a driver's license number and a social security number.

**RESPONSE:**

## REQUESTS FOR PRODUCTION

1.      Produce all documents relied upon in answering the foregoing interrogatories.

**RESPONSE:**

2.      Produce the statewide computerized voter registration list or other document(s) used in identifying the persons listed in Interrogatory Number 1.

**RESPONSE:**

3.      Produce all documents or correspondence relating to directives given to county boards of elections or other persons or parties tasked with processing and/or accepting voter registration applications regarding your instructions on what to do with an application when it does not contain either the last four digits of the applicant's social security number or their driver's license number.

**RESPONSE:**

**JA93**

12

4.    Produce all documents or correspondence relating to Carol Snow's amended complaint as identified and described more fully in the Complaint for the above-captioned matter. This request includes but is not limited to any investigations into Ms. Snow's allegations contained therein.

**RESPONSE:**

This, the 29th day of August, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/  Phillip J. Strach

Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, PC**

By: /s/   John E. Branch, III

John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

**JA94**

13

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 29th day of August, 2024, a true and accurate copy of the same was served via email to the addresses listed below.

Terrence Steed
Mary Carla Babb
Tsteed@ncdoj.gov
MCBabb@ncdoj.gov
*Counsel for Defendants*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/  Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**JA95**

14

EXHIBIT N

STATE OF NORTH CAROLINA

WAKE COUNTY

REPUBLICAN NATIONAL
COMMITTEE; and NORTH CAROLINA
REPUBLICAN PARTY,

        Plaintiffs,

   v.

NORTH CAROLINA STATE BOARD
OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as
Executive Director of the North Carolina
State Board of Elections; ALAN
HIRSCH, in his official capacity as Chair
of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North
Carolina State Board of Elections;
STACY EGGERS IV, KEVIN N.
LEWIS, and SIOBHAN O'DUFFY
MILLEN, in their official capacities as
members of the North Carolina State
Board of Elections,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24CV026995-910

**MOTION TO INTERVENE
BY THE DEMOCRATIC NATIONAL
COMMITTEE**

      The Democratic National Committee ("DNC") is the nationwide coalition of voters, volunteers, party officers, and elected officials dedicated to strengthening our democracy and preserving every voter's right to vote. The Republican National Committee ("RNC") and North Carolina Republican Party ("NCRP") threaten that purpose with this lawsuit. They seek to disenfranchise 225,000 North Carolinians not because those voters did anything wrong, but because—according to them—small portions of North Carolina's approved voter registration form were improperly color coded. Their claims are unsupported by state or federal law, and their

**JA97**

request to disenfranchise voters on the eve of an election is expressly prohibited by the National Voter Registration Act.

Many of the 225,000 North Carolinians targeted by the RNC belong to the broad coalition of Democrats, Republicans, independents, and third-party voters who intend to cast votes for Democratic candidates this fall. The DNC therefore respectfully moves to intervene in this lawsuit pursuant to North Carolina Rule of Civil Procedure 24. The DNC moves to intervene in this case as a matter of right, or in the alternative by permission, to protect its unique interests in North Carolina's 2024 general election being conducted in accordance with North Carolina and federal law.

1.      Rule 24(a)(2) of the North Carolina Rules of Civil Procedure allows a timely movant that makes three showings to intervene in a civil action as of right. N.C. Gen. Stat. § 1A-1, Rule 24(a)(2). Specifically, intervention as of right requires the movant to show that "(1) it has a direct and immediate interest relating to the property or transaction, (2) denying intervention would result in a practical impairment of the protection of that interest, and (3) there is inadequate representation of that interest by existing parties." *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 459, 515 S.E.2d 675, 683 (1999). These three requirements are satisfied in this case, so intervention of right should (indeed must) be allowed.

2.      This motion, filed just seven days after Plaintiffs filed their Complaint, is timely.

3.      The DNC—the oldest continuing party committee in the United States—is the Democratic Party's national committee as defined by 52 U.S.C. §30101(14). The DNC's organizational purposes and functions are to communicate the Democratic Party's position and messages on issues; protect voters' rights; and aid and encourage the election of Democratic candidates at the national, state, and local levels, including by persuading and organizing citizens

not only to register to vote as Democrats but also to cast their ballots for Democratic nominees and candidates. The DNC's leadership is composed of the chair, vice chairs, and over 200 members elected by Democrats in every U.S. state and territory and the District of Columbia, including North Carolina.

4.     As a political organization representing and campaigning for candidates standing for office in the upcoming election, the DNC has a clear and direct interest in the election and its proper administration. *See James v. Bartlett*, 359 N.C. 260, 263 n.2, 607 S.E.2d 638, 640 n.2 (2005); *cf. Libertarian Party of N.C. v. State*, 200 N.C. App. 323, 324, 688 S.E.2d 700, 703 (2009), *aff'd as modified*, 365 N.C. 41, 707 S.E.2d 199 (2011). The DNC has dedicated significant resources to encouraging its supporters and constituents in North Carolina to register and to vote in the upcoming election, including through door knocking, text messaging, phone banking, mailed advertising, and digital advertising targeting counties across North Carolina. The DNC has a substantial interest in protecting the right of its members who do choose to vote (and of others who will support Democratic candidates) to have those votes counted in accordance with federal and North Carolina law. These members include individuals qualified to vote in (and candidates for offices in) every county in this state.

5.     The complaint challenges the administration of the election by seeking to invalidate the voter registrations (and, by extension, the lawful votes) of 225,000 North Carolinians. Such a challenge is a practical impairment to the DNC's interests in running successful campaigns to elect its candidates to public office. It is also contrary to "the object of elections," which is "to ascertain the popular will, and not to thwart it." *Owens v. Chaplin*, 228 N.C. 705, 711, 47 S.E.2d 12, 17 (1948). And it is contrary to another "object of election laws," which is "to secure the rights of duly-qualified electors, and not to defeat them." *Id.*

**JA99**

3

6.      The relief the complaint seeks would require the DNC to expend and divert funds and resources that it would otherwise spend on voter outreach and mobilization efforts toward informing and educating voters about their rights under federal and North Carolina law, in order to ensure that those voters are not erroneously prevented from voting or removed from the voting rolls.  The likely erroneous denial of Democratic voters' right to cast a ballot and have it counted, and the likely erroneous removal of Democratic voters from the voting rolls, each further injures the DNC by reducing the number of registered Democrats able to cast a ballot in North Carolina that will be counted.

7.      The RNC alleges that disenfranchising 225,000 North Carolina voters will give it a competitive advantage in this year's general election.  The DNC has a mirror-image interest in ensuring that eligible voters can cast votes for Democratic candidates.

8.      The parties in this action do not adequately represent the DNC's interests in seeing Democratic candidates elected.  Respondents are public officeholders focused on efficient administration of elections.  They do not share the DNC's particularized interest in helping Democratic candidates win elections or its members' particularized interest in ensuring that their votes are each counted.  The DNC thus should be allowed to represent its interests as of right in this action.

9.      In recognition of the DNC's substantial interests in the outcome of cases affecting the electoral rights of Democratic voters, courts across the country routinely grant intervention to political party committees such as the DNC in cases like this—particularly cases that threaten to undermine the ability of one party's voters to vote or harm the electoral prospects of the party's candidates.  For example, the U.S. Court of Appeals for the Third Circuit recently granted the motion of the DNC and other Democratic Party committees to intervene in a lawsuit challenging

**JA100**

4

a Pennsylvania state voting requirement as violating the federal Voting Rights Act. Order Granting Motion To Proceed As Intervenor, *Pennsylvania State Conference of NAACP Branches v. Northampton County Board of Elections*, No. 23-03166 (3d Cir. Dec. 7, 2023). Other such cases are legion.[1]

10.    In the alternative, the DNC should be granted permissive intervention. N.C. Gen. Stat. § 1A-1, Rule 24(b)(2). For the reasons stated above, the DNC's defenses raise common questions of law and fact as those presently pending in this case. And the DNC will abide by whatever schedules and deadlines this Court sets for the original parties. Intervention therefore will not delay or prejudice the adjudication of the rights of those parties.

11.    Pursuant to Rule 24(c) of the North Carolina Rules of Civil Procedure, attached as Exhibit A is an answer that the DNC would file if intervention is granted.

12.    The DNC has conferred with the parties regarding their respective positions on the motion. Defense counsel stated that Defendants consent to the DNC's request to intervene. Plaintiffs' counsel indicated that Plaintiffs would consider the DNC's request and would provide a response to the DNC the following week.

---

[1] *E.g.*, *Paher v. Cegavske*, 2020 WL 2042365, at *4 (D. Nev. Apr. 28, 2020) (granting the DNC intervention in an election-law case brought by a conservative interest group); Order (ECF No. 35), *Donald J. Trump for President v. Bullock*, No. 6:20-cv-66 (D. Mont. Sept. 8, 2020) (granting the Democratic Congressional Campaign Committee ("DCCC"), the Democratic Senatorial Campaign Committee, and the Montana Democratic Party intervention in a lawsuit brought by four Republican party entities); *Donald J. Trump for President*, *Inc. v. Murphy*, 2020 WL 5229209, at *1 (D.N.J. Sept. 1, 2020) (granting the DCCC intervention in a lawsuit by a Republican candidate and party entities); Minute Entry (ECF No. 37), *Cook County Republican Party v. Pritzker*, No. 20-cv-4676 (N.D. Ill. Aug. 28, 2020) (granting the DCCC intervention in a lawsuit by a Republican party entity); *Issa v. Newsom*, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020) (granting the DCCC and the California Democratic Party intervention in a lawsuit by a Republican congressional candidate).

**JA101**

WHEREFORE, the DNC respectfully requests that the Court grant its motion, allow it to intervene in this matter, and grant such other and further relief as the Court deem just and proper.

Respectfully submitted, this 30th day of August, 2024.

| | |
|---|---|
| SETH P. WAXMAN* | /s/ Jim W. Phillips, Jr. |
| DANIEL S. VOLCHOK* | JIM W. PHILLIPS, JR. |
| CHRISTOPHER E. BABBITT* | N.C. BAR NO. 12516 |
| GARY M. FOX* | SHANA L. FULTON |
| JOSEPH M. MEYER* | N.C. BAR NO. 27836 |
| JANE KESSNER* | WILLIAM A. ROBERTSON |
| NITISHA BARONIA* | N.C. BAR NO. 53589 |
| WILMER CUTLER PICKERING | JAMES W. WHALEN |
|   HALE AND DORR LLP | N.C. Bar No. 58477 |
| 2100 Pennsylvania Avenue N.W. | BROOKS, PIERCE, MCLENDON |
| Washington, D.C. 20037 |   HUMPHREY & LEONARD, LLP |
| Phone: (202) 663-6000 | 150 Fayetteville Street |
| Fax: (202) 663-6363 | 1700 Wells Fargo Capitol Center |
| seth.waxman@wilmerhale.com | Raleigh, N.C. 27601 |
| daniel.volchok@wilmerhale.com | Phone: (919) 839-0300 |
| christopher.babbitt@wilmerhale.com | Fax: (919) 839-0304 |
| gary.fox@wilmerhale.com | jphillips@brookspierce.com |
| jane.kessner@wilmerhale.com | sfulton@brookspierce.com |
| nitisha.baronia@wilmerhale.com | wrobertson@brookspierce.com |
| joseph.meyer@wilmerhale.com | jwhalen@brookspierce.com |
| (*Pro Hac Vice application forthcoming) | |

**JA102**

6

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was served by electronic mail upon the following:

Philip J. Strach
phil.strach@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com

John E. Branch, III
jbranch@bakerdonelson.com
Thomas G. Hooper
thooper@bakerdonelson.com

*Counsel for Plaintiffs Republican National Committee and North Carolina Republican Party*

Mary Carla Babb
mcbabb@ncdoj.gov

*Counsel for Defendants North Carolina State Board of Elections, Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen*

This the 30th day of August, 2024.

/s/ William A. Robertson
William A. Robertson

**JA103**

# EXHIBIT A

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24cv026995-910

REPUBLICAN NATIONAL
COMMITTEE; and NORTH CAROLINA
REPUBLICAN PARTY,

            Plaintiffs,

    v.

NORTH CAROLINA STATE BOARD
OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as
Executive Director of the North Carolina
State Board of Elections; ALAN
HIRSCH, in his official capacity as Chair
of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North
Carolina State Board of Elections;
STACY EGGERS IV, KEVIN N.
LEWIS, and SIOBHAN O'DUFFY
MILLEN, in their official capacities as
members of the North Carolina State
Board of Elections,

            Defendants,

    v.

DEMOCRATIC NATIONAL
COMMITTEE and NORTH CAROLINA
DEMOCRATIC PARTY

            Intervenor Defendants.

**PROPOSED MOTION TO DISMISS,
ANSWER AND AFFIRMATIVE DEFENSES
BY INTERVENOR-DEFENDANT
THE DEMOCRATIC NATIONAL
COMMITTEE**

**(JURY TRIAL DEMANDED)**

Intervenor-Defendant the Democratic National Committee ("DNC"), pursuant to Rules 8
and 12 of the North Carolina Rules of Civil Procedure, respectfully submits the following motion
to dismiss, answer, and affirmative defenses to the complaint of plaintiffs the Republican National
Committee ("RNC") and the North Carolina Republican Party ("NCRP").

**JA105**

## MOTION TO DISMISS

The DNC moves to dismiss Plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and for failure to join necessary parties pursuant to Rule 12(b)(7) of the North Carolina Rules of Civil Procedure.

## ANSWER TO COMPLAINT

The DNC answers each of the numbered paragraphs in the complaint as follows:

1.      The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

2.      Denied.

3.      Denied.

4.      Denied.

5.      Denied on information and belief.

6.      Denied.

7.      Denied.

8.      Denied.

9.      Denied.

10.     Denied.

11.     It is admitted that the RNC is the national committee for the Republican Party as defined by 52 U.S.C. § 30101(14) and a political party as defined by N.C. Gen. Stat. § 163-96, and that its principal place of business is 310 First Street SE, Washington, D.C. Except as explicitly admitted, the allegations of this paragraph are denied.

12.     Denied. On information and belief, there is no recent rise in non-citizens and other unqualified persons voting. On information and belief, the RNC's efforts are not intended to

**JA106**

2

"ensure that the votes and voices of its members, its candidates, and the party are not silenced or diluted," but rather to use false claims to undermine the public's confidence in our nation's safe and secure elections.

13.     It is admitted that the NCRP is a state committee of the Republican Party as defined by 52 U.S.C. § 30101(15) and a political party as defined by N.C. Gen. Stat. § 163-96, and that its principal place of business is 1506 Hillsborough St, Raleigh, N.C. 27605. Except as explicitly admitted, the allegations of this paragraph are denied.

14.     Denied on information and belief.

15.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

16.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

17.     Denied.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

**JA107**

3

26.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

27.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

28.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

29.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

30.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

31.     Denied.

32.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

33.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

34.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

35.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

36.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

37.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

38.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

39.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

40.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

41.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

42.     Denied on information and belief.

43.     Denied on information and belief.

44.     Denied.

45.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

46.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

47.     Denied.

48.     It is admitted that Carol Snow filed a complaint with the State Board on October 6, 2023 ("Snow complaint"). Except as expressly admitted, the allegations of this paragraph are denied.

49.     It is admitted that the Snow complaint is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

**JA109**

5

50.     It is admitted that the Snow complaint is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

51.     It is admitted that the State Board met on November 28, 2023 and issued an order on December 6, 2023. It is further admitted that State Board's order is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

52.     Denied.

53.     Denied.

54.     This paragraph characterizes the State Board's December 6, 2023, order. That written document speaks for itself, and the DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

55.     This paragraph characterizes the State Board's December 6, 2023, order. That written document speaks for itself, and the DNC denies all allegations that are inconsistent with the referenced document. The allegations of this paragraph state legal conclusions to which no answer is required. Except as expressly admitted, the allegations of this paragraph are denied.

56.     It is admitted, upon information and belief, that Ms. Snow attended and spoke at the State Board's meetings on March 11 and April 11, 2024. Except as expressly admitted, the allegations of this paragraph are denied.

57.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

**JA110**

58.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

59.    Denied on information and belief.

60.    Denied.

61.    Denied.

62.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

63.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

64.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

65.    Denied.

66.    Denied.

67.    Denied on information and belief.

68.    Denied on information and belief.

69.    Denied.

70.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

71.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

72.    Admitted.

73.    It is admitted that North Carolina county boards of elections collect additional information from some voters who vote provisional ballots on election day. Except as expressly admitted, the allegations of this paragraph are denied.

74.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

75.    Denied.

76.    Denied.

77.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

78.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

79.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

80.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

81.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

82.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

83.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

84.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

85.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

86.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

87.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that plaintiffs lacked alternative remedies.

88.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

89.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

90.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

91.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

92.     Denied on information and belief.

93.     Denied on information and belief.

94.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that the conduct alleged in the complaint allowed ineligible voters to remain on voter rolls or that the mere presence of ineligible voters on voter rolls dilutes legitimate votes.

95.     Denied.

96.     Denied.

*Except as expressly admitted herein, the DNC generally denies all the allegations of the complaint in their entirety and demands strict proof of the same.*

## AFFIRMATIVE OR ADDITIONAL DEFENSES

Having fully answered the complaint, the DNC pleads the following defenses and/or affirmative defenses without waiving any arguments that it may be entitled to assert regarding the burden of proof, legal presumptions, or other legal characterizations. The DNC expressly reserves the right to plead additional defenses and other matters of defense to the complaint by way of amendment after further discovery and investigation is complete.

## FIRST DEFENSE

Plaintiffs are not entitled to relief under the Help America Vote Act, 52 U.S.C. § 20501 et seq.

**JA114**

**SECOND DEFENSE**

Plaintiffs' claims are barred by the National Voter Registration Act, 52 U.S.C.
§ 20507(c)(2)(A).

**THIRD DEFENSE**

Plaintiffs' claims are barred by the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

**FOURTH DEFENSE**

Plaintiffs' claims are barred by the Fourteenth Amendment to the United States
Constitution and Article I, §§ 1 and 19 of the North Carolina Constitution.

**FIFTH DEFENSE**

Plaintiffs' claims are barred because N.C. Gen. Stat. § 163-82.11(c) does not impose a
mandatory non-discretionary duty, rendering mandamus unavailable as a remedy.

**SIXTH DEFENSE**

Plaintiffs' claims are barred they do not meet any of the factors necessary for issuance of
an injunction.

**SEVENTH DEFENSE**

Plaintiffs' claims fail to comply with the requirements of state law regarding challenges
to voter registrations. Among other things, Plaintiffs have failed to use the prescribed statutory
process for challenging voter registrations in an effort to circumvent the State Board's authority
under N.C. Gen. Stat. § 163-22 and failed to join the voters they seek to disenfranchise in this
lawsuit.

**EIGHTH DEFENSE**

Plaintiffs' claims are barred in whole or in part by the doctrines of claim preclusion and
issue preclusion.

**JA115**

11

**NINTH DEFENSE**

Plaintiffs' requested relief is barred by the doctrines of estoppel, laches, waiver, ratification, and the doctrine of unclean hands.

**PRAYER FOR RELIEF**

Wherefore, the DNC, having moved to dismiss, answered, and otherwise responded to the Complaint, respectfully prays unto the Court:

1. That plaintiffs' claims be dismissed with prejudice;

2. For a trial by jury on all issues so triable;

3. To tax the costs of this action against plaintiffs; and

4. For such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 30th day of August, 2024.

SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
GARY M. FOX[*]
JOSEPH M. MEYER[*]
JANE KESSNER[*]
NITISHA BARONIA[*]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
joseph.meyer@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
(*Pro Hac Vice application forthcoming)

/s/ Jim W. Phillips, Jr.
JIM W. PHILLIPS, JR.
N.C. BAR NO. 12516
SHANA L. FULTON
N.C. BAR NO. 27836
WILLIAM A. ROBERTSON
N.C. BAR NO. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

*Counsel for Defendant-Intervenor the Democratic National Committee*

**JA116**

12

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was served by electronic mail upon the following:

> Philip J. Strach
> phil.strach@nelsonmullins.com
> Jordan A. Koonts
> jordan.koonts@nelsonmullins.com
>
> John E. Branch, III
> jbranch@bakerdonelson.com
> Thomas G. Hooper
> thooper@bakerdonelson.com
>
> *Counsel for Plaintiffs Republican National Committee and North Carolina Republican Party*
>
> Mary Carla Babb
> mcbabb@ncdoj.gov
>
> *Counsel for Defendants North Carolina State Board of Elections, Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen*

This the 30th day of August, 2024.

> /s/ William A. Robertson
> William A. Robertson

**JA117**

13

# EXHIBIT O

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV026995-910

REPUBLICAN NATIONAL COMMITTEE and
NORTH CAROLINA REPUBLICAN PARTY

Plaintiffs,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

Defendants.

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Terence Steed, Special Deputy Attorney General, enters

his Notice of Appearance on behalf of Defendants North Carolina State Board of Elections,

Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers, IV, Kevin N. Lewis, and Siobhan

O'Duffy Millen, reserving all rights to raise jurisdictional defenses at a later date.  By this Notice

of Appearance, the undersigned requests that he receive all notices from the Court and all papers

served by the parties hereto.

Respectfully submitted this the 4th day of September, 2024.

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov
North Carolina Dept. of Justice
Post Office Box 629
Raleigh, N.C. 27602
Tele No.: (919) 716-6900
Fax No.: (919) 716-6763
*Counsel for State Board Defendants*

**JA119**

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this day served the foregoing NOTICE OF

APPEARANCE in the above-titled action upon all parties to this cause by electronic mail as

follows:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley & Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McClendon, Humphrey, and Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capital Center
Raleigh, NC 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

*Counsel for Defendant-Intervenor the Democratic National Committee*

**JA120**

This the 4th day of September, 2024.

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General

EXHIBIT P

FILED
DATE:September 12, 2024
TIME: 09/12/2024 9:01:39 AM
WAKE COUNTY
SUPERIOR COURT JUDGES OFFICE
BY:S. Smallwood

STATE OF NORTH CAROLINA                   IN THE GENERAL COURT OF JUSTICE
                                          SUPERIOR COURT DIVISION
WAKE COUNTY                               No. 24CV026995-910

REPUBLICAN NATIONAL
COMMITTEE; and NORTH CAROLINA
REPUBLICAN PARTY,

            Plaintiffs,

      v.

NORTH CAROLINA STATE BOARD
OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as          **UNOPPOSED ORDER ON MOTION TO**
Executive Director of the North Carolina        **INTERVENE**
State Board of Elections; ALAN             **BY THE DEMOCRATIC NATIONAL**
HIRSCH, in his official capacity as Chair           **COMMITTEE**
of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North
Carolina State Board of Elections;
STACY EGGERS IV, KEVIN N.
LEWIS, and SIOBHAN O'DUFFY
MILLEN, in their official capacities as
members of the North Carolina State
Board of Elections,

            Defendants.

THIS CAUSE comes before the undersigned Superior Court Judge on the Democratic

National Committee's ("DNC") motion to intervene (filed August 30, 2024) (the "Motion"). The

Court has reviewed the motion and proposed pleading, the file, and the relevant law. Furthermore,

Plaintiffs and Defendants do not oppose the relief sought by the DNC in its motion. It appears to

the Court that the DNC's Motion should be granted.

**JA123**

IT IS THEREFORE ORDERED that the DNC's Motion to Intervene is GRANTED. Within three days of the filing of this Order, the DNC shall file its answer in intervention on the docket.

SO ORDERED, this the ___10th___ day of September, 2024.

_____
Superior Court Judge Presiding

9/10/2024 10:12:57 PM

**JA124**

2

# EXHIBIT Q

STATE OF NORTH CAROLINA

WAKE COUNTY

REPUBLICAN NATIONAL COMMITTEE;
and NORTH CAROLINA REPUBLICAN
PARTY,

          Plaintiffs,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL, in
her official capacity as Executive Director of
the North Carolina State Board of Elections;
ALAN HIRSCH, in his official capacity as
Chair of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North Carolina
State Board of Elections; STACY EGGERS
IV, KEVIN N. LEWIS, and SIOBHAN
O'DUFFY MILLEN, in their official
capacities as members of the North Carolina
State Board of Elections,

          Defendants,

   and

DEMOCRATIC NATIONAL COMMITTEE,

          Intervenor-Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24cv026995-910

**MOTION TO DISMISS, ANSWER AND
AFFIRMATIVE DEFENSES BY
INTERVENOR-DEFENDANT
THE DEMOCRATIC NATIONAL
COMMITTEE**

**(JURY TRIAL DEMANDED)**

Intervenor-Defendant the Democratic National Committee ("DNC"), pursuant to Rules 8 and 12 of the North Carolina Rules of Civil Procedure, respectfully submits the following motion to dismiss, answer, and affirmative defenses to the complaint of plaintiffs the Republican National Committee ("RNC") and the North Carolina Republican Party ("NCRP").

**JA126**

## MOTION TO DISMISS

The DNC moves to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and for failure to join necessary parties pursuant to Rule 12(b)(7) of the North Carolina Rules of Civil Procedure.

## ANSWER TO COMPLAINT

The DNC answers each of the numbered paragraphs in the complaint as follows:

1.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

2.     Denied.

3.     Denied.

4.     Denied.

5.     Denied on information and belief.

6.     Denied.

7.     Denied.

8.     Denied.

9.     Denied.

10.    Denied.

11.    It is admitted that the RNC is the national committee for the Republican Party as defined by 52 U.S.C. § 30101(14) and a political party as defined by N.C. Gen. Stat. § 163-96, and that its principal place of business is 310 First Street SE, Washington, D.C. Except as explicitly admitted, the allegations of this paragraph are denied.

12.    Denied. On information and belief, there is no recent rise in non-citizens and other unqualified persons voting. On information and belief, the RNC's efforts are not intended to

**JA127**

2

"ensure that the votes and voices of its members, its candidates, and the party are not silenced or diluted," but rather to undermine the public's confidence in our nation's safe and secure elections.

13.     It is admitted that the NCRP is a state committee of the Republican Party as defined by 52 U.S.C. § 30101(15) and a political party as defined by N.C. Gen. Stat. § 163-96, and that its principal place of business is 1506 Hillsborough St, Raleigh, N.C. 27605. Except as explicitly admitted, the allegations of this paragraph are denied.

14.     Denied on information and belief.

15.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

16.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

17.     Denied.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

26.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

27.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

28.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

29.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

30.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

31.     Denied.

32.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

33.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

34.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

35.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

36.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

37.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

38.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

39.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

40.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

41.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

42.    Denied on information and belief.

43.    Denied on information and belief.

44.    Denied.

45.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

46.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

47.    Denied.

48.    It is admitted that Carol Snow filed a complaint with the State Board on October 6, 2023 ("Snow complaint"). Except as expressly admitted, the allegations of this paragraph are denied.

49.    It is admitted that the Snow complaint is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

50.    It is admitted that the Snow complaint is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

**JA130**

51.     It is admitted that the State Board met on November 28, 2023 and issued an order on December 6, 2023. It is further admitted that State Board's order is a written document, the content of which speaks for itself. The DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

52.     Denied.

53.     Denied.

54.     This paragraph characterizes the State Board's December 6, 2023, order. That written document speaks for itself, and the DNC denies all allegations that are inconsistent with the referenced document. Except as expressly admitted, the allegations of this paragraph are denied.

55.     This paragraph characterizes the State Board's December 6, 2023, order. That written document speaks for itself, and the DNC denies all allegations that are inconsistent with the referenced document. The allegations of this paragraph state legal conclusions to which no answer is required. Except as expressly admitted, the allegations of this paragraph are denied.

56.     It is admitted, upon information and belief, that Ms. Snow attended and spoke at the State Board's meetings on March 11 and April 11, 2024. Except as expressly admitted, the allegations of this paragraph are denied.

57.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

58.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

59.     Denied on information and belief.

60.     Denied.

**JA131**

61.    Denied.

62.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

63.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

64.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

65.    Denied.

66.    Denied.

67.    Denied on information and belief.

68.    Denied on information and belief.

69.    Denied.

70.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

71.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

72.    Admitted.

73.    It is admitted that North Carolina county boards of elections collect additional information from some voters who vote provisional ballots on election day. Except as expressly admitted, the allegations of this paragraph are denied.

74.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations of this paragraph are denied.

75.    Denied.

**JA132**

76.     Denied.

77.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

78.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

79.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

80.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

81.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

82.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

83.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

84.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied.

85.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

**JA133**

86.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

87.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that plaintiffs lacked alternative remedies.

88.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

89.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

90.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

91.     The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that federal law permits the State Board to systematically remove registered voters from the voter-registration list within 90 days of any federal election.

92.     Denied on information and belief.

93.     Denied on information and belief.

94.    The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent a response is required, the allegations in this paragraph are denied. It is expressly denied that the conduct alleged in the complaint allowed ineligible voters to remain on voter rolls or that the mere presence of ineligible voters on voter rolls dilutes legitimate votes.

95.    Denied.

96.    Denied.

*Except as expressly admitted herein, the DNC generally denies all the allegations of the complaint in their entirety and demands strict proof of the same.*

## AFFIRMATIVE OR ADDITIONAL DEFENSES

Having fully answered the complaint, the DNC pleads the following defenses and/or affirmative defenses without waiving any arguments that it may be entitled to assert regarding the burden of proof, legal presumptions, or other legal characterizations. The DNC expressly reserves the right to plead additional defenses and other matters of defense to the complaint by way of amendment after further discovery and investigation is complete.

### FIRST DEFENSE

Plaintiffs are not entitled to relief under the Help America Vote Act, 52 U.S.C. § 20501 et seq.

### SECOND DEFENSE

Plaintiffs' claims are barred by the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A).

### THIRD DEFENSE

Plaintiffs' claims are barred by the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

**JA135**

**FOURTH DEFENSE**

Plaintiffs' claims are barred by the Fourteenth Amendment to the United States Constitution and Article I, §§ 1 and 19 of the North Carolina Constitution.

**FIFTH DEFENSE**

Plaintiffs' claims are barred because N.C. Gen. Stat. § 163-82.11(c) does not impose a mandatory non-discretionary duty, rendering mandamus unavailable as a remedy.

**SIXTH DEFENSE**

Plaintiffs' claims are barred they do not meet any of the factors necessary for issuance of an injunction.

**SEVENTH DEFENSE**

Plaintiffs' claims fail to comply with the requirements of state law regarding challenges to voter registrations. Among other things, plaintiffs have failed to use the prescribed statutory process for challenging voter registrations in an effort to circumvent the State Board's authority under N.C. Gen. Stat. § 163-22 and failed to join the voters they seek to disenfranchise in this lawsuit.

**EIGHTH DEFENSE**

Plaintiffs' claims are barred in whole or in part by the doctrines of claim preclusion and issue preclusion.

**NINTH DEFENSE**

Plaintiffs' requested relief is barred by the doctrines of estoppel, laches, waiver, ratification, and the doctrine of unclean hands.

## PRAYER FOR RELIEF

Wherefore, the DNC, having moved to dismiss, answered, and otherwise responded to the

Complaint, respectfully prays unto the Court:

1.  That plaintiffs' claims be dismissed with prejudice;

2.  For a trial by jury on all issues so triable;

3.  To tax the costs of this action against plaintiffs; and

4.  For such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 12th day of September, 2024.

/s/ Jim W. Phillips, Jr.

SETH P. WAXMAN*
DANIEL S. VOLCHOK*
CHRISTOPHER E. BABBITT*
GARY M. FOX*
JOSEPH M. MEYER*
JANE KESSNER*
NITISHA BARONIA*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
joseph.meyer@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
(*Pro Hac Vice application forthcoming)

JIM W. PHILLIPS, JR.
N.C. BAR NO. 12516
SHANA L. FULTON
N.C. BAR NO. 27836
WILLIAM A. ROBERTSON
N.C. BAR NO. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON
    HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

*Counsel for Defendant-Intervenor the
Democratic National Committee*

**JA137**

12

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served by electronic mail upon the following:

Philip J. Strach
phil.strach@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com

John E. Branch, III
jbranch@bakerdonelson.com
Thomas G. Hooper
thooper@bakerdonelson.com

*Counsel for Plaintiffs Republican National Committee and North Carolina Republican Party*

Mary Carla Babb
mcbabb@ncdoj.gov
Terence Steed
tsteed@ncdoj.gov

*Counsel for Defendants North Carolina State Board of Elections, Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen*

This the 12th day of September, 2024.

/s/ William A. Robertson
William A. Robertson

**JA138**

13

# EXHIBIT R

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24CV026995-910

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants.* | **MOTION TO INTERVENE AS DEFENDANTS AND TO EXPEDITE CONSIDERATION OF SAME** |

NOW COME Proposed Intervenors North Carolina State Conference of the NAACP ("North Carolina NAACP") and Jackson Sailor Jones pursuant to Rule 24(a)(2) of the North Carolina Rules of Civil Procedure move to intervene as of right as Defendants in this matter, or in the alternative, move for permissive intervention pursuant to Rule 24(b). Pursuant to Rule 24(c), an unsigned proposed Answer by Proposed Intervenors is attached hereto as **Exhibit A**. In support of their Motion, Proposed Intervenors show the Court as follows:

## INTRODUCTION AND BACKGROUND

Plaintiffs seek to quickly force Defendants to identify and remove approximately 225,000 North Carolinian voters from the state's voter registration rolls less than sixty-five days before the

**JA140**

2024 presidential election. Plaintiffs' request, on the eve of the impending General Election, is unprecedented and improper. The action is founded on the unsupported belief that every one of these 225,000 voters is "ineligible" because they allegedly did not include their driver's license number or Social Security number on their voter registration forms when registering to vote. The notion that these voters are "unlawfully" registered to vote and therefore must be purged is patently false. The exclusion of this information from many individuals' voter registration forms is largely due to a simple fact—until December 2023, North Carolina's voter registration forms made this information *optional* rather than *mandatory*. This cannot and does not justify purging individual voters, who would find themselves kicked off of the rolls through no fault of their own.

Proposed Intervenor North Carolina NAACP seeks to intervene on behalf of its members, some of whom are also directly implicated by the present Complaint. Plaintiffs' requested relief would not only deny these members of their right to vote, it would also cause North Carolina NAACP to divert organizational resources from its voter mobilization and election protection efforts to identify, contact, and assist voters affected by the Complaint in time to participate in the upcoming 2024 General Election. Proposed Individual Intervenor Jackson Sailor Jones is an eligible North Carolina voter directly implicated by the present Complaint, by which Plaintiffs' requested relief would strip him of his right to vote.

The existing Defendants do not adequately represent Proposed Intervenors' interests here. They necessarily represent the interests of the government, which has a wide array of constituents who may not have the same needs as the 225,000 vulnerable voters targeted by Plaintiffs' requested purge. Furthermore, the Democratic National Committee ("DNC"), intervening on behalf of the Democratic Party to defend the specific interests of Democratic voters and candidates, cannot adequately represent Proposed Intervenors' interests. Proposed Intervenors seek to protect their

**JA141**

2

own fundamental right, and the right of North Carolina NAACP's members and the voters it has engaged in the political process on a nonpartisan basis, to have their voices heard on Election Day.

In sum, Plaintiffs' assertion that Defendants' actions will "jeopardize the individual right to vote that is guaranteed to every qualified voter in North Carolina," Compl. ¶ 9, is unjustified and clearly false. In fact, it is Plaintiffs, not Defendants, that jeopardize the fundamental right to vote of eligible citizens of this state in filing a request for *en masse* removal of voters from North Carolina's voter rolls on the eve of the 2024 General Election and mere days before voting is to begin. Eligible North Carolina voters, including Proposed Intervenor Jones and members of the North Carolina NAACP, risk having their registrations canceled and their right to vote denied or unlawfully subject to casting provisional ballots.

Because Proposed Intervenors satisfy each requirement for intervention as a matter of right under North Carolina Rule of Civil Procedure 24(a)(2), the Court should grant their motion to intervene. Alternatively, the motion should be granted on a permissive basis under Rule 24(b)(2).

## **ARGUMENT**

### I.     **Proposed Intervenors Are Entitled to Intervene as a Matter of Right.**

Proposed Intervenors meet all the requirements under Rule 24(a)(2) of the North Carolina Rules of Civil Procedure, which permits intervention as of right "upon timely application," "[w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." *See Alford v. Davis*, 131 N.C. App. 214, 217 (1998) (citing N.C.R. Civ. P. 24(a)(2)). North Carolina's Rule 24 "is virtually identical to Rule 24 of the Federal Rules of Civil Procedure," and North Carolina courts "look to the federal court decisions for guidance." *Nicholson v. F. Hoffmann-Laroche, Ltd.*, 156 N.C. App. 206, 208 (2003) (quotations omitted). The

**JA142**

Fourth Circuit has stated that "liberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (quotation omitted). Proposed Intervenors meet each of Rule 24(a)(2)'s requirements and are thus entitled to intervene in this case.

### A.     The Motion to Intervene Is Timely.

*First*, the Motion is timely. In determining the timeliness of a motion to intervene, the trial court must consider "(1) the status of the case, (2) the possibility of unfairness or prejudice to the existing parties, (3) the reason for the delay in moving for intervention, (4) the resulting prejudice to the applicant if the motion is denied, and (5) any unusual circumstances." *Procter v. City of Raleigh Bd. of Adjustment*, 133 N.C. App. 181, 183 (1999) (citing *State Emps. Credit Union, Inc. v. Gentry*, 75 N.C. App. 260, 264 (1985) (holding "motions to intervene made prior to trial are seldom denied" due to lack of timeliness).

The Complaint in this action was filed less than two weeks ago, on August 23, 2024. To date, no hearings have occurred nor have any briefs on the merits of Plaintiffs' claims been filed. Proposed Intervenors have not delayed in moving to intervene and there are no unusual circumstances in the case that would warrant denying intervention. Indeed, as described in further detail below, granting the proposed Motion would not prejudice the existing parties whereas denying the proposed Motion would prejudice Proposed Intervenors' interests.

### B.     The Disposition of This Case Will Impede the Ability of Proposed Intervenors to Protect Their Fundamental Voting Rights.

*Second*, Proposed Intervenors have a direct interest in the disposition of this action. An intervenor's interest is sufficient for intervention purposes if it is of "such direct and immediate character that he will either gain or lose by the direct operation and effect of the judgment."

**JA143**

*Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 459 (1999) (quoting *Strickland v. Hughes*, 273 N.C. 481, 485 (1968)). Proposed Intervenor Jones and those members of North Carolina NAACP who purportedly lack a driver's license or Social Security number in their voter files, are directly implicated by the present Complaint.

North Carolina NAACP has 70 adult branches and numerous students and youth branches, composed of well over 10,000 members across the State. North Carolina NAACP engages in educational advocacy to ensure that communities of color and other marginalized communities throughout North Carolina can exercise the right to vote. This includes registering eligible individuals to vote, engaging in election protection, and mobilizing voters to the polls such as through its Souls-to-the-Polls events hosted by branches of the State Conference. In addition, North Carolina NAACP conducts voter education events and educational campaigns intended to inform voters about the requirements to register and vote, as well as any legal changes that might affect how, where, or when they are able to vote. The list of voters identified by Plaintiffs includes current North Carolina NAACP members. These members were not aware that their names were identified by Plaintiffs and alleged to be unlawfully registered to vote and thus subject to immediate removal from the rolls. Through no fault of their own, these voters are at risk of disenfranchisement. North Carolina NAACP has a direct interest in protecting the interests of its members who are predominantly Black. Upon information and belief, Black voters comprise at least 22 percent of those registrants on the list who have demographic information included in their registration file, and Black voters are disproportionately more likely than white voters to appear on the list. **Exhibit B** (Declaration of Deborah Dicks Maxwell) ¶ 12. Thus, Black voters are more likely than voters of any other race to be impacted by the disposition of this action. Consequently,

**JA144**

North Carolina NAACP has a strong interest in protecting the right to vote of Black voters and especially of its members.

Jackson Sailor Jones has voted in North Carolina for more than three decades. **Exhibit C** (Declaration of Jackson Sailor Jones) ¶ 4. He re-registered to vote on July 8, 2022, after changing residences. *Id.* Despite presenting his driver's license when voting in the 2024 Primary Election and having provided his Social Security number to election officials in the past, Mr. Jones appears as not having either number in the list generated in response to Carol Snow's Public Records Request 24-16. *Id.* ¶ 9.

Furthermore, Plaintiffs have not plead any facts to support the allegation that 225,000 North Carolina voters are actually ineligible to vote. By all accounts, these voters are lawfully registered and could not have voted in past elections without furnishing proof of identity in some way. Moreover, in addition to this lack of evidentiary support, Plaintiffs' requested relief is precluded under both the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"); there is no appeal of HAVA determinations under state law per N.C.G.S. § 163-91 and subsequent State Board rulemaking; there is no private right of action to enforce the provisions of HAVA on which Plaintiffs rely; and the relief sought would violate other federal protections and state law. *See* **Exhibit A** at 33–40. If Plaintiffs prevail, then Proposed Intervenors will have their right to vote and their members' right to vote stripped away. *See Stephenson v. Bartlett*, 355 N.C. 354, 378 (2002) (reaffirming the ability "to vote on equal terms is a fundamental right" protected under the North Carolina Constitution); *Northampton Cty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747 (1990) (same); U.S. Const. amend. XV; N.C. Const. art. I, §§ 9, 10, 11, 19. Indeed, "[t]he right to vote is the right to participate in the decision-making process of government" among all persons "sharing an identity with the broader humane, economic,

**JA145**

6

ideological, and political concerns of the human body politic." *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 13 (1980); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."). It is "one of the most cherished rights in our system of government, enshrined in both our Federal and State Constitutions." *Blankenship v. Bartlett*, 363 N.C. 518, 522 (2009).

### C.    Defendants Do Not Adequately Represent the Proposed Intervenors' Interests.

*Third*, the existing parties do not adequately represent the interests of Proposed Intervenors. A prospective intervenor seeking intervention as a matter of right under Rule 24(a)(2) must show that "there is inadequate representation of that interest by existing parties." *Virmani*, 350 N.C. at 459; *Bailey & Assocs., Inc.* v. *Wilmington Bd. of Adjustment*, 202 N.C. App. 177, 185-86 (N.C. Ct. App. 2010) (finding intervenors were entitled to intervene under Rule 24(a)(2), where facts showed numerous ways in which "they and their property would be injured" if a particular party prevailed in the lawsuit).

By law, Defendants' interests are to protect the public welfare at large and to fulfill the supervisory powers and duties required under North Carolina law. *Letendre v. Currituck Cnty.*, 261 N.C. App. 537, 2018 WL4440587, *4 (Sept. 18, 2018) (unpublished) (noting that public officials' "sole litigation interests are to protect the public welfare and the interests of [the] general citizenry."); N.C. Gen. Stat. § 163-22 (setting forth the "[p]owers and duties of the State Board of Elections" including general supervision over elections, advising the county board of elections as to the proper methods of conducting elections, determining the form and content of election ballots, among others). Thus, the Board may assert its own interests, but it cannot assert the interests of individual voters.

**JA146**

7

By contrast, Proposed Intervenor Jones seeks to protect his individual right to vote in the upcoming election. Proposed Intervenor North Carolina NAACP seeks to protect its members, who are predominantly Black, from being removed from the voter rolls prior to the General Election, as well as its ability to fulfill organizational objectives through voter engagement which will be threatened by the relief requested by Plaintiffs. These unique interests are distinct from those advanced by Defendants or the DNC.

Furthermore, Proposed Intervenors' interests in this litigation are distinct from Defendants', as Proposed Intervenors have a personal and unique interest in the outcome of this litigation, which directly implicates their right to vote. Courts have allowed voters to intervene in cases implicating their right to vote, even when they are on the same side as a government entity. *See, e.g.*, *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 571 n.2 (6th Cir. 2004) (noting that voters were granted permissive intervention by the district court shortly before hearing on motion for preliminary injunction); *League of Women Voters of Ohio v. Blackwell*, 235 F.R.D. 388, 389-90 (N.D. Ohio 2005) (permitting individual voter to intervene in action challenging problems with electronic voting machines). Here, the Proposed Intervenors seek to intervene for the purpose of challenging Plaintiffs' claims, and to ensure that no unreasonable measures are adopted that could pose an elevated risk of removing or impeding their right to vote. These interests are sufficiently distinct from those of election officials, who have a larger obligation to all constituents that may not align with the vulnerable 225,000 voters whose voting rights are at stake, to warrant intervention by those who could be impacted by any relief that is ordered in this Court.

Nor are the interests asserted by the DNC sufficient to cover those of Proposed Intervenors here. The DNC intervenes on behalf of the Democratic Party and seeks to protect the specific interests of Democratic voters and candidates. Conversely, Proposed Intervenors here represent

the interests of not only themselves, but all potentially impacted voters regardless of their partisan affiliation. North Carolina NAACP has another unique interest in its focus on the harms to Black voters, who make up a disproportionate share of the list that forms the basis of Plaintiffs' allegations. By intervening in this case, it seeks to mitigate any disproportionate harm to Black voters who may find themselves purged from the voter rolls depending on the disposition of this lawsuit.

## II.    In the Alternative, the Court Should Grant Permissive Intervention.

Alternatively, Proposed Intervenors and the Proposed Class also meet the requirements for permissive intervention pursuant to Rule 24(b)(2) of the North Carolina Rules of Civil Procedure. The Court should grant permissive intervention where an applicant shows that their "claim or defense and the main action have a question of law or fact in common." N.C.R. Civ. P. 24(b)(2). As discussed above, Proposed Intervenors' defenses—that Plaintiffs' claims are unconstitutional, invalid, and violate the rights of voters—present clear questions of law and fact in common with the pending action. And because Proposed Intervenors are representative of the voters who stand to be most harmed by the relief Plaintiffs seek, they will aid the Court in developing a full record of the relevant considerations—including the impact of this litigation on those 225,000 voters whose rights it threatens. Proposed Intervenors stand to be directly harmed if Plaintiffs' requested relief is granted. Those realities should be at the forefront of the Court's consideration as to whether to grant Plaintiffs' requested relief. It is unclear whether, absent intervention by Proposed Intervenors, any individual voter impacted by the relief Plaintiffs seek would be heard by the Court.

Finally, "[i]n exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the [other] parties." N.C.R. Civ. P. 24(b)(2). This intervention will neither unduly delay nor prejudice any other parties' rights given

the common questions of law and fact, and because Proposed Intervenors are seeking intervention shortly after the case was filed, before any dispositive motion practice or Court orders establishing briefing deadlines and setting hearing dates.

Proposed Intervenors also represent that they are willing and able to meet any Scheduling Order set forth by this Court in this matter.

Proposed Intervenors have sought to confer with the parties regarding their respective positions on the Motion. As of filing, Defendants were unable to provide a position on the Motion, and Proposed Intervenors have not heard from Plaintiffs regarding their position on the Motion. Proposed Intervenor DNC does not oppose the Motion.

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request that the Court grant its motion to intervene as a matter of right under North Carolina Rule of Civil Procedure 24(a), or in the alternative, permit it to intervene under North Carolina Rule of Civil Procedure 24(b).

## MOTION TO EXPEDITE

Proposed Intervenors also respectfully requests that the Court resolve the Motion as expeditiously as possible to ensure that Proposer Intervenors' fundamental rights in this action can be properly heard in conjunction with Defendants and are not infringed. North Carolina courts have granted motions to expedite intervention in previous voting rights cases. *See, e.g.*, *N.C. League of Conservation Voters v. Hall*, 2022 N.C. Super. LEXIS 99, at *13-14 (Jan. 11, 2022); *Harper v. Lewis*, 2019 N.C. Super. LEXIS 122, at *2-3 (Oct. 28, 2019). In light of the extraordinary public interest in this case, including Plaintiffs' request for relief by September 6, justice requires that that Proposed Intervenors' Motion be granted on an expedited basis.

**WHEREFORE**, Proposed Intervenors respectfully request that the Court grant their Motion to Intervene as a matter of right, or in the alternative with permission of the Court, and an expedited consideration of this Motion.

Respectfully submitted this 4th day of September 2024.

By: */s/ Hilary Harris Klein*

Lee Rubin (*pro hac vice* forthcoming)
Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com

Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice* forthcoming)
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (State Bar No. 52194)
Mayer Brown LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717
(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No. 60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice* forthcoming)
Jennifer Nwachukwu (*pro hac vice* forthcoming)
Pooja Chaudhuri (*pro hac vice* forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA150**

11

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day submitted a copy of the foregoing

MOTION TO INTERVENE AND EXPEDITE CONSIDERATION OF SAME and its Exhibits in

the above titled action by mail and/or electronic mail, in the manner requested, to the following

parties:

Josh Branch, III
jbranch@bakerdonelson.com
Thomas G. Hooper
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

Philip J. Strach
phil.strach@nelsonmullins.com
Jordan Koonts
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs Republican National
Committee and North Carolina Republican
Party*

Mary Carla Babb
mcbabb@ncdoj.gov
Terence Steed
Tsteed@ncdoj.gov

*Counsel for Defendants North Carolina State
Board of Elections, Karen Brinson Bell, Alan
Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin
N. Lewis, and Siobhan O'Duffy Millen*

Jim Phillips
jphillips@brookspierce.com
Shana Fulton
sfulton@brookspierce.com
William Robertson
wrobertson@brookspierce.com
James Whalen
jwhalen@brookspierce.com
Seth Waxman
seth.waxman@wilmerhale.com;
Daniel Volchok
daniel.volchok@wilmerhale.com;
Christopher Babbitt

**JA151**

12

christopher.babbitt@wilmerhale.com
Gary Fox
Gary.Fox@wilmerhale.com
Jane Kessner
Jane.Kessner@wilmerhale.com
Nitisha Baronia
nitisha.baronia@wilmerhale.com

*Counsel for Defendant-Intervenor the*
*Democratic National Committee*

This is the 4th day of September 2024.

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**JA152**

13

# EXHIBIT A

## Intervenors' Proposed Answer

**JA153**

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

NO. 24CV026995-910

REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,

*Plaintiffs*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,

*Defendants*.

**PROPOSED ANSWER OF INTERVENORS**

Intervenors North Carolina State Conference of the National Association for the Advancement of Colored People ("North Carolina NAACP") and Jackson Sailor Jones ("Intervenors"), by and through their attorneys, submit the following Answer to Plaintiffs' Complaint. Intervenors respond to the allegations in the Complaint as follows:

## INTRODUCTION

1.     "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S.

**JA154**

1, 4, 166 L. Ed. 2d 1, 7 (2006).

ANSWER: Admitted that the case quoted speaks for itself and, otherwise, that this paragraph states a legal conclusion to which no response is required.

2.      Free and fair elections are the bulwark of the citizenry's trust in their government. Ensuring that qualified voters—and only qualified voters—are able to vote in elections is the cornerstone of that compact between the state and its citizens. But trust must be earned.

ANSWER: Admitted that free and fair elections are fundamental to trust in government and that ensuring qualified voters are able to vote in elections is a cornerstone of that compact between the state and its citizens. Denied to the extent the allegations in this paragraph imply a lack of trust in North Carolina's elections or that any lack of trust in North Carolina's elections has any foundation in fact.

3.      The North Carolina State Board of Elections ("NCSBE") betrayed that trust when it allowed over 225,000 people to register to vote with registration forms that failed to collect certain required identification information before the registration forms were processed, a plain violation of Section 303 of the Help America Vote Act ("HAVA"). Because of these errors, the North Carolina voter rolls, which both HAVA and state law mandates that Defendants regularly maintain, are potentially replete with ineligible voters—including possible non-citizens—all of whom are now registered to vote.

ANSWER: Denied.

4.      By failing to collect certain statutorily required information prior to registering these applicants to vote, Defendants placed the integrity of the state's elections into jeopardy.

ANSWER: Denied.

**JA155**

5.      Defendants admit they violated HAVA and, as a result, state law. Yet, even when concerned citizens brought these issues to their attention, Defendants inexplicably refused to correct their wrongs. All Defendants offer as a solution is a half-hearted promise that those who were ineligible to register but were allowed to anyway will naturally filter themselves out from the state's voter rolls when they conduct other election-related activities.

ANSWER: Denied, on information and belief, that the Defendants have admitted to any HAVA violation. The North Carolina State Board of Elections issued an Order on December 6, 2023, stating that "a violation of Section 303 of HAVA *could* occur as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number, and that the appropriate remedy is to implement changes recommended by staff to the voter registration application form and any related materials," (emphasis added) while further determining that "no one who lacked this information when registering since the enactment of HAVA would have been allowed to vote without proving their identity consistent with HAVA." The remaining allegations in this paragraph are also denied.

6.      This inaction misses the mark. Not only does this "solution" fail to remedy the ongoing violations of state and federal law or account for Defendants' responsibilities under the same, but it leaves North Carolinians to wonder how they can trust in the security of their elections, especially when those tasked with protecting their rights cannot be bothered to do what is required by law.

ANSWER: Denied.

7.      Even worse, this "solution" sends the message to the millions of duly qualified and registered voters in North Carolina that their chief elections officials will shirk their

**JA156**

responsibilities and refuse to verify whether those who vote in the state's elections are entitled to do so in the first place.

ANSWER: Denied

8.      This ominous message eviscerates confidence in North Carolina's elections and it ensures that *Purcell*'s warning of distrust and disenfranchisement may soon come true.

ANSWER: Denied

9.      By failing to do the required work to determine if Defendants' violation of HAVA has resulted in the registration of ineligible voters, and thereby allowing unlawfully registered persons to vote in the state's elections, Defendants' actions further jeopardize the individual right to vote that is guaranteed to every qualified voter in North Carolina. *See,* N.C. Const. art. VI § I; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533,

 561 (1964)).

ANSWER: Admitted that the constitutional provision and cases cited exist and speak for themselves. The allegations in this paragraph are otherwise denied.

10.     With the November 2024 election fast approaching, North Carolinians cannot afford to simply wait and see. Defendants admit they violated federal law. Now, they must be required to remedy their actions before these failures impact the results of the 2024 elections.

ANSWER: Denied, and the response to paragraph 5 above is incorporated by reference in the response to the allegations in this paragraph.

## PARTIES

11.     The Republican National Committee is the national committee for the Republican Party; representing all registered Republicans across both the state and nation, as well

as the values

they stand for. The RNC serves as the collective voice for the Republican Party's platform. It is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14) and a political party as defined by N.C. Gen. Stat. § 163-96. The RNC's principal place of business is 310 First Street SE, Washington, D.C.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

12.     The RNC's core mission involves organizing lawful voters and encouraging them to support Republican candidates at all levels of government, including throughout North Carolina. The RNC expends significant time and resources fighting for election security and voting integrity across the nation, including in North Carolina. These efforts are intended to ensure that the votes and voices of its members, its candidates, and the party are not silenced or diluted in any way. Recent rises in non-citizens and other unqualified persons voting or seeking to vote in elections has forced the RNC to divert its efforts and funds in order to hold elections officials accountable to what both federal and state laws require.

ANSWER: Denied to the extent that the allegations in this paragraph suggest that non-citizens are voting or seeking to vote in elections in any measurable, significant, provable degree or is "rising" in any way. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

13.     The North Carolina Republican Party is a state committee of the Republican Party, as defined by 52 U.S.C. § 30101(15), and a political party as defined by N.C. Gen. Stat. § 163-96. The NCGOP represents the interests of registered Republicans across North Carolina. Its headquarters and principal place of business is 1506 Hillsborough St, Raleigh, NC 27605.  The

**JA158**

NCGOP represents the interests of registered Republican voters, residing across all one hundred counties in the state. The NCGOP also advocates for the interests of tens of thousands of non-affiliated voters who align with various aspects of the Republican Party platform.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

14.    The NCGOP's mission and platform largely mirror that of the RNC, including an emphasis on election integrity and security. The NCGOP's core mission includes counseling interested voters and volunteers on election participation including hosting candidate and voter registration events, staffing voting protection hotlines, investigating reports of voter fraud and disenfranchisement, and providing election day volunteers in all one hundred counties across North Carolina. The NCGOP spends tremendous time and effort advocating for its members throughout all levels of state government, working to make sure they are heard both at the ballot box and beyond.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

15.    Plaintiffs have organizational standing to bring this action. Defendants' actions and inaction directly impact Plaintiffs' core organizational missions of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates for office. Defendants' violations of HAVA and the subsequent refusal to remedy their wrongdoing, in accordance with what state law requires, has forced Plaintiffs to divert significantly more of their resources into combatting election fraud in North Carolina. Plaintiffs' organizational and voter outreach efforts have been and will continue to be significantly stymied due to Defendants' ongoing failures. As a result, Plaintiffs will have no choice but to expend

**JA159**

6

increased amounts of time and money, beyond what they would have already spent, in order to combat this unwarranted interference with their central activities. For example, because of Defendants' violations of state law, Plaintiffs will need to commit added time and resources into monitoring North Carolina's voter rolls, voter activity, and responding to instances of potential voter fraud in upcoming elections, tasks required of Defendants under state and federal law.

> ANSWER: This paragraph states a legal conclusion regarding standing to which no response is required. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

16.    Additionally, NCGOP has associational standing because its members have standing in their own right to challenge Defendants' actions here. NCGOP represents millions of registered Republican voters across the state of North Carolina, including at least one registered Republican voter in every one of the state's one hundred counties, which is a matter of public record. NCGOP's members are harmed by these inaccurate voter rolls as well as Defendants' ongoing HAVA and state law violations. These members' votes are undoubtedly diluted due to ineligible voters participating in elections due to Defendants' statutory violations. Additionally, these members' rights to participate in a fair and secure electoral process, free from voter fraud, will be significantly hindered. Ensuring such freedom and security in all elections throughout North Carolina is germane to the NCGOP's organizational mission.

> ANSWER: This paragraph states a legal conclusion regarding standing to which no response is required. Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph regarding NCGOP membership or the NCGOP's organizational mission. The allegations in this paragraph are otherwise denied.

17.    Plaintiffs are further harmed in their ability to effectively compete in elections

**JA160**

7

across the state as Defendants' refusal to maintain accurate and updated voter rolls risks opening the door to potentially fraudulent votes and inaccurate election results. This harm is especially palpable considering North Carolina's party-based primary system which makes verifying the accuracy of each voter registration form that much more crucial.

ANSWER: Denied.

18.     The North Carolina State Board of Elections is the state agency tasked with "general supervision over primaries and elections of the state." *See* N.C. Gen. Stat. § 163-22. NCSBE is tasked with ensuring that elections in North Carolina comply with all relevant state and federal laws and, in NCSBE's own words, "ensur[ing] that elections are conducted lawfully and fairly."[1]

ANSWER: Admitted that the statute cited exists and speaks for itself, but denied that it is accurately quoted. N.C. Gen. Stat. § 163-22(a) provides the North Carolina State Board of Elections with "general supervision over *the* primaries and elections *in* the *State.*" (emphasized text corrected from that in the allegation). Admitted that the NCSBE's website is accurately quoted.

19.     Karen Brinson Bell is the Executive Director of NCSBE and the state's "Chief Election Official" as defined by N.C. Gen. Stat. § 163-82.2. In this capacity, Ms. Brinson Bell oversees elections in all one hundred counties in North Carolina and administering all elections occurring therein. *See* N.C. Gen. Stat. § 163-27(d). Ms. Brinson Bell is sued in her official capacity.

ANSWER: Admitted that Ms. Brinson Bell is the Executive Director of the State Board of Elections and that the statutes cited exist and speak for themselves.

20.     Alan Hirsch is the Chair of NCSBE. He resides in Chapel Hill, North Carolina.

---

[1] https://www.ncsbe.gov/about

**JA161**

Mr. Hirsch is sued in his official capacity.

> ANSWER: Admitted that Mr. Hirsch is the Chair of the State Board of Elections, and that Plaintiffs have purported to sue Mr. Hirsch in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

21.     Jeff Carmon is the Secretary of NCSBE. He resides in Snow Hill, North Carolina. Mr. Carmon is sued in his official capacity.

> ANSWER: Admitted that Mr. Carmon is the Secretary of the State Board of Elections, and that Plaintiffs have purported to sue Mr. Carmon in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

22.     Stacy Eggers, IV is a member of NCSBE. He resides in Boone, North Carolina. Mr. Eggers, IV is sued in his official capacity.

> ANSWER: Admitted that Mr. Eggers is a member of the State Board of Elections, and that Plaintiffs have purported to sue Mr. Eggers in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

23.     Kevin N. Lewis is a member of NCSBE. He resides in Rocky Mount, North Carolina. Mr. Lewis is sued in his official capacity.

> ANSWER: Admitted that Mr. Lewis is a member of the State Board of Elections, and that Plaintiffs have purported to sue Mr. Lewis in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

24.    Siobhan O'Duffy Millen is a member of NCSBE. She resides in Raleigh, North Carolina. Ms. Millen is sued in her official capacity.

ANSWER: Admitted that Ms. Millen is a member of the State Board of Elections, and that Plaintiffs have purported to sue Ms. Millen in her official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

**JURISDICTION AND VENUE**

25.    This Court has jurisdiction over the claims asserted herein pursuant to N.C. Gen.

Stat. § 7A-245.

ANSWER: This paragraph contains legal conclusions to which no response is required. To the extent this paragraph requires a further response, denied.

26.    This Court has personal jurisdiction over NCSBE as it is a state agency in North Carolina.

ANSWER: This paragraph contains legal conclusions to which no response is required. .

27.    This Court has personal jurisdiction over Executive Director Karen Brinson Bell, Chair Alan Hirsch, Secretary Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen as each is sued in their official capacities as appointed officials in North Carolina. Each is a citizen of North Carolina and each resides in the state.

ANSWER: This paragraph contains legal conclusions to which no response is required. Admitted that Plaintiffs have purported to sue the listed individuals in their official capacities. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

**JA163**

10

28.     Venue is proper in this court pursuant to N.C. Gen. Stat. § 1-82.

ANSWER: This paragraph contains legal conclusions to which no response is required.

## FACTUAL ALLEGATIONS

29.     Defendants are required to maintain accurate and updated statewide voter registration lists ("voter rolls"). N.C. Gen. Stat. § 163-82.11.

ANSWER: Denied that Plaintiffs' characterization of the cited statute is correct, and instead admit that the cited statute exists speaks for itself. N.C. Gen. Stat. § 163-82.11 requires the State Board of Elections to "develop and implement a statewide computerized voter registration system to facilitate voter registration and to provide a central database containing voter registration information for each county" in compliance with federal law.

30.     In addition to other standards, Defendants must ensure that the voter rolls are in full compliance with the requirements of Section 303 of HAVA. *Id*. at § 163-82.11(c) ("The State Board of Elections *shall* update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA].") (emphasis added).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The remaining allegations in this paragraph constitute legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in this paragraph are otherwise denied.

31.     Due to this express mandate that North Carolina's voter rolls must be maintained in a manner compliant with section 303(a) of HAVA, it is important to review what that section requires of Defendants. This, in turn, illustrates Defendants' failure to fulfill their statutory duties under state law.

ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in

**JA164**

11

this paragraph are otherwise denied.

32.     Congress, through HAVA, set requirements for how states must implement and maintain their voter rolls. *See*, *e.g.*, 52 U.S.C. § 21081, 21082, and 21083.

ANSWER: Admitted that the cited statutes exist and speak for themselves. Denied to the extent this allegation implies HAVA sets forth the only federal requirements by Congress on states on how they must implement and maintain their voter rolls. Importantly, the National Voter Registration Act ("NVRA"), and provisions codified in 52 U.S.C. § 20507, impose requirements on North Carolina's voter list maintenance practices in addition to other federal statutory and constitutional requirements.

33.     Among other standards, HAVA mandates that states must implement computerized statewide voter rolls to serve as the "single system for storing and managing the official list of registered voters throughout the State." *Id.* at  § 21083(a)(1)(A)(i).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

34.     HAVA goes on to require that the rolls will "be coordinated with other agency databases within the state" and that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id*. at § 21083(a)(1)(A)(iv), (vi).

ANSWER: Admitted that the quoted statute exists and speaks for itself. To the extent a further response is required, the allegations in this paragraph are otherwise denied.

35.     HAVA further provides that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* at (viii).

**JA165**

ANSWER: Admitted that the quoted statute exists and speaks for itself. To the extent a further response is required, the allegations in this paragraph are otherwise denied.

36.     Once a state has established the computerized voter registration list required by HAVA, 52 U.S.C. § 21083(a)(2) provides certain actions the state must take to ensure the list is accurately maintained "on a regular basis." *Id.*

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

37.     Importantly, these maintenance instructions include processes and procedures for removing the names of ineligible voters from the state's voter rolls. *Id.* at § 21083(a)(2)(A). HAVA also sets the standard of conduct for voter roll maintenance, requiring the state to ensure that: "(i) the name of each registered voter appears in the computerized list; (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and (iii) duplicate names are eliminated from the computerized list." *Id.* at § 21083(a)(2)(B).

ANSWER: Admitted that the quoted statute exists and speaks for itself.  Denied to the extent this allegation implies this provision is the only set of requirements regarding the removal of voter registrations. Importantly, the NVRA, and specifically 52 U.S.C. § 20507(c)(2), provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal Office, any program the purpose of which is to systematically remove the ineligible voters form the official lists of eligible voters" with limited exceptions that do not apply here. The NVRA further requires, as set forth in 52 U.S.C. § 20507(b), that "[a]ny State program or activity to protect the integrity of the electoral process ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . (1) shall be uniform, nondiscriminatory, and in

**JA166**

13

compliance with the Voting Rights Act of 1965."

38.    Next, HAVA mandates that states maintain the technological security of their voter rolls, requiring the states to implement provisions making "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(3)(4).

> ANSWER: Admitted that the quoted statute exists and speaks for itself. Denied that Plaintiffs' characterization of the quoted statute is correct. The security provision in 52 U.S.C. § 21083(a)(3) requires states to implement "adequate technological security measures to prevent the *unauthorized access* to the computerized list," (emphasis added), whereas the separate provision under § 21083(a)(4) addresses removals and, in addition to the quoted passage requiring a "reasonable effort" to maintain those lists, also requires states to provide "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."

39.    In addition to setting the standards for establishing and maintaining accurate state voter rolls, HAVA has a clearly described process for verifying the identification of applicants registering to vote. *See id.* at § 21083(a)(5)(A)(i).

> ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

40.    First, it requires that applicants provide either a driver's license number or the last four digits of their social security number. Providing this information is a necessary prerequisite **before** the registration form can be processed by the state. *Id.* at § 21083 (viii). In fact, § 21083(a)(5) prevents a state from accepting a voter registration form for an election for Federal office unless the form includes the listed information. *Id.*

**JA167**

ANSWER: Denied that Defendants' characterization of the cited statutes is accurate and denied that the alleged "§ 21083 (viii)" provision exists under Chapter 52 of the United States Code at all. 52 U.S.C.S. § 21083(a)(1)(A)(viii) provides that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(5) provides that voters lacking a current and valid driver's license or social security number may still be registered so long as the state "assign[s] the applicant a number which will serve to identify the applicant for voter registration purposes." In North Carolina, this alternative number can include the NCID that, upon information and belief, is issued to every registered voter by the North Carolina State Board of Elections, as well as the ID number on identification issued by the N.C. Division of Motor Vehicles for individuals who require a photo ID but do not require a driver license, and which registrants can enter on their voter registration form to satisfy the identification requirement. 52 U.S.C. § 21083(a)(5) also provides that "[t]he State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law," delegating to the States the form and method by which individuals can meet these HAVA requires.

41.     Only if a registrant affirmatively confirms they do not have either form of identification, the state must "assign the applicant a number which will serve to identify the applicant for voter registration purposes . . . [which] shall be the unique identifying number assigned under the list." *Id*. at § 21083(a)(5)(A)(ii).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

42.     Prior to December 2023, NCSBE used voter registration forms that failed to

**JA168**

collect this required information. Specifically, NCSBE collected, processed, and accepted voter registration applications that lacked **both** the driver's license number and social security number because NCSBE's form did not tell the voter the information was required.

ANSWER: Denied that, prior to December 2023, the NCSBE used voter registration forms that failed to collect this required information. The voter registration form used in and prior to December 2023 provided a box in which voters could provide this information and, as a result, this information exists on the registration records for millions of voters in the state. Otherwise, it is admitted upon information and belief that the voter registration form in use before a revised version was issued in early 2024 did not require voters to provide a NC DMV number or the last four digits of the voter's Social Security Number in instances where the voter had such numbers when they registered.

43.     As a result of these errors, voters did not utilize the catchall provision of § 21083(a)(5)(A)(ii) as the registration forms failed to make registrants aware that the driver's license or social security number identifying information was necessary for the application to be processed. Thus, any affirmative attestation regarding one's lack of those relevant documents was impossible.

ANSWER: Admitted that the statute cited exists and speaks for itself. Denied to the extent that this paragraph implies that because the prior voter registration form made it impossible to attest to one's eligibility under the catchall provision, the eligibility of registrants who used the old form is reasonably questioned. Otherwise denied.

44.     Defendants ignored HAVA's requirement that the identifying information be collected before an application can be accepted and processed. As a result, NCSBE accepted hundreds of thousands of voter registration applications without applying the HAVA identifying

**JA169**

information requirement, resulting in approximately 225,000 applicants being registered to vote in a manner out-of-compliance with HAVA.

ANSWER: Denied.

I.  ***Defendants Admit They Used Voter Registration Forms Which Were HAVA Non-Compliant***

45.    In North Carolina, an individual must register to vote prior to voting. *See* N.C. Gen. Stat. §§163-54, 163-82.1(a); *see also* N.C. Const. art. VI § 3(1).

ANSWER: Admitted that the statute and constitutional provision cited exist and speak for themselves.

46.    The state's registration form asks certain information, seeking to ascertain whether the applicant is qualified to vote under applicable state and federal laws. N.C. Gen. Stat. §163- 82.4(e). In addition to the information on the form, an elections official may ask an applicant for other "information [that is] necessary to enable officials  of the county where the person resides to satisfactorily process the application." *Id.* at § 163-82.4(a).

ANSWER: Admitted that the statutes cited exist and speak for themselves.

47.    Despite the informational requirements mandated by both state and federal law— along with the processes and procedures under state law for obtaining the same information— Defendants wholly failed to uphold their statutory duties.

ANSWER: Denied.

48.    Defendants' noncompliance with HAVA was first raised when a concerned citizen, Carol Snow, filed a complaint with NCSBE on October 6, 2023. (hereinafter, "Snow Amended HAVA Complaint").[2]

---

[2] Publicly  available  at:
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20Complaint.pdf

**JA170**

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

49.      In her complaint, Ms. Snow alleged that NCSBE's voter registration form, which was still in use at the time of her filing, failed to indicate that "the applicant's qualifying identification of the applicant's driver's license number or last 4 digits of the applicant's social security number, are required if one or the other have been issued to the applicant." *See* Snow Amended HAVA Complaint, p. 1.

ANSWER: Admitted that a HAVA Complaint was filed by Carol Snow on October 6, 2023, and that the contents of that filing speak for themselves. The allegations in this paragraph are otherwise denied.

50.      As Ms. Snow's complaint pointed out, the relevant portion of NCSBE's voter registration form then in use identified certain categories of **required** information by denoting them in text blocks with red background. This is contrasted by the white background used for **optional** categories of information on the form. Despite HAVA requiring either a driver's license number or the last four digits of a social security number be provided by the applicant, the registration form had a white text box background for this information, not red. *See* Fig. 1, below; *see also* Snow Amended HAVA Complaint, p. 2.  The applicant had no way to know from the form that the driver's license number or the social security number were required for their form to be accepted and processed by NCSBE.

**JA171**

**Fig. 1 – NCSBE Voter Registration Form Prior to NCSBE's December 6, 2023 Order**



ANSWER: Admitted that a HAVA Complaint was filed by Carol Snow on October 6, 2023, and that the contents of that filing speak for themselves. The allegations in this paragraph are otherwise denied.

51.     At its meeting on November 28, 2023, NCSBE considered Ms. Snow's complaint. At the meeting[3] and in its December 6, 2023 Order,[4] NCSBE acknowledged that its voter registration forms did not sufficiently notify applicants that their driver's license number or last four digits of their social security number were required in order for their registration to be processed and accepted.

ANSWER: Denied as to Plaintiffs' characterization of the November 28, 2023, meeting and the December 6, 2023 Order. Intervenors incorporate by reference their Answer to paragraph 5 in response to this paragraph.

---

[3] Meeting documents and a recording of NCSBE's November 28, 2023 meeting is available here: dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2023-11-28/
[4] The December 6, 2023 Order from NCSBE is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20C omplaint%20-%20Snow.pdf

**JA172**

52.    Defendants further acknowledged that they used the voter registration form which failed to comply with HAVA for approximately 225,000 voters throughout North Carolina.[5]

ANSWER: Denied as to Plaintiffs' characterization of the November 28, 2023, meeting and the December 6, 2023, Order. Upon information and belief, denied as to the allegations in Footnote 5.

53.    It follows then, that by failing to comply with HAVA, Defendants admittedly violated their duties under N.C. Gen. Stat. § 163-82.11(c).

ANSWER: Denied.

54.    Ultimately, Defendants granted Ms. Snow's request to change the voter registration form **moving forward**.

ANSWER: Admitted that, in the December 6, 2023, Order, the North Carolina State Board of Elections stated that "the appropriate remedy is to implement changes recommended by staff to the voter registration application form and any related materials" and that this Order speaks for itself. Except as expressly admitted, the allegations of this paragraph are denied.

55.    In contrast, Defendants denied Ms. Snow's request to identify and contact voters whose registrations were improperly accepted due to their forms lacking the necessary identification information. Specifically, Defendants took the position that:

a.  HAVA does not authorize NCSBE to contact registered voters (as opposed to

---

[5] Given that NCSBE could approximate the number of voters registered in this manner, Defendants, upon information and belief, have the ability to track which voters were registered using the non-compliant form and thus, can contact those voters and request the missing information from them.

**JA173**

20

applicants)[6]; and

b. Even if those registered voters did not provide the required identification information as part of their application, they would have to provide other identifying information in connection with other features of the voting process, such as requesting an absentee ballot.

ANSWER: Denied as to Plaintiffs' characterization of the December 6, 2023, Order, which speaks for itself. In that Order, the North Carolina State Board of Elections stated that HAVA's "purpose of identifying the registrant upon initial registration is already accomplished because any voter who did not provide a driver's license number or the last four digits of a Social Security number would have had to provide additional documentation to prove their identity before being allowed to vote, by operation of the separate provision of HAVA identified above. In other words, no one who lacked this information when registering since the enactment of HAVA would have been allowed to vote without proving their identity consistent with HAVA." Denied as to Plaintiffs' characterization of the statutes cited in footnote 6, and otherwise admitted that these statutes exist and speak for themselves, except that 52 U.S.C. § 21083(a)(2)(A)(B) does not exist, but § 21083(a)(2)(A), and § 21083(a)(2)(B), do.

56.    Recognizing the inadequacy of Defendants' "solution," Ms. Snow raised the need to actually remedy these improper registrations during NCSBE's March 11, 2024 and April

---

[6] Curiously, this position is not supported by the plain language of HAVA which provides, among other things, processes for identifying and removing the names of "ineligible **voters**" from the state's voter rolls. *See* 52 U.S.C. § 21083(a)(2)(A)(B). To the extent Defendants believe HAVA only allows them to notify applicants of issues with their registration forms, *see id.* at § 21083(4), Defendants failed to do so on the front end and instead, improperly processed and accepted their registration forms. Thus, NCSBE's logic is self-defeating; it cannot violate the statute by allowing these invalid applicants to become registered voters, only to then say they cannot contact them because those registrants are not "applicants."

**JA174**

11, 2024 meetings. Both times NCSBE denied Ms. Snow's requests.

ANSWER: Admitted that Carol Snow submitted a second HAVA complaint on February 20, 2024, concerning alleged duplicates in the voter file, and that the North Carolina State Board initially heard complaint on March 11, recessed, and resumed and concluded the hearing on this complaint on April 11 in a unanimous vote to dismiss the Complaint. Also admitted that the North Carolina State Board of Elections issued a written Order on May 20, 2024, dismissing Ms. Snow's February 20 HAVA complaint. The allegations in this paragraph are otherwise denied.

57.     Under the plain text of HAVA, NCSBE should not have accepted or processed these registration forms since they lacked either the required identification or an affirmative attestation that the registrant did not have the necessary information. *See* 52 U.S.C. §21083(a)(5).

ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

58.     Similarly, Defendants should have taken immediate action to correct the accuracy of the state's voter rolls, a task mandated by HAVA and, in turn, state law. *See id.* at § 21083(a)(2); *see also* N.C. Gen. Stat. § 163-82.11(c).

ANSWER: Denied as to Plaintiffs' characterization of the requirements of the cited statutes, but otherwise admitted that these statutes exist and speak for themselves.

59.     Nevertheless, public records provided by Defendants reveal that 225,000 voter registrations were processed and accepted despite missing both the applicant's driver's license number and the last four digits of the registrant's social security number.

ANSWER: On information and belief, denied.

60.     Thus, Defendants' refusal to correct their violations is unjustifiable.

**JA175**

ANSWER: Upon information and belief, denied.

61.     Defendants' dismissal of Ms. Snow's straightforward solution is irreconcilable with their duties, and it damages lawfully-registered North Carolina voters and candidates, including Republican voters who are members of Plaintiffs, and Republican candidates whom Plaintiffs and their members support.

ANSWER: Denied.

II.     ***Despite Their Errors, Defendants Refuse to Identify Unqualified Voters or Remove Them From The State's Voter Rolls***

62.     HAVA places the burden on the state to "determine whether the information provided by an individual is sufficient to meet the requirements of [the statute]." *See* 52 U.S.C. § 21083(a)(5)(A)(iii). Similarly, N.C. Gen. Stat. § 163-82.11(c) mandates that the state maintain its voter rolls in accordance with what HAVA requires.

ANSWER: Denied as to Plaintiffs' characterization of 52 U.S.C. § 21083(a)(5)(A)(iii), and otherwise admitted that the statutes cited exist and speak for themselves.

63.     Through this affirmative directive—along with the other enumerated requirements throughout the statute—Defendants either knew or should have known that they were tasked with ensuring that only properly completed registration forms were accepted and processed. Even still, Defendants permitted hundreds of thousands of people to register without providing the basic information HAVA requires.

ANSWER: Intervenors lack sufficient information and knowledge to deny or admit the allegations in this paragraph.

64.     After this failure, Defendants should have immediately taken action to remedy this mistake, including confirming that ineligible voters were not on the state's voter rolls. *See* 52 U.S.C. § 21803(a)(2)(A)(B); *see also* N.C. Gen. Stat. § 163-82.11(c).

**JA176**

ANSWER: Denied that § 21803(a)(2)(A)(B) exists under Chapter 52 of the United States Code, but otherwise admitted that § 21803(a)(2)(A) and § 21803(a)(2)(B) exist and N.C. Gen. State. § 163-82.11(c) exist and that these statutes speak for themselves. The allegations in this paragraph are otherwise denied.

65.     By declining to uphold their statutory duties, Defendants violated both state and federal law, irreparably damaged North Carolina voters, the NCGOP, the RNC, and their organizational missions, and most importantly, their members. Defendants opened the door to insecure elections in North Carolina, marred by potentially fraudulent votes.

ANSWER: The allegations in this paragraph set forth legal conclusions to which no response is required. The allegations in this paragraph are otherwise denied.

III.     ***By Failing to Correct Their HAVA Violations, Defendants Place Foundational Election Principles Into Jeopardy***

66.     Many states, including North Carolina, have recently confronted issues relating to non-citizens and other ineligible persons attempting to register to vote. *See, e.g.,* N.C. Gen. Stat. § 163-82.14(c1).[7]

ANSWER: Upon information and belief, denied as to the allegations in this paragraph and the contention that North Carolina has recently faced "issues relating to non-citizens and other ineligible persons attempting to register to vote" in any systematic or widespread manner. Denied that the article cited in footnote 7 supports this assertion. Admitted that the statute cited exists and speaks for itself.

67.     North Carolina's statutory requirements notwithstanding, Defendants' failure to

---

[7] On Wednesday, August 21, 2024, Ohio announced that it had identified at least 597 non-citizens who registered and/or voted in recent elections. This finding was precipitated by a comprehensive statewide audit which identified 154,995 ineligible registrants on the state's voter rolls. *See* https://apnews.com/article/ohio-voters-citizenship-referrals-42799a379bdda8bca7201d6c42f99c65 [last accessed 08.22.2024].

**JA177**

require necessary HAVA identification information before processing and accepting hundreds of thousands of voter registration forms allowed untold numbers of ineligible voters to register. Now, those ineligible voters could vote in the upcoming November 5, 2024 election and beyond.

ANSWER: Upon information and belief, denied.

68.　　Upon information and belief, Defendants' violations of HAVA allowed non-citizens to register to vote in North Carolina, in direct contravention of both federal and state law. *See, e.g.,* N.C. Const. art. VI §I.

ANSWER: Admitted that N.C. Const. art. VI § I exists and speaks for itself. The allegations in this paragraph are otherwise denied.

69.　　By allowing ineligible voters to register and then remain on the North Carolina voter rolls, Defendants have brought the security and validity of the state's elections into question.

ANSWER: Denied.

70.　　Even worse, by refusing to correct their errors, Defendants are willfully ignoring their statutory responsibilities.

ANSWER: Denied.

71.　　If Defendants do not remove ineligible voters from the state's voter rolls, then the legitimate votes of qualified voters will be diluted and disenfranchised in upcoming elections. This reality will, in turn, have a substantial chilling effect on North Carolinians' right to vote in free and fair elections. *See* N.C. Const. art. I §10.

ANSWER: Denied to the extent Plaintiffs omit and disregard the myriad of safeguards that exist in North Carolina to prevent ineligible voters from casting a ballot and from that ballot counting. Denied to the extent Plaintiffs fail to plead that any registered voter is actually ineligible to cast a ballot in North Carolina. Admitted that N.C. Const. art. I § 10

**JA178**

exists and speaks for itself. To the extent the remaining allegations require a response, denied.

IV.    *Remedying These Errors Will Not Burden NCSBE*

72.    Defendants already maintain processes for seeking out additional information from voters who fail to provide necessary information.

ANSWER: Admitted.

73.    For example, the county boards of elections regularly contact voters who vote with a provisional ballot on election day, seeking additional identifying information from these voters as part of post-election day processes.

ANSWER: Intervenors lack sufficient information or knowledge to admit or deny the allegations in this paragraph.

74.    Notably, accurate voter roll maintenance, including removing the names of ineligible voters from voting rolls, is already required by HAVA and state law. *See* 52 U.S.C. § 21083(a)(2)(A)(B); N.C. Gen. Stat. § 163-82.11(c). Thus, any burden on Defendants in terms of time required to correct the state's voter rolls is mitigated by the fact that federal law mandates the same.

ANSWER: Denied that § 21083(a)(2)(A)(B) exists under Chapter 52 of United States Code, but otherwise admitted that § 21083(a)(2)(A) and § 21083(a)(2)(b) and N.C. Gen. State. § 163-82.11(c) exist and speak for themselves. The allegations in this paragraph are otherwise denied, especially because the NVRA, and specifically 52 U.S.C. § 20507(c)(2), provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal Office, any program the purpose of which is to systematically remove the ineligible voters form the official lists of eligible voters" with limited

**JA179**

exceptions that do not apply here.

75.    Unlike the minimal burden Defendants would face if required to correct the state's voter rolls in compliance with federal law, the burden placed on Plaintiffs is palpable. Absent immediate corrective action by Defendants, the significant harm faced by Plaintiffs will only increase. Not only will Plaintiffs' members be disenfranchised, but Plaintiffs' mission of advocating for Republican voters, causes, and candidates will be impeded by contrary votes of potentially ineligible voters.

ANSWER: Denied.

76.    With the November 5, 2024 election now three months away, early voting starting in less than two months, and ballots being mailed starting September 6, 2024, it is exceedingly important that Defendants take immediate actions to correct their wrongs, guaranteeing that qualified voters are able to vote, while preventing ineligible persons from trying to do the same.

ANSWER: Denied to the extent it implies that the current administrative practices of the North Carolina State Board of Elections and the County Board of Elections will not sufficiently guarantee the accurate tabulation of election results for the November 5, 2024, election.

**CLAIMS FOR RELIEF**

**COUNT ONE: VIOLATION OF N.C.G.S. § 163-82.11(c) – WRIT OF MANDAMUS**

77.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

ANSWER: Intervenors incorporate by reference all responses to the allegations in the foregoing paragraphs.

**JA180**

78.     North Carolina law unambiguously requires Defendants to maintain the state's voter rolls in a manner compliant with Section 303 of HAVA. N.C. Gen. Stat. § 163-82.11(c).

ANSWER: The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

79.     Section 303 of HAVA requires that North Carolina create a computerized statewide voter registration list containing the names and registration information of every legally registered voter. 52 U.S.C. § 21083(a)(1)(A).

ANSWER: Admitted.

80.     HAVA similarly mandates that North Carolina verify the accuracy of a prospective voter's registration information, **prior** to accepting the registration. Specifically, the state must collect the registrant's driver's license number or last four digits of their social security number or, alternatively, the registrant must affirmatively attest that they have neither. *Id.* at § 21083(a)(5)(A).

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied as to Plaintiffs' characterization of that statute.

81.     HAVA also requires that Defendants regularly review and maintain the accuracy of the state's voter registration list, including, if applicable, removing ineligible persons from the voter roll. *Id.* at § 21083(a)(2)(4).

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied as to Plaintiffs' characterization of the statute.

82.     North Carolina law similarly mandates the collection of certain identification information from applicants, creating certain tools for verification of the same. *See* N.C. Gen. Stat. §§163-54, 163-82.1(a); 163-82.4 (a)(e).

**JA181**

ANSWER: Admitted that N.C. Gen. Stat. §§ 163-54 and 163-82.1(a) exist and speak for themselves. Denied that a subsection (a)(e) exists under N.C. Gen. Stat. § 163-82.4, but admitted that §§ 163-82.4(a) and 163-82.4(e) exist and speak for themselves.

83.     Upon information and belief, Defendants failed to collect the statutorily required information from at least 225,000 registrants whose registrations were, in turn, processed and accepted despite lacking this necessary information.

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

84.     Upon information and belief, even once this error was identified and corrected on a forward-looking basis, NCSBE refused, and continues to refuse, to contact these registrants or verify if they have the necessary information in order to correct the accuracy of the state's voter registration list.

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

85.     Not only does the language of N.C. Gen. Stat. § 163-82.11(c) create a duty for Defendants to maintain accurate voter rolls in compliance with HAVA, but Defendants have no discretion or permissible freedom to deviate from this mandate.

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied.

86.     It is without dispute that, even when this was brought to their attention, Defendants failed to act. In fact, Defendants affirmatively refused to act and correct the accuracy of the state's voter rolls as to be compliant with HAVA.

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the

**JA182**

29

allegations in this paragraph.

87.     Due to Defendants' unambiguous refusal to act, even after acknowledging their own violation of the law, Plaintiffs have no other adequate remedy than to seek relief from this Court.

ANSWER: Denied.

88.     Unless enjoined and ordered to comply with their statutory duties, Defendants will continue to violate state law by refusing to maintain accurate voter rolls and declining to remedy the 225,000 voter registrations that should have never been processed or accepted in the first place.

ANSWER: Upon information and belief, denied.

## COUNT TWO: VIOLATION OF N.C. CONST. ART. I § 19 – MANDATORY INJUNCTION

89.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

ANSWER: Intervenors incorporate by reference all responses to the allegations in the foregoing paragraphs.

90.     As described more fully above, Defendants have a non-discretionary, statutory duty to maintain the state's voter rolls in a manner compliant with Section 303(a) of HAVA.

ANSWER: Admitted.

91.     N.C. Gen. Stat. § 163-82.11(c) is an affirmative command, creating a duty imposed by law.

ANSWER: Admitted.

92.     Defendants admit they failed to uphold this duty when they accepted hundreds

**JA183**

30

of thousands of voter registrations which were plainly non-compliant with Section 303(a) of HAVA.

ANSWER: Upon information and belief, denied.

93.     Despite this admission, Defendants refuse to take any action to remedy their violations.

ANSWER: Intervenors lack sufficient information or knowledge to admit or deny the allegation in this paragraph.

94.     Defendants' actions directly interfere with North Carolinian's fundamental right to vote. By allowing potentially ineligible persons to vote in the state's elections and remain on the state's voter rolls, Defendants have ignored their statutory and constitutional duties while simultaneously opening the door to potential widespread dilution of legitimate votes in upcoming elections.

ANSWER: Denied.

95.     Defendants cannot offer any legitimate justification, let alone a compelling interest, for this dereliction of duty.

ANSWER: Upon information and belief, denied.

96.     Defendants must be ordered to immediately and permanently rectify this harm in order to protect the integrity of North Carolina's elections.

ANSWER: Denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Issue a writ of mandamus and a mandatory injunction ordering Defendants to develop, implement, and enforce practices and policies to ensure compliance with HAVA and, in

**JA184**

turn, N.C. Gen. Stat. § 163-82.11(c);

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

2. Direct Defendants, under a court-approved plan to be completed no later than September 6, 2024, including mandatory reporting and monitoring requirements, to take all actions necessary to remedy their violations of state law and HAVA, specifically, identifying all ineligible registrants and removing them from the state's voter registration lists in a manner consistent with state and federal law, and to the extent such removal is not feasible prior to the date set forth herein, then direct Defendants to require all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation of the required HAVA information;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

3. Direct Defendants, under a court-approved plan including mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with state law and HAVA, specifically, registering only eligible, qualified voters in a manner consistent with both statutes and maintaining the state's voter registration lists in accordance therewith;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any

**JA185**

of the requested relief or any other relief.

4.  Award Plaintiffs their reasonable attorney's fees, litigation expenses, and associated costs incurred in connection with this action, as otherwise permitted by law;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

5.  Retain jurisdiction over this matter to ensure Defendants comply with any orders issued by this Court; and

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

6.  Grant such additional relief deemed just and proper.

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

## GENERAL DENIAL

Intervenors deny every allegation in the Complaint that is not expressly admitted herein.

## AFFIRMATIVE DEFENSES

Intervenors set forth their Affirmative Defenses below, and reserve the right to amend or supplement these Affirmative Defenses upon learning of additional facts and with additional particularity, including citation to additional law, consistent with the North Carolina Rules of Civil Procedure. Intervenors do not admit the relevance of any particular issue or subject in asserting these Affirmative Defenses, nor do they admit to assuming the burden of proving any issue of fact

**JA186**

or element of cause of action where that burden properly belongs to Plaintiffs.

In their Affirmative Defenses, Intervenors allege as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs do not have standing for the claims they allege.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim on which relief can be granted because, *inter alia*, Plaintiffs have failed to sufficiently allege that the voters lacking a driver's license or Social Security number in their voter registration record are, in fact, ineligible voters or should be presumptively considered as such. Plaintiffs' claims are unsupported by any factual allegations supporting the actual ineligibility for even a single voter, much less hundreds of thousands. By contrast, applicable law, and the documents cited and referenced in the Complaint (including North Carolina State Board of Elections meeting records), support many reasons an eligible and registered voter might lack either identification number in their voter file at no fault of their own, including but not limited to the voter:

> ➢ not providing a driver's license or Social Security number at a time when the North Carolina voter registration form did not require it;

> ➢ not possessing a driver's license or Social Security number but otherwise being an eligible North Carolina citizen, as contemplated by both state and federal law exceptions;

> ➢ possessing a driver's license or Social Security number but being unable to provide that number when registering;

> ➢ providing a driver's license or Social Security number at the time of registration that was not entered into their voter registration file due to inadvertent error;

> ➢ providing a driver's license or Social Security number at the time of registration, but

**JA187**

having the voter information mismatch to the DMV database or Social Security Administration databases for reasons unrelated to eligibility (e.g., inadvertent typos in information, misspelling or reasonable variation in names) and thus omitted in the voter file;

➤ providing a driver's license or Social Security number at a later time (such as when requested a mail-in absentee ballot) that was not entered into their voter registration file.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the November 5, 2024, election is foreclosed by the NVRA. Among other applicable federal that would be violated, their request that Defendants be compelled to "identify[] all ineligible registrations and remov[e] them from the state's voter registration lists" is prohibited by the NVRA's 90-day prohibition on such systematic removals, which came into force on August 7, 2024. 52 U.S.C. § 20507(2). The requested *en masse* removal of registered voters for lacking a driver's license or Social Security number in their registration record is also not included among the permitted reasons for removals and would thus violate this provision. *Id.* § 20507(a)(3), (4). It may also violate the state's obligation under the NVRA to "ensure that any eligible applicant is registered to vote in an election" if they have submitted a valid registration form not later than 30 days before the election. *Id.* § 20507(a)(1).

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the November 5, 2024, election is foreclosed by HAVA. The relief requested, and specifically its

timing and the natural limitations on implementation before voting begins, violates HAVA's requirement that states provide "safeguards to ensure voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the November 5, 2024, election is foreclosed by the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), which prohibits "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters is foreclosed by state law. Among other applicable provisions, state law enumerates specific and limited grounds for removing voter registrations and further provides that:

> Every person registered to vote by a county board of elections in accordance with this Article shall remain registered until:
>
> (1) The registrant requests in writing to the county board of elections to be removed from the list of registered voters; or
>
> (2) The registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or
>
> (3) The county board of elections determines, through the procedure outlined in G.S. 163-82.14, that it can no longer confirm where the voter resides.

N.C.G.S. § 163-82.1(c). As none of the grounds on which Plaintiffs' request removal is enumerated in this statute, their request to remove voters is a direct violation of state law.

**JA189**

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to require voters lacking a driver's license number or Social Security number in their voter registration to vote provisionally is foreclosed by state law. Any voter found duly registered and who has not been successfully challenged is required under state law to receive "the official ballot that voter is entitled to vote." N.C. Gen. Stat. § 163-166.7(b). Provisional ballots are only permitted for any voter who "does not appear on the official list of eligible registered voters in the voting place." N.C. Gen. Stat. § 163-166.11.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs fail to state a claim upon which relief can be granted because their claims and allegations amount to an appeal of the HAVA complaints brought by Carol Snow.

Plaintiffs have no right to appeal Ms. Snow's HAVA complaint under state law. Pursuant to the HAVA requirement that states "establish and maintain State-based administrative complaint procedures" for alleged HAVA violations, 52 USC § 21112, North Carolina has required the State Board of Elections to "establish a complaint procedure" for "complaints alleging violations of Title III" of HAVA, N.C. Gen. Stat. § 163-91. However, North Carolina has also exempted the State Board from judicial review of these decisions under the Administrative Procedure Act. NCGS § 150B-1(c)(6)(providing a specific exemption from North Carolina's Administrative Procedure Act for "[t]he State Board of Elections in administering the HAVA Administrative Complaint Procedure."). Notwithstanding they were not the original party bringing the HAVA administrative complaint before the State Board, and thus have failed to exhaust administrative remedies, state law forecloses an appeal of that action as Plaintiffs attempt here.

Plaintiffs have otherwise failed to substantiate a right to relief via writ of mandamus or pursuant

**JA190**

to N.C. Const. Art. I § 19.

### NINTH AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted because Plaintiffs lack a private right of action to enforce the cited provisions of HAVA in this posture under either state or federal law. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (finding respondents were "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce [HAVA] § 303 in an action brought by a private litigant to justify the issuance of a temporary restraining order). The sections of HAVA that have been found to be privately enforceable involve provisions that "directly and explicitly *protect*[] individual voters." *Colon-Marrero v. Velez*, 813 F.3d 1, 17-19 (1st Cir. 2016) (emphasis added). No such individual right to systematically remove duly registered voters other than one's self from a state's voter rolls exists, and thus no private action under color of HAVA requesting such relief can be sustained.t

### TENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would violate North Carolina's Free Election Clause, N.C. Const. art. I § 10, by interfering with the voting process. *See Harper v. Hall*, 384 N.C. 292, 355, 886 S.E.2d 393, 434, 363-64 (2023) (holding the free elections clause was intended to "protect against interference" and allow voters to cast a ballot "without interference").

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring

voters lacking identifying information to vote provisionally in the November 2024 election, would violate North Carolina's Equal Protection Clause, N.C. Const. art. I § 19, by denying those voters without a driver's license or Social Security number in their voter file both equal protection of the laws and due process under law. *See Harper v. Hall*, 384 N.C. 292, 364 (2023) ("This Court has previously explained that the right to vote *on equal terms* is a fundamental right.") (internal quotations and citations omitted, emphasis in original).

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would impose undue and severe burdens on the fundamental right to vote, in violation of the First and Fourteenth Amendments of the United States Constitution.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would violate the right to due process under the Fourteenth Amendment.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief is barred by the doctrine of laches.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, is

**JA192**

39

barred by the *Purcell* principle.

# EXHIBIT B

## Maxwell Declaration

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24CV026995-910

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs,* <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants.* | |

**DECLARATION OF DEBORAH DICKS MAXWELL
PRESIDENT OF THE NORTH CAROLINA STATE CONFERENCE
OF THE NAACP**

**JA195**

1

I, Deborah Dicks Maxwell, swear under penalty of perjury that the following information is true to the best of my knowledge and state as follows:

1. I am personally knowledgeable of the facts contained below and, if called to testify, would affirm all matters set forth herein.

2. I am a resident of Wilmington, North Carolina in New Hanover County, where I have lived since 1992. I was born in Wilmington and previously resided there for approximately 15 years.

3. Since October 2021, I have served as President of the North Carolina State Conference of the National Association for the Advancement of Colored People ("North Carolina NAACP"), a state chapter of the National NAACP, which is a 501(c)(4) registered nonpartisan, nonprofit community organization dedicated to eliminating racial hatred and racial discrimination through education, advocacy, and litigation.

4. I have been a member of the NAACP for 25 years. Prior to my time as President, I served as Assistant Treasurer, Treasurer, Vice President, and President for the New Hanover County local branch of the North Carolina NAACP. I also served as the North Carolina State Conference District Director for Bladen, Brunswick, Columbus, New Hanover, Onslow and Pender Counties, which required me to oversee six counties in southeastern North Carolina.

5. As President of the North Carolina NAACP, I am responsible for communicating with NAACP branches across North Carolina, identifying matters of statewide concern, and taking steps to address members' concerns. These responsibilities include, among other things, traveling to various parts of North Carolina for meetings and events, communicating statewide concerns to the National NAACP, advocating for or against proposed legislation or policies, making statewide programmatic decisions, and acting as a spokesperson for the North Carolina NAACP at public and private engagements.

6. I am authorized to speak for the NAACP in this matter.

7. The mission of the NAACP is to eliminate racial hatred and racial discrimination. The North Carolina NAACP follows the national NAACP mission statement in focusing on political, educational, and other rights affecting all people and people of color. The national mission statement identifies the NAACP's mission: "[T]o achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color."[1]

8. The North Carolina NAACP engages in a wide variety of educational, advocacy, and legal work to ensure that communities of color and other marginalized communities throughout North Carolina are able to exercise the right to vote. This includes voter

---

[1] *See* https://ncnaacp.org/mission-vision/.

**JA196**

2

registration, election protection, and voter mobilization events hosted by branches of the state conference. In addition, the North Carolina NAACP conducts voter education events and educational campaigns intended to inform voters about the requirements to register and vote, as well as any legal changes that might affect how, where, or when they are able to vote. This work is achieved through engagement with our members, who volunteer and organize events held both statewide and by local branches. The North Carolina NAACP has been engaging in all of these activities ahead of the 2024 General Election.

9. National NAACP membership compliance standards require a NAACP state conference to have six adult branches and six youth branches.[2] The North Carolina NAACP has 70 adult branches and numerous students and youth branches, composed of over 10,000 members.

10. To become a member of a branch of the North Carolina NAACP, an individual must sign a form affirming that they live or work in the county in which they wish to join a chapter and agree to pay dues. Lifetime membership is maintained with a one-time payment of dues. To maintain yearly membership with the North Carolina NAACP, members must pay yearly dues in the amount of thirty dollars for adults and ten dollars for youth.

11. North Carolina NAACP membership is predominately Black and other minority individuals and includes registered voters who reside throughout the state.

12. I am aware that the Republican National Committee has filed a complaint asking for the removal of up to 225,000 voters who lack either a driver's license or Social Security number in their voter file. I understand from counsel that at least 22% of voters who would be impacted by the removal have self-identified as Black in their voter file, a figure my counsel has calculated by matching registered voters listed on the file provided by the North Carolina State Board of Elections in response to Public Records Request 24-16 submitted by Carol Snow to the current voter file. I also understand from counsel that self-identified Black voters are the largest group of voters of color in the file produced in response to Public Records Request 24-16.

13. If the Republican National Committee were successful in its goal of removing those approximately 225,000 voters from the voter rolls, the North Carolina NAACP's programming would have to substantially change. The North Carolina NAACP would have to direct significant organizational resources to respond to this voter purge. At a minimum, the North Carolina NAACP would have to divert staff and volunteer time as well as financial resources that had been designated to register, activate, and educate voters for the upcoming general election, to instead research the voters who were removed from the rolls despite remaining eligible voters, contact them to inform them of their removal, and help them re-register in time to participate in the November election. This task would be challenging and resource-intensive, especially in the marginalized

---

[2] *See*
https://naacp.org/convention/faqs#:~:text=Financial%20compliance%20consists%20of%20submitting%20the%20Annual%20Financial%20Report%20and,does%20ACT%2DSO%20stand%20for?

**JA197**

communities with whom the North Carolina NAACP works. If the Republican National Committee obtains its desired voter removals, the North Carolina NAACP will not be able to conduct the same amount of activity in support of its core organizational functions as it would otherwise be able to do.

14. Given the substantial number of Black voters impacted by this lawsuit, it would directly harm the North Carolina NAACP's organizational mission to ensure communities of color can vote if such a substantial number of voters of color were removed from the voter rolls, as has been requested in this lawsuit. The North Carolina NAACP is thus seeking to intervene in this matter to protect its organizational interests and the direct harm this lawsuit, if successful, would have to the organization itself.

15. I am also aware that at least one of the individuals impacted, and on the file provided in response to Public Records Request 24-16, is a North Carolina NAACP member who intends to vote in the upcoming 2024 General Election. On information and belief, there are additional North Carolina NAACP members listed on this file. The North Carolina NAACP is therefore asking to intervene in this matter to protect its members as well.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on: September 4, 2024

_____
Deborah Dicks Maxwell

**JA198**

4

# EXHIBIT C

## Jones Declaration

**JA199**

**STATE OF NORTH CAROLINA**

**WAKE COUNTY**

**IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION**
**No. 24CV026995-910**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>*Defendants.* | **DECLARATION OF**<br><br>**JACKSON SAILOR JONES** |

I, Jackson Sailor Jones, hereby declare as follows:

1.    I am over eighteen years of age. I have personal knowledge of the facts set forth herein. If called to testify before this Court, I would do so to the same effect.

2.    I was born in Warren County and am currently a resident of Mebane, North Carolina, in Alamance County. I have lived at my current residence since June 2022.

3.    I am a citizen of the United States.

4.    I have been a registered voter in this state for over three decades, and I last updated my registration shortly after moving residences, on July 8, 2022.

5.    I intend to cast a ballot in the upcoming November 5, 2024, election.

**JA200**

1

6.      My name and NCID number are on the list of registrations in North Carolina lacking either a Social Security Number or driver's license number in their voter file, according to a list provided by the State Board of Elections on April 1, 2024, in response to Public Records Request 24-16 submitted by Carol Snow.

7.      I have a North Carolina driver's license number and a social security number. I am not sure why my registration lacks this information.

8.      I do not believe that I should be removed from the voter rolls because a group says that my valid voter registration, which I completed by filling out North Carolina's registration form, violates federal law. To my knowledge, I followed all directions when filling out the voter registration form.

9.      I have also already provided this information to election officials on multiple occasions. I presented my North Carolina driver's license when I voted in person during the 2024 Primary Election. I also provided this information on my Absentee Ballot Request Form for the 2024 General Election, which I have already submitted and which requires this information. The Absentee Ballot Request Form cannot be processed without a driver's license or Social Security number. A copy of that form is attached to this Declaration as Exhibit 1.

10.     Because I meet the qualifications for eligibility to vote in North Carolina and am lawfully registered to vote, I should not be removed from the rolls.

11.      If I am removed from the voter rolls, and my ability to vote is taken away, I will be denied my fundamental right to vote and engage in the political process.

**JA201**
2

I declare under penalty of perjury under the laws of North Carolina that the foregoing is true and correct. Executed on September 3, 2024.

_____
Jackson Sailor Jones

**JA202**

3

# **Exhibit 1**

# NC Absentee Ballot Request Form

**JA203**



**2024**

## Request an absentee ballot

You can request an absentee ballot for 1 voter per form, for 1 election at a time.

The information that you provide on this form will be used to update your current voter record if signed by the voter. You may not change your party using this form.

If you are not registered, you must submit a voter registration form with this request.

**Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.**

### How to return this form

Return your completed and signed form to your county board of elections by **5:00 pm on the Tuesday before the election.**

You can:
- Drop it off in-person
- Mail it

This form can only be returned by:
- The voter or the voter's near relative or verifiable legal guardian
- A Multipartisan Assistance Team sent by the county elections office
- A person who assisted due to the voter's disability.

### Return this form to:

Your County Board of Elections office. County addresses can be found on the pages following this form.

### Questions?

Call your county board of elections or visit ncsbe.gov

**REQUEST ONLINE**
Complete, sign, and submit your request online at **votebymail.ncsbe.gov.**

## Instructions

### 1: Election Date

Request for 1 election per form.

Indicate in this section if you require an absentee ballot for other possible elections in 2024 *due to your continued or expected illness or disability.*

### 2: Voter name

Provide your full legal name. If your name has changed, this form will be used to update your current voter record.

### 3: Identification Information

You must provide your date of birth **and** one of the following:
- A NC Driver's License or DMV ID card number
- The last 4 digits of your social security number

### 4: Home address

Provide your residential (home) address. **However**, if you moved and have no plans to return to your former residence, provide your new address here. Signing in Section 10 will update your voter registration. If your new address is in a different county, you will not be able to update your address using this form and will need to submit a new voter registration form in your new county. Provide a mailing address in Section 5 if different from your residence.

### 5: Ballot mailing address

Indicate where you would like your ballot to be sent. If you do not want your ballot to be sent to your residential or mailing address, provide another address here.

If you require an accessible electronic ballot due to blindness or visual impairment also provide your email in Section 6.

### 6: Voter's Contact information

Your contact information is optional and is helpful if we have questions about this request or about any issues with your voted absentee ballot.

### 7: Requesting a ballot for a voter

A near relative or legal guardian may request a ballot for a voter but may not make changes to the voter's registration record. A near relative is a voter's:
- Spouse
- Brother or sister
- Parent or stepparent
- Mother/father-in-law
- Child or stepchild
- Son/daughter-in-law
- Grandparent/Grandchild

Any person may request an absentee ballot for a voter **who needs assistance making the request due to disability.** Under the Americans with Disabilities Act, a disability is a physical or mental impairment that causes someone to be substantially limited in a major life activity. *When requesting a ballot on behalf of a voter, the requester must complete and sign this section.*

### 8: Assisting a voter in filling out or returning this form

If you are helping a voter fill out or return their form, complete this section. *The voter will still need to sign or make their mark in Section 10.* Any voter may receive assistance from their near relative or verifiable legal guardian. A voter who needs assistance completing or returning their request form due to their blindness, disability, or inability to read or write may receive assistance from a person of their choice.

**For voters living in a facility (clinic, nursing home, or adult care home) who do NOT require assistance due to a disability, certain limitations apply:**
The voter must first seek to have a near relative, legal guardian or Multipartisan Assistance Team (MAT) to assist with requesting a ballot. If none of these options is available within 7 days of making a request for a MAT, the voter may get assistance from anyone who is not:

- An owner, manager, director, or employee of the facility
- An elected official, a candidate, or an officeholder in a political party
- A campaign manager or treasurer for a candidate or political party

### 9: Military or overseas

Complete this section if you claim North Carolina as your voting residence and are:

A U.S. citizen currently outside of the United States **or**

A member of one of the following, **or** a spouse or dependent of a member of one of the following:

- The active or reserve components of the Army, Navy, Air Force, Marine Corps, or Coast Guard of the United States who is on active duty
- A member of the Merchant Marines, the Commissioned Corps of the Public Health Service, or the Commissioned Corps of the National Oceanic and Atmospheric Administration of the United States
- A member of the National Guard or State militia unit who is on activated status

### 10: Voter's signature

This form must be signed **by the voter** (unless a near relative or legal guardian or assistant is requesting a ballot on the voter's behalf and completes Section 7). If the voter cannot physically sign this form, they can make a mark. **A typed signature, including signature fonts, is not allowed.**

If you indicate that you have changed your name (Section 2) or address (Section 4), signing will update your voter registration.

**JA204**

# 2024

## North Carolina Absentee Ballot Request Form
**Required sections are in red**

2024.04

| | | |
|---|---|---|
| **Election date** | **1** | **11/05/24  General Election Absentee Ballot Request** |

○ *Due to* continued or expected illness or disability, I am *also* requesting absentee ballots for all elections this year.

**Print voter name**
Any name change you give on this form will update your registration.
**Required**

**2**

Last name _____   Suffix (Jr, Sr., III, IV, if applicable) _____
First name _____   Middle name _____
Former name (*if* your name has changed) _____

**Identification Information**
**Required**

**3**

Date of birth *(mm/dd/yyyy)* _____  **AND**

NC Driver's License/DMV ID number _____
**OR**
Last 4 digits of your Social Security number _____

**Home address**
Provide your **residential** address (where you live).
**Required**

**4**

Street _____   Unit # _____
City _____   **NC**  Zip _____   County _____
Have you moved in the last 30 days?  ○ Yes  ○ No   If yes, date moved? (mm/dd/yyyy) _____
**Mailing Address** (*if different from above*)
Street _____   Unit # _____
City _____   State _____   Zip _____

**Where should we send your ballot?**
Check 1.
**Required**

**5**

○ Your home address in Section 4   ● Your mailing address in Section 4
○ The address below:
Street _____   Unit # _____
City _____   State _____   Zip _____

○ *Due to* blindness/visual impairment, I require an accessible electronic ballot (Provide your email address in Section 6).

**Voter contact information**

**6**

Phone _____   Email _____

**Requesting ballot on behalf of voter by near relative, legal guardian, or person the voter asks to help due to disability?**
The **requester** must complete and sign in this section. See instructions about who can request for a voter.

**7**

Requester's Name _____   Include relationship to voter, or status as legal guardian or disability requester
Street _____   Unit # _____
City _____   State _____   Zip _____   Phone _____

**Relative/legal guardian/disability requester, sign and date here** (required if requesting on behalf of a voter)
Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.

| X | Date *(mm/dd/yyyy)* |
|---|---|

**Assisting a voter to fill out or return this request?**
If yes, complete this section. See instructions about who can assist a voter. **Voter must sign in Section 10.**

**8**

Assistant's full name _____
Assistant's full address _____

If the voter is in an eligible care facility and needs assistance in voting and returning the ballot, enter the facility name below.
Facility Name _____

**Are you a military member on active duty (including spouse/dependents) or a U.S. citizen outside the U.S.?**
*Only the voter may complete this section.*

**9**

○ Uniformed Services or Merchant Marines on active duty
○ U.S. citizen outside the U.S. (Overseas address required)
Overseas full address _____

I want my ballot delivered to my:
○ Email _____
○ Fax _____
○ Address indicated in Section 5
○ Overseas address provided in this section

**Voter's signature**
Use a pen. No electronic signatures allowed.
**Required**

**10**

**Voter, sign and date here** (*Required unless ballot requested by a near relative, legal guardian, or disability requester*)
Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.

| X | Date *(mm/dd/yyyy)* |
|---|---|

**JA205**

Return form to the County Board of Elections by 5:00 pm on the Tuesday before the election. Do not email or fax.

**County Board Office Mailing Addresses (A–J)**

**NC Absentee Ballot Request Form for 2024**

| | | | | |
|---|---|---|---|---|
| ALAMANCE<br>PO BOX 418<br>GRAHAM NC<br>27253-0418<br>(336) 570-6755 | ALEXANDER<br>PO BOX 326<br>TAYLORSVILLE NC<br>28681-0326<br>(828) 632-2990 | ALLEGHANY<br>PO BOX 65<br>SPARTA NC<br>28675-0065<br>(336) 372-4557 | ANSON<br>402 MORVEN RD<br>WADESBORO NC<br>28170-2743<br>(704) 994-3223 | ASHE<br>150 GOVERNMENT CIR<br>STE 2100<br>JEFFERTON NC<br>28640-8959<br>(336) 846-5570 |
| AVERY<br>PO BOX 145<br>NEWLAND NC<br>28657-0145<br>(828) 733-8282 | BEAUFORT<br>PO BOX 1016<br>WASHINGTON NC<br>27889-1016<br>(252) 946-2321 | BERTIE<br>PO BOX 312<br>WINDSOR NC<br>27983-0312<br>(252) 794-5306 | BLADEN<br>PO BOX 512<br>ELIZABETHTOWN NC<br>28337-0512<br>(910) 862-6951 | BRUNSWICK<br>PO BOX 2<br>BOLIVIA NC<br>28422-0002<br>(910) 253-2620 |
| BUNCOMBE<br>PO BOX 7468<br>ASHEVILLE NC<br>28802-7468<br>(828) 250-4200 | BURKE<br>PO BOX 798<br>MORGANTON NC<br>28680-0798<br>(828) 764-9010 | CABARRUS<br>PO BOX 1315<br>CONCORD NC<br>28026-1315<br>(704) 920-2860 | CALDWELL<br>PO BOX 564<br>LENOIR NC<br>28645-0564<br>(828) 757-13HF | CAMDEN<br>PO BOX 206<br>CAMDEN NC<br>27921-0206<br>(252) 338-5530 |
| CARTERET<br>1702 LIVE OAK ST<br>STE 200<br>BEAUFORT NC<br>28516-1638<br>(252) 728-8460 | CASWELL<br>PO BOX 698<br>YANCEYVILLE NC<br>27379-0698<br>(336) 694-4010 | CATAWBA<br>PO BOX 132<br>NEWTON NC<br>28658-0132<br>(828) 464-2424 | CHATHAM<br>PO BOX 111<br>PITTSBORO NC<br>27312-0111<br>(919) 545-8500 | CHEROKEE<br>40 PEACHTREE ST<br>MURPHY NC<br>28906-2940<br>(828) 837-6670 |
| CHOWAN<br>PO BOX 133<br>EDENTON NC<br>27932-0133<br>(252) 482-4010 | CLAY<br>75 RIVERSIDE CIR<br>STE 3<br>HAYESVILLE NC<br>28904-7769<br>(828) 389-6812 | CLEVELAND<br>PO BOX 1299<br>SHELBY NC<br>28151-1299<br>(704) 484-4858 | COLUMBUS<br>PO BOX 37<br>WHITEVILLE NC<br>28472-0037<br>(910) 640-6609 | CRAVEN<br>406 CRAVEN ST<br>NEW BERN NC<br>28560-4911<br>(252) 636-6610 |
| CUMBERLAND<br>227 FOUNTAINHEAD LN<br>STE 101<br>FAYETTEVILLE NC<br>28301-5493<br>(910) 678-7733 | CURRITUCK<br>PO BOX 177<br>CURRITUCK NC<br>27929-0177<br>(252) 232-2525 | DARE<br>PO BOX 1000<br>MANTEO NC<br>27954-1000<br>(252) 475-5631 | DAVIDSON<br>PO BOX 1084<br>LEXINGTON NC<br>27293-1084<br>(336) 242-2190 | DAVIE<br>161 POPLAR ST<br>STE 102<br>MOCKSVILLE NC<br>27028-2148<br>(336) 753-6072 |
| DUPLIN<br>PO BOX 975<br>KENANSVILLE NC<br>28349-0975<br>(910) 296-2170 | DURHAM<br>201 N ROXBORO ST<br>DURHAM NC<br>27701-3741<br>(919) 560-0700 | EDGECOMBE<br>PO BOX 10<br>TARBORO NC<br>27886-0010<br>(252) 641-7852 | FORSYTH<br>201 N CHESTNUT ST<br>WINSTON SALEM NC<br>27101-4120<br>(336) 703-2800 | FRANKLIN<br>PO BOX 180<br>LOUISBURG NC<br>27549-0180<br>(919) 496-3898 |
| GASTON<br>PO BOX 1396<br>GASTONIA NC<br>28053-1396<br>(704) 852-6005 | GATES<br>PO BOX 621<br>GATESVILLE NC<br>27938-0621<br>(252) 357-1780 | GRAHAM<br>PO BOX 1239<br>ROBBINSVILLE NC<br>28771-1239<br>(828) 479-7969 | GRANVILLE<br>PO BOX 83<br>OXFORD NC<br>27565-0083<br>(919) 693-2515 | GREENE<br>PO BOX 583<br>SNOW HILL NC<br>28580-0583<br>(252) 747-5921 |
| GUILFORD<br>PO BOX 3427<br>GREENSBORO NC<br>27402-3427<br>(336) 641-3836 | HALIFAX<br>PO BOX 101<br>HALIFAX NC<br>27839-0101<br>(252) 583-4391 | HARNETT<br>PO BOX 356<br>LILLINGTON NC<br>27546-0356<br>(910) 893-7553 | HAYWOOD<br>63 ELMWOOD WAY<br>STE A<br>WAYNESVILLE NC<br>28786-5829<br>(828) 452-6633 | HENDERSON<br>PO BOX 2090<br>HENDERSONVILLE NC<br>28793-2090<br>(828) 697-4970 |
| HERTFORD<br>PO BOX 355<br>AHOSKIE NC<br>27910-0355<br>(252) 358-7812 | HOKE<br>PO BOX 1565<br>RAEFORD NC<br>28376-1565<br>(910) 875-8751 EXT 1550 | HYDE<br>PO BOX 152<br>SWAN QUARTER NC<br>27885-0152<br>(252) 926-4194 | IREDELL<br>203 STOCKTON ST<br>STATESVILLE NC<br>28677-5245<br>(704) 878-3140 | JACKSON<br>401 GRINDSTAFF COVE RD<br>SYLVA NC<br>28779-3250<br>(828) 586-7538 |

JA206

**County Board Office Mailing Addresses (J–Y)**

**NC Absentee Ballot Request Form for 2024**

| | | | | |
|---|---|---|---|---|
| JOHNSTON<br>PO BOX 1172<br>SMITHFIELD NC<br>27577-1172<br>(919) 989-5095 | JONES<br>367 NC HIGHWAY 58 S<br>UNIT B<br>TRENTON NC<br>28585-7787<br>(252) 448-3921 | LEE<br>1503 ELM ST<br>STE 1<br>SANFORD NC<br>27330-4200<br>(919) 718-4646 | LENOIR<br>PO BOX 3503<br>KINSTON NC<br>28502-3503<br>(252) 523-0636 | LINCOLN<br>PO BOX 977<br>LINCOLNTON NC<br>28093-0977<br>(704) 736-8480 |
| MACON<br>5 W MAIN ST<br>FL 1<br>FRANKLIN NC<br>28734-3005<br>(828) 349-2034 EXT 2035 | MADISON<br>PO BOX 142<br>MARSHALL NC<br>28753-0142<br>(828) 649-3731 | MARTIN<br>PO BOX 801<br>WILLIAMSTON NC<br>27892-0801<br>(252) 789-4317 | MCDOWELL<br>PO BOX 1509<br>MARION NC<br>28752-1509<br>(828) 659-0834 | MECKLENBURG<br>PO BOX 31788<br>CHARLOTTE NC<br>28231-1788<br>(704) 336-2133 |
| MITCHELL<br>11 N MITCHELL AVE<br>RM 108<br>BAKERSVILLE NC<br>28705-6511<br>(828) 688-3101 | MONTGOMERY<br>PO BOX 607<br>TROY NC<br>27371-0607<br>(910) 572-2024 | MOORE<br>PO BOX 787<br>CARTHAGE NC<br>28327-0787<br>(910) 947-3868 | NASH<br>PO BOX 305<br>NASHVILLE NC<br>27856-0305<br>(252) 459-1350 | NEW HANOVER<br>1241A MILITARY CUTOFF RD<br>WILMINGTON NC<br>28405-3637<br>(910) 798-7330 |
| NORTHAMPTON<br>PO BOX 603<br>JACKSON NC<br>27845-0603<br>(252) 534-5681 | ONSLOW<br>246 GEORGETOWN RD<br>JACKSONVILLE NC<br>28540-4146<br>(910) 455-4484 | ORANGE<br>PO BOX 220<br>HILLSBOROUGH NC<br>27278-0220<br>(919) 245-2350 | PAMLICO<br>PO BOX 464<br>BAYBORO NC<br>28515-0464<br>(252) 745-4821 | PASQUOTANK<br>PO BOX 1797<br>ELIZABETH CITY NC<br>27906-1797<br>(252) 335-1739 |
| PENDER<br>PO BOX 1232<br>BURGAW NC<br>28425-1232<br>(910) 259-1220 | PERQUIMANS<br>PO BOX 336<br>HERTFORD NC<br>27944-0336<br>(252) 426-5598 | PERSON<br>331 S MORGAN ST<br>ROXBORO NC<br>27573-5223<br>(336) 597-1727 | PITT<br>PO BOX 56<br>GREENVILLE NC<br>27835-0056<br>(252) 902-3300 | POLK<br>PO BOX 253<br>COLUMBUS NC<br>28722-0253<br>(828) 894-8181 |
| RANDOLPH<br>1457 N FAYETTEVILLE ST<br>ASHEBORO NC<br>27203-3957<br>(336) 318-6900 | RICHMOND<br>PO BOX 1843<br>ROCKINGHAM NC<br>28380-1843<br>(910) 997-8253 | ROBESON<br>PO BOX 2159<br>LUMBERTON NC<br>28359-2159<br>(910) 671-3080 | ROCKINGHAM<br>PO BOX 22<br>WENTWORTH NC<br>27375-0022<br>(336) 342-8107 | ROWAN<br>1935 JAKE ALEXANDER BLVD W STE D10<br>SALISBURY NC<br>28147-1176<br>(704) 216-8140 |
| RUTHERFORD<br>PO BOX 927<br>RUTHERFORDTON NC<br>28139-0927<br>(828) 287-6030 | SAMPSON<br>335 COUNTY COMPLEX RD STE 100<br>CLINTON NC<br>28328-4851<br>(910) 592-5796 | SCOTLAND<br>231 E CRONLY ST<br>STE 305<br>LAURINBURG NC<br>28352-3820<br>(910) 277-2595 | STANLY<br>PO BOX 1309<br>ALBEMARLE NC<br>28002-1309<br>(704) 986-3647 | STOKES<br>PO BOX 34<br>DANBURY NC<br>27016-0034<br>(336) 593-2409 |
| SURRY<br>PO BOX 372<br>DOBSON NC<br>27017-0372<br>(336) 401-8225 | SWAIN<br>PO BOX 133<br>BRYSON CITY NC<br>28713-0133<br>(828) 488-6177 | TRANSYLVANIA<br>PO BOX 868<br>BREVARD NC<br>28712-0868<br>(828) 884-3114 | TYRRELL<br>PO BOX 449<br>COLUMBIA NC<br>27925-0449<br>(252) 796-0775 | UNION<br>PO BOX 1106<br>MONROE NC<br>28111-1106<br>(704) 283-3809 |
| VANCE<br>300 S GARNETT ST<br>STE C<br>HENDERSON NC<br>27536-4566<br>(252) 492-3730 | WAKE<br>PO BOX 695<br>RALEIGH NC<br>27602-0695<br>(919) 404-4040 | WARREN<br>PO BOX 803<br>WARRENTON NC<br>27589-0803<br>(252) 257-2114 | WASHINGTON<br>PO BOX 550<br>ROPER, NC<br>27970-0550<br>(252) 793-6017 | WATAUGA<br>PO BOX 528<br>BOONE NC<br>28607-0528<br>(828) 265-8061 |
| WAYNE<br>309 E CHESTNUT ST<br>GOLDSBORO NC<br>27530-4903<br>(919) 731-1411 | WILKES<br>110 NORTH ST<br>RM 315<br>WILKESBORO NC<br>28697-2469<br>(336) 651-7339 | WILSON<br>PO BOX 2121<br>WILSON NC<br>27894-2121<br>(252) 399-2836 | YADKIN<br>PO BOX 877<br>YADKINVILLE NC<br>27055-0877<br>(336) 849-7907 | YANCEY<br>PO BOX 763<br>BURNSVILLE NC<br>28714-0763<br>(828) 682-3950 |

JA207

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | |
| *Plaintiffs,* | |
| *v.* | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | **AMENDED MOTION TO INTERVENE AS DEFENDANTS** |
| *Defendants,* | |
| and | |
| DEMOCRATIC NATIONAL COMMITTEE, | |
| *Intervenor-Defendant.* | |

Pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, Proposed Intervenors North Carolina State Conference of the NAACP ("North Carolina NAACP"), Jackson Sailor Jones, and Bertha Leverette move to intervene as of right as Defendants in this matter, or in the alternative, move for permissive intervention pursuant to Rule 24(b). This Amended Motion and its accompanying Memorandum of Law amends the Motion to Intervene filed with the Wake

**JA208**

County Superior Court on September 4, 2024, before this case was removed to this Court on September 23, 2024, to (1) explain the grounds for intervention under the Federal Rules of Civil Procedure and federal law in a memorandum of law consistent with Local Rule 5.3(c)(2); and (2) add an additional Proposed Intervenor, Bertha Leverette.

Pursuant to Rule 24(c), a proposed Answer by Proposed Intervenors is attached hereto as **Exhibit A**.[1] Proposed Intervenors also attach as **Exhibits B, C, and D**, the declarations of Proposed Intervenors North Carolina NAACP, Jackson Sailor Jones, and Bertha Leverette, respectively. Consistent with Judge Richard E. Myers II's preferences, Proposed Intervenors also attach a proposed order granting intervention.

As set forth in the accompanying memorandum in support of the Amended Motion to Intervene, Proposed Intervenors oppose Plaintiffs' requested relief that Defendant identify and remove approximately 225,000 North Carolinian voters from the state's voter registration rolls or, alternatively, to erect additional barriers (including requiring them to vote provisional ballots) for these voters. At the time Plaintiffs filed the Complaint, they sought this drastic relief fewer than 65 days before the 2024 presidential election, which is now fewer than 40 days away. Plaintiffs' request, on the eve of the impending General Election, is unprecedented and improper. The action is founded on the unsupported belief that every one of these 225,000 voters is "ineligible" because they allegedly did not include their driver's license number or Social Security number on their voter registration forms when registering to vote. The notion that these voters are "unlawfully" registered to vote and therefore must be purged is patently false. The exclusion of this information

---

[1] If this Court grants intervention to the Proposed Intervenors, the Proposed Intervenors respectfully request the opportunity to file a motion to dismiss before the Proposed Answer is docketed, and would respectfully request that that motion be heard at earliest opportunity and/or on the same timeline as any other similar motions filed by Defendants or Intervenor-Defendant DNC.

**JA209**

from many individuals' voter registration forms is largely due to a simple fact—until December 2023, North Carolina's voter registration forms made this information *optional* rather than *mandatory*. This cannot and does not justify purging individual voters, who would find themselves kicked off of the rolls through no fault of their own.

Proposed Intervenor North Carolina NAACP seeks to intervene on behalf of its members, some of whom are also directly implicated by the present Complaint. Plaintiffs' requested relief would not only deny these members of their right to vote, it would also cause North Carolina NAACP to divert organizational resources from its voter mobilization and election protection efforts to identify, contact, and assist voters affected by the Complaint in time to participate in the upcoming 2024 General Election. Proposed Individual Intervenors Jackson Sailor Jones and Bertha Leverette are eligible North Carolina voters who would be stripped of their right to vote by Plaintiffs' requested relief, and are thus directly implicated by the present Complaint.

The existing Defendants do not adequately represent Proposed Intervenors' interests here. They necessarily represent the interests of the government, which has a wide array of constituents who may not have the same needs as the 225,000 vulnerable voters targeted by Plaintiffs' requested purge. Furthermore, the Democratic National Committee ("DNC"), intervening on behalf of the Democratic Party to defend the specific interests of Democratic voters and candidates, cannot adequately represent Proposed Intervenors' interests. Proposed Intervenors seek to protect their own fundamental right, and the right of North Carolina NAACP's members and the voters it has engaged in the political process on a nonpartisan basis, to have their voices heard on Election Day.

For these reasons, those set forth in more detail in the accompanying memorandum, and because Proposed Intervenors satisfy each requirement for intervention as a matter of right under

**JA210**

Federal of Civil Procedure 24(a)(2), the Court should grant their motion to intervene. Alternatively, the motion should be granted on a permissive basis under Rule 24(b)(2).

Proposed Intervenors have sought to confer with the parties regarding their respective positions on the Motion on September 26, 2024. As of filing, Defendants and Intervenor-Defendant have both consented to the proposed motion, and Plaintiffs have not indicated their position.

**WHEREFORE**, Proposed Intervenors respectfully request that the Court grant their Motion to Intervene as a matter of right, or in the alternative with permission of the Court,.

Respectfully submitted this 27th day of September 2024.

By: */s/ Hilary Harris Klein*

Lee H. Rubin (*pro hac vice* forthcoming)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com

Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (*pro hac vice* forthcoming)
MAYER BROWN LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No. 60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice* forthcoming)
Jennifer Nwachukwu (*pro hac vice* forthcoming)
Pooja Chaudhuri (*pro hac vice* forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600

**JA211**

(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA212**

5

## CERTIFICATE OF SERVICE

I hereby certify that September 27, 2024, I electronically filed the foregoing **AMENDED MOTION TO INTERVENE AS DEFENDANTS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Defendants and Intervenor-Defendant Republican National Committee. I also hereby certify that I have transmitted via mail and electronic mail the document to the following non-CM/ECF participants:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley & Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**JA213**

6

# EXHIBIT A

Intervenors' Proposed Answer

**JA214**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | |
| *Plaintiffs*, | |
| *v.* | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | **[PROPOSED] ANSWER OF INTERVENOR-DEFENDANTS NORTH CAROLINA NAACP, JACKSON SAILOR JONES, and BERTHA LEVERETTE** |
| *Defendants*, | |
| and | |
| DEMOCRATIC NATIONAL COMMITTEE, | |
| *Intervenor-Defendant*, | |
| and | |
| NORTH CAROLINA NAACP, JACKSON SAILOR JONES, and BERTHA LEVERETTE, | |
| *Intervenor-Defendants*. | |

Intervenors North Carolina State Conference of the National Association for the

Advancement of Colored People ("North Carolina NAACP"), Jackson Sailor Jones, and Bertha

**JA215**

Leverette, ("Individual Intervenors"), by and through their attorneys, submit the following Answer to Plaintiffs' Complaint. Intervenors respond to the allegations in the Complaint as follows:

### INTRODUCTION

1.     "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

ANSWER: Admitted that the case quoted speaks for itself and, otherwise, that this paragraph states a legal conclusion to which no response is required.

2.     Free and fair elections are the bulwark of the citizenry's trust in their government. Ensuring that qualified voters—and only qualified voters—are able to vote in elections is the cornerstone of that compact between the state and its citizens. But trust must be earned.

ANSWER: Admitted that free and fair elections are fundamental to trust in government and that ensuring qualified voters are able to vote in elections is a cornerstone of that compact between the state and its citizens. Denied to the extent the allegations in this paragraph imply a lack of trust in North Carolina's elections or that any lack of trust in North Carolina's elections has any foundation in fact.

3.     The North Carolina State Board of Elections ("NCSBE") betrayed that trust when it allowed over 225,000 people to register to vote with registration forms that failed to collect certain required identification information before the registration forms were processed, a

### JA216

plain violation of Section 303 of the Help America Vote Act ("HAVA"). Because of these errors, the North Carolina voter rolls, which both HAVA and state law mandates that Defendants regularly maintain, are potentially replete with ineligible voters—including possible non-citizens—all of whom are now registered to vote.

ANSWER: Denied.

4.       By failing to collect certain statutorily required information prior to registering these applicants to vote, Defendants placed the integrity of the state's elections into jeopardy.

ANSWER: Denied.

5.       Defendants admit they violated HAVA and, as a result, state law. Yet, even when concerned citizens brought these issues to their attention, Defendants inexplicably refused to correct their wrongs. All Defendants offer as a solution is a half-hearted promise that those who were ineligible to register but were allowed to anyway will naturally filter themselves out from the state's voter rolls when they conduct other election-related activities.

ANSWER: Denied, on information and belief, that the Defendants have admitted to any HAVA violation. The North Carolina State Board of Elections issued an Order on December 6, 2023, stating that "a violation of Section 303 of HAVA *could* occur as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number, and that the appropriate remedy is to implement changes recommended by staff to the voter registration application form and any related materials," (emphasis added) while further determining that "no one who lacked this information when registering since the enactment of HAVA would have been allowed to vote without proving their identity consistent with HAVA." The remaining allegations in this paragraph are also denied.

**JA217**

6.      This inaction misses the mark. Not only does this "solution" fail to remedy the ongoing violations of state and federal law or account for Defendants' responsibilities under the same, but it leaves North Carolinians to wonder how they can trust in the security of their elections, especially when those tasked with protecting their rights cannot be bothered to do what is required by law.

ANSWER: Denied.

7.      Even worse, this "solution" sends the message to the millions of duly qualified and registered voters in North Carolina that their chief elections officials will shirk their responsibilities and refuse to verify whether those who vote in the state's elections are entitled to do so in the first place.

ANSWER: Denied.

8.      This ominous message eviscerates confidence in North Carolina's elections and it ensures that *Purcell*'s warning of distrust and disenfranchisement may soon come true.

ANSWER: Denied.

9.      By failing to do the required work to determine if Defendants' violation of HAVA has resulted in the registration of ineligible voters, and thereby allowing unlawfully registered persons to vote in the state's elections, Defendants' actions further jeopardize the individual right to vote that is guaranteed to every qualified voter in North Carolina. *See,* N.C. Const. art. VI § I; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

ANSWER: Admitted that the constitutional provision and cases cited exist and speak for themselves. The allegations in this paragraph are otherwise denied.

10.      With the November 2024 election fast approaching, North Carolinians cannot

**JA218**

afford to simply wait and see. Defendants admit they violated federal law. Now, they must be required to remedy their actions before these failures impact the results of the 2024 elections.

ANSWER: Denied, and the response to Paragraph 5 above is incorporated by reference in the response to the allegations in this paragraph.

**PARTIES**

11.     The Republican National Committee is the national committee for the Republican Party; representing all registered Republicans across both the state and nation, as well as the values they stand for. The RNC serves as the collective voice for the Republican Party's platform. It is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14) and a political party as defined by N.C. Gen. Stat. § 163-96. The RNC's principal place of business is 310 First Street SE, Washington, D.C.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

12.     The RNC's core mission involves organizing lawful voters and encouraging them to support Republican candidates at all levels of government, including throughout North Carolina. The RNC expends significant time and resources fighting for election security and voting integrity across the nation, including in North Carolina. These efforts are intended to ensure that the votes and voices of its members, its candidates, and the party are not silenced or diluted in any way. Recent rises in non-citizens and other unqualified persons voting or seeking to vote in elections has forced the RNC to divert its efforts and funds in order to hold elections officials accountable to what both federal and state laws require.

ANSWER: Denied to the extent that the allegations in this paragraph suggest that non-citizens are voting or seeking to vote in elections in any measurable, significant, provable

**JA219**

degree or that the number of non-citizens voting or seeking to vote is "rising" in any way. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

13.    The North Carolina Republican Party is a state committee of the Republican Party, as defined by 52 U.S.C. § 30101(15), and a political party as defined by N.C. Gen. Stat. § 163-96. The NCGOP represents the interests of registered Republicans across North Carolina. Its headquarters and principal place of business is 1506 Hillsborough St, Raleigh, NC 27605. The NCGOP represents the interests of registered Republican voters, residing across all one hundred counties in the state. The NCGOP also advocates for the interests of tens of thousands of non-affiliated voters who align with various aspects of the Republican Party platform.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

14.    The NCGOP's mission and platform largely mirror that of the RNC, including an emphasis on election integrity and security. The NCGOP's core mission includes counseling interested voters and volunteers on election participation including hosting candidate and voter registration events, staffing voting protection hotlines, investigating reports of voter fraud and disenfranchisement, and providing election day volunteers in all one hundred counties across North Carolina. The NCGOP spends tremendous time and effort advocating for its members throughout all levels of state government, working to make sure they are heard both at the ballot box and beyond.

ANSWER: Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

15.    Plaintiffs have organizational standing to bring this action. Defendants' actions

**JA220**

and inaction directly impact Plaintiffs' core organizational missions of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates for office. Defendants' violations of HAVA and the subsequent refusal to remedy their wrongdoing, in accordance with what state law requires, has forced Plaintiffs to divert significantly more of their resources into combatting election fraud in North Carolina. Plaintiffs' organizational and voter outreach efforts have been and will continue to be significantly stymied due to Defendants' ongoing failures. As a result, Plaintiffs will have no choice but to expend increased amounts of time and money, beyond what they would have already spent, in order to combat this unwarranted interference with their central activities. For example, because of Defendants' violations of state law, Plaintiffs will need to commit added time and resources into monitoring North Carolina's voter rolls, voter activity, and responding to instances of potential voter fraud in upcoming elections, tasks required of Defendants under state and federal law.

> ANSWER: This paragraph states a legal conclusion regarding standing to which no response is required. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

16. Additionally, NCGOP has associational standing because its members have standing in their own right to challenge Defendants' actions here. NCGOP represents millions of registered Republican voters across the state of North Carolina, including at least one registered Republican voter in every one of the state's one hundred counties, which is a matter of public record. NCGOP's members are harmed by these inaccurate voter rolls as well as Defendants' ongoing HAVA and state law violations. These members' votes are undoubtedly diluted due to ineligible voters participating in elections due to Defendants' statutory violations. Additionally, these members' rights to participate in a fair and secure electoral process, free from voter fraud,

will be significantly hindered. Ensuring such freedom and security in all elections throughout North Carolina is germane to the NCGOP's organizational mission.

> ANSWER: This paragraph states a legal conclusion regarding standing to which no response is required. Intervenors lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph regarding NCGOP membership or the NCGOP's organizational mission. The allegations in this paragraph are otherwise denied.

17.     Plaintiffs are further harmed in their ability to effectively compete in elections across the state as Defendants' refusal to maintain accurate and updated voter rolls risks opening the door to potentially fraudulent votes and inaccurate election results. This harm is especially palpable considering North Carolina's party-based primary system which makes verifying the accuracy of each voter registration form that much more crucial.

> ANSWER: Denied.

18.     The North Carolina State Board of Elections is the state agency tasked with "general supervision over primaries and elections of the state." *See* N.C. Gen. Stat. § 163-22. NCSBE is tasked with ensuring that elections in North Carolina comply with all relevant state and federal laws and, in NCSBE's own words, "ensur[ing] that elections are conducted lawfully and fairly."[1]

> ANSWER: Admitted that the statute cited exists and speaks for itself, but denied that it is accurately quoted. N.C. Gen. Stat. § 163-22(a) provides the North Carolina State Board of Elections with "general supervision over *the* primaries and elections *in* the *State*." (emphasized text corrected from that in the allegation). Admitted that the NCSBE's website is accurately quoted.

---

[1] https://www.ncsbe.gov/about

**JA222**

19.     Karen Brinson Bell is the Executive Director of NCSBE and the state's "Chief Election Official" as defined by N.C. Gen. Stat. § 163-82.2. In this capacity, Ms. Brinson Bell oversees elections in all one hundred counties in North Carolina and administering all elections occurring therein. *See* N.C. Gen. Stat. § 163-27(d). Ms. Brinson Bell is sued in her official capacity.

ANSWER: Admitted that Ms. Brinson Bell is the Executive Director of the State Board of Elections and that the statutes cited exist and speak for themselves.

20.     Alan Hirsch is the Chair of NCSBE. He resides in Chapel Hill, North Carolina. Mr. Hirsch is sued in his official capacity.

ANSWER: Admitted that Mr. Hirsch is the Chair of the State Board of Elections and that Plaintiffs have purported to sue Mr. Hirsch in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

21.     Jeff Carmon is the Secretary of NCSBE. He resides in Snow Hill, North Carolina. Mr. Carmon is sued in his official capacity.

ANSWER: Admitted that Mr. Carmon is the Secretary of the State Board of Elections and that Plaintiffs have purported to sue Mr. Carmon in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

22.     Stacy Eggers, IV is a member of NCSBE. He resides in Boone, North Carolina. Mr. Eggers, IV is sued in his official capacity.

ANSWER: Admitted that Mr. Eggers is a member of the State Board of Elections and that Plaintiffs have purported to sue Mr. Eggers in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining

**JA223**

allegations in this paragraph.

23.     Kevin N. Lewis is a member of NCSBE. He resides in Rocky Mount, North Carolina. Mr. Lewis is sued in his official capacity.

ANSWER: Admitted that Mr. Lewis is a member of the State Board of Elections and that Plaintiffs have purported to sue Mr. Lewis in his official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

24.     Siobhan O'Duffy Millen is a member of NCSBE. She resides in Raleigh, North Carolina. Ms. Millen is sued in her official capacity.

ANSWER: Admitted that Ms. Millen is a member of the State Board of Elections and that Plaintiffs have purported to sue Ms. Millen in her official capacity. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the claims asserted herein pursuant to N.C. Gen. Stat. § 7A-245.

ANSWER: This paragraph contains legal conclusions to which no response is required. To the extent this paragraph requires a further response, denied.

26.     This Court has personal jurisdiction over NCSBE as it is a state agency in North Carolina.

ANSWER: This paragraph contains legal conclusions to which no response is required.

27.     This Court has personal jurisdiction over Executive Director Karen Brinson Bell, Chair Alan Hirsch, Secretary Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy

Millen as each is sued in their official capacities as appointed officials in North Carolina. Each is a citizen of North Carolina and each resides in the state.

ANSWER: This paragraph contains legal conclusions to which no response is required. Admitted that Plaintiffs have purported to sue the listed individuals in their official capacities. Intervenors lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph.

28.     Venue is proper in this court pursuant to N.C. Gen. Stat. § 1-82.

ANSWER: This paragraph contains legal conclusions to which no response is required.

## FACTUAL ALLEGATIONS

29.     Defendants are required to maintain accurate and updated statewide voter registration lists ("voter rolls"). N.C. Gen. Stat. § 163-82.11.

ANSWER: Denied that Plaintiffs' characterization of the cited statute is correct, and instead admit that the cited statute exists speaks for itself. N.C. Gen. Stat. § 163-82.11 requires the State Board of Elections to "develop and implement a statewide computerized voter registration system to facilitate voter registration and to provide a central database containing voter registration information for each county" in compliance with federal law.

30.     In addition to other standards, Defendants must ensure that the voter rolls are in full compliance with the requirements of Section 303 of HAVA. *Id*. at § 163-82.11(c) ("The State Board of Elections *shall* update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA].") (emphasis added).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The remaining allegations in this paragraph constitute legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in this paragraph are

**JA225**

otherwise denied.

31.     Due to this express mandate that North Carolina's voter rolls must be maintained in a manner compliant with section 303(a) of HAVA, it is important to review what that section requires of Defendants. This, in turn, illustrates Defendants' failure to fulfill their statutory duties under state law.

ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

32.     Congress, through HAVA, set requirements for how states must implement and maintain their voter rolls. *See*, *e.g.*, 52 U.S.C. § 21081, 21082, and 21083.

ANSWER: Admitted that the cited statutes exist and speak for themselves. Denied to the extent this allegation implies HAVA sets forth the only federal requirements by Congress on states on how they must implement and maintain their voter rolls. Importantly, the National Voter Registration Act ("NVRA"), and provisions codified in 52 U.S.C. § 20507, impose requirements on North Carolina's voter list maintenance practices in addition to other federal statutory and constitutional requirements.

33.     Among other standards, HAVA mandates that states must implement computerized statewide voter rolls to serve as the "single system for storing and managing the official list of registered voters throughout the State." *Id.* at § 21083(a)(1)(A)(i).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

34.     HAVA goes on to require that the rolls will "be coordinated with other agency databases within the state" and that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an

**JA226**

expedited basis at the time the information is provided to the local official." *Id*. at § 21083(a)(1)(A)(iv), (vi).

ANSWER: Admitted that the quoted statute exists and speaks for itself. To the extent a further response is required, the allegations in this paragraph are otherwise denied.

35.    HAVA further provides that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* at (viii).

ANSWER: Admitted that the quoted statute exists and speaks for itself. To the extent a further response is required, the allegations in this paragraph are otherwise denied.

36.    Once a state has established the computerized voter registration list required by HAVA, 52 U.S.C. § 21083(a)(2) provides certain actions the state must take to ensure the list is accurately maintained "on a regular basis." *Id.*

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

37.    Importantly, these maintenance instructions include processes and procedures for removing the names of ineligible voters from the state's voter rolls. *Id.* at § 21083(a)(2)(A). HAVA also sets the standard of conduct for voter roll maintenance, requiring the state to ensure that: "(i) the name of each registered voter appears in the computerized list; (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and (iii) duplicate names are eliminated from the computerized list." *Id.* at § 21083(a)(2)(B).

ANSWER: Admitted that the quoted statute exists and speaks for itself. Denied to the extent this allegation implies this provision is the only set of requirements regarding the removal of voter registrations. Importantly, the NVRA, and specifically 52 U.S.C. § 20507(c)(2), provides that "[a] State shall complete, not later than 90 days prior to the

**JA227**

date of a primary or general election for Federal Office, any program the purpose of which is to systematically remove the ineligible voters form the official lists of eligible voters" with limited exceptions that do not apply here. The NVRA further requires, as set forth in 52 U.S.C. § 20507(b), that "[a]ny State program or activity to protect the integrity of the electoral process ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . (1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."

38.    Next, HAVA mandates that states maintain the technological security of their voter rolls, requiring the states to implement provisions making "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(3)(4).

ANSWER: Admitted that the quoted statute exists and speaks for itself. Denied that Plaintiffs' characterization of the quoted statute is correct. The security provision in 52 U.S.C. § 21083(a)(3) requires states to implement "adequate technological security measures to prevent the *unauthorized access* to the computerized list," (emphasis added), whereas the separate provision under § 21083(a)(4) addresses removals and, in addition to the quoted passage requiring a "reasonable effort" to maintain those lists, also requires states to provide "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."

39.    In addition to setting the standards for establishing and maintaining accurate state voter rolls, HAVA has a clearly described process for verifying the identification of applicants registering to vote. *See id.* at § 21083(a)(5)(A)(i).

ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in

**JA228**

this paragraph are otherwise denied.

40.    First, it requires that applicants provide either a driver's license number or the last four digits of their social security number. Providing this information is a necessary prerequisite **before** the registration form can be processed by the state. *Id.* at § 21083 (viii). In fact, § 21083(a)(5) prevents a state from accepting a voter registration form for an election for Federal office unless the form includes the listed information. *Id.*

ANSWER: Denied that Defendants' characterization of the cited statutes is accurate, and denied that the alleged "§ 21083 (viii)" provision exists under Chapter 52 of the United States Code at all. 52 U.S.C.S. § 21083(a)(1)(A)(viii) provides that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(5) provides that voters lacking a current and valid driver's license or social security number may still be registered so long as the state "assign[s] the applicant a number which will serve to identify the applicant for voter registration purposes." In North Carolina, this alternative number can include the NCID, which, upon information and belief, is issued to every registered voter by the North Carolina State Board of Elections, as well as the ID number on identification issued by the N.C. Division of Motor Vehicles for individuals who require a photo ID but do not require a driver license, and which registrants can enter on their voter registration form to satisfy the identification requirement. 52 U.S.C. § 21083(a)(5) also provides that "[t]he State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law," delegating to the States the form and method by which individuals can meet these HAVA requires.

41.    Only if a registrant affirmatively confirms they do not have either form of

**JA229**

identification, the state must "assign the applicant a number which will serve to identify the applicant for voter registration purposes . . . [which] shall be the unique identifying number assigned under the list." *Id*. at § 21083(a)(5)(A)(ii).

ANSWER: Admitted that the quoted statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

42.     Prior to December 2023,  NCSBE used voter registration forms that failed to collect this required information. Specifically, NCSBE collected, processed, and accepted voter registration applications that lacked **both** the driver's license number and social security number because NCSBE's form did not tell the voter the information was required.

ANSWER: Denied that, prior to December 2023, the NCSBE used voter registration forms that failed to collect this required information. The voter registration form used in and prior to December 2023 provided a box in which voters could provide this information and, as a result, this information exists on the registration records for millions of voters in the state. Otherwise, it is admitted upon information and belief that the voter registration form in use before a revised version was issued in early 2024 did not require voters to provide a NC DMV number or the last four digits of the voter's Social Security Number in instances where the voter had such numbers when they registered.

43.     As a result of these errors, voters did not utilize the catchall provision of § 21083(a)(5)(A)(ii) as the registration forms failed to make registrants aware that the driver's license or social security number identifying information was necessary for the application to be processed. Thus, any affirmative attestation regarding one's lack of those relevant documents was impossible.

ANSWER: Admitted that the statute cited exists and speaks for itself. Denied to the extent

**JA230**

that this paragraph implies that because the prior voter registration form made it impossible to attest to one's eligibility under the catchall provision, the eligibility of registrants who used the old form is reasonably questioned. Otherwise denied.

44.    Defendants ignored HAVA's requirement that the identifying information be collected before an application can be accepted and processed. As a result, NCSBE accepted hundreds of thousands of voter registration applications without applying the HAVA identifying information requirement, resulting in approximately 225,000 applicants being registered to vote in a manner out-of-compliance with HAVA.

ANSWER: Denied.

I.    ***Defendants Admit They Used Voter Registration Forms Which Were HAVA Non-Compliant***

45.    In North Carolina, an individual must register to vote prior to voting. *See* N.C. Gen. Stat. §§163-54, 163-82.1(a); *see also* N.C. Const. art. VI § 3(1).

ANSWER: Admitted that the statute and constitutional provision cited exist and speak for themselves.

46.    The state's registration form asks certain information, seeking to ascertain whether the applicant is qualified to vote under applicable state and federal laws. N.C. Gen. Stat. §163- 82.4(e). In addition to the information on the form, an elections official may ask an applicant for other "information [that is] necessary to enable officials of the county where the person resides to satisfactorily process the application." *Id.* at § 163-82.4(a).

ANSWER: Admitted that the statutes cited exist and speak for themselves.

47.    Despite the informational requirements mandated by both state and federal law— along with the processes and procedures under state law for obtaining the same information— Defendants wholly failed to uphold their statutory duties.

**JA231**

ANSWER: Denied.

48.     Defendants' noncompliance with HAVA was first raised when a concerned citizen, Carol Snow, filed a complaint with NCSBE on October 6, 2023. (hereinafter, "Snow Amended HAVA Complaint").[2]

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

49.     In her complaint, Ms. Snow alleged that NCSBE's voter registration form, which was still in use at the time of her filing, failed to indicate that "the applicant's qualifying identification of the applicant's driver's license number or last 4 digits of the applicant's social security number, are required if one or the other have been issued to the applicant." *See* Snow Amended HAVA Complaint, p. 1.

ANSWER: Admitted that a HAVA Complaint was filed by Carol Snow on October 6, 2023, and that the contents of that filing speak for themselves. The allegations in this paragraph are otherwise denied.

50.     As Ms. Snow's complaint pointed out, the relevant portion of NCSBE's voter registration form then in use identified certain categories of **<u>required</u>** information by denoting them in text blocks with red background. This is contrasted by the white background used for **<u>optional</u>** categories of information on the form. Despite HAVA requiring either a driver's license number or the last four digits of a social security number be provided by the applicant, the registration form had a white text box background for this information, not red. *See* Fig. 1, below; *see also* Snow Amended HAVA Complaint, p. 2.  The applicant had no way to know from the form

---

[2] Publicly available at:
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20Complaint.pdf

**JA232**

that the driver's license number or the social security number were required for their form to be accepted and processed by NCSBE.

**Fig. 1 – NCSBE Voter Registration Form Prior to NCSBE's December 6, 2023 Order**



ANSWER: Admitted that a HAVA Complaint was filed by Carol Snow on October 6, 2023, and that the contents of that filing speak for themselves. The allegations in this paragraph are otherwise denied.

51.      At its meeting on November 28, 2023, NCSBE considered Ms. Snow's complaint. At the meeting[3] and in its December 6, 2023, Order,[4] NCSBE acknowledged that its voter registration forms did not sufficiently notify applicants that their driver's license number or last four digits of their social security number were required in order for their registration to be processed and accepted.

ANSWER: Denied as to Plaintiffs' characterization of the November 28, 2023, meeting

---

[3] Meeting documents and a recording of NCSBE's November 28, 2023 meeting is available here: dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2023-11-28/

[4] The December 6, 2023 Order from NCSBE is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf

**JA233**

and the December 6, 2023, Order. Intervenors incorporate by reference their Answer to

Paragraph 5 in response to this paragraph.

52.    Defendants further acknowledged that they used the voter registration form

which failed to comply with HAVA for approximately 225,000 voters throughout North

Carolina.[5]

ANSWER: Denied as to Plaintiffs' characterization of the November 28, 2023, meeting

and the December 6, 2023, Order. Upon information and belief, denied as to the

allegations in Footnote 5.

53.    It follows then, that by failing to comply with HAVA, Defendants admittedly

violated their duties under N.C. Gen. Stat. § 163-82.11(c).

ANSWER: Denied.

54.    Ultimately, Defendants granted Ms. Snow's request to change the voter

registration form **moving forward**.

ANSWER: Admitted that, in the December 6, 2023, Order, the North Carolina State

Board of Elections stated that "the appropriate remedy is to implement changes

recommended by staff to the voter registration application form and any related materials"

and that this Order speaks for itself. Except as expressly admitted, the allegations of this

paragraph are denied.

55.    In contrast, Defendants denied Ms. Snow's request to identify and contact voters

whose registrations were improperly accepted due to their forms lacking the necessary

identification information. Specifically, Defendants took the position that:

---

[5] Given that NCSBE could approximate the number of voters registered in this manner, Defendants, upon information and belief, have the ability to track which voters were registered using the non-compliant form and thus, can contact those voters and request the missing information from them.

**JA234**

   a.  HAVA does not authorize NCSBE to contact registered voters (as opposed to applicants)[6]; and

   b.  Even if those registered voters did not provide the required identification information as part of their application, they would have to provide other identifying information in connection with other features of the voting process, such as requesting an absentee ballot.

ANSWER: Denied as to Plaintiffs' characterization of the December 6, 2023, Order, which speaks for itself. In that Order, the North Carolina State Board of Elections stated that HAVA's "purpose of identifying the registrant upon initial registration is already accomplished because any voter who did not provide a driver's license number or the last four digits of a Social Security number would have had to provide additional documentation to prove their identity before being allowed to vote, by operation of the separate provision of HAVA identified above. In other words, no one who lacked this information when registering since the enactment of HAVA would have been allowed to vote without proving their identity consistent with HAVA." Denied as to Plaintiffs' characterization of the statutes cited in Footnote 6, and otherwise admitted that these statutes exist and speak for themselves, except that 52 U.S.C. § 21083(a)(2)(A)(B) does not exist, but § 21083(a)(2)(A), and § 21083(a)(2)(B), do.

56.     Recognizing the inadequacy of Defendants' "solution," Ms. Snow raised the

---

[6] Curiously, this position is not supported by the plain language of HAVA which provides, among other things, processes for identifying and removing the names of "ineligible **voters**" from the state's voter rolls. *See* 52 U.S.C. § 21083(a)(2)(A)(B). To the extent Defendants believe HAVA only allows them to notify applicants of issues with their registration forms, *see id.* at § 21083(4), Defendants failed to do so on the front end and instead, improperly processed and accepted their registration forms. Thus, NCSBE's logic is self-defeating; it cannot violate the statute by allowing these invalid applicants to become registered voters, only to then say they cannot contact them because those registrants are not "applicants."

**JA235**

need to actually remedy these improper registrations during NCSBE's March 11, 2024 and April 11, 2024 meetings. Both times NCSBE denied Ms. Snow's requests.

> ANSWER: Admitted that Carol Snow submitted a second HAVA complaint on February 20, 2024, concerning alleged duplicates in the voter file, and that the North Carolina State Board initially heard complaint on March 11, recessed, and resumed and concluded the hearing on this complaint on April 11 in a unanimous vote to dismiss the Complaint. Also admitted that the North Carolina State Board of Elections issued a written Order on May 20, 2024, dismissing Ms. Snow's February 20 HAVA complaint. The allegations in this paragraph are otherwise denied.

57.     Under the plain text of HAVA, NCSBE should not have accepted or processed these registration forms since they lacked either the required identification or an affirmative attestation that the registrant did not have the necessary information. *See* 52 U.S.C. §21083(a)(5).

> ANSWER: Admitted that the cited statute exists and speaks for itself. The allegations in this paragraph are otherwise denied.

58.     Similarly, Defendants should have taken immediate action to correct the accuracy of the state's voter rolls, a task mandated by HAVA and, in turn, state law. *See id.* at § 21083(a)(2); *see also* N.C. Gen. Stat. § 163-82.11(c).

> ANSWER: Denied as to Plaintiffs' characterization of the requirements of the cited statutes, but otherwise admitted that these statutes exist and speak for themselves.

59.     Nevertheless, public records provided by Defendants reveal that 225,000 voter registrations were processed and accepted despite missing both the applicant's driver's license number and the last four digits of the registrant's social security number.

> ANSWER: On information and belief, denied.

**JA236**

60.     Thus, Defendants' refusal to correct their violations is unjustifiable.

ANSWER: Upon information and belief, denied.

61.     Defendants' dismissal of Ms. Snow's straightforward solution is irreconcilable with their duties, and it damages lawfully-registered North Carolina voters and candidates, including Republican voters who are members of Plaintiffs, and Republican candidates whom Plaintiffs and their members support.

ANSWER: Denied.

II.     ***Despite Their Errors, Defendants Refuse to Identify Unqualified Voters or Remove Them From The State's Voter Rolls***

62.     HAVA places the burden on the state to "determine whether the information provided by an individual is sufficient to meet the requirements of [the statute]." *See* 52 U.S.C. § 21083(a)(5)(A)(iii). Similarly, N.C. Gen. Stat. § 163-82.11(c) mandates that the state maintain its voter rolls in accordance with what HAVA requires.

ANSWER: Denied as to Plaintiffs' characterization of 52 U.S.C. § 21083(a)(5)(A)(iii), and otherwise admitted that the statutes cited exist and speak for themselves.

63.     Through this affirmative directive—along with the other enumerated requirements throughout the statute—Defendants either knew or should have known that they were tasked with ensuring that only properly completed registration forms were accepted and processed. Even still, Defendants permitted hundreds of thousands of people to register without providing the basic information HAVA requires.

ANSWER: Intervenors lack sufficient information and knowledge to deny or admit the allegations in this paragraph.

64.     After this failure, Defendants should have immediately taken action to remedy this mistake, including confirming that ineligible voters were not on the state's voter rolls.

**JA237**

*See* 52 U.S.C. § 21803(a)(2)(A)(B); *see also* N.C. Gen. Stat. § 163-82.11(c).

ANSWER: Denied that § 21803(a)(2)(A)(B) exists under Chapter 52 of the United States Code, but otherwise admitted that § 21803(a)(2)(A) and § 21803(a)(2)(B) exist and N.C. Gen. State. § 163-82.11(c) exist and that these statutes speak for themselves. The allegations in this paragraph are otherwise denied.

65.     By declining to uphold their statutory duties, Defendants violated both state and federal law, irreparably damaged North Carolina voters, the NCGOP, the RNC, and their organizational missions, and most importantly, their members. Defendants opened the door to insecure elections in North Carolina, marred by potentially fraudulent votes.

ANSWER: The allegations in this paragraph set forth legal conclusions to which no response is required. The allegations in this paragraph are otherwise denied.

III.     ***By Failing to Correct Their HAVA Violations, Defendants Place Foundational Election Principles Into Jeopardy***

66.     Many states, including North Carolina, have recently confronted issues relating to non-citizens and other ineligible persons attempting to register to vote. *See, e.g.,* N.C. Gen. Stat. § 163-82.14(c1).[7]

ANSWER: Upon information and belief, denied as to the allegations in this paragraph and the contention that North Carolina has recently faced "issues relating to non-citizens and other ineligible persons attempting to register to vote" in any systematic or widespread manner. Denied that the article cited in Footnote 7 supports this assertion. Admitted that the statute cited exists and speaks for itself.

---

[7] On Wednesday, August 21, 2024, Ohio announced that it had identified at least 597 non-citizens who registered and/or voted in recent elections. This finding was precipitated by a comprehensive statewide audit which identified 154,995 ineligible registrants on the state's voter rolls. *See* https://apnews.com/article/ohio-voters-citizenship-referrals-42799a379bdda8bca7201d6c42f99c65 [last accessed 08.22.2024].

**JA238**

67.     North Carolina's statutory requirements notwithstanding, Defendants' failure to require necessary HAVA identification information before processing and accepting hundreds of thousands of voter registration forms allowed untold numbers of ineligible voters to register. Now, those ineligible voters could vote in the upcoming November 5, 2024 election and beyond.

ANSWER: Upon information and belief, denied.

68.     Upon information and belief, Defendants' violations of HAVA allowed non-citizens to register to vote in North Carolina, in direct contravention of both federal and state law. *See, e.g.,* N.C. Const. art. VI §I.

ANSWER: Admitted that N.C. Const. art. VI § I exists and speaks for itself. The allegations in this paragraph are otherwise denied.

69.     By allowing ineligible voters to register and then remain on the North Carolina voter rolls, Defendants have brought the security and validity of the state's elections into question.

ANSWER: Denied.

70.     Even worse, by refusing to correct their errors, Defendants are willfully ignoring their statutory responsibilities.

ANSWER: Denied.

71.     If Defendants do not remove ineligible voters from the state's voter rolls, then the legitimate votes of qualified voters will be diluted and disenfranchised in upcoming elections. This reality will, in turn, have a substantial chilling effect on North Carolinians' right to vote in free and fair elections. *See* N.C. Const. art. I §10.

ANSWER: Denied to the extent Plaintiffs omit and disregard the myriad of safeguards that exist in North Carolina to prevent ineligible voters from casting a ballot and from that ballot counting. Denied to the extent Plaintiffs fail to plead that any registered voter is

**JA239**

actually ineligible to cast a ballot in North Carolina. Admitted that N.C. Const. art. I § 10 exists and speaks for itself. To the extent the remaining allegations require a response, denied.

IV.    *Remedying These Errors Will Not Burden NCSBE*

72.    Defendants already maintain processes for seeking out additional information from voters who fail to provide necessary information.

ANSWER: Admitted.

73.    For example, the county boards of elections regularly contact voters who vote with a provisional ballot on election day, seeking additional identifying information from these voters as part of post-election day processes.

ANSWER: Intervenors lack sufficient information or knowledge to admit or deny the allegations in this paragraph.

74.    Notably, accurate voter roll maintenance, including removing the names of ineligible voters from voting rolls, is already required by HAVA and state law. *See* 52 U.S.C. § 21083(a)(2)(A)(B); N.C. Gen. Stat. § 163-82.11(c). Thus, any burden on Defendants in terms of time required to correct the state's voter rolls is mitigated by the fact that federal law mandates the same.

ANSWER: Denied that § 21083(a)(2)(A)(B) exists under Chapter 52 of United States Code, but otherwise admitted that § 21083(a)(2)(A) and § 21083(a)(2)(b) and N.C. Gen. State. § 163-82.11(c) exist and speak for themselves. The allegations in this paragraph are otherwise denied, especially because the NVRA, and specifically 52 U.S.C. § 20507(c)(2), provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal Office, any program the purpose of which is to systematically

**JA240**

remove the ineligible voters form the official lists of eligible voters" with limited exceptions that do not apply here.

75.    Unlike the minimal burden Defendants would face if required to correct the state's voter rolls in compliance with federal law, the burden placed on Plaintiffs is palpable. Absent immediate corrective action by Defendants, the significant harm faced by Plaintiffs will only increase. Not only will Plaintiffs' members be disenfranchised, but Plaintiffs' mission of advocating for Republican voters, causes, and candidates will be impeded by contrary votes of potentially ineligible voters.

ANSWER: Denied.

76.    With the November 5, 2024 election now three months away, early voting starting in less than two months, and ballots being mailed starting September 6, 2024, it is exceedingly important that Defendants take immediate actions to correct their wrongs, guaranteeing that qualified voters are able to vote, while preventing ineligible persons from trying to do the same.

ANSWER: Denied to the extent it implies that the current administrative practices of the North Carolina State Board of Elections and the County Board of Elections will not sufficiently guarantee the accurate tabulation of election results for the November 5, 2024, election.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF N.C.G.S. § 163-82.11(c) – WRIT OF MANDAMUS

77.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

ANSWER: Intervenors incorporate by reference all responses to the allegations in the

**JA241**

foregoing paragraphs.

78.     North Carolina law unambiguously requires Defendants to maintain the state's voter rolls in a manner compliant with Section 303 of HAVA. N.C. Gen. Stat. § 163-82.11(c).

ANSWER: The allegations of this paragraph state a legal conclusion to which no answer is required. To the extent an answer is required, the allegations are denied.

79.     Section 303 of HAVA requires that North Carolina create a computerized statewide voter registration list containing the names and registration information of every legally registered voter. 52 U.S.C. § 21083(a)(1)(A).

ANSWER: Admitted.

80.     HAVA similarly mandates that North Carolina verify the accuracy of a prospective voter's registration information, **_prior_** to accepting the registration. Specifically, the state must collect the registrant's driver's license number or last four digits of their social security number or, alternatively, the registrant must affirmatively attest that they have neither. _Id._ at § 21083(a)(5)(A).

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied as to Plaintiffs' characterization of that statute.

81.     HAVA also requires that Defendants regularly review and maintain the accuracy of the state's voter registration list, including, if applicable, removing ineligible persons from the voter roll. _Id._ at § 21083(a)(2)(4).

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied as to Plaintiffs' characterization of the statute.

82.     North Carolina law similarly mandates the collection of certain identification information from applicants, creating certain tools for verification of the same. _See_ N.C. Gen. Stat.

§§163-54, 163-82.1(a); 163-82.4 (a)(e).

ANSWER: Admitted that N.C. Gen. Stat. §§ 163-54 and 163-82.1(a) exist and speak for themselves. Denied that a subsection (a)(e) exists under N.C. Gen. Stat. § 163-82.4, but admitted that §§ 163-82.4(a) and 163-82.4(e) exist and speak for themselves.

83.      Upon information and belief, Defendants failed to collect the statutorily required information from at least 225,000 registrants whose registrations were, in turn, processed and accepted despite lacking this necessary information.

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

84.      Upon information and belief, even once this error was identified and corrected on a forward-looking basis, NCSBE refused, and continues to refuse, to contact these registrants or verify if they have the necessary information in order to correct the accuracy of the state's voter registration list.

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

85.      Not only does the language of N.C. Gen. Stat. § 163-82.11(c) create a duty for Defendants to maintain accurate voter rolls in compliance with HAVA, but Defendants have no discretion or permissible freedom to deviate from this mandate.

ANSWER: Admitted that the statute cited exists and speaks for itself, and otherwise denied.

86.      It is without dispute that, even when this was brought to their attention, Defendants failed to act. In fact, Defendants affirmatively refused to act and correct the accuracy of the state's voter rolls as to be compliant with HAVA.

**JA243**

ANSWER: Intervenors lack sufficient information and knowledge to admit or deny the allegations in this paragraph.

87.     Due to Defendants' unambiguous refusal to act, even after acknowledging their own violation of the law, Plaintiffs have no other adequate remedy than to seek relief from this Court.

ANSWER: Denied.

88.     Unless enjoined and ordered to comply with their statutory duties, Defendants will continue to violate state law by refusing to maintain accurate voter rolls and declining to remedy the 225,000 voter registrations that should have never been processed or accepted in the first place.

ANSWER: Upon information and belief, denied.

**COUNT TWO: VIOLATION OF N.C. CONST. ART. I § 19 – MANDATORY INJUNCTION**

89.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

ANSWER: Intervenors incorporate by reference all responses to the allegations in the foregoing paragraphs.

90.     As described more fully above, Defendants have a non-discretionary, statutory duty to maintain the state's voter rolls in a manner compliant with Section 303(a) of HAVA.

ANSWER: Admitted.

91.     N.C. Gen. Stat. § 163-82.11(c) is an affirmative command, creating a duty imposed by law.

ANSWER: Admitted.

92.      Defendants admit they failed to uphold this duty when they accepted hundreds of thousands of voter registrations which were plainly non-compliant with Section 303(a) of HAVA.

ANSWER: Upon information and belief, denied.

93.      Despite this admission, Defendants refuse to take any action to remedy their violations.

ANSWER: Intervenors lack sufficient information or knowledge to admit or deny the allegation in this paragraph.

94.      Defendants' actions directly interfere with North Carolinian's fundamental right to vote. By allowing potentially ineligible persons to vote in the state's elections and remain on the state's voter rolls, Defendants have ignored their statutory and constitutional duties while simultaneously opening the door to potential widespread dilution of legitimate votes in upcoming elections.

ANSWER: Denied.

95.      Defendants cannot offer any legitimate justification, let alone a compelling interest, for this dereliction of duty.

ANSWER: Upon information and belief, denied.

96.      Defendants must be ordered to immediately and permanently rectify this harm in order to protect the integrity of North Carolina's elections.

ANSWER: Denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a writ of mandamus and a mandatory injunction ordering Defendants to develop,

**JA245**

implement, and enforce practices and policies to ensure compliance with HAVA and, in turn, N.C. Gen. Stat. § 163-82.11(c);

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

2. Direct Defendants, under a court-approved plan to be completed no later than September 6, 2024, including mandatory reporting and monitoring requirements, to take all actions necessary to remedy their violations of state law and HAVA, specifically, identifying all ineligible registrants and removing them from the state's voter registration lists in a manner consistent with state and federal law, and to the extent such removal is not feasible prior to the date set forth herein, then direct Defendants to require all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation of the required HAVA information;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response is required, denied that Plaintiffs are entitled to any of the requested relief or any other relief.

3. Direct Defendants, under a court-approved plan including mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with state law and HAVA, specifically, registering only eligible, qualified voters in a manner consistent with both statutes and maintaining the state's voter registration lists in accordance therewith;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response

**JA246**

is required. To the extent a response is required, denied that Plaintiffs are entitled to any

of the requested relief or any other relief.

4. Award Plaintiffs their reasonable attorney's fees, litigation expenses, and associated costs

incurred in connection with this action, as otherwise permitted by law;

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response

is required. To the extent a response is required, denied that Plaintiffs are entitled to any

of the requested relief or any other relief.

5. Retain jurisdiction over this matter to ensure Defendants comply with any orders issued

by this Court; and

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response

is required. To the extent a response is required, denied that Plaintiffs are entitled to any

of the requested relief or any other relief.

6. Grant such additional relief deemed just and proper.

ANSWER: This paragraph constitutes Plaintiffs' request for relief, to which no response

is required. To the extent a response is required, denied that Plaintiffs are entitled to any of

the requested relief or any other relief.

## **GENERAL DENIAL**

Intervenors deny every allegation in the Complaint that is not expressly admitted herein.

## **AFFIRMATIVE DEFENSES**

Intervenors set forth their Affirmative Defenses below, and reserve the right to amend or

supplement these Affirmative Defenses upon learning of additional facts and with additional

particularity, including citation to additional law, consistent with the North Carolina Rules of Civil

Procedure. Intervenors do not admit the relevance of any particular issue or subject in asserting

**JA247**

these Affirmative Defenses, nor do they admit to assuming the burden of proving any issue of fact

or element of cause of action where that burden properly belongs to Plaintiffs.

In their Affirmative Defenses, Intervenors allege as follows:

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs do not have standing for the claims they allege.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim on which relief can be granted because, *inter alia*, Plaintiffs have

failed to sufficiently allege that the voters lacking a driver's license or Social Security number in

their voter registration record are, in fact, ineligible voters or should be presumptively considered

as such. Plaintiffs' claims are unsupported by any factual allegations supporting the actual

ineligibility for even a single voter, much less hundreds of thousands. By contrast, applicable law,

and the documents cited and referenced in the Complaint (including North Carolina State Board

of Elections meeting records), support many reasons an eligible and registered voter might lack

either identification number in their voter file at no fault of their own, including but not limited to

the voter:

  ➤ not providing a driver's license or Social Security number at a time when the North
     Carolina voter registration form did not require it;

  ➤ not possessing a driver's license or Social Security number but otherwise being an eligible
     North Carolina citizen, as contemplated by both state and federal law exceptions;

  ➤ possessing a driver's license or Social Security number but being unable to provide that
     number when registering;

  ➤ providing a driver's license or Social Security number at the time of registration that was
     not entered into their voter registration file due to inadvertent error;

**JA248**

➢ providing a driver's license or Social Security number at the time of registration, but having the voter information mismatch to the DMV database or Social Security Administration databases for reasons unrelated to eligibility (e.g., inadvertent typos in information, misspelling or reasonable variation in names) and thus omitted in the voter file;

➢ providing a driver's license or Social Security number at a later time (such as when requested a mail-in absentee ballot) that was not entered into their voter registration file.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the November 5, 2024, election is foreclosed by the NVRA. Among other applicable federal that would be violated, their request that Defendants be compelled to "identify[] all ineligible registrations and remov[e] them from the state's voter registration lists" is prohibited by the NVRA's 90-day prohibition on such systematic removals, which came into force on August 7, 2024. 52 U.S.C. § 20507(2). The requested *en masse* removal of registered voters for lacking a driver's license or Social Security number in their registration record is also not included among the permitted reasons for removals and would thus violate this provision. *Id.* § 20507(a)(3), (4). It may also violate the state's obligation under the NVRA to "ensure that any eligible applicant is registered to vote in an election" if they have submitted a valid registration form not later than 30 days before the election. *Id.* § 20507(a)(1).

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the

**JA249**

November 5, 2024, election is foreclosed by HAVA. The relief requested, and specifically its timing and the natural limitations on implementation before voting begins, violates HAVA's requirement that states provide "safeguards to ensure voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters on the eve of the November 5, 2024, election is foreclosed by the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), which prohibits "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to remove registrants from North Carolina's list of registered voters is foreclosed by state law. Among other applicable provisions, state law enumerates specific and limited grounds for removing voter registrations and further provides that:

> Every person registered to vote by a county board of elections in accordance with this Article shall remain registered until:
>
> (1) The registrant requests in writing to the county board of elections to be removed from the list of registered voters; or
>
> (2) The registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or
>
> (3) The county board of elections determines, through the procedure outlined in G.S. 163-82.14, that it can no longer confirm where the voter resides.

N.C.G.S. § 163-82.1(c). As none of the grounds on which Plaintiffs' request removal is

**JA250**

enumerated in this statute, their request to remove voters is a direct violation of state law.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' requested relief to require voters lacking a driver's license number or Social Security number in their voter registration to vote provisionally is foreclosed by state law. Any voter found duly registered and who has not been successfully challenged is required under state law to receive "the official ballot that voter is entitled to vote." N.C. Gen. Stat. § 163-166.7(b). Provisional ballots are only permitted for any voter who "does not appear on the official list of eligible registered voters in the voting place." N.C. Gen. Stat. § 163-166.11.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted because their claims and allegations amount to an appeal of the HAVA complaints brought by Carol Snow.

Plaintiffs have no right to appeal Ms. Snow's HAVA complaint under state law. Pursuant to the HAVA requirement that states "establish and maintain State-based administrative complaint procedures" for alleged HAVA violations, 52 USC § 21112, North Carolina has required the State Board of Elections to "establish a complaint procedure" for "complaints alleging violations of Title III" of HAVA, N.C. Gen. Stat. § 163-91. However, North Carolina has also exempted the State Board from judicial review of these decisions under the Administrative Procedure Act. NCGS § 150B-1(c)(6)(providing a specific exemption from North Carolina's Administrative Procedure Act for "[t]he State Board of Elections in administering the HAVA Administrative Complaint Procedure."). Notwithstanding they were not the original party bringing the HAVA administrative complaint before the State Board, and thus have failed to exhaust administrative remedies, state law forecloses an appeal of that action as Plaintiffs attempt here.

<div align="center">

**JA251**

</div>

Plaintiffs have otherwise failed to substantiate a right to relief via writ of mandamus or pursuant to N.C. Const. art. I § 19.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted because Plaintiffs lack a private right of action to enforce the cited provisions of HAVA in this posture under either state or federal law. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (finding respondents were "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce [HAVA] § 303 in an action brought by a private litigant to justify the issuance of a [temporary restraining order]"). The sections of HAVA that have been found to be privately enforceable involve provisions that "directly and explicitly *protect*[] individual voters." *Colon-Marrero v. Velez*, 813 F.3d 1, 17–19 (1st Cir. 2016) (emphasis added). No such individual right to systematically remove duly registered voters other than one's self from a state's voter rolls exists, and thus no private action under color of HAVA requesting such relief can be sustained.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would violate North Carolina's Free Election Clause, N.C. Const. art. I § 10, by interfering with the voting process. *See Harper v. Hall*, 384 N.C. 292, 355, 886 S.E.2d 393, 434, 363–64 (N.C. 2023) (holding the free elections clause was intended to "protect against interference" and allow voters to cast a ballot "without interference").

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of

**JA252**

Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would violate North Carolina's Equal Protection Clause, N.C. Const. art. I § 19, by denying those voters without a driver's license or Social Security number in their voter file both equal protection of the laws and due process under law. *See Harper v. Hall*, 384 N.C. 292, 364 (2023) ("This Court has previously explained that the right to vote *on equal terms* is a fundamental right.") (internal quotations and citations omitted, emphasis in original).

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would impose undue and severe burdens on the fundamental right to vote, in violation of the First and Fourteenth Amendments of the United States Constitution.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring voters lacking identifying information to vote provisionally in the November 2024 election, would violate the right to due process under the Fourteenth Amendment.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief is barred by the doctrine of laches.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' requested relief, including but not limited to ordering the North Carolina State Board of Elections to remove voters *en masse* on the eve of the November 2024 election and/or requiring

**JA253**

voters lacking identifying information to vote provisionally in the November 2024 election, is

barred by the *Purcell* principle.

Respectfully submitted this 27th day of September 2024.

By: */s/ Hilary Harris Klein*

Lee Rubin (*pro hac vice* forthcoming)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com

Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (*pro hac vice* forthcoming)
MAYER BROWN LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717
(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No. 60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice* forthcoming)
Jennifer Nwachukwu (*pro hac vice* forthcoming)
Pooja Chaudhuri (*pro hac vice* forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA254**

# EXHIBIT B

Maxwell Declaration

Exhibit to Motion to Intervene by North Carolina NAACP, Jackson Sailor Jones, and Bertha Leverette

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
No. 24CV026995-910

REPUBLICAN NATIONAL COMMITTEE;
and NORTH CAROLINA REPUBLICAN
PARTY,

        *Plaintiffs,*

        *v.*

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL, in
her official capacity as Executive Director of
the North Carolina State Board of Elections;
ALAN HIRSCH, in his official capacity as
Chair of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North Carolina
State Board of Elections; STACY EGGERS
IV, KEVIN N. LEWIS, and SIOBHAN
O'DUFFY MILLEN, in their official
capacities as members of the North Carolina
State Board of Elections,

        *Defendants.*

## DECLARATION OF DEBORAH DICKS MAXWELL
## PRESIDENT OF THE NORTH CAROLINA STATE CONFERENCE
## OF THE NAACP

**JA256**

1

I, Deborah Dicks Maxwell, swear under penalty of perjury that the following information is true to the best of my knowledge and state as follows:

1. I am personally knowledgeable of the facts contained below and, if called to testify, would affirm all matters set forth herein.

2. I am a resident of Wilmington, North Carolina in New Hanover County, where I have lived since 1992. I was born in Wilmington and previously resided there for approximately 15 years.

3. Since October 2021, I have served as President of the North Carolina State Conference of the National Association for the Advancement of Colored People ("North Carolina NAACP"), a state chapter of the National NAACP, which is a 501(c)(4) registered nonpartisan, nonprofit community organization dedicated to eliminating racial hatred and racial discrimination through education, advocacy, and litigation.

4. I have been a member of the NAACP for 25 years. Prior to my time as President, I served as Assistant Treasurer, Treasurer, Vice President, and President for the New Hanover County local branch of the North Carolina NAACP. I also served as the North Carolina State Conference District Director for Bladen, Brunswick, Columbus, New Hanover, Onslow and Pender Counties, which required me to oversee six counties in southeastern North Carolina.

5. As President of the North Carolina NAACP, I am responsible for communicating with NAACP branches across North Carolina, identifying matters of statewide concern, and taking steps to address members' concerns. These responsibilities include, among other things, traveling to various parts of North Carolina for meetings and events, communicating statewide concerns to the National NAACP, advocating for or against proposed legislation or policies, making statewide programmatic decisions, and acting as a spokesperson for the North Carolina NAACP at public and private engagements.

6. I am authorized to speak for the NAACP in this matter.

7. The mission of the NAACP is to eliminate racial hatred and racial discrimination. The North Carolina NAACP follows the national NAACP mission statement in focusing on political, educational, and other rights affecting all people and people of color. The national mission statement identifies the NAACP's mission: "[T]o achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color."[1]

8. The North Carolina NAACP engages in a wide variety of educational, advocacy, and legal work to ensure that communities of color and other marginalized communities throughout North Carolina are able to exercise the right to vote. This includes voter

[1] *See* https://ncnaacp.org/mission-vision/.

**JA257**

2

registration, election protection, and voter mobilization events hosted by branches of the state conference. In addition, the North Carolina NAACP conducts voter education events and educational campaigns intended to inform voters about the requirements to register and vote, as well as any legal changes that might affect how, where, or when they are able to vote. This work is achieved through engagement with our members, who volunteer and organize events held both statewide and by local branches. The North Carolina NAACP has been engaging in all of these activities ahead of the 2024 General Election.

9. National NAACP membership compliance standards require a NAACP state conference to have six adult branches and six youth branches.[2] The North Carolina NAACP has 70 adult branches and numerous students and youth branches, composed of over 10,000 members.

10. To become a member of a branch of the North Carolina NAACP, an individual must sign a form affirming that they live or work in the county in which they wish to join a chapter and agree to pay dues. Lifetime membership is maintained with a one-time payment of dues. To maintain yearly membership with the North Carolina NAACP, members must pay yearly dues in the amount of thirty dollars for adults and ten dollars for youth.

11. North Carolina NAACP membership is predominately Black and other minority individuals and includes registered voters who reside throughout the state.

12. I am aware that the Republican National Committee has filed a complaint asking for the removal of up to 225,000 voters who lack either a driver's license or Social Security number in their voter file. I understand from counsel that at least 22% of voters who would be impacted by the removal have self-identified as Black in their voter file, a figure my counsel has calculated by matching registered voters listed on the file provided by the North Carolina State Board of Elections in response to Public Records Request 24-16 submitted by Carol Snow to the current voter file. I also understand from counsel that self-identified Black voters are the largest group of voters of color in the file produced in response to Public Records Request 24-16.

13. If the Republican National Committee were successful in its goal of removing those approximately 225,000 voters from the voter rolls, the North Carolina NAACP's programming would have to substantially change. The North Carolina NAACP would have to direct significant organizational resources to respond to this voter purge. At a minimum, the North Carolina NAACP would have to divert staff and volunteer time as well as financial resources that had been designated to register, activate, and educate voters for the upcoming general election, to instead research the voters who were removed from the rolls despite remaining eligible voters, contact them to inform them of their removal, and help them re-register in time to participate in the November election. This task would be challenging and resource-intensive, especially in the marginalized

---

[2] *See*
https://naacp.org/convention/faqs#:~:text=Financial%20compliance%20consists%20of%20submitting%20the%20Annual%20Financial%20Report%20and,does%20ACT%2DSO%20stand%20for?

**JA258**

3

communities with whom the North Carolina NAACP works. If the Republican National Committee obtains its desired voter removals, the North Carolina NAACP will not be able to conduct the same amount of activity in support of its core organizational functions as it would otherwise be able to do.

14. Given the substantial number of Black voters impacted by this lawsuit, it would directly harm the North Carolina NAACP's organizational mission to ensure communities of color can vote if such a substantial number of voters of color were removed from the voter rolls, as has been requested in this lawsuit. The North Carolina NAACP is thus seeking to intervene in this matter to protect its organizational interests and the direct harm this lawsuit, if successful, would have to the organization itself.

15. I am also aware that at least one of the individuals impacted, and on the file provided in response to Public Records Request 24-16, is a North Carolina NAACP member who intends to vote in the upcoming 2024 General Election. On information and belief, there are additional North Carolina NAACP members listed on this file. The North Carolina NAACP is therefore asking to intervene in this matter to protect its members as well.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on: September 4, 2024

_____
Deborah Dicks Maxwell

**JA259**

4

# EXHIBIT C

Jones Declaration

Exhibit to Motion to Intervene by North Carolina NAACP, Jackson Sailor Jones, and Bertha Leverette

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF
JUSTICE SUPERIOR COURT DIVISION
No. 24CV026995-910

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>*Defendants.* | **DECLARATION OF**<br><br>**JACKSON SAILOR JONES** |

I, Jackson Sailor Jones, hereby declare as follows:

1.     I am over eighteen years of age. I have personal knowledge of the facts set forth herein. If called to testify before this Court, I would do so to the same effect.

2.     I was born in Warren County and am currently a resident of Mebane, North Carolina, in Alamance County. I have lived at my current residence since June 2022.

3.     I am a citizen of the United States.

4.     I have been a registered voter in this state for over three decades, and I last updated my registration shortly after moving residences, on July 8, 2022.

5.     I intend to cast a ballot in the upcoming November 5, 2024, election.

**JA261**

1

6.      My name and NCID number are on the list of registrations in North Carolina lacking either a Social Security Number or driver's license number in their voter file, according to a list provided by the State Board of Elections on April 1, 2024, in response to Public Records Request 24-16 submitted by Carol Snow.

7.      I have a North Carolina driver's license number and a social security number. I am not sure why my registration lacks this information.

8.      I do not believe that I should be removed from the voter rolls because a group says that my valid voter registration, which I completed by filling out North Carolina's registration form, violates federal law. To my knowledge, I followed all directions when filling out the voter registration form.

9.      I have also already provided this information to election officials on multiple occasions. I presented my North Carolina driver's license when I voted in person during the 2024 Primary Election. I also provided this information on my Absentee Ballot Request Form for the 2024 General Election, which I have already submitted and which requires this information. The Absentee Ballot Request Form cannot be processed without a driver's license or Social Security number. A copy of that form is attached to this Declaration as Exhibit 1.

10.     Because I meet the qualifications for eligibility to vote in North Carolina and am lawfully registered to vote, I should not be removed from the rolls.

11.      If I am removed from the voter rolls, and my ability to vote is taken away, I will be denied my fundamental right to vote and engage in the political process.

I declare under penalty of perjury under the laws of North Carolina that the foregoing is true and correct. Executed on September 3, 2024.

_____
Jackson Sailor Jones

**JA263**
3

# Exhibit 1
# NC Absentee Ballot Request Form

**JA264**



**2024**

**North Carolina**
**Absentee Ballot Request Form**

**2024.04**

## Request an absentee ballot

You can request an absentee ballot for 1 voter per form, for 1 election at a time.

The information that you provide on this form will be used to update your current voter record if signed by the voter. You may not change your party using this form.

If you are not registered, you must submit a voter registration form with this request.

Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.

## How to return this form

Return your completed and signed form to your county board of elections by **5:00 pm on the Tuesday before the election.**

You can:
- Drop it off in-person
- Mail it

This form can only be returned by:
- The voter or the voter's near relative or verifiable legal guardian
- A Multipartisan Assistance Team sent by the county elections office
- A person who assisted due to the voter's disability.

## Return this form to:

Your County Board of Elections office. County addresses can be found on the pages following this form.

### Questions?

Call your county board of elections or visit ncsbe.gov

**REQUEST ONLINE**
Complete, sign, and submit your request online at **votebymail.ncsbe.gov.**

## Instructions

### 1: Election Date

Request for 1 election per form.

Indicate in this section if you require an absentee ballot for other possible elections in 2024 *due to your continued or expected illness or disability*.

### 2: Voter name

Provide your full legal name. If your name has changed, this form will be used to update your current voter record.

### 3: Identification Information

You must provide your date of birth **and** one of the following:
- A NC Driver's License or DMV ID card number
- The last 4 digits of your social security number

### 4: Home address

Provide your residential (home) address. **However**, if you moved and have no plans to return to your former residence, provide your new address here. Signing in Section 10 will update your voter registration. If your new address is in a different county, you will not be able to update your address using this form and will need to submit a new voter registration form in your new county. Provide a mailing address in Section 5 if different from your residence.

### 5: Ballot mailing address

Indicate where you would like your ballot to be sent. If you do not want your ballot to be sent to your residential or mailing address, provide another address here.

If you require an accessible electronic ballot due to blindness or visual impairment also provide your email in Section 6.

### 6: Voter's Contact information

Your contact information is optional and is helpful if we have questions about this request or about any issues with your voted absentee ballot.

### 7: Requesting a ballot for a voter

A near relative or legal guardian may request a ballot for a voter but may not make changes to the voter's registration record. A near relative is a voter's:
- Spouse
- Brother or sister
- Parent or stepparent
- Mother/father-in-law
- Child or stepchild
- Son/daughter-in-law
- Grandparent/Grandchild

Any person may request an absentee ballot for a voter **who needs assistance making the request due to disability.** Under the Americans with Disabilities Act, a disability is a physical or mental impairment that causes someone to be substantially limited in a major life activity. *When requesting a ballot on behalf of a voter, the requester must complete and sign this section.*

### 8: Assisting a voter in filling out or returning this form

If you are helping a voter fill out or return their form, complete this section. *The voter will still need to sign or make their mark in Section 10.* Any voter may receive assistance from their near relative or verifiable legal guardian. A voter who needs assistance completing or returning their request form due to their blindness, disability, or inability to read or write may receive assistance from a person of their choice.

**For voters living in a facility (clinic, nursing home, or adult care home) who do NOT require assistance due to a disability, certain limitations apply:**
The voter must first seek to have a near relative, legal guardian or Multipartisan Assistance Team (MAT) to assist with requesting a ballot. If none of these options is available within 7 days of making a request for a MAT, the voter may get assistance from anyone who is not:

- An owner, manager, director, or employee of the facility
- An elected official, a candidate, or an officeholder in a political party
- A campaign manager or treasurer for a candidate or political party

### 9: Military or overseas

Complete this section if you claim North Carolina as your voting residence and are:

A U.S. citizen currently outside of the United States **or**

A member of one of the following, **or** a spouse or dependent of a member of one of the following:

- The active or reserve components of the Army, Navy, Air Force, Marine Corps, or Coast Guard of the United States who is on active duty
- A member of the Merchant Marines, the Commissioned Corps of the Public Health Service, or the Commissioned Corps of the National Oceanic and Atmospheric Administration of the United States
- A member of the National Guard or State militia unit who is on activated status

### 10: Voter's signature

This form must be signed **by the voter** (unless a near relative or legal guardian or assistant is requesting a ballot on the voter's behalf and completes Section 7). If the voter cannot physically sign this form, they can make a mark. **A typed signature, including signature fonts, is not allowed.**

If you indicate that you have changed your name (Section 2) or address (Section 4), signing will update your voter registration.

JA265

**2024**

**North Carolina Absentee Ballot Request Form**
Required sections are in red

2024.04

| | | |
|---|---|---|
| Election date | **1** | **11/05/24  General Election Absentee Ballot Request** |

○ *Due to* continued or expected illness or disability, I am *also* requesting absentee ballots for all elections this year.

| | | |
|---|---|---|
| Print voter name | **2** | Last name ___ Suffix (Jr, Sr., III, IV, if applicable) ___ |
| Any name change you give on this form will update your registration. **Required** | | First name ___ Middle name ___ |
| | | Former name (*if* your name has changed) ___ |

**Identification Information**
**Required**

**3**

Date of birth *(mm/dd/yyyy)* ___ **AND**   NC Driver's License/DMV ID number ___
**OR**
Last 4 digits of your Social Security number ___

**Home address**
Provide your **residential** address (where you live).
**Required**

**4**

Street ___ Unit # ___
City ___ **NC** Zip ___ County ___
Have you moved in the last 30 days? ○ Yes ○ No   If yes, date moved? (mm/dd/yyyy) ___
**Mailing Address** (*if different from above*)
Street ___ Unit # ___
City ___ State ___ Zip ___

**Where should we send your ballot?**
Check 1.
**Required**

**5**

○ Your home address in Section 4   ◉ Your mailing address in Section 4
○ The address below:
Street ___ Unit # ___
City ___ State ___ Zip ___
○ *Due to* blindness/visual impairment, I require an accessible electronic ballot (Provide your email address in Section 6).

**Voter contact information**

**6**

Phone ___ Email ___

**Requesting ballot on behalf of voter by near relative, legal guardian, or person the voter asks to help due to disability?**
The **requester** must complete and sign in this section. See instructions about who can request for a voter.

**7**

Requester's Name ___ Include relationship to voter, or status as legal guardian or disability requester ___
Street ___ Unit # ___
City ___ State ___ Zip ___ Phone ___
**Relative/legal guardian/disability requester, sign and date here** (required if requesting on behalf of a voter)
Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.
| X | Date *(mm/dd/yyyy)* |

**Assisting a voter to fill out or return this request?**
If yes, complete this section. See instructions about who can assist a voter. **Voter must sign in Section 10.**

**8**

Assistant's full name ___
Assistant's full address ___
If the voter is in an eligible care facility and needs assistance in voting and returning the ballot, enter the facility name below.
Facility Name ___

**Are you a military member on active duty (including spouse/dependents) or a U.S. citizen outside the U.S.?**
*Only the voter may complete this section.*

**9**

○ Uniformed Services or Merchant Marines on active duty
○ U.S. citizen outside the U.S. (Overseas address required)
Overseas full address ___
I want my ballot delivered to my:
○ Email ___
○ Fax ___
○ Address indicated in Section 5
○ Overseas address provided in this section

**Voter's signature**
**Use a pen.** No electronic signatures allowed.
**Required**

**10**

**Voter, sign and date here** *(Required unless ballot requested by a near relative, legal guardian, or disability requester)*
Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.
| X | Date *(mm/dd/yyyy)* |

**JA266**

Return form to the County Board of Elections by 5:00 pm on the Tuesday before the election. Do not email or fax.

**County Board Office Mailing Addresses (A-J)**

**NC Absentee Ballot Request Form for 2024**

| | | | | |
|---|---|---|---|---|
| ALAMANCE<br>PO BOX 418<br>GRAHAM NC<br>27253-0418<br>(336) 570-6755 | ALEXANDER<br>PO BOX 326<br>TAYLORSVILLE NC<br>28681-0326<br>(828) 632-2990 | ALLEGHANY<br>PO BOX 65<br>SPARTA NC<br>28675-0065<br>(336) 372-4557 | ANSON<br>402 MORVEN RD<br>WADESBORO NC<br>28170-2743<br>(704) 994-3223 | ASHE<br>150 GOVERNMENT CIR<br>STE 2100<br>JEFFERSON NC<br>28640-8959<br>(336) 846-5570 |
| AVERY<br>PO BOX 145<br>NEWLAND NC<br>28657-0145<br>(828) 733-8282 | BEAUFORT<br>PO BOX 1016<br>WASHINGTON NC<br>27889-1016<br>(252) 946-2321 | BERTIE<br>PO BOX 312<br>WINDSOR NC<br>27983-0312<br>(252) 794-5306 | BLADEN<br>PO BOX 512<br>ELIZABETHTOWN NC<br>28337-0512<br>(910) 862-6951 | BRUNSWICK<br>PO BOX 2<br>BOLIVIA NC<br>28422-0002<br>(910) 253-2620 |
| BUNCOMBE<br>PO BOX 7468<br>ASHEVILLE NC<br>28802-7468<br>(828) 250-4200 | BURKE<br>PO BOX 798<br>MORGANTON NC<br>28680-0798<br>(828) 764-9010 | CABARRUS<br>PO BOX 1315<br>CONCORD NC<br>28026-1315<br>(704) 920-2860 | CALDWELL<br>PO BOX 564<br>LENOIR NC<br>28645-0564<br>(828) 757-13HF | CAMDEN<br>PO BOX 206<br>CAMDEN NC<br>27921-0206<br>(252) 338-5530 |
| CARTERET<br>1702 LIVE OAK ST<br>STE 200<br>BEAUFORT NC<br>28516-1638<br>(252) 728-8460 | CASWELL<br>PO BOX 698<br>YANCEYVILLE NC<br>27379-0698<br>(336) 694-4010 | CATAWBA<br>PO BOX 132<br>NEWTON NC<br>28658-0132<br>(828) 464-2424 | CHATHAM<br>PO BOX 111<br>PITTSBORO NC<br>27312-0111<br>(919) 545-8500 | CHEROKEE<br>40 PEACHTREE ST<br>MURPHY NC<br>28906-2940<br>(828) 837-6670 |
| CHOWAN<br>PO BOX 133<br>EDENTON NC<br>27932-0133<br>(252) 482-4010 | CLAY<br>75 RIVERSIDE CIR<br>STE 3<br>HAYESVILLE NC<br>28904-7769<br>(828) 389-6812 | CLEVELAND<br>PO BOX 1299<br>SHELBY NC<br>28151-1299<br>(704) 484-4858 | COLUMBUS<br>PO BOX 37<br>WHITEVILLE NC<br>28472-0037<br>(910) 640-6609 | CRAVEN<br>406 CRAVEN ST<br>NEW BERN NC<br>28560-4911<br>(252) 636-6610 |
| CUMBERLAND<br>227 FOUNTAINHEAD LN<br>STE 101<br>FAYETTEVILLE NC<br>28301-5493<br>(910) 678-7733 | CURRITUCK<br>PO BOX 177<br>CURRITUCK NC<br>27929-0177<br>(252) 232-2525 | DARE<br>PO BOX 1000<br>MANTEO NC<br>27954-1000<br>(252) 475-5631 | DAVIDSON<br>PO BOX 1084<br>LEXINGTON NC<br>27293-1084<br>(336) 242-2190 | DAVIE<br>161 POPLAR ST<br>STE 102<br>MOCKSVILLE NC<br>27028-2148<br>(336) 753-6072 |
| DUPLIN<br>PO BOX 975<br>KENANSVILLE NC<br>28349-0975<br>(910) 296-2170 | DURHAM<br>201 N ROXBORO ST<br>DURHAM NC<br>27701-3741<br>(919) 560-0700 | EDGECOMBE<br>PO BOX 10<br>TARBORO NC<br>27886-0010<br>(252) 641-7852 | FORSYTH<br>201 N CHESTNUT ST<br>WINSTON SALEM NC<br>27101-4120<br>(336) 703-2800 | FRANKLIN<br>PO BOX 180<br>LOUISBURG NC<br>27549-0180<br>(919) 496-3898 |
| GASTON<br>PO BOX 1396<br>GASTONIA NC<br>28053-1396<br>(704) 852-6005 | GATES<br>PO BOX 621<br>GATESVILLE NC<br>27938-0621<br>(252) 357-1780 | GRAHAM<br>PO BOX 1239<br>ROBBINSVILLE NC<br>28771-1239<br>(828) 479-7969 | GRANVILLE<br>PO BOX 83<br>OXFORD NC<br>27565-0083<br>(919) 693-2515 | GREENE<br>PO BOX 583<br>SNOW HILL NC<br>28580-0583<br>(252) 747-5921 |
| GUILFORD<br>PO BOX 3427<br>GREENSBORO NC<br>27402-3427<br>(336) 641-3836 | HALIFAX<br>PO BOX 101<br>HALIFAX NC<br>27839-0101<br>(252) 583-4391 | HARNETT<br>PO BOX 356<br>LILLINGTON NC<br>27546-0356<br>(910) 893-7553 | HAYWOOD<br>63 ELMWOOD WAY<br>STE A<br>WAYNESVILLE NC<br>28786-5829<br>(828) 452-6633 | HENDERSON<br>PO BOX 2090<br>HENDERSONVILLE NC<br>28793-2090<br>(828) 697-4970 |
| HERTFORD<br>PO BOX 355<br>AHOSKIE NC<br>27910-0355<br>(252) 358-7812 | HOKE<br>PO BOX 1565<br>RAEFORD NC<br>28376-1565<br>(910) 875-8751 EXT 1550 | HYDE<br>PO BOX 152<br>SWAN QUARTER NC<br>27885-0152<br>(252) 926-4194 | IREDELL<br>203 STOCKTON ST<br>STATESVILLE NC<br>28677-5245<br>(704) 878-3140 | JACKSON<br>401 GRINDSTAFF COVE RD<br>SYLVA NC<br>28779-3250<br>(828) 586-7538 |

JA2703

**County Board Office Mailing Addresses (J–Y)**

**NC Absentee Ballot Request Form for 2024**

| | | | | |
|---|---|---|---|---|
| JOHNSTON<br>PO BOX 1172<br>SMITHFIELD NC<br>27577-1172<br>(919) 989-5095 | JONES<br>367 NC HIGHWAY 58 S<br>UNIT B<br>TRENTON NC<br>28585-7787<br>(252) 448-3921 | LEE<br>1503 ELM ST<br>STE 1<br>SANFORD NC<br>27330-4200<br>(919) 718-4646 | LENOIR<br>PO BOX 3503<br>KINSTON NC<br>28502-3503<br>(252) 523-0636 | LINCOLN<br>PO BOX 977<br>LINCOLNTON NC<br>28093-0977<br>(704) 736-8480 |
| MACON<br>5 W MAIN ST<br>FL 1<br>FRANKLIN NC<br>28734-3005<br>(828) 349-2034 EXT 2035 | MADISON<br>PO BOX 142<br>MARSHALL NC<br>28753-0142<br>(828) 649-3731 | MARTIN<br>PO BOX 801<br>WILLIAMSTON NC<br>27892-0801<br>(252) 789-4317 | MCDOWELL<br>PO BOX 1509<br>MARION NC<br>28752-1509<br>(828) 659-0834 | MECKLENBURG<br>PO BOX 31788<br>CHARLOTTE NC<br>28231-1788<br>(704) 336-2133 |
| MITCHELL<br>11 N MAPLE AVE<br>RM 108<br>BAKERSVILLE NC<br>28705-6511<br>(828) 688-3101 | MONTGOMERY<br>PO BOX 607<br>TROY NC<br>27371-0607<br>(910) 572-2024 | MOORE<br>PO BOX 787<br>CARTHAGE NC<br>28327-0787<br>(910) 947-3868 | NASH<br>PO BOX 305<br>NASHVILLE NC<br>27856-0305<br>(252) 459-1350 | NEW HANOVER<br>1241A MILITARY CUTOFF<br>RD<br>WILMINGTON NC<br>28405-3637<br>(910) 798-7330 |
| NORTHAMPTON<br>PO BOX 603<br>JACKSON NC<br>27845-0603<br>(252) 534-5681 | ONSLOW<br>246 GEORGETOWN RD<br>JACKSONVILLE NC<br>28540-4146<br>(910) 455-4484 | ORANGE<br>PO BOX 220<br>HILLSBOROUGH NC<br>27278-0220<br>(919) 245-2350 | PAMLICO<br>PO BOX 464<br>BAYBORO NC<br>28515-0464<br>(252) 745-4821 | PASQUOTANK<br>PO BOX 1797<br>ELIZABETH CITY NC<br>27906-1797<br>(252) 335-1739 |
| PENDER<br>PO BOX 1232<br>BURGAW NC<br>28425-1232<br>(910) 259-1220 | PERQUIMANS<br>PO BOX 336<br>HERTFORD NC<br>27944-0336<br>(252) 426-5598 | PERSON<br>331 S MORGAN ST<br>ROXBORO NC<br>27573-5223<br>(336) 597-1727 | PITT<br>PO BOX 56<br>GREENVILLE NC<br>27835-0056<br>(252) 902-3300 | POLK<br>PO BOX 253<br>COLUMBUS NC<br>28722-0253<br>(828) 894-8181 |
| RANDOLPH<br>1457 N FAYETTEVILLE ST<br>ASHEBORO NC<br>27203-3957<br>(336) 318-6900 | RICHMOND<br>PO BOX 1843<br>ROCKINGHAM NC<br>28380-1843<br>(910) 997-8253 | ROBESON<br>PO BOX 2159<br>LUMBERTON NC<br>28359-2159<br>(910) 671-3080 | ROCKINGHAM<br>PO BOX 22<br>WENTWORTH NC<br>27375-0022<br>(336) 342-8107 | ROWAN<br>1935 JAKE ALEXANDER<br>BLVD W STE D10<br>SALISBURY NC<br>28147-1176<br>(704) 216-8140 |
| RUTHERFORD<br>PO BOX 927<br>RUTHERFORDTON NC<br>28139-0927<br>(828) 287-6030 | SAMPSON<br>335 COUNTY COMPLEX<br>RD STE 100<br>CLINTON NC<br>28328-4851<br>(910) 592-5796 | SCOTLAND<br>231 E CRONLY ST<br>STE 305<br>LAURINBURG NC<br>28352-3820<br>(910) 277-2595 | STANLY<br>PO BOX 1309<br>ALBEMARLE NC<br>28002-1309<br>(704) 986-3647 | STOKES<br>PO BOX 34<br>DANBURY NC<br>27016-0034<br>(336) 593-2409 |
| SURRY<br>PO BOX 372<br>DOBSON NC<br>27017-0372<br>(336) 401-8225 | SWAIN<br>PO BOX 133<br>BRYSON CITY NC<br>28713-0133<br>(828) 488-6177 | TRANSYLVANIA<br>PO BOX 868<br>BREVARD NC<br>28712-0868<br>(828) 884-3114 | TYRRELL<br>PO BOX 449<br>COLUMBIA NC<br>27925-0449<br>(252) 796-0775 | UNION<br>PO BOX 1106<br>MONROE NC<br>28111-1106<br>(704) 283-3809 |
| VANCE<br>300 S GARNETT ST<br>STE C<br>HENDERSON NC<br>27536-4566<br>(252) 492-3730 | WAKE<br>PO BOX 695<br>RALEIGH NC<br>27602-0695<br>(919) 404-4040 | WARREN<br>PO BOX 803<br>WARRENTON NC<br>27589-0803<br>(252) 257-2114 | WASHINGTON<br>PO BOX 550<br>ROPER, NC<br>27970-0550<br>(252) 793-6017 | WATAUGA<br>PO BOX 528<br>BOONE NC<br>28607-0528<br>(828) 265-8061 |
| WAYNE<br>309 E CHESTNUT ST<br>GOLDSBORO NC<br>27530-4903<br>(919) 731-1411 | WILKES<br>110 NORTH ST<br>RM 315<br>WILKESBORO NC<br>28697-2469<br>(336) 651-7339 | WILSON<br>PO BOX 2121<br>WILSON NC<br>27894-2121<br>(252) 399-2836 | YADKIN<br>PO BOX 877<br>YADKINVILLE NC<br>27055-0877<br>(336) 849-7907 | YANCEY<br>PO BOX 763<br>BURNSVILLE NC<br>28714-0763<br>(828) 682-3950 |

JA268

# EXHIBIT D

Leverette Declaration

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | |
| *Plaintiffs,* | |
| *v.* | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | **DECLARATION OF** <br><br> **BERTHA LEVERETTE** |
| *Defendants,* | |
| and | |
| Democratic National Committee, | |
| *Intervenor-Defendant.* | |

I, Bertha Leverette, hereby declare as follows:

1.      I am over eighteen years of age. I have personal knowledge of the facts set forth herein. If called to testify before this Court, I would do so to the same effect.

2.      I was born in Granville County and am currently a resident of Oxford, North Carolina, in Granville County. I have lived at my current residence since 1985.

**JA270**
1

3.      I am a citizen of the United States.

4.      I have been a registered voter in this state since 1972, and I last updated my registration on September 28, 2016.

5.      I intend to cast a ballot in the upcoming November 5, 2024, election.

6.      My name and NCID number are on the list of registrations in North Carolina lacking either a Social Security Number or driver's license number in their voter file, according to a list provided by the State Board of Elections on April 1, 2024, in response to Public Records Request 24-16 submitted by Carol Snow.

7.      I have a North Carolina driver's license number and a social security number. I am not sure why my registration lacks this information.

8.      I do not believe that I should be removed from the voter rolls because a group says that my valid voter registration, which I completed by filling out North Carolina's registration form, violates federal law. To my knowledge, I followed all directions when filling out the voter registration form.

9.      I have also already provided this information to election officials. I presented my North Carolina driver's license when I voted early curbside during the 2024 Primary Election.

10.      Because I meet the qualifications for eligibility to vote in North Carolina and am lawfully registered to vote, I should not be removed from the rolls.

11.      If I am removed from the voter rolls, and my ability to vote is taken away, I will be denied my fundamental right to vote and engage in the political process.

I declare under penalty of perjury under the laws of North Carolina that the foregoing is true and correct. Executed on September 26, 2024.

Bertha Leverette

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | **[PROPOSED] ORDER REGARDING AMENDED MOTION TO INTERVENE** |

Before the Court is Proposed Intervenors' Amended Motion to Intervene, filed on September 27, 2024. Having considered the underlying Motion, proposed pleadings, the file, and the relevant law, it appears to the Court that the Proposed Intervenors' Motion should be granted.

IT IS HEREBY ORDERED that the Amended Motion to Intervene is GRANTED.

**JA273**

1

SO ORDERED, on this _____ day of _____ 2024.

_____
Richard E. Myers II
United States District Judge

**JA274**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | **MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION TO INTERVENE AS DEFENDANTS** |

    Proposed Intervenors North Carolina State Conference of the NAACP ("North Carolina NAACP"), Jackson Sailor Jones, and Bertha Leverette (collectively, "Proposed Intervenors") seek to protect their unique interests and to ensure that neither they, nor (in the case of North Carolina NAACP) their members, nor any similarly-situated voter be denied their fundamental right to vote or to vote on an equal basis in the upcoming 2024 General Election. Accordingly, Proposed

**JA275**

1

Intervenors respectfully request intervention as of right, pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, or in the alternative, move for permissive intervention pursuant to Rule 24(b).[1]

## INTRODUCTION AND BACKGROUND

Plaintiffs seek to quickly force Defendants to identify and remove approximately 225,000 North Carolinian voters from the state's voter registration rolls. At the time Plaintiffs filed the Complaint, they sought this drastic relief fewer than 65 days before the 2024 presidential election, which is now fewer than 40 days away. Plaintiffs' request, on the eve of the impending General Election, is unprecedented and improper. The action is founded on the unsupported belief that every one of these 225,000 voters is "ineligible" because they allegedly did not include their driver's license number or Social Security number on their voter registration forms when registering to vote. The notion that these voters are "unlawfully" registered to vote and therefore must be purged is patently false. The exclusion of this information from many individuals' voter registration forms is largely due to a simple fact—until December 2023, North Carolina's voter registration forms made this information *optional* rather than *mandatory*. This cannot and does not justify purging individual voters, who would find themselves kicked off of the rolls through no fault of their own.

Proposed Intervenor North Carolina NAACP seeks to intervene on behalf of its members, some of whom are also directly implicated by the present Complaint. Plaintiffs' requested relief would not only deny these members of their right to vote, it would also impair the North Carolina

---

[1]      As set forth in the Amended Motion, this Memorandum of Law amends the Motion to Intervene filed with the Wake County Superior Court on September 4, 2024, before this case was removed to this Court on September 23, 2024, to (1) explain the grounds for intervention under the Federal Rules of Civil Procedure and federal law consistent with Local Rule 5.3(c)(2); and (2) add an additional Proposed Intervenor, Bertha Leverette.

NAACP's core mission, forcing the organization to divert resources from its voter mobilization and election protection efforts to identify, contact, and assist already-registered voters affected by the Complaint in time to participate in the upcoming 2024 General Election. Proposed Individual Intervenors Jackson Sailor Jones and Bertha Leverette are eligible North Carolina voters directly implicated by the present Complaint, by which Plaintiffs' requested relief may well strip them of their right to vote.

The existing Defendants do not adequately represent Proposed Intervenors' interests here. They necessarily represent the interests of the government, which has a wide array of constituents who may not have the same needs as the 225,000 vulnerable voters targeted by Plaintiffs' requested purge. Furthermore, the Democratic National Committee ("DNC"), intervening on behalf of the Democratic Party to defend the specific interests of Democratic voters and candidates, cannot adequately represent Proposed Intervenors' interests. Proposed Intervenors (who include a registered unaffiliated voter) seek to protect their own fundamental right and the right of North Carolina NAACP's members and the voters it has engaged in the political process on a nonpartisan basis, to have their voices heard on Election Day.

In sum, Plaintiffs' assertion that Defendants' actions will "jeopardize the individual right to vote that is guaranteed to every qualified voter in North Carolina," Compl. ¶ 9, is unjustified and clearly false. In fact, it was Plaintiffs, not Defendants, who jeopardized the fundamental right to vote of eligible citizens of this state when they filed a request for *en masse* removal of voters from North Carolina's voter rolls on the eve of the 2024 General Election and mere days before voting began. Eligible North Carolina voters, including Proposed Intervenors Jones and Leverette and members of the North Carolina NAACP, now risk having their registrations canceled and their

right to vote denied or unlawfully subject to casting provisional ballots. For these reasons, Proposed Intervenors also request the Court expedite review of the motion to intervene.

Because Proposed Intervenors satisfy each requirement for intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2), the Court should grant their motion to intervene. Alternatively, the motion should be granted on a permissive basis under Rule 24(b).

## ARGUMENT

### I.    Proposed Intervenors Are Entitled to Intervene as a Matter of Right.

Proposed Intervenors meet all the requirements under Rule 24(a)(2) of the Federal Rules of Civil Procedure, which requires district courts to grant intervention as of right upon "timely motion," if the proposed intervenor "can demonstrate (1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (citing *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)). The Fourth Circuit has stated that "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (quotation marks omitted). Proposed Intervenors meet each of Rule 24(a)(2)'s requirements and are thus entitled to intervene in this case.

#### A.    The Motion to Intervene Is Timely.

*First*, the Motion is timely. In determining the timeliness of a motion to intervene, the trial court must consider "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014).

**JA278**

Proposed Intervenors have not delayed in moving to intervene. The Complaint in this action was filed on August 23, 2024, in the North Carolina Superior Court for Wake County. Proposed Intervenors moved to intervene fewer than two weeks later on September 4, 2024. Proposed Intervenors now file this amended motion to intervene just four days after the action was removed on September 23, 2024. To date, no hearings have occurred nor have any briefs on the merits of Plaintiffs' claims been filed. Indeed, as described in further detail below, granting the proposed Motion would not prejudice the existing parties whereas denying the proposed Motion would prejudice Proposed Intervenors' interests.

### B.     The Disposition of This Case Will Impede the Ability of Proposed Intervenors to Protect Their Fundamental Voting Rights.

*Second*, Proposed Intervenors have a direct interest in the subject matter of this action. An intervenor's interest is sufficient for intervention purposes if the proposed intervenor "stand[s] to gain or lose by the direct legal operation of the district court's judgment[.]" *Teague*, 931 F.2d at 261. Proposed Intervenors Jones and Leverette and those members of North Carolina NAACP who purportedly lack a driver's license or Social Security number in their voter files are directly implicated by the present Complaint.

North Carolina NAACP has 70 adult branches and numerous student and youth branches composed of well over 10,000 members across the State. North Carolina NAACP engages in educational advocacy to ensure that communities of color and other marginalized communities throughout North Carolina can exercise the right to vote. This advocacy includes registering eligible individuals to vote, engaging in election protection, and mobilizing voters to the polls, such as through its Souls-to-the-Polls events hosted by branches of the State Conference. In addition, North Carolina NAACP conducts voter education events and educational campaigns intended to inform voters about the requirements to register and vote, as well as any legal changes

**JA279**

that might affect how, where, or when they are able to vote. The list of voters identified by Plaintiffs includes current North Carolina NAACP members. These members were not aware that their names were identified by Plaintiffs and alleged to be unlawfully registered to vote and thus subject to immediate removal from the rolls. Through no fault of their own, these voters are at risk of disenfranchisement. North Carolina NAACP has a direct interest in protecting the interests of its members who are predominantly Black. Upon information and belief, Black voters comprise at least 22 percent of those registrants on the list who have demographic information included in their registration file, and Black voters are disproportionately more likely than white voters to appear on the list. **Exhibit B** (Declaration of Deborah Dicks Maxwell) ¶ 12. Thus, Black voters are more likely than voters of any other race to be impacted by the disposition of this action. Consequently, North Carolina NAACP has a strong interest in protecting the right to vote of Black voters and especially of its members.

Jackson Sailor Jones has voted in North Carolina for more than three decades. **Exhibit C** (Declaration of Jackson Sailor Jones) ¶ 4. He re-registered to vote on July 8, 2022, after changing residences. *Id.* Despite presenting his driver's license when voting in the 2024 Primary Election and having provided his Social Security number to election officials in the past, Mr. Jones appears as not having either number in the list generated in response to Carol Snow's Public Records Request 24-16. *Id.* ¶ 9.

Bertha Leverette has been a registered voter in North Carolina since 1972 and last updated her registration in Granville County, North Carolina in 2016. **Exhibit D** (Declaration of Bertha Leverette) ¶ 4. Despite presenting her driver's license when voting in the 2024 Primary Election and having provided her Social Security number to election officials in the past, Ms. Leverette

**JA280**

appears as not having either number in the list generated in response to Carol Snow's Public Records Request 24-16. *Id.* ¶¶ 6–9.

Furthermore, Plaintiffs have not plead any facts to support the allegation that 225,000 North Carolina voters are actually ineligible to vote. By all accounts, these voters are lawfully registered and could not have voted in past elections without furnishing proof of identity in some way. Moreover, in addition to this lack of evidentiary support, Plaintiffs' requested relief is precluded under both the Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (Oct. 29, 2002) (codified at 52 U.S.C. §§ 20901-21145) ("HAVA"), and the National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77 (May 20, 1993) (codified as 52 U.S.C. §§ 20501-20511) ("NVRA"). There is no appeal of HAVA determinations under state law per N.C.G.S. § 163-91 and subsequent State Board rulemaking; there is no private right of action to enforce the provisions of HAVA on which Plaintiffs rely; and the relief sought would violate other federal protections and state law. *See* **Exhibit A** ¶¶ 33–40.

If Plaintiffs prevail, then Proposed Intervenors will have their right to vote and their members' right to vote stripped away. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 229, 247 (4th Cir. 2014) (explaining that "[t]he right to vote is fundamental" and that "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury"); U.S. Const. amend. XV; N.C. Const. art. I, §§ 9, 10, 11, 19. Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 13, 269 S.E.2d 142 (N.C. 1980) ("[t]he right to vote is the right to participate in the decision-making process of government" among all persons "sharing an identity with the broader humane, economic, ideological, and

political concerns of the human body politic"). And, recognizing the importance of the right to vote, the Supreme Court has made clear "[i]n decision after decision" that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (collecting cases). Proposed Intervenors' ability to exercise their fundamental rights to vote hinges on the disposition of this action, and thus they meet the second requirement for intervention by right.

### C.      Defendants Do Not Adequately Represent the Proposed Intervenors' Interests.

*Third*, the existing parties do not adequately represent the interests of Proposed Intervenors. A prospective intervenor seeking intervention as a matter of right under Rule 24(a)(2) must show that "the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart*, 706 F.3d at 349; *see also N. Carolina All. for Retired Americans v. Hirsch*, No. 23-CV-837, 2023 WL 9422596, at *2 (M.D.N.C. Dec. 15, 2023) (granting intervention by right and highlighting that "[t]he burden of making this showing for Proposed Intervenors should be treated as minimal") (citing *Trbovich v. Mine Workers*, 404 U.S. 528, 538 n.10 (1972)) (internal quotation marks omitted), *report and recommendation adopted*, No. 23-CV-837, 2024 WL 308513 (M.D.N.C. Jan. 26, 2024).

Where a proposed intervenor holds a similar ultimate objective as an existing party in a suit and where that existing party is a governmental agency, the "putative intervenor must mount a strong showing of inadequacy." *Stuart*, 706 F.3d at 352. The Proposed Intervenors are able to make that showing here.

By law, Defendants' interests are to protect the public welfare at large and to fulfill the supervisory powers and duties required under North Carolina law. *See Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 197 (2022) (reasoning that "North Carolina has authorized

**JA282**

different agents to defend its practical interests precisely because, thanks to how it has structured its government, each may be expected to vindicate different points of view on the State's behalf"); *Letendre v. Currituck Cnty.*, 261 N.C. App. 537, 2018 WL4440587, at *4 (N.C. Ct. App. Sept. 18, 2018) (unpublished) (noting that public officials' "sole litigation interests are to protect the public welfare and the interests of [the] general citizenry") (internal quotation marks omitted), *writ denied, temporary stay dissolved*, 372 N.C. 59, 822 S.E.2d 638 (N.C. 2019) (mem.); N.C.G.S. § 163-22 (setting forth the "[p]owers and duties of the State Board of Elections" including general supervision over elections, advising the county board of elections as to the proper methods of conducting elections, determining the form and content of election ballots, among others). Thus, the Board may assert its own interests, but it cannot assert the interests of individual voters.

By contrast, Proposed Individual Intervenors Jones and Leverette seek to protect their individual rights to vote in the upcoming election. Proposed Intervenor North Carolina NAACP seeks to protect its members, who are predominantly Black, from being removed from the voter rolls prior to the General Election, as well as its ability to fulfill organizational objectives through voter engagement, which will be threatened by the relief requested by Plaintiffs. These unique interests are distinct from those advanced by Defendants or the DNC.

Furthermore, Proposed Intervenors' interests in this litigation are distinct from Defendants', as Proposed Intervenors have a personal and unique interest in the outcome of this litigation, which directly implicates their and their members' right to vote. Courts have allowed voters to intervene in cases implicating their right to vote, even when they are on the same side as a government entity. *See, e.g.*, *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 570 n.2, 571 (6th Cir. 2004) (per curiam) (noting that voters were granted permissive intervention by the district court shortly before hearing on motion for preliminary injunction); *League of Women*

**JA283**

9

*Voters of Ohio v. Blackwell*, 235 F.R.D. 388, 389-90 (N.D. Ohio 2005) (permitting individual voter to intervene in action challenging problems with electronic voting machines). Here, the Proposed Intervenors seek to intervene for the purpose of challenging Plaintiffs' claims and to ensure that no unreasonable measures are adopted that could pose an elevated risk of removing or impeding their right to vote and that of the members of the North Carolina NAACP. These interests are sufficiently distinct from those of election officials, who have a larger obligation to all constituents that may not align with the vulnerable 225,000 voters whose voting rights are at stake, to warrant intervention by those who could be impacted by any relief that is ordered in this Court.

Nor are the interests asserted by the DNC sufficient to cover those of Proposed Intervenors here. The DNC intervenes on behalf of the Democratic Party and seeks to protect the specific interests of Democratic voters and candidates. Conversely, Proposed Intervenors represent the interests of not only themselves, but all potentially impacted voters regardless of their partisan affiliation. North Carolina NAACP has another unique interest in its focus on the harms to Black voters who make up a disproportionate share of the list that forms the basis of Plaintiffs' allegations. By intervening in this case, it seeks to mitigate any disproportionate harm to Black voters who may find themselves purged from the voter rolls depending on the disposition of this lawsuit. It is crucial that this Court hear directly from those North Carolinians who are eligible voters in this state and who would be directly threatened by the instant lawsuit. It is at best unclear whether, without such intervention, the Court would have opportunity to hear directly from voters in this matter.

## II. In the Alternative, the Court Should Grant Permissive Intervention.

Alternatively, Proposed Intervenors and the Proposed Class also meet the requirements for permissive intervention pursuant to Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure. The Court may grant permissive intervention where an applicant shows that it has a "claim or defense

**JA284**

that shares with the main action a common question of law or fact" Fed. R. Civ. P. 24(b)(1)(B). As discussed above, Proposed Intervenors' defenses—that Plaintiffs' claims are unconstitutional, invalid, and violate the rights of voters—present clear questions of law and fact in common with the pending action. And because Proposed Intervenors are representative of the voters who stand to be most harmed by the relief Plaintiffs seek, they will aid the Court in developing a full record of the relevant considerations—including the impact of this litigation on those 225,000 voters whose rights it threatens. Proposed Intervenors stand to be directly harmed if Plaintiffs' requested relief is granted. Those realities should be at the forefront of the Court's consideration as to whether to grant Plaintiffs' requested relief.

Finally, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). This intervention will neither unduly delay nor prejudice any other parties' rights given the common questions of law and fact and because Proposed Intervenors initially sought intervention shortly after the case was filed and now seek it shortly after the case has been removed, before any dispositive motion practice or Court orders establishing briefing deadlines and setting hearing dates.

Proposed Intervenors also represent that they are willing and able to meet any Scheduling Order set forth by this Court in this matter.

## **CONCLUSION**

For these reasons, Proposed Intervenors respectfully request that the Court grant its motion to intervene as a matter of right under Federal Rule of Civil Procedure 24(a), or in the alternative, permit it to intervene under Federal Rule of Civil Procedure 24(b).

Respectfully submitted this 27th day of September 2024.

By: /s/ Hilary Harris Klein

Lee H. Rubin (*pro hac vice* forthcoming)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com
Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice*
forthcoming)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (*pro hac vice* forthcoming)
MAYER BROWN LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717
(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No.
60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL
JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice*
forthcoming)
Jennifer Nwachukwu (*pro hac vice*
forthcoming)
Pooja Chaudhuri (*pro hac vice*
forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA286**

## CERTIFICATE OF SERVICE

I hereby certify that September 27, 2024, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF AMENDED MOTION TO INTERVENE AS DEFENDANTS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Defendants and Intervenor-Defendant Republican National Committee. I also hereby certify that I have transmitted via mail and electronic mail the document to the following non-CM/ECF participants:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley & Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**JA287**

13

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | |
| *Plaintiffs,* | |
| *v.* | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | **MOTION TO EXPEDITE DECISION ON CONTEMPORANEOUS AMENDED MOTION TO INTERVENE** |
| *Defendants,* | |
| and | |
| DEMOCRATIC NATIONAL COMMITTEE, | |
| *Intervenor-Defendant.* | |

For the reasons set forth in the accompanying memorandum in support, Proposed Intervenors respectfully request that the Court resolve the Amended Motion to Intervene as expeditiously as possible to ensure that Proposer Intervenors' fundamental rights in this action can be properly heard in conjunction with Defendants' and are not infringed. In light of the extraordinary public interest in this case and the close proximity to the 2024 General Election

**JA288**

1

detailed in the accompanying memorandum, there is good cause and justice requires that that Proposed Intervenors' Motion be granted on an expedited basis.

Proposed Intervenors have sought to confer with the parties regarding their respective positions on the Motion on September 26, 2024. As of filing, Defendants and Intervenor-Defendant have both consented to the proposed motion, and Plaintiffs have not indicated their position.

**WHEREFORE**, Proposed Intervenors respectfully request that the Court expedite its decision on the contemporaneously filed Amended Motion to Intervene.

Respectfully submitted this 27th day of September 2024.

By: /s/ Hilary Harris Klein

Lee H. Rubin (*pro hac vice* forthcoming)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com

Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (*pro hac vice* forthcoming)
MAYER BROWN LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No. 60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice* forthcoming)
Jennifer Nwachukwu (*pro hac vice* forthcoming)
Pooja Chaudhuri (*pro hac vice* forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600

**JA289**

2

(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA290**

3

## CERTIFICATE OF SERVICE

I hereby certify that September 27, 2024, I electronically filed the foregoing **MOTION TO EXPEDITE** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Defendants and Intervenor-Defendant Republican National Committee. I also hereby certify that I have transmitted via mail and electronic mail the document to the following non-CM/ECF participants:

>John E. Branch III
>Thomas G. Hooper
>Baker Donelson Bearman, Caldwell & Berkowitz, PC
>2235 Gateway Access Point, Suite 220
>Raleigh, NC 27607
>(984) 844-7900
>jbranch@bakerdonelson.com
>thooper@bakerdonelson.com
>
>Phillip J. Strach
>Jordan A. Koonts
>Nelson Mullins Riley & Scarborough LLP
>301 Hillsborough Street, Suite 1400
>Raleigh, NC 27603
>(919) 329-3800
>phil.strach@nelsonmullins.com
>jordan.koonts@nelsonmullins.com
>
>*Counsel for Plaintiffs*

>*/s/ Hilary Harris Klein*
>Hilary Harris Klein

**JA291**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | **[PROPOSED] ORDER REGARDING MOTION TO EXPEDITE DECISION ON CONTEMPORANEOUS AMENDED MOTION TO INTERVENE** |

    Before the Court is Proposed Intervenor's Motion to Expedite Decision on Contemporaneous Amended Motion to Intervene ("Motion to Expedite"), filed on September 27, 2024. Having considered the Motion to Expedite, as well as the contemporaneously filed Amended Motion to Intervene, and for good cause shown;

    IT IS HEREBY ORDERED that the Motion to Expedite is GRANTED.

**JA292**

1

SO ORDERED, on this _____ day of _____ 2024.

_____
Richard E. Myers II
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24cv547**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXPEDITE DECISION ON CONTEMPORANEOUS AMENDED MOTION TO INTERVENE** |

Proposed Intervenors North Carolina State Conference of the NAACP ("North Carolina NAACP"), Jackson Sailor Jones, and Bertha Leverette (collectively, the "Proposed Intervenors") respectfully request that the Court expedite consideration of their Amended Motion to Intervene as Defendant-Intervenors so that they have an opportunity to participate in any forthcoming proceedings to ensure that Proposed Intervenors' fundamental rights in this action can be properly heard in conjunction with Defendants' response and are not infringed. The parties were made

**JA294**

1

aware on September 4, 2024, that intervention by the Proposed Intervenors is requested, and thus have had three weeks to consider and respond to the arguments in the Amended Motion, which remain substantially the same under federal rules that closely align with the standard under state law. In light of the extraordinary public interest in this case and the close proximity to the 2024 General Election, justice requires that that Proposed Intervenors' Motion be granted on an expedited basis, and there is good cause to do so.

As explained in Proposed Intervenors Memorandum of Law in Support of its Amended Motion to Intervene, Proposed Intervenors oppose Plaintiffs' requested relief that Defendant identify and remove approximately 225,000 North Carolinian voters from the state's voter registration rolls or, alternatively, to erect additional barriers (including requiring them to vote provisional ballots) for these voters. At the time Plaintiffs filed the Complaint, they sought this drastic relief fewer than 65 days before the 2024 presidential election, which is now fewer than 40 days away. Plaintiffs' request, on the eve of the impending General Election, is unprecedented and improper. The action is founded on the unsupported belief that every one of these 225,000 voters is "ineligible" because they allegedly did not include their driver's license number or Social Security number on their voter registration forms when registering to vote. The notion that these voters are "unlawfully" registered to vote and therefore must be purged is patently false. The exclusion of this information from many individuals' voter registration forms is largely due to a simple fact—until December 2023, North Carolina's voter registration forms made this information *optional* rather than *mandatory*. This cannot and does not justify purging individual voters, who would find themselves kicked off of the rolls through no fault of their own.

Good cause exists for expediting consideration of the Amended Motion to Intervene. The Court's resolution of this action will directly impact the Proposed Intervenors' significant

**JA295**

2

protectable interests in this litigation and impair their ability to protect those interests. If a decision on the Amended Motion to Intervene is not expedited, the relief sought by Plaintiffs—the removal of approximately 225,000 North Carolinian voters from the state's voter registration rolls or, alternatively, to erect additional barriers (including requiring them to vote provisional ballots) for these voters—will impair the Proposed Intervenors' interests before they even have an opportunity to be heard, defeating the purpose of their intervention. *See In re Grand Jury Proceedings (PHE, Inc.)*, 640 F. Supp. 149, 151 (E.D.N.C. 1986) ("The purpose of intervention is to allow a third party to protect its interests[.]").

Moreover, courts within this Circuit have expedited consideration of motions to intervene in similar circumstances. *See N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 551 (E.D.N.C. 2022) (granting intervenors motion to expedite, and underlying motion to intervene, when intervenors agreed to comply with the Court's briefing schedule); *League of Women Voters of Virginia v. Va. State Bd. of Elections*, No. 6:20-CV00024, 2020 WL 2090678, at *5 (W.D. Va. Apr. 30, 2020) (granting the Republican Party of Virginia's request to intervene within a week of filing its motion after the party "agreed that, if allowed to intervene, they would comply with the Court's expedited briefing schedule on Plaintiff's motion for a preliminary injunction."); *see also Thomas v. Andino*, 335 F.R.D. 364, 371 (D.S.C. 2020) (granting South Carolina Republican Party's motion to intervene one week after filing where party was prepared "to meet the expedited briefing deadline" and attend hearing). The Proposed Intervenors here similarly made clear that they "are willing and able to meet any Scheduling Order set forth by this Court in this Matter." Mem. at 11.

For these reasons, Proposed Intervenors respectfully request that the Court grant its motion and expedite consideration of their Amended Motion to Intervene.

**JA296**

Respectfully submitted this 27th day of September 2024.

By: /s/ Hilary Harris Klein

Lee H. Rubin (*pro hac vice* forthcoming)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
(650) 331-2060-Facsimile
lrubin@mayerbrown.com

Rachel J. Lamorte (*pro hac vice* forthcoming)
Catherine Medvene (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3000
(202) 263-3300-Facsimile
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton (*pro hac vice* forthcoming)
MAYER BROWN LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717
(801) 289-3142-Facsimile
jhilton@mayerbrown.com

Harsha Tolappa (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
htolappa@mayerbrown.com

Hilary H. Klein (State Bar No. 53711)
hilaryhklein@scsj.org
Jeffrey Loperfido (State Bar No. 52939)
jeffloperfido@scsj.org
Christopher Shenton (State Bar No. 60442)
chrisshenton@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525

Ezra D. Rosenberg (*pro hac vice* forthcoming)
Jennifer Nwachukwu (*pro hac vice* forthcoming)
Pooja Chaudhuri (*pro hac vice* forthcoming)
Javon Davis (*pro hac vice* forthcoming)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

**JA297**

## CERTIFICATE OF SERVICE

I hereby certify that September 27, 2024, I electronically filed the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO EXPEDITE** with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following: Defendants and Intervenor-Defendant Republican National Committee. I also hereby

certify that I have transmitted via mail and electronic mail the document to the following non-

CM/ECF participants:

> John E. Branch III
> Thomas G. Hooper
> Baker Donelson Bearman, Caldwell & Berkowitz, PC
> 2235 Gateway Access Point, Suite 220
> Raleigh, NC 27607
> (984) 844-7900
> jbranch@bakerdonelson.com
> thooper@bakerdonelson.com
>
> Phillip J. Strach
> Jordan A. Koonts
> Nelson Mullins Riley & Scarborough LLP
> 301 Hillsborough Street, Suite 1400
> Raleigh, NC 27603
> (919) 329-3800
> phil.strach@nelsonmullins.com
> jordan.koonts@nelsonmullins.com
>
> *Counsel for Plaintiffs*

<div align="right">

*/s/ Hilary Harris Klein*
Hilary Harris Klein

</div>

**JA298**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00547-M

REPUBLICAN NATIONAL COMMITTEE
and NORTH CAROLINA REPUBLICAN
PARTY,

        Plaintiffs,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

        Defendants.

ORDER

This matter comes before the court on the North Carolina State Conference of the NAACP ("North Carolina NAACP"), Jackson Sailor Jones, and Bertha Leverette's ("Proposed Intervenors") amended motion to intervene [19] and motion to expedite [DE 21]. For good cause shown, the motion to expedite is granted. For the reasons that follow, the motion to intervene is denied.

**I.    Case History**

Plaintiffs initiated this action in North Carolina state court on August 23, 2024. *See* DE 1-3 at 23. The Complaint contends that Defendants violated state law that requires the North Carolina State Board of Elections ("NCSBE") to comply with Section 303 of the Help America Vote Act ("HAVA"). *Id.* at 3, 10-11, 18-19; N.C.G.S. § 163-82.11(c). That provision of HAVA obligates states to collect, in connection with a voter's registration, either the applicant's driver's license number or the last 4 digits of the applicant's social security number (or an affirmation that

**JA299**

the applicant has neither). 52 U.S.C. § 21083(a)(5)(A). Defendant's alleged noncompliance with HAVA has resulted in "NCSBE accept[ing] hundreds of thousands of voter registration applications without applying the HAVA identifying information requirement." DE 1-3 at 11. Plaintiffs seek a court order that Defendants remedy their prior noncompliance with HAVA, including by either removing any ineligible voters from voter registration lists or by requiring registered voters who did not provide HAVA identification information at the time of their application to cast a provisional ballot. *Id.* at 20-21.

While this action was pending in state court, the Democratic National Committee ("DNC") moved to intervene. DE 1-16 at 2. That motion was granted on September 10. DE 1-18 at 3. Approximately two weeks later, Defendants removed the action to this court. DE 1 at 1-3. Proposed Intervenors now seek to intervene as of right, or alternatively, with the court's permission. DE 19.

## II.    Legal Standards

"On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Fourth Circuit "has interpreted Rule 24(a)(2) to entitle an applicant to intervention of right if the applicant can demonstrate: (1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991); *see also North Carolina State Conf. of NAACP v. Berger*, 970 F.3d 489, 502 (4th Cir. 2020) ("There are three requirements for intervention as of right.").

**JA300**

2

"Proposed Intervenors bear the burden of demonstrating to the Court that they have a right to intervene." *North Carolina All. for Retired Americans v. Hirsch*, No. 1:23-CV-837, 2023 WL 9422596, at *1 (M.D.N.C. Dec. 15, 2023), *recommendation adopted*, No. 1:23-CV-837, 2024 WL 308513 (M.D.N.C. Jan. 26, 2024).

As to the first factor, although Rule 24 "speaks in general terms . . . "[w]hat is obviously meant there is a significantly protectable interest." *Donaldson v. United States*, 400 U.S. 517, 531 (1971); *cf. Diamond v. Charles*, 476 U.S. 54, 66 (1986) ("Article III requires more than a desire to vindicate value interests."). In other words, the movant must "stand to gain or lose by the direct legal operation of the district court's judgment." *Teague*, 931 F.2d at 261. An "interest" shared by all members of an electorate is not "sufficient[ly particularized] to meet the requirements of Rule 24(a)." *League of Women Voters of Virginia v. Virginia State Bd. of Elections*, 458 F. Supp. 3d 460, 466 (W.D. Va. 2020).

As to the second factor, "[t]he focus . . . is on whether the proposed intervenor would suffer a 'practical disadvantage or impediment' if not permitted to intervene." *North Carolina NAACP*, 970 F.3d at 504 (quoting *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981)). This broad language encompasses more than legal disadvantages "in the *res judicata* sense." *Francis v. Chamber of Com. of U. S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973) (discussing intent of 1966 amendment to Rule 24 "to liberalize the right to intervene in federal actions") (italics in original). If a third party satisfies the first factor of Rule 24(a), it often follows that participation as a party is necessary to protect that interest. *See Nuesse v. Camp*, 385 F.2d 694, 704 n.10 (D.C. Cir. 1967) (observing that "relegat[ion] to the status of amicus curiae . . . is not an adequate substitute for participation as a party").

**JA301**

3

Lastly, a movant must show "that the present litigants fail adequately to represent their interests." *Teague*, 931 F.2d at 262. This showing may entail different burdens depending on the circumstances. Generally, the burden "should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). But "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented." *Commonwealth of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976); *see also Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 197 (2022) ("this presumption applies only when interests overlap fully") (internal brackets and quotation mark omitted). When a movant and party share the same objective, "the [movant] must demonstrate adversity of interest, collusion, or nonfeasance." *Westinghouse*, 542 F.2d at 216. Further, when the movant shares the same objective as a government party, "a more exacting showing of inadequacy should be required." *Stuart v. Huff*, 706 F.3d 345, 351 (4th Cir. 2013).

## III. Analysis

Proposed Intervenors have a protectable interest in this action, the protection of which would be practically impeded by disposition of the action. But Defendants and the DNC adequately represent Proposed Intervenors' interests, compelling denial of the motion to intervene.

First, Proposed Intervenors have "a significantly protectable interest" in this action. *Donaldson*, 400 U.S. at 531. "[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The North Carolina NAACP includes members who registered to vote without providing their driver's license number or the last 4 digits of their social security number, and the individual Proposed Intervenors "are on the list of registrations in North Carolina lacking either a Social Security Number or driver's license number in their voter file." DE 19-2 at 5; DE 19-3 at

**JA302**

4

3; DE 19-4 at 3. They thus "stand to gain or lose by the direct legal operation of the district court's judgment." *Teague*, 931 F.2d at 261.

Next, Proposed Intervenors' fundamental interest in voting would be practically impeded by disposition of this action. *See North Carolina NAACP*, 970 F.3d at 504. If Plaintiffs prevail, North Carolina NAACP members or the individual Proposed Intervenors may be removed from voter registration lists or required to cast provisional ballots. *See* DE 1-3 at 20-21. Mere weeks before the 2024 election, that sort of practical impediment satisfies the second factor of Rule 24(a). *See Teague*, 931 F.2d at 261.

However, Proposed Intervenors have not shown that "existing parties" do not "adequately represent th[eir] interest." Fed. R. Civ. P. 24(a)(2). As an initial matter, the court finds that Proposed Intervenors have "the same ultimate objective" as Defendants and the DNC: protecting the right to vote for all eligible North Carolina voters. This objective is imposed on Defendants as a matter of law. 52 U.S.C. § 20507(a)(1) ("In the administration of voter registration for elections for Federal office, each State shall . . . ensure that any eligible applicant is registered to vote in an election"); 52 U.S.C. § 21083(a)(4)(B) ("The State election system shall include . . . "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."); *Green v. Bell*, No. 3:21-CV-00493, 2023 WL 2572210, at *6 (W.D.N.C. Mar. 20, 2023) (denying intervention based on finding that Defendant Karen Bell could adequately represent interests of proposed intervenors because she is "authorized to further and protect the interest that North Carolina voters have in the enforcement of" federal election law). And the DNC has stated its objective as protecting the right to vote not just for registered Democrats, but rather "the broad coalition of Democrats, Republicans, independents, and third-party voters who intend to cast votes for Democratic candidates this fall." DE 1-16 at 3. Just because Defendants may have additional

**JA303**

5

objectives (such as the orderly administration of elections) or because the DNC's interest may be particularly acute for some registered voters (such as those the DNC suspects will vote for Democrat candidates), does not mean that the existing parties' interests do not "overlap fully" with the interest of Proposed Intervenors in remaining on the voter registration list for the 2024 election. *Berger*, 597 U.S. at 197.

Given the overlap of objectives, "a presumption arises that" Proposed Intervenors' "interests are adequately represented." *Westinghouse*, 542 F.2d at 216. They therefore "must demonstrate adversity of interest, collusion, or nonfeasance." *Id.* The court need not impose *Stuart's* "more exacting showing of inadequacy," *Stuart*, 706 F.3d at 351, because here, Proposed Intervenors have not even made a "minimal" showing, *Trbovich*, 404 U.S. at 538 n.10.

Proposed Intervenors contend that they "have a personal and unique interest in the outcome of this litigation," whereas Defendants "have a larger obligation to all constituents that may not align with the vulnerable 225,000 voters whose voting rights are at stake." DE 20 at 9-10. But the same could be said in any case where an individual seeks intervention and the government is a party. As noted, Defendants are obligated by law to ensure that eligible voters retain the ability to cast their votes in forthcoming elections. 52 U.S.C. § 20507(a)(1); 52 U.S.C. § 21083(a)(4)(B). Their obligation thus necessarily embraces the interests of Proposed Intervenors, who are among the constituents whose right to vote Defendants must protect. *See Stuart*, 706 F.3d at 351 ("In matters of public law litigation that may affect great numbers of citizens, it is the government's basic duty to represent the public interest.").

Proposed Intervenors further assert that the DNC's interests are not "sufficient to cover those of Proposed Intervenors" because the DNC represents "Democratic voters and candidates" whereas Proposed Intervenors represent "all potentially impacted voters regardless of their partisan

**JA304**

affiliation." DE 20 at 10. But the DNC has described its objective much more broadly. *See* DE 1-16 at 3. And as a practical matter, the court cannot conceive of a scenario where the DNC's interest in protecting the right to vote for a "broad coalition of Democrats, Republicans, independents, and third-party voters who intend to cast votes for Democratic candidates," *id.*, would diverge from that of Proposed Intervenors. Proposed Intervenors' generalized assertion to the contrary cannot overcome even a minimal burden. *See Trbovich*, 404 U.S. at 538 n.10.

In sum, the DNC and Proposed Intervenors are aligned: both groups want to protect the right to vote of all eligible and registered North Carolinians. Defendants are obligated to do the same. Accordingly, existing parties adequately represent Proposed Intervenors' interests; they all share an ultimate objective and there has been no suggestion of "adversity of interest, collusion, or nonfeasance." *Westinghouse*, 542 F.2d at 216. Proposed Intervenors have not established a right to intervention. Fed. R. Civ. P. 24(a)(2).

The court has also considered whether permissive intervention is appropriate. A court retains discretion to grant a timely motion for permissive intervention where the movants' "claims or defenses have a question of law or fact in common with the main action" and where "intervention will not result in undue delay or prejudice to the existing parties." *League of Women Voters of Virginia*, 458 F. Supp. 3d at 466; Fed. R. Civ. P. 24(b)(1)(B) & (b)(3). The court finds that permissive intervention is not warranted here because intervention "would necessarily complicate the discovery process and consume additional resources of the court and the parties." *Stuart*, 706 F.3d at 355. Because Defendants' and the DNC's interests overlap with those of Proposed Intervenors, "intervention is 'likely only to result in duplicative briefing.'" *Green*, 2023 WL 2572210, at *7 (quoting *Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 31 (S.D.W.

**JA305**

Va. 2015)). The resulting strain on limited judicial resources would result in undue delay for the parties. Fed. R. Civ. P. 24(b)(3).

Further, granting intervention under the circumstances would "open the floodgates on this lawsuit to any voter in the state" who registered to vote without providing their driver's license number or the last 4 digits of their social security number. *League of Women Voters of Virginia*, 458 F. Supp. 3d at 466. Based on Plaintiffs' allegation that that number may run into the "hundreds of thousands," DE 1-3 at 11, this court is disinclined to "convert[] this lawsuit into a public forum," *League of Women Voters of Virginia*, 458 F. Supp. 3d at 466, particularly with only weeks until the election. The court declines to grant permissive intervention.

## IV.    Conclusion

Proposed Intervenors' motion to expedite [DE 21] is GRANTED and their motion to intervene [DE 19] is DENIED.


SO ORDERED this __30th__ day of September, 2024.


RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE


**JA306**

8

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> Plaintiffs, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> Defendants, <br><br> and <br><br> THE DEMOCRATIC NATIONAL COMMITTEE, <br><br> Intervenor-Defendant. | **STATE BOARD DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** <br> Fed. R. Civ. P. 12(b)(6) |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants the North Carolina State Board of Elections, its members, and its Executive Director move to dismiss Plaintiffs' Complaint (D.E. 1-3) for lack of jurisdiction and failure to state a claim upon which relief can be granted. In support of their motion, Defendants file the accompanying memorandum of law and proposed order.

This the 30th day of September, 2024.

**JA307**

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA309**

3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>             Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>             Defendants,<br><br>and<br><br>THE DEMOCRATIC NATIONAL COMMITTEE,<br><br>             Intervenor-Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS** |

**JA310**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

    A. HAVA and North Carolina state law establish rules for voter registration, voter identification, and voter-list maintenance ........................................... 2

    B. The National Voter Registration Act forbids the systematic removal of ineligible voters within 90 days of an election. ................................................ 4

    C. A voter challenges the State's registration form. ......................................... 5

    D. Fewer than 90 Days before the 2024 general election, Plaintiffs sue. ......... 6

ARGUMENT ................................................................................................................. 7

    I.   Legal Standard ........................................................................................... 7

    II.  Plaintiffs' Claims Are Independently Barred by Laches. ....................... 7

    III. Plaintiffs Have Failed to State a Claim for Which Relief Can Be Granted. ..................... 10

        A. Plaintiffs have failed to state a claim for mandamus relief. ..................... 11

            1.  Plaintiffs have no clear right to the remedies they ask the Court to impose. ........................................................................................... 11

            2.  The State Board Defendants have no "clear duty" to provide Plaintiffs' chosen remedies. ....................................................... 13

            3.  Plaintiffs have an alternative route to relief. ................................. 15

        B. Plaintiffs have failed to state a claim under the North Carolina Constitution. ........... 16

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3) ...................... 22

CERTIFICATE OF SERVICE ................................................................................... 23

**JA311**

## TABLE OF AUTHORITIES

**Cases**

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ............................................................. 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................... 7, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 7

*Blankenship v. Bartlett*,
    363 N.C. 518, 681 S.E. 759 (2009) ...................................................... 16

*Bost v. Ill. State Bd. of Elections*,
    684 F. Supp. 3d 720 (N.D. Ill. 2023) .................................................... 19

*Bowyer v. Ducey*,
    506 F. Supp. 3d 699 (D. Ariz. 2020) .................................................... 19

*Clements v. Fashing*,
    457 U.S. 957 (1982) ......................................................................... 9

*Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*,
    816 F.3d 48 (4th Cir. 2016) .............................................................. 11

*Democratic Nat'l Comm. v. Wisc. State Legislature*,
    141 S. Ct. 28 (2020) .................................................................... 8, 10

*Donald J. Trump for President v. Boockvar*,
    493 F. Supp. 3d 331 (W.D. Pa. 2020) .................................................. 19

*EEOC v. Propak Logistics, Inc.*,
    746 F.3d 145 (4th Cir. 2014) .............................................................. 7

*Election Integrity Project Cal., Inc. v. Weber*,
    113 F.4th 1072 (9th Cir. 2024) .......................................................... 20

*Election Integrity Project Cal., Inc. v. Weber*,
    No. 2:21-cv-32, 2023 WL 5357722 (C.D. Cal. July 18, 2023) ............................. 19

*First Fed. Sav. & Loan Ass'n v. Baker*,
    860 F.2d 135 (4th Cir. 1988) ...................................... 2, 11, 13, 15, 16

*Francis v. Giacomelli*,
    588 F.3d 186 (4th Cir. 2009) ........................................................ 17, 19

**JA312**

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) ................................................................. 7

*Giddens v. Isbrandtsen Co.*,
    355 F.2d 125 (4th Cir. 1966) ................................................................. 8

*In re T.H.T.*,
    362 N.C. 446, 665 S.E.2d 54 (2008) .................................................... 11

*Langford v. Joyner*,
    62 F.4th 122 (4th Cir. 2023) ................................................................ 17

*N.C. State Conf. NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*,
    No. 1:16-cv-1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) .......... 13

*Perry v. Judd*,
    471 F. App'x 219 (4th Cir. 2012) ....................................................... 8, 9

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) ................................................................. 8

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ................................................................................ 10

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    589 U.S. 423 (2020) ............................................................................ 10

*Smith v. Virginia*,
    No. 3:08-cv-800, 2009 WL 2175759 (E.D. Va. July 15, 2009) ........... 18

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
    198 F.3d 502 (4th Cir. 1999) ............................................................... 15

*Voters Organized for the Integrity of Elections v. Balt. City Elections Bd.*,
    214 F. Supp. 3d 448 (D. Md. 2016) ....................................................... 7

*White v. Daniel*,
    909 F.2d 99 (4th Cir. 1990) ............................................................... 7, 9

**Federal Statutes**

52 U.S.C. § 20501 ................................................................................. 4, 5

52 U.S.C. § 20507 ................................................................................. 5, 13

52 U.S.C. § 21083 ............................................................................... *passim*

52 U.S.C. § 21112 ................................................................................... 15

**JA313**

**State Statutes**

N.C. Gen. Stat. § 163-82.1 .................................................................. 3, 14

N.C. Gen. Stat. § 163-82.11 .................................................................. *passim*

N.C. Gen. Stat. § 163-82.14 .............................................................. 3, 4, 14

N.C. Gen. Stat. § 163-166.12 ........................................ 4, 12, 14, 15, 18

N.C. Gen. Stat. § 163-166.16 ............................................................ 4, 15

N.C. Gen. Stat. § 163-166.40 ............................................................ 4, 15

N.C. Gen. Stat. § 163-230.1 .............................................................. 4, 15

**Constitutional Provision**

N.C. Const., Art. I, § 19 .................................................................... 6, 16

**Regulation**

69 Fed. Reg. 14,844 ............................................................................ 16

**Rule**

Fed. R. Civ. P. 12 ................................................................................ 7

**Other Authority**

Press Release, *NC Election Officials Removed Nearly 750,00 Ineligible Registrants Since Start of 2023*, N.C. State Bd. of Elections (updated Sept. 27, 2024) .......................................... 5

**JA314**

# INTRODUCTION

Voting in North Carolina began ten days ago, on September 20, 2024, when ballots were transmitted to uniformed and overseas civilian voters. Amid this ongoing voting, the Republican National Committee and North Carolina Republican Party ask this Court to order the State Board to remove en masse hundreds of thousands of voters from North Carolina's voter rolls. Plaintiffs allege that these voters registered using an erroneous voter registration form that, contrary to the demands of the Help America Vote Act of 2002 ("HAVA"), did not clearly require registrants to provide their driver's license or social security number. Plaintiffs contend that unless the State Board removes these voters now—in the middle of a general election—illegal voting will proliferate and the results of the State's election will be cast into doubt. This Court should forcefully reject Plaintiffs' allegations and dismiss this suit in its entirety.

As an initial matter, Plaintiffs' suit is barred by laches. Plaintiffs concede that they have been aware of the alleged defect in the State Board's registration form since at least October 2023. Yet they waited ten months to bring this lawsuit—until voting was about to begin. Because Plaintiffs failed to diligently pursue their claims, and because Plaintiffs' delay will cause the State Board—and North Carolina voters—significant prejudice, laches provides an independent reason to dismiss this case.

Plaintiffs' claims should alternatively be dismissed for failure to state a claim. Plaintiffs' complaint purports to raise two claims: one for a writ of mandamus and the other for a violation of Article I, § 19 of the North Carolina Constitution. But the threadbare allegations included in Plaintiffs' complaint are insufficient to state either of these claims.

First, Plaintiffs have failed to state a claim for mandamus relief. Such relief is available "only where three elements co-exist: (1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner;

**JA315**

and (3) no other adequate remedy is available." *First Fed. Sav. & Loan Ass'n v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988). Plaintiffs cannot satisfy *any* of these three requirements.

Second, Plaintiffs have failed to state a constitutional claim. Though Plaintiffs decline to articulate a clear constitutional theory, their allegations seem to gesture at an equal-protection claim. According to Plaintiffs, the fact that certain voters were able to register without providing a driver's license or social security number is likely to give rise to voter fraud and, thus, to dilute the votes of lawful voters. This claim fails. To state a cognizable equal-protection claim grounded in vote dilution, plaintiffs must allege that their votes have been weighted differently than others'. Plaintiffs make no such allegations. And the allegations that they do make are conclusory and wholly unsupported. Plaintiffs cannot survive a motion to dismiss merely by crying voter fraud, without any coherent theory as to how such fraud might transpire.

The State Board Defendants have no higher priority than ensuring the State's elections are administered in a manner that engenders the trust of all North Carolinians. This lawsuit—and the meritless claims it advances—needlessly undermines that trust. This Court should dismiss Plaintiffs' claims with prejudice.

## STATEMENT OF FACTS

### A.     HAVA and North Carolina state law establish rules for voter registration, voter identification, and voter-list maintenance.

Section 303 of HAVA tasks the "chief State election official" in each State with "implement[ing], in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). State elections officials are then required to "perform list maintenance . . . on a regular basis." *Id.* § 21083(a)(2)(A). Voters may be removed, among other reasons, based on "felony status" or because they have died. *Id.* Any removals that occur, however, must happen

**JA316**

"in accordance with the provisions of the National Voter Registration Act of 1993." *Id.* § 21083(a)(2)(A)(i). And list maintenance "shall be conducted in a manner that ensures that . . . the name of each registered voter appears in the computerized list [and] only voters who are not registered or who are not eligible to vote are removed." *Id.* § 21083(a)(2)(B).

State law in North Carolina reiterates these requirements, N.C. Gen. Stat. § 163-82.14, and underscores that the State Board must "update the statewide computerized voter registration list and database to meet the requirements of section 303(a)" of HAVA, *id.* § 163-82.11(c). Consistent with HAVA, North Carolina law permits the removal of registered voters only in certain limited circumstances: (1) when the registrant requests, in writing, to the county board of elections to be removed; (2) when the registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or (3) when the county board of elections determines, through a separate statutory process, that it can no longer confirm where the voter resides. *Id.* § 163-82.1(c).

HAVA also instructs States to gather certain identification information from individuals as part of the voter registration process. *E.g.*, 52 U.S.C. § 21083(a)(4)(A), (a)(5)(A). For instance, States are not to "accept[ ] or process[ ]" a voter-registration application "unless the application includes" either an applicant's driver's license number or the last four digits of her social security number. *Id.* § 21083(a)(5)(A)(i). If an applicant does not have a driver's license or social security number, States must assign the applicant an identification number. *Id.* § 21083(a)(5)(A)(ii).

Separately, HAVA imposes certain requirements on voters who register by mail the first time they show up to vote in a federal election. Before those individuals can cast a ballot, whether by mail or in person, they must provide either "current and valid photo identification" or

an official document like a bank statement that verifies the voter's name and address. *Id.* § 21083(b)(2)(A)(i)-(ii); *see also* N.C. Gen Stat. § 163-166.12 (reiterating the same requirements under state law). Voters who include a driver's license or social security number on their registration application are exempt from this requirement, so long as the State is able to validate the number provided. 52 U.S.C. § 21083(b)(3)(B); N.C. Gen. Stat. § 163-166.12(f).

Starting with the 2023 municipal elections, North Carolina has imposed one further identification requirement on voters who seek to cast a ballot. Under state law, North Carolinians are required to present current and valid photo identification before they can vote. N.C. Gen. Stat. §§ 163-166.16, 163-166.40(c)(3), 163-230.1(f1). One such acceptable photo ID is a North Carolina driver's license, but voters can also use passports, student ID cards, or military ID cards, among others. *Id.* § 163-166.16(a). If voters do not present a valid photo ID when voting, they may "cast a provisional ballot that is counted only if the registered voter brings an acceptable form of photograph identification" to the county board of elections prior to the board's canvass of the votes. N.C. Gen. Stat. § 163-166.16(c).

### B.   The National Voter Registration Act forbids the systematic removal of ineligible voters within 90 days of an election.

As mentioned above, both HAVA and state law require any list maintenance that North Carolina conducts be performed in accordance with the National Voter Registration Act ("NVRA"). 52 U.S.C. § 21083(a)(2)(A)(i); N.C. Gen. Stat. § 163-82.14(a1). The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote," to "enhance[ ] the participation of eligible citizens as voters," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). In enacting the NVRA, Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter

**JA318**

4

participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

Consistent with these objectives, the NVRA provides for the removal of ineligible voters from the rolls but demands that any systematic removals be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A). Voters may be removed beyond this time limit only in limited circumstances: if the registrant requests to be removed, if State law requires removal due to "criminal conviction or mental incapacity," if the registrant dies, or to correct a registration record. *Id.* § 20501(a)(3)(A); -(a)(3)(B); -(a)(4)(A); -(c)(2)(B). In keeping with its obligations under the NVRA, the State Board has systematically removed nearly 750,000 ineligible registrants since January 2023. *See* Press Release, *NC Election Officials Removed Nearly 750,00 Ineligible Registrants Since Start of 2023*, N.C. State Bd. of Elections (updated Sept. 27, 2024), *available at* https://www.ncsbe.gov/news/press-releases/2024/09/26/nc-election-officials-removed-nearly-750000-ineligible-registrants-start-2023.

### C.    A voter challenges the State's registration form.

For nearly two decades, the State Board used a voter-registration form that did not make clear that a voter's driver's license or social security numbers was required information under HAVA. Compl. (D.E. 1-3) ¶ 50. Plaintiffs allege that, over that time period, 225,000 applicants did not provide this information when they submitted their registration form. Compl. ¶ 52.

This potential discrepancy between the state form and federal law was raised in a complaint filed with the Board by Carol Snow on October 6, 2023. The Board considered the complaint at its November 28, 2023 meeting. Compl. ¶¶ 48-49, 51. On December 6, 2023, the Board ordered that the form be changed to indicate that voters must provide a driver's license or

social security number or check a box indicating that they do not have such numbers. Compl. ¶¶ 42, 50, 51, 54.

Ms. Snow was unsatisfied with these corrective actions and submitted additional complaints to the Board on March 11, 2024, and April 11, 2024, respectively. Compl. ¶ 56. The Board granted no further remedies. *Id.*

### D.  Fewer than 90 Days before the 2024 general election, Plaintiffs sue.

Plaintiffs then waited to bring this suit until August 23, 2024—nearly a year after Ms. Snow first raised her concerns about the voter-registration form. The NVRA deadline for the systematic removal of voters was August 7, 2024, and voting began in North Carolina on September 20, when ballots were transmitted to uniformed and overseas civilian voters. Compl. ¶¶ 51, 54, 56.

Plaintiffs' suit alleges that the Board violated HAVA when it registered voters without their driver's license or social security numbers, and their complaint expressly identifies claims under N.C. Gen. Stat. § 163-82.11(c) and Article I, § 19 of the North Carolina Constitution. To redress these claims, Plaintiffs demand a writ of mandamus and mandatory injunction "ordering Defendants to develop, implement, and enforce practices and policies to ensure compliance with HAVA and, in turn, N.C. Gen. Stat. § 163-82.11(c)." Prayer for Relief ¶ 1. Plaintiffs further ask that the Court "[d]irect Defendants, under a court-approved plan to be completed no later than September 6, 2024" to "identify[] all ineligible registrants and remov[e] them from the state's voter registration lists." Prayer for Relief ¶ 2. If "such removal is not feasible" before September 6, 2024, Plaintiffs request that the Court direct the State Board to require all individuals who filled out an application form without a driver's license or social security number "to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation" of this information. Prayer for Relief ¶ 2.

**JA320**

6

The State Board removed this case from North Carolina Superior Court for Wake County to this Court on September 23, 2024.

## ARGUMENT

### I.      Legal Standard

A motion to dismiss under Rule 12(b)(6) should be granted if, accepting all well-pleaded allegations as true, the complaint is not legally and factually sufficient. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). In other words, a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court need not accept as true a complaint's legal conclusions, elements of a cause of action, or conclusory statements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### II.      Plaintiffs' Claims Are Independently Barred by Laches.

Laches provides an independent basis for dismissing Plaintiffs' suit. *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *see also EEOC v. Propak Logistics, Inc.*, 746 F.3d 145, 149 (4th Cir. 2014). Laches bars the claim of a plaintiff (1) who has shown a lack of diligence in bringing its claim when (2) that lack of diligence has prejudiced the defendant. *White*, 909 F.2d at 102. Both of those factors are clearly satisfied here.

First, Plaintiffs were not diligent in bringing this suit. A plaintiff shows a lack of diligence when its filing of the lawsuit is "delayed inexcusably or unreasonably" after it discovered or could have discovered the facts giving rise to suit. *White*, 909 F.2d at 102 (citation omitted). "Diligence in the compressed timeline applicable to elections is measured differently from how it might be measured in other contexts." *Voters Organized for the Integrity of Elections v. Balt. City Elections Bd.*, 214 F. Supp. 3d 448, 454 (D. Md. 2016). Plaintiffs concede that they became aware of the issues with the State's registration form as early as October 2023.

**JA321**

7

Compl. ¶¶ 48, 56. Yet they waited nearly a year to bring suit and finally did so on the eve of an election, at a point when federal law prohibits the Board from taking the corrective action that Plaintiffs demand. *See infra* Part III.A.2.

This kind of gamesmanship is particularly problematic in the context of elections litigation, where candidates or parties may attempt to alter election results by filing belated challenges. In those circumstances, the Fourth Circuit has not hesitated to dismiss claims based on laches. In *Perry v. Judd*, for example, the Fourth Circuit held that a Presidential candidate had unreasonably delayed in bringing suit when he challenged a Virginia ballot-access requirement at the eleventh hour—despite having had four months to do so. 471 F. App'x 219, 224 (4th Cir. 2012). The Fourth Circuit explained that allowing late-filed challenges to election rules "would encourage candidates to wait until the last minute" to file suit, so that a candidate who was disappointed in the outcome "would take his disappointment to the courthouse." *Id.* at 225.

The Supreme Court, too, has cautioned courts not to entertain challenges to election procedures when the plaintiffs have sat on their rights. Indeed, one of the chief aims of the *Purcell* principle—which provides that federal courts should not change election rules close to an election—is to "discourage[] last-minute litigation and instead encourage[] litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process." *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 30-31 (2020) (Roberts, J., concurring). Applying the *Purcell* principle, this Court recently affirmed a district court's conclusion that plaintiffs challenging an alleged racial gerrymander unreasonably delayed in bringing their suit when they waited 26 days to challenge a legislatively enacted congressional district plan. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 226-27 (4th Cir. 2024).

Plaintiffs' delay here should similarly bar their claims. Plaintiffs offer no explanation for their decision to wait until the eleventh hour to file suit, when they could have done so immediately after Ms. Snow filed her first complaint in late 2023 or, at the latest, after her subsequent complaints this past spring.

Second, Plaintiffs' delay prejudiced the State Board. Though courts have been reluctant to establish any rigid timelines with respect to laches, in general, "the greater the delay, the less the prejudice" a defendant is required to show. *White*, 909 F.2d at 102; *see also Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 126 (4th Cir. 1966) (contrasting "laches" with "rigid limitation" periods). Prejudice "is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." *White*, 909 F.2d at 102. In the elections context, harm to orderly and uniform operation of elections is a "state interest the Supreme Court has repeatedly credited." *Perry*, 471 F. App'x at 227 (citing *Clements v. Fashing*, 457 U.S. 957, 965 (1982)).

Here, Plaintiffs' delay prejudices the State Board in several ways. First, because Plaintiffs inexplicably waited to file suit until shortly before the election, if Plaintiffs were to prevail, the State Board would be forced to violate the NVRA. *See infra* Part III.A.2.s

Additionally, Plaintiffs' suit threatens the orderly operation of elections, a core responsibility of the Board's. If the Board is indeed compelled to remove hundreds of thousands of voters from the voter rolls amid an ongoing election, the result will be widespread chaos and disenfranchisement. Scores of voters will show up at the polls on Election Day only to learn that—through no fault of their own—they are no longer registered to vote and, thus, that they cannot participate in the election. Other voters may already have submitted absentee ballots, and

**JA323**

the Board will presumably need to spoil those ballots, locate the voters, alert them to their removal from the voter rolls, help them re-register, and then allow them to submit a new ballot.

Plaintiffs' alternative remedy—requiring hundreds of thousands of voters to vote provisionally—is also likely to breed extensive disarray and dysfunction. Voters will be surprised when they show up to vote and, despite being eligible voters and presenting HAVA ID, they are told that they must vote provisionally. Worse still, these voters will not know—right up until the night before canvass—whether their votes have been counted at all. And the State Board and county boards of election will have to manage the Herculean administrative task of processing potentially hundreds of thousands of additional provisional ballots during the canvassing period. This is a recipe to create just what Plaintiffs claim to want to avoid: bringing "the security and validity of the state's elections into question." Compl. ¶ 69.

The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*)). "[R]unning a statewide election is a complicated endeavor," and "[e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *Wisc. State Legislature*, 141 S. Ct. 31 (2020) (Kavanaugh, J., concurring). The relief Plaintiffs seek is not just an "innocuous late-in-the-day" alteration—it is the systematic disenfranchisement of hundreds of thousands of North Carolina's voters on the eve of a general election in a Presidential year. This Court should not facilitate that result. Plaintiffs' claim should be dismissed on laches grounds.

## III.    Plaintiffs Have Failed to State a Claim for Which Relief Can Be Granted.

Plaintiffs' complaint alleges two claims. First, Plaintiffs seek a writ of mandamus ordering the State Board to comply with N.C. Gen. Stat. § 163-82.11(c). Compl. ¶¶ 77-88.

**JA324**

10

Second, Plaintiffs allege that the State Board's refusal to purge over a quarter of a million voters from the State's voter rolls somehow violates their rights under Article I, Section 19 of North Carolina's Constitution. Compl. ¶¶ 89-96. Plaintiffs have not adequately alleged either claim.

### A.     Plaintiffs have failed to state a claim for mandamus relief.

Plaintiffs' first claim asks this Court to issue a writ of mandamus to remove, en masse, any voters who were registered without providing a driver's license or social security number or to require those voters "to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation of the required HAVA information." Prayer For Relief ¶ 2. Mandamus is a "drastic remedy that must be reserved for extraordinary situations." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016). Plaintiffs cannot establish that they are entitled to the extraordinary remedy they seek. Their claim should therefore be dismissed.

A court may enter mandamus "only where three elements co-exist: (1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." *First Fed. Sav. & Loan Ass'n v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988); *see also In re T.H.T.*, 362 N.C. 446, 453, 665 S.E.2d 54, 59 (2008) (identifying the same elements under state law). Plaintiffs cannot satisfy any of these three elements, much less all three.

### 1.     Plaintiffs have no clear right to the remedies they ask the Court to impose.

To start, Plaintiffs lack any "clear right" to the relief they request. Plaintiffs' mandamus claim is based on an alleged violation of N.C. Gen. Stat. § 163-82.11(c), which requires the State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a)" of HAVA. As far as the State Board is aware, no state or federal court has ever recognized a cause of action for violations of that state statute. Indeed, the absence

**JA325**

of any private right of action under this statute is presumably why Plaintiffs have sought to characterize their claim as a petition for mandamus, as opposed to a more straightforward statutory claim. But Plaintiffs cannot manufacture a "clear right" to a sweeping voter purge by creatively repackaging an otherwise unavailable claim.

Moreover, even if Plaintiffs could establish a right to *some* form of relief under § 163-82.11(c), there is no reason to accept that Plaintiffs are entitled to the specific relief they seek. Plaintiffs' complaint demands a writ that would either (a) cancel the registrations of hundreds of thousands of voters or (b) require that any registrants who failed to provide a driver's license or social security number on their registration form cast provisional ballots unless they provide that information. Prayer for Relief ¶¶ 1-2. Plaintiffs have no right to either of these remedies.

Nothing in § 163-82.11(c)—or any other state or federal law, for that matter—suggests that a plaintiff who alleges that voters were erroneously registered because they failed to provide a driver's license or social security number has any right to have those voters removed from the voter rolls. In fact, as discussed below, the mass removal that Plaintiffs demand would violate both state and federal law. *See infra* Part III.A.2.

Nor have Plaintiffs pointed to any law that empowers them to force such voters to cast provisional ballots. Indeed, that particular remedy seems incompatible with N.C. Gen. Stat. § 163-166.12(e). That statute requires only those voters who fail to provide a valid driver's license or social security number on their registration form—and then *also* fail to present a HAVA ID when they show up to cast a ballot—to vote a provisional ballot. *Id.* This provision suggests that the General Assembly could have opted to make all voters who do not include a driver's license or social security number on their registration forms vote a provisional ballot unless and until they provide such a number or certify that they have never been issued one. The

General Assembly made a different choice, and required only voters who fail to comply with HAVA's alternative process for proving their identity to cast provisional ballots. Plaintiffs point to nothing that affords them a "clear right" to alter the legislature's decision and force a wider swath of voters to cast provisional ballots.

### 2. The State Board Defendants have no "clear duty" to provide Plaintiffs' chosen remedies.

Plaintiffs likewise cannot establish that the State Board has any "clear duty" to provide their desired relief. *See First Fed. Sav. & Loan Ass'n*, 860 F.2d at 138. "Mandamus against a public official will not lie unless the alleged duty to act involves a mandatory or ministerial obligation which is so plainly prescribed as to be free of doubt." *Id.* The Board faces no such duty here.

To be sure, Section 163-82.11(c) does obligate the State Board to "update the statewide computerized voter registration list and database to meet" the HAVA requirements. But Plaintiffs can hardly argue that this provision imposes a *clear duty* on the Board to *purge* the voters at the center of this lawsuit. In fact, removing those voters en masse in response to this suit would violate both federal and state law.

The NVRA requires the State Board to carry out any plan to "systematically remove" ineligible voters from the rolls "not later than 90 days prior to the date of a primary or general election." 52 U.S.C. § 20507(c)(2)(A); *see also* N.C. Gen. Stat. § 163-82.14(a1) (requiring all list maintenance efforts in North Carolina to comply with the NVRA). States cannot systematically remove voters fewer than 90 days before an election because that is "when the risk of disenfranchising eligible voters is the greatest." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014); *N.C. State Conf. NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at *6 (M.D.N.C. Aug. 7, 2018), This year, the NVRA cutoff

**JA327**

was August 7, more than two weeks before Plaintiffs filed their Complaint. The State Board is therefore forbidden, at this point, from removing the voters that Plaintiffs have identified from the rolls.

In addition, state law also seems to prohibit the removal of registrants that Plaintiffs seek. Section § 163-82.1(c) provides that "[e]very person registered to vote by a county board of elections in accordance with [Article 7A of the General Statutes] *shall remain registered*" unless one of three limited circumstances occurs. (Emphasis added.) These three circumstances are: (1) when the registrant requests, in writing, to the county board of elections to be removed; (2) when the registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or (3) when the county board of elections determines, through a separate statutory process, that it can no longer confirm where the voter resides. N.C. Gen. Stat. § 163-82.1(c). Plaintiffs have not alleged that any of those circumstances is present here. The State Board thus cannot remove the voters at the center of this suit without running headlong into the restrictions set forth in state law.

Importantly, the fact that Plaintiffs cannot compel the State Board to implement a sweeping voter purge does not mean that state law provides no safeguards. There are at least two additional barriers in place to ensure that ineligible voters do not cast a ballot in a North Carolina election. The first is in HAVA itself. Voters who do not provide a driver's license or social security number on their registration application cannot cast a ballot until they provide either "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck or other government document that shows the[ir] name and address." 52 U.S.C. § 21083(b)(2)(A)(i); N.C. Gen. Stat. § 163-166.12(a); *see also* 52 U.S.C. § 21083(b)(2)(A)(ii) (requiring individuals who vote by mail to submit the same forms of ID

**JA328**

14

with their ballot); N.C. Gen. Stat. § 163-166.12(b) (same). In addition, since the November 2023 municipal elections, North Carolina has also imposed a photo-identification requirement on *all* voters. Under North Carolina law, voters are required to present current and valid photo identification before they can vote. N.C. Gen. Stat. §§ 163-166.16, 163-166.40(c)(3), 163-230.1(f1). These belt-and-suspenders provisions ensure that there is virtually no chance of voter fraud resulting from a voter not providing her driver's license or social security number on her voter registration.

In short, Plaintiffs cannot establish that the State Board has any "clear duty" to provide their desired actions. Indeed, they cannot even establish that implementation of their desired remedies would be consistent with state and federal law. Mandamus is therefore unavailable. *See First Fed. Sav. & Loan Ass'n*, 860 F.2d at 138 (mandamus will lie only if the "alleged duty to act . . . is so plainly prescribed as to be free of doubt"); *Syngenta Crop Prot. Inc. v. EPA*, 444 F. Supp. 2d 435 (M.D.N.C. 2006) (denying a writ of mandamus where federal law did not contemplate that the EPA would cancel approved pesticide registrations if they were submitted without proper notice).

### 3.    Plaintiffs have an alternative route to relief.

Finally, because state law affords Plaintiffs an alternative path to relief, mandamus is not available. Where "other adequate means to attain the relief exist," including administrative procedures, "the existence of [those] procedures will preclude the issuance of a writ of mandamus." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 515 (4th Cir. 1999).

HAVA requires every State to provide an "administrative complaint procedure[ ] to remedy grievances." 52 U.S.C. § 21112. Consistent with that mandate, the State Board has created a detailed administrative scheme for "the resolution of any complaint alleging a violation

**JA329**

of any provision of Title III of HAVA." 69 Fed. Reg. 14,844. These procedures allow "[a]ny person who believes that there is a violation of Title III" of HAVA to file a complaint. *Id.* If the complainant requests one, the State Board must hold a hearing and consider the relevant testimony and evidence. *Id.* Finally, if the Board "determines that a violation has occurred, the Board, acting through the Board or designee, shall provide the appropriate remedy" within 90 days of the complaint being filed. *Id.*

Plaintiffs offer no explanation for their failure to seek relief under this regulatory scheme. Whatever the reason, though, the mere existence of that alternative avenue for relief is fatal to Plaintiffs' effort to secure mandamus.

\* \* \*

Plaintiffs bear the burden of demonstrating that their right to issuance of a mandamus is "clear and indisputable." *First Fed. Sav. & Loan Ass'n*, 860 F.2d at 138. Because Plaintiffs have failed to satisfy a single one of the three requisite elements, their mandamus claim must be dismissed. *Id.*

### B. Plaintiffs have failed to state a claim under the North Carolina Constitution.

Plaintiffs' second claim is difficult to parse, but should also be dismissed. That claim invokes Article I, § 19 of the North Carolina Constitution, which functions, among other things, as the State's analog to the federal Equal Protection Clause. *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E. 759, 762 (2009) ("[The North Carolina Supreme Court's] analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United State in interpreting the corresponding federal clause."). Plaintiffs make little effort to actually articulate their legal claim under Article I, § 19, alleging only that the Board has "directly interfered with North Carolinian[s'] fundamental right to vote." Compl. ¶ 94. "By allowing potentially ineligible persons to vote in the state's elections and remain on the state's

**JA330**

voter rolls," Plaintiffs say, the Board has "open[ed] the door to potential widespread dilution of legitimate votes." Compl. ¶ 94. These threadbare allegations—which fail even to clarify exactly what Plaintiffs' substantive claim is—should be dismissed on that basis alone. *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). But even if the Court construes Plaintiffs' allegations charitably and reads into them an equal-protection claim, that claim, as pled, cannot survive a motion to dismiss.

Plaintiffs' equal-protection claim (if that is what it is) seems to go as follows: The fact that county boards registered certain voters even though they failed to provide a driver's license or social security number increases the likelihood that the upcoming election will be rife with voter fraud. That voter fraud will mean that the lawful votes cast by Plaintiffs' members are diluted. And that amounts to an equal-protection violation.

Such a claim is not cognizable and must be dismissed. As an initial matter, Plaintiffs' threadbare allegations related to voter fraud are not sufficient to pass muster. A plaintiff must "state a claim to relief *that is plausible on its face*." *Ashcroft*, 556 U.S. at 678 (emphasis added). The plausibility standard is "context-specific" and requires a court "to draw on its judicial experience and common sense." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

Plaintiffs fall short of this standard. Plaintiffs do not allege knowledge of any *actual* instances of voter fraud due to the State's failure to collect driver's license or social security numbers in the past. Nor do they identify any concrete basis for believing that voter fraud is likely to occur in the future.

Instead, Plaintiffs hypothesize a world in which unqualified voters are able to register without providing a driver's license or social security number and then cast illegal votes. Compl. ¶ 65. But Plaintiffs make no effort to actually connect the dots between a failure to provide these numbers at the time of registration and an increased likelihood of voter fraud. What is more, Plaintiffs ignore entirely the safeguards that state law provides to ensure that voters who fail to provide a driver's license or social security number do not vote illegally. HAVA and its state-law analog make clear that voters who do not provide a valid driver's license or social security number may still lawfully cast a ballot. 52 U.S.C. § 21083(b); N.C. Gen. Stat. § 163-166.12(a), (b), (d), (f). They simply must jump through an additional legal hoop before they can do so: Voters who do not provide a driver's license or social security number on their registration application cannot cast a ballot until they provide either "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the[ir] name and address." 52 U.S.C. § 21083(b)(2)(A)(i); N.C. Gen. Stat. § 163-166.12(a); *see also* 52 U.S.C. § 21083(b)(2)(A)(ii) (requiring individuals who vote by mail to submit the same forms of ID with their ballot); N.C. Gen. Stat. § 163-166.12(b) (same). This alternative process—which Plaintiffs do not contend that Defendants have failed to follow—prevents voters from casting a ballot without first proving their identity and confirming their eligibility to lawfully vote.

If voters who do not have a driver's license or social security number can lawfully vote—and they plainly can—then Plaintiffs cannot simply point to the fact that North Carolina's voter rolls contain voters who failed to provide that information to support their allegation that illegal votes will be cast in upcoming elections. Without factual allegations explaining how illegal votes will be cast, Plaintiffs are left with nothing more than a "naked assertion" of illegality. *See*

**JA332**

*Francis*, 588 F.3d at 192-93. That naked assertion does not entitle them to relief. *See Smith v. Virginia*, No. 3:08-cv-800, 2009 WL 2175759, at *6 (E.D. Va. July 15, 2009) (dismissing vote-dilution claim as "purely conclusory" because the plaintiff had not identified "any way" in which Virginia's registration system could have violated § 2 of the Voting Rights Act).

The problems with Plaintiffs' equal-protection claim, moreover, go beyond Plaintiffs' failure to advance anything more than conclusory allegations. The claim is also foreclosed by a wealth of case law. Federal courts have routinely rejected equal-protection claims that, like the one here, are grounded in vote dilution. *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 732-33 (N.D. Ill. 2023); *see also Election Integrity Project Cal., Inc. v. Weber*, No. 2:21-cv-32, 2023 WL 5357722, at *12 (C.D. Cal. July 18, 2023) ("[V]ote dilution claims based on potential or actual voter fraud are noncognizable."); *Donald J. Trump for President v. Boockvar*, 493 F. Supp. 3d 331, 389 (W.D. Pa. 2020); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 712 (D. Ariz. 2020). An equal-protection claim that relies on vote dilution can prevail only if a plaintiff can show that certain votes have been weighted differently to the disadvantage of an identifiable group. *Bowyer*, 506 F. Supp. 3d at 711 ("[V]ote dilution is a very specific claim that involves votes being weighed differently.").

Plaintiffs' vote-dilution theory does not qualify. Plaintiffs' complaint alleges that ineligible registrants will vote in upcoming elections. But ineligible registrants' casting ballots only increases the pool of voters—it does not result in the votes of certain voters being weighted differently than others. "That's because *any* ballot—whether valid or invalid—will always dilute the electoral power of all other votes in the electoral unit equally, regardless of the voting method a voter chooses to utilize." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072,

**JA333**

1087 (9th Cir. 2024). Because Plaintiffs fail to allege that their members' votes will be weighted any differently than any other voters' votes, their equal-protection claim is not cognizable.

Plaintiffs' constitutional claim has one final problem: recognizing a claim based on such flimsy allegations of vote dilution would "appear to be limitless." *Id.* at 1087 n.10. "If every allegation of a mistakenly counted ballot were sufficient to state a vote-dilution claim, 'it would transform every violation of state election law into a potential federal equal-protection claim requiring scrutiny of the government's interest in failing to do more to stop the illegal activity.'" *Id.* The Court should not open the floodgates in this manner. Plaintiffs' equal-protection claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' complaint.

This the 30th day of September, 2024.

<div style="margin-left:40%">

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

</div>

**JA334**

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law is in compliance Local Rule 7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no more than 8,400 words as indicated by Word, the program used to prepare the brief.

This the 30th day of September, 2024.

<u>/s/ Sarah G. Boyce</u>
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA336**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA337**

23

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and<br>NORTH CAROLINA REPUBLICAN PARTY,<br><br>          Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF<br>ELECTIONS; KAREN BRINSON BELL, in<br>her official capacity as Executive Director of<br>the North Carolina State Board of Elections;<br>ALAN HIRSCH, in his official capacity as<br>Chair of the North Carolina State Board<br>of Elections; JEFF CARMON, in his official<br>capacity as Secretary of the North Carolina<br>State Board of Elections; STACY EGGERS<br>IV, KEVIN N. LEWIS, and SIOBHAN<br>O'DUFFY MILLEN, in their official capacities<br>as members of the North Carolina State Board<br>of Elections,<br><br>          Defendants,<br><br>and<br><br>THE DEMOCRATIC NATIONAL COMMITTEE,<br><br>          Intervenor-Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**STATE BOARD DEFENDANTS'**<br>**MOTION TO EXPEDITE**<br>**CONSIDERATION OF THEIR**<br>**MOTION TO DISMISS**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Defendants the North Carolina State Board of Elections, its members, and its Executive

Director respectfully request that this Court exercise its discretion to manage its own docket and

expedite consideration of their motion to dismiss, filed earlier today. The State Board Defendants

respectfully request that this Court modify the regular briefing schedule for motions as follows:

      State Board Defendants' motion to dismiss and opening brief: September 30

      Plaintiffs' response in opposition: October 7

**JA338**

State Board Defendants' reply: October 11

Hearing on the motion to dismiss: Week of October 14

In support of their motion, the State Board files the accompanying memorandum of law and proposed order.

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**JA339**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA340**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>       Plaintiffs,<br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>       Defendants,<br><br>and<br><br>THE DEMOCRATIC NATIONAL COMMITTEE,<br><br>       Intervenor-Defendant. | **[PROPOSED] ORDER GRANTING MOTION TO EXPEDITE CONSIDERATION OF STATE BOARD DEFENDANTS' MOTION TO DISMISS** |

Upon Defendants the North Carolina State Board of Elections, its members, and its Executive Director's Motion to Expedite Consideration of Their Motion to Dismiss (D.E. __), the memorandum of law in support of their motion, all filings and proceedings relevant to this motion, and all findings made by this Court, with sufficient reason, it is hereby:

**JA341**

ORDERED that the State Board's Motion to Expedite Consideration of Their Motion to Dismiss (D.E. __) is GRANTED and all responsive deadlines under Local Rule 7.1 to that motion are amended as follows:

Responses in opposition to the State Board's motion to dismiss are due on October 7.

The State Board's reply to their motion to dismiss is due on October 11.

The Court shall hear argument on this motion to dismiss the week of October 14, with a text order to follow.

SO ORDERED this __th day of _____, 2024.

_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

**JA342**

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, <br><br> Plaintiffs, <br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> Defendants, <br><br> and <br><br> THE DEMOCRATIC NATIONAL COMMITTEE, <br><br> Intervenor-Defendant. | **STATE BOARD DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXPEDITE CONSIDERATION OF THEIR MOTION TO DISMISS** |

Defendants the North Carolina State Board of Elections, its members, and its Executive Director respectfully request that this Court expedite consideration of their motion to dismiss, filed earlier today. The lawsuit filed by Plaintiffs, the Republican National Committee and North Carolina Republican Party, seeks to have this Court remove hundreds of thousands of voters from the rolls after voting has already begun and—at this point—five weeks before Election Day. In the interest of justice and to ensure public confidence in the results of the upcoming

**JA343**

elections, the State Board Defendants seek expedited consideration of their motion to dismiss this lawsuit.

On August 23, 2024, Plaintiffs, the Republican National Committee and the North Carolina Republican Party, filed this action alleging that, until January 2024, the State Board violated the Help America Vote Act of 2002 and state law by using the wrong voter registration form. Compl. (D.E. 1-3) ¶¶ 49-54. Under HAVA, a State's voter registration form must collect the registrant's social security number or driver's license number if the voter has one. 52 U.S.C. § 21083(a)(5). If the registrant does not provide either of those two pieces of information, the State must assign the registrant a unique identification number to be used for voter-registration purposes. *Id.* In addition, those registrants must provide either "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, or other government document that shows the name and address of the voter" prior to voting in a federal election. *Id.* § 21083(b)(2)(A)(i).

The State's voter registration form lists certain fields as "mandatory" and others as "optional." Compl. ¶ 50. Until December 2023, the State's voter registration form listed the fields for the registrant's driver's license or social security number as optional, not mandatory. *Id.* As a result, some voters were registered without a record of their driver's license or social security numbers.

Plaintiffs ask this Court to issue a writ of mandamus and injunction ordering the State Board to either: (1) remove all registrants whose voter registration form does not contain a driver's license or social security number; or (2) require all of those registrants to cast a provisional ballot in all upcoming elections until they provide the State Board with one of these

numbers. Compl. at 19-20. In addition, Plaintiffs ask for relief by "no later than September 6, 2024." *Id.* at 19.

Plaintiffs originally filed this lawsuit in state court. On September 23, the State Board removed the action to federal court. D.E. 1. Today, pursuant to Rule 81, the State Board has filed its motion to dismiss. Fed. R. Civ. P. 81(c)(2)(C).

The motion to dismiss outlines several reasons why this lawsuit cannot and should not move forward. First among them is that registering voters who failed to provide a driver's license or social security number does not risk ineligible voting. That is because in North Carolina, *all voters* must present at the polls a valid photo ID. *See* N.C. Gen. Stat. § 163-166.16(a). This photo ID requirement overlaps completely with the HAVA requirement that registrants without a social security or driver's license number must present at the polls additional identification. *Compare id. with* 52 U.S.C. § 21083(b)(2)(A)(i). As a result, whether or not voters were properly registered under HAVA, ineligible registrants will not be able to actually vote in the upcoming elections. Moreover, Plaintiffs have failed to state a claim and have unreasonably delayed in bringing their lawsuit. Plaintiffs were aware of their claims by at least October 2023 but waited to bring suit until more than ten months after that—74 days before the general election. This delay sows chaos in the middle of the election unless this case can be resolved expeditiously.

Until the State Board's motion to dismiss is decided, a pall hangs over the elections process. If Plaintiffs manage to secure their desired relief, hundreds of thousands of voters will be removed from the rolls en masse on the eve of Election Day, after many of those voters may have already cast ballots during early voting or through the mail. Moreover, the uncertainty caused while this case is pending threatens the ease of elections administration, as well as voter confidence. Voters may question whether they are properly registered and whether their votes

**JA345**

will count. And the meritless suggestion that ineligible voters may vote in the election needlessly threatens public trust in our election's results. Swift resolution of the motion to dismiss—particularly before the election—is essential to mitigate these risks.

Expedited consideration of this lawsuit would be entirely consistent with this Court's authority to manage its docket. This Court has previously allowed expedited consideration of a motion to dismiss in cases implicating elections rules when challenges to those rules have been filed close to an election. *See, e.g.*, *Sharma v. Circosta*, No. 5:22-cv-59, Doc. 38 (E.D.N.C. May 16, 2022) (order granting motion to expedite proceedings); *Disability Rights N.C. v. N.C. State Bd. of Elections*, No. 5:21-cv-361, Doc. 29 (E.D.N.C. Apr. 28, 2022) (order granting motion to expedite consideration of motion to dismiss and modify discovery plan). Granting the State Board's motion to expedite would promote the interests of justice while remaining in line with this Court's practices.

This request to expedite does not prejudice Plaintiffs. After all, Plaintiffs themselves originally sought resolution of this case by September 6. Compl. at 19. And while September 6 has come and gone, the urgency in Plaintiffs' complaint suggests that they would also welcome swift resolution of the State Board Defendants' dispositive motion.

For these reasons, the State Board Defendants respectfully request that this Court modify the regular briefing schedule for motions as follows:

> State Board Defendants' motion to dismiss and opening brief: September 30
>
> Plaintiffs' response in opposition: October 7
>
> State Board Defendants' reply: October 11
>
> Hearing on the motion to dismiss: Week of October 14

<div align="center">**JA346**</div>

The above schedule ensures that all parties are able to thoroughly brief and argue the motion, while leaving sufficient time for interested parties to pursue any appeals before Election Day, if necessary.

Should any of the parties seek to oppose this motion to expedite, the State Board respectfully requests that this Court order that any response to this motion be filed by October 2. The State Board Defendants waive any reply.

For the foregoing reasons, the State Board Defendants respectfully request that the Court grant their motion to expedite consideration of their motion to dismiss on the schedule proposed.

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**JA347**

5

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law is in compliance Local Rule 7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no more than 8,400 words as indicated by Word, the program used to prepare the brief.

This the 30th day of September, 2024.

<u>/s/ Sarah G. Boyce</u>
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA348**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic
National Committee*

This the 30th day of September, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA349**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00547-M

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,<br><br>Defendants. | ORDER |

This matter comes before the court on Defendants' motion to expedite consideration of their motion to dismiss [DE 32]. For good cause shown and in the interest of justice, the motion is GRANTED. *See Dietz v. Bouldin*., 579 U.S. 40, 47 (2016) (underscoring principle that "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"). The following briefing schedule shall apply for Defendants' motion to dismiss [DE 30]:

1. Plaintiffs and Intervenor-Defendant Democratic National Committee shall file any response in opposition to or in support of the motion to dismiss on or before October 7, 2024;

2. Defendants shall file a reply on or before October 11, 2024; and

3. The court will hear the motion to dismiss on October 17, 2024, at 10:00 a.m. in Courtroom 1, Alton Lennon Federal Courthouse, 2 Princess Street, Wilmington, North Carolina.

**JA350**

Any party seeking modification of this briefing schedule shall file a motion demonstrating good cause for such modification on or before October 3, 2024.

SO ORDERED this _____ day of October, 2024.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

**JA351**

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00547-BO

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>                                              *Plaintiffs*,<br><br><br>                vs.<br><br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br><br>                                              *Defendants*,<br><br><br>and<br><br><br>THE DEMOCRATIC NATIONAL COMMITTEE,<br><br><br>                                              *Intervenor-Defendant.* | **EMERGENCY MOTION TO REMAND TO STATE COURT AND FOR EXPEDITED CONSIDERATION OF THE SAME** |

NOW COMES Plaintiffs the Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP") (collectively, "Plaintiffs") by and through undersigned counsel, pursuant to 28 U.S.C. § 1447(c), respectfully move the Court for an order remanding this

**JA352**

matter to the Superior Court of Wake County, North Carolina. Additionally, Plaintiffs respectfully request that this Court enter an order expediting consideration of and a hearing on the same, such that briefing deadlines and hearing dates are consolidated with those set forth in this Court's order regarding Defendants' Motion to Dismiss. [Dkt. 36]. In support of this Motion, Plaintiffs file a Memorandum of Law herewith.

This, the 1ˢᵗ day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: */s/ Phillip J. Strach*
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, PC**

By: */s/ John E. Branch, III*
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

**JA353**

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such to all counsel of record in the above-captioned matter.

This, the 1st day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: */s/  Phillip J. Strach*
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**JA354**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00547-BO

REPUBLICAN NATIONAL
COMMITTEEE; and NORTH CAROLINA
REPUBLICAN PARTY,

                    *Plaintiffs*,

     vs.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL,
in her official capacity as Executive
Director of the North Carolina State Board
of Elections; ALAN HIRSCH, in his
official capacity as Chair of the North
Carolina State Board of Elections; JEFF
CARMON, in his official capacity as
Secretary of the North Carolina State Board
of Elections; STACY EGGERS IV, KEVIN
N. LEWIS, and SIOBHAN O'DUFFFY
MILLEN, in their official capacities as
members of the North Carolina State Board
of Elections,

                    *Defendants,*

and

THE DEMOCRATIC NATIONAL
COMMITTEE,

               *Intervenor-Defendant.*

**[PROPOSED] ORDER**

     This matter is before the Court on Plaintiffs the Republican National Committee and the

North Carolina Republican Party's Emergency Motion for Remand, requesting an Order

**JA355**

remanding the matter to the Superior Court of Wake County North Carolina pursuant to 28 U.S.C.

§ 1447(c). It appearing to the Court that Plaintiffs' requested relief is warranted,

IT IS THEREFORE ORDERED that:

(1)     The above-captioned matter shall be remanded in its entirety to the Superior Court

of Wake County North Carolina.

This, the ____ day of _____ , 2024.

_____

**JA356**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00547-BO

REPUBLICAN NATIONAL
COMMITTEEE; and NORTH CAROLINA
REPUBLICAN PARTY,

*Plaintiffs*,

vs.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL,
in her official capacity as Executive
Director of the North Carolina State Board
of Elections; ALAN HIRSCH, in his
official capacity as Chair of the North
Carolina State Board of Elections; JEFF
CARMON, in his official capacity as
Secretary of the North Carolina State Board
of Elections; STACY EGGERS IV, KEVIN
N. LEWIS, and SIOBHAN O'DUFFFY
MILLEN, in their official capacities as
members of the North Carolina State Board
of Elections,

*Defendants*,

and

THE DEMOCRATIC NATIONAL
COMMITTEE,

*Intervenor-Defendant.*

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO REMAND
TO STATE COURT AND FOR
EXPEDITED CONSIDERATION OF
THE SAME**

Plaintiffs Republican National Committee ("RNC") and the North Carolina Republican

Party ("NCGOP") (collectively, "Plaintiffs") submit this Memorandum of Law in support of their

Emergency Motion to Remand to State Court.

**JA357**

## INTRODUCTION

In this case, Plaintiffs filed suit in North Carolina state court against the North Carolina State Board of Elections ("NCSBE") and its members Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis in their respective official capacities, and the NCSBE's Executive Director Karen Brinson Bell (collectively "Defendants") seeking a Writ of Mandamus compelling Defendants to fulfill their duties as set forth in N.C. Gen Stat. § 163-82.11 *et seq.* Plaintiffs complaint asserts that Defendants must carry out their to duties—all of which arise under state law—to ensure that only qualified voters are able to vote in the general election in North Carolina this coming November. Due to the nature of the relief requested and the exigent circumstances which exist due to the impending November 2024 election, Plaintiffs request the Court treat this Motion on an expedited basis.[1]

## STATEMENT OF FACTS

Plaintiffs filed their Verified Complaint in Wake County Superior Court on August 23, 2024 wherein Plaintiffs sought a writ of mandamus and a permanent injunction arising from Defendants' violations of state law and the state constitution. (Compl. ¶¶ 77-96). Defendants' counsel accepted service of the Complaint on August 27, 2024. Thereafter, on August 29, 2024 Plaintiffs filed a motion to expedite discovery and served a narrow set of discovery requests upon Defendants concurrently with the motion. Then, on September 23, 2024, Defendants noticed their removal to this Court ("Removal").

---

[1] On October 1, 2024 this Court granted Defendants' Motion requesting expedited briefing regarding their motion to dismiss and in doing so, the Court set expedited briefing deadlines. [Dkt. no. 36]. The Court also noticed a hearing on Defendants' Motion to Dismiss for Thursday, October 17, 2024. As set forth in the accompanying motion, Plaintiffs respectfully request that the resolution of the present motion to remand be treated on the same timeline and with a hearing consolidated for the same date as Defendants' Motion to Dismiss. [Dkt. no. 30]

**JA358**
2

In support of their Removal, Defendants cite several bases—28 U.S.C. §§ 1331, 1441(a), 1443(2), and 1367(a). (Dkt. no. 1, pp. 1-2.). Critically, the Removal claims that Plaintiffs' complaint brings "claims arising under the laws of the United States" and specifically, the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901. (Dkt. no. 1, ¶¶ 1-2). This, Defendants claim, provides the Court with original jurisdiction. *Id.* However, a simple reading of Plaintiffs' Complaint reveals that it is devoid of <u>any</u> causes of action arising under HAVA or any federal law. *See generally* (Compl. at ¶¶ 77-96). The Removal also claims that Plaintiffs' requested relief— i.e., requiring NCSBE to identify all persons who were allowed to register to vote in violation of North Carolina law and working to confirm the identity of those who are eligible voters and remove those who are not—would force Defendants to violate federal law, specifically, 52 U.S.C. §§10101(a)(2) and 20507(c)(2)(A). (Dkt. no. 1, ¶¶ 4-5). Yet again, a plain reading of the Complaint shows that Plaintiffs are not asking for relief which would violate either of these statutes, instead, Plaintiffs seek a uniform system which confirms legitimate voters and removes illegitimate ones. (Compl. at pp. 19-20). Importantly, Plaintiffs request that, to the extent removal is not possible at this date—which the Removal contends it is not—that Defendants be ordered to have such voters vote a provisional ballot pending the confirmation of their status as legitimate voters under applicable law. *Id.* at p. 19 ¶ 2. Thus, Defendants' arguments under 28 U.S.C. §1443(2) are contrary to the face of the Complaint. Due to the foregoing, Plaintiffs file this Motion in order to remand the case to state court so it may resolve these issues of state law.

## LEGAL STANDARD

A defendant may remove a state court action to federal court only if the federal court would have been able to exercise original jurisdiction based on the face of the state court complaint. 28

U.S.C. § 1441(a). If, at any time, it appears that a federal court lacks subject matter jurisdiction, it must remand the case to the state court. 28 U.S.C. § 1447(c).

In order for a federal court to exercise federal question jurisdiction, the action must arise under "the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A "suit arises under the law that creates the cause of action." *American Well Works v. Layne*, 241 U.S. 257, 260 (1916). The presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly-pleaded complaint. The rule makes the plaintiff the master of the claim." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (internal citation omitted). Indeed, a plaintiff may avoid federal jurisdiction "by exclusive reliance on state law." *Id.* In this case, Plaintiffs seek to compel Defendants to perform their duties as required exclusively by the laws of the State of North Carolina. Their claims arise under state statutes and the State Constitution. Defendants must not be allowed to usurp plaintiffs' role as master of their claim by misconstruing the action as one that arises under the laws of the United States.

## ARGUMENT

The face of Plaintiffs' complaint raises no federal question—both claims for relief expressly arise under state law. Whether a plaintiff's claim arises under federal law as opposed to state law is determined by the application of the well-pleaded complaint rule which requires that a court "ordinarily . . . look no further than the plaintiff's [properly pleaded] complaint in determining whether a lawsuit raises issues of federal law capable of creating federal-question jurisdiction under 28 U.S.C. § 1331." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 442 (4th Cir. 2005) (quoting *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir. 1996) (alteration in original). However, federal-question jurisdiction can sometimes exist in a small group of otherwise state law "cases in

which a well-pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law, in that federal law is a necessary element of one of the well-pleaded . . . claims." *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988)). Under the substantial federal question doctrine, the burden lies on the defendant to establish "(1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." *Id.* (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004). Here, Defendants have not established either of the two necessary elements to satisfy the substantial federal question inquiry.

1. **Defendants fail to establish that plaintiffs' claim for relief necessarily depends on a question of federal law.**

"A plaintiff's right to relief necessarily depends on a question of federal law when 'it appears that some . . . disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Id.* (quoting *Franchise Tax Bd. of Cal. V. Constr. Laborer's Vacation Trust*, 463 U.S. 1, 8 (1983). In their Notice of Removal, Defendants assert that Plaintiffs bring claims arising under the laws of the United States and claims for relief which would violate federal law. (Dkt. no. 1. ¶¶ 2–6). However, they fail to point to any section of the Complaint in which Plaintiffs raise a disputed question of federal law. Indeed, the face of Plaintiffs' Complaint raises no federal questions, as all of the claims expressly arise under state law. North Carolina General Statute § 163-82.11 establishes that Defendants are required to maintain accurate and updated statewide voter registration lists ("voter rolls"). Part of that state mandate for accuracy includes compliance with the requirements of Section 303 of the Help America Vote Act ("HAVA"). *Id.* at § 163-82.11(c) ("The State Board of Elections shall update the statewide voter registration list and database to meet the requirements of section 303(a) of [HAVA].") But there is no dispute about

**JA361**

5

compliance with federal law.  The NCSBE admitted in a 2023 meeting[2] and subsequent Order[3] that it did not, until 2023 comply with then existing federal law.  Even if Plaintiffs had referenced this point about federal law in their Complaint, it would not change the analysis because the federal law is nothing but a reference point—the Defendants' lack of compliance with HAVA has already been admitted elsewhere.  Plaintiffs do not dispute the meaning of the Section 303(a) of HAVA in their complaint, and the record reflects that Defendants do not dispute that they failed to comply with HAVA. Plaintiffs' first assertion is that a straightforward application of whether admitted noncompliance with law gives rise to a claim for relief under North Carolina's General Statutes that its voter rolls are indeed incorrect.

Furthermore, Plaintiffs' second claim for relief arises under Article I, Section 19 of the North Carolina State Constitution which protects North Carolinians' fundamental right to vote. (Compl. ¶¶ 89–96). Similar to the statutory argument above, no one disputes the meaning of Section 303(a) of HAVA. Instead, Plaintiffs point out that NCBE's actions are noncompliant with HAVA based on a straightforward application of the statute as well as the undisputed fact of noncompliance with the plain language of HAVA, and question under whether those facts give rise to a complaint under the North Carolina Constitution. Additionally, the remedy provisions of HAVA itself—52 U.S.C. §§ 21111-21112—are silent on what to do if a state admits it violated HAVA but refuses to remedy the violation. Because HAVA is silent on the matter, Plaintiffs are entitled to seek a relief in state court arising from Defendants' violations of state law. In sum,

---

[2] Meeting documents and a recording of NCSBE's November 28, 2023 meeting is available here: dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2023-11-28/
[3] The December 6, 2023 Order from NCSBE is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20 Complaint%20-%20Snow.pdf

**JA362**
6

Defendants wholly fail to establish that a "*disputed* question of federal law is a necessary element" of Plaintiffs' claims under state law.

Similarly, Plaintiffs' claims for relief would not result in any violation of federal law for the simple reason that, as established above, Plaintiffs seek a uniform system applicable to all persons registered to vote under NCSBE's improper registration form and, to the extent removal is not possible prior to the November election, then Plaintiffs ask those persons to be required to vote a provisional ballot subject to confirmation of their eligibility to vote. (Compl. pp. 19-20). Thus, the face of Plaintiffs' Complaint defeats Defendants arguments from the outset.

## 2. **Defendants fail to establish that the question of federal law is substantial.**

Even assuming *arguendo* that Plaintiffs' right to relief does necessarily depend on a question of federal law, Defendants have failed to establish the second element of the inquiry, namely, that the question of federal law is substantial. The central consideration for what makes a question substantial for the purposes of federal-question jurisdiction is that the issue is "'important[t] . . . to the federal system as a whole,' and not just to the 'particular parties in the immediate suit." *Burrell v. Bayer Corp.*, 918 F.3d 372, (4th Cir. 2019) (quoting *Gunn v. Minton*, 568 U.S. 251, 260 (2013)). "[T]here is a high bar for treating a federal issue as sufficiently 'substantial' under the . . . § 1331 analysis. *Id.* at 385. Indeed, "any doubt" as to substantiality is to be resolved against Defendants as they "bear[ ] the burden of establishing jurisdiction, especially given the significant federalism implications of removing a state-law action from state court." *Id.* at 384. Generally speaking, a substantial question "will involve a 'pure issue of law,'" rather than being "fact-bound and situation-specific." *Id.* (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700-01 (2006). Here, Plaintiffs' complaint under state law is intensely fact bound and situation specific to the ways that Defendants failed to comply with HAVA as they

JA363

are required by North Carolina General Statute § 163-82.11(c) and the state Constitution. This is true even granting the fact that Defendants admitted their failure to comply.

Plaintiffs' complaint points out that prior to December 2023, NCSBE used voter registration forms that failed to collect either the registrant's driver's license number or the last four digits of their social security number. According to the standards established by HAVA, states must provide either of those two pieces of information before a registration can be processed. 52 U.S.C. § 21083(iii). In fact, § 21083(a)(5) prevents a state from accepting a voter registration form for Federal office unless the form includes the listed information. *Id.* Only if a registrant affirmatively confirms they do not have either form of identification, the state must "assign the applicant a number which will serve to identify the applicant for voter registration purposes . . . [which] shall be the unique identifying number assigned under the list." *Id.* at § 21083(a)(5)(A)(ii). As a result of these errors, voters did not utilize the catchall provision of § 21083(a)(5)(A)(ii), as the registration forms failed to make registrants aware that the driver's license or social security number identifying information was necessary for the application to be processed. Thus, any affirmative attestation regarding one's lack of those relevant documents was impossible. Plaintiffs' Complaint explains these failures in great detail as well as NCSBE's acknowledgement of these shortcomings. (Compl. ¶¶ 29–61). The question of NCSBE's compliance with HAVA is manifestly fact bound and situation specific and, at the very least, Plaintiffs' allegations raise some doubt as to the substantiality of the question. Indeed, Defendants admitted that their actions violate the state statute. Even granting for the sake of argument that the admission of the NCSBE makes this a legal question, that would be a question under state law and not a substantial question of federal law. Therefore, the question of substantiality should be resolved against NCSBE as they have failed to establish that a "pure issue of law" is at stake in this case.

**3.** **Defendants' argument for removal under 28 U.S.C. § 1443(2) is unavailing because Defendants are not refusing to do any act on the ground that it would be inconsistent with a law providing for equal rights.**

In their Complaint, Plaintiffs' claims for relief are based on Defendants' *violations* of both N.C. Gen. Stat. § 163-82.11 and Article I, Section 19 of the state Constitution. (Compl. ¶¶ 77–96). In their Notice, Defendants state that Plaintiffs allege that Defendants have refused to take "certain actions." (Dkt. no. 1, ¶ 4). Defendants' claim that their refusal to take those actions is based on their duty to comply with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A). (Dkt. no. 1, ¶ 4). The allegations that Defendants have failed take "certain actions" merely point out how Defendants have exacerbated the problem caused by their violation of state law by taking no corrective action regarding 225,000 potentially ineligible voters participating in the 2024 General Election in North Carolina.

Section 1443(2) provides for removal of a civil action "[f]or any act under color of authority derived from any law providing for equal rights, or for refusing to act on the ground that it would be inconsistent with such law." 28 U.S.C. 1443(2). Sitting en banc, the Fourth Circuit noted that this statutory language "has been described as a text of exquisite obscurity." *Baines v. City of Danville, Va.*, 357 F.2d 756, 759 (4th Cir. 1966) (en banc) (internal quotations omitted). While the statute may be exquisitely obscure, the United States Supreme Court did provide guidance as to its interpretation by pointing to the legislative history of the statute:

> The second phrase of 28 U.S.C. [§] 1443(2), "for refusing to do any act on the ground that it would be inconsistent with such law," . . . was added by the House of Representatives as an amendment to the Senate bill during the debates on the Civil Rights Act of 1866. In reporting the House bill, Representative Wilson, the chairman of the House Judiciary Committee and the floor manager of the bill, said, 'I will state that this amendment is intended to enable State officers, *who shall refuse to enforce State laws discriminating in reference to (the rights created by [Section] 1 of the bill) on account of race or color*, to remove their cases to the United States courts when prosecuted for refusing to enforce those laws.'

**JA365**

9

*City of Greenwood, Miss. v. Peacock*, 384, U.S. 808, 824 n.22 (1966) (citing Cong. Globe, 39th Cong., 1st Sess., 1367) (emphasis added).

Here, Defendants have not claimed that they refused to enforce N.C. Gen. Stat. § 163-82.11 because the statute discriminates on account of race or color. Accordingly, removal under Section 1443(2) is unavailable to them. *See, e.g.*, *Burns v. Bd. of Sch. Comm'rs of City of Indianapolis*, Ind. 302 Fed. Supp. 309, 311-312 (S.D. Ind. 1969) ("[T]he privilege of removal is conferred . . . only upon state officers who refuse to enforce state laws discriminating on account of race or color.") Defendants may well refuse to follow through on remedying their failure to enforce the statute out of concern for compliance with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A), but refusing those remedies as proposed by Plaintiffs are different from refusing to enforce state law on the grounds that it discriminates on the basis of race or color. Indeed, Defendants agreed to follow the statutory language *going forward*, therefore foreclosing any argument that they are refusing to enforce state law on the grounds that it is discriminatory. (Compl. ¶ 54).

In any event, granting Plaintiffs' claim for relief would not be inconsistent with either statute Defendants cite. Defendants admitted that the law requires voters to provide a Driver's License number or last four digits of a Social Security number, or otherwise attest that they have not been issued such numbers, in order to register to vote. Defendants admitted that they failed to enforce this requirement in the past, and they have agreed to enforce this requirement going forward. Defendants do not, and cannot, assert that enforcing these legal requirements violates the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2). Accordingly, they cannot plausibly assert, as they do in the Removal Notice, that enforcing these requirements by seeking

this information from registrants who did not previously provide it would run afoul of the Materiality Provision.

Nor would granting Plaintiffs' requested relief run afoul of 52 U.S.C. § 20507(c)(2)(A), which requires that states "complete … any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" at least 90 days before a federal election. This provision does not apply here for two reasons. First, Plaintiffs have already acknowledged that requiring such voters to cast a provisional ballot pending receipt and confirmation of the required HAVA information—rather than removal from the voter rolls—may be the only feasible option and expressly asked for such relief. *See* Dkt. no. 1-3, Prayer for Relief at 19-20. Second, even if any such voter is removed from the rolls before the election[4] for failure to supply the required information, such removal is not the completion of a program to systematically remove the names of ineligible voters from the voter rolls, such as routine voter list maintenance programs. Removal here would be the result of an individualized inquiry and request that a voter supply the required information.

In sum, the privilege of removal is simply not available to Defendants under these facts. In order to avail themselves of removal under Section 1443(2), Defendants must claim that they have refused to enforce state law on the grounds that it would be discriminatory on account of race or color. Defendants have not done so. Instead, they have admitted that they simply failed to enforce the law and agreed to comply going forward. Any refusal to act on Defendants' part is a refusal to go back and rectify the mistaken registrations it wrongfully accepted, not a refusal to enforce state law.  Defendants must correct their errors not just going forward, but take the steps suggested by Plaintiffs to ensure that Defendants errors do not lead to upwards of 225,000 ineligible ballots

---

[4] The statute would not be implicated at all if removal from the voter rolls occurred after the general election.

being cast in North Carolina in just a matter of weeks. Therefore, Defendants' attempt to remove this action under 28 U.S.C. 1443(2) should be rejected by this Court and the case immediately remanded.

## **CONCLUSION**

As Plaintiffs point out in their complaint, the NCSBE has potentially jeopardized the integrity of the general election in North Carolina by improperly registering over 225,000 people to vote with forms that failed to require collection of certain identification information prior to the voter registration forms being processed. As a result of that failure, North Carolina's voter rolls include a vast number of voters who are potentially ineligible to vote. The integrity of the results of the 2024 general election could be in jeopardy. Plaintiffs filed their complaint in state court on August 23, 2024 and requested relief including a court approved plan to ensure that NCSBE's violations would be remedied in time to preserve the integrity of the general election. Defendants waited a month before filing their notice of removal. As the November 5, 2024 election will soon arrive, Plaintiffs make this emergency request to remand this case to the proper jurisdiction so that a state court can provide a remedy for Defendants' violations of state law, before potentially 225,000 improperly registered voters head to the polls. Given the nature of the relief requested and fast approaching date of the general election, Plaintiffs respectfully request an emergency hearing and expedited briefing schedule on this motion to be set as soon as is practical.

This, the 1st day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts

**JA368**
12

North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com


**BAKER DONELSON BEARMAN,
CALDWELL & BERKOWITZ, PC**

By: /s/    John E. Branch, III
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

**JA369**
13

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

I hereby certify that this memorandum of law is in compliance with Local Rule 7.2(f)(3) as the brief, including headings, footnotes, citations, and quotations, contains no more than 8,400 words as indicated by the computer's word processing program.

This, the 1st day of October, 2024.

/s/ Phillip J. Strach
Phillip J. Strach
*Counsel for Plaintiffs*

**JA370**
14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such to all counsel of record in the above-captioned matter.

This, the 1st day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By*: /s/ Phillip J. Strach*
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**JA371**
15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00547-M

|  |  |  |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY, | | ORDER |
| Plaintiffs, | | |
| v. | | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | | |
| Defendants. | | |

This matter comes before the court on Plaintiffs' emergency motion to remand and for expedited consideration [DE 37]. For good cause shown and in the interest of justice, the court finds expedited consideration of the motion to remand is warranted. *See Dietz v. Bouldin.*, 579 U.S. 40, 47 (2016) (underscoring principle that "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"). The following briefing schedule shall apply for Plaintiffs' emergency motion to remand:

1. Defendants and Intervenor-Defendant Democratic National Committee shall file any response in opposition to the motion to remand on or before October 7, 2024;

2. Plaintiffs shall file a reply on or before October 11, 2024; and

3. The court will hear the motion to remand on October 17, 2024, at 10:00 a.m. in Courtroom 1, Alton Lennon Federal Courthouse, 2 Princess Street, Wilmington, North Carolina.

**JA372**

1

Any party seeking modification of this briefing schedule shall file a motion demonstrating good cause for such modification on or before October 3, 2024.

SO ORDERED this ___1ˢᵗ___ day of October, 2024.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

**JA373**

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | Case No. 5:24-cv-547-M-RJ |

**THE DEMOCRATIC NATIONAL COMMITTEE'S RESPONSE IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
(Fed. R. Civ. P. 12(b)(6))**

**JA374**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

STATEMENT ........................................................................................................ 2

    A.    Registration And First-Time Voting Requirements................................2

    B.    Citizenship Verification During Voter Registration In North Carolina.................3

    C.    Prohibition Of Systematic Removals Of Voters From The Rolls Within 90 Days Of A Federal Election .......................................................................4

    D.    Litigation Over North Carolina's Prior Voter-Registration Form ..........................4

    E.    This Litigation ........................................................................................5

LEGAL STANDARDS ......................................................................................... 8

ARGUMENT ......................................................................................................... 8

I.    PLAINTIFFS FAIL TO PLEAD A VIABLE CAUSE OF ACTION ................................... 9

    A.    Plaintiffs Have No Private Right Of Action To Prosecute Their Alleged Violation Of HAVA's List-Maintenance Provisions.................................9

    B.    The Complaint Does Not Plead Facts Sufficient To Establish A HAVA Violation ...............................................................................................12

    C.    Even If HAVA Could Be Enforced Through A State-Law Claim, Plaintiffs Do Not Allege A Viable One................................................................13

II.    FEDERAL LAW PROHIBITS THE LATE-STAGE VOTER PURGE PLAINTIFFS SEEK ................ 18

    A.    HAVA And The NVRA Each Prohibit Systematic Removal Of Voters Within 90 Days Of A Federal Election....................................................18

    B.    Due Process Bars The Relief Plaintiffs Seek........................................21

III.    EQUITABLE PRINCIPLES INDEPENDENTLY BAR ANY RELIEF.............................................. 24

    A.    The Doctrine Of Laches Bars Relief......................................................24

    B.    Granting Any Late-Stage Remedy Would Violate The Supreme Court's *Purcell* Principle ...............................................................................26

CONCLUSION...................................................................................................... 28

**JA375**

## INTRODUCTION

Just weeks before election day, and with voting already underway, the Republican National Committee and the North Carolina Republican Party ask this Court to purge up to 225,000 registered North Carolinians from the voter rolls—without providing them *any* notice or opportunity to be heard—even though these voters filled out the state's voter-registration form, had their applications (and their eligibility to vote) verified by election officials, and will bring identification to the polls (as state law now requires). Plaintiffs seek this mass disenfranchisement, moreover, based on a data-collection requirement that has nothing to do with voters' eligibility to vote.

Plaintiffs' claims should be rejected. Plaintiffs have no viable cause of action; they ask for relief that would itself violate federal law—including the constitutional right to due process and a statutory ban on removing voters from the rolls shortly before any federal election—and their claim is barred by laches as well as the U.S. Supreme Court's *Purcell* doctrine barring last-minute changes to state election law.

Indeed, this lawsuit is so marred with defects that it is best understood as an effort simply to sow doubt about the integrity of North Carolina's elections. That understanding is reinforced by the fact that, in the same month this lawsuit was filed, Republican organizations flooded courts in states like Michigan, Wisconsin, Pennsylvania, Arizona, and Nevada with similar, baseless requests for courts to disqualify votes cast by registered voters. *E.g.*, Vento, *Republicans Sued 3 Battleground States This Week. Here's What You Need to Know*, The Hill (Sept. 14, 2024), https://tinyurl.com/2a93kv; Morgan & Goudsward, *Even Before Election, Trump, Allies Sue Over Claims That Non-Citizens Might Vote*, Reuters (Sept. 19, 2024), https://tinyurl.com/42jzdfv2; Riccardi, *GOP Lawsuits Set the Stage for State Challenges if Trump Loses the Election*, AP News

**JA376**

1

(Sept. 5, 2024), https://tinyurl.com/4zc9e2vu.  Courts are not hesitating to reject these untimely lawsuits.  Just a few days ago, for example, Pennsylvania's highest court rejected a last-minute Republican effort to change the voting rules in that state.  Ex. 1 (*Republican National Committee v. Schmidt*, No. 108 MM 2024 (Pa. Oct. 5, 2024)).  The Court should likewise dismiss this lawsuit with prejudice—and do so swiftly before early voting begins in North Carolina on October 17, so that the election can proceed without the specter of doubt that plaintiffs hope to cast.

## STATEMENT

### A.    Registration And First-Time Voting Requirements

Federal and North Carolina law each impose requirements for voter registration, voting, and maintenance of the voter rolls.

*Federal law.*  Under the Help America Vote Act, or HAVA, an application to register to vote in federal elections cannot "be accepted or processed by a State unless" it includes "the applicant's driver's license number" or (if the applicant lacks a valid driver's license) "the last 4 digits of the applicant's social security number."  52 U.S.C. §21083(a)(5)(A)(i).  If an applicant has neither a valid driver's license nor a social security number, then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes."  *Id.* §21083(a)(5)(A)(ii).  Once an applicant completes a registration form, "[t]he State shall determine whether the information provided by" the applicant "is sufficient to meet the requirements" outlined in HAVA, "in accordance with State law."  *Id.* §21083(a)(5)(A)(iii).

HAVA imposes additional requirements on applicants who register *by mail* without providing either their driver's license numbers or the last four digits of their social security numbers.  Such a registrant must either present a photo ID or another identifying document to vote in person in their first federal election or submit a copy of their photo ID or identifying document to vote in their first federal election by mail.  52 U.S.C. §21083(b)(1)-(3).  Voters who do not do

**JA377**

2

so may cast only provisional ballots, *id.* §21083(b)(2)(B), which are not counted unless election officials later determine the voters are "eligible under State law to vote," *id.* §21082(a)(4).

    ***North Carolina law.***  North Carolina law mirrors many of the HAVA requirements just discussed.  For example, when a voter who registered by mail has not previously voted in a federal election, she must present a photo ID or other identifying document to vote in person.  N.C. Gen. Stat. §163-166.12(a).  The state's election manual, a public record published by the State Board detailing voting-site processes and procedures, calls for election officials to collect this information for "[f]irst-time voters, who at the time of their initial voter registration did not provide their North Carolina driver license number or the last four digits of their Social Security number, or who provided a number that could not be validated."  Ex. 2 (*North Carolina Official Election Manual*, §§5.7.3, 8.3.1, https://tinyurl.com/bdeyzdcj).  Likewise, a person who registers by mail must, when voting for the first time in a federal election by mail, submit a copy of her photo ID or other identifying document.  N.C. Gen. Stat. §163-166.12(b).  Those who do not present or submit identification are permitted to cast only provisional ballots.  *Id.* §163-166.12(e).  Finally, as under HAVA, these requirements do not apply to voters who provided their driver's license or social security numbers on their mailed registration forms.  *Id.* §163-166.12(f)(2).

### B.    Citizenship Verification During Voter Registration In North Carolina

    Under both the North Carolina Constitution and state statutes, an individual must be "born in the United States" or a "naturalized" citizen to vote in North Carolina.  N.C. Const. art. VI, §1; N.C. Gen. Stat. §163-55(a).  When registering to vote in the state, therefore, applicants must confirm—and have always had to confirm—that they are U.S. citizens in order to be registered.  People who register using the North Carolina form confirm their citizenship by checking the appropriate box for the question asking if the applicant is "a citizen of the United States of America."  Ex. 3 (NCSBE, *North Carolina Voter Registration Application* (updated Aug. 2024),

**JA378**

3

https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf); *see also* N.C. Gen. Stat. §163-82.4(e). If the applicant is not a U.S. citizen, the form instructs her "not [to] submit this form" because she is "not qualified to vote." Ex. 3. At the bottom of the form, the applicant must include her signature, which confirms that she has "reviewed the contents of [the] form" and attests that she is "a U.S. citizen." *Id.* The form is clear that "[f]raudulently or falsely completing" it "is a Class I felony" under state law. *Id.*

### C. Prohibition Of Systematic Removals Of Voters From The Rolls Within 90 Days Of A Federal Election

Federal law requires most states to (1) maintain a single authoritative list of voters registered in the state, and (2) conduct "list maintenance" to remove ineligible individuals from the rolls. 52 U.S.C. §21083(a). Under the National Voter Registration Act (NVRA), voters may be removed from the rolls at their request or because of change in residence, criminal conviction, mental incapacity, or death. *Id.* §20507(a)(3)-(4). North Carolina law provides for removal from the voter rolls for largely the same reasons. *See* N.C. Gen. Stat. §163-82.1(c).

At the same time, federal law sharply limits states' ability to remove voters from the rolls shortly before any federal election, providing that states "shall complete, *not later than 90 days prior to the date of a primary or general election for Federal office*, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A) (emphasis added); *see, e.g.*, *North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, 2018 U.S. Dist. LEXIS 134228, at *15-29 (M.D.N.C. Aug. 7, 2018) (applying the NVRA's 90-day removal ban).

### D. Litigation Over North Carolina's Prior Voter-Registration Form

On October 6, 2023, "a concerned citizen" named Carol Snow filed an administrative complaint with the North Carolina State Board of Elections. Compl. (D.E. 1-3) ¶48. The

**JA379**
4

administrative complaint challenged a prior version of North Carolina's voter-registration form, alleging that that version did "not clearly indicate[]" that "the applicant's driver's license number or last 4 digits of the applicant's social security number[] are [sic] required if one or the other ha[s] been issued to the applicant." Ex. 4 (Admin. Compl. at 1, https://s3.amazonaws.com/dl. ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20 Complaint.pdf); Ex. 5 (NCSBE, *North Carolina Voter Registration Application* (updated Apr. 2023), https://web.archive.org/web/20230824145321/https://dl.ncsbe.gov/Voter_Registration/ NCVoterRegForm_06W.pdf).

After holding a public meeting in November 2023, during which the administrative complaint was discussed, the State Board issued a written order in December 2023 resolving the complaint. Compl. (D.E. 1-3) ¶51 & nn.3-4. That same month, the board addressed the substance of the complaint by updating North Carolina's voter-registration form to make even clearer that an applicant with a North Carolina driver's license or DMV ID number must provide that number, that an applicant without a number from the DMV must provide the last four digits of her social security number, and that an applicant without any of those numbers must indicate that fact on the form. *See id.* ¶54.

Despite these revisions, Ms. Snow raised similar complaints about the form during public meetings of the State Board in March and April 2024. Compl. (D.E. 1-3) ¶56. Having already updated the form (as just discussed), the board denied her requests for further action. *Id.*

### E.    This Litigation

On August 23, 2024—i.e., months after the events just discussed, and with fewer than 90 days to go before election day—plaintiffs filed this action in Wake County Superior Court. *See* Compl. (D.E. 1-3) at 2. Plaintiffs' lawsuit relates to the same (non-current) version of North Carolina's voter-registration form that was challenged in the October 2023 administrative

**JA380**

5

complaint. Specifically, plaintiffs allege that, for an unspecified period of time "[p]rior to December 2023," the State Board "used voter registration forms that failed to collect" driver's license and social security numbers. Compl. (D.E. 1-3) ¶42. As the prior version of the form itself shows, however, item #3 contained fields for that information:



Ex. 5 at 1 (yellow highlighting added). The instructions for the prior version of the form, moreover, directed registrants to provide either a driver's license number or the last four digits of a social security number:



*Id.* at 2 (yellow highlighting added).

The complaint includes two claims. First, plaintiffs seek a writ of mandamus to address an alleged violation of North Carolina General Statutes §163-82.11(c), which requires the State Board to maintain North Carolina's voter rolls in compliance with HAVA. Compl. (D.E. 1-3) ¶¶77-88. Plaintiffs seek mandamus, in other words, for alleged non-compliance with HAVA's list-maintenance provisions. Second, plaintiffs seek a mandatory injunction to redress an alleged violation of the North Carolina Constitution. *See id.* ¶¶89-96. Again, the basis for that purported

**JA381**

6

violation is the State Board's supposed failure to comply with both HAVA and the implementing state statute. *Id.* ¶¶90-92. Plaintiffs request "a court-approved plan to be completed no later than September 6" under which "ineligible registrants" will be "remov[ed] … from the state's voter registration lists." *Id.* at 19. If "removal is not feasible" before that date, then plaintiffs seek a court order requiring "all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in the upcoming elections pending" the State Board's "receipt and confirmation of the required HAVA information." *Id.* at 19-20.

On August 30, the Democratic National Committee (DNC) moved to intervene, attaching its proposed pleading. D.E. 1-16. The superior court granted the motion, D.E. 1-18, and the DNC filed its motion to dismiss, answer, and affirmative defenses shortly thereafter, D.E. 1-19. The State Board subsequently removed the case to this Court. D.E. 1. It then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), D.E. 30, 31, and the Court ordered the DNC to file any brief regarding dismissal by October 7, D.E. 36 at 1. Plaintiffs subsequently moved to remand this case to the superior court, D.E. 37, 38, a motion the Court has stated it will consider together with the State Board's motion to dismiss, *see* D.E. 39.

Meanwhile, on September 28, 2024, a major disaster declaration was issued in North Carolina in the wake of widespread devastation caused by Tropical Storm Helene. *See* Ex. 6 (Governor Cooper, *Disaster Declaration Request* (Sept. 27, 2024), https://governor.nc.gov/expedited-major-disaster-declaration-request/open); Ex. 7 (*President Joseph R. Biden, Jr. Approves North Carolina Disaster Declaration*, White House (Sept. 28, 2024), https://tinyurl.com/mstkxf8a).

**JA382**
7

## LEGAL STANDARDS

When considering a Rule 12(b)(6) motion to dismiss, a court must accept the complaint's well-pled factual allegations and draw reasonable inferences in the plaintiff's favor, while disregarding unsupported legal conclusions. *Blue Coral, LLC v. West Bend Mutual Insurance Co.*, 533 F.Supp.3d 279, 282 (E.D.N.C. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the well-pled factual allegations must "'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Those allegations must "'be enough to raise a right to relief above the speculative level'"; in other words, they must "'raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].'" *Id.* (alteration in *Blue Coral*) (quoting *Twombly*, 550 U.S. at 555-556). "A speculative claim resting upon conclusory allegations without sufficient factual enhancement cannot survive a Rule 12(b)(6) challenge." *Id.* The Court may take judicial notice of matters of public record and consider documents attached to the motion to dismiss that are "integral to the complaint and authentic." *Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Finally, "affirmative defenses can be considered in resolving Rule 12(b)(6) motions when the facts surrounding the defense are clear from the complaint." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023).

## ARGUMENT

Plaintiffs' case fails many times over. Plaintiffs enjoy no private right of action to enforce HAVA's list-maintenance provisions, and their attempt to transform their alleged HAVA violations into violations of state law fails to state a claim upon which relief can be granted. Their request to systematically remove approximately 225,000 voters from the voter rolls shortly before the upcoming election is explicitly prohibited by both HAVA and the NVRA, which bars such

**JA383**

8

removals within 90 days of a federal election. And removing those voters without notice and an opportunity to be heard would violate their constitutional right to due process. Finally, dismissal is warranted both under the doctrine of laches because plaintiffs inexcusably delayed in filing their lawsuit mere weeks before voting was set to begin, and (for the same reason) under the Supreme Court's *Purcell* line of cases.

## I.    PLAINTIFFS FAIL TO PLEAD A VIABLE CAUSE OF ACTION

### A.    Plaintiffs Have No Private Right Of Action To Prosecute Their Alleged Violation Of HAVA's List-Maintenance Provisions

Plaintiffs' case rests on their contention that the State Board violated HAVA by not properly soliciting driver's license or social security numbers from registrants on the registration form that the State Board used before December 2023. Indeed, the complaint expressly labels this "a plain violation of Section 303 of the Help America Vote Act." Compl. (D.E. 1-3) ¶3. But HAVA provides no private right of action to enforce the relevant provisions, leaving judicial enforcement to cases brought by the U.S. Attorney General, and providing private parties a right to seek relief only through state administrative procedures.

In particular, HAVA authorizes the U.S. Attorney General to bring a civil action against any state that violates the relevant statutory provisions. 52 U.S.C. §21111. HAVA also requires states that receive federal funding to "establish and maintain State-based administrative complaint procedures" through which private individuals may complain of a HAVA violation. *Id.* §21112. (The operation of that administrative system is evident here, as the State Board "granted Ms. Snow's request to change the voter registration form moving forward." Compl. (D.E. 1-3) ¶54 (emphasis omitted).) Because Congress's provision of "one method of enforcing a substantive rule … preclude[s] others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), these remedial

options are preclusive—meaning that anyone other than the U.S. Attorney General cannot sue to enforce the relevant provisions of HAVA.

Indeed, the Supreme Court has rejected a similar attempt by private parties to enforce one of those provisions.  Citing *Alexander*, the Court held that the Ohio Republican Party was "not … likely to prevail on the question whether Congress has authorized the District Court to enforce" HAVA's requirements "in an action brought by a private litigant."  *Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 & n.* (2008) (per curiam) (quoting provision now codified at 52 U.S.C. §21083(a)(5)(B)).  Multiple federal appellate and district courts have reached the same conclusion: The list-maintenance requirements HAVA places on the states may not be enforced privately to remove registered voters from the rolls.  *E.g.*, *American Civil Rights Union v. Philadelphia City Commissioners* (*ACRU*), 872 F.3d 175, 184 (3d Cir. 2017); *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *Wisconsin Voter Alliance v. Millis*, 2024 U.S. Dist. LEXIS 44025, at *17 (E.D. Wis. Mar. 13, 2024).  Though the Fourth Circuit has not directly addressed the question, the circuits that have (the Third and Eleventh) have found no privately enforceable right in this context. *ACRU*, 872 F.3d at 184; *Bellitto*, 935 F.3d at 1202.  The DNC knows of no case holding that a private party can enforce HAVA's list-maintenance requirements.

Where courts have found other provisions of HAVA privately enforceable, they have done so not by implying a right of action, but under 42 U.S.C. §1983—in cases brought by or on behalf of voters whom a state threatens to *deprive* of individual rights guaranteed by HAVA, such as the entitlement not to be arbitrarily removed from voter rolls, *see Colón-Marrero v. Vélez*, 813 F.3d 1, 22 (1st Cir. 2016), or "the right to cast a provisional ballot," *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (per curiam); *see also Voto Latino v. Hirsch*, 2024 U.S. Dist. LEXIS 11180, at *44 (M.D.N.C. Jan. 21, 2024) (listing cases).  The complaint here

**JA385**

10

never invokes section 1983, no doubt because that provision is inapplicable, as plaintiffs seek to *deny* voters the rights HAVA guarantees. Congress has not authorized plaintiffs to use HAVA's list-maintenance provisions as a sword against the very voters HAVA is meant to protect.

Plaintiffs' scattered references to state statutes implementing HAVA do not supply the missing cause of action. For example, although their complaint refers (¶¶29, 31) to North Carolina's statute establishing a statewide voter-registration list, plaintiffs acknowledge (*id.* ¶62) that that statute is co-extensive with HAVA: It requires the State Board to "develop and implement a statewide computerized voter registration system" and to update the voter-registration list "to meet the requirements of section 303(a)" of HAVA. N.C. Gen. Stat. §163-82.11(c). Like the State Board, the DNC is unaware of any court "ever recogniz[ing] a cause of action for violations of that state statute." D.E. 31 at 11. The other North Carolina statute plaintiffs cite, meanwhile (Compl. (D.E. 1-3) ¶46), likewise references HAVA's requirements, stating that "[t]he form required by" North Carolina General Statutes §162-82.3(a) "shall request the applicant's … [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number," N.C. Gen. Stat. §163-82.4(a)(11).[1]

However plaintiffs label it, then, their claim is under HAVA. That pleads them "out of court," *ACRU*, 872 F.3d at 184, because Congress has not authorized any court to interfere with HAVA's exclusive enforcement mechanisms at the behest of a private plaintiff, "'no matter how desirable that might be as a policy matter, or how compatible with the statute,'" *Bellitto*, 935 F.3d at 1202. The complaint should therefore be dismissed with prejudice. *See, e.g.*, *American Civil*

---

[1] Plaintiffs' passing reference to a "chilling effect on North Carolinians' right to vote in free and fair elections" under Article I, §10 of the North Carolina Constitution (Compl. (D.E. 1-3) ¶71) is vague and inadequately pled.

**JA386**
11

*Rights Union v. Philadelphia City Commissioners*, 2016 U.S. Dist. LEXIS 122052, at *13 (E.D. Pa. Sept. 9, 2016), *aff'd*, 872 F.3d at 187.

### B.      The Complaint Does Not Plead Facts Sufficient To Establish A HAVA Violation

Even if there were a private right of action, dismissal would still be required.  As relevant here, HAVA imposes two obligations on North Carolina officials: to collect certain information from voters, and to require that some first-time voters verify their identities at the polls.  Plaintiffs have not plausibly alleged a violation as to either category.

Plaintiffs allege (Compl. (D.E. 1-3) ¶¶43-44) that the State Board violated 52 U.S.C. §21083(a)(5)(A) by accepting completed voter-registration applications that did not provide either a driver's license or social security number.  But HAVA contains an exception for the provision of such information:  "If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number," then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes."  *Id.* §21083(a)(5)(A)(ii).  All that is required when a registrant lacks either a driver's license or social security number, then, is that the state assign that voter a number.  The complaint contains no allegation that the Board failed to assign an identifying number to any—let alone all—of the applicants who did not provide such information when registering with the prior form.

Nor is there any allegation in the complaint that, for voters who register by mail, North Carolina fails to comply with 52 U.S.C. §21083(b), which requires that such voters provide identifying documents when they first vote.  To the contrary, North Carolina law *requires* first-time voters who registered by mail to present a photo or HAVA ID when voting in order to avoid having to cast a provisional ballot, N.C. Gen. Stat. §163-166.12, and the State Board's guidance is consistent with that mandate, Ex. 2, §§5.7.3, 8.3.1.  Because the complaint fails to state a

**JA387**

12

plausible claim for a HAVA violation, dismissal is required.  *See Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 559.

### C.   Even If HAVA Could Be Enforced Through A State-Law Claim, Plaintiffs Do Not Allege A Viable One

#### 1.   Plaintiffs have not alleged a viable claim for mandamus

Plaintiffs' plea (Compl. (D.E. 1-3) ¶¶77-88) for a writ of mandamus to address an alleged violation of a state law requiring compliance with HAVA, N.C. Gen. Stat. §163-82.11(c), is not a plausible ground for relief.  Mandamus allows a court to order state officers to perform mandatory ministerial duties.  *In re T.H.T.*, 362 N.C. 446, 453-454, 665 S.E.2d 54, 59 (2008).  To obtain mandamus relief, the petitioner must show: (1) it has "'a clear legal right to the act requested'"; (2) the defendant has "'a legal duty to perform the act requested'"; (3) performance is "'ministerial,'" not discretionary; (4) the defendant neglected or refused to perform the act requested, and the time to do so has expired; and (5) there is no "'alternative, legally adequate remedy'" available to the petitioner.  *Morningstar Marinas/Eaton Ferry, LLC v. Warren County*, 368 N.C. 360, 364, 777 S.E.2d 733, 736 (2015).  Plaintiffs cannot meet these requirements here.

a.   As to the first factor, plaintiffs have no "clearly established" right to relief, *T.H.T.*, 362 N.C. at 453, 665 S.E.2d at 59.  "[C]ourts may only issue mandamus to enforce established rights, not to create new rights."  *Id.*  Mandamus, that is, "will not be issued to enforce an alleged right which is in question."  *Moody v. Transylvania County*, 271 N.C. 384, 390, 156 S.E.2d 716, 720 (1967).  Applying these standards leaves no doubt that mandamus is not available here.  HAVA provides no private cause of action, *supra* §I.A, and plaintiffs have failed to allege facts sufficient to establish a HAVA violation, *supra* §I.B.  As set forth below, moreover, HAVA and the NVRA affirmatively bar the relief that plaintiffs seek, *infra* §II.A, as do the equitable doctrine

**JA388**

13

of laches and the *Purcell* principle, *infra* §III.  These myriad obstacles preclude a conclusion that plaintiffs have any clear right to relief.

b.     As to the second mandamus factor, plaintiffs have not shown that the State Board has a clear duty to prevent voting based on alleged deficiencies in voters' registration forms after those voters' eligibility has been verified.  And even if the State Board were prohibited from accepting up to 225,000 voter-registration forms, Compl. (D.E. 1-3) ¶¶42-57, "it is not the office of mandamus to redress a past wrong," *Sutton v. Figgatt*, 280 N.C. 89, 93, 185 S.E.2d 97, 100 (1971).  A writ of mandamus, in other words, cannot compel the State Board to retroactively impose requirements on completed voter-registration forms.  Instead, plaintiffs must show that the State Board has a clear duty to *remove* up to 225,000 North Carolina voters from the voting rolls or to force them to cast only provisional ballots.  They cannot do so, because federal law does not require the State Board to remove voters from the rolls based on deficiencies in their forms—and in fact prohibits that so close to an election.  *Infra* §II.A.  Plaintiffs point to North Carolina General Statutes §163-82.11(c) as establishing a duty (*e.g.*, Compl. (D.E. 1-3) ¶58), but that provision simply incorporates federal law, which again establishes no such duty.

A closer look at the State Board's actual legal duties confirms the point.  North Carolina's list-maintenance statute, like its federal equivalent, requires the State Board to "remove the names of ineligible voters," i.e., non-U.S. citizens, convicted felons, minors, out-of-state residents, the deceased, and so on.  N.C. Gen. Stat. §163-14(a)-(d); N.C. Const. art. VI, §§1, 2(1)-(3).  Plaintiffs have not alleged, and cannot allege, that the 225,000 voters they seek to disenfranchise are ineligible under that statute.  And even if this Court could order the State Board to retroactively reject 225,000 voter-registration forms, the solution would not be disenfranchisement or mandatory use of provisional ballots.  Under state law, affected voters would be entitled to notice

**JA389**

14

and an opportunity to supply missing information.  N.C. Gen. Stat. §163-82.4(f).  They would vote provisional ballots only if they failed to correct the information before election day.  *Id.*  And their provisional ballots would still count so long as they supplied all necessary information to their county board of elections by 5:00 p.m. on November 14.  *Id.*  The State Board's duty is to follow these removal provisions, not to create new removal procedures that the legislature never enacted.

If removal is not feasible, plaintiffs' alternative requested relief is that voters who registered without providing the requisite information on their registration forms be required to vote provisional ballots (i.e., ballots that will not be counted unless the board can verify the voter's eligibility with its own data).  Compl. (D.E. 1-3) at 19-20; N.C. Gen. Stat. §163-166.11.  But again, plaintiffs cannot point to any legal duty for the State Board to require provisional voting under these circumstances.  To the contrary, both federal and state law require voters to cast provisional ballots only if they do not present HAVA-compliant ID at the polls or their name is absent from the polling place's list of registered voters.  *See* 52 U.S.C. §§21083(b)(2)(B), 21082(a); N.C. Gen. Stat. §163-166.12(e).  Voters, in other words, have a right to cast a regular, non-provisional ballot that they can be sure will be counted by supplying the requisite identification when they show up to vote.  Indeed, HAVA treats provisional voting as a "[f]ail-safe" to ensure voters denied a regular ballot may still cast some type of ballot, 52 U.S.C. §21083(b)(2)(B), not a substitute for such a ballot—as some jurisdictions make plain, provisional ballots are really "questioned ballot[s]," *Nageak v. Mallott*, 426 P.3d 930, 936 (Alaska 2018).  Plaintiffs' alternative relief would impermissibly eliminate the right to cast regular ballots by bringing HAVA-compliant ID to the polls—a right codified in both federal and state law.  The State Board's legal duty is to follow the law on provisional voting, not to expand it beyond the Congress's intended reach.

Plaintiffs' inability to show a legal duty for the State Board to perform the requested relief by itself makes mandamus inappropriate.

c.      Assuming plaintiffs' posited duty exists, plaintiffs must also show (under the third mandamus factor) that it is "ministerial" and does "not involve the exercise of discretion," *T.H.T.*, 665 S.E.2d at 59.  Performance of a duty is discretionary if it requires "personal deliberation, decision and judgment." *Meyer v. Walls*, 347 N.C. 97, 113-114, 489 S.E.2d 880, 889 (1997). Duties are ministerial, by contrast, when they are "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Id.*

Plaintiffs' prayer for relief asks for court interference with several of the State Board's discretionary duties, requesting review and approval of board plans to "develop, implement, and enforce practices and policies to ensure compliance" with state and federal law; "identify[]" and "remov[e]" "all ineligible registrants"; and in the future, register "only eligible, qualified voters." Compl. (D.E. 1-3) at 19-20.  None of that is remotely "ministerial" or free of discretion.

To the contrary, implementing election laws is expressly within the State Board's discretion.  As the North Carolina Supreme Court has explained, the General Assembly "has, in the exercise of its authority to delegate the making of interstitial policy decisions to administrative agencies, given decision making responsibilities to the … State Board." *Cooper v. Berger*, 370 N.C. 392, 416 n.11, 809 S.E.2d 98, 113 n.11 (2018).  In particular, the General Assembly has delegated to the Board "general supervision over the primaries and elections" and the power to "advise[s] county boards of elections as to the proper methods of conducting" elections, N.C. Gen. Stat. §163-22(a), (c), and to design list-maintenance procedures, *id.* §163-82.14(a).  The Board exercises discretion in (among other things) designing list-maintenance strategies and carrying out individual voter removal through quasi-judicial "challenges" that require collecting and evaluating

**JA391**

16

evidence.  *Id.* §§163-14(a), 163-85, 163-86, 163-88, 163-89.  This broad discretion is another reason mandamus relief is unavailable.

### 2.    Plaintiffs have not alleged a viable claim for violation of the North Carolina Constitution

To be viable, a claim under the North Carolina Constitution must be "plausible … given the facts presented and the current law (or [seek] a reasonable and logical extension or modification of the current law)."  *Deminski ex rel. C.E.D. v. State Board of Education*, 377 N.C. 406, 413, 858 S.E.2d 788, 793 (2021).  Here, neither the law nor the facts are on plaintiffs' side.

The North Carolina Constitution protects the "'right to vote *on equal terms*,'" meaning that "each vote must have the same weight."  *Harper v. Hall*, 384 N.C. 292, 364-365, 886 S.E.2d 393, 440 (2023); *see also State ex rel. Martin v. Preston*, 325 N.C. 438, 455, 385 S.E.2d 473, 481 (1989) ("once the right to vote is conferred, the *equal* right to vote is a fundamental right").  Because plaintiffs have not alleged that their members' votes will be weighted differently than anyone else's votes, plaintiffs have failed to state a constitutional claim.

Plaintiffs' actual claim—that their members' votes will be *diluted* if the 225,000 North Carolinians they seek to disenfranchise are allowed to vote—is not recognized under North Carolina law.  As the North Carolina Supreme Court has explained, "a claim of vote dilution allegedly based on one's affiliation with a political party does not raise a claim" under the North Carolina Constitution.  *Harper*, 384 N.C. at 364-365, 886 S.E.2d at 440.  This Court should not "create or expand" Article I, § 19 beyond what the North Carolina Supreme Court has previously allowed.  *Time Warner Entertainment-Advance/Newhouse Partnership v. Carteret-Craven Electric Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007).

But even if plaintiffs' constitutional claim were cognizable, plaintiffs have not plausibly alleged that their members' votes *will* be diluted by ineligible registrants' votes.  The North

Carolina Constitution sets eligibility requirements:  A voter is eligible if he is a U.S. citizen, at least 18 years old, a North Carolina resident, and has not been convicted of a felony (or has had his rights restored post-conviction).  N.C. Const. art. VI, §§1, 2(1)-(3).  And once a voter who meets these requirements is registered, "his vote will not be rejected" just because "the registration books show that he had not complied with all the minutiae of the registration law."  *Woodall v. Western Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226, 232 (1918).  Plaintiffs' bare allegation that some voters are "potentially" ineligible to vote (Compl. (D.E. 1-3) ¶94) is speculative and hence insufficient to state any direct constitutional claim.

## II.  FEDERAL LAW PROHIBITS THE LATE-STAGE VOTER PURGE PLAINTIFFS SEEK

### A.  HAVA And The NVRA Each Prohibit Systematic Removal Of Voters Within 90 Days Of A Federal Election

1.      To protect eligible voters from improper removal, the NVRA precludes states from removing people from the voter rolls as plaintiffs request.  Under the NVRA, states "shall complete, not later than 90 days [before] a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. §20507(c)(2)(A).  As of this filing, the November 5 elections are only 29 days away, well within the NVRA's 90-day period.

There is no question, moreover, that plaintiffs seek to do exactly what the NVRA prohibits during that 90-day period: "systematically remove the names of ineligible voters from the official lists of eligible voters," 52 U.S.C. §20507(c)(2)(A).  In this litigation, plaintiffs have not brought *individualized* challenges against any of the 225,000 registered voters that are "potentially ineligible," Compl. (D.E. 1-3) ¶94.  Rather, plaintiffs ask this Court to order the State Board to systematically purge all those voters from the rolls.  Specifically, plaintiffs pray for "a court-approved plan" under which the State Board must "identify[] all ineligible registrants and remov[e]

**JA393**

18

them from the state's voter registration lists." Compl. (D.E. 1-3) at 19. Such a plan falls squarely within the scope of the NVRA's broad phrase "any program." Hence, while plaintiffs ask that voters be removed from the rolls "consistent with … federal law," *id.*, that cannot now be done in the manner they seek (not least because of how long plaintiffs waited to bring this action).

There are good reasons for the NVRA's 90-day ban. As a court in this circuit recently acknowledged when barring a voter purge that violated that ban, the 90-day period reflects a congressional judgment that "'[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote.'" *North Carolina State Conference of NAACP*, 2018 U.S. Dist. LEXIS 134228, at *18 (quoting *Arcia v. Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)); *see also Mi Familia Vota v. Fontes*, 691 F.Supp.3d 1077, 1093 (D. Ariz. 2023), *on appeal*, No. 24-3188 (9th Cir.). The NVRA's 90-day removal ban "strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346. Plaintiffs have invited the very risk Congress prohibits states from introducing by filing this late-stage lawsuit (which they could have filed long before Congress's chosen cutoff date, *see infra* §III.A).

The NVRA does contain an exception to the 90-day removal ban, but it does not apply here. The exception states that the 90-day prohibition "shall not be construed to preclude" the "correction of registration records pursuant to this chapter." 52 U.S.C. §20507(c)(2)(B)(ii). The language "this chapter," however, refers to the NVRA, not to HAVA and its voter-registration requirements, which are in a different chapter of the U.S. Code. And the NVRA provides for removal only at the request of the registrant or by reason of criminal conviction, mental incapacity, death, or change in residence. *Id.* §20507(a)(3)-(4). None of that is what plaintiffs seek here,

which is removal based on completion of a registration form that plaintiffs believe was improperly color coded. That relief is not available.

If more were needed, the NVRA requires that any method to remove voters be "uniform, nondiscriminatory, and in compliance with" the Voting Rights Act. 52 U.S.C. §20507(b)(1). That provision is violated when a method for purging voters is overinclusive, "identif[ying] many properly registered citizens as potential noncitizens." *United States v. Florida*, 870 F.Supp.2d 1346, 1350 (N.D. Fla. 2012). Plaintiffs' requested relief constitutes such an overinclusive method, because not every applicant who failed to provide either a driver's license number or a social security number is ineligible to vote. Indeed, plaintiffs concede the point, alleging only that the voters they have targeted for removal are "*potentially* ineligible." Compl. (D.E. 1-3) ¶94 (emphasis added).

Plaintiffs' remand motion hints at a couple of counterarguments, but those are unavailing. First, plaintiffs suggest that removal of each of the potentially 225,000 voters from the rolls would be "the result of an individualized inquiry." D.E. 38 at 11. That understanding of "individualized" would improperly eviscerate the NVRA's 90-day provision. Plaintiffs seek to disqualify a whole class of up to 225,000 voters without explaining any of the facts that led to each voter's supposedly deficient registration form. A court-approved plan for up to 225,000 voters would be "systematic[]," 52 U.S.C. §20507(c)(2)(A), in that it would apply to hundreds of thousands of voters without considering the underlying facts.

Second, plaintiffs' remand motion suggests that the NVRA's 90-day removal ban "would not be implicated … if removal from the voter rolls occurred after the general election." D.E. 38 at 11 n.4. To the extent plaintiffs mean that voters should be allowed to vote but then their registrations might be canceled in between election day and certification of the election—which

**JA395**

20

would disqualify their votes—that is preposterous.  Under the plain text of the statute, systematic removals are prohibited starting 90 days before the election and lasting through the election.  *See* 52 U.S.C. §20507(c)(2)(A).  The election is not over until the results are certified.  *See* N.C. Gen. Stat. §163-182.15.  Permitting any intervening removals would directly contradict Congress's intent in passing the NVRA to set a cutoff for voters being removed from the rolls well before their votes are counted in the election.  *Supra* pp.19-20.

2.    HAVA likewise prohibits plaintiffs' requested voter purge.  Although the statute provides (with an exception not relevant here) that states must have "a single … computerized statewide voter registration list," 52 U.S.C. §21083(a)(1)(A), and must regularly perform "maintenance" of that list, *id.* §21083(a)(2)(A), HAVA also commands that the maintenance must "be conducted in a manner that ensures that[] … only voters who are not registered or who are not eligible to vote are removed," *id.* §21083(a)(2)(B)(ii).  But as explained, many of the 225,000 voters whom plaintiffs target *are* eligible to vote.  Plaintiffs have suggested no way for the State Board to remove only those "who are not," *id.*  Moreover, HAVA expressly incorporates the NVRA's prohibition on systematic voter removals within 90 days of a federal election, *id.* §21083(a)(2)(A)(i) (incorporating 52 U.S.C. §20507(c)(2)), which again forecloses plaintiffs' requested relief.

### B.    Due Process Bars The Relief Plaintiffs Seek

Removing registered voters from North Carolina's rolls (or disqualifying their already-cast ballots) without providing them notice and an opportunity to be heard would violate their constitutional right to procedural due process, *see* U.S. Const. amend. XIV, §1.  These 225,000 voters submitted the proper version of North Carolina's registration form, had their eligibility verified by election officials, and were told that they are registered to vote in all future elections.

It cannot be that they must be told now—on the eve of a presidential and other elections—that they will be removed from the rolls or prohibited from casting a regular ballot.

Such removals would violate due process because they would constitute "state action" that infringed "'a cognizable liberty … interest'" (the right to vote) using "'constitutionally inadequate'" procedures, *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). Courts evaluating whether a procedure is "constitutionally" inadequate, *id.*, consider three factors: (1) "the private interest that will be affected;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, all three factors support finding a due-process violation.

As to the first, there is no doubt that the private interest is enormously important. Indeed, the Supreme Court has explained that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). It is "preservative of all rights." *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973). The Fourth Circuit has made the same point more recently, deeming it "beyond dispute that 'voting is of the most fundamental significance under our constitutional structure.'" *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). If this lawsuit were to proceed, voters risk being improperly removed from the rolls or being made to cast provisional ballots the state may not count. *Supra* §II.B. Either injury threatens the right to vote, which includes voters' right to "cast their ballots" (which removal from the rolls would prohibit)

**JA397**

22

*and* "have them counted" (which being made to cast a provisional ballot threatens). *United States v. Classic*, 313 U.S. 299, 315 (1941); *see supra* pp.15-16.

As to second factor, the relief plaintiffs seek creates a significant risk of erroneous deprivations of the right to vote, because (as explained) many, if not most, of the 225,000 registered voters at issue are in fact eligible to vote. As noted, plaintiffs concede that the voters they target are only "*potentially* ineligible." Compl. (D.E. 1-3) ¶94 (emphasis added). And additional procedures—such as providing voters notice and an opportunity to be heard before removal— would undoubtedly reduce that risk, because voters who are in fact eligible would be able to demonstrate their eligibility. Indeed, the Fourth Circuit has made clear that procedures that do not provide "notice and opportunity to be heard" are generally deficient. *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145-146 (4th Cir. 2018); *see also Voto Latino*, 2024 U.S. Dist. LEXIS 11180, at *85. North Carolina law recognizes this point, and thus gives voters individual hearings before being purged from the rolls. N.C. Gen. Stat. §§163-85, 163-86. That is the *minimum* process due to them. *E.g.*, *Jones v. Governor of Florida*, 975 F.3d 1016, 1049 (11th Cir. 2020); *Bell v. Marinko*, 235 F.Supp.2d 772, 777 (N.D. Ohio 2002).

As to the third *Mathews* factor, there is no reasonable argument that providing people with notice and an opportunity to be heard before being removed from the rolls would impose an excessive fiscal or administrative burden on the state. There is no such argument because state law *already requires* such notice and opportunity. Again, under North Carolina law, if a registered voter is challenged by another voter as being ineligible, the appropriate county board must hold a hearing on the challenge before removing the voter, providing the voter with notice of the hearing and an opportunity to be heard there. *See* N.C. Gen. Stat. §§163-85, 163-86. In any event, any

burden on the state from providing adequate process is far outweighed by the paramount importance of the right to vote.[2]

Confronted with a request comparable to plaintiffs', the chief justice of the Arizona Supreme Court recently rejected an attempt to deny nearly 100,000 voters the ability to vote in state and local elections because they had not provided documentary proof of U.S. citizenship when they registered to vote. *See Richer v. Fontes*, 2024 Ariz. LEXIS 263, at *8 (Ariz. Sept. 20, 2024) (Timmer, C.J.). The chief justice was "unwilling" to "disenfranchise voters en masse" when doing so "is not authorized by state law and would violate principles of due process." *Id.* That was "particularly true" given that (1) it was a "state administrative failure" that led to voters being registered without the requisite proof of citizenship, and (2) there was "so little time remaining before the beginning of the 2024 General Election." *Id.* at *7. Another federal judge in this state similarly rejected such an effort because the "en masse cancellation of voter registrations lacked individualized inquiry into the circumstances of each voter and provided little to no opportunity for improper removals to be corrected." *North Carolina State Conference of NAACP*, 2018 U.S. Dist. LEXIS 134228, at *25. The same conclusion is warranted here.

## III.     EQUITABLE PRINCIPLES INDEPENDENTLY BAR ANY RELIEF

### A.     The Doctrine Of Laches Bars Relief

Laches is an affirmative defense that precludes equitable relief where (1) there has been a "lack of diligence by the party against whom the defense is asserted," and (2) granting relief despite that delay would "prejudice … the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961); *accord, e.g.*, *EEOC v. Propak Logistics, Inc.*, 746 F.3d 145, 149 n.5 (4th

---

[2] Removal from the voter rolls without notice and an opportunity to be heard would still violate due process if, instead of the *Mathews* factors, the Supreme Court's *Anderson-Burdick* framework applied here. *See generally Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

**JA399**

24

Cir. 2014).  The "greater the delay, the less … prejudice required to show laches, and vice versa." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).  Here, both the delay and the prejudice easily suffice to trigger laches.

1.      Plaintiffs' lack of diligence in filing this lawsuit is considerable, and in fact astounding, given the relief now sought.  Almost a *year* ago, an administrative complaint was filed with the State Board making the same basic claim plaintiffs raise here.  Ex. 3 at 1-2.  The State Board publicly issued a written order ruling on it in December 2023.  *See* Compl. (D.E. 1-3) ¶51. Plaintiffs could have filed their suit shortly after the administrative complaint was raised or after the State Board ruled on the complaint late last year.  Instead, plaintiffs waited many months, not suing until August 23 of this year—scarcely two weeks before ballots were scheduled to be distributed throughout North Carolina, *see* N.C. Gen. Stat. §163-227.10(a).  The Fourth Circuit has deemed the first laches requirement met where the filing of an eleventh-hour election-related lawsuit was delayed for four months—far less than the delay here.  *See Perry v. Judd*, 471 F.App'x 219, 224 (4th Cir. 2012).  Excusing that delay, the court explained, "would encourage [others] to wait until the last minute to bring [similar] challenges."  *Id.* at 225.  The court declined to do so, and this Court should as well.

2.      The second element of laches is likewise met here, as the DNC has been prejudiced by plaintiffs' delay in suing.  As explained, the relief plaintiffs seek would result in preventing or disqualifying the votes of many North Carolinians who are in fact eligible to vote—people who would have had more time to demonstrate their eligibility (and thereby would have remained on the rolls for the upcoming elections) had plaintiffs sued earlier.  Because many of these people are likely to vote for Democratic candidates in November's general election, plaintiffs' delay would, if their relief is granted, prejudice the DNC by hindering its ability to accomplish its mission of

getting Democrats elected.  Even as to voters among the 225,000 who are not removed, plaintiffs' last-minute complaint threatens to cause confusion that may keep voters away from the polls, again to the prejudice of the DNC given that at least some of the voters plaintiffs target will support Democratic candidates.

In short, the laches requirements are met here.  This Court can and should dismiss plaintiffs' complaint on this basis alone.  *See Perry*, 471 F.App'x at 228.

### B.    Granting Any Late-Stage Remedy Would Violate The Supreme Court's *Purcell* Principle

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam).  "Court orders affecting elections" tend to "result in voter confusion and consequent incentive to remain away from the polls" if they are made shortly before an election occurs.  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam).  This is a "bedrock tenet of election law:  When an election is close at hand, the rules of the road must be clear and settled."  *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring).

Both the Fourth Circuit and Supreme Court regularly enforce this rule against "lower court injunctions of state election [procedures] in the period close to an election," *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194, 226 (4th Cir. 2024), especially in a general election year, *see, e.g.*, *Merrill v. People First of Alabama*, 141 S.Ct. 25 (2020); *Andino v. Middleton*, 141 S.Ct. 9 (2020); *Republican National Committee*, 589 U.S. at 424.  That is because state election officials "need substantial time to plan for elections," and this need "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding

late, judicially imposed changes to its election … procedures." *Milligan*, 142 S.Ct. at 880-881 (Kavanaugh, J., concurring).

All this is well-known to plaintiffs.  The Republican Party has invoked *Purcell* in case after case this year, including as early as May 2024, i.e., *six months* before the election.  Ex. 8 (Non-Party Brief of the Republican National Committee et al., *Priorities USA v. Evers*, No. 2024AP164 (Wis. May 3, 2024)).  Likewise, the Republican Party invoked *Purcell* in their recent *opposition* to a late-stage voter purge.  "[G]iven the proximity to the election," the Arizona Republican Party represented to the Arizona Supreme Court two weeks ago, "it is less likely that voters will stay home than they will show up to vote without knowing that there is any problem with their registration.  In other words, U.S. citizen voters who have … consistently participated in state elections without issue are likely to show up at their polling place on November 5 only to learn that they have been disenfranchised by a state government clerical error of which they had no prior knowledge."  Ex. 9 (Brief of Arizona Republican Party as Amicus Curiae in Support of Respondent at 10, *Richer v. Fontes*, No. CV-24-0221-SA (Ariz. Sept. 18, 2024)).

These principles—which North Carolina law likewise reflects, *see Pender County v. Bartlett*, 361 N.C. 491, 510, 649 S.E.2d 364, 376 (2007), *aff'd on other grounds sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009)—preclude the relief plaintiffs seek.  Voting is underway in North Carolina.  "The election is not merely 'close[],' or even 'imminen[t]'—it is happening *right now*." *Pierce*, 97 F.4th at 227 (emphasis added).  The targeted voters, who "'deserve clarity' about their elections," *id.* at 229 (quoting *Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (en banc)), have been registered, and that state action "establishes the status quo" that cannot now be disrupted, *id.* at 209 (quoting *Wise*, 978 F.3d at 98).  Indeed, many of the 225,000 registered voters plaintiffs target may have already voted by mail, while others will no doubt do so in the coming days.  And

still others will soon head to the polls for early, in-person voting, which begins on the day the Court scheduled for a hearing on the State Board's motion. To change the rules now, after the state has assured voters (perhaps for years in some cases) that they are eligible to vote, or to threaten not to count their ballots, could sow confusion and chaos, undermining public confidence in the election. To make matters worse, the state is reeling from the effects of a natural disaster that only makes it harder for voters in large portions of the state to cast their ballots, *supra* p.8, let alone comply with an onerous, late-stage requirement that they re-prove their eligibility to vote. *Purcell* and its progeny forbid that outcome.

<p align="center">*    *    *</p>

Plaintiffs' last-minute gambit to sow election chaos with a wholly meritless complaint should be rejected—and promptly, so that the election may proceed unimpugned and uninterrupted, and North Carolinians who have long been registered to vote may rest assured in exercising one of our most sacred constitutional rights.

## CONCLUSION

The complaint should be dismissed with prejudice.

October 7, 2024

Respectfully submitted,

/s/ Seth P. Waxman

SETH P. WAXMAN*
DANIEL S. VOLCHOK*
CHRISTOPHER E. BABBITT*
GARY M. FOX*
JOSEPH M. MEYER*
JANE KESSNER*
NITISHA BARONIA*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
joseph.meyer@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com

* Local Rule 83.1(e) special appearance.

/s/ Jim W. Phillips, Jr.

JIM W. PHILLIPS, JR.
N.C. BAR NO. 12516
SHANA L. FULTON
N.C. BAR NO. 27836
ERIC M. DAVID
N.C. BAR NO. 38118
WILLIAM A. ROBERTSON
N.C. BAR NO. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON
    HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
edavid@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

**JA404**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>*Defendants*,<br><br>and<br><br>DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Intervenor-Defendant*. | Case No. 5:24-cv-547-M-RJ |

## THE DEMOCRATIC NATIONAL COMMITTEE'S
## INDEX OF EXHIBITS

**JA405**

| Exhibit | Document |
|---------|----------|
| 1 | *Republican National Committee v. Schmidt*, No. 108 MM 2004 (Pa. Oct. 5, 2024) |
| 2 | North Carolina Official Election Manual (Sections 5.7.3 and 8.3.1) |
| 3 | Current North Carolina Voter-Registration Form |
| 4 | Administrative Complaint Filed by Carol Snow |
| 5 | Prior North Carolina Voter-Registration Form |
| 6 | Governor Cooper, *Disaster Declaration Request* (Sept. 27, 2024) |
| 7 | *President Joseph R. Biden, Jr. Approves North Carolina Disaster Declaration*, White House (Sept. 28, 2024) |
| 8 | Non-Party Brief of the Republican National Committee et al., *Priorities USA v. Evers*, No. 2024AP164 (Wis. May 3, 2024) |
| 9 | Brief of Arizona Republican Party as Amicus Curiae in Support of Respondent, *Richer v. Fontes*, No. CV-24-0221-SA (Ariz. Sept. 18, 2024) |

# EXHIBIT 1

**JA407**

2024 WL 4406909 (Table)
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

REPUBLICAN NATIONAL COMMITTEE
AND REPUBLICAN PARTY OF
PENNSYLVANIA, Petitioners

v.

AL SCHMIDT, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE COMMONWEALTH,
AND ALL 67 COUNTY BOARDS OF ELECTIONS
(ADAMS COUNTY BOARD OF ELECTIONS;
ALLEGHENY COUNTY BOARD OF ELECTIONS;
ARMSTRONG COUNTY BOARD OF ELECTIONS;
BEAVER COUNTY BOARD OF ELECTIONS;
BEDFORD COUNTY BOARD OF ELECTIONS;
BERKS COUNTY BOARD OF ELECTIONS; BLAIR
COUNTY BOARD OF ELECTIONS; BRADFORD
COUNTY BOARD OF ELECTIONS; BUCKS
COUNTY BOARD OF ELECTIONS; BUTLER
COUNTY BOARD OF ELECTIONS; CAMBRIA
COUNTY BOARD OF ELECTIONS; CAMERON
COUNTY BOARD OF ELECTIONS; CARBON
COUNTY BOARD OF ELECTIONS; CENTRE
COUNTY BOARD OF ELECTIONS; CHESTER
COUNTY BOARD OF ELECTIONS; CLARION
COUNTY BOARD OF ELECTIONS; CLEARFIELD
COUNTY BOARD OF ELECTIONS; CLINTON
COUNTY BOARD OF ELECTIONS; COLUMBIA
COUNTY BOARD OF ELECTIONS; CRAWFORD
COUNTY BOARD OF ELECTIONS; CUMBERLAND
COUNTY BOARD OF ELECTIONS; DAUPHIN
COUNTY BOARD OF ELECTIONS; DELAWARE
COUNTY BOARD OF ELECTIONS; ELK COUNTY
BOARD OF ELECTIONS; ERIE COUNTY BOARD
OF ELECTIONS; FAYETTE COUNTY BOARD
OF ELECTIONS; FOREST COUNTY BOARD OF
ELECTIONS; FRANKLIN COUNTY BOARD OF
ELECTIONS; FULTON COUNTY BOARD OF
ELECTIONS; GREENE COUNTY BOARD OF
ELECTIONS; HUNTINGDON COUNTY BOARD
OF ELECTIONS; INDIANA COUNTY BOARD
OF ELECTIONS; JEFFERSON COUNTY BOARD
OF ELECTIONS; JUNIATA COUNTY BOARD OF
ELECTIONS; LACKAWANNA COUNTY BOARD
OF ELECTIONS; LANCASTER COUNTY BOARD
OF ELECTIONS; LAWRENCE COUNTY BOARD
OF ELECTIONS; LEBANON COUNTY BOARD
OF ELECTIONS; LEHIGH COUNTY BOARD OF
ELECTIONS; LUZERNE COUNTY BOARD OF
ELECTIONS; LYCOMING COUNTY BOARD OF
ELECTIONS; MCKEAN COUNTY BOARD OF
ELECTIONS; MERCER COUNTY BOARD OF
ELECTIONS; MIFFLIN COUNTY BOARD OF
ELECTIONS; MONROE COUNTY BOARD OF
ELECTIONS; MONTGOMERY COUNTY BOARD
OF ELECTIONS; MONTOUR COUNTY BOARD OF
ELECTIONS; NORTHAMPTON COUNTY BOARD
OF ELECTIONS; NORTHUMBERLAND COUNTY
BOARD OF ELECTIONS; PERRY COUNTY BOARD
OF ELECTIONS; PHILADELPHIA COUNTY
BOARD OF ELECTIONS; PIKE COUNTY BOARD
OF ELECTIONS; POTTER COUNTY BOARD OF
ELECTIONS; SCHUYLKILL COUNTY BOARD
OF ELECTIONS; SNYDER COUNTY BOARD
OF ELECTIONS; SOMERSET COUNTY BOARD
OF ELECTIONS; SULLIVAN COUNTY BOARD
OF ELECTIONS; SUSQUEHANNA COUNTY
BOARD OF ELECTIONS; TIOGA COUNTY BOARD
OF ELECTIONS; UNION COUNTY BOARD OF
ELECTIONS; VENANGO COUNTY BOARD
OF ELECTIONS; WARREN COUNTY BOARD
OF ELECTIONS; WASHINGTON COUNTY
BOARD OF ELECTIONS; WAYNE COUNTY
BOARD OF ELECTIONS; WESTMORELAND
COUNTY BOARD OF ELECTIONS; WYOMING
COUNTY BOARD OF ELECTIONS; AND YORK
COUNTY BOARD OF ELECTIONS), Respondents

No.
**108**
**MM**
**2024**
|
October 5, 2024

**ORDER**

PER CURIAM

**JA408**

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 1

**\*1  AND NOW,** this 5th day of October, 2024, Petitioners' Application for the Exercise of King's Bench or Extraordinary Jurisdiction is hereby **DENIED**. *See Stilp v. Hafer*, 718 A.2d 290, 292 (Pa. 1998) ("Laches .. bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another.); *Kelly v. Commonwealth*, 240 A.3d 1255 (lack of due diligence demonstrated where action could have been brought at an earlier date and prejudice to voters would result from disruptive late filing). King's Bench jurisdiction will not be exercised where, as here, the alleged need for timely intervention is created by Petitioners' own failure to proceed expeditiously and thus, the need for timely intervention has not been demonstrated. *See In re Bruno*, 101 A.3d 635, 670 (2014) ("[T]he Court will generally employ the King's Bench authority when the issue requires timely intervention by the court of last resort of the Commonwealth and is one of public importance.").[1]

Further, Petitioners' Application for the Exercise of King's Bench jurisdiction over *Genser v. Butler County Board of Elections*, 1074 & 1085 C.D. 2024, 2024 WL 4051375, *appeal granted in part*, 2024 WL 4248971 (Pa. Sept., 20, 2024), is **DENIED**, as this Court has assumed appellate jurisdiction of that matter. The Application for Leave to Amend Answer filed by Respondents Allegheny, Bucks, Chester, Montgomery and Philadelphia is **GRANTED**. Petitioners' Application for Relief to File an Exhibit Under Seal and Application for Relief to File Supplemental Response to Application for Leave to Intervene are **DENIED**. The Applications of Faith A. Genser, Frank P. Matis, Center for Coalfield Justice, Washington Branch NAACP, Bruce Jacobs, Jeffrey Marks, June Devaughn Hython, Erika Worobec, Sanda Macioce, Kenneth Elliott, David Dean, the Democratic National Committee and the Pennsylvania Democratic Party to Intervene are **DISMISSED AS MOOT**.

Justice Brobson files a concurring statement in which Justice Mundy joins.

## CONCURRING STATEMENT

JUSTICE BROBSON

**\*2**  I agree with the *per curiam* disposition of this matter. As this Court stated in *New PA Project Education Fund v. Schmidt* (Pa., No. 112 MM 2024, filed Oct. 5, 2024) (PCO), "[t]his Court will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election."[1]

Petitioners do raise some important questions with respect to the authority of county boards of election to create and implement their own "notice and cure" procedures under the Election Code[2] absent express legislative authority to do so and, if they do, whether the varied "notice and cure" practices and policies from county-to-county violate Article I, Section 5[3] and/or Article VII, Section 6[4] of the Pennsylvania Constitution. That said, the 2024 General Election is underway. Petitioners, however, could have pursued these challenges in a more-timely fashion. Deciding these questions at this point would, in my view, be highly disruptive to county election administration. Moreover, I can see the potential need to develop a factual record in this matter, which could prove difficult in the compressed timeframe available to us.

The decision to deny the application, however, does not mean that these important questions should not be decided in advance of future elections. Petitioners, or anyone else with standing for that matter, may present these challenges after the impending election for consideration by an appropriate court with appropriate parties in the ordinary course.

Justice Mundy joins this concurring statement.

**All Citations**

Slip Copy, 2024 WL 4406909 (Table)

---

**Footnotes**

1    In September 2022, approximately two months before the General Election, Petitioners filed a petition for review in the Commonwealth Court's original jurisdiction against the acting Secretary of the Commonwealth

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2

and all sixty-seven County Boards. In that case, as here, they challenged the implementation of county-level notice and cure procedures for defective absentee and mail-in ballots. Ultimately, the Commonwealth Court dismissed the action, concluding that it lacked jurisdiction over Petitioners' claims. *Republican Nat'l Comm. v. Schmidt* (Pa. Cmwlth., No. 447 M.D. 2022 at 28, filed March 23, 2023) (unreported decision) (concluding that "jurisdiction for an action challenging a [c]ounty [b]oard's development and implementation of notice and cure procedures properly lies in the respective [c]ounty's court of common pleas."). Three election cycles have since passed, and the Petitioners have not challenged any of the county notice and cure policies in a court of common pleas. Petitioners filed their instant Application on September 18, 2024.

1    *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."); *See also Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").

2    Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2601-3556.

3    "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

4    "All laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State ...." Pa. Const. art. VII, § 6.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**JA410**

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    3

# EXHIBIT 2

**JA411**

Navigation: Home | 5 Voting Site - Check-in Station Procedures | Step 7 - Check Voter Status | 5.7.3 Issue: Voter is Subject to HAVA ID

-Search-

INDEX        GLOSSARY        FILTER

Preface

1 Election Officials

2 Voting Site Administration

3 One-stop Absentee Administration

4 Voting Site - Precheck-in Procedures

5 Voting Site - Check-in Station Procedures

  5 Voting Site: Check-in Station Procedures

  Step 1 - Ask Voter to State Name

  Step 2 - Search for Voter

  Step 3 - Compare Name

  Step 4 - Ask Voter to State Address

  Step 5 - Compare Stated Address

  Step 6 - Ask Voter to State Party

  Step 7 - Check Voter Status

    5.7 Check-in Step 7: Check Voter Status

    5.7.1 Issue: Voter is Inactive

    5.7.2 Issue: Voter Record Shows Voter Already Voted

    **5.7.3 Issue: Voter is Subject to HAVA ID**

    5.7.4 Issue: Voter Has No Eligible Ballot

  Step 8 - Make Determination of Eligibility to Vote

  Step 9 - Direct Voter to Ballot Station

6 Voting Site - Curbside Station

## 5.7.3 Issue: Voter is a First-time Voter Who Has Not Provided Verifiable Identification (HAVA Voter)

First-time voters, who at the time of their initial voter registration did not provide their North Carolina driver license number or the last four digits of their Social Security number, or who provided a number that could not be validated, are required to show identification when they vote.

This identification does not have to be a photo ID. The requirement for first-time voters to show identification is a requirement of the Help America Vote Act (HAVA) of 2002, a federal law not unique to North Carolina. Acceptable forms of HAVA ID include:

- A current and valid photo identification; or

- A copy of one of the following documents that show the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document.

First-time voters who are required to show HAVA ID will have been notified of this requirement by their county board of elections. If the voter complies with North Carolina's photo ID requirements, the requirements under HAVA are met. The election official must note the type of identification submitted by the voter.

If the voter does not present acceptable ID under North Carolina law, the voter must be referred to the Help Station.

[Station Guide - Record Indicates HAVA ID is Required](#)

[Station Guide - Record Indicates HAVA ID is Required - Guidance to Voter](#)

**JA412**

© Copyright 2017. All rights reserved.

USCA4 Appeal: 24-2044        Doc: 45        Filed: 10/23/2024        Pg: 418 of 686



**North Carolina Election Official Manual**

8 Voting Record Explained » Voter ID » 8.3.1 ID Required – HAVA

Navigation: Home | 8 Voting Record Explained | Voter ID | 8.3.1 ID Required – HAVA

-Search-

INDEX        GLOSSARY        FILTER

## 8.3.1    ID Required – HAVA

First-time voters, who, at the time of their initial voter registration, did not provide their North Carolina driver license number or the last four digits of their Social Security number, or who provided a number that could not be validated, are required to show identification when they vote.

This identification does <u>not</u> have to be a photo ID. The requirement for first-time voters to show identification is a requirement of the Help America Vote Act (HAVA) of 2002, a federal law not unique to North Carolina. Acceptable forms of HAVA ID include:

- A current and valid photo identification.

- A copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document.

First-time voters who are required to show HAVA ID will have been notified of this requirement by their county board of elections. The election official must note the type of identification submitted by the voter.

If the voter does not present acceptable HAVA ID, the voter must be referred to the Help Station.

Preface

1 Election Officials

2 Voting Site Administration

3 One-stop Absentee Administration

4 Voting Site - Precheck-in Procedures

5 Voting Site - Check-in Station Procedures

6 Voting Site - Curbside Station Procedures

7 Voting Site - Help Station Procedures

8 Voting Record Explained

   8 Voting Record Explored

   General Information

   Voter Status

   Voter ID

      8.3 Voter ID

      **8.3.1 ID Required – HAVA**

   Voting Status

9 Precinct Transfers

10 Provisional Voting

11 Voting Systems and Ballots

12 Other Voting Site Activity

13 Voting Site Documents

**JA413**

© Copyright 2017. All rights reserved.

# EXHIBIT 3

# North Carolina Voter Registration Application *(Sections in red are required.)*

**06w**

## 1 — Eligibility

You must be a U.S. citizen and old enough to register to submit this form. Required.

**Are you a citizen of the United States of America?**
*If you checked "no" in response to this question, do not submit this form. You are not qualified to vote.*   ☐ Yes   ☐ No

**Will you be 18 years of age on or before election day?**   ☐ Yes   ☐ No

**If you answered "no" to the question above, are you at least 16 years of age and understand that you must be 18 years of age on or before election day to vote?**   ☐ Yes   ☐ No

*If you checked "no" in response to both of these age questions, do not submit this form. You are not qualified to register or preregister to vote.*

## 2 — Print your name

Required.

Last Name _____  Suffix (Jr, Sr., II, III, IV) _____
First Name _____  Middle Name _____

## 3 — Identification information

Required.

Date of birth _____ *(mm/dd/yyyy)*   **AND**

NC Driver's License/DMV ID number _____
**OR, if you do not have one**
Last 4 digits of your Social Security number _____
**OR**
☐ I do not have a driver's license/DMV ID or Social Security number.

## 4 — Residential address

Your home address. Required.

Address *(not P.O. Box)* _____  Apt/Unit # _____
City _____  **NC**  Zip _____  County _____
If you have lived at this address less than 30 days, when did you move here? *(mm/dd/yyyy)* _____

## 5 — Mailing address

If you do not receive mail at your residential address, you must provide a mailing address. Required.

☐ Same as above
Address or P.O. Box _____  Apt/Unit # _____
City _____  State _____  Zip _____

## 6 — No physical address?

If you do not have an address, show on the map where you live or normally sleep.

Write the names of the nearest crossroads (or streets).
Draw an **X** on the map to show where you live/sleep.

Remember to provide a valid **mailing address** in Section 5 so that the board of elections can send you a voter card.

**North**

## 7 — About you

**Gender**
☐ Male
☐ Female

**Ethnicity**
☐ Hispanic/Latino
☐ Not Hispanic/Latino

**Race**
☐ African American/Black
☐ American Indian/Alaska Native
☐ Asian
☐ White
☐ Multiracial
☐ Native Hawaiian/Pacific Islander
☐ Other

## 8 — Political party affiliation

☐ Constitution Party
☐ Democratic Party
☐ Green Party
☐ Justice For All Party
☐ Libertarian Party
☐ No Labels Party
☐ Republican Party
☐ Unaffiliated (No Party)
☐ We The People Party
☐ Other _____

If you select a party that is not recognized in North Carolina, you will be registered as *Unaffiliated*.

## 9 — Old registration

If you are currently registered to vote somewhere else, complete this section so that your prior registration can be cancelled.

**Name and address on last registration to cancel**
Last Name _____  Suffix _____
First Name _____  Middle Name _____
Street _____
City _____  State _____  Zip _____  County _____

## 10 — Contact information

This optional information is helpful if we have questions.

Phone _____  Email _____

## 11 — Signature

Fraudulently or falsely completing this form is a Class I felony under Chapter 163 of the NC General Statutes.

I have reviewed the contents of this form and attest that:
• I am a U.S. citizen;
• I am at least 18 years old, or will be by the date of the general election; or I am at least 16 years old and understand that I must be at least 18 years old on the day of the general election to vote;
• I will have lived at the residence identified on this form for 30 days before the date of the election in which I intend to vote;
• If I filled out Section 9 above, I am requesting that my old registration be cancelled; and
• I am not currently serving a felony sentence (including any probation, post-release supervision, or parole).

**Voter, sign and date here** *(Required)*

**JA415**

X _____  Date *(mm/dd/yyyy)* _____

☐ I would like to be contacted by a poll worker.

2024.08

USA

Zip Code
State
City

NC

BOARD OF ELECTIONS

TO:



OFFICIAL ELECTION MAIL
Authorized by the U.S. Postal Service®

PLACE
STAMP
HERE

FROM:

## APPLICATION INSTRUCTIONS

*Use this application to: (1) register to vote; (2) preregister to vote if you are at least 16 years old; (3) change party affiliation or unaffiliated status; (4) report a change of address within a county; or (5) report a name change.*

**Specific Instructions for Each Numbered Section of the Application:**

**1.** Indicate whether you meet the citizenship and age qualifications to vote or preregister to vote: (1) you must be a citizen of the United States; and (2) you must be at least 18 years old, or you will be 18 years old by the next general election, or you must be at least 16 years old if you want to preregister to vote.

**2.** Provide your full legal name. If your name has changed, this form will be used to update your current voter registration.

**3.** Provide your date of birth. If you have an NC driver's license or NCDMV ID number, you must provide this number. If not, you must provide the last four digits of your social security number. If you have none of these ID numbers and you are registering to vote for the first time in North Carolina, you must check the box indicating that you do not have these forms of identification. If you check that box, you may attach to this application a copy of a current and valid photo identification, utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.

**4-6.** Provide your home address as of today's date in **Section 4**. If you do not receive mail at the address listed in **Section 4** or you do not have a traditional address, you must provide your mailing address in **Section 5**. If you do not have a traditional address, show on the map where you live or normally sleep in **Section 6**. Be descriptive and note any nearby streets or landmarks.

**7.** You may choose to provide your gender, race, and ethnicity. You are not required to provide this information.

**8.** You may choose to affiliate with any political party recognized in North Carolina. If you do not want to affiliate with a political party, you may opt to be registered as *Unaffiliated*. If you are applying for new registration in North Carolina and leave the party affiliation section blank, you will be registered as *Unaffiliated*.

**9.** If you are currently registered in another North Carolina county or another state, provide your name and previous address used on that prior registration. This information will be used to request the cancellation of your registration in the other county or state.

**10.** You may choose to provide your phone number and email address. This is helpful if the board of elections needs to contact you with any questions about the form.

**11.** You must sign this form or make your mark. Only the person applying for registration is eligible to sign this form. If you are applying for new registration in your county of residence, you must submit this form with your original signature on the form. By signing this form, you are attesting that you meet the qualifications to register to vote, as listed above your signature.

| National Voter Registration Act Statement | Submitting Your Form: |
|---|---|
| If you are submitting this application to an NVRA agency or the North Carolina Division of Motor Vehicles, the location or office where you submitted the application will remain confidential and will be used only for voter registration purposes. Public assistance agencies, disability services agencies, the North Carolina Division of Motor Vehicles, and unemployment services agencies must offer you the opportunity to register to vote at the initial application for service or assistance and during any recertification, renewal or change of address. If you decline to register to vote, the fact that you so declined will also remain confidential. If you would like help completing the voter registration application, the agency will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private and bring it to the agency that provided you the form or you may mail or deliver the form to your county board of elections office. | You must mail or deliver this application in-person with your original signature if you are registering to vote for the first time in your county of residence. If you are changing your name, address or party affiliation within your current county of registration, or registering to mail, you may also fax or email a scanned image of your signed application. If you give your signed application to another person or organization to submit on your behalf, be sure the person or organization can commit to timely submitting your application to the proper board of elections. |
| Applying to register or declining to register to vote will not affect the amount of assistance provided. If you believe that someone has interfered with your right to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with the State Board of Elections, P.O. Box 27255, Raleigh NC 27611-7255 or you may call the agency at 1-866-522-4723. | **Submit this form to:**<br><br>NC State Board of Elections<br>P.O. Box 27255<br>Raleigh, NC 27611-7255 |

# EXHIBIT 4

**JA417**



# N.C. HAVA ADMINISTRATIVE COMPLAINT FORM

## FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.

Any person who believes that there is a violation of any provision of Title III of the Help America Voting Act (HAVA), 52 U.S.C. §§ 21081–21102, may file a complaint. A complaint shall be in writing and notarized, signed and sworn by the complainant. You (the complainant) may use: (1) this form prescribed by the State Board of Elections; or (2) any other document providing the same information required in this Board-prescribed form, if signed and notarized.

A complaint shall be filed within 30 days after the occurrence of the actions or events that form the basis for the complaint, including the actions or events that form the basis for your (complainant's) belief that a violation is about to occur, or, if later, within 30 days after you knew or, with the exercise of reasonable diligence, should have known of those actions or events. The complaint is filed when it is either: delivered to 430 N. Salisbury St., Third Floor, Raleigh, N.C.; mailed to P.O. Box 27255, Raleigh, N.C. 27611; faxed to (919) 715-0135 to the attention of the General Counsel of the State Board of Elections; or scanned and emailed to legal@ncsbe.gov. The complainant shall also mail, fax, email, or otherwise deliver a copy of the complaint to each state or local election official or board whose actions are asserted to have been in violation of Title III of HAVA. More information on the procedures as to this complaint can be found on the website of the State Board of Elections at www.ncsbe.gov or you may call the State Board at (919) 814-0700.

### PLEASE PRINT AND ADD ADDITIONAL PAGES IF NEEDED

1. My name, address, phone numbers, and e-mails are (please print)

> Carol L. Snow
> 6281 Jenkins Rd; Morganton NC 28655
> (828) 448-4680
> cls28655@gmail.com

2. I am alleging a violation of Title III of HAVA as follows (mark all that apply):

- [ ] 52 U.S.C. § 21081 (Section 301) (Voting systems standards and accessibility)
- [ ] 52 U.S.C. § 21082 (Section 302) (Provisional voting and voting information)
- [x] 52 U.S.C. § 21083 (Section 303) (Voter registration and voter identification)

3. As to each violation alleged above, state in detail the circumstances of the alleged violation, election officials involved, and what occurred as a result of the alleged violation. (Please print)

> Please see attached. This amended complaint is my operative complaint.

NCSBE 2023.01                    **JA418**                    1

Dated _October 6_____, 20_23_.

_Carol S. Snow_
Signature of Person Complaining

STATE OF NORTH CAROLINA, COUNTY OF _Burke_

The forgoing complaint was sworn to as true and subscribed before me this day by

_Carol Snow_____.

My Commission Expires ___7-27-28___

_Maria Reep_____
Signature of Notary Public

_Maria Reep_____
Printed Name of Notary Public

Notary Public (Official Seal)

MARIA REEP
NOTARY
PUBLIC
BURKE COUNTY, N.C.



## N.C. HAVA ADMINISTRATIVE COMPLAINT FORM

**FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY
UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.**

I am alleging a violation of Title III of HAVA as follows (mark all that apply)

■ 52 U.S.C. § 21083 (Section 303) (Voter registration and voter identification)

3. As to each violation alleged above, state in detail the circumstances of the alleged violation, election officials involved, and what occurred as a result of the alleged violation. (Please print)

**Section 303(a)(5) of the Help America Vote Act, Public Law 107-252 enacted on 10/29/2002 (see page 46)**, reads as follows:

(5) VERIFICATION OF VOTER REGISTRATION INFORMATION.—

    (A) REQUIRING PROVISION OF CERTAIN INFORMATION BY APPLICANTS.—

    (i) IN GENERAL.— Except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes—

        (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or

        (II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

    (ii) SPECIAL RULE FOR APPLICANTS WITHOUT DRIVER'S LICENSE OR SOCIAL SECURITY NUMBER.— If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list.

However, it is not clearly indicated on the **NC Voter Registration Application Form** nor in the video entitled "***Register to Vote in North Carolina***" posted on YouTube on 8/17/2021 by the North Carolina State Board of Elections, that the applicant's qualifying identification of the applicant's driver's license number or last 4 digits of the applicant's social security number, are required if one or the other have been issued to the applicant.

**JA420**

Complainant: Carol L. Snow                                                          Page 1

***Register to Vote in North Carolina* video**

https://www.youtube.com/watch?v=ZvYUqlFgpw0

At the 1:47 mark, the narrator begins, "*Let's look at a voter registration application. The required fields on the application are in red. These are the eligibility requirements: your name, date of birth, residential address, mailing address, and your signature. Once you complete the application...*"

Notice there is no mention of the requirement for those who have been issued a driver's license to provide the number, or for those without a driver's license to provide the last 4 digits of their social security number, if they possess one.

**NC's Voter Registration Application**

https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf

The application indicates that (fields in red text are required), which to the reader would imply *only* the fields in red text are required. Further, these fields are also highlighted in red tint.

Note neither the fields for the NC Driver's License/NC DMV ID Number field nor Last 4 Digits of the Social Security Number are in red font, nor highlighted in red tint, which would imply that these fields are not required.

For those who choose to read the APPLICATION INSTRUCTIONS on the back page of the North Carolina Voter Registration Application, it states that the date of birth is required. However, it is not clear to the reader if the applicant is required to complete the NC Driver License or NC DMV ID Number and/or Last 4 digits of Social Security Number fields. The current instructions, as written, could be considered ambiguous to the applicant.

The following instructions would not be ambiguous: "If you have a NC driver license or non-operator's identification number, <u>you are required to</u> provide this number. If you do not have a NC driver license or ID card, <u>but you do have a social security number, you are required to</u> provide the last four digits of your social security number.

**Specific Instructions for Each Numbered Section of the Application:**

| | |
|---|---|
| **1** | Indicate whether you are qualified to vote or preregister to vote: (1) you must be a citizen of the United States; (2) you must be at least 18 years of age, or you will be 18 years of age by the next general election and you are voting in the primary, or you must be between the ages of 16 or 17 and desire to preregister to vote; (3) you must have resided in North Carolina and in the precinct in which you present to vote for at least 30 days prior to the election; (4) you have not been convicted of a felony, or if so, you have completed your sentence (including any probation, post-release supervision, or parole). |
| **2** | Provide your full legal name. If your name has changed, this form will be used to update your current voter registration. |
| **3** | You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application. |

Below is a NC Voter Registration Application that was received in Rowan County on 1/21/2020. Notice the application only states the Name and Date of Birth are required in this section.



**Compare this to the Federal Voter Registration Application**

https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf



## Voter Registration Application
Before completing this form, review the General, Application, and State specific instructions.

And its accompanying **Application Instructions** are clear. **Box 6 – ID Number**: <u>Federal law requires that states collect from each registrant an identification number.</u>

### State Instructions

**North Carolina**

Updated: 03-01-2006

**Box 6 — ID Number**
Federal law requires that states collect from each registrant an identification number. You must refer to your state's specific instructions for item 6 regarding information on what number is acceptable for your state. If you have neither a drivers license nor a social security number, please indicate this on the form and a number will be assigned to you by your state.

OMB Control No. 3265-0015

**Registration Deadline —**
Postmarked 25 days before the election or received in the elections office or designated voter registration agency site by 5:00 p.m. 25 days before the election.

**6. ID Number.** Provide your North Carolina driver's license number, or North Carolina Department of Motor Vehicles ID number. If you do not have a driver's license, then list the last four digits of your social security number.

**JA423**

According to data received on 8/23/2023 from Public Records Request #23-128, the NC voter rolls dated *9/30/2023 contained **217,436 Voters' Registration Records** and an additional **541 Voters' Registration Records** with an unknown or likely incorrect registration date (01/01/1900 and registered prior to 1909), for a total of 217,977 voter registration records, all with a status making the voters eligible to vote, but these records are missing **both** an NC Driver License or NC DMV ID Number **and** the last 4 digits of their Social Security Number.

These voters' registration dates are either after the required date to comply with the Help America Vote Act of 1/1/2004, or their registration dates are unknown.

https://ncsbe-nc.nextrequest.com/requests/23-128

**Requested Remedies**

1. Please revise all versions of the **NC Voter Registration Application** to use red colored text and red tinted background for all required personal identifying information, including the Driver License number if issued, or if no Driver License, the last 4 digits of their Social Security Number if issued.

2. Please revise the "**Register to Vote in North Carolina**" video posted on YouTube on 8/17/2021 by the North Carolina State Board of Elections to be consistent with the above changes. https://www.youtube.com/watch?v=ZvYUqlFgpw0

3. Please revise all versions of the **NC Voter Registration Application** to make it a requirement to "*Check if you do not have driver license or Social Security number*" when both numbers are not provided.

4. Old versions of the **NC Voter Registration Application** form will not be accepted.

5. Please make North Carolina compliant with Sec 303(a)(5)(A) of the Help America Vote Act of 2002, by obtaining this required identifying information, if possessed, from the 217,977 Registered voters who registered on or after 1/1/2004, or their registration date is unknown, but are missing this personal identifying information.

Thank you for your consideration.

**JA424**

# EXHIBIT 5

## NORTH CAROLINA VOTER REGISTRATION APPLICATION (fields in red text are required)

2023.04    **06w**

**1** Indicate whether you are qualified to vote or preregister to vote based on U.S. citizenship and age.

**Are you a citizen of the United States of America?**
IF YOU CHECKED "NO" IN RESPONSE TO THIS CITIZENSHIP QUESTION, DO NOT SUBMIT THIS FORM. YOU ARE NOT QUALIFIED TO VOTE

☐ Yes ☐ No

**Will you be at least 18 years of age on or before election day?**

☐ Yes ☐ No

**Are you at least 16 years of age and understand that you must be 18 years of age on or before election day to vote?**
IF YOU CHECKED "NO" IN RESPONSE TO BOTH OF THESE AGE QUESTIONS, DO NOT SUBMIT THIS FORM.
YOU ARE NOT QUALIFIED TO REGISTER OR PREREGISTER TO VOTE.

☐ Yes ☐ No

**2** Provide your full legal name.

Last Name

Suffix

First Name

Middle Name

**3** Provide your date of birth and identification information.

Date of Birth (MM/DD/YYYY)     /     /

State or Country of Birth

NC Driver License or NC DMV ID Number

Last 4 Digits of Social Security Number

☐ Check if you do not have a driver license or Social Security number.

State Voter Registration Number (Optional: To locate, check "Voter Lookup" at www.NCSBE.gov.)

**4** Provide your residential address - where you physically live.
*Do not enter a P.O. Box or a mail drop location.*

Address Number

Street Name and Type

Address Line 2 (e.g., apartment, lot or unit number)

City

State

Zip Code

County

Have you lived at this address for 30 or more days?
☐ Yes ☐ No

If "No", date moved?

**5** Provide a mailing address.

Do you receive mail at your residential
☐ Yes ☐ No
If "No", you are required to provide a mailing address.

Mailing Address Line 1

Mailing Address Line 2

Mailing Address Line 3

City

State

Zip Code

**No Physical Address?** If you do not have an address, use the space to the right to illustrate where you normally live or sleep. Write in the names of the nearest crossroads (or streets). Draw an **X** on the map to show where you live or usually sleep.

**NORTH** ⬆

IMPORTANT: You should also provide a valid mailing address above to permit the board of elections to send you a voter card.

**6** Provide your demographic information (optional).

Gender  ☐ Male  ☐ Female

Ethnicity  ☐ Not Hispanic/Latino  ☐ Hispanic/Latino

Race
☐ African American/Black
☐ American Indian/Alaska Native
☐ Asian  ☐ Multiracial
☐ Native Hawaiian/Pacific Islander
☐ White  ☐ Other

**7** Provide your choice for political party affiliation.

☐ Democratic Party  ☐ Unaffiliated
☐ Green Party
☐ Libertarian Party
☐ Republican Party

☐ Other _____

If you select a party that is not recognized in North Carolina, you will be registered as *Unaffiliated*.

**8** Complete if you are currently registered to vote in another NC county or in another state.
*(This information will be used to cancel your previous voter registration in the other county or state.)*

First Name Used in Last Registration

Middle Name Used in Last Registration

Last Name Used in Last Registration

Suffix

Address Where You Were Last Registered

City/State/Zip Code of Last Registration

County of Last Registration

**9** Provide your contact information (optional).
*(This information is helpful if we need to contact you concerning your voter registration. Your telephone number may be disclosed as a public record.)*

Area Code

Phone Number

Email Address

Would you like to be contacted to be a poll worker?
☐ Yes ☐ No

**10** Sign below to attest to your qualifications to vote.
**FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.**

I attest, under penalty of perjury, that in addition to having read and understood the contents of this form, that: (1) I am a United States citizen, as indicated above; (2) I am at least 18 years of age, or will be by the date of the general election; or I am at least 16 years old and understand that I must be at least 18 years old on the day of the general election to vote; I shall have been a resident of North Carolina, this county, and precinct for 30 days before the date of the election in which I intend to vote; (3) I will not vote in any other county or state after submission of this form and if I am registered elsewhere, I am canceling that registration at this time; and (4) I have not been convicted of a felony, or if so, have completed my sentence (including any probation, post-release supervision, or parole).

**X** _____  **JA426**  _____

Signature Required

Date

## APPLICATION INSTRUCTIONS

*Use this application to: (1) register to vote; (2) preregister to vote if between the ages of 16 and 17; (3) change party affiliation or unaffiliated status; (4) report a change of address within a county; or (5) report a name change.*

### Specific Instructions for Each Numbered Section of the Application:

| | |
|---|---|
| 1 | Indicate whether you are qualified to vote or preregister to vote: (1) you must be a citizen of the United States; (2) you must be at least 18 years of age, or you will be 18 years of age by the next general election and you are voting in the primary, or you must be between the ages of 16 or 17 and desire to preregister to vote; (3) you must have resided in North Carolina and in the precinct in which you present to vote for at least 30 days prior to the election; (4) you have not been convicted of a felony, or if so, you have completed your sentence (including any probation, post-release supervision, or parole). |
| 2 | Provide your full legal name. If your name has changed, this form will be used to update your current voter registration. |
| 3 | You are required to provide your date of birth. If you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number. If you have neither a NC driver license, NC DMV ID card or a social security number and you are registering to vote for the first time in North Carolina, attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address to this application. |
| 4 | Provide the address of your residence (where you physically live) as of the date of your application. In this section, do not list a post office address or a location where you *only* receive mail. If you have moved to this residence within the past 30 days, provide the date of your move. If you do not have a traditional address, draw a picture in the space provided on this form of your usual sleeping location. Be descriptive and note any nearby streets or physical buildings. |
| 5 | If you do not receive mail at your residential address, you must provide a mailing address. |
| 6 | This section asks for your gender, race, and ethnicity. You are not required to provide this information. |
| 7 | This section asks that you designate how you would like to be affiliated. You may choose to affiliate with any recognized political party in North Carolina or you may opt to be registered as *Unaffiliated*. If you are applying for new registration in the county and leave the party affiliation section blank, you will be registered as *Unaffiliated.* |
| 8 | If you are currently registered in another North Carolina county or another state, please provide your name and previous address used on that prior registration. This information will be used to cancel your registration in the other county or state. |
| 9 | At your option, provide your phone number and email address. |
| 10 | You must sign this form. Only the person applying for registration is eligible to sign (or place your mark on) this form. If you are applying for new registration in your county of residence, you must mail your original signature on this form. |

**National Voter Registration Act Statement**: If you are submitting this application to an NVRA agency or the North Carolina Division of Motor Vehicles, the location or office where you submitted the application will remain confidential and will be used only for voter registration purposes. Public assistance agencies, disability services agencies, the North Carolina Division of Motor Vehicles, and unemployment services agencies must offer you the opportunity to register to vote at the initial application for service of assistance and during any recertification, renewal or change of address. If you decline to register to vote, the fact that you so declined will also remain confidential. If you would like help completing the voter registration application, the agency will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private and return it to the agency that provided you the form or you may mail or deliver the form to your county board of elections office.

Applying to register or declining to register to vote will not affect the amount of assistance provided. If you believe that someone has interfered with your right to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with the NC State Board of Elections, P.O. Box 27255, Raleigh NC 27611-7255 or you may call the agency at 1-866-522-4723.

**Submitting Your Form:** You must mail or deliver this application in-person with your original signature if you are registering to vote for the first time in your county of residence. If you are changing your name, address or party affiliation within your current county of registration, in addition to mail, you may also fax or email a scanned image of your signed application. If you give your signed application to another person or organization to submit on your behalf, be sure the person or organization can commit to timely submitting your application to the proper board of elections.

Submit this form to:
**NC State Board of Elections**
**P.O. Box 27255**
**Raleigh, NC 27611-7255**
**or to your County Board of Elections Office**

## JA427

# MAILING ADDRESSES OF COUNTY BOARD OFFICES

**ALAMANCE**
115 SOUTH MAPLE ST
GRAHAM, NC 27253
☎ (336) 570-6755

**ALEXANDER**
PO BOX 326
TAYLORSVILLE, NC 28681
☎ (828) 632-2990

**ALLEGHANY**
PO BOX 65
SPARTA, NC 28675
☎ (336) 372-4557

**ANSON**
PO BOX 768
WADESBORO, NC 28170
☎ (704) 994-3223

**ASHE**
150 GOVERNMENT CIR, STE 2100
JEFFERSON, NC 28640
☎ (336) 846-5570

**AVERY**
PO BOX 145
NEWLAND, NC 28657
☎ (828) 733-8282

**BEAUFORT**
PO BOX 1016
WASHINGTON, NC 27889
☎ (252) 946-2321

**BERTIE**
PO BOX 312
WINDSOR, NC 27983
☎ (252) 794-5306

**BLADEN**
PO BOX 512
ELIZABETHTOWN, NC 28337
☎ (910) 862-6951

**BRUNSWICK**
PO BOX 2
BOLIVIA, NC 28422
☎ (910) 253-2620

**BUNCOMBE**
PO BOX 7468
ASHEVILLE, NC 28802
☎ (828) 250-4200

**BURKE**
PO BOX 798
MORGANTON, NC 28680-0798
☎ (828) 764-9010

**CABARRUS**
PO BOX 1315
CONCORD, NC 28026-1315
☎ (704) 920-2860

**CALDWELL**
PO BOX 564
LENOIR, NC 28645
☎ (828) 757-1326

**CAMDEN**
PO BOX 206
CAMDEN, NC 27921-0206
☎ (252) 338-5530

**CARTERET**
1702 LIVE OAK ST, STE 200
BEAUFORT, NC 28516-1898
☎ (252) 728-8460

**CASWELL**
PO BOX 698
YANCEYVILLE, NC 27379
☎ (336) 694-4010

**CATAWBA**
PO BOX 132
NEWTON, NC 28658-0389
☎ (828) 464-2424

**CHATHAM**
PO BOX 111
PITTSBORO, NC 27312
☎ (919) 545-8500

**CHEROKEE**
40 PEACHTREE ST
MURPHY, NC 28906
☎ (828) 837-6670

**CHOWAN**
PO BOX 133
EDENTON, NC 27932
☎ (252) 482-4010

**CLAY**
54 CHURCH ST
HAYESVILLE, NC 28904
☎ (828) 389-6812

**CLEVELAND**
PO BOX 1299
SHELBY, NC 281511299
☎ (704) 484-4858

**COLUMBUS**
PO BOX 37
WHITEVILLE, NC 28472
☎ (910) 640-6609

**CRAVEN**
406 CRAVEN ST
☎ (252) 636-6610

**CUMBERLAND**
227 FOUNTAINHEAD LN, STE 101
FAYETTEVILLE, NC 28301
☎ (910) 678-7733

**CURRITUCK**
PO BOX 177
CURRITUCK, NC 27929
☎ (252) 232-2525

**DARE**
PO BOX 1000
MANTEO, NC 27954
☎ (252) 475-5631

**DAVIDSON**
PO BOX 1084
LEXINGTON, NC 27293-1084
☎ (336) 242-2190

**DAVIE**
161 POPLAR ST, STE 102
MOCKSVILLE, NC 27028-2225
☎ (336) 753-6072

**DUPLIN**
PO BOX 975
KENANSVILLE, NC 28349
☎ (910) 296-2170

**DURHAM**
PO BOX 868
DURHAM, NC 27702
☎ (919) 560-0700

**EDGECOMBE**
PO BOX 10
TARBORO, NC 27886
☎ (252) 641-7852

**FORSYTH**
201 N. CHESTNUT ST
WINSTON SALEM, NC 27101-4120
☎ (336) 703-2800

**FRANKLIN**
PO BOX 180
LOUISBURG, NC 27549
☎ (919) 496-3898

**GASTON**
PO BOX 1396
GASTONIA, NC 28053
☎ (704) 852-6005

**GATES**
PO BOX 621
GATESVILLE, NC 27938
☎ (252) 357-1780

**GRAHAM**
PO BOX 1239
ROBBINSVILLE, NC 28771
☎ (828) 479-7969

**GRANVILLE**
PO BOX 83
OXFORD, NC 27565-0083
☎ (919) 693-2515

**GREENE**
110 SE FIRST ST
SNOW HILL, NC 28580
☎ (252) 747-5921

**GUILFORD**
PO BOX 3427
GREENSBORO, NC 27402
☎ (336) 641-3836

**HALIFAX**
PO BOX 101
HALIFAX, NC 27839
☎ (252) 583-4391

**HARNETT**
PO BOX 356
LILLINGTON, NC 27546
☎ (910) 893-7553

**HAYWOOD**
63 ELMWOOD WAY, STE A
WAYNESVILLE, NC 28786
☎ (828) 452-6633

**HENDERSON**
PO BOX 2090
HENDERSONVILLE, NC 28793
☎ (828) 697-4970

**HERTFORD**
PO BOX 355
AHOSKIE, NC 27910
☎ (252) 358-7812

**HOKE**
PO BOX 1565
RAEFORD, NC 28376-1565
☎ (910) 875-8751

**HYDE**
PO BOX 152
SWAN QUARTER, NC 27885
☎ (252) 926-4194

**IREDELL**
203 STOCKTON ST
STATESVILLE, NC 28677
☎ (704) 878-3140

**JACKSON**
876 SKYLAND DR, STE 1
SYLVA, NC 28779
☎ (828) 586-7538

**JOHNSTON**
PO BOX 1172
SMITHFIELD, NC 27577
☎ (919) 989-5095

**JONES**
367-B HWY 58-S
TRENTON, NC 28585
☎ (252) 448-3921

**LEE**
PO BOX 1443
SANFORD, NC 27331
☎ (919) 718-4646

**LENOIR**
PO BOX 3503
KINSTON, NC 28502-3503
☎ (252) 523-0636

**LINCOLN**
451 SALEM CHURCH RD LINCOLNTON,
NC 28092
☎ (704) 736-8480

**MACON**
5 WEST MAIN ST, FL 1
FRANKLIN, NC 28734
☎ (828) 349-2034

**MADISON**
PO BOX 142
MARSHALL, NC 28753
☎ (828) 649-3731

**MARTIN**
PO BOX 801
WILLIAMSTON, NC 27892
☎ (252) 789-4317

**MCDOWELL**
PO BOX 1509
MARION, NC 28752
☎ (828) 659-0834

**MECKLENBURG**
PO BOX 31788
CHARLOTTE, NC 28231-1788
☎ (704) 336-2133

**MITCHELL**
11 N MITCHELL AVE, RM 108
BAKERSVILLE, NC 28705
☎ (828) 688-3101

**MONTGOMERY**
PO BOX 607
TROY, NC 27371
☎ (910) 572-2024

**MOORE**
POST OFFICE BOX 787
CARTHAGE, NC 28327
☎ (910) 947-3868

**NASH**
PO BOX 305
NASHVILLE, NC 27856
☎ (252) 459-1350

**NEW HANOVER**
1241A MILITARY CUTOFF ROAD
WILMINGTON, NC 28405
☎ (910) 798-7330

**NORTHAMPTON**
PO BOX 603
JACKSON, NC 27845
☎ (252) 534-5681

**ONSLOW**
246 GEORGETOWN RD JACKSONVILLE,
NC 28540
☎ (910) 455-4484

**ORANGE**
PO BOX 220
HILLSBOROUGH, NC 27278
☎ (919) 245-2350

**PAMLICO**
PO BOX 464
BAYBORO, NC 28515
☎ (252) 745-4821

**PASQUOTANK**
PO BOX 1797
ELIZABETH CITY, NC 27906
☎ (252) 335-1739

**PENDER**
PO BOX 1232
BURGAW, NC 28425
☎ (910) 259-1220

**PERQUIMANS**
PO BOX 336
HERTFORD, NC 27944
☎ (252) 426-5598

**PERSON**
331 SOUTH MORGAN ST
ROXBORO, NC 27573-5223
☎ (336) 597-1727

**PITT**
PO BOX 56
GREENVILLE, NC 27835-0056
☎ (252) 902-3300

**POLK**
PO BOX 253
COLUMBUS, NC 28722
☎ (828) 894-8181

**RANDOLPH**
1457 N. FAYETTEVILLE ST
ASHEBORO, NC 27203
☎ (336) 318-6900

**RICHMOND**
PO BOX 1843
ROCKINGHAM, NC 28380
☎ (910) 997-8253

**ROBESON**
PO BOX 2159
LUMBERTON, NC 28359
☎ (910) 671-3080

**ROCKINGHAM**
PO BOX 22
WENTWORTH, NC 27375
☎ (336) 342-8107

**ROWAN**
1935 JAKE ALEXANDER BLVD W, STE D10
SALISBURY, NC 28147
☎ (704) 216-8140

**RUTHERFORD**
PO BOX 927
RUTHERFORDTON, NC 28139
☎ (828) 287-6030

**SAMPSON**
120 COUNTY COMPLEX RD, STE 110
CLINTON, NC 28328
☎ (910) 592-5796

**SCOTLAND**
231 EAST CRONLY ST, STE 305
LAURINBURG, NC 28352
☎ (910) 277-2595

**STANLY**
PO BOX 1309
ALBEMARLE, NC 28002
☎ (704) 986-3647

**STOKES**
PO BOX 34
DANBURY, NC 27016
☎ (336) 593-2409

**SURRY**
PO BOX 372
DOBSON, NC 27017
☎ (336) 401-8225

**SWAIN**
PO BOX 133
BRYSON CITY, NC 28713
☎ (828) 488-6177

**TRANSYLVANIA**
PO BOX 868
BREVARD, NC 28712
☎ (828) 884-3114

**TYRRELL**
PO BOX 449
COLUMBIA, NC 27925
☎ (252) 796-0775

**UNION**
PO BOX 1106
MONROE, NC 28111-1106
☎ (704) 283-3809

**VANCE**
300 S. GARNETT ST, STE C
HENDERSON, NC 27536
☎ (252) 492-3730

**WAKE**
PO BOX 695
RALEIGH, NC 27602-0695
☎ (919) 404-4040

**WARREN**
PO BOX 803
WARRENTON, NC 27589
☎ (252) 257-2114

**WASHINGTON**
PO BOX 1007
PLYMOUTH, NC 27962-1007
☎ (252) 793-6017

**WATAUGA**
PO BOX 528
BOONE, NC 28607
☎ (828) 265-8061

**WAYNE**
309 E. CHESTNUT ST
GOLDSBORO, NC 27530
☎ (919) 731-1411

**WILKES**
110 NORTH ST, RM 315
WILKESBORO, NC 28697
☎ (336) 651-7339

**WILSON**
PO BOX 2121
WILSON, NC 27894-2121
☎ (252) 399-2836

**YADKIN**
PO BOX 877
YADKINVILLE, NC 27055
☎ (336) 849-7907

**YANCEY**
PO BOX 763
BURNSVILLE, NC 28714
☎ (828) 682-3950

**JA428**

# EXHIBIT 6

**JA429**



**STATE OF NORTH CAROLINA**
**OFFICE OF THE GOVERNOR**

**ROY COOPER**
**GOVERNOR**

September 27, 2024

The Honorable Joseph R. Biden
President of the United States
The White House
1600 Pennsylvania Ave, N.W.
Washington, DC

Through:     Mr. Robert D. Samaan, Regional Administrator
              FEMA Region IV
              3003 Chamblee Tucker Road
              Atlanta, Georgia 30341

Dear Mr. President:

      Under the provisions of Section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207 (Stafford Act), and implemented by 44 C.F.R. § 206.36, I request that you declare an expedited major disaster for the State of North Carolina due to the impacts of Hurricane Helene (Helene). Impacts to the State started on September 26, 2024, and are ongoing. The significant amount of damage and other impacts associated with Helene exceed the local and state capacity to recover.

      Given the "unusual severity and magnitude" of the damages caused by Helene, I am requesting the expedited processing of this request pursuant to 44 C.F.R. § 206.36(d). This request is timely under 44 C.F.R. § 206.36(a).

      I am requesting that you declare an Expedited Major Disaster Declaration for the following 38 North Carolina counties and one federally recognized tribe for all categories of Public Assistance (PA), including direct Federal Assistance, and Individual Assistance (IA): Alexander, Alleghany, Ashe, Avery, Buncombe, Burke, Cabarrus, Caldwell, Catawba, Cherokee, Clay, Cleveland, Eastern Band of Cherokee Indians, Forsyth, Gaston, Graham, Haywood, Henderson, Iredell, Jackson, Lee, Lincoln, Macon, Madison, McDowell, Mecklenburg, Mitchell, Nash, Polk, Rowan, Rutherford, Stanly, Surry, Swain, Transylvania, Union, Yadkin, Yancey, Watauga, and Wilkes, and Hazard Mitigation Grant Program (HMPG) assistance statewide.

**JA430**

Hurricane Helene entered the Florida panhandle as a Category 4 hurricane and moved northward impacting North Carolina with significant, damaging, and life-threatening flash flooding across the western portions of the North Carolina mountains. Widespread, catastrophic flash flooding is being experienced across the Blue Ridge Escarpment. Rainfall amounts through midday, Friday, September 27, 2024, have reached up to 20 inches in some locations creating power outages, major highway closures, major transportation stoppages, and the need for rescues and evacuations. Numerous landslides, with large damaging debris flows and slope failures, are occurring along the Blue Ridge Escarpment and in western North Carolina. Tornado watches are in effect for Eastern and Central North Carolina. Wind gusts reaching 35 mph are ongoing and isolated tornadoes have been reported throughout the State. Two deaths have been confirmed in North Carolina due to weather-related impacts.

Numerous river gauges have rapidly climbed above flood stage, with seven rivers (French Broad, Swannanoa, Pigeon, Broad, Catawba, South Fork Catawba, and Yadkin) at major flood stage and eighteen at moderate flood stage. Tropical Storm Helene has caused widespread damage including downed trees and flooding that blocked roadways, damaged residential structures and businesses, and caused at least 900,000 power outages and climbing. The investor-owner, municipal, and co-opt utilities have reported significant damage to the electric infrastructure in western and portions of central North Carolina and assessments are ongoing. Communication services have been degraded or are completely unavailable.

**Actions under State Law and Implementation of the State Operations Plan:**

Based on the National Weather Service Storm Prediction Center and the National Hurricane Center forecast on September 24, 2024, the Division of North Carolina Emergency Management (NCEM) placed the State Emergency Operations Center (SEOC) on Enhanced Watch. NCEM created an NCSPARTA (WebEOC) event on September 24, 2024. In response to the statewide situation, pursuant to 44 C.F.R. § 206.36, appropriate actions were taken under state law, and I declared a state of emergency for all 100 counties and the Eastern Band of Cherokee Indians on September 25, 2024, at 8:30 a.m. (See Executive Order No. 315). The incident period for Helene is from the date and time of the state of emergency and is ongoing and continuing. As part of that declaration, I directed the execution of the state emergency operations plan, in accordance with Section 401(a) of the Stafford Act. The requested counties for that declaration request were for all 100 counties and the Eastern Band of the Cherokee Indians.

The State received an Emergency Declaration under Section 501 of the Stafford Act on September 26, 2024, as FEMA declaration 3617-EM-NC.

**JA431**

Pursuant to 44 C.F.R. § 206.36, I have determined that this incident is of such severity and magnitude that effective response is beyond the capabilities of the State and affected local governments and that supplementary Federal assistance is necessary to save lives and to protect property, public health, and safety, or to lessen or avert the threat of a disaster.

I am requesting direct federal assistance for work and services to save lives and protect property such as generators, food, water, shelter supplies, evacuation assistance, non-congregate and congregate shelter assistance, medical assistance, swift water rescue teams, urban search and rescue (USAR) teams, technical assistance, and other response measures.

I am requesting Public Assistance in all categories of work, including direct Federal assistance, for the requested counties.

## Preliminary Damage Assessment Findings

Preliminary Damage Assessments are currently not possible due to ongoing conditions. Two deaths have been confirmed. The affected region has experienced landslides, fallen debris, more than 114 road closures, assisted living homes damaged and evacuated, over 900,000 homes and businesses with power outages, school closures, airport and train transportation stoppages, at least 7 major rivers at moderate to major flood risk levels, 25 gauges currently at moderate to major flooding, and hospitals on generator power, along with other damages impacting the health and safety of the public.

## Nature and amount of State and local resources that have been or will be used to alleviate the conditions of this incident (See Also FEMA Form 010-0-13)

## Public Assistance

NCEM staff, including the human services branch, area coordinators, emergency services, multi-hazard field planners, and Individual and Public Assistance staff are currently working with the affected areas and local governments and volunteers to assist in coordinating response and recovery efforts. The State has undertaken the following actions to respond to Helene, as of 5:00 p.m. on September 27, 2024.

- The State Emergency Response Team (SERT) was activated at 7:00 a.m. on September 25, 2024.

**JA432**

- On September 25, 2024, I declared a state of emergency at 8:00 a.m. in response to Helene. See Executive Order 315 attached.
- I activated the State Emergency Operations Plan on September 25, 2024.
- Local emergency operations centers are activated or partially activated.
- Local states of emergency have been declared for the following counties and their municipalities: Alexander, Ashe, Avery, Buncombe, Burke, Caldwell, Catawba, Cherokee, Clay, Graham, Haywood, Henderson, Jackson, Lincoln, Macon, Madison, McDowell, Nash, New Hanover, Polk, Rutherford, Surry, Swain, Transylvania, Watauga, Wilkes, Wilson, Yadkin, and Yancey.
- Buncombe, McDowell, Mecklenburg, and Transylvania have issued mandatory evacuation orders due to flooding. Alexander, Burke, Haywood, Rutherford, and Wilkes Counties issued have issued voluntary evacuation orders.
- Shelters have been opened in Alexander, Allegheny, Avery, Buncombe, Clay, Haywood, Henderson, Madison, McDowell, Polk, Lincoln, Rutherford, Watauga, and Wilkes Counties.
- Rescues have been performed in Haywood, Henderson, McDowell, and Sampson Counties.
- Swift water rescues have occurred in multiple counties.
- The North Carolina National Guard has activated 175 soldiers/airmen, five (5) armories, maintenance and fuel support teams, cyber security support, and command/control personnel. The NCNG may also activate additional vehicles and one more armory.
- We have activated seventeen (17) swift water rescue teams and are evaluating additional teams with a current EMAC broadcast, as well as federal support.
- Three EOC Overhead Team and staffing for local EOC is deployed.
- We have seven communications specialists deployed and have deployed several communications equipment caches.
- We activated an additional fifteen (15) swift water rescue teams deployed through the Emergency Management Assistance Compact.
- The SERT Emergency Services Functional Branch is implementing a State Medical Support Shelter plan to support local evacuations of medical facilities and special needs populations.
- The SERT Human Services Branch, along with our county partners are actively engaged in deploying mass feeding, congregate sheltering, and staffing and identifying shelter support teams including for special needs sheltering and the general population.
- One feeding site has been opened in Arden, North Carolina in Buncombe County. A State Shelter has been opened in the Western North Carolina Agricultural Center.
- The SERT Infrastructure Branch continues to survey evacuation routes for fuel issues and construction sites that may impede evacuations. They are also providing situational awareness on Duke Energy's, ElectriCities, and Electric Cooperatives plans for responding to power outages. Duke Energy has surged approximately 600 additional personnel to the region to support outage response. We are supporting our critical infrastructure and key resources partners at local water

**JA433**

treatment plants, and sewer treatment plants, and communicating with actions during the incident.
- The SERT Logistics Section has brought in additional purchasing agents to review our contracts for buses to support evacuations and shelters. The section is also fulfilling commodities requests for meals ready to eat and water.
- The SERT Hazard Mitigation Branch is conducting modeling based on MEOWS and monitoring the riverine flood gages to assist with evacuation decisions and timing thereof.
- We will support the deployment of CAMETS (Companion Animal Mobile Equipment Trailers) to host shelter operations and Mass Care Support Trailers to assist with sheltering operations.

**Individual Assistance**

**COUNTY DEMOGRAPHICS**

The State of North Carolina utilizes ARGIS tools to track demographic information. This data is an average of the previous two years of data and was last evaluated in May 2022. In September 2023, the North Carolina Budget and Tax Center reported that 12.8% of North Carolinians were in poverty. The table below shows the demographics of the counties affected by this Disaster thus far. Nearly three-fourths of the counties in the affected area fall below the State poverty level (24 out of 38). An additional four counties affected are within one (1) point of the federal poverty guidelines. Twenty-eight (28) out of thirty-eight (38) counties affected are within one percentage point or below the poverty percentage for the State. This will make it difficult or impossible for families affected by this storm to recover without Federal assistance.

Additionally, reports of homes that have been severely damaged as a result of Helene will drive the State's request for all forms of Individual Assistance including temporary housing.

**JA434**

September 27, 2024
Page 6

Below are the indicators affecting resilience for the affected Counties:

| County | % pop. for whom poverty status is determined | % pop. already receiving governmental assistance | Pre-disaster unemployment rate | % pop. 65 years and older | % pop. 18 years and younger | % pop. With a disability | % pop. who speak a language other than English |
|---|---|---|---|---|---|---|---|
| Alexander | 12.2% | 9.1% | 3.2% | 20.4% | 19.7% | 17.1% | 5.9% |
| Alleghany | 19.5% | 11.6% | 4.5% | 28.0% | 16.3% | 17.4% | 7.4% |
| Ashe | 14.1% | 12.4% | 3.0% | 26.6% | 16.9% | 17.9% | 5.0% |
| Avery | 11.2% | 9.7% | 3.0% | 22.7% | 13.9% | 19.0% | 5.1% |
| Buncombe | 11.2% | 9.2% | 2.7% | 20.6% | 18.0% | 13.6% | 8.4% |
| Burke | 17.0% | 14.9% | 3.3% | 21.0% | 18.2% | 20.4% | 9.6% |
| Cabarrus | 8.4% | 10.0% | 3.2% | 13.3% | 25.2% | 10.7% | 13.8% |
| Caldwell | 13.3% | 12.4% | 3.4% | 20.7% | 19.9% | 18.8% | 5.7% |
| Catawba | 13.0% | 13.1% | 3.3% | 18.3% | 21.8% | 14.0% | 13.3% |
| Cherokee | 16.7% | 10.5% | 3.9% | 30.7% | 16.1% | 18.1% | 2.9% |
| Clay | 13.5% | 11.4% | 3.7% | 31.9% | 16.5% | 16.3% | 4.3% |
| Cleveland | 18.4% | 19.8% | 3.5% | 18.7% | 22.1% | 16.2% | 4.5% |
| Forsyth | 15.2% | 13.5% | 3.5% | 16.4% | 22.7% | 12.3% | 15.0% |
| Gaston | 12.4% | 15.7% | 3.4% | 16.4% | 22.3% | 14.7% | 8.5% |
| Graham | 11.3% | 13.0% | 4.4% | 23.6% | 20.3% | 19.6% | 5.7% |
| Haywood | 12.1% | 11.8% | 3.0% | 25.1% | 17.9% | 17.2% | 3.7% |
| Henderson | 11.4% | 8.8% | 2.9% | 26.1% | 18.6% | 14.8% | 10.3% |
| Iredell | 9.4% | 8.0% | 3.2% | 16.3% | 22.5% | 11.8% | 10.1% |
| Jackson | 19.3% | 10.6% | 3.6% | 20.4% | 16.6% | 13.2% | 8.1% |
| Lee | 16.0% | 16.2% | 4.0% | 16.8% | 23.8% | 17.4% | 18.6% |
| Lincoln | 9.3% | 11.1% | 3.0% | 18.6% | 20.8% | 15.2% | 7.8% |
| Macon | 15.4% | 10.4% | 3.2% | 28.8% | 17.8% | 16.9% | 7.1% |
| Madison | 12.5% | 12.6% | 3.2% | 22.9% | 17.6% | 18.5% | 1.3% |
| McDowell | 14.9% | 17.6% | 3.2% | 20.6% | 19.6% | 19.1% | 7.8% |
| Mecklenburg | 10.5% | 9.0% | 3.4% | 11.6% | 23.0% | 8.1% | 20.5% |
| Mitchell | 13.4% | 14.8% | 3.6% | 25.1% | 18.2% | 18.6% | 5.2% |
| Nash | 14.5% | 17.4% | 4.6% | 18.8% | 21.9% | 15.1% | 7.5% |
| Polk | 11.0% | 9.1% | 3.3% | 31.7% | 15.7% | 18.1% | 7.0% |
| Rowan | 16.4% | 16.2% | 3.4% | 17.7% | 22.0% | 15.5% | 9.7% |
| Rutherford | 18.4% | 19.5% | 4.6% | 21.7% | 20.2% | 21.2% | 5.1% |
| Stanly | 13.8% | 13.9% | 3.0% | 18.9% | 21.5% | 17.1% | 6.5% |
| Surry | 17.9% | 18.1% | 3.2% | 20.6% | 21.0% | 19.0% | 10.5% |
| Swain | 19.8% | 14.8% | 2.9% | 19.2% | 22.6% | 17.9% | 7.4% |
| Transylvania | 13.4% | 11.0% | 3.2% | 31.0% | 15.5% | 14.9% | 2.6% |
| Union | 6.8% | 7.9% | 3.0% | 13.1% | 26.0% | 9.2% | 15.6% |
| Watauga | 24.9% | 7.1% | 3.0% | 16.2% | 12.1% | 11.1% | 5.1% |
| Wilkes | 17.1% | 15.9% | 3.7% | 22.3% | 20.0% | 19.0% | 6.8% |
| Yadkin | 13.8% | 12.8% | 3.1% | 20.6% | 20.6% | 15.6% | 9.8% |
| Yancey | 15.3% | 12.6% | 3.1% | 26.2% | 18.5% | 18.4% | 4.9% |

Disaster History

The State of North Carolina has a strong Emergency Management Division with both an Individual and Public Assistance recovery program. However, in the last two months, the state and local emergency management teams have had to respond to and continue to address impacts from a federally declared emergency event from Tropical Storm Debby, and last week's significant rainfall from Potential Tropical Cyclone Eight. Furthermore, in the last 60 months, state and local emergency management agencies have responded to the unprecedented COVID-19 global pandemic, with nine federally declared major disaster declarations to wit: Tropical Storm Fred in August 2021, Tropical Storm Eta in November 2020, Hurricane Isaias in July 2020-August 2020, the COVID-19

JA435

pandemic in March 2020; severe storms, tornadoes and flooding in February 2020; and Hurricane Dorian in September 2019. I have declared eleven state disaster declarations in the last two years, the most recent in July 2024. The damages for those events are far in the millions, if not billions of dollars of direct State appropriations or cost share for the federally declared events.

I have determined that this incident is of such unusual severity and magnitude that effective recovery is beyond the capabilities of the State and affected local governments and that supplementary Federal assistance is necessary. The State has expended an extraordinary amount of money on Stafford Act and non-Stafford Act disasters in the previous five years, as well as the current fiscal year. With the recent impacts of Tropical Storm Debby, Potential Tropical Cyclone Eight, and now Helene, there are many impacts that will need to be addressed. Therefore, I am respectfully requesting you issue a Major Disaster Declaration for Individual Assistance, including the Individual and Households Program (IHP), the Small Business Administration's Disaster Assistance Loans, Crisis Counseling, Disaster Legal Services, Disaster Unemployment Assistance, Serious Needs Assistance, Displacement Assistance, Transitional Sheltering Assistance, Other Needs Assistance, Disaster Case Management,  the Disaster Supplement Nutritional Assistance Program for the requested counties. I am requesting Public Assistance category A (debris removal), category B (emergency protective measures), and C-G (Permanent Work) for the requested counties and HMPG assistance statewide.

I certify that for this major disaster, the State and local governments will assume all non-Federal shares of costs required by the Stafford Act.

I have designated William C. Ray as the State Coordinating Officer for this request. He will work with the Federal Emergency Management Agency and may provide further information or justification on my behalf.

I appreciate your support and recognition of the State's need for Federal support in its response to this Disaster.

Sincerely,

Roy Cooper

RAC/wmp/swh

Enclosures

FEMA Form 010-0-13

**JA436**

# EXHIBIT 7

**JA437**

SEPTEMBER 28, 2024

# President Joseph R. Biden, Jr. Approves North Carolina Disaster Declaration

Today, President Joseph R. Biden, Jr. declared that a major disaster exists in the State of North Carolina and ordered Federal aid to supplement State, tribal, and local recovery efforts in the areas affected by Tropical Storm Helene beginning on September 25, 2024, and continuing.

The President's action makes Federal funding available to affected individuals in Alexander, Alleghany, Ashe, Avery, Buncombe, Burke, Caldwell, Catawba, Clay, Cleveland, Gaston, Haywood, Henderson, Jackson, Lincoln, Macon, Madison, McDowell, Mitchell, Polk, Rutherford, Transylvania, Watauga, Wilkes, and Yancey Counties and the Eastern Band of Cherokee Indians.

Assistance can include grants for temporary housing and home repairs, low-cost loans to cover uninsured property losses, and other programs to help individuals and business owners recover from the effects of the disaster.

Federal funding also is available to State, tribal, and eligible local governments and certain private nonprofit organizations on a cost-sharing basis for emergency work in Alexander, Alleghany, Ashe, Avery, Buncombe, Burke, Caldwell, Catawba, Clay, Cleveland, Gaston, Haywood, Henderson, Jackson, Lincoln, Macon, Madison, McDowell, Mitchell, Polk, Rutherford, Transylvania, Watauga, Wilkes, and Yancey Counties and the Eastern Band of Cherokee Indians.

Finally, Federal funding is available on a cost-sharing basis for hazard mitigation measures statewide.

Mr. Thomas J. McCool of the Federal Emergency Management Agency (FEMA) has been appointed to coordinate Federal recovery operations in the affected areas.

**JA438**

Damage assessments are continuing in other areas, and more counties and additional forms of assistance may be designated after the assessments are fully completed.

Residents and business owners who sustained losses in the designated areas can begin applying for assistance at www.DisasterAssistance.gov, or by calling 800-621-FEMA (3362), or by using the FEMA App. Anyone using a relay service, such as video relay service (VRS), captioned telephone service or others, can give FEMA the number for that service.

FOR FURTHER INFORMATION MEDIA SHOULD CONTACT THE FEMA NEWS DESK AT (202) 646-3272 OR FEMA-NEWS-DESK@FEMA.DHS.GOV.

### 

**JA439**

FILED
05-03-2024
CLERK OF WISCONSIN
SUPREME COURT

No. 2024AP164

# IN THE
# WISCONSIN SUPREME COURT

———————

PRIORITIES USA,
 WISCONSIN ALLIANCE FOR RETIRED AMERICANS, AND
 WILLIAM FRANKS, JR.,

*Plaintiffs-Appellants,*

GOVERNOR TONY EVERS,

*Intervenor-Appellant,*

v.

WISCONSIN ELECTIONS COMMISSION,

*Defendant-Respondent,*

WISCONSIN STATE LEGISLATURE,

*Intervenor-Respondent.*

———————

## NON-PARTY BRIEF OF THE REPUBLICAN NATIONAL COMMITTEE, THE REPUBLICAN PARTY OF WISCONSIN, AND RITE PAC IN SUPPORT OF DEFENDANT-RESPONDENTS

———————

Thomas R. McCarthy*
Conor D. Woodfin*
R. Gabriel Anderson**
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
gabe@consovoymccarthy.com

*admitted pro hac vice
**pro hac vice application forthcoming

Matthew M. Fernholz, #1065765
CRAMER MULTHAUF LLP
1601 E. Racine Ave., Ste. 200
Waukesha, Wisconsin 53186
262-542-4278
mmf@cmlawgroup.com

**JA440**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

ARGUMENT ............................................... 1

   I.   *Teigen* was right. .............................. 2

   II.  Overturning *Teigen* would violate the Constitution......................................... 9

   III. Overturning *Teigen* would disrupt the elections. ........................................... 11

CONCLUSION ......................................... 13

CERTIFICATIONS .................................... 14

**JA441**

i

# TABLE OF AUTHORITIES

### Cases

*Alberte v. Anew Health Care*
    2000 WI 7, 232 Wis. 2d 587, 605 N.W.2d 515 ......... 6

*Bush v. Gore*
    531 U.S. 98 (2000) ........................................... 10, 11

*Bush v. Palm Beach Cnty. Canvassing Bd.*
    531 U.S. 70 (2000) ................................................. 10

*Carson v. Simon*
    978 F.3d 1051 (8th Cir. 2020) ............................... 10

*City of W. Allis v. Dieringer*
    275 Wis. 208, 81 N.W.2d 533 (1957) ....................... 5

*DNC v. Wis. State Leg.*
    141 S.Ct. 28 (2020) ......................................... 12, 13

*Duncan v. Asset Recovery Specialists*
    2022 WI 1, 400 Wis. 2d 1, 968 N.W.2d 661 ......... 3, 5

*Engelhardt v. New Berlin*
    2019 WI 2, 385 Wis. 2d 86, 921 N.W.2d 714 ........... 1

*Frederick v. Zimmerman*
    254 Wis. 600, 37 N.W.2d 473 (1949) ..................... 11

*Griffin v. Roupas*
    385 F.3d 1128 (7th Cir. 2004) ................................. 7

*Hawkins v. WEC*
    2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877 ..... 13

*Hinrichs v. DOW Chem.*
    2020 WI 2, 389 Wis. 2d 669,
    937 N.W.2d 37 ............................................. 1, 2, 8, 9

*In re Visitation of A.A.L.*
    2019 WI 57, 387 Wis. 2d 1, 927 N.W.2d 486 ........... 2

*James v. Heinrich*
    2021 WI 58, 397 Wis. 2d 517, 960 N.W.2d 350 ..... 11

*Johnson Controls, Inc. v. Emps. Ins. of Wausau*
    2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257 ....... 8

**JA442**

*Madison Tchrs. v. Scott*
   2018 WI 11, 379 Wis. 2d 439, 906 N.W.2d 436 ....... 7

*McPherson v. Blacker*
   146 U.S. 1 (1892) .................................................... 10

*Merrill v. Milligan*
   142 S.Ct. 879 (2022) .............................................. 12

*Moore v. Harper*
   600 U.S. 1 (2023) ..................................................... 2

*Myers v. WDNR*
   2019 WI 5, 385 Wis. 2d 176, 922 N.W.2d 47 ........... 4

*Pinter v. Vill. of Stetsonville*
   2019 WI 74, 387 Wis. 2d 475, 929 N.W.2d 547 ....... 9

*Purcell v. Gonzalez*
   549 U.S. 1 (2006) ..................................................... 7

*RNC v. DNC*
   589 U.S. 423 (2020) ............................................... 12

*Roberts v. T.H.E. Ins.*
   2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492 ....... 6

*Schauer v. DeNeveu Homeowners Ass'n*
   194 Wis. 2d 62, 533 N.W.2d 470 (1995)................. 12

*Sommerfeld v. Bd. of Canvassers of City of St. Francis*
   269 Wis. 299, 69 N.W.2d 235 (1955)....................... 9

*State ex rel. Bell v. Conness*
   106 Wis. 425, 82 N.W. 288 (1900)............................ 7

*State v. Dinkins*
   2012 WI 24, 339 Wis. 2d 78, 810 N.W.2d 787 ......... 7

*State v. Johnson*
   2023 WI 39, 407 Wis. 2d 195, 990 N.W.2d. ............. 8

*State v. Rector*
   2023 WI 41, 407 Wis. 2d 321,
   990 N.W.2d 213................................................ 3, 4, 8

*Tetra Tech EC v. WDR*
   2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21 ....... 13

**JA443**

iii

*Trump v. Biden*
  2020 WI 91, 394 Wis. 2d 629,
  951 N.W.2d 568...................................................... 3, 13

**Statutes**

Wis. Stat. §5.02 ............................................................ 4

Wis. Stat. §6.84 ..................................................... 6, 7

Wis. Stat. §6.87 ...................................................passim

**Other Authorities**

5 Wis. Op. Att'y Gen. 591 (1916) ............................ 5, 9

*American Heritage Dictionary* (3d ed. 1992),
  perma.cc/NYY2-EQ3T ..................................... 4

*Black's Law Dictionary* (11th ed. 2019) ..................... 4

*Drop Box Information* 2 (2020),
  perma.cc/62SJ-S57H ................................... 4

*Wis. Elections Comm. Calendar of Election Events*,
  perma.cc/PHR3-D3FS............................. 12

**Constitutional Provisions**

U.S. Const. art. I, §4 ............................................. 2, 10

U.S. Const. art. II, §1............................................... 10

**JA444**

iv

## ARGUMENT

"*Stare decisis* is fundamental to the rule of law." *Hinrichs v. DOW Chem.*, 2020 WI 2, ¶66, 389 Wis. 2d 669, 937 N.W.2d 37. For good reason. It ensures that the law is "'evenhanded, predictable, and consistent.'" *Engelhardt v. New Berlin*, 2019 WI 2, ¶24, 385 Wis. 2d 86, 921 N.W.2d 714 (Dallet, J., concurring). It avoids "arbitrary and unpredictable results." *Hinrichs*, 2020 WI 2, ¶67. It assures people that they are governed according to the stability of the law, rather than the fluctuating composition of the courts. And it is "particularly important" when "this court has authoritatively interpreted a statute," which means the reasons for abandoning it must be compelling. *In re Visitation of A.A.L.*, 2019 WI 57, ¶33 n.15, 387 Wis. 2d 1, 927 N.W.2d 486. In that situation, "any departure from *stare decisis* requires special justification." *Hinrichs*, 2020 WI 2, ¶67.

There is no justification here—special or not. Voters must deliver their absentee ballots in one of two ways: by mail or "in person, to the municipal clerk." Wis. Stat. §6.87(4)(b)(1). Drop boxes do neither. Depositing a ballot in a box isn't the same as "mail[ing]" it "to the municipal clerk." *Id.* And it isn't the same as "deliver[ing]" a ballot "in person, to the municipal clerk" either. *Id.* Text, history, and structure support that conclusion. So do purpose, *stare decisis*, and *Teigen*.

Overruling *Teigen* would be atextual and unwise— and unconstitutional. The U.S. Constitution vests "the

**JA445**

1

Legislature" of each State with the power to regulate congressional elections. U.S. Const. art. I, §4. Overturning *Teigen* would accomplish precisely what the Elections Clause prohibits, thwarting more than a century of settled law and permitting a novel approach to absentee voting that "the Legislature" has never condoned. *See Moore v. Harper*, 600 U.S. 1, 36 (2023).

That novel approach would sow chaos in this State's elections just months before the presidential election. Overruling *Teigen* threatens to politicize this Court and cast a pall over the election. And far from settling the matter today, overruling *Teigen* would unleash a wave of new challenges and injunctions on the eve of the election. The Court has long refused to upend the status quo "in the election context." *E.g.*, *Trump v. Biden*, 2020 WI 91, ¶¶26-31, 394 Wis. 2d 629, 951 N.W.2d 568. It should refuse here, too.

## I.    *Teigen* was right.

Less than two years ago, this Court answered the same question it's considering now. In *Teigen*, the Court held that "ballot drop boxes are illegal," and voters must return their absentee ballots "by mail" or "personally deliver" them "to the municipal clerk." *Teigen v. Wisconsin Elections Commission,* 2022 WI 64, ¶4, 403 Wis. 2d 607, 976 N.W.2d 519. Text, history, and structure support that conclusion. So do the canons, common sense, and caselaw.

**Text.** "[S]tatutory interpretation begins with the language of the statute." *State v. Rector*, 2023 WI 41, ¶10, 407 Wis. 2d 321, 990 N.W.2d 213. If the language

**JA446**

is "plain," statutory interpretation "stop[s] there," too. *Duncan v. Asset Recovery Specialists*, 2022 WI 1, ¶9, 400 Wis. 2d 1, 968 N.W.2d 661. Here, the law is plain: Absentee ballots can be "mailed by the elector, or delivered in person, to the municipal clerk." Wis. Stat. §6.87(4)(b)(1). Drop boxes do neither, so the law forbids them.

For starters, a ballot isn't "mailed … to the municipal clerk" when someone deposits it in a drop box. *Id.* Something qualifies as "mail"—and therefore can be "mailed"—only when it's "processed for distribution [at] a post office." Mail, *American Heritage Dictionary* (3d ed. 1992).[1] So ballots are "mailed" only if they are "properly addressed, stamped with postage, and deposited for delivery in the postal system." Mail, *Black's Law Dictionary* (11th ed. 2019). Voters "mail" their ballots only when they "send" them through the "postal system." *American Heritage Dictionary*, *supra*.

By that metric, drop boxes fall short. Drop boxes are part of "municipal" governments—not the postal system. WEC, *Drop Box Information* 2 (2020).[2] They're "operated by local election officials," not postal workers. *Id.* at 1. So it's no wonder that Plaintiffs and WEC admit that placing "absentee ballots [in] a drop box" is different than "sending them back through the mail." *Id.*; *accord* Compl.¶¶42-43. Simply put, voters don't "mail[]" their ballots to anyone when they stuff them in a drop box. Wis. Stat. §6.87(4)(b)(1).

---

[1] perma.cc/NYY2-EQ3T

[2] perma.cc/62SJ-S57H

**JA447**

3

And voters don't "deliver[]" their ballots "in person[] to the municipal clerk" when they drop them in a box either. *Id.* The statutory definition of "municipal clerk" refers to people, not objects, so voters must give their ballots to a person—not an object. *E.g.*, *Rector*, 2023 WI 41, ¶10 ("specially-defined words" must be given their "special definitional meaning"); *accord Myers v. WDNR*, 2019 WI 5, ¶18, 385 Wis. 2d 176, 922 N.W.2d 47. As the Legislature instructed, "municipal clerk" refers to specific people, including only "the city clerk, town clerk, village clerk," and a few other "election" officials. Wis. Stat. §5.02(10). So the law's command— "deliver[]" your ballots "to the municipal clerk"—requires voters to hand their ballots to *a person*: "the city clerk, town clerk, village clerk," and so on. *Id.* Placing a ballot inside an object (a drop box) isn't the same as handing it to a person (the "municipal clerk").

The plain meaning of "in person" confirms that conclusion. Since 1916, the phrase "delivered in person" has meant one thing: "manual transmission by the one to the other." 5 Wis. Op. Att'y Gen. 591, 593 (1916). Less than a year after the Legislature approved absentee voting, Attorney General Walter Owen—who later served on the Wisconsin Supreme Court—interpreted the phrase "[d]elivery in person," concluding that the term "must mean handed directly by an elector to the officer." *Id.*; *City of W. Allis v. Dieringer*, 275 Wis. 208, 219, 81 N.W.2d 533 (1957) ("[I]nterpretations by the attorney general … have important bearing upon statutory meaning."). The Court reaffirmed that conclusion in *Sommerfeld*, unanimously agreeing that "the

**JA448**

4

'in person' delivery requirement means personal delivery, in the flesh, by the voter, to the municipal clerk." *Teigen*, 2022 WI 64, ¶176 (Hagedorn, J., concurring). So, as the history shows, someone "deliver[s]" an absentee ballot "in person" only when they hand it to someone else—*i.e.*, the "municipal clerk." Wis. Stat. §6.87(4)(b)(1). Dropping a ballot in a box doesn't suffice.

**Structure.** The Act's "context and structure" confirm its plain meaning. *Duncan*, 2022 WI 1, ¶9. Wisconsin's election laws draw a hard line between in-person voting and absentee voting, recognizing that in-person voting is generally allowed while absentee voting is generally not. Wis. Stat. §6.84(1). In-person voting "is a constitutional right" that "should be strongly encouraged." *Id.* So in-person voting is allowed unless another law says it's not. But "voting by absentee ballot is a privilege," which "must be carefully regulated." *Id.* So absentee voting isn't allowed unless another law says it is.

Nothing in Wisconsin's election code permits drop boxes. When the Court decided *Teigen*, no one—not the plaintiffs, the defendants, or the Court—could "point to any statute authorizing ballot drop boxes." 2022 WI 64, ¶54 (majority). For good reason: none exists. "[D]rop boxes" have never "been in common and longstanding use in this state." *Id.* ¶65 (plurality). They're "'unprecedented.'" *Id.* ¶66 n.26. They're "a novel creation" that is "nowhere in the statutes." *Id.* ¶58 (majority). So the Legislature "did not contemplate" drop boxes, much less condone them. *Alberte v.*

**JA449**

5

*Anew Health Care*, 2000 WI 7, ¶17, 232 Wis. 2d 587, 605 N.W.2d 515. That means "drop boxes are illegal." *Teigen*, 2022 WI 64, ¶4.

**Purpose.** Statutory purpose supports the text, history, and structure. Statutory purpose "is relevant," especially when "the legislature has expressly stated the purpose [in] a statute." *Roberts v. T.H.E. Ins.*, 2016 WI 20, ¶21, 367 Wis. 2d 386, 879 N.W.2d 492. Here, that purpose couldn't be clearer. In the very first sentence of its absentee-voting laws, the Legislature told courts how to "constru[e]" those statutes, reminding them that "voting by absentee ballot must be carefully regulated." Wis. Stat. §6.84(1). Consistent with that "Legislative policy," absentee-voting laws "shall be construed as mandatory," *id.* §6.84(2), thus requiring courts to "test" any election procedure under "the strictest legal standards," *State ex rel. Bell v. Conness*, 106 Wis. 425, 428, 82 N.W. 288 (1900).

That requirement makes good sense. "Ensuring the integrity of elections is an important public interest." *Madison Tchrs. v. Scott*, 2018 WI 11, ¶76, 379 Wis. 2d 439, 906 N.W.2d 436 (Walsh Bradley, J., dissenting). But voter fraud is "a serious problem in U.S. elections," and it's "facilitated by absentee voting." *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004). Like anything of value, elections are targets for malicious actors. Even if fraud is rare, it is still a threat. And because elections are the very essence of our democracy, it is essential that people perceive them to be run according to the highest standard of integrity. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). So even though

**JA450**

6

"absentee voting has many benefits," it also has many problems—problems "the legislature" sought "to minimize" through a series of statutory "safeguards," including the law that Plaintiffs challenge today. *Teigen*, 2022 WI 64, ¶71 (plurality). Short-circuiting those safeguards—and imposing a novel drop-box requirement that the Legislature never enacted, the Governor never signed, and the voters never ratified—would "contravene[] the manifest purpose of the statute." *State v. Dinkins*, 2012 WI 24, ¶29, 339 Wis. 2d 78, 810 N.W.2d 787.

**Stare Decisis.** The Court reached all these conclusions in *Teigen* after an exhaustive and "authoritative" examination of §6.87(4)(b)(1)'s text, history, structure, and purpose. *See Rector*, 2023 WI 41, ¶32. This Court should respect that recent conclusion.

This Court unanimously held that "stare decisis is fundamental to the rule of law." *Hinrichs*, 2020 WI 2, ¶66. The doctrine reflects a "scrupulous[]" and "abiding respect for the rule of law." *Johnson Controls, Inc. v. Emps. Ins. of Wausau*, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. That respect "ensures that existing law will not be abandoned lightly." *Hinrichs*, 2020 WI 2, ¶67. And it "requires" that "any departure from *stare decisis*" have a "special" justification. *Id.*

There is no "special justification" here. The Court has identified five flaws that justify "overruling precedent": a past opinion must be legally inconsistent, factually inaccurate, doctrinally unsound, practically unworkable, or the law must have "changed in a way that

**JA451**

7

undermines the prior decision's rationale." *State v. Johnson*, 2023 WI 39, ¶20, 407 Wis. 2d 195, 990 N.W.2d. None are present here. The law hasn't changed. The facts haven't changed. And Wisconsin has followed the same absentee-voting rules for more than a century, so *Teigen*'s ratification of those rules wasn't "unsound," "unworkable," or inconsistent with "the law." *Id.*

But overruling *Teigen* would create the very problems that *stare decisis* is supposed to avoid. For more than a century, almost every governmental entity— from the attorney general, to the counties, to the municipalities, to this Court—has said that Wisconsin's absentee-voting laws prohibit drop boxes. *E.g.*, 5 Wis. Op. Att'y Gen. at 593; *Sommerfeld v. Bd. of Canvassers of City of St. Francis*, 269 Wis. 299, 304, 69 N.W.2d 235 (1955); *Teigen*, 2022 WI 64, ¶4.

Overturning *Teigen* would change all that. "Adopting the dissent's reasoning [in *Teigen*] 'would effectively pull the rug out from under municipalities and other governmental entities that have managed their affairs relying upon [those] decades-old interpretation[s].'" *Pinter v. Vill. of Stetsonville*, 2019 WI 74, ¶37, 387 Wis. 2d 475, 929 N.W.2d 547. Such an abrupt change would be "'especially jarring to the public and legal community'" who have all (rightly) assumed that the Court settled this issue "two years prior in [*Teigen*]." *Id.* Upsetting those reliance interests now would beget the very type of "arbitrary and unpredictable results" that *stare decisis* cautions against, signaling to litigants that any decision—no matter how

**JA452**

well-established, well-settled, or well-reasoned—is "open to revision in every case." *Hinrichs*, 2020 WI 2, ¶67.

The Court should not take that step. Rather, it should reaffirm its commitment to *stare decisis* and hold—as it often does—that "the legislature is free to change" the State's absentee-voting laws if it disagrees with *Teigen*'s analysis. *E.g.*, *Pinter*, 2019 WI 74, ¶¶36-38; *A.A.L.*, 2019 WI 57, ¶33 & n.15.

## II.   Overturning *Teigen* would violate the Constitution.

Even if the Court wanted to overturn *Teigen*, it couldn't. The Elections Clause vests state legislatures with the power to set "[t]he Times, Places and Manner" of congressional elections. U.S. Const. art. I, §4. And the Electors Clause gives state legislatures authority over the "Manner" of appointing presidential electors. art. U.S. Const. art. II, §1. Those provisions "leav[e] it to the legislature exclusively to define the method" of regulating elections. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892). So "state legislatures" have the "primary responsibility for setting election rules"—"not state judges." *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020).

State courts thwart that rule when they read election statutes too "liberally." *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 77 (2000). The Constitution requires state courts to fairly apply "the legislative scheme" that Wisconsin's representatives enacted, barring courts from "broaden[ing] the scope of [a] statute beyond what a fair reading provide[s]."

**JA453**

9

*Bush v. Gore*, 531 U.S. 98, 113-15 (2000) (Rehnquist, C.J., concurring). If the Court places a thumb on the scale and concludes that Wisconsin's election laws "must be liberally construed in favor of the citizens' right to vote"—that act "circumscribe[s] the legislative power" and is unconstitutional. *Palm Beach*, 531 U.S. at 77.

Abandoning *Teigen* would "transgress the ordinary bounds of judicial review" and usurp "the power vested in state legislatures to regulate federal elections." *Moore*, 600 U.S. at 36. The Legislature has long required absentee voters to mail their ballots or deliver them in person, mandating those procedures—and no others—across three separate statutes for more than one hundred years. *Teigen*, 2022 WI 64, ¶77 n.11 (Hagedorn, J., concurring). But after more than a century of settled practice, WEC tried to skirt that rule, concocting a novel absentee-voting procedure that was "found nowhere in the statutes," "history," or "evidence." *Id.* ¶58 (majority).

*Teigen* rightly rejected that lawless novelty. Overturning *Teigen* would resurrect it, marking a "significant departure from the legislative scheme" that the Federal and Wisconsin Constitutions don't permit. *Bush*, 531 U.S. at 112-13; *Frederick v. Zimmerman*, 254 Wis. 600, 613, 37 N.W.2d 473 (1949) (Only "the legislature has the constitutional power to say how, when and where [a] ballot shall be cast.").

At a minimum, constitutional avoidance calls for reaffirming *Teigen*. The Court can "interpret the challenged statute in a way that both resolves the case and avoids [a] constitutional question." *James v. Heinrich*, 2021 WI 58, ¶85, 397 Wis. 2d 517, 960 N.W.2d 350

**JA454**

10

(Dallet, J., dissenting). That approach would have the added benefit of deciding the case "on the narrowest available grounds"—a restrained approach that the Court has endorsed "time and again." *Id.*

### III.  Overturning *Teigen* would disrupt the elections.

Overturning *Teigen* now would also upend election administration. Under the *Purcell* doctrine, federal courts "should not alter state election laws in the period close to an election." *DNC v. Wis. State Leg.*, 141 S.Ct. 28, 30 (2020) (Kavanaugh, J., concurring). That period, called the *Purcell* window, opens long before a general election—and once it opens, courts reverse decisions that "chang[e] the election rules." *RNC v. DNC*, 589 U.S. 423, 424 (2020) (seven months); *Merrill v. Milligan*, 142 S.Ct. 879 (2022) (nine months).

This case is well within the *Purcell* window. The Wisconsin primary is approaching August 13, and candidates for the general election began circulating nomination papers last month. Clerks have already begun publishing absentee voting instructions for the primary. *Wis. Elections Comm., Calendar of Election Events*.[3] Voters have already begun to request absentee ballots and make plans around the current law. *Id.* Implementing drop-boxes will require herculean planning, monitoring, security, time, and resources to administer. That feat cannot be accomplished at this late hour in a manner that preserves uniformity and instills confidence in the election.

This case's procedural posture only makes matters worse. The Court took this case on a motion to dismiss,

---

[3] perma.cc/PHR3-D3FS

**JA455**

11

so even siding with Plaintiffs wouldn't end the matter. Instead, the case would return to the circuit court for further litigation. Unless that further litigation concluded in a final judgment for Plaintiffs, WEC is still bound by the judgment in *Teigen*. *See Schauer v. DeNeveu Homeowners Ass'n*, 194 Wis. 2d 62, 75 n.8, 533 N.W.2d 470 (1995) ("[P]recedent can either be followed or overruled. It cannot be reversed or vacated."). And Wisconsin procedure "does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled in an unrelated proceeding." *Tetra Tech EC v. WDR*, 2018 WI 75, ¶90, 382 Wis. 2d 496, 914 N.W.2d 21. That means that WEC could introduce drop boxes, if at all, only after this case reaches a final judgment in Plaintiffs' favor. On that timeline, the rule changes would be far too close to the election to be feasible. The Court should not encourage such drastic changes at the eleventh hour.

Siding with Plaintiffs will bring other predictable consequences. Courts could issue a state-wide injunction, "unilaterally chang[ing]" the laws just days before Wisconsinites start voting. *Wis. State Leg.*, 141 S.Ct. at 30 (Kavanaugh, J., concurring). In that event, "election administrators" would have to "first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters," "local election officials," and "volunteers." *Id.* at 31. That mess "puts courts in a difficult spot" that this Court can avoid by reaffirming *Teigen* (or staying the case until after the election). *Trump*, 2020 WI 91, ¶30; *Hawkins v. WEC*, 2020 WI 75, ¶10, 393 Wis. 2d 629, 948 N.W.2d 877.

**JA456**

12

## CONCLUSION

The Court should affirm the judgment below.

Dated this day May 3, 2024

Respectfully submitted,

*Electronically signed by Matthew M. Fernholz*

**CRAMER MULTHAUF LLP**
Matthew M. Fernholz,
SBN 1065765
1601 E. Racine Ave., Suite 200
Waukesha, Wisconsin 53186
262-542-4278
mmf@cmlawgroup.com

**CONSOVOY MCCARTHY PLLC**
Thomas R. McCarthy*
Conor D. Woodfin*
R. Gabriel Anderson**
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
gabe@consovoymccarthy.com

*admitted pro hac vice*
**pro hac vice application forthcoming*

Attorneys for Non-Parties RNC, RPW, and RITE
PAC

**JA457**

# CERTIFICATIONS

I hereby certify that this brief conforms to the rules contained in Wis. Stat. Rule 809.19(8)(b), (bm), and (c). The brief uses a proportional serif font and is 2,998 words.

Dated this 3rd day of May, 2024.

Respectfully submitted,

*Electronically signed by Matthew M. Fernholz*

**CRAMER MULTHAUF LLP**
Matthew M. Fernholz,
SBN 1065765
1601 E. Racine Ave., Suite 200
Waukesha, Wisconsin 53186
262-542-4278
mmf@cmlawgroup.com

**JA458**

# EXHIBIT 9

Andrew Gould (No. 013234)
Drew. C. Ensign (No. 25463)
HOLTZMAN VOGEL BARAN
TORCHINSKY JOSEFIAK PLLC
2555 East Camelback Rd., Ste. 700
Phoenix, Arizona 85016
Telephone: (602) 388-1262
densign@holtzmanvogel.com

*Attorneys for Arizona Republican Party*

## ARIZONA SUPREME COURT

| | |
|---|---|
| Maricopa County Recorder Stephen Richer, in his official capacity, | Arizona Supreme Court No. CV-24-0221-SA |
| Petitioner, | |
| v. | |
| Arizona Secretary of State Adrian Fontes, in his official capacity, | |
| Respondent. | |

**BRIEF OF ARIZONA REPUBLICAN PARTY AS AMICUS CURIAE IN SUPPORT OF RESPONDENT (FILED WITH CONSENT OF THE PARTIES)**

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

Andrew Gould
Drew C. Ensign
2555 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

*Attorneys for Arizona Republican Party*

**JA460**

## INTEREST OF AMICI

The Arizona Republican Party ("AZ GOP") is a political party in Arizona with over 1.4 million registered voters. AZ GOP's members would be disproportionately affected by the unlawful contraction of the right to vote sought by Petitioner Richer here.[1]

## ARGUMENT

The declaratory relief sought by Petitioner would violate both state and federal law and should be denied for five independent reasons. The governmental failure to enforce state law regarding proof of citizenship must be corrected—but not on the eve of an election where doing so may cause massive voter disenfranchisement and would be unlawful.

## I.    The Relief Would Violate The NVRA

Petitioner's requested declaratory judgment flouts federal statutory law in the form of the National Voter Registration Act ("NVRA"). The NVRA prescribes specific procedures for the removal of ineligible voters from the voter rolls. Section 8 tasks state election administrators with the responsibility to conduct regular voter list maintenance "that makes a reasonable effort to remove the names of

---

[1]  Petitioner and Respondent consent to filing of this brief.

ineligible voters" who are not eligible to vote for certain enumerated reasons. 52 U.S.C. §20507(a)(4). It further limits the bases for removals of registration. *Id.* §§ 20507(a)(3), (4).

Beyond restricting the permissible bases for removal, the NVRA prohibits voter list maintenance at certain times—specifically including now until the November election. A State must complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a ... general election for Federal office." *Id.* §20507(c)(2)(A). This period during which systematic removals are prohibited is known as the "NVRA Blackout Period," and this year it began on August 7, 2024.

Notable for its absence from the NVRA's list of permissible reasons for removal is the category of "state government clerical errors"—let alone colossal errors that could diminish the voting rights of nearly 100,00 voters. Voters who have resided in Arizona for three decades or more—and have *never* previously been notified of any issues with their voter registrations—would now be informed that they cannot vote a full ballot without first producing documentary proof of citizenship ("DPOC").

**JA462**

2

As a result, many voters may not discover the need to provide DPOC until it is too late.

Not only is a coding error on the part of a government agency an invalid reason for attempting to invalidate the registrations of eligible voters (even partially), but the damage is compounded by the fact that Petitioner is attempting to effectuate these removals during the NVRA Blackout Period, when such removals are unlawful. The NVRA thus prohibits the relief sought here.

## II.    Petitioner's Requested Relief Would Violate The U.S. Constitution

The declaratory judgment sought by Petitioner violates the First and Fourteenth Amendments under the U.S. Supreme Court's *Anderson-Burdick* framework. This test requires reviewing courts to "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments … against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden [] rights." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (citation omitted). Under *Anderson/Burdick*, "[a] law that imposes a 'severe' burden on voting

rights must meet strict scrutiny," whereas "[l]esser burdens ... trigger less exacting review." *Id.* If the burden on voting rights is sufficiently severe, then "the regulation [must] be narrowly tailored to advance a compelling state interest." *Burdick*, 504 U.S. at 433.

It is difficult to imagine state action that would impose a more "severe" burden on the right to vote than abruptly informing an individual who has lived and voted in Arizona for decades—and previously voted in *all* elections, state and federal—that they must suddenly prove that they are a U.S. citizen in the handful of days remaining before Arizona's October 7 voter registration deadline if they want to vote in state elections this year. And that assumes that the notice provided is effective and actually reaches the affected voters. For many, given the short amount of time available to provide notice before the election, the Recorder's proposed notice of the "glitch" may never reach the voter, and they may only discover it when they go to vote in-person or receive a federal-only mail-in ballot—when it would be too late to cure the deficiency belated identified by the State's glitch. Hence, strict scrutiny would apply here.

The government's compelling interest in this case is presumably the need to verify the citizenship status of all registered Arizona voters before

**JA464**

4

permitting them to vote in state elections. But Petitioner's admission that the administrative error that prompted this situation has apparently existed since 2005—*i.e.*, through nine election cycles—demonstrates that the State's interest is insufficiently compelling to justify *sudden disenfranchisement* based on the State's own error. Emer. Pet. for Special Action at 1.

Nor does it "make it necessary to burden [voting] rights" now. *Ariz. Democratic Party*, 18 F.4th at 1187. If requiring DPOC from people who have held valid Arizona driver's licenses since before 1996 was not deemed necessary for the affected voters to cast ballots in 2006, 2008, 2010, 2012, 2014, 2016, 2018, 2020, or 2022, then it is likewise an insufficiently compelling interest to abruptly require it on the eve of the deadline for registering to vote for the 2024 election.

Finally, it is not "narrowly tailored" to demand that voters take immediate action in the final weeks before voting begins to rectify a clerical error for which fault lies solely with the government. If this Court grants the requested declaratory judgment, almost 100,000 Arizonans would be prevented from voting a full ballot; it is difficult to imagine a remedy that would sweep more broadly than that.

**JA465**

## III.   The Requested Relief Would Violate The Due Process Clause

If nearly 100,000 longtime Arizonans are prevented from voting this year due solely to a state agency administrative error that has gone unnoticed for almost twenty years, then the federal due process rights of everyone affected would be violated. The Fourteenth Amendment provides that States may not "deprive any person of ... liberty ... without due process of law." "Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990).

Due process does not entail any particular set of procedures, only "such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court has traditionally required courts to weigh three factors to assess the precise combo of protections required: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used...; and finally, the Government's interest, including ... the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

First, the private interest affected is the right to vote, a right that the Supreme Court has deemed "fundamental" because it "is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). "[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.*

Second, the "risk of an erroneous deprivation of such interest" is extremely and unforgivably high when Petitioner seeks a court order preventing nearly 100,000 Arizonans from voting in state elections a mere three days before UOCAVA ballots are set to be mailed to voters. *Mathews*, 424 U.S. at 335. Although the current situation was instigated by the discovery of a lawful permanent resident with an Arizona driver's license, Petitioner concedes that "most of these voters are likely United States citizens," meaning that there are likely more "false negatives" (U.S. citizens) than true positives (noncitizens) in this universe of voters. Decl. of Stephen Richer, ¶17. That admission is crucial here as "'procedural due process rules are shaped by the *risk of error* inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" *Walters v. National Ass'n of Radiation Survivors*, 473

JA467

7

U.S. 305, 321 (1985) (emphasis added). Here, Petitioner *admits* that the "generality of cases" that the remedy sought will *erroneously* diminish the voting rights of voters who are, in fact, citizens.

Finally, "at minimum" the Due Process Clause requires that deprivation of a liberty interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). It is not clear what kind of notice or hearing Petitioner intends to provide to the affected voters, but the Secretary has properly expressed concern that whatever notice is provided will be insufficient given the limited time remaining before the election. Emer. Pet. at 7. Hence, the Secretary has appropriately issued guidance to the County Recorders ordering that they permit the affected voters to participate in all elections this year and verify eligibility later. *Id.*

Unlike in most due process cases, the government here would not be forced to shoulder any additional administrative burden if it adopted the course urged by Respondent and by *amicus*. Ironically, it is *Petitioner* who seeks to impose additional costs upon his own office during the busiest part of the election cycle by recklessly invalidating tens of thousands of valid voter registrations in the weeks leading up to a

JA468

8

presidential election. The Due Process Clause does not require—or permit—such a result.

## IV.    Petitioner's Requested Relief Would Violate Arizona's Free and Equal Elections Clause

The requested declaratory judgment also violates the Arizona Constitution Article II, Section 21 requires that "[a]ll elections shall be free and equal, and no power ... shall at any time interfere to prevent the free exercise of the right of suffrage." This provision "must be read to apply [] to those citizens who have the right of suffrage." *Coronado v. Napolitano*, 2008 U.S. Dist. LEXIS 4909, at *16-17 (D. Ariz. Jan. 22, 2008).

Each of the affected voters currently have the right of suffrage and have regularly exercised that right in state elections, many multiple times *for decades*. Yet Petitioner seeks to interfere with the free exercise of that right by an eleventh-hour demand for proof of citizenship when the government—if it had acted competently—would have identified the issue back in 2005. That relief violates the Arizona Constitution for the same essential reasons as it does the U.S. Constitution under the *Anderson-Burdick* framework. *See supra* at 3-5.

**JA469**

9

## V.    The Relief Would Violate the *Purcell* Doctrine

Finally, if for no other reason, the requested relief should be denied because of the predictable consequences of granting it. "Court orders affecting elections ... can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

Here, given the proximity to the election, it is less likely that voters will stay home than they will show up to vote without knowing that there is any problem with their registration. In other words, U.S. citizen voters who have lived in Arizona for decades and consistently participated in state elections without issue are likely to show up at their polling place on November 5 only to learn that they have been disenfranchised by a state government clerical error of which they had no prior knowledge. "Confidence in the integrity of our election processes is essential to the functioning of our participatory democracy." *Id.* But the relief Petitioner seeks here would gravely and wantonly undermine that confidence.

## CONCLUSION

For the foregoing reasons, the Court should decline to grant the declaratory judgment sought by Petitioner. This error can be promptly corrected after the election.

**JA470**

10

Respectfully submitted this 18th day of September, 2024.

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

/s/ Andrew Gould
Andrew Gould
Drew C. Ensign
2555 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

*Attorneys for Arizona Republican Party*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,<br><br>*Defendants*,<br><br>and<br><br>DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Intervenor-Defendant*. | Case No. 5:24-cv-547-M-RJ |

**THE DEMOCRATIC NATIONAL COMMITTEE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' EMERGENCY MOTION TO REMAND TO STATE COURT**

**JA472**

## INTRODUCTION

Plaintiffs allege in this lawsuit that the North Carolina State Board of Elections (Board), its members, and its executive director have committed "a plain violation of Section 303 of the Help America Vote Act ('HAVA')," Compl. (D.E. 1-3) ¶3—and further allege that "because of" that violation, North Carolina's voter rolls "potentially" include ineligible voters, *id.*  Based on those allegations, the complaint asks this Court to remove those potentially ineligible voters from the rolls, seeking an injunction to enforce what plaintiffs call "a non-discretionary, statutory duty to maintain the state's voter rolls in in a manner compliant with Section 303(a) of HAVA." *Id.* ¶90.  The complaint is thus based on a federal law—HAVA—so the Board's removal was proper. The Court should deny the remand motion (and promptly grant the pending motion to dismiss in order to dispel the cloud plaintiffs seek to cast over the integrity of the upcoming elections).

## STATEMENT

Plaintiffs filed this action in Wake County Superior Court (Case No. 24CV026995-910) on August 23, 2024.  They allege that, for an unspecified period of time before December 2023, the Board used a voter-registration form that requested but did not require the applicant to provide a driver's license or social security number.  Compl. (D.E. 1-3) ¶¶3, 42.

The complaint includes two claims.  First, plaintiffs request a writ of mandamus to address a purported violation of North Carolina General Statutes §163-82.11(c)—a violation that depends entirely on the alleged HAVA violation, because §163-82.11(c) requires the State Board to maintain North Carolina's voter rolls in compliance with HAVA.  Compl. (D.E. 1-3) ¶¶77-88. Second, plaintiffs seek a mandatory injunction to redress an alleged violation of the North Carolina Constitution.  *See id.* ¶¶89-96.  The basis for that purported violation is likewise the State Board's supposed failure to comply with both HAVA and the implementing state statute.  *Id.* ¶¶90-92.

Plaintiffs primarily seek a "court-approved plan" to "identify[] all ineligible registrants and remov[e] them from the state's voter registration lists." *Id.* at 19. Alternatively, plaintiffs request a court order requiring "all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form[] to cast a provisional ballot in the upcoming elections pending" the State Board's "receipt and confirmation of the required HAVA information." *Id.* at 19-20.

Days after this case was filed, the Democratic National Committee (DNC) moved to intervene. After the superior court granted the motion, the DNC filed its motion to dismiss, answer, and affirmative defenses on September 12. The State Board then removed the case to this Court pursuant to 28 U.S.C. §§1331, 1441(a), 1443(2), and 1367(a). D.E. 1 at 2. They subsequently moved to dismiss on multiple grounds, D.E. 30, 31, and filed an accompanying motion to expedite consideration of the dismissal motion, D.E. 32, 33. On October 1, plaintiffs filed an emergency motion to remand, D.E. 37, and a memorandum in support, D.E. 38 (Br.).

## ARGUMENT

### I.   REMOVAL IS PROPER UNDER 28 U.S.C. §1441(a)

Federal courts have jurisdiction over "all civil actions arising under the … laws[] … of the United States." 28 U.S.C. §1331. Any such case "may be removed" to federal court. *Id.* §1441(a). Showing "that removal jurisdiction is proper" requires no more "than is required to establish federal jurisdiction as alleged in a complaint." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008). Under that standard, removal of this case was appropriate.

A. To assess whether a plaintiff's cause of action "has some basis in federal law," courts apply the "well-pleaded complaint rule." *Old Dominion Electric Cooperative v. PJM Interconnection, LLC*, 24 F.4th 271, 279 (4th Cir. 2022). Applying that rule here leaves no doubt that the complaint "has some basis in federal law." *Id.* As noted, plaintiffs accuse the Board of "a

**JA474**

plain violation of Section 303 of" HAVA, and allege that "[b]ecause of" that violation, North Carolina's voter rolls are "potentially replete with ineligible voters." Compl. (D.E. 1-3) ¶3. And the complaint repeats again and again (and again) the allegation that defendants "violated" or "ignored" HAVA. *Id.* ¶¶5-6, 10, 44; *see also id.* ¶¶3, 48, 50, 52, 55.a, 58, 62-65, 68, 74. It is also filled with yet more references to that federal law. For example, the complaint alleges that "[u]nder the plain text of HAVA," defendants "should not have accepted or processed" voter registrations using the form in place prior to December 2023. *Id.* ¶57. Likewise, plaintiffs allege that "Congress, through HAVA, set requirements for how states must implement and maintain their voter rolls." *Id.* ¶32. And—seemingly recognizing that no court can grant them relief without interpreting HAVA—they then devote another ten paragraphs to describing what "HAVA mandates," *id.* ¶¶32-43. Put simply, the complaint from start to finish alleges a violation of, and therefore arises under, federal law.

B.     Plaintiffs' inclusion of state-law causes of action does not alter that conclusion; it constitutes (at best) "'clothing a federal claim in state garb,'" *Old Dominion*, 24 F.4th at 279 (quoting *Travelers Indemnity Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986)). Under Fourth Circuit precedent, that does not preclude removal, so long as "the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986), *quoted in Old Dominion*, 24 F.4th at 280. Federal jurisdiction in such circumstances "will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'" *Gunn v. Minton*, 568 U.S. 251, 258 (2013), *quoted in Old Dominion*, 24 F.4th at 280.

1. As discussed, *see supra* p.3, plaintiffs' complaint satisfies the first *Gunn v. Minton* factor because it necessarily raises a federal question. That question is: When election officials register a voter whose registration form lacked a current, valid driver's license number or the last four digits of her social security number as required by 52 U.S.C. §21083(a)(5)(A)(i), does the State Board's obligation under 52 U.S.C. §21083(a)(2)(A) to "perform list maintenance with respect to the computerized [registration] list on a regular basis" require either that the voter be removed from the rolls or allowed to cast only a provisional ballot? Compl. (D.E. 1-3) ¶¶30-38, 55.a. n.6, 58, 64, 74, 78-81, 85-86, 90-91, 93.

Plaintiffs cloak that claim in particularly thin "state garb," *Old Dominion*, 24 F.4th at 279, asserting that a North Carolina statute is the real basis of their claim. Br. (D.E. 38) p.5; Compl. (D.E. 1-3) ¶85. But what that statute requires is compliance with *federal* law, namely HAVA. The state statute requires the Board to maintain North Carolina voter rolls in manner that "meet[s] the requirements of Section 303(a) of" HAVA. N.C. Gen. Stat. §163-82.11(c). Indeed, the provision is *titled* "Compliance With Federal Law." *Id.* But a state statute cannot bar removal merely by referencing federal law; otherwise, states could sweep *every* federal-question case into their courts by enacting a catch-all statute requiring "compliance with all federal laws," which a plaintiff could then invoke to defeat removal in any federal-question case. Plaintiffs therefore cannot obtain the relief they seek—removal of "potentially ineligible" voters or a mandate that they cast provisional ballots if they have not separately provided "the required HAVA information" (Compl. (D.E. 1-3) ¶94, pp.19-20)—without a judicial determination that: (1) the State Board violated HAVA, (2) the voters have not separately provided "the required HAVA information," and (3) that HAVA requires, or even *permits* the requested relief. A federal issue is thus "necessarily raised," *Gunn*, 568 U.S. at 258.

Plaintiffs also cite North Carolina General Statute §163-82.4(a)(11). Compl. (D.E. 1-3) ¶82. But that provision does not help them either, because it likewise simply incorporates HAVA's requirements. Specifically, the provision states that "[t]he form required by" §162-82.3(a) "shall request the applicant's … [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." This state-law requirement manifestly implements HAVA's requirement that an application to register to vote in federal elections not "be accepted or processed by a State unless" it includes "the applicant's driver's license number" or (if the applicant lacks a valid driver's license or another identification number from North Carolina's Division of Motor Vehicles) "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5)(A)(i). Nor does plaintiffs' passing reference (*see* Compl. (D.E. 1-3) ¶71) to a "chilling effect on North Carolinians' right to vote in free and fair elections" under Article I, §10 of the North Carolina Constitution mask the federal nature of their claim. Such chilling, they allege, will occur only "[i]f [d]efendants do not remove ineligible voters from the state's voter rolls," *id.*—the action they claim HAVA mandates, *e.g.*, *id.* ¶58.

Plaintiffs' presentation of their putative state-law claims further confirms that those claims depend entirely on federal law. For example, the complaint alleges that defendants "should have taken immediate action to correct the accuracy of the state's voter rolls, a task *mandated by HAVA* and, *in turn*, state law." Compl. (D.E. 1-3) ¶58 (emphases added). Likewise, plaintiffs' request for relief asks that defendants be directed to (1) "ensure compliance with HAVA and, *in turn*, N.C. Gen. Stat. §163-82.11(c);" (2) "take all actions necessary to remedy their violations of state law and HAVA"; and (3) "ensure future compliance with state law and HAVA." *Id.* at 19-20 (emphasis added). Even plaintiffs' press release about this case admits that it is based on federal law. Indeed, the release does not even *mention* state law—instead accusing the Board of "violating [the] Help

**JA477**

5

America Vote Act (HAVA)." Ex. 1 (*Back-to-Back Lawsuits: RNC Sues North Carolina State Board of Elections*, RNC (Aug. 26, 2024), https://gop.com/press-release/back-to-back-lawsuits-rnc-sues-north-carolina-state-board-of-elections/). Thus, while plaintiffs tout the case in the media as an effort to remedy HAVA violations, they tell this Court that their case "raises no federal question," Br. (D.E. 38) p.4. The law does not (and this Court should not) countenance such conduct.

Finally, plaintiffs' assertion that HAVA "*is silent* on what to do if a state admits it violated HAVA but refuses to remedy the violation," Br. (D.E. 38) p.6, is both irrelevant and untrue. It is irrelevant because the Board has not admitted "it violated HAVA but refuses to remedy the violation," *id.* And it is untrue because HAVA is not "silent" on the matter. To the contrary, as set forth by defendants (D.E. 31 pp.4, 13) and the DNC (D.E. 48 at 19-22), both HAVA and the National Voter Registration Act affirmatively preclude the relief plaintiffs seek here, i.e., systematic removals of voters from the rolls within 90 days of a federal election. *See* 52 U.S.C. §§20507(c)(2)(A), 21083(a)(2)(A)(i), 21083(a)(2)(B)(ii). What HAVA *is* silent about is any private right of action for the relief plaintiffs seek—and *that* silence is another reason why (as explained in the DNC's response supporting dismissal) plaintiffs' complaint fails as a matter of law.

2.    As to the second *Gunn* factor, the federal issue here is "actually disputed," 568 U.S. at 258. Again, the federal question is: When election officials register a voter whose registration form lacked a current, valid driver's license number or the last four digits of her social security number as required by 52 U.S.C. §21083(a)(5)(A)(i), does the State Board's obligation under 52 U.S.C. §21083(a)(2)(A) to "perform list maintenance with respect to the computerized list on a regular basis" require either that the voter be removed from the rolls or allowed to cast only a

**JA478**

provisional ballot?  Plaintiffs say the answer is yes, defendants and the DNC say the answer is no. That is the essence, if not the entirety, of the dispute here.

3.      The federal issue here is "substantial," *Gunn*, 568 U.S. at 258, as the relief that plaintiffs seek based on their reading of HAVA could cost tens if not hundreds of thousands of registered North Carolinians their fundamental right to vote (and have that vote counted) in the upcoming November 5 general election.  Nor is the matter "fact bound" or "situation specific," Br. (D.E. 38) p.7.  Plaintiffs seek an order requiring state election officials to remove registered voters from the rolls just before a federal election, based on plaintiffs' interpretation of HAVA.  If their interpretation is correct, and if the relief they seek is permissible (i.e., not barred by federal law), that would have the potential to affect registered voters in every jurisdiction in the country.

4.      Finally, this issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress," *Gunn*, 568 U.S. at 258.  This fourth factor concerns "the appropriate balance of federal and state judicial responsibilities."  *Id.* at 264 (quotation marks omitted).  In *Gunn*, the Supreme Court deemed this factor to cut against federal jurisdiction because "States … have a special responsibility for maintaining standards among members of the licensed professions."  *Id.* (quotation marks omitted).  This case, by contrast, concerns statutes that safeguard Americans' right to vote in *federal* elections.  HAVA, for example, provides that "[t]he computerized list [at issue here] shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  52 U.S.C. §21803(a)(1)(A)(viii).  And the NVRA's 90-day removal ban covers the "90 days prior to … a[ny] … election for Federal office."  *Id.* §20507(c)(2)(A).  There is "no reason to suppose that Congress" intended to preclude federal courts from hearing litigation so centrally focused on the fundamental right to vote in federal elections.  *Gunn*, 568 U.S. at 264.

<div align="center">**JA479**</div>

## II.    REMOVAL IS PROPER UNDER 28 U.S.C. §1443(2)

Even if a case does not arise under federal law, it may be removed by a defendant that "refus[ed] to do an[] act on the ground that [the act] would be inconsistent with" the defendant's "authority derived from any law providing for equal rights."  28 U.S.C. §1443(2).  Although defendants removed under this provision (citing the NVRA's 90-day removal ban, D.E. 1 at 2), plaintiffs say §1443 does not apply, arguing that "[d]efendants have not claimed that they refused to enforce N.C. Gen. Stat. §163-82.11 because the statute discriminates on account of race or color."  Br. (D.E. 38) p.10.  That misunderstands §1443(2), which authorizes removal here because plaintiffs seek *relief* that would force the State Board to act in a manner inconsistent with federal law enacted expressly for the purpose of protecting equal civil rights.  *See* D.E. 1 at 2-3.

The Supreme Court has held that the phrase "any law providing for … equal civil rights" in §1443 "must be construed to mean any law providing for specific civil rights stated in terms of racial equality."  *Georgia v. Rachel*, 384 U.S. 780, 792 (1966), *quoted in Vlaming v. West Point School Board*, 10 F.4th 300, 309 (4th Cir. 2021).  The NVRA is such a statute.  It provides for a specific civil right—the "fundamental right" to "vote"—and prohibits "discriminatory and unfair registration laws and procedures" which "disproportionately harm … racial minorities."  52 U.S.C. §20501(a).

## III.    SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE-LAW CLAIMS IS PROPER UNDER 28 U.S.C. §1367(a)

Even if plaintiffs' complaint could be read to raise more than its core HAVA claim, this Court, if it has original jurisdiction over any claim alleged in this action, could then exercise supplemental jurisdiction over all of plaintiffs' related claims.  28 U.S.C. §1367(a).  Plaintiffs do not argue otherwise, and any such argument is thus forfeited, if not waived.  *Grayson O Co. v. Agadir International LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

**JA480**

## CONCLUSION

This Court should deny plaintiffs' motion to remand.

October 7, 2024                                    Respectfully submitted,

/s/ Seth P. Waxman                                 /s/ Jim W. Phillips, Jr.

SETH P. WAXMAN*                                    JIM W. PHILLIPS, JR.
DANIEL S. VOLCHOK*                                 N.C. BAR NO. 12516
CHRISTOPHER E. BABBITT*                            SHANA L. FULTON
GARY M. FOX*                                       N.C. BAR NO. 27836
JOSEPH M. MEYER*                                   ERIC M. DAVID
JANE KESSNER*                                      N.C. BAR NO. 38118
NITISHA BARONIA*                                   WILLIAM A. ROBERTSON
WILMER CUTLER PICKERING                            N.C. BAR NO. 53589
   HALE AND DORR LLP                               JAMES W. WHALEN
2100 Pennsylvania Avenue N.W.                      N.C. Bar No. 58477
Washington, D.C. 20037                             BROOKS, PIERCE, MCLENDON
Phone: (202) 663-6000                                 HUMPHREY & LEONARD, LLP
Fax: (202) 663-6363                                150 Fayetteville Street
seth.waxman@wilmerhale.com                         1700 Wells Fargo Capitol Center
daniel.volchok@wilmerhale.com                      Raleigh, N.C. 27601
christopher.babbitt@wilmerhale.com                 Phone: (919) 839-0300
gary.fox@wilmerhale.com                            Fax: (919) 839-0304
joseph.meyer@wilmerhale.com                        jphillips@brookspierce.com
jane.kessner@wilmerhale.com                        sfulton@brookspierce.com
nitisha.baronia@wilmerhale.com                     edavid@brookspierce.com
                                                   wrobertson@brookspierce.com
* Local Rule 83.1(e) special appearance.           jwhalen@brookspierce.com

**JA481**

# Exhibit 1

10/5/24, 4:19 PM          Back-to-Back Lawsuits: RNC Sues North Carolina State Board of Elections | GOP

Home  >  News  >  Press Releases  >  Back-To-Back Lawsuits: RNC Sues North Carolina State Board Of Elections

## PRESS RELEASE

# BACK-TO-BACK LAWSUITS: RNC SUES NORTH CAROLINA STATE BOARD OF ELECTIONS

🕐 AUG 26, 2024



WASHINGTON – For the second time in the last week, the RNC and NCGOP sued the North Carolina State Board of Elections (NCSBE) – this time for failing to require identification to prove citizenship. By violating Help America Vote Act (HAVA) and not checking the identification of approximately 225,000 voters, the agency is opening the door for non-citizens to vote.

RNC Chairman Michael Whatley stated: "The NCSBE has once again failed in its mandate to keep non-citizens off the voter rolls, fueling distrust and jeopardizing our elections. We are committed to the basic principle – and commonsense law – that only Americans decide American elections. Deliberately failing to follow the law, right before our country's most important election, is inexcusable. We will fight every day to ensure that NCSBE follows the law, cleans the voter rolls, and protects the vote for North Carolinians."

NCGOP Chairman Jason Simmons stated: "This State Board continually has problems ensuring voter rolls only have verified citizens. This lawsuit will remedy their ongoing refusal to collect the required information from those who want to take part in North Carolina elections. Accountability and fidelity to following the rule of law is long overdue for the most partisan Elections Board in state history."

Background:

- The NCSBE formerly used a voter registration form that failed to require HAVA-required identification information, such as a driver's license number or the last four digits of a Social Security Number.
- The NCSBE admitted the form was non-compliant with HAVA and eventually fixed it.
- But in the meantime, approximately 225,000 people registered without supplying the HAVA-required information.
- The NCSBE has refused to take remedial action, and did not reach out to these voters to collect the required information. The agency has offered a half-hearted promise to North Carolinians that those ineligible to register, but were allowed to anyways, will naturally filter themselves out.
- The NCSBE needs to be held accountable and do their job – we are taking action to ensure that only citizens and legal voters cast a ballot in November.
- Last week, we also sued the NCSBE for failing to check jury questionnaire responses to identify and remove non-citizens from the voter rolls, as required by law.

Read the filing HERE.



CONNECT

*Republican National Committee*

*Chairman Michael Whatley*

*Co-Chair Lara Trump*

**JA483**

https://gop.com/press-release/back-to-back-lawsuits-rnc-sues-north-carolina-state-board-of-elections/          1/2



© Copyright 2024 All Rights Reserved · Privacy Policy · Contact Us

By providing your phone number, you are consenting to receive calls and recurring SMS/MMS messages, including artificial, pre-recorded, autodialed and automated calls and texts, to that number from the Republican National Committee. Msg&data rates may apply. Reply HELP for help, STOP to end. Terms & conditions/privacy policy apply. Terms & Conditions

Paid for by the Republican National Committee. Not Authorized By Any Candidate Or Candidate's Committee. www.gop.com

**JA484**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### No. 5:24-CV-00547

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs*,<br><br>vs.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS, et al<br><br>*Defendants*, | **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** |

## INTRODUCTION

Defendants'[1] Motion to Dismiss reveals nothing but the flaws in their defense. Rather than being contrite about their admitted failure to comply with the law in registering voters, Defendants double down on their do-nothing approach to cleaning up their own mess. In doing so, Defendants blame Plaintiffs,[2] and by extension the people of North Carolina, for Defendants' own failures to create a compliant voter registration form. As such, the equitable relief Defendants desire in the form of a dismissal pursuant to the doctrine of laches, is barred by their own unclean hands. Nor can Defendants prove any unreasonable delay on the part of the Plaintiffs in this action. Moreover, Defendants arguments that the case should be dismissed pursuant to Federal Rule of Civil

---

[1] "Defendants" refers to the State Board of Elections ("NCSBE") and its members Alan Hirsch, Jeff Carmon, Siobhan Millen, Stacy Eggers IV, and Kevin Lewis in their respective official capacities, and the NCSBE's Executive Director Karen Brinson Bell.
[2] "Plaintiffs" refers to the Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP").

**JA485**

Procedure 12(b)(6) does nothing but support Plaintiffs' Motion for Remand because their arguments demonstrate that this Court lacks federal question jurisdiction.

## **FACTUAL BACKGROUND**

This lawsuit arises out of the NCSBE's unabashed failure to follow black letter law. It is undisputed that the law requires that applicants seeking to register to vote must provide either: (1) a driver's license number; or (2) the last four digits of their social security number before their registration form can be processed by the state. (Verified Compl. ¶29, 40; Defs. Br. p. 3). It is likewise undisputed that for an undetermined period of time, the NCSBE promulgated a voter registration form that failed to inform registrants that either their last four digits of their social security number or their driver's license number **must** be provided as part of the registration process. (Verified Compl. ¶48-51; Def. Br. pp. 5-6). No party disputes that this error was originally discovered by a third party—Ms. Carol Snow in or about October of 2023. (*Id*). It is estimated that this error infected approximately 225,000 voter registrations. (Verified Compl. ¶ 52). While Defendants issued a compliant voter registration form, shockingly, Defendants did nothing to attempt to cure these faulty registrations.

Ms. Snow's complaints continued into the summer of this year. At the NCSBE's June 17, 2024 meeting, the NCSBE denied Ms. Snow's request for relief, determining that North Carolina state law permits verification of voter identification through alternative means, and those alternative means were sufficient to satisfy the law. Plaintiffs promptly reached out to the NCSBE to understand the scope of the issue raised by Ms. Snow after becoming aware that the NCSBE refused to cure the problem. Unfortunately, Defendants refused to provide Plaintiffs with the information necessary to understand the scope of the NCSBE's abject failure to follow the law.

As a result, Plaintiffs filed their Verified Complaint in Wake County Superior Court on August 23, 2024, seeking a writ of mandamus and a permanent injunction arising from Defendants' violations of state law and the North Carolina Constitution. (Verified Compl. ¶¶ 77-96). Defendants' counsel accepted service of the Verified Complaint on August 27, 2024. On August 29, 2024 Plaintiffs filed a motion to expedite discovery and served a narrow set of discovery requests upon Defendants, seeking again the information requested earlier in the summer in order to understand the scope of the issue caused by the NCSBE's non-compliance. To date, Defendants have refused to respond to discovery. Twenty-five days later, on September 23, 2024, Defendants noticed their removal to this Court and then moved to dismiss.[3] In support of their dismissal, Defendants ask the Court for relief because of the lateness of the hour before the election, accusing Plaintiffs of playing games. (Def. Br. pp 8-9).

As described below, Defendants' dismissal arguments fail. The procedural history of this case, however, begs the question—if Defendants were on notice of its violation of the law as early as October of 2023, then why did they take no action to remedy the non-compliant voter registrations?

## ARGUMENT

### I.    The Court Lacks Jurisdiction.

At the outset, the Court must resolve the question of whether it has jurisdiction and issue a ruling on Plaintiffs' Motion to Remand before it can reach Defendants' Motion to Dismiss. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998) (declining to adopt the hypothetical jurisdiction doctrine and ordering issues of subject matter jurisdiction be reached before the merits).

---

[3] Plaintiffs filed a Motion to Remand and accompanying brief on October 1, 2024. [D.E. 37-38]

As the removing party Defendants have the burden to prove that subject matter jurisdiction exists. *Mayor of Balt. v. BP P.L.C.,* 31 F.4th 178, 197 (4th Cir. 2022). Defendants fail to meet that burden. Defendants' briefing conflates federal and state law on a variety of substantive issues to create a basis for federal jurisdiction. Defendants' claims that North Carolina law on laches and common law mandamus are the same as their federal counterparts are simply wrong. Similarly, claims brought under Article I, Section 19 of the North Carolina Constitution are not always the same as equal protection claims. Finally, it is well settled that Defendants' invocation of a federal defense (Br. at p. 18) under the NVRA cannot form the basis for federal jurisdiction. *Caterpillar Inc., v. Williams*, 482 U.S. 386, 392-93 (1987) ("it is now settled law that a case may not be removed to federal court on the basis of a federal defense"). This is true even when the defense is anticipated in the plaintiff's complaint, and even in circumstances (not present here) where both parties concede that the federal defense is the only question truly at issue. *Id.*; *see also Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 198-99 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795, 215 L. Ed. 2d 678 (2023); *Badalato v. Wish to Give Prod., LLC*, No. 7:19-CV-66-FL, 2019 WL 3661164, at *4 (E.D.N.C. Aug. 6, 2019).

To the extent this Court finds that Defendants have met the minimum threshold of proving subject matter jurisdiction, which it should not, abstention is appropriate. As a general principle, "federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). But even in circumstances where a court may exercise jurisdiction, there are certain instances when the United States Supreme Court has held that "the prospect of undue interference with state court proceedings counsels against federal relief." *Id.* (citation omitted). One such instance applicable here is *Pullman* abstention. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).

**JA488**

*Pullman* abstention "is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question." *Meredith v. Talbot Cnty.*, 828 F.2d 228, 231 (4th Cir. 1987) (citations omitted). *Pullman* abstention is warranted when there is (1) "an unconstrued state statute" that "is susceptible of a construction by the state judiciary[,]" which (2) could "avoid in whole or in part the necessity for the federal constitutional adjudication, or at least materially change the nature of the problem." *Bellotti v. Baird*, 428 U.S. 132, 146-47 (1976) (quotations omitted).

Here, Defendants admit that that "no state or federal court has ever recognized a cause of actions for violations of [N.C. Gen. Stat. §163-82.11]." (Br. at p. 11). Both of Plaintiffs' causes of action, for mandamus and violation of Article I, Section 19 of the North Carolina constitution, are premised upon Defendants' refusal to comply with N.C. Gen. Stat. §163-82.11. (*See* Verified Compl. at ¶¶77-96).  As such, this Court should abstain from determining these issues so that the state courts can resolve the scope of the North Carolina statute before further adjudication by federal courts.  However, to the extent this Court might decide to exercise jurisdiction over one or more of Plaintiffs' claims, which it should not, North Carolina substantive law applies under well-established choice of law principles. *See, e.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427-28 (1996); *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 781-82 (2023).

## II.    Defendants' Laches Defense Fails.

Laches is not a basis for dismissal of Plaintiffs' suit. Laches is "a rule of equity by which equitable relief is denied to one who has been guilty of unconscionable delay, as shown by surrounding facts and circumstances, in seeking that relief." *Harris & Gurganus, Inc. v. Williams*, 37 N.C. App. 585, 588, 246 S.E.2d 791, 794 (1978). The party asserting laches has the burden of proof. *Id.* Defendants fail to meet that burden of proof for several reasons. First, Defendants cite

only to the federal standard for laches, but ignore the fact that North Carolina's laches doctrine is different than its federal counterpart. Because Plaintiffs' claims were brought under state law, even if this court has jurisdiction, which it does not, the Court is bound to apply state substantive law. *Gasperini,* 518 U.S. at 427-28. Second, Defendants' entire theory of laches is predicated on the un-plead and faulty premise that Plaintiffs knew of Ms. Snow's complaints to the NCBSE in October of 2023.  Third, Plaintiffs cannot seek an equitable defense because their own hands are unclean.

Plaintiffs cite to a threadbare federal standard that the elements of laches are met when a plaintiff shows "a lack of diligence in bringing its claim" and when "that lack of diligence has prejudiced the defendant." (Def. Br. p. 7 citing *White v. Daniel,* 909 F.2d 99, 102 (4th Cir. 1990)). Under North Carolina law the elements of laches are more robust. Specifically, under North Carolina law:

> To establish the affirmative defense of laches, our case law recognizes that 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*Johnson v. N. Carolina Dep't of Cultural Res*., 223 N.C. App. 47, 55, 735 S.E.2d 595, 600 (2012) *quoting MMR Holdings, LLC v. City of Charlotte,* 148 N.C. App. 208, 209–10, 558 S.E.2d 197, 198 (2001).

At base, Defendants have a duty to prove an unreasonable delay. *Id.* But Defendants' entire theory of delay is predicated on the faulty premise that Plaintiffs knew of Ms. Snow's complaints to the NCBSE in October of 2023. To be clear, Ms. Snow is not a Plaintiff in this case, nor is she

**JA490**

an employee or agent of Plaintiffs. While the Complaint acknowledges that Ms. Snow raised this issue first with the NCSBE in October of 2023, Defendants ask this Court to take a leap of faith (outside of the allegations of the Complaint) and impute Ms. Snow's knowledge from October of 2023 to Plaintiffs.[4] Notably, Defendants fail to present the Court with any authority that would support such a leap of faith. Rather, it is undisputed that when Plaintiffs became aware that NCSBE would not resolve this issue, they properly first sought to resolve the issue with the NCSBE directly. When that failed, Plaintiffs were left with no choice but to seek emergency relief. Moreover, delay has not caused the relationship between the parties to cease. To the extent Ms. Snow's knowledge can be imputed to Plaintiffs (which it cannot), the relationship has not been altered. The NCSBE is still a state agency that failed to comply with black letter law providing basic voter integrity safeguards which were supposed to be implemented **before** the NCSBE processed voter registration applications. Plaintiffs are still organizations attempting to ensure that the NCSBE not only follows black letter law going forward, but also to ensure NCSBE cures its past failure to do so. As such, there is no change in the relations of the parties. *See Johnson,* 735 S.E.2d 595, 600 (N.C. App. 2012) (holding there was no relationship change between the parties where one party died because the descendants possessed the same rights in the Collection).

Nor can Defendants show that Plaintiffs acted with unreasonable delay. First, all cases cited by Defendants in supported of the allegedly unreasonable delay involved a delay of the party who ultimately brought suit. Here, that is not the case, and as discussed above, Defendants cannot impute Ms. Snow's knowledge to Plaintiffs. To the extent Defendants argue on reply that Plaintiffs delay of a few weeks is unreasonable, this too misses the mark. Upon receiving and verifying

---

[4] That Plaintiffs know now that Ms. Snow raised this issue in October of last year is immaterial. What matters is when Plaintiffs learned of this issue and whether any delay (if there was even a delay at all) was unreasonable.

**JA491**

7

information regarding this issue, Defendants promptly contacted the NCSBE. That the NCSBE failed to take any steps to mitigate its failure to follow the law after the issue was raised not once, but twice, can only speak to the unreasonableness of the NCSBE's own conduct and need for mandamus, not an unreasonable delay on the part of Plaintiffs.

Any delay here is materially different than the time periods in the cases cited by Plaintiffs. In *White,* the delay was seventeen years. 909 F.2d at 100-101. In *Perry v. Judd,* the delay was four months. 471 F. App'x 219, 224 (4th Cir. 2012). In *Voters Organized for the Integrity of Elections v. Balt. City Elections Bd.,* 214 F. Supp. 3d 448, 455 (D. Md. 2016), the issue was not just the timeliness of the complaint, but also the failure to seek an expedited basis for relief, which Plaintiffs did here. And finally, in *Pierce,* the plaintiffs not only delayed in bringing suit, but raised no objections during the legislative process (despite their being several avenues for them to do so) and failed to put the Defendants on notice of the suit in the time between the passage of the plans and the filing of the suit and motion for preliminary injunction. *See Pierce v. N. Carolina St. Board of Elections*, 97 F.4th 194, 222 (4th Cir. 2024). Finally, Defendants' own actions here cut against their arguments of delay. Instead of moving to dismiss in state court, Defendants waited nearly the full time allotted to them under law to remove to federal court, and then moved to dismiss, tying this case up in extra weeks of litigation.

Finally, Defendants are barred from using an equitable defense to obtain dismissal because of their own unclean hands. It is well settled that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814–15 (1945). *See also Brissett v. First Mount Vernon Indus. Loan Ass'n,* 233 N.C. App. 241, 255, 756 S.E.2d 798, 808–09 (2014) ("The doctrine of clean hands is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands."); *Worldcom, Inc. v. Boyne,*

68 F. App'x 447, 451 (4th Cir. 2003) ("The doctrine of unclean hands prevents a plaintiff from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" (internal quotation omitted)). Defendants' hands are far from clean. Defendants admit (Br. pp. 5-6) that this issue was raised by Ms. Snow in October of 2023. Defendants further admit that the NCSBE changed the voter registration form to be compliant with the law after receiving Ms. Snow's complaint. (*Id.*). Finally, Defendants admit that Ms. Snow continued to object to the adequacy of that change (*Id.*).

Put simply, Defendants knew they broke the law, cured the non-compliant registration regime after several months on a going-forward basis, but did **nothing** to address the adequacy of those who registered under the non-compliant regime. Defendants had months to address these registration concerns and willfully failed to do so, ultimately deciding at its June 17, 2024 meeting that the supposed state law process for verification of voter identification through alternate means is sufficient. Nothing prevented the NCSBE from reaching out to the individuals who registered under the non-compliant regime to get the required information and cure any deficiency. Now, in support of their argument that laches bars Plaintiffs claims, the NCSBE claims it's too late to address the non-compliant registrations. But it is precisely because of the NCSBE's refusal to clean up a mess of its own making that puts the parties, and the Court, in this time crunch. [5]

## III.    The Complaint States Claims Upon Which Relief Can (and Should) Be Granted.

Defendants' arguments seeking dismissal pursuant to Rule 12(b)(6) do nothing but prove the Court should grant Plaintiffs' Motion to Remand. In evaluating a motion to dismiss under Rule

---

[5] Even assuming arguendo the federal standard applies, it is clear that Plaintiffs quickly raised this issue with the NCSBE when they became aware of, and promptly filed suit when an out of court resolution proved fruitless. Moreover, any "prejudice" Defendants claim as a result of this suit is more properly attributed to their own failure to cure a known issue in a timely manner.

12(b)(6), the court's inquiry focuses on whether the complaint, viewed in the light most favorable to the plaintiff, presents sufficient factual matter to establish a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court must refrain from dismissing a complaint unless it is "beyond doubt" that the plaintiff cannot prove any set of facts that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Here it is clear that Plaintiff can prove facts that entitle them to relief. In fact, it is undisputed that Defendants failed to comply with the law. The only question is how to remedy that abject failure.

### A.    Plaintiffs Adequately Stated a Claim Under North Carolina Common Law for Mandamus Relief.

Plaintiffs' mandamus action is brought under North Carolina common law. The North Carolina Supreme Court has made clear that North Carolina law treats mandamus actions differently than federal courts in *Committee to Elect Dan Forest v. Employees Political Action Committee*, 376 N.C. 558, 569, 853 S.E.2d 698, (2021) (discussing North Carolina's incorporation of "the prerogative writ of mandamus" through the common law). N.C. Gen. Stat. §4-1 ("Common law declared to be in force"). Indeed, the North Carolina Supreme Court has held that "[s]ince 1776, North Carolina law contemplated that the writ of mandamus and an action in the nature of the writ of quo warranto were available without any showing of a personal stake in the litigation, continuing a legacy that originated in the earliest days of the common law." *Comm. to Elect Dan Forest*, 376 N.C. at 591, 853 S.E.2d at 722. Therefore, not only must North Carolina's common law mandamus rules apply, but the federal standards cited by Defendants are inapplicable here.

Additionally, the one state court case Defendants cite, *In re T.H.T.*, 362 N.C. 446, 665 S.E.2d 54 (2008), involved a mandamus action brought on appeal pursuant to Rule 22 of the North

**JA494**

Carolina Rules of Appellate Procedure when a trial court failed to adhere to statutory timelines. (Defs. Br. p. 16). Notably, it is questionable whether *In re T.H.T.* is still good law in the wake of *Committee to Elect Dan Forest*. Moreover, Plaintiffs do not bring suit under N.C. R. App. P. 22. North Carolina's common law mandamus rules only require proof that a public official defendant has failed to perform a specified official duty imposed by law. *Comm. to Elect Dan Forest*, 376 N.C. at 574, 853 S.E.2d at 711 (citing *Carr v. Coke*, 116 N.C. 223, 223, 22 S.E. 16, 16 (1985)).

Applying the correct law, Plaintiffs have stated a claim that § 163-82.11(c) requires the statewide computerized voter registration list and database to meet the HAVA requirements, which in turn require an applicant to present either a driver's license number or the last four digits of their SSN. Defendants admit this duty in their Memorandum in Support of their Motion to Dismiss. That is all that is required under North Carolina law. *Comm. to Elect Dan Forest*, 376 N.C. at 574, 591, 853 S.E.2d at 711, 722; *Carr v. Coke*, 116 N.C. 223, 223, 22 S.E. 16 (1895). There is no requirement of a "clear right" and "alternative route to relief" and as such those prongs simply do not apply[6].

Nevertheless, even under the federal standards, Defendants have failed to state how Plaintiffs' factual allegations are lacking. Instead, Defendants misconstrue the burden of proof and attack remedies that are plainly viable, such as provisional ballots. It is undisputed that North Carolinians can vote provisionally, N.C. Gen. Stat. § 163-166.12(e), giving impacted individuals time to present the missing required information. And Defendants' arguments (Br. p. 10) that this would be a "Herculean administrative task" falls flat, as Defendants' have been on notice of this "administrative task" for over a year. That the "administrative task" is now "Herculean" is the

---

[6] Even if the Court were to erroneously apply the federal mandamus standard, whether there is a "clear right" for political parties to enforce §163-82.11(c) is a matter of first impression and, again, interpretation of that statute is best left to the discretion of state courts under *Pullman* abstention.

direct result of Defendants refusal to follow the law, and their refusal to provide notice to impacted registrants over the course of the last year. This is the *exact* reason mandamus is both needed and appropriate.

**B.    Plaintiffs Also State a Claim Under Article I, Section 19 of the North Carolina Constitution.**

As with Plaintiffs' mandamus claim, Defendants again seek to construe a state law claim as a federal one in a not-so-veiled attempt at forum shopping.  While the North Carolina Supreme Court's analysis of Article I, Section 19 of the North Carolina Constitution "generally follows" the corresponding federal clause, *see Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E. 759, 762 (2009), state courts are not bound by the federal court cases that Defendants cite. *See, e.g., Libertarian Party of N. Carolina v. State*, 365 N.C. 41, 47, 707 SE.2d. 199, 203 (2011); *Northampton Cnty. Drainage Dist. No. One v. Bailey,* 326 N.C. 742, 745–47, 392 S.E.2d 352, 355–56 (1990). (Defs. Br. at 19-20).

Moreover, Defendants' argument that N.C. Gen. Stat. § 163-166.12 provides safeguards "to ensure that voters who fail to provide a driver's license or social security number do not vote illegally" (Def. Br. p. 18) is false. N.C. Gen. Stat. § 163-166.12(d) states that:

> Regardless of whether an individual has registered by mail or by another method, if the individual has provided with the registration form a driver's license number or last four digits of a Social Security number but the computer validation of the number as required by G.S. 163-82.12 did not result in a match, and the number has not been otherwise validated by the board of elections, in the first election in which the individual votes that individual shall submit with the ballot the form of identification described in subsection (a) or subsection (b) of this section, depending upon whether the ballot is voted in person or absentee.

Setting aside the serious question of whether an individual who fills out a voter registration application that fails to comply with the law is lawfully "registered to vote" the statute clearly contemplates that an individual who *has* provided a license number or the last four of digits of his

**JA496**

12

or her SSN, but has the match fail, has an opportunity to cure that deficiency by presenting other identification.[7] However, the statute does not contemplate a situation like this one, where no social security number or drivers' license number was provided because the form promulgated by the NCSBE violated the law. Crucially, the entirety of N.C. Gen. Stat. § 163-166.12 is premised on NCSBE following the law and create a compliant form requiring applicants to provide their identification information. Defendants' willful refusal to remedy its violation of the law and contact individuals who registered under the non-complaint registration scheme is, thus, the proper subject matter of mandamus.

Moreover N.C. Gen. Stat. §163-166.12(e) provides the right for an individual to vote provisionally. This is the precise relief Plaintiffs seek in this action. (Prayer for Relief ¶2). As such, Defendants' *Purcell* arguments, which rest upon the idea that it is too late to change laws before the election also fail. Plaintiffs seek not to change the law, but enforce existing law and have individuals who may be subject to the remedy process provide information that should have been required on their voter registration application. And any argument about the lateness of this request is barred by Defendants' own unclean hands on the subject. This is more than enough for Plaintiffs' state law constitution claim to survive Defendants' motion to dismiss.

## CONCLUSION

For these reasons, should this Court find that subject matter jurisdiction exists in the first instance, then Plaintiff's Motion to Dismiss pursuant to Rule 12(b)(6) should be denied in its entirety.

---

[7] It is the Plaintiffs' position that, at a minimum, any individual who did not provide a driver's license number or the last four digits of his or her SSN because of the NCSBE's non-compliant registration form is not "[a]n individual who has registered to vote" under N.C. Gen. Stat. §163-166.12 because they failed to complete the requirements of registration under the law.

**JA497**

13

Respectfully submitted, this the 7th day of October, 2024.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**BAKER DONELSON BEARMAN,
CALDWELL & BERKOWITZ, PC**

By: /s/    John E. Branch, III
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Attorneys for Plaintiffs*

**JA498**

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)

I hereby certify that this memorandum of law is in compliance with Local Rule 7.2(f)(3) as the brief, including headings, footnotes, citations, and quotations, contains no more than 8,400 words as indicated by the computer's word processing program.

This, the 7th day of October, 2024.

/s/ Phillip J. Strach
Phillip J. Strach
*Counsel for Plaintiffs*

**JA499**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send electronic notification of such to all counsel of

record in the above-captioned matter.

This, the 7th day of October, 2024.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

**JA500**

16

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | | |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **STATE BOARD DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO REMAND** |
| Defendants, | ) ) | |
| and | ) ) | |
| THE DEMOCRATIC NATIONAL COMMITTEE, | ) ) | |
| Intervenor-Defendant. | ) | |

**JA501**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

    A.  Statutory Background. ................................................................................ 3

    B.  Procedural History. ................................................................................... 4

ARGUMENT ............................................................................................................ 6

   I.  Legal Standard ......................................................................................... 6

  II.  Removal Is Proper Because Plaintiffs' Claims Necessarily Raise a Disputed
      and Substantial Federal Question and Therefore Arise Under Federal Law. .................... 6

    A.  The Court necessarily must construe HAVA to resolve Plaintiffs' claims. ................. 7

    B.  The State Board disagrees with Plaintiffs' construction of HAVA. ........................... 9

    C.  The proper construction of HAVA is a substantial federal question. ......................... 10

    D.  Construing HAVA in federal court is consistent with Congress's division
        of labor between federal and state courts. ................................................................ 12

  III.  Removal Is Proper Because Plaintiffs Are Suing the State Board for Refusing
       to Take Acts that Are Inconsistent with Federal Civil Rights Laws. ............................... 13

CONCLUSION ......................................................................................................... 17

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3) ........................ 19

CERTIFICATE OF SERVICE .................................................................................. 20

**JA502**

# TABLE OF AUTHORITIES

**Cases**

*Arcia v. Fla. Sec'y of State*,
 772 F.3d 1335 (11th Cir. 2014) ............................................................ 14

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
 489 U.S. 141 (1989) ............................................................................. 11

*Cavanagh v. Brock*,
 577 F. Supp. 176 (E.D.N.C. 1983) ...................................................... 16

*City of Greenwood v. Peacock*,
 384 U.S. 808 (1966) ............................................................................. 16

*Common Cause v. Lewis*,
 358 F. Supp. 3d 505 (E.D.N.C. 2019) ................................................. 16

*First Fed. Sav. & Loan Ass'n v. Baker*,
 860 F.2d 135 (4th Cir. 1988) ................................................................. 8

*Georgia v. Rachel*,
 384 U.S. 780 (1966) ............................................................................. 15

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005) .......................................................... 1, 7, 9, 11, 12

*Gunn v. Minton*,
 568 U.S. 251 (2013) ............................................................................. 11

*In re T.H.T.*,
 362 N.C. 446, 665 S.E.2d 54 (2008) ..................................................... 8

*Jackson v. Riddell*,
 476 F. Supp. 849 (N.D. Miss. 1979) .................................................... 17

*King v. Marriott Int'l, Inc.*,
 337 F.3d 421 (4th Cir. 2003) ................................................................. 6

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*,
 No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ........... 14

*North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*,
 853 F.3d 140 (4th Cir. 2017) (amended) ............................................... 7

*O'Keefe v. N.Y.C. Bd. of Elections*,
 246 F. Supp. 978 (S.D.N.Y. 1965) ...................................................... 15

**JA503**

*Old Dominion Elec. Coop. v. PJM Interconnection, LLC,*
 24 F.4th 271 (4th Cir. 2022) ............................................................. 7

*Smith v. Winter*,
 717 F.2d 191 (5th Cir. 1983) ........................................................... 17

*Strawn v. AT & T Mobility LLC,*
 530 F.3d 293 (2008) ......................................................................... 6

*Vlaming v. W. Point Sch. Bd.*,
 10 F.4th 300 (4th Cir. 2021) ........................................................... 14

*Whatley v. City of Vidalia*,
 399 F.2d 521 (5th Cir. 1968) ........................................................... 15

**Statutes**

28 U.S.C. § 1331 ............................................................................ 7, 12

28 U.S.C. § 1441 ..................................................................... 1, 2, 6, 13

28 U.S.C. § 1443 ....................................................................... passim

52 U.S.C. § 10307 ............................................................................. 16

52 U.S.C. § 20501 ........................................................................ 4, 15

52 U.S.C. § 20507 .................................................................... 4, 13, 14

52 U.S.C. § 21083 ................................................................. 3, 4, 9, 12

52 U.S.C. § 21111 ............................................................................. 12

Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 .................... 11

N.C. Gen. Stat. § 163-82.11 ......................................................... 2, 5, 8, 12, 15

**Constitutional Provision**

U.S. Const., art. III, § 2 ...................................................................... 7

**Other Authority**

S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278 (Leg. Hist.) .......... 15

**JA504**

## INTRODUCTION

Plaintiffs' Complaint repeatedly alleges that the State Board is engaged in "ongoing violations of . . . federal law"—specifically, the Help America Vote Act ("HAVA"). Compl. (D.E. 1-3) ¶ 6.[1] Plaintiffs now attempt to downplay their reliance on federal law because they would much prefer to proceed in state court. In particular, Plaintiffs emphasize that their Complaint "is devoid of *any* causes of action arising under HAVA or any federal law," and instead raises only two state-law claims. Remand Mem. (D.E. 38) at 3-4. True enough, but not dispositive. Federal courts have developed doctrines to ensure that plaintiffs cannot artfully plead away federal jurisdiction when their claims necessarily turn on the construction of federal law. Specifically, federal courts retain jurisdiction to consider a plaintiff's state-law claims when those claims necessarily raise a substantial and disputed federal question. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005) (clarifying the tests for removal under 28 U.S.C. § 1441(a)).

Here, the substantial federal-question doctrine suffices to defeat Plaintiffs' attempt to avoid federal court. Plaintiffs' "state-law" claims arise from an alleged violation of a state statute that is titled "Compliance with Federal Law" and whose sole function is to require the State Board to implement certain provisions of HAVA. Compl. ¶¶ 77-88, 90-93 (citing N.C. Gen. Stat.

---

[1] *See also* Compl. ¶ 5 (alleging that the State Board "violated HAVA"); Compl. ¶ 9 (alleging that the State Board's refusal to purge certain voters or have those voters cast a provisional ballot is a "violation of HAVA"); Compl. ¶ 10 (alleging that the State Board "violated federal law"); Compl. ¶ 15 (claiming organizational standing based on the State Board's alleged "violations of HAVA"); Compl. ¶ 16 (claiming that Plaintiff North Carolina Republican Party is harmed by the State Board's alleged "ongoing HAVA and state law violations"); Compl. ¶ 47 (alleging that the State Board "wholly failed to uphold" "both state and federal law"); Compl. ¶ 65 (alleging the State Board "violated both state and federal law"); Compl. ¶ 68 (alleging that the State Board "contraven[ed] . . . both federal and state law"); Compl., Prayer for Relief ¶ 2 (asking the Court to remedy the State Board's alleged "violations of state law and HAVA").

**JA505**

§ 163-82.11 (c)). Unsurprisingly, determining whether the State Board violated this "Compliance with Federal Law" statute will require this Court to construe federal law.

Moreover, the State Board and Plaintiffs disagree about how to construe HAVA. Deciding whose reading is correct is a task best entrusted to federal courts. After all, imposing uniformity in federal elections was one of Congress's main reasons for passing HAVA. Diverse—and potentially divergent—state-court interpretations of HAVA threaten that uniformity, not to mention the ability of voters across the country to exercise one of their most fundamental rights. Because Plaintiffs' Complaint necessarily raises a substantial and disputed federal question, the Complaint arises under federal law. Accordingly, this Court should deny Plaintiffs' motion to remand.

Even if the Court disagrees that Plaintiffs' claims arise under federal law, the State Board's removal was nevertheless proper. Plaintiffs' Complaint challenges the State Board's refusal to remove a quarter of a million voters in the middle of the general election. The State Board is refusing to conduct such a purge because doing so would violate the National Voter Registration Act ("NVRA"). Congress has made clear that state officials who, like the State Board here, refuse to take an action because doing so would run afoul of a civil rights law are entitled to a federal forum. 28 U.S.C. § 1443(2). Thus, § 1443(2) is an independent basis for the State Board's removal.

Plaintiffs chose to premise their Complaint on allegations that the State Board violated federal law and to demand that the State Board take actions prohibited by federal civil rights law. Those choices subject Plaintiffs to this Court's jurisdiction under both § 1441 and § 1443. The Court should therefore deny their motion to remand.

## STATEMENT OF FACTS

### A.      Statutory Background

Section 303 of HAVA instructs States to gather certain identification information from individuals as part of the voter registration process. *E.g.*, 52 U.S.C. § 21083(a)(4)(A), (a)(5)(A). For instance, States are not to "accept[ ] or process[ ]" a voter-registration application "unless the application includes" either an applicant's driver's license number or the last four digits of her social security number. *Id.* § 21083(a)(5)(A)(i). If an applicant does not have a driver's license or social security number, States must assign the applicant an identification number. *Id.* § 21083(a)(5)(A)(ii).

Relatedly, HAVA imposes certain requirements on voters who register by mail the first time they vote in a federal election in the jurisdiction. Before those individuals can cast a ballot, whether by mail or in person, they must provide either "current and valid photo identification" or an official document like a bank statement that verifies the voter's name and address. *Id.* § 21083(b)(2)(A)(i)-(ii). Voters who include a driver's license or social security number on their registration application are exempt from this requirement, so long as the State is able to validate the number provided. *Id.* § 21083(b)(3)(B).

HAVA also tasks the "chief State election official" in each State with "implement[ing], in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." *Id.* § 21083(a)(1)(A). State elections officials are then required to "perform list maintenance . . . on a regular basis." *Id.* § 21083(a)(2)(A). Voters may be removed, among other reasons, based on "felony status" or because they have died. *Id.* List maintenance must "be conducted in a manner that ensures that . . . the name of each registered voter appears in the computerized list [and] only voters who are not registered or who are not eligible to vote are removed." *Id.* § 21083(a)(2)(B).

**JA507**

If elections officials remove any voters, HAVA requires they do so "in accordance with the provisions of the National Voter Registration Act of 1993," a federal law that Congress enacted to eliminate voter purges that disproportionately disenfranchise racial minorities on the eve of an election. *Id.* § 21083(a)(2)(A)(i); *see id.* § 20501 (a)(3). The NVRA provides for the removal of ineligible voters from the rolls in specific circumstances, but demands that all systematic removals be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507 (c)(2)(A). This election cycle, the NVRA cut-off was August 7, 2024.

### B.    Procedural History

When the State Board designed its voter registration form in the wake of HAVA's passage, it failed to make clear that voters with a driver's license or social security number needed to include one of those numbers on the registration form. Compl. ¶ 50. Plaintiffs estimate that roughly 225,000 North Carolinians registered to vote using this form without providing either number. Compl. ¶ 52.

The State Board was alerted to the error in the registration form by a complaint filed by Ms. Carol Snow on October 6, 2023. Compl. ¶¶ 48-49. The State Board considered the complaint at its November 28, 2023 meeting. Compl. ¶ 51. On December 6, 2023, the State Board ordered that the form be changed to indicate that voters must provide either a driver's license or the last four digits of their social security number or check a box indicating that they do not have such numbers. Compl. ¶¶ 42, 50, 51, 54. The State Board declined, however, to take any action with respect to voters who had already been registered. Compl. ¶ 55. The State Board noted that, consistent with HAVA, "any voter who did not provide a driver's license number or the last four digits of a Social Security number would have had to provide additional documentation to prove their identity before being allowed to vote." Compl. ¶ 51 n.4 (citing the

**JA508**

State Board's Dec. 2023 Order at 4-5). The State Board thus had no reason to believe that the error in the form had resulted in any ineligible voters being allowed to vote. Compl. ¶ 51 n.4 (citing Dec. 2023 Order at 4-5). HAVA, the State Board further explained, did not authorize, much less require, action to remove eligible voters. Compl. ¶ 51 n.4 (citing Dec. 2023 Order at 4).

On August 23, 2024, more than eight months after the State Board's December 6, 2023 Order, Plaintiffs filed their Complaint in North Carolina Superior Court for Wake County. By that point, Election Day was just 74 days away, and voting by mail was set to begin in a matter of weeks.

Plaintiffs allege that the State Board is violating N.C. Gen. Stat. § 163-82.11(c), and demand a writ of mandamus ordering the State Board to come into compliance. *E.g.*, Compl. ¶¶ 77-88, 91-93. They also assert, without explanation, that the State Board's alleged violation of § 163-82.11(c) runs afoul of Article I, Section 19 of the North Carolina Constitution. Compl. ¶¶ 89-96. Section 163-82.11(c) is titled "Compliance with Federal Law" and requires the State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Voter Act of 2002."

To remedy the State Board's alleged violation of HAVA, Plaintiffs ask this Court to order the State Board to "identify[] all ineligible registrants and remov[e] them from the state's voter registration lists." Prayer for Relief ¶ 2. Alternatively, Plaintiffs request that the Court direct the State Board to require all individuals who submitted the pre-December 2023 registration form without a driver's license or social security number "to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation" of this information. Prayer for Relief ¶ 2.

**JA509**

Plaintiffs served their Complaint on the State Board on August 27, 2024. Although the Complaint insists that Plaintiffs' allegations demand "immediate action[]," including relief by September 6, 2024 (a date that has long since passed), Compl. ¶ 76, Prayer for Relief ¶ 2, Plaintiffs declined to file a motion for a temporary restraining order, preliminary injunction, or other emergency relief. Instead, Plaintiffs filed a single motion for expedited discovery.

The State Board removed this case from North Carolina Superior Court for Wake County to this Court on September 23, 2024. D.E. 1. More than a week later, and after the State Board filed a motion to dismiss Plaintiffs' Complaint, *see* D.E. 30, Plaintiffs filed an "emergency" motion to remand. D.E. 37.

## ARGUMENT

### I.    Legal Standard

Federal law allows a defendant to remove certain claims originally brought in state court into federal court. *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 424 (4th Cir. 2003). A defendant may remove nearly any claim that a federal district court would have original jurisdiction over. 28 U.S.C. § 1441(a). Additionally, a defendant who is a state official may remove a claim that is based on the official's refusal to take an act that would be inconsistent with a federal law providing for equal rights. 28 U.S.C. § 1443(2). The defendant bears the burden of demonstrating that removal is proper. *Strawn v. AT & T Mobility LLC*, 530 F.3d 293, 296-97, 299 (2008) (reversing district court's order remanding a case to state court).

### II.   Removal Is Proper Because Plaintiffs' Claims Necessarily Raise a Disputed and Substantial Federal Question and Therefore Arise Under Federal Law.

Removal of Plaintiffs' Complaint is proper under 28 U.S.C. § 1441(a). With a few exceptions not relevant here, § 1441(a) allows a defendant to remove any claim over which a federal district court would have original jurisdiction. Federal district courts have original

**JA510**

jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* § 1331; *see also* U.S. Const., art. III, § 2, cl. 1.

Claims "arise under" federal law in several ways. A suit obviously arises under federal law when federal law supplies the plaintiff's cause of action. *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 279 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 87 (2022). But a suit that contains only state-law claims can also "arise under" federal law, so long as vindication of the alleged state-law right "turns on some construction of federal law." *North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017) (amended) (cleaned up, citation omitted). Indeed, it is just "common[]sense" that federal courts "ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312.

Under this second test (sometimes called "the *Gunn-Grable* framework" in this circuit), "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal state balance approved by Congress." *Old Dominion*, 24 F.4th at 280 (citation omitted). Applying that test here reveals that Plaintiffs' state-law claims turn on a substantial federal question and therefore arise under federal law.

## A.     The Court necessarily must construe HAVA to resolve Plaintiffs' claims.

Plaintiffs' claims necessarily raise a federal issue. A state-law claim necessarily raises a federal issue when one or more elements of the state-law claim "rise[s] or fall[s] on the resolution of a question of federal law." *Id.* (citation omitted). As Plaintiffs themselves concede in their Complaint, both of their claims turn on a determination of what HAVA requires of the State Board. Compl. ¶ 31 (explaining that "it is important to review what [section 303(a) of HAVA] requires of Defendants" to understand Plaintiffs' state-law claims).

**JA511**

7

Plaintiffs' first claim asks this Court to issue a writ of mandamus to remove, en masse, any voters who were registered without providing a driver's license or social security number or to require those voters "to cast a provisional ballot in upcoming elections pending Defendants' receipt and confirmation of the required HAVA information." Prayer For Relief ¶ 2. To prevail on this mandamus claim, Plaintiffs must show, among other things, that they have a "clear right" to relief and that the State Board "has a clear duty to do the particular act requested." *First Fed. Sav. & Loan Ass'n v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988); *see also In re T.H.T.*, 362 N.C. 446, 453, 665 S.E.2d 54, 59 (2008) (same, state law).[2]

Plaintiffs claim that N.C. Gen. Stat. § 163-82.11(c) imposes this "clear duty" and supplies their "clear right" to relief. In their view, that state law compels the State Board to remove eligible voters who did not provide a driver's license or social security number or force them to vote provisionally, and entitles Plaintiffs to a court order commanding the State Board to remove voters from the rolls. *See* Compl. ¶ 85, Prayer for Relief ¶ 2. But § 163-82.11(c) merely requires the State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." To determine the scope of any rights that § 163-82.11 grants, or any duty that it imposes, the Court must construe HAVA.

Plaintiffs' ill-defined state-constitutional claim would also seem to depend on a construction of HAVA. Though the precise nature of Plaintiffs' claim is unclear, Plaintiffs appear to be making a vote-dilution argument. They allege that the State Board failed to

---

[2] Even if Plaintiffs are correct that they need only show that the State Board failed to perform an official duty imposed by law, it is *federal* law they claim imposed the official duty on the State Board. *See* Pls.' Resp. to Defs.' Mot. to Dismiss (D.E. 50) at 11 (asserting that "HAVA . . . require[s] an applicant to present either a driver's license number or the last four digits of their SSN").

**JA512**

8

"maintain the state's voter rolls in a manner compliant with Section 303(a) of HAVA" by refusing to remove voters who registered using a form that did not clearly require their driver's license or social security number. Compl. ¶¶ 90, 94. According to Plaintiffs, the State Board's failure to remove those voters means that hundreds of thousands of illegitimate voters remain on the State's rolls, diluting the power of Plaintiffs' voters. Compl. ¶¶ 92, 94. But the voters' inclusion on the rolls is illegitimate only if Plaintiffs are correct that HAVA requires the State Board to remove them. Thus, just as with Plaintiffs' mandamus claim, the Court must necessarily construe HAVA to evaluate Plaintiffs' constitutional claim.

Plaintiffs premised both of their state-law claims on the State Board's alleged violation of HAVA, a federal law. Accordingly, their Complaint necessarily raises a federal issue. *Grable*, 545 U.S. at 314.

**B.     The State Board disagrees with Plaintiffs' construction of HAVA.**

The federal question raised by Plaintiffs' Complaint—whether HAVA requires the State Board to remove or require a provisional ballot from voters who were registered without providing a driver's license or social security number—is also actually disputed. As the State Board recently explained in its motion to dismiss Plaintiffs' Complaint, it does not read HAVA to require a sweeping purge of, or provisional ballots from, voters who did not provide a driver's license or social security number in their initial registration. *See* Mem. in Support of Mot. to Dismiss (D.E. 31) at 18. HAVA, the State Board recently argued, "make[s] clear that voters who do not provide a valid driver's license or social security number may still lawfully cast a ballot," so long as they provide "a current and valid photo identification" or other official document bearing their name and address before doing so. *Id.* (citing 52 U.S.C. § 21083(b)).

Plaintiffs disagree. In their view, any voters who have a driver's license or social security number, but failed to provide it upon registration, are "ineligible" to vote under HAVA. Compl.

**JA513**

¶¶ 67, 69-71. Plaintiffs understand HAVA to require all such voters to be removed from the rolls or required to vote a provisional ballot unless and until they provide the requisite number.

Despite these conflicting constructions, Plaintiffs assert that there is no dispute about HAVA's meaning because the State Board conceded in December 2023 that its prior registration form was not consistent with HAVA. Remand Mem. at 6 & nn. 2 & 3 (citing Dec. 2023 Order). This narrow consensus is irrelevant. Plaintiffs' suit here does not challenge the State Board's prior registration form, which has since been revised. Nor does it challenge the Board's current registration form, which all parties agree is consistent with federal law. *See* Compl. ¶ 84.

This suit instead challenges the State Board's decision not to remove or require a provisional ballot from voters who registered using the old form and did not provide a driver's license or social security number. *See, e.g.*, Compl. ¶ 86 (alleging that the State Board "affirmatively refused to act and correct the accuracy of the state's voter rolls as to be compliant with HAVA."). On this issue, the parties diverge sharply. The State Board has never agreed that it violated HAVA by not taking action with respect to those voters. To the contrary, as Plaintiffs themselves admit, the State Board expressly refused to take any such action, in part because it concluded that HAVA did not specifically authorize, much less require, the State Board to do so. Compl. ¶ 55; *see also* Remand Mem. at 6 n.3 (Dec. 2023 Order at 4).

Because the State Board has consistently resisted the idea that its decision not to purge or demand provisional ballots from eligible voters violates HAVA, the key federal question raised by this suit is "actually disputed," as the *Gunn-Grable* framework requires.

**C.    The proper construction of HAVA is a substantial federal question.**

The disputed federal question at the heart of Plaintiffs' Complaint is also "substantial." A federal question embedded in a state-law claim is substantial enough to trigger federal courts'

**JA514**

jurisdiction when the issue is "importan[t] . . . to the federal system as a whole." *Gunn v. Minton*, 568 U.S. 251, 260 (2013).

As an initial matter, it is difficult to argue that any issue that could affect whether hundreds of thousands of Americans (if not more) can exercise their fundamental right to vote in the next federal election is not "substantial." The Court's decision in this case will directly decide whether nearly a quarter-of-a-million North Carolinians can vote this fall. And it could also influence whether other States are required to remove voters from their rolls for similar reasons. An issue with such a wide-ranging impact on the fundamental rights of voters across the country is "substantial" under any conventional understanding of that word.

But the question is "substantial" for other reasons as well. The Supreme Court has signaled that questions concerning federal statutes that are designed to promote national uniformity meet that standard. *See Gunn*, 568 U.S. at 261 (explaining that a federal issue embedded in a legal malpractice claim involving a patent was not substantial because the question did not "undermine 'the development of a uniform body of [patent] law'" (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989)) (alteration in original)). Uniformity is the entire point of Section 303 of HAVA. In fact, Section 303 is located within Title III of HAVA, which is titled "Uniform and Nondiscriminatory Election Technology and Administration Requirements." Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666, 1708. Congress's desire for uniform minimum standards in election administration makes construction of those standards a substantial federal question.

Questions that might impact actions brought by federal enforcers under a federal statute are also important to the federal system. *See Grable*, 545 U.S. at 315 (holding that the proper interpretation of federal tax law was a substantial federal question because "[t]he [federal]

Government . . . has a direct interest in the availability of a federal forum to vindicate its own administrative action"). How the courts construe HAVA will undoubtedly impact federal enforcement actions, given that it is the United States Attorney General who is tasked with enforcing the very section of HAVA about which Plaintiffs and the State Board disagree. 52 U.S.C. § 21111 (giving the Attorney General authority to enforce the requirements of 52 U.S.C. § 21083); Compl. ¶ 58 (alleging the State Board violated § 21083(a)(2)).

### D. Construing HAVA in federal court is consistent with Congress's division of labor between federal and state courts.

Finally, accepting federal jurisdiction over Plaintiffs' claims would not upset the balance between state and federal courts. This prong of the *Grable-Gunn* test ensures that courts respect Congress's decisions about the proper forum for particular claims and do not extend federal jurisdiction to a "horde of original filings and removal cases" involving state-law claims. *Grable*, 545 U.S. at 318-19. Here, there is no reason to think Congress did not want federal courts to determine what HAVA requires of state elections administrators, or that Congress generally disapproves of cases involving federal elections being litigated in federal court. Indeed, Congress requires the United States Attorney General to bring any actions enforcing HAVA in federal court.[3] Additionally, there is little risk that allowing removal in this case will open the floodgates to the federal courts. After all, few state statutes so explicitly—and so exclusively—invoke federal law as N.C. Gen. Stat. § 163-82.11(c).

<div align="center">*          *          *</div>

---

[3] HAVA does not extend a private right of action, but that has no bearing on whether this case was properly removed. As *Grable* held, a private right of action is not necessary for jurisdiction under § 1331. 545 U.S. at 318-20 (affirming removal even though the disputed federal statute did not provide a private cause of action).

<div align="center">**JA516**</div>

Plaintiffs allege that the State Board violated a state statute that simply requires the State Board to comply with HAVA, a federal law. It is no surprise, then, that a straightforward application of the *Gunn-Grable* test reveals that Plaintiffs' claims necessarily raise substantial and disputed questions of federal law that are best resolved in federal court. Plaintiffs cannot avoid this conclusion by dressing their federal claims up in state-law clothing. At bottom, Plaintiffs' lawsuit arises under federal law, and the State Board properly removed under § 1441(a). Plaintiffs' motion to remand should be denied.

## III. Removal Is Proper Because Plaintiffs Are Suing the State Board for Refusing to Take Acts that Are Inconsistent with Federal Civil Rights Laws.

Even if this Court were to conclude that 28 U.S.C. § 1441 does not allow the State Board to remove Plaintiffs' Complaint, the civil rights removal statute (28 U.S.C. § 1443) does. When state officials are sued for their refusal to take an action, and their refusal is based on a "law providing for equal rights," § 1443(2) allows the officials to remove the suit to federal court. Here, Plaintiffs demand that the State Board remove nearly a quarter of a million eligible voters from the State's voter rolls in the middle of a general election. The State Board has refused to do that, in part because the National Voter Registration Act prohibits the State Board from systematically removing registered voters fewer than 90 days before an election. *See* 52 U.S.C. § 20507(c)(2)(A). Under these circumstances, removal is appropriate under § 1443(2).

There can be no dispute over most of the elements for § 1443(2) removal. Plaintiffs allege that the State Board's members are state officials who enforce state election laws. *See* Compl. ¶ 18 ("[The State Board] is tasked with ensuring that elections in North Carolina comply with all relevant state and federal laws . . . ."); Compl. ¶ 19-24 (suing State Board's members and Executive Director "in [their] official capacity"). And Plaintiffs further allege that the State

**JA517**

13

Board is refusing to purge voters from the State's voter rolls, as Plaintiffs would have them do. *See* Compl. ¶¶ 5, 7, 15, 60, 69-71, 84, 86-88, 93.

The only outstanding question, then, is whether the Plaintiffs' insistence that the State Board purge voters from the State's rolls is inconsistent with a "law providing for equal rights." 28 U.S.C. § 1443(2). The answer is plainly yes.

A mass purge in the middle of the general election is inconsistent with the NVRA. The NVRA requires the State Board to carry out any plan to "systematically remove" ineligible voters from the rolls "not later than 90 days prior to the date of a primary or general election." 52 U.S.C. § 20507(c)(2)(A). The NVRA's 90-day quiet period provision has a "broad" and "expansive meaning." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014). States cannot systematically remove voters fewer than 90 days before an election because that is "when the risk of disenfranchising eligible voters is the greatest." *Id.* at 1346; *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *6 (M.D.N.C. Aug. 7, 2018).

Removing voters en masse, rather than after a "rigorous individualized inquiry" of the voter's eligibility, constitutes a systematic removal. *N.C. State Conf. of NAACP*, 2018 WL 3748172, at *6; *Arcia*, 772 F.3d at 1344 (holding that proposed removal coupled with notice to voter was not an individualized inquiry). This year, the NVRA cutoff was August 7, more than two weeks before Plaintiffs filed their Complaint. Thus, even if HAVA required the State Board to remove the voters that Plaintiffs have identified from the rolls, the NVRA forbids the State Board from doing so until after the election.

And the NVRA is a law providing for equal rights. For purposes of § 1443(2), a "law providing for equal rights" is a law that concerns racial equality. *Vlaming v. W. Point Sch. Bd.*,

**JA518**

10 F.4th 300, 309 (4th Cir. 2021) (citing *Georgia v. Rachel*, 384 U.S. 780, 792 (1966)). As long as the purpose of the relevant statute generally is to advance racial equality, § 1443(2) removal is available, even if the specific statutory provision that motivated the state official's refusal does not expressly discuss race. *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (permitting § 1443 removal where defendants relied on the Voting Rights Act provisions that protect those assisting others in registering to vote); *O'Keefe v. N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 979-80 (S.D.N.Y. 1965) (permitting § 1443(2) removal where defendant refused to reinstate a literacy test because doing so would violate the Voting Rights Act).

The NVRA indisputably has as one of its purposes the promotion of racial equality. Its opening provisions expressly state that the law was enacted to eliminate "discriminatory and unfair registration laws and procedures" that "have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). The NVRA's legislative history confirms that Congress enacted the statute to combat racial discrimination. The statute's Senate Report explained that the legislation was necessary in part because some "discriminatory and unfair practices" persisted in election administration notwithstanding the Voting Rights Act of 1965. S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278 at *3 (Leg. Hist.). Accordingly, the NVRA is a law providing for equal rights that is capable of supporting this case's removal.

Plaintiffs make two attempts to avoid this conclusion; neither has merit. First, Plaintiffs argue that removal is unavailable under § 1443(2) because N.C. Gen. Stat. § 163-82.11 does not discriminate on account of race or color. *See* Remand Mem. at 10. Plaintiffs misstate the test for removal under § 1443(2). Section 1443 permits removal when a requested action—not a state

**JA519**

statute—is "inconsistent with any law providing for equal rights." *Cavanagh v. Brock*, 577 F. Supp. 176, 180 (E.D.N.C. 1983) (cleaned up) (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 n.22 (1966)). This Court itself recently rejected the argument that § 1443(2) requires a conflict between state and federal law. *Common Cause v. Lewis*, 358 F. Supp. 3d 505, 513 (E.D.N.C. 2019), *aff'd*, 956 F.3d 246 (4th Cir. 2020) ("[T]he language of the removal statute . . . references in its text inconsistency only between *the act* being refused and federal equal protection law."). Because the *act* that Plaintiffs demand the State Board take is inconsistent with the NVRA, removal under § 1443(2) is proper.

Plaintiffs also argue that the State Board's refusal to grant Plaintiffs' request for a massive voter purge is not grounds for removal because Plaintiffs would be willing to accept other forms of relief. Remand Mem. at 11. This argument, too, misreads § 1443(2). Section 1443 does not condition removal on a state official's refusing *every* act requested by a plaintiff. To the contrary, removal is available anytime a plaintiff sues a state official for refusing to take any act that is inconsistent with a law protecting equal rights. 28 U.S.C. § 1443(2).

In any event, Plaintiffs' alternative request—where the State Board will force eligible, registered voters to cast provisional ballots—conflicts with a different law providing for equal rights. Under Plaintiffs' alternative plan, any voter who registered without a driver's license or social security number would be required to cast a provisional ballot, and that ballot would be counted only if the voter ultimately provided one of those numbers to the State Board. This request is equally problematic under federal law, because it would require the State Board to violate Section 11(a) of the Voting Rights Act. That provision prohibits the State Board from "refus[ing] to permit a person to vote" or "tabulate, count, and report such person's vote" if the person is "entitled to" or "otherwise qualified to vote." 52 U.S.C. § 10307(a). Because the State

**JA520**

16

Board understands the voters who Plaintiffs have identified to be eligible voters, so long as they provide the forms of alternative identification contemplated by HAVA, the State Board cannot implement Plaintiffs' provisional-ballot remedy without running headlong into the Voting Rights Act. The Voting Rights Act ("VRA") is the quintessential "law providing for equal rights," and courts have consistently permitted removal under § 1443(2) when a state official refuses to take an act that is inconsistent with the VRA. *See, e.g.*, *Smith v. Winter*, 717 F.2d 191, 194 (5th Cir. 1983) ("Because it confers rights specifically in terms of racial equality, the Voting Rights Act may support § 1443 removal."); *Jackson v. Riddell*, 476 F. Supp. 849 (N.D. Miss. 1979) (holding that Section 11(b) of the VRA "present[s] a right arising under a federal law 'providing for specific civil rights stated in terms of racial equality'").

Because Plaintiffs have sued the State Board for refusing to act in a manner that the State Board believes would violate laws providing for equal rights, removal under § 1443(2) is proper.

## CONCLUSION

For the foregoing reasons, State Board Defendants respectfully request that the Court deny Plaintiffs' Motion to Remand.

This the 7th day of October, 2024.

<div style="text-align: right;">

Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

</div>

**JA521**

/s/ South A. Moore
South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law complies with Local Rule

7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no

more than 8,400 words as indicated by Word, the program used to prepare the brief.

This the 7th day of October, 2024.

/s/ South A. Moore
South A. Moore
Deputy General Counsel

**JA523**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic
National Committee*

This the 7th day of October, 2024.

/s/ South A. Moore
South A. Moore
Deputy General Counsel

**JA524**

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:24-cv-547-M-RJ

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*,<br><br>*Defendants*,<br><br>and<br><br>THE DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Defendant-Intervenors*. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO REMAND** |

## INTRODUCTION

On its face, Plaintiffs' Complaint raises only state law causes of action. Defendants ask this

Court to ignore that fact and retain jurisdiction in a thinly veiled attempt at forum-shopping. Well-

established precedent forecloses Defendants' arguments from the outset.

Stripped of its conclusory language, Defendants' Response to Plaintiffs' Motion to Remand

proves why remand is necessary. ***First***, there is no disputed question of federal law at issue. Rather,

Defendants' dispute is one of both remedies and defenses. Yet neither a remedy nor a defense can

form the basis for federal jurisdiction. *See Caterpillar Inc., v. Williams*, 482 U.S. 386, 392-393

(1987); *see also Common Cause v. Lewis*, 358 F. Supp. 3d 505, 514 (E.D.N.C. 2019), *aff'd*, 956

F.3d 246 (4th Cir. 2020) (rejecting the argument that removal was proper because a state law

**JA525**

challenge's remedy would conflict with federal law); *Aegis Def. Servs., LLC v. Chenega-Patriot Grp., LLC,* 141 F. Supp. 3d 479, 485 (E.D. Va. 2015) (holding that even if the remedy sought is exclusively federal in nature, that alone does not support federal question jurisdiction if the claim itself is based in state law).

Defendants concede that they failed to comply with certain mandates of the Help America Vote Act ("HAVA") and, thus, N.C. Gen. Stat. § 163-82.11(c). (Dkt. 51 at p. 4). With that concession, the only remaining question is whether Defendants' failure to seek this information violates North Carolina state law. (Compl. ¶¶ 77-96). This Court is not the proper forum to answer that question.

**Second**, Defendants' wholesale reliance on N.C. Gen. Stat. § 163-82.11(c)'s reference to HAVA does not create federal jurisdiction. The presence of a federal issue within a state law cause of action does not *per se* confer federal jurisdiction. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986).  **Third**, Defendants' theory of federal jurisdiction runs headlong into state sovereignty and a state court's ability to decide unsettled questions of state law. Not only is resolution of this case in state court both necessary and proper, but doctrines of abstention counsel against any further involvement by this Court. *See Railroad Comm'n. of Texas v. Pullman Co.*, 312 U.S. 496 (1941). **Fourth**, Plaintiffs' requested relief cannot be squared with the type of removal contemplated by either the text or the history of 28 U.S.C.§ 1443(2).

At its core, Defendants' arguments ask this court to expand a doctrine of removal which the Fourth Circuit has coined as applying only to a "slim category of cases" beyond its current boundaries. *See Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019). Defendants cannot merely cite to federal law in hopes that jurisdiction will materialize. *See Common Cause* 358 F. Supp. 3d at 514; *see also Appalachian Power Co. v. Region Properties, Inc*., 364 F. Supp. 1273,

**JA526**

2

1275 (W.D. Va. 1973). Precedent makes clear that a remand to state court is warranted in situations such as this. Because state law, and only state law, dictates this case, Plaintiffs respectfully request that this Court reject Defendants' efforts and issue an order remanding the case to state court.

## ARGUMENT

As a threshold matter this Court must resolve questions of its jurisdiction before it can proceed to any merits-based analyses. *See Hensley v. City of Charlotte*, No. 21-2308, 2023 WL 1990298, at *2 (4th Cir. Feb. 14, 2023). As the removing party, Defendants have the burden to establish the existence of subject matter jurisdiction. *See Mayor of Balt. v. BP P.L.C.*, 31 F.4th 178, 197 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023). Defendants wholly fail to carry their burden and, as a result, a remand to state court is proper.

### I. *Defendants' Arguments Under 28 U.S.C. § 1441(a) Fail as There is No Substantial, Let Alone a Disputed, Question of Federal Law at Issue*

Defendants' Response leans heavily on the substantial federal question inquiry of 28 U.S.C. § 1441(a).[1] The Fourth Circuit has described this jurisdictional basis as applying to only a "slim category of cases," requiring that the federal question meet all four prongs of a fact-intensive inquiry. *See Burrell*, 918 F.3d at 380. Those four factors—or as Defendants call them, the "*Gunn-Grable* framework" are: (1) the federal question must be necessarily raised; (2) the federal question must be actually disputed; (3) the federal question must be substantial, "meaning that its resolution is important to the federal system as a whole,"; and (4) "the federal system must be able to hear

---

[1] Defendants' citation to *North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, is inapposite. In *Alcoa,* the question presented involved a challenge to waterway navigability and state ownership rights arising from a binding and fact-specific interpretation of Supreme Court precedent, along with a right which turned on a unique theory of statehood rights and state sovereignty. 853 F.3d 140, 146-47 (4th Cir. 2017). None of those theories are applicable here. If anything, *Alcoa*'s narrow holding shows that this dispute is solely one of state law.

**JA527**
3

the issue without disturbing any congressionally approved balance for federal and state judicial responsibilities." *See id*. Defendants' arguments fail each step of the way.

**A.    No Federal Question is "Necessarily Raised" in the Complaint**

"[A] plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when **every** legal theory supporting the claim requires the resolution of a federal issue." *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014) (emphasis in original). "In other words, if the plaintiff can support [the] claim with even one theory that does not call for an interpretation of federal law, [the] claim does not arise under federal law[.]" *Dixon v. Coburg Dairy, Inc.,* 369 F.3d 811, 818 (4th Cir. 2004). For a federal question to be deemed "necessarily raised," under the first prong of the *Gunn-Grable* framework, it must be a "necessary element of one of the well-pleaded state claims." *See Burrell*, 918 F.3d at 381. However, the court must distinguish between state law claims which may involve federal standards and those which necessarily turn on a question of federal law because "the mere presence of a federal issue in a state cause of action is not enough to confer [federal] jurisdiction." *See Merrell Dow Pharms. Inc.* 478 U.S. at 813. Plaintiffs' causes of action fall into the former of the two categories.

Defendants' theory of removal is predicated on the notion that because N.C. Gen. Stat. §163-82.11(c) takes guidance from HAVA, that any resolution thereunder must necessarily involve some construction of HAVA. But this reading of the Complaint is both unsupported and contrary to precedent. *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 818-19 (4th Cir. 2004) (*en banc*) (finding removal improper when the allegations could plausibly involve construction of state law issues as well as federal law); *see also Common Cause*, 358 F.Supp.3d at 514 (rejecting the claim that removal was warranted under the theory that federal law was an "affirmative element" of plaintiffs' *prima facie* claim). Defendants' theory would have the Court read N.C. Gen. Stat. § 163-82.11(c),

as though it restates HAVA and nothing more; the text of the statute does not support Defendants' argument. In fact, the statute's plain text reveals cross references to other state statutory schemes beyond HAVA for additional guidance. Defendants do not argue that those statutes confer a basis for federal jurisdiction, nor could they. Indeed, the statute itself reveals the intensely fact-specific state law inquiry Plaintiffs' claims require. Not only is such an inquiry plausible on the face of the Complaint, but it is probable. Defendants cannot cite to any authority for the proposition that a state law's internal cross reference, even to a federal statute, makes the question *per se* one of federal law.

In an attempt to distract from this inconvenient fact, Defendants argue that this Court must construe HAVA in order to provide Plaintiffs their requested relief. For the reasons previously discussed, this argument is unconvincing. No party disputes that HAVA provides some—but importantly not all—guardrails for Defendants' compliance with N.C. Gen. Stat. § 163-82.11(c). At most, Plaintiffs' Complaint, much like the statute itself, merely shows that Defendants' actions (or inaction) involve tangential federal issues. What Defendants ignore is that the Complaint's driving question, whether they maintained the state's voter registration lists in compliance with all that state law requires, does not necessarily turn on any question of federal law. Thus, the Complaint does not "necessarily raise" a question of federal law.

**B.** **Defendants' Response Confirms There is No Disputed Question of Federal Law**

Whether or not a disputed question of federal law exists is determined by looking at the substance of Plaintiffs' claims, along with any facts the parties agree upon. *See Pressl v. Appalachian Power Co*., 842 F.3d 299, 305 (4th Cir. 2016). Where the parties agree about a federal law but disagree about a state law, courts routinely find that there is no federal question in dispute. *See, e.g., Mullins v. Dominion Energy S.C. Inc*., No. 3:21-CV-03165-SAL, 2022 WL 1498293, at

**JA529**

5

*4 (D.S.C. May 12, 2022) (finding that there was no federal question in dispute when the parties agreed on defendants' federal licensure status but disagreed on duties owed to plaintiffs under state law). Further, it is well established that asserting a defense based on federal law does not transform the state law claims into federal questions. *See Caterpillar Inc.* 482 U.S. at 392-93; *see also Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 198-99 (4th Cir. 2022), *cert denied*, 143 S. Ct. 1795 (2023). Naturally, this same principle holds true for assertions of federal obstacles to state law remedies. *See, e.g., Aegis Def. Servs., LLC*, 141 F. Supp. 3d at 485.  This shines a light on the most glaring deficiencies of Defendants' removal arguments.

First, Defendants concede that they failed to collect the information HAVA requires, namely, that Defendants allowed applicants to register to vote without providing a social security number or driver's license number. (Dkt. 51 at p. 4). This admission forecloses any further inquiry into whether Plaintiffs' claims present a disputed question of federal law. *See Pressl*, 842 F.3d at 305. The only remaining question is one of state law, i.e., whether or not Defendants' failure to maintain accurate statewide voter registration lists under state law is actionable.

Second, Defendants cannot circumvent the lack of a disputed question of federal law by asserting a federal defense, even if that defense is cloaked in the guise of a question. At their core, each of the federal "questions" Defendants claim warrant this court's jurisdiction are actually disputes over remedies.[2] Aside from failing to establish the existence of a disputed federal question, it is also worth noting the implicit irony in Defendants' arguments. Defendants violated

---

[2] For example, Defendants, for the first time, raise the argument that they "disagree" with Plaintiffs' "construction of HAVA." (Dkt. 51 p. 9 ¶ II(B)). Setting aside Defendants' apparent attempts to manufacture a disputed question of federal law in a last-ditch effort to avoid remand, Defendants' arguments are, at their core, questions of remedies and defenses. For example, this entire section of Defendants' Response is dedicated to whether Plaintiffs' requested relief is feasible under HAVA. That, by its very nature, is a defense. *See Burrell*, 918 F.3d at 381 ("It is **not** enough that federal law becomes relevant by virtue of a [defense].") (citation omitted) (emphasis in original).

the law, admitted they violated the law, and then refused to act to remedy their violations. Instead of taking any actions to rectify their wrongdoings, Defendants sat idly by in an attempt to run out the clock. Now, when Plaintiffs seek relief, Defendants raise federal law as a defense as a shield to block any action. There is good reason why federal courts routinely reject such arguments as the basis for jurisdiction, and this type of gamesmanship is exactly why. *See Flying Pigs, LLC*, 757 F.3d at 181.  Thus, this *Gunn-Grable* factor also weighs in favor of remand.

C.   **Any Federal Question Presented Here is Not Substantial As It Relates Solely to North Carolina's Voter Registration Lists**

"In general, "a nearly pure issue of law, the resolution of which would establish a rule applicable to numerous ... cases" is substantial, while a "fact-bound and situation-specific" issue is not." *Columbus Emergency Grp., LLC v. Blue Cross & Blue Shield of N. Carolina*, No. 7:23-CV-1601-FL, 2024 WL 1342764, at *3 (E.D.N.C. Mar. 29, 2024). This court recently reaffirmed the Fourth Circuit's fundamental principle that "'fact-intensive inquiries into [defendant's] compliance with certain [federal] requirements' [are] not 'substantial in the relevant sense.'" *Id.* This rule, the *Columbus* court held, was especially true when a plaintiff's claims are retrospective in nature. *Id.* at 3-4.

Here, much like in *Columbus*, Plaintiffs' claims are fact-intensive and retrospective in nature. *Id.* at 4. Plaintiffs contend that Defendants failed to maintain accurate voter registration lists in violation of state law. Not only is the question one of state law, but Defendants cannot point to any tangible evidence that Plaintiffs' claims are somehow an "attempt[ ] to circumvent [a] federal regulatory scheme." *Id.* Further, an interest in uniformity in results, without more, is not sufficiently substantial to permit removal. *See Burrell*, 918 F.3d at 385.

Amazingly, Defendants – who previously refused to take a position regarding the number of affected registrants while openly disputing Plaintiffs' claims regarding the same – now use

Plaintiffs' estimates as the basis to claim a "substantial" federal question. (Dkt. 51 at p. 11). Not only are Defendants' attempts to paint a parade of horribles disingenuous, but again, their theory relies on a question of federal defenses and remedies, none of which confer federal jurisdiction.

**D.    Defendants' Theory of Removal Directly Conflicts With State Sovereignty and Federal Court Interference Would Massively Disrupt That Balance**

Defendants' argument that "no state or federal court has ever recognized a cause of action for violations of [N.C. Gen. Stat. § 163-82.11]," (Dkt. 31 at p. 11) proves why remand is necessary and proper. Plaintiffs allege purely state law causes of action, both of which are substantively independent of any federal law counterparts. To the extent a state statute has not yet been interpreted by a court or is otherwise unsettled, and construction by the state's judiciary could avoid the need for federal court involvement, precedent counsels in favor of federal court abstention. *See Pullman Co.*, 312 U.S. 496; *see also Meredith v. Talbot Cnty.*, 828 F.2d 228, 231 (4th Cir. 1987). Additionally, choice of law principles, along with the nature of the state law claims asserted, demands the application of North Carolina substantive law. *See, e.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427-28 (1996).

Plaintiffs are not asking this court or any court to interpret or construe any aspect of federal law. Regardless of any relief provided in this case, HAVA's requirements will remain unchanged. Defendants claim that Section 303(a) of HAVA is predicated on uniformity and on that, Plaintiffs agree. Nothing in Plaintiffs' claims for relief would disrupt that system. Try as they might, Defendants cannot point to any scenario in which asking whether Defendants maintained accurate voter registration lists under state law would have any impact on HAVA's black letter identification collection requirements. To the extent Defendants can muster any arguments relating to HAVA's construction, each clearly pertain to remedies and, as established, those cannot form the basis for federal jurisdiction. Further, Defendants' assertions that Plaintiffs' claims somehow fall within this

**JA532**

8

court's purview because a sub-section of HAVA provides that the U.S. Attorney General may bring suit to enforce the statute's terms, are similarly implausible. Plaintiffs have not brought any claims under HAVA, nor have they sought vindication under any of its provisions. That the Attorney General is empowered to bring suit under a statute which is not at issue here is of little effect. The fact remains that asking this Court to inject itself into an unsettled question of state law would be the antithesis of what the fourth *Gunn-Grable* factor asks.

## II.     *28 U.S.C. § 1443(2) is Inapposite As Plaintiffs' Requested Relief Does Not Require Any Actions Which Are Inconsistent With Federal Civil Rights Law*

The text and history of 28 U.S.C. § 1443(2) reveal the novelty and inapplicability of Defendants' theory of removal on this ground. *See Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 310 (4th Cir. 2021) *cert. granted, judgment aff'd*, 384 U.S. 890 (1966) (per curiam) (explaining that the refusal clause in § 1443(2) "was intended to enable state officers who refused to enforce discriminatory state laws in conflict with Section 1 of the Civil Rights Act of 1866" to remove their prosecutions to federal court)). Defendants do not, and indeed cannot, point to any requested relief which would actually impact equal rights or racial equality. nor do Defendants argue they are refusing to enforce a discriminatory state law in conflict with the Civil Rights Act. Instead, Defendants equivocate, pointing to election laws generally and claiming that because removal is proper because certain inapplicable statutes were previously held to permit removal under inapposite factual scenarios. Curiously, Defendants claim that an "en masse" removal of persons from the state's voter rolls would systematically disenfranchise voters, as opposed to a "'rigorous individualized inquiry' of the voter's eligibility." (Dkt. 51 at p. 14). But it is Defendants who refused to implement **any** individualized remedy at the front end, thus creating the very situation the parties find themselves in.

Defendants' generalized assertions aside, Plaintiffs are aware of no cases interpreting the NVRA's removal provisions as somehow affecting a "law providing for equal rights" under the meaning of § 1443(2).  Further, Plaintiffs' claims for relief seek a uniform system of applicability, without regard to race, asking only whether the Defendants have complied with state law in determining the accuracy of the state's voter registration list. Defendants are no stranger to removing ineligible persons from the state's voter registration list.[3] Additionally, Defendants argued earlier this year that provisional voting complies with HAVA. *See North Carolina Democratic Party, et al. v. North Carolina State Board of Elections, et al*., 1:23-cv-00862 (M.D.N.C. Oct. 10, 2023), ECF No. 53 at p. 18-19. Thus, Defendants cannot point to any action that would fall into § 1443(2)'s narrow scope. It is Defendants' burden to justify removal; they have failed to carry that burden.

## CONCLUSION

Defendants violated state law when they allowed untold numbers of people to be added to the state's voter registration lists despite failing to collect necessary identification information. Rather than correct their wrongs, Defendants did nothing. Now, when faced with accountability, Defendants improperly attempt to invoke this court's jurisdiction. This type of forum shopping should not be condoned. Due to the intensely state-law nature of the Complaint and the relief sought therein, Plaintiffs respectfully request that this Court remand the matter for resolution in state court.

*[Signatures on following page]*

---

[3] *See* Press Release, NCSBE, NC Elections Officials Removed Nearly 750,000 Ineligible Registrants Since Start of 2023 (Sept. 26, 2023), available at: https://www.ncsbe.gov/news/press-releases/2024/09/26/nc-election-officials-removed-nearly-750000-ineligible-registrants-start-2023 (last accessed Oct. 9, 2024).

**JA534**

10

Respectfully submitted, this, the 11th day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com


**BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, PC**

By: /s/    John E. Branch, III
John E. Branch, III
North Carolina State Bar no. 32598
Thomas G. Hooper
North Carolina State Bar no. 25571
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

*Counsel for Plaintiffs*

**JA535**
11

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)**

I hereby certify that this memorandum of law is in compliance with Local Rule 7.2(f)(2) as the brief, including headings, footnotes, citations, and quotations, contains no more than 10 pages, as indicated by the computer's word processing program.

Respectfully submitted this, the 11th day of October, 2024.

/s/ Phillip J. Strach
Phillip J. Strach
*Counsel for Plaintiffs*

**JA536**
12

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such to all counsel of record in the above-captioned matter.

Respectfully submitted this, the 11th day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/   Phillip J. Strach
Phillip J. Strach
North Carolina State Bar no. 29456
Jordan A. Koonts
North Carolina State Bar no. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

| | | |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE; and NORTH CAROLINA REPUBLICAN PARTY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **STATE BOARD DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS** |
| Defendants, | ) ) | |
| and | ) ) | |
| THE DEMOCRATIC NATIONAL COMMITTEE, | ) ) | |
| Intervenor-Defendant. | ) | |

**JA538**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................2

    I.   This Court Has Jurisdiction over Plaintiffs' Claims and No Basis for Declining to Exercise that Jurisdiction. .....................................................................................2

    II.  Plaintiffs' Claims Are Barred by Laches. .......................................................3

    III. Plaintiffs Have Not Alleged Any Claims for Which Relief Can be Granted. ...................6

        A.  Plaintiffs are not entitled to mandamus relief. ...........................................6

        B.  Plaintiffs have not stated a claim under the North Carolina Constitution. ...................8

CONCLUSION..........................................................................................................10

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2) .......................................11

CERTIFICATE OF SERVICE .................................................................................12

**JA539**

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ. v. Bd. of Comm'rs*,
   178 N.C. 305, 100 S.E. 698 (1919) ........................................................ 6

*Burton v. Furman*,
   115 N.C. 166, 20 S.E. 443 (1894) .......................................................... 6

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*,
   260 N.C. App. 1, 817 S.E.2d 738 (2018) ................................................ 7

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*,
   376 N.C. 558, 853 S.E.2d 698 (2021) ................................................. 6, 7

*In re T.H.T.*,
   362 N.C. 446, 665 S.E.2d 54 (2008) ....................................................... 6

*Johnson v. N.C. Dep't of Cultural Res.*,
   223 N.C. App. 47, 735 S.E.2d 595 (2012) ........................................... 3, 5

*Meredith v. Talbot County*,
   828 F.2d 228 (4th Cir. 1987) ................................................................. 2

*Morningstar Marinas v. Warren County*,
   233 N.C. App. 23, 755 S.E.2d 75 (2014) ................................................ 7

*Nivens v. Gilchrist*,
   444 F.3d 237 (4th Cir. 2006) ................................................................. 3

*Ray v. Norris*,
   78 N.C. App. 379, 337 S.E.2d 137 (1985) .............................................. 6

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   589 U.S. 423 (2020) .............................................................................. 5

*Save Our Schs. of Bladen Cnty., Inc. v. Bladen Cnty. Bd. of Educ.*,
   140 N.C. App. 233, 535 S.E.2d 906 (2000) ........................................ 4, 5

*Sonda v. W. Va. Oil & Gas Conservation Comm'n*,
   92 F.4th 213 (4th Cir. 2024) ................................................................. 3

*Stratton v. Royal Bank of Canada*,
   211 N.C. App. 78, 712 S.E.2d 221 (2011) ........................................... 3, 4

*White v. Daniel*,
   909 F.2d 99 (4th Cir. 1990) ................................................................... 3

**JA540**

*Williams v. Blue Cross Blue Shield of N.C.*,
 357 N.C. 170, 581 S.E.2d 415 (2003) ................................................... 3

*Wise v. Circosta*,
 978 F.3d 93 (4th Cir. 2020) ..................................................................... 2

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
 780 F.3d 597 (4th Cir. 2015) .................................................................... 4

**Statutes**

52 U.S.C. § 10307 ...................................................................................... 10

52 U.S.C. § 20507 ........................................................................................ 5

52 U.S.C. § 21083 ........................................................................................ 8

N.C. Gen. Stat. § 143-318.10 ....................................................................... 4

N.C. Gen. Stat. § 143-318.12 ....................................................................... 4

N.C. Gen. Stat. § 163-20 .............................................................................. 4

**Other Authority**

Notice of Meeting, N.C. State Bd. of Elections (Nov. 22, 2023) .................. 4

**JA541**

## INTRODUCTION

Plaintiffs' Complaint should be dismissed with prejudice. First, Plaintiffs' unreasonable delay in bringing their suit warrants dismissal. Plaintiffs' Complaint reveals that they had at least constructive knowledge of the facts that form the basis of their claims by December 2023, possibly earlier. Even if, as Plaintiffs now imply, they only obtained knowledge in June 2024, their two-month delay would be unreasonable, given both the National Voter Registration Act's bar on systematic removal of voters 90 days before an election and courts' reluctance, under *Purcell*, to change voting rules during an election. Plaintiffs continue to delay even now: though they claim this suit requires "immediate action," they have not yet sought any form of emergency relief.

Second, even if Plaintiffs' Complaint were timely, it would fail to state a claim. Plaintiffs' suit is premised on their mistaken belief that because the Help America Vote Act requires the State Board's registration form to collect either a voter's driver's license number or the last four digits of her social security number, HAVA also requires the State Board to purge or relegate to provisional voting anyone who did not provide that information when they registered. But HAVA does not authorize, much less compel, the State Board to purge voters. To the contrary, HAVA requires the State Board to accept votes from any voter who mistakenly registered without providing a driver's license or social security number but who presents a current, valid photo identification or other HAVA document at the polls. And since *all* North Carolina voters, even those not subject to the HAVA ID requirement, will be asked to present a photo identification to confirm their identity before voting, the State Board will be in compliance with HAVA in administering the upcoming election, and the risk of ineligible voters casting ballots will be slim to none. Because Plaintiffs built their untimely Complaint on a

**JA542**

misunderstanding of what HAVA requires, they have failed to state a claim, and this case should be dismissed with prejudice.

## ARGUMENT

**I.      This Court Has Jurisdiction over Plaintiffs' Claims and No Basis for Declining to Exercise that Jurisdiction.**

Plaintiffs argue that this Court either lacks jurisdiction or should decline to exercise it. They are wrong on both counts. First, they argue that the NVRA cannot support this Court's jurisdiction because it is merely a federal defense. Plaintiffs misunderstand the State Board's jurisdictional arguments: This Court has federal question jurisdiction because Plaintiffs' so-called state-law claims necessarily turn on a disputed and substantial question about *HAVA*, not the NVRA. Defs.' Remand Opp. (D.E. 51) 6-13. The NVRA, meanwhile, allows the State Board to remove this case under a different statute, 28 U.S.C. § 1443. Defs.' Remand Opp. 13-17.

Plaintiffs' *Pullman* abstention argument fares no better. Plaintiffs argue that this Court should decline jurisdiction until a state court "resolve[s] the scope of" N.C. Gen. Stat. § 163.82(c); Pls. Opp. (D.E. 50) 5. But *Pullman* abstention applies only "where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding [a] *constitutional* question." *Meredith v. Talbot County*, 828 F.2d 228, 231 (4th Cir. 1987) (emphasis added)). Indeed, avoiding advisory opinions on federal constitutional questions is *Pullman* abstention's chief aim. *See Wise v. Circosta*, 978 F.3d 93, 102 (4th Cir. 2020).

Plaintiffs have not alleged a federal constitutional claim. Rather, Plaintiffs ask the Court to invoke *Pullman* to avoid resolving a federal *statutory* issue. *Pullman* abstention simply does not apply in this context. *See Sonda v. W. Va. Oil & Gas Conservation Comm'n*, 92 F.4th 213,

219 (4th Cir. 2024) (district court abused its discretion by abstaining without connecting state-law issues to federal constitutional claim).[1]

## II.    Plaintiffs' Claims Are Barred by Laches.

This Court should dismiss Plaintiffs' Complaint because laches bar their claims. Plaintiffs say North Carolina law treats laches differently than federal law. But the test under both is the same. Laches applies when a plaintiff delays action for so long that it becomes unjust to allow them to prevail on their claim. *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 181, 581 S.E.2d 415, 424 (2003). The delay must be "unreasonable" and prejudice the defendant. *White*, 909 F.2d at 102; *Williams*, 357 N.C. at 181-82, 581 S.E.2d at 424-25.

Plaintiffs maintain that that they cannot be charged with knowledge of Ms. Snow's complaint. Pls. Opp. (D.E. 50) 6-7. But their Complaint does not allege—nor does their response outright say—that they did not actually know about Ms. Snow's complaint. And knowledge of the facts giving rise to their claims can be imputed to them anyway.

"[C]onstructive, rather than actual, knowledge of a claim can be used to establish laches." *Johnson v. N.C. Dep't of Cultural Res.*, 223 N.C. App. 47, 57, 735 S.E.2d 595, 601 (2012). A plaintiff has constructive knowledge when it knows of the grounds for its claim. *Stratton v. Royal Bank of Canada*, 211 N.C. App. 78, 90, 712 S.E.2d 221, 231 (2011).

Plaintiffs' Complaint reveals that they had constructive and actual knowledge of their claim by December 2023 at the latest. Plaintiffs allege that the State Board decided not to act with respect to voters who registered without providing a driver's license or social security

---

[1] Plaintiffs also mistakenly believe *Pullman* will get them out of federal court. But *Pullman* abstention does not result in remand; instead, the federal court retains jurisdiction but stays proceedings pending a state-court ruling on the state-law question. *Nivens v. Gilchrist*, 444 F.3d 237, 245-46 (4th Cir. 2006).

**JA544**

number in December 2023. Compl. (D.E. 1-3) ¶¶ 51-55. They also allege that the State Board

used the deficient voter registration form until December 2023. Compl. ¶ 42. And they allege

that the errors on the form were apparent on the form's face. *See* Compl. ¶¶ 49-51 & Fig. 1.

Thus, *anyone* who registered voters in North Carolina was aware of the "grounds" for Plaintiffs'

claim long ago. *See Stratton*, 211 N.C. App. at 90, 712 S.E.2d at 231. That would include

Plaintiff North Carolina Republican Party, who "host[s] . . . voter registration events." Compl. ¶

14.

      Plaintiffs also had constructive notice of the State Board's December 2023 decision on

Ms. Snow's complaint. As institutional plaintiffs, Plaintiffs can be charged with constructive

knowledge of decisions made by public bodies during public meetings on matters germane to the

organization's mission. *See Save Our Schs. of Bladen Cnty., Inc. v. Bladen Cnty. Bd. of Educ.*,

140 N.C. App. 233, 236, 535 S.E.2d 906, 909 (2000). Under that standard, they should have

known of their claim by December 2023. Ms. Snow's complaint was "[p]ublicly available."

Compl. ¶ 48 n.2. So, too, was the State Board's December 2023 Order resolving her complaint.

Compl. ¶ 51 n.4. Additionally, the State Board published notice of the meeting where it

discussed Ms. Snow's complaint. N.C. Gen. Stat. § 143-318.12(b). The notice included an

agenda listing Ms. Snow's complaint as a topic for discussion.[2] The State Board also made

minutes and a recording from that meeting publicly available. *See* N.C. Gen. Stat. §§ 143-

318.10(e), 163-20(e); Compl. ¶ 51 n.3. If, as Plaintiffs say, this is an important election

administration decision, organizations like Plaintiffs, whose "core organizational missions"

---

      [2] Notice of Meeting, N.C. State Bd. of Elections (Nov. 22, 2023), *available at* https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Meeting%20 Notice_2023-11-28.pdf. Courts may consider facts and documents subject to judicial notice on a motion to dismiss. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

**JA545**

include "counseling interested voters and volunteers on election participation" and ensuring "election security," should have known about it. Compl. ¶¶ 14-15; *see Save Our Schs.*, 140 N.C. App. at 236, 535 S.E.2d at 909.

But now, Plaintiff imply—for the first time—that they only learned of the problem with the registration form in June. Pls. Opp. 2, 6-9. Even if that were true, Plaintiffs' decision to wait two more months to file suit would be unreasonable, given that they are asking the State Board to remove a quarter-of-a-million voters from the rolls amidst an election. Waiting to file suit until two weeks *after* the NVRA's deadline to systematically remove voters from the rolls had passed is itself unreasonable. 52 U.S.C. § 20507(c)(2)(A). If Plaintiffs wanted this Court to change voting rules on the eve of an election—something courts disfavor—they should have brought this claim *immediately* after learning of it. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020).

Plaintiffs next argue that even if they had knowledge, laches is inapplicable because their delay did not cause a change in the parties' circumstances. They rely on *Johnson*, which rejected laches in a case where the plaintiff bailor delayed in bringing suit so long that the original bailor passed away. Pls. Opp. 7 (citing *Johnson*, 223 N.C. App. at 55, 735 S.E.2d at 600). Because the new bailor "possess[ed] the same rights" as the old bailor, the court explained, the delay did not cause a change in the parties' legal relationship. *Johnson*, 223 N.C. App. at 55, 735 S.E.2d at 600. But, unlike *Johnson*, Plaintiffs' delay here did occasion a change in circumstances. Because Plaintiffs waited to bring suit until fewer than 90 days before a general election, even if HAVA authorized the State Board to give Plaintiffs the relief they seek, the NVRA clearly prohibits the State Board from doing so. 52 U.S.C. § 20507(c)(2)(A).

Finally, Plaintiffs argue that the State Board has unclean hands. Unclean hands is available only to a party harmed by alleged wrongful conduct. *Ray v. Norris*, 78 N.C. App. 379, 385, 337 S.E.2d 137, 142 (1985). But the State Board has not engaged in any wrongful conduct, much less any wrongful conduct that might excuse Plaintiffs' delay. Plaintiffs concede that the State Board promptly corrected the registration form. Compl. ¶ 54. And they acknowledge that the State Board did not act with respect to registered voters because the State Board believed HAVA did not authorize it do so. Compl. ¶ 55. Plaintiffs read HAVA differently, but that good-faith difference of opinion does not make the State Board's conduct wrongful.

Plaintiffs' unreasonable delay prejudiced the State Board, not to mention North Carolina's voters. Accordingly, this Court should dismiss their Complaint on laches grounds.

**III.    Plaintiffs Have Not Alleged Any Claims for Which Relief Can be Granted.**

**A.    Plaintiffs are not entitled to mandamus relief.**

Plaintiffs claim that mandamus law in North Carolina differs from federal law because, in North Carolina, "mandamus rules only require proof that a public official defendant has failed to perform a specified official duty imposed by law." Pls. Opp. 11 (citing *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 574, 853 S.E.2d 698, 711 (2021)). Although North Carolina law does not support that assertion, Plaintiffs fail that standard too.

The standard for mandamus in North Carolina maps neatly onto the federal standard. A plaintiff must show, in the main: (1) a clear right to the act requested, (2) that the defendant had a clear duty to perform the act, and (3) the absence of other adequate remedies. *See, e.g.*, *In re T.H.T.*, 362 N.C. 446, 453-54, 665 S.E.2d 54, 59 (2008) (collecting cases); *Bd. of Educ. v. Bd. of Comm'rs*, 178 N.C. 305, 313, 100 S.E. 698, 702 (1919); *Burton v. Furman*, 115 N.C. 166, 20 S.E. 443, 444 (1894); *Morningstar Marinas v. Warren County*, 233 N.C. App. 23, 27, 755 S.E.2d

6

75, 78 (2014); *see also* Defs.' Mem. in Supp. Mot. to Dismiss (D.E. 31) 11.[3] In their response

brief, Plaintiffs do not even attempt to show how they can satisfy these three factors. *See* Pls.

Opp. 11 & n.6 (stating that those "prongs simply do not apply" and, in the alternative, urging the

Court to apply *Pullman* abstention).

Plaintiffs ignore these cases and rely on *Committee to Elect Dan Forest*, but that case is

irrelevant. *Committee to Elect* is the seminal case on whether North Carolina law imposes the

same injury-in-fact requirement as Article III. *Comm. to Elect*, 376 N.C. at 558-59, 853 S.E.2d at

702. Although the opinion does explore the use of mandamus as a historical matter, *Committee

to Elect*, 376 N.C. at 569-75, 853 S.E.2d at 708-12, the actual claims in the case were all

statutory, *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 260 N.C. App. 1, 2, 817

S.E.2d 738, 739 (2018). The opinion thus contains no discussion of the substantive requirements

for mandamus.

Even if Plaintiffs were right that they need only allege that the State Board "failed to

comply with the law," Pls. Opp. 10, their mandamus claim should still be dismissed. Though

Plaintiffs repeatedly accuse the State Board of a HAVA violation, they have not actually alleged

facts to support that claim. Plaintiffs do not dispute that the State Board already revised the

voter-registration form to ensure that applicants provide their driver's license or social security

number if they have one. Instead, Plaintiffs insist that HAVA additionally requires either

removal of or provisional ballots from voters who register without providing a driver's license or

social security number. HAVA requires nothing of the sort. If a voter is registered without a

---

[3] Plaintiffs argue that *In re T.H.T* is inapt because it was brought on appeal pursuant to
North Carolina Rule of Appellate Procedure 22. But the court's analysis of the *substantive* claim
had nothing to do with Rule 22 and, instead, applied to writs of mandamus generally. *In re
T.H.T.*, 362 N.C. at 453-56, 665 S.E.2d at 59-61. Besides, these other opinions adopt the same
substantive standard for claims that were not raised under Rule 22.

**JA548**

driver's license or social security number, HAVA mandates two things: (1) that the State Board assign the voter an identification number, and (2) that it require voters to show qualifying identification the first time they attempt to cast a ballot in a federal election in the jurisdiction. 52 U.S.C. § 21083(a)(5)(A)(ii), (b)(2)(A)(i)-(ii). The State Board has complied with these two duties, and Plaintiffs do not allege otherwise.

Plaintiffs' only real response to any of this is that their requested remedies are "viable." Pls. Opp. 11. Setting aside whether Plaintiffs are actually correct, the standard for mandamus is not whether a remedy is viable. It is whether the law imposes a *clear duty* to provide the remedy. Again, neither HAVA nor Section 163-82.11 *requires* that voters who are registered without their social security or driver's license numbers vote provisionally. Plaintiffs thus are not entitled to this remedy, no matter its "viability." Even on Plaintiffs' own terms, their mandamus claim fails.

**B.      Plaintiffs have not stated a claim under the North Carolina Constitution.**

Plaintiffs' claim under the North Carolina Constitution remains inscrutable. All they say about Article I, Section 19 is that federal law does not necessarily bind interpretations of it. Pls. Opp. 12. But before Plaintiffs can argue about *how* to interpret the state constitution, they must explain *why* it is relevant. They have not done so. Their claim should be dismissed.

Since Plaintiffs did not dispute the State Board's charitable reading of their allegations as stating an equal-protection claim, the Board continues to assume that is Plaintiffs' theory. But if it is, Plaintiffs have failed to distinguish the wealth of cases rejecting equal-protection claims based on vote-dilution theories. Defs.' Mem. 19 (collecting cases). Nor do Plaintiffs cite any case—state or federal—that recognizes a similar equal-protection claim.

Even if their vote-dilution theory were colorable, Plaintiffs have not adequately pled it. Plaintiffs' claim is dependent on their allegation that the State Board's use of the prior voter-

registration form allowed ineligible people to vote in the election, which, they say, could lead to "widespread dilution of legitimate votes." Compl. ¶ 94. Yet Plaintiffs never explain how a voter's failure to provide a social security or driver's license number during registration increases the likelihood of voter fraud—especially given the safeguards found in HAVA and state law.

Rather than grapple with those safeguards, Plaintiffs mistakenly claim the safeguards are inapplicable to the voters they are concerned about. This is incorrect. Section 163-166.12 sets forth the requirements that control the first time these voters seek to cast a ballot in a federal election. Subsections (a) and (b) require *all* of those voters to provide either (1) a current and valid photo ID or (2) a copy of a current utility bill, bank statement, government check, paycheck, or other government document before voting for the first time. N.C. Gen. Stat. § 163-166.12(a), (b). There are certain exemptions from that rule—most notably, voters who already provided a valid driver's license or social security number need not present additional identification. *Id.* § 163-166.12(f)(2). But voters who were mistakenly registered using the prior form would not fall within this exemption. As a result, subsections (a) and (b) apply, and these voters will have to show HAVA ID the first time they attempt to vote. In addition, state law now requires *all voters* to show valid photo ID when they vote. *See* Defs.' Mem. 18. Together, these measures provide an ample backstop against the risk of ineligible voting.

Finally, Plaintiffs assert that, because certain voters who show up without the requisite identification are permitted to vote provisionally under Section 163-166.12(e), Plaintiffs are also entitled to that relief. Pls. Opp. 13. This puts the cart before the horse: Plaintiffs must first state and prove their claim before being entitled to relief. Here, moreover, their demanded relief is neither statutorily required, nor theoretically possible. Requiring provisional ballots from *eligible*

**JA550**

9

voters—those who are "entitled to" or "otherwise qualified to vote"— violates Section 11(a) of

the Voting Rights Act. Defs.' Remand Opp. 16-17 (quoting 52 U.S.C. § 10307(a)).

Given the multitude of infirmities in Plaintiffs' Complaint, this Court should not entertain

Plaintiffs' request to disenfranchise hundreds of thousands of voters at this late date.

## CONCLUSION

For the foregoing reasons, State Board Defendants ask this Court to dismiss Plaintiffs'

Complaint.

This the 11th day of October, 2024.

/s/Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)

Undersigned counsel certifies that this memorandum of law complies with Local Rule

7.2(f)(2) in that the brief, including headings, footnotes, citations, and quotations, is no more

than ten pages.

This the 11th day of October, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA552**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell
Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

This the 11th day of October, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA553**

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV026995-910

REPUBLICAN NATIONAL COMMITTEE;
and NORTH CAROLINA REPUBLICAN
PARTY,

              Plaintiffs,

     v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS' KAREN BRINSON BELL, in
her official capacity as Executive Director of
the North Carolina State Board of Elections;
ALAN HIRSCH, in his official capacity as
Chair of the North Carolina State Board of
Elections; JEFF CARMON, in his official
capacity as Secretary of the North Carolina
State Board of Elections; STACY EGGERS IV,
KEVIN N. LEWIS, and SIOBHAN O'DUFFY
MILLEN, in their official capacities as
members of the North Carolina State Board of
Elections,

              Defendants,

     and

THE DEMOCRATIC NATIONAL
COMMITTEE,

              Intervenor-Defendant.

**STATE BOARD DEFENDANTS'
NOTICE OF REMOVAL**

       Pursuant to 28 U.S.C. § 1446(d), State Board Defendants give notice to Plaintiffs that they

are filing a notice of removal of the above-captioned civil action from the North Carolina Superior

Court for Wake County to the United States District Court for the Eastern District of North

Carolina. A copy of that notice and the exhibits to it are being filed along with this notice. State

Board Defendants also request that this Court forward to the U.S. District Court a complete copy

of the state court file.

**JA554**
1

Respectfully submitted, this 23rd day of September 2024.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**JA555**

## <u>CERTIFCATE OF SERVICE</u>

This is to certify that the undersigned has this day served the foregoing NOTICE OF APPEARANCE in the above-titled action upon all parties to this cause by electronic mail as follows:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer

**JA556**
3

Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Door LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

Lee Rubin
Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real Palo Alto, CA 94306-2112 (650) 331-2000
lrubin@mayerbrown.com

Rachel J. Lamorte
Catherine Medvene
Mayer Brown LLP
1999 Street, NW
Washington, DC 20006-1101
(202) 263-3000
rlamorte@mayerbrown.com
cmedvene@mayerbrown.com

Jordan Hilton
Mayer Brown LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 907-2717
jhilton@mayerbrown.com

Harsha Tolappa
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
htolappa@mayerbrown.com

Hilary H. Klein

**JA557**
4

Jeffrey Loperfido
Christopher Shenton
Southern Coalition for Social Justice
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
(919) 794-4213
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org

Ezra D. Rosenberg
Jennifer Nwachukwu
Pooja Chaudhuri
Javon Davis
Lawyers' Committee for Civil Rights Under Law
1500 Street, NW, Ste. 900
Washington DC, 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
Jowachukwu@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jdavis@lawyerscommittee.org

*Counsel for Proposed Intervenor Defendants North Carolina State Conference of the NAACP and Jackson Sailor Jones*

This the 23rd day of September, 2024.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney Genera

**JA558**
5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00547-M

REPUBLICAN NATIONAL COMMITTEE
and NORTH CAROLINA REPUBLICAN
PARTY,

        Plaintiffs,

        v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

        Defendants,

        and

DEMOCRATIC NATIONAL
COMMITTEE,

        Intervenor Defendant.

ORDER

    This matter comes before the court on Defendants' motion to dismiss [DE 30] and Plaintiffs' emergency motion to remand [DE 37]. The court ordered an expedited briefing schedule on each motion. DE 36; DE 39. Plaintiffs responded to Defendants' motion and Defendants responded to Plaintiffs' motion. DE 50; DE 51. Intervenor Defendant Democratic National Committee (the "DNC") filed a response in support of Defendants' motion and a response in opposition to Plaintiffs' motion. DE 48; DE 49. Plaintiffs and Defendants also filed reply briefs. DE 52; DE 53. The court then held a hearing on both motions on October 17, 2024.

    The court appreciates the parties' compliance with the expedited briefing order and commends them for the comprehensive arguments they presented on a compressed timeline. In

**JA559**

1

considering all the written submissions and the oral arguments made, the court does find that Count One of the Complaint raises a disputed and substantial issue of federal law. The court may therefore exercise subject matter jurisdiction over that claim (and supplemental jurisdiction over Count Two), and further finds that Count One fails on the merits because it provides no private right of action. Accordingly, the court dismisses Count One with prejudice, declines to exercise supplemental jurisdiction over Count Two, and remands that claim to state court.

## I.    CASE HISTORY

Plaintiffs initiated this action in North Carolina state court on August 23, 2024. *See* DE 1-3 at 23. The Complaint contends that Defendants violated state law that requires the North Carolina State Board of Elections ("NCSBE") to comply with Section 303(a) of the Help America Vote Act ("HAVA"). *Id.* at 3, 10-11, 18-19; N.C.G.S. § 163-82.11(c). One relevant provision of HAVA obligates states to collect, in connection with a voter's registration, either the applicant's driver's license number or the last 4 digits of the applicant's social security number (or an affirmation that the applicant has neither). 52 U.S.C. § 21083(a)(5)(A).

Notwithstanding HAVA's dictates, the Complaint alleges that Defendants' voter registration form made optional the fields on the form where applicants would provide either their driver's license number or the last 4 digits of their social security number. DE 1-3 at 12. The Complaint further alleges that, as a result, applicants would "ha[ve] no way to know from the form that the driver's license number or the social security number were required for their form to be accepted and processed by [Defendants]." *Id.* A concerned citizen realized this flaw on the form and filed an administrative complaint with Defendants. *Id.* According to the Complaint, Defendants acknowledged that the voter registration form created the risk of HAVA violations, modified the form prospectively so that it would fully comply with federal law, but declined the

**JA560**

2

citizen's request that they "identify and contact voters whose registrations were improperly accepted." *Id.* at 13-14.

Defendant's alleged noncompliance with HAVA has resulted in "NCSBE accept[ing] hundreds of thousands of voter registration applications without applying the HAVA identifying information requirement." *Id.* at 11. Citing concerns about the potential for voter fraud and vote dilution, Plaintiffs brought this action, raising two claims for relief. *Id.* at 18-20. First, Plaintiffs bring a state law claim under N.C.G.S. § 163-82.11(c), which requires the state to maintain its voter registration list in compliance with Section 303(a) of HAVA. *Id.* at 18-19. Second, Plaintiffs raise a direct claim under the North Carolina Constitution, alleging that "Defendants' actions directly interfere with North Carolinian's fundamental right to vote." *Id.* at 19-20. Plaintiffs seek a court order that Defendants remedy their prior noncompliance with HAVA, including by either removing any ineligible voters from voter registration lists or by requiring registered voters who did not provide HAVA identification information at the time of their application to cast a provisional ballot. *Id.* at 20-21.

While this action was pending in state court, the DNC moved to intervene. DE 1-16 at 2. That motion was granted on September 10. DE 1-18 at 3. Approximately two weeks later, Defendants removed the action to this court. DE 1 at 1-3. Once in federal court, the North Carolina State Conference of the NAACP and two individual voters also sought to intervene. DE 19. The court denied that motion. DE 29.

Plaintiffs now seek remand to state court. DE 37. They argue that remand is warranted because their "complaint raises no federal question." DE 38 at 4. They further assert that removal under 28 U.S.C. § 1443(2) was improper because Defendants have not refused to enforce any discriminatory state law. *Id.* at 9-10.

**JA561**

3

Defendants oppose remand and argue for dismissal of Plaintiffs' complaint. DE 30; DE 51. In support of dismissal, Defendants contend that the doctrine of laches bars Plaintiffs' claims. DE 31 at 12. They also assert that the Complaint fails to state a claim upon which relief may be granted. *Id.* at 16-25. The DNC raised several arguments in support of dismissal and in opposition to remand. DE 48; DE 49. These matters are ripe and ready for decision.

## II. LEGAL PRINCIPLES

There exist two possible paths to establishing subject matter jurisdiction in this action. First, the claims could raise a federal question under 28 U.S.C. § 1331, which would permit removal under 28 U.S.C. § 1441(a). Second, the action could implicate a federal law providing for equal rights in terms of racial equality, which would authorize removal under 28 U.S.C. § 1443(2). The court discusses each in turn.

### a. Federal Question Jurisdiction: 28 U.S.C. §§ 1331, 1441(a)

"Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal district court is authorized to exercise subject matter jurisdiction over a "civil action brought in a State court" and removed to federal court, but only if the court would have had "original jurisdiction" if the action were brought in federal court in the first instance. 28 U.S.C. § 1441(a); *Sonoco Prod. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003) ("Typically, an action initiated in a state court can be removed to federal court only if it might have been brought in federal court originally.") (internal brackets and quotation mark omitted). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

**JA562**

4

Subject matter jurisdiction "involves a court's power to hear a case" and "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Consequently, this court "ha[s] an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). This obligation "must be policed" because it keeps the court "within the bounds the Constitution and Congress have prescribed." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

This court's subject matter jurisdiction extends "to all Cases, in Law and Equity, arising under th[e United States] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. CONST. art. III, § 2. "That grant of power, however, is not self-executing, and it was not until the Judiciary Act of 1875 that Congress gave the federal courts general federal-question jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986). As currently codified, the federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. That statute, like any that confers jurisdiction on an Article III court, is to be strictly construed, *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941), and "[i]t is to be presumed that a cause lies outside this limited jurisdiction," *Kokkonen*, 511 U.S. at 377. The burden of overcoming that presumption rests with the party invoking the court's subject matter jurisdiction. *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

"[T]he vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action." *Merrell Dow*, 478 U.S.

at 808. "There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction[;] in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Phrased another way, a state law cause of action may present a federal question "where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 9 (1983).[1]

But the full scope of federal question jurisdiction over state law claims that present a federal issue has not always been a model of clarity. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 470 (1957) (Frankfurter, J., dissenting) (characterizing this "litigation-provoking problem" as "the degree to which federal law must be in the forefront of the case and not collateral, peripheral or remote"); *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (describing this area of jurisprudence as "[u]nfortunately" not "a blank canvas" but rather one "that Jackson Pollock got to first"). Over a century ago, in *American Well Works*, Justice Holmes straightforwardly declared that state law claims that raise a federal issue were beyond the reach of federal courts, because "[a] suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). Thus, a state law defamation claim predicated on a defendant's statement that the plaintiff's product infringed the defendant's patent did not confer federal question jurisdiction, and any inquiry into the patent was "merely a piece of evidence." *Id.* at 259-260.

---

[1] In an attempt to distinguish between phrases that sound practically identical, the court will refer to a federal "question" to connote the existence of federal subject matter jurisdiction, and otherwise refer to federal "law" or a federal "issue" to connote the presence of a dispute that requires consideration of federal law but that may not necessarily raise a federal "question," that is, a federal court's subject matter jurisdiction.

**JA564**

6

The Supreme Court almost immediately retreated from that position, clarifying that federal question jurisdiction exists "where an appropriate statement of the plaintiff's cause of action . . . discloses that it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of a law of Congress." *Hopkins v. Walker*, 244 U.S. 486, 489 (1917). Several years later, in the seminal *Smith* case, the Court acknowledged federal question jurisdiction where a plaintiff shareholder sued a defendant corporation under Missouri law to enjoin the corporation from purchasing United States Government bonds on the basis that the issuance of those bonds was unconstitutional. *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 195 (1921). Even though state law supplied the cause of action, because it was "apparent that the controversy concern[ed] the constitutional validity of an act of Congress," *id.* at 245-46, the *Smith* Court found that the action raised a federal question. More recently, it has been "settled that Justice Holmes' test [in *American Well Works*] is more useful for describing the vast majority of cases that come within the district courts' original jurisdiction than it is for describing which cases are beyond district court jurisdiction." *Franchise Tax Bd.*, 463 U.S. at 9; *see also T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964) ("Mr. Justice Holmes' formula is more useful for inclusion than for the exclusion for which it was intended.").

In the years that followed, however, "[t]he *Smith* statement [was] subject to some trimming." *Grable*, 545 U.S. at 313. In *Gully*, the Court explained that "[n]ot every question of federal law emerging in a suit is proof that a federal law is the basis of the suit." *Gully v. First Nat. Bank*, 299 U.S. 109, 115 (1936). Rather, in departing significantly from Justice Holmes' test but stressing a degree of nuance absent from *Smith*, Justice Cardozo emphasized that "[w]hat is needed" to determine whether an action presents a federal question "is something of that common-sense accommodation of judgment to kaleidoscopic situations which" involve a federal issue. *Id.*

**JA565**

at 117.  This involves "a selective process which picks the substantial causes out of the web and lays [aside] the other ones."  *Id.* at 118.  Decades later, the Court made the understated concession that the phrase "arising under" in Section 1331 "has resisted all attempts to frame a single, precise definition" and "masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system."  *Franchise Tax Bd.*, 463 U.S. at 8; *see also Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 379 (1959) (acknowledging that Section 1331 must be "continuously construed and limited in the light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy which have emerged from [that statute's] function as a provision in the mosaic of federal judiciary legislation").

The current boundaries of Section 1331, as applied to state law claims that present an issue of federal law, have been outlined by a (somewhat recent) quartet of Supreme Court cases.  First, in *Franchise Tax Board*, the Court articulated that a state cause of action confers federal question jurisdiction only if the "right to relief . . . requires resolution of a substantial question of federal law in dispute between the parties."  *Franchise Tax Bd.*, 463 U.S. at 13.  If "federal law becomes relevant only by way of a defense," then federal question jurisdiction is lacking.  *Id.*  Likewise, even a "state declaratory judgment claim[]" that "rais[es] questions of federal law" does not provide a federal court with "original jurisdiction."  *Id.* at 18-19.

Then, in *Merrell Dow*, the Court held that a state law products liability claim did not present a federal question, even though the plaintiffs were entitled to a rebuttable presumption of negligence if they could establish that the defendant misbranded the product in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA").  *Merrell Dow*, 478 U.S. at 805.  Critical to the Court's analysis there was its assumption that "that there is no federal cause of action for FDCA

**JA566**

8

violations." *Id.* at 811. The "significance" of that "assumption" could not "be overstated," because it would "flout, or at least undermine, congressional intent to conclude that the federal courts might [] exercise federal-question jurisdiction and provide remedies for violations of that federal statute solely because the violation of the federal statute is" an element of a state law cause of action. *Id.* at 812. In other words, "the congressional determination that there should be no federal remedy for the violation of [the FDCA] is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently substantial to confer federal-question jurisdiction." *Id.* at 814. *Merrell Dow* thus underscores that judicial determinations about the substantiality of a federal issue take place in context, and require "sensitive judgments about congressional intent, judicial power, and the federal system." *Id.* at 810.

By implication, *Merrell Dow* left open the question of whether a state law claim that presents a federal issue only confers federal question jurisdiction if federal law independently supplies a cause of action, and a circuit split emerged. *Compare Utley v. Varian Assocs., Inc.*, 811 F.2d 1279, 1283 (9th Cir. 1987) ("Under *Merrell Dow*, if a federal law does not provide a private right of action, then a state law action based on its violation perforce does not raise a 'substantial' federal question."), *with Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996) (concluding that state law claim "arises under federal law within the meaning of 28 U.S.C. § 1331" where it "implicates a substantial federal interest," notwithstanding that "the cause of action is not federally created to arise under federal law"). The Supreme Court sought to answer that question in *Grable*.

*Grable* involved a state law quiet title action. *Grable*, 545 U.S. at 310. The Internal Revenue Service ("IRS") seized the petitioner's property to satisfy a tax delinquency, and prior to

**JA567**

9

the seizure provided the petitioner with notice by certified mail. *Id.* The IRS then sold the property to the respondent. *Id.* The petitioner later brought an action to quiet title to the property, in which he alleged that the respondent's title was invalid because the IRS failed to personally serve him with notice of the seizure in violation of federal law. *Id.* at 310–11.

In considering whether the petitioner's state law claim presented a federal question, the Court noted that there was no "federal cause of action to try claims of title to land obtained at a federal tax sale." *Id.* at 310. Even so, the Court concluded that the "case warrants federal jurisdiction" because an "essential element" of the state law claim, perhaps "the only legal or factual issue contested in the case," involved "an important issue of federal law that sensibly belongs in a federal court." *Id.* at 314-15.

The *Grable* Court stressed further that *Merrell Dow* should not be read as adopting any "bright-line rule" that "make[s] a federal right of action mandatory." *Id.* at 317. Instead, that case "specifically retained" the "contextual enquiry" a court must make into "congressional intent." *Id.* *Grable* and *Merrell Dow* can therefore be interpreted as reaching different conclusions due to case-specific concerns regarding federalism. On the one hand, "because it will be the rare state title case that raises a contested matter of federal law [such as in *Grable*], federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.* at 315. On the other, "exercising federal jurisdiction over a state misbranding action [such as in *Merrell Dow*] would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues." *Id.* at 318. Accordingly, those cases instruct that, when making a "sensitive judgment[] about congressional intent, judicial power, and the federal system," *Merrell Dow*, 478 U.S. at 810, a federal court must

**JA568**

10

consider the impact of its judgment on "the normal currents of litigation." *Grable*, 545 U.S. at 319.

Since *Grable*, the Court has indicated that state law causes of action that raise a sufficiently substantial federal issue so as to confer federal question jurisdiction represent a "special and small category." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006). Several years later, the Court in *Gunn* ultimately "outlin[ed] the contours of this slim category," and in so doing "condensed [its] prior cases into a [four-element] inquiry," where "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. *Gunn's* four-factor test remains the yardstick against which the propriety of extending federal question jurisdiction to state law causes of action is measured. *E.g.*, *Burrell v. Bayer Corp.*, 918 F.3d 372, 379 (4th Cir. 2019) (finding that North Carolina tort claims did not necessarily raise question of federal law).

### b. Private Rights of Action

The presence or absence of a private right of action is, at a minimum, "relevant to" the substantiality inquiry, *Grable*, 545 U.S. at 318, and at times its absence may be "tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction," *Merrell Dow*, 478 U.S. at 814. Although typically, "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), here it does because of its bearing on the court's substantiality analysis under *Merrell Dow*, *Grable*, and *Gunn*.

**JA569**

11

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Sometimes, Congress does so expressly. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 166 (2008). Other times, a right of action may be "implicit in a statute." *Cort v. Ash*, 422 U.S. 66, 78 (1975). The ultimate "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286. The absence of that dual intent is dispositive because "[r]aising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring).

"[S]everal factors are relevant" in this inquiry, including (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted," (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one," (3) whether an implied right of action would be "consistent with the underlying purposes of the legislative scheme," and (4) whether "the cause of action [is] one traditionally relegated to state law." *Cort*, 422 U.S. at 78. Although these several factors are all relevant, the determination "must ultimately rest on congressional intent to provide a private remedy." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991); *see also Alexander*, 532 U.S. at 286 ("Statutory intent . . . is determinative."); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (emphasizing that the focus "in any case involving the implication of a right of action[] is on the intent of Congress"). After all, "the Legislature is in the better position" than the judicial branch "to consider if the public interest would be served by imposing a new substantive legal liability." *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017) (internal quotation marks omitted).

**JA570**

12

As it relates to private causes of action, North Carolina law is at least as restrictive as federal law. Although in theory a state "statute may authorize a private right of action either explicitly or implicitly," *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 338, 828 S.E.2d 467, 474 (2019), typically "a statute allows for a private cause of action *only* where the legislature has expressly provided a private cause of action within the statute," *Time Warner Ent. Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 516, 747 S.E.2d 610, 615 (2013) (emphasis added); *see also United Daughters of the Confederacy v. City of Winston-Salem by & through Joines*, 383 N.C. 612, 637, 881 S.E.2d 32, 52 (2022) (observing that state Supreme Court "has not addressed the circumstances in which a statute *implicitly* authorizes a private cause of action") (emphasis in original).

Notwithstanding the lack of guidance from the North Carolina Supreme Court, several state Court of Appeals decisions have recognized an implicit right of action in a statute where the statute directs one party to take some discrete action for the benefit of an identified group, and the party directed to act "has failed to comply with the statutory mandate." *Sugar Creek Charter Sch., Inc. v. Charlotte-Mecklenburg Bd. of Educ.*, 195 N.C. App. 348, 356, 673 S.E.2d 667, 673 (2009). For example, in *Williams v. Alexander County*, the Court of Appeals concluded that a statute requiring school boards to pay specific sums to teachers participating in a particular training program created an implied right of action for those teachers to recover for nonpayment in violation of the statute. *Williams v. Alexander Cnty. Bd. of Educ.*, 128 N.C. App. 599, 604, 495 S.E.2d 406, 409 (1998). And in *Sugar Creek*, the Court of Appeals held that a statute directing county school boards to pay fixed amounts to local charter schools based on their enrollment impliedly created a right of action for charter schools "when they allege [a] violation of the mandatory provisions of this statute." *Sugar Creek*, 195 N.C. App. at 357, 673 S.E.2d at 674.

**JA571**

13

But where a state statute "do[es] not enunciate an explicit or implicit intent on the part of the General Assembly to create a statutory protection for" a particular group, a court is not free to fashion an implied right of action. *Lea v. Grier*, 156 N.C. App. 503, 509, 577 S.E.2d 411, 416 (2003). And where a statute provides for an administrative enforcement regime, there is "no legislative implication" that the statute "allow[s] for enforcement by a private party." *Sykes*, 372 N.C. at 338, 828 S.E.2d at 474–75; *see also Cobb v. Pennsylvania Life Ins. Co.*, 215 N.C. App. 268, 281, 715 S.E.2d 541, 552 (2011). Like federal jurisprudence on implied rights of action, North Carolina law recognizes that "[t]he regulation of access to the courts is largely a legislative task and one that courts should hesitate to undertake. For this reason, implied rights of action are disfavored and will not be found in the absence of clear legislative intent." *Long v. State Dep't of Hum. Res.*, 145 N.C. App. 186, 188, 548 S.E.2d 832, 834 (2001).

### c. Removal Jurisdiction Under 28 U.S.C. § 1443(2)

Removal is independently authorized for any civil action that involves an "act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). The second portion of that provision is relevant here, known as the refusal clause. *Stephenson v. Bartlett*, 180 F. Supp. 2d 779, 785 (E.D.N.C. 2001) (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any law providing for civil rights") (internal brackets and quotation marks omitted).

Although the plain terms of Section 1443(2) appear to capture any number of recognized civil rights, "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309 (4th Cir. 2021). In *Rachel*, the Supreme Court concluded that the statutory language "must be

**JA572**

14

construed to mean any law providing for specific civil rights *stated in terms of racial equality*."

*State of Ga. v. Rachel*, 384 U.S. 780, 792 (1966) (emphasis added). On the other hand, laws that

"are phrased in terms of general application available to all persons or citizens," and not in

"specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.*

Although "the plain text of the statute suggests a broader interpretation," this court "must take the

Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310.

### d. Motions to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader

is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) tests the

legal sufficiency of the complaint; "it does not resolve contests surrounding the facts, the merits

of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d

943, 952 (4th Cir. 1992). As a result, the court accepts the complaint's factual allegations as true,

and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v.*

*Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations," the "allegations must be enough to raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And importantly, "the

tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Likewise, "[l]abels,

conclusions, recitation of a claim's elements, and naked assertions devoid of further factual

enhancement will not suffice." *ACA Fin. Guar. Corp. v. City of Buena Vista*, Virginia, 917 F.3d

206, 211 (4th Cir. 2019). Ultimately, when considering a motion to dismiss, the court must "draw

**JA573**

15

on its judicial experience and common sense" to determine whether the complaint "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## III.  ANALYSIS

### a.  Motion to Remand

The court's analysis must begin with Plaintiffs motion to remand because that motion challenges the court's subject matter jurisdiction. DE 37.  Without subject matter jurisdiction, the court has no power to hear the case and cannot reach the merits of Defendants' motion. *Cotton*, 535 U.S. at 630.

As previously detailed, this court's subject matter jurisdiction extends to any civil action "arising under" the laws of the United States.  28 U.S.C. § 1331.  For federal jurisdiction to lie over the state law claims presented here, those claims must "(1) necessarily raise[]" an issue of federal law, and that issue of federal law must be "(2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.  Defendants, the parties invoking the court's subject matter jurisdiction, bear the burden of establishing that these four factors are met. *Mulcahey*, 29 F.3d at 151.  If any factor is not met, "the case shall be remanded." 28 U.S.C. § 1447(c).

First, the court will consider whether Count Two raises a federal question, because the analysis of that claim is more straightforward and Defendants have not convincingly argued that it does. *See* DE 51 at 12 (suggesting that "Plaintiffs' ill-defined state-constitutional claim would also seem to depend on a construction of HAVA"), 16-17 (discussing fourth prong of *Grable-Gunn* test as applied to Count One, but not Count Two); DE 49 at 8 (DNC brief discussing federal-state balance without mention of state interest in adjudication of state constitutional claim).  After concluding that original jurisdiction is lacking as to Count Two, the court will then evaluate

**JA574**

16

whether Count One raises a federal question. That claim does, so the court may exercise original jurisdiction over it, as well as supplemental jurisdiction over Count Two. 28 U.S.C. §1367(a).

After completing its federal question analysis, the court will next consider whether Section 1443(2) independently supplies removal jurisdiction. The court concludes it does not. That jurisdictional posture partially informs resolution of Defendants' motion to dismiss, which the court considers last.

### i. Count Two – State Constitutional Claim

Plaintiffs allege that Defendants denied North Carolinians equal protection of the laws in violation of the North Carolina Constitution, in that Defendants' failure to comply with state law and HAVA has interfered with citizens' "fundamental right to vote." DE 1-3 at 20. The court will assume without deciding that this claim necessarily raises a disputed and substantial issue of federal law.[2]  Nonetheless, finding federal question jurisdiction over this claim would fundamentally disrupt "the federal-state balance," *Gunn*, 568 U.S. at 258, precluding the exercise of original jurisdiction.

"It is fundamental that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940). Since the founding of our constitutional republic, it has been settled that "the powers of the states depend upon their own constitutions," and that "the people of every state ha[ve] the right to modify and restrain them, according to their own views of the policy or principle." *Martin v. Hunter's Lessee*, 14 U.S. 304, 325 (1816). Usurping that role from the state would "disregard[] principles of federalism" and "denigrate[] the state's authority to fashion independent constitutional law." *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 367 (5th Cir. 1995) (finding that state

---

[2] At the October 17 hearing, Defendants and the DNC persuasively argued that Count 2 involves the same disputed issues pertaining to HAVA as Count One.

**JA575**

17

constitutional claim did not present federal question and reversing denial of motion to remand); *accord Lynchburg Range & Training v. Northam*, 455 F. Supp. 3d 238, 246 (W.D. Va. 2020) ("recogniz[ing] the paramount importance of state judiciaries in interpreting their respective constitutions" and remanding state constitutional claim to state court).

For that matter, it is of no moment that the North Carolina Supreme Court's "analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009). Regardless of that general practice, the North Carolina Supreme Court "is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States." *State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984); *see also Cooper v. State of Cal.*, 386 U.S. 58, 62 (1967) (acknowledging "State's power to impose higher standards [for analogous state constitutional provisions] than [those] required by the Federal Constitution if it chooses to do so"). And the North Carolina Supreme Court's "independent authority to interpret state constitutional provisions reflects the unique role of state constitutions and state courts within our system of federalism." *State v. Kelliher*, 381 N.C. 558, 580, 873 S.E.2d 366, 383 (2022).

Declaring the existence of federal question jurisdiction over a state constitutional claim, even where that claim raises an issue of federal law, would contort "the interrelation of federal and state authority," and upend "the proper management of the federal judicial system." *Franchise Tax Bd.*, 463 U.S. at 8. The "disruptive portent in exercising federal jurisdiction" would create the risk of "a horde of original filings and removal cases" involving state constitutional claims. *Grable*, 545 U.S. at 314, 318. That would leave federal judges as the arbiters of state constitutional rights and turn our system of federalism on its head. That is not what Congress could have intended

when it granted federal courts subject matter jurisdiction over "civil actions arising under" the "laws . . . of the United States." 28 U.S.C. § 1331. The court finds it has no original jurisdiction over Count Two in the Complaint.

### ii. Count One - N.C.G.S. 163-82.11(c)

Count One raises a violation of state law that requires the NCSBE to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c). Per the Complaint, Defendants violated HAVA, and therefore this statute, by failing to collect either a driver's license number or the last 4 digits of a social security number in connection with hundreds of thousands of voter registrations, and by refusing to "to maintain accurate voter rolls." DE 1-3 at 18-19.

#### 1. *Necessarily Raised*

This claim necessarily raises an issue of federal law. "To prevail on [the] claim," Plaintiffs "must show that" Defendants failed to comply with Section 303(a) of HAVA. *Gunn*, 568 U.S. at 259. "That will necessarily require application of [HAVA] to the facts of [Plaintiffs'] case." *Id.* In other words, whether Defendants violated HAVA is "an essential element" of Plaintiffs' state law claim. *Grable*, 545 U.S. at 315; *see also* N.C.G.S. § 163-82.11(c). And "the claim's very success depends on giving effect to a federal requirement." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 384 (2016). The court finds the first factor is met.

#### 2. *Disputed*

Plaintiffs argue that any issue of federal law necessarily raised by Count One is not disputed, because Defendants admitted in a meeting and through a written order that they formerly did not use a voter registration form that complied with Section 303(a) of HAVA. DE 38 at 5-6. The court has independently considered that evidence, as it is permitted to do when its subject

**JA577**

19

matter jurisdiction is in question. *Arbaugh*, 546 U.S. at 514; *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Wild v. Gaskins*, 30 F. Supp. 3d 458, 461 (E.D. Va. 2014).[3] After review of the recording of the NCSBE meeting,[4] as well as the order issued, the court finds that Defendants effectively conceded a violation of 52 U.S.C. § 21083(a)(5)(a), so any issue involving that specific provision of HAVA is undisputed.

That narrow finding, however, does not resolve whether Count One raises disputed issues of federal law. Section 163-82.11 employs broad language and requires Defendants to "*update* the statewide computerized voter registration *list and database* to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c) (emphasis added). By its plain terms, Section 163-82.11 does not concern only the initial act of voter registration, the requirements for which are found at 52 U.S.C. § 21083(a)(5)(A). The state statute also governs "update[s]" to the "list and database," N.C.G.S. § 163-82.11(c), which corresponds to 52 U.S.C. § 21083(a)(2)(A), a separate sub-provision that also falls under Section 303(a) of HAVA.

Section 21083(a)(2) obligates state officials to "perform list maintenance with respect to" the state's voter registration list. 52 U.S.C. § 21083(a)(2)(A). In conducting regular list maintenance, a state official may *only* remove a registered voter from a registration list in accordance with certain "provisions of the National Voter Registration Act of 1993." 52 U.S.C. § 21083(a)(2)(A)(i). The National Voter Registration Act ("NVRA"), in turn, circumscribes the

---

[3] These materials were also incorporated into the Complaint by reference, and the court may take judicial notice of them. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Alternatively, to the extent this extrinsic evidence is also partially relevant to the merits of Plaintiffs' claim, implicating the right to trial by jury, *see Arbaugh*, 546 U.S. at 514 (noting that "the jury is the proper trier of contested facts" related to an "essential element of a claim for relief"), the court would still be free to consider it because there would have been no constitutional right to trial by jury for claims addressing North Carolina's compliance with HAVA, a law passed in 2002, "at the time the [State] Constitution of 1868 was adopted." *Kiser v. Kiser*, 325 N.C. 502, 507, 385 S.E.2d 487, 490 (1989).

[4] A recording of the meeting is available at https://dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Part%201%20-%20State%20Board%20of%20Elections%20Meeting-20231128.mp4. The vote on the concerned citizen's complaint occurs at 1:26:42. The full discussion begins at 1:09:08. A copy of the NSCBE order is available at https://dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf.

circumstances under which a state official may remove a registered voter from a registration list. 52 U.S.C. § 20507(a). Those circumstances include removal (1) "at the request of the registrant," (2) due to a "criminal conviction or mental incapacity" that mandates removal by operation of state law, (3) by reason of "the death of the registrant," or (4) because of "a change in the residence of the registrant," where the state uses "change-of-address information supplied by the Postal Service," and either confirms the change of address with the registrant, or provides notice to the registrant that the state has received information indicating that the registrant has changed addresses, and the registrant fails to respond and "has not voted or appeared to vote in 2 or more consecutive general elections for Federal office." 52 U.S.C. §§ 20507(a)(3)(A), (a)(3)(B), (a)(4)(A), (a)(4)(B), (b)(2)(A), (b)(2)(B), (c)(1)(A), (c)(1)(B), (d)(1)(A), & (d)(1)(B).

Notably, those defined circumstances do not include a voter's failure to initially register to vote in compliance with Section 21083(a)(5)(A)(i) of HAVA. *See generally* 52 U.S.C. § 20507. Accordingly, the issue of federal law presented by the claim in Count One is whether Defendants failed to "update . . . the voter registration list and database," N.C.G.S. § 163-82.11(c), when they "perform[ed] list maintenance," 52 U.S.C. § 21083(a)(2)(A), and (as Plaintiffs allege) did not "remov[e] ineligible persons from the voter roll," DE 1-3 at 18, when Defendants based their removal decisions on specified "provisions of the National Voter Registration Act of 1993," 52 U.S.C. § 21083(a)(2)(A)(i), and not an initial failure to register in a manner consistent with 52 U.S.C. § 21083(a)(5)(A)(i).[5]

---

[5] The court has also considered whether this disputed issue of federal law is necessarily raised, considering that Defendants effectively conceded the old voter registration form violated Section 21083(a)(5)(A) of HAVA. To be sure, if a plaintiff pleads alternative theories to relief, and only one of those theories necessarily raises a disputed issue of federal law, federal question jurisdiction is lacking. *Burrell*, 918 F.3d at 383. As a result, Plaintiffs in theory could have attempted to articulate a violation of Section 163-82.11(c) that rested *solely* on Defendants' registration of voters in a manner out of compliance with HAVA. But Plaintiffs are the masters of their Complaint and that is not the theory that they alleged. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Rather, their theory captures a singular course of conduct where Defendants violated state law by registering voters without collecting information required by HAVA and then by refusing to consider removal of those improperly-registered voters; under a fair reading of the

That is the issue of federal law, and it is disputed. Plaintiffs say Defendants are required to remove these voters. *See* DE 1-3 at 18-19. Defendants say they cannot do so. *See* DE 31 at 7-8. The court expresses no view on the strength of either position, but observes that, if Defendants' argument prevails, then they will not have violated their duty to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002," meaning that Count One would likely fail on the merits. N.C.G.S. § 163-82.11(c). On the other hand, if Plaintiffs' position prevails (i.e., that the NVRA's restrictions on removals only applies to valid registrants, and individuals who registered to vote in a manner inconsistent with HAVA are not valid registrants), then they could prevail on their claim that Defendants failed to update the voter registration list to meet the requirements of HAVA.

Like in *Grable*, the meaning of "section 303(a)" of HAVA is "an essential element" of Plaintiffs' claim under Section 163-82.11. *Grable*, 545 U.S. at 315. This question of federal law "requires resolution," *Franchise Tax Bd.*, 463 U.S. at 13, and "is the central point of dispute," *Gunn*, 568 U.S. at 259. Because Plaintiffs' state law claim "really . . . involves a dispute"

---

Complaint, the court cannot dissect and accentuate the allegations related to registration and overlook those related to list maintenance. *See, e.g.*, DE 1-3 at 9 (describing as "[i]mportant[]" HAVA's "processes and procedures for *removing* the names of ineligible voters from the state's voter rolls"), 14 (alleging that Defendants must "identify and contact voters whose registrations were improperly accepted"), 14 (contending that Section 163-82.11(c) mandates that Defendants "take[] immediate action to *correct* the accuracy of the state's voter rolls"), 15 (asserting that "Defendants should have immediately taken action to remedy" situation of improperly-registered voters), 16 ("By allowing ineligible voters to register *and then remain* on the North Carolina voter rolls, Defendants have brought the security and validity of the state's elections into question."), 16 ("If Defendants do not *remove* ineligible voters from the state's voter rolls, then the legitimate votes of qualified voters will be diluted and disenfranchised in upcoming elections."), 17 (contending that Section 163-82.11(c) requires "remov[al of] the names of ineligible voters from voting rolls"), 18 ("HAVA also requires that Defendants . . . remov[e] ineligible persons from the voter roll.") (emphases added). As the foregoing excerpts demonstrate, the theory Plaintiffs articulated in their Complaint necessarily raises the HAVA and NVRA issues related to removal of voters from registration lists that the court has just highlighted. Plaintiffs have attempted to reframe their Section 163-82.11 theory through briefing to avoid disputed issues of federal law, DE 38 at 5-6, particularly their Reply brief in support of remand, DE 52 at 4-6, but "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy," *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

**JA580**

22

concerning the "construction, or effect," of a federal law, *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912), the court finds the second factor met.

### 3. *Substantial*

The court turns next to consideration of whether the HAVA (and, by extension, NVRA) issues presented by Plaintiffs' claim involves a substantial question of federal law. As noted previously, there is a "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 813. Rather, the court seeks to adhere to Justice Cardozo's instruction that courts should apply a "common-sense accommodation of judgment" in what is assuredly "a selective process which picks the substantial causes out of the web and lays [aside] the other ones." *Gully*, 299 U.S. at 115.

On balance, the court finds that Count One falls into that "special and small category" of state law claims that present a substantial question of federal law. *Empire Healthchoice*, 547 U.S. at 699. Distilled to its essence, this case concerns whether or not a state may, or in fact must, remove a registered voter from a voting roll shortly before a national election or require that voter to cast a provisional ballot because that voter (through no apparent fault of their own) was initially registered to vote in a manner inconsistent with federal law. From Plaintiffs' perspective, this case is about public confidence in the integrity of an election and the importance of removing improperly-registered voters from voting rolls as a potential means to prevent voting fraud and voter disenfranchisement or dilution. From Defendants' perspective, the act of removing voters who were improperly registered but who are nonetheless eligible to vote would result in another form of the very disenfranchisement that Plaintiffs ostensibly seek to avoid. There is a substantial federal interest in protecting the right to vote *and* in ensuring the integrity of elections. From

**JA581**

23

whichever perspective the court views the question presented, it discerns a substantial question of federal law.

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasis omitted). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). This fundamental right is "secured by the Equal Protection Clause of the Fourteenth Amendment," *Schilling v. Washburne*, 592 F. Supp. 3d 492, 497 (W.D. Va. 2022), and the significance of voting to our constitutional structure is reflected in the NVRA. 52 U.S.C. § 20501(a).

At the same time, the court recognizes that each state also has "a compelling interest in preserving the integrity of its election process," and that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Weighing the respective federal and state interests in the electoral context represents a delicate endeavor because both sovereigns share constitutional authority over this field. U.S. Const. Art. I, § 4, cl. 1. HAVA attempts to reflect this balance, by granting the states substantial discretion in implementing their own "methods" for "complying with the requirements" of HAVA. 52 U.S.C. § 21085. North Carolina's General Assembly has exercised that discretion in part by enacting Section 163-82.11.

Ultimately, though, this third factor does not call for a balancing test. Rather, the inquiry turns on whether the federal issue is substantial. A state law claim involves a substantial issue of federal law when it entails "construction of a federal statute" and is important "to the federal system as a whole." *Burrell*, 918 F.3d at 385.

**JA582**

24

With the relevant inquiry so framed, the court concludes that "[t]he meaning of federal [election statutes] is an important issue of federal law that sensibly belongs in a federal court." *Grable*, 545 U.S. 315. This is not a case where "a question of federal law is [merely] lurking in the background." *Gully*, 299 U.S. at 117. Rather, determination of a state's continuing obligations under HAVA and the NVRA for registered voters who were initially registered improperly would have "real-world result[s]" and implications for a forthcoming national election. *Gunn*, 568 U.S. at 261. Where those implications include an individual's capability to cast a vote, a fundamental right secured by the Fourteenth Amendment, the federal interest is near its zenith.

Cases evaluating the extent to which a state law claim presents a substantial question of federal law emphasize that the question must be important to more than just the "particular parties in the immediate suit." *Burrell*, 918 F.3d at 385. The question must be important "to the federal system as a whole." *Gunn*, 568 U.S. at 260. The questions of federal law embedded in Count One meet that standard; the answers to those questions will "affect non-parties to this case," *Burrell*, 918 F.3d at 386, and the federal "Government has a strong interest in" states' compliance with federal election law, *Grable*, 545 U.S. 315. Likewise, "[s]tate by state variations of interpretation about" the scope of a state's obligations under HAVA and the NVRA creates the risk of horizontal disuniformity and would "thereby undermine the very device[s] that Congress created" to ensure a uniform national system of voter registration and election administration. *Ormet Corp.*, 98 F.3d at 807. This case presents a substantial federal question.

**JA583**

25

a. Neither Section 21083(a)(2)(A) nor Section 21083(a)(5)(A)(i)
confer a private right of action.

As part of its analysis of this third factor, the court has considered whether the provisions of HAVA relevant here independently supply a private cause of action.[6] The absence of a private right of action under the FDCA was dispositive in *Merrell Dow*, and *Grable* instructs that the presence or absence of a private cause of action is at least relevant to the substantiality inquiry. *Merrell Dow*, 478 U.S. at 814; *Grable*, 545 U.S. at 318.

"HAVA by its terms does not create a private right of action." *Colon-Marrero v. Velez*, 813 F.3d 1, 15 (1st Cir. 2016). In the absence of an express private right of action, the court should presume "one does not exist." *Ormet Corp.*, 98 F.3d at 805. That said, a right of action may still be "implicit in a statute." *Cort*, 422 U.S. at 78. As a result, this court's task is to interpret the relevant provisions of HAVA "to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286.

The court's analysis does not take place on an entirely blank slate. In *Brunner*, a one-paragraph per curiam opinion, the Supreme Court vacated a temporary restraining order issued by a district court and held that the plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 [of HAVA] in an action brought by a private litigant to justify the issuance of a TRO." *Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008). That holding is not dispositive in this case, though, for two reasons. First, a finding that the plaintiffs were not "sufficiently likely to prevail" in order "to justify the issuance of a TRO" is not tantamount to a conclusion that a private right of action is entirely foreclosed by the statute. *Id.* And second, although the *Brunner* Court referred broadly to Section 303 of HAVA,

---

[6] At the October 17 hearing, all parties appeared in agreement that HAVA does not provide a private cause of action. But given its bearing on the court's subject matter jurisdiction, the court nevertheless undertakes this inquiry notwithstanding the agreement of the parties.

**JA584**

26

the specific provision at issue in *Brunner* was Section 21083(a)(5)(B)(i), not Section 21083(a)(5)(A)(i) or Section 21083(a)(2)(A). *See id.* at 6 n.*.

Accordingly, since *Brunner*, two courts of appeals have found an implied private right of action (enforceable through 42 U.S.C. § 1983) under certain provisions of Section 303 of HAVA. *See Colon-Marrero*, 813 F.3d at 17–18 (finding implied private of action under Section 21083(a)(4)(A) for registrants who were improperly removed from voter rolls); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004) ("Individual enforcement of [HAVA's provision permitting casting of provisional ballot] under § 1983 is not precluded"). Other courts have come to contrary conclusions. *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("HAVA creates no private cause of action."); *American C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 184–85 (3d Cir. 2017) ("HAVA only allows enforcement via attorney general suits or administrative complaint."); *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 736 n.4 (9th Cir. 2012) (district court's assumption that HAVA creates a private right of action was "doubt[ful]"). In the absence of authoritative guidance from the Fourth Circuit, and in recognition of the fact that "courts have disagreed as to whether HAVA provides a private right of action," *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 662 (M.D.N.C. 2024), this court's analysis remains guided by the *Cort* factors, *Cort*, 422 U.S. at 78, although the determination "must ultimately rest on congressional intent to provide a private remedy," *Virginia Bankshares*, 501 U.S. at 1102.

Section 21083(a)(2)(A) provides that "[t]he appropriate State or local election official shall perform list maintenance with respect to" that state's voter registration list in a manner consistent with the NVRA. 52 U.S.C. § 21083(a)(2)(A). Section 21083(a)(5)(A)(i) mandates that, prior to

**JA585**

27

processing a voter's registration, "a State" must collect the applicant's "driver's license number" or "the last 4 digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A)(i).

The court finds the first *Cort* factor, whether Plaintiffs are within the class for whose "especial benefit" these provisions were intended, weighs heavily against implying a private right of action. *Cort*, 422 U.S. at 78. These provisions of HAVA "are designed only to guide the State in structuring its systemwide efforts at" voter registration and voter list maintenance. *Blessing v. Freestone*, 520 U.S. 329, 344 (1997). Statutory provisions such as these "that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander*, 532 U.S. at 289 (internal quotation mark omitted).

Although at some level these provisions of HAVA are aimed at ensuring the proper administration and integrity of elections, which in turn benefits all voters, it's not enough that "the plaintiff falls within" some "general zone of interest that the statute is intended to protect." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). "[S]uch a definition of 'especial' beneficiary" would "make[] this factor meaningless." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). Rather, something more "is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Gonzaga*, 536 U.S. at 283. The statute must manifest "an unmistakable focus on the benefited class." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979)

Put another way, "[t]he question is not simply who would benefit from" these provisions of HAVA, but rather "whether Congress intended to confer federal rights upon those beneficiaries." *Sierra Club*, 451 U.S. at 294. These provisions of HAVA do not "unmistakabl[y] focus" on Plaintiffs or the voters they represent; the provisions do not mention them at all. *Cannon*, 441 U.S. at 691. The court thus finds that these provisions do not "create[] an individually

**JA586**

28

enforceable right in the class of beneficiaries to which [Plaintiffs] belong." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005).

The court's conclusion on this first factor is supported by *Brunner*. Although that case dealt with a separate provision of Section 303(a) of HAVA, the provision at issue there directed "[t]he chief State election official and the official responsible for the State motor vehicle authority of a State" to enter into an information sharing agreement. *Brunner*, 555 U.S. at 6 n.*. That provision is structurally indistinguishable from those at issue in this case. They all are designed to "guide the State" and its officials. *Blessing*, 520 U.S. at 344. They focus "on the person regulated," *Alexander*, 532 U.S. at 289, and there is no focus, much less an "unmistakable" one, *Cannon*, 441 U.S. at 691, on any identifiable class of beneficiaries or the Plaintiffs.

As to the second *Cort* factor, the court finds that Section 21083(a)(2)(A) and Section 21083(a)(5)(A)(i) contain no indication of legislative intent to imply a private remedy. This inquiry involves resort to legislative history, *Cort*, 422 U.S. at 80, an inherently perilous exercise akin to "looking over a crowd and picking out your friends," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)). But here, the relevant legislative history "is entirely silent on the question whether a private right of action . . . should or should not be available," and "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979); *see also* H.R. Rep. 107–329 (2001). If anything, "[t]his silence on the remedy question serves to confirm that in enacting [HAVA], Congress was concerned not with private rights but with" states' compliance with minimum standards of election administration. *Sierra Club*, 451 U.S. at 296.

**JA587**

29

Third, the court finds that implying a private right of action under these provisions of HAVA would not be consistent with the underlying purposes of the legislative scheme. *Cort*, 422, U.S. at 78. To the contrary, consideration of the legislative scheme as a whole leads the court to discern a legislative intent to deny a private remedy. On that point, HAVA contains "separate . . . enforcement mechanisms." *Indiana Prot. & Advoc. Servs. v. Indiana Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 379 (7th Cir. 2010). Specifically, "[t]he Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court" to remedy violations of Section "21083 of this title." 52 U.S.C. § 21111. In addition, states that receive federal funding must "establish and maintain State-based administrative complaint procedures." 52 U.S.C.A. § 21112(a)(1). North Carolina has done so, N.C.G.S. § 163-91(a), and the concerned citizen took advantage of this complaint procedure, DE 1-3 at 12-14.

"The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander*, 532 U.S. at 290; *see also Gonzaga*, 536 U.S. at 290 (finding that an express provision authorizing administrative enforcement "counsel[s] against [] finding a congressional intent to create individually enforceable private rights"). "After all, when Congress wants to create a private cause of action, it knows how to do so expressly." *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020). Congress's decision in HAVA to expressly create enforcement remedies other than a private right of action strongly suggests that it intended not to impliedly create a private right of action under the provisions at issue here.

The final *Cort* factor, whether "the cause of action [is] one traditionally relegated to state law," has no bearing in this case. *Cort*, 422 U.S. at 78. Although *Cort* identified several factors that could be relevant, it "did not decide that each of these factors is entitled to equal weight," and "[t]he central inquiry remains whether Congress intended to create, either expressly or by

**JA588**

30

implication, a private cause of action." *Touche Ross*, 442 U.S. at 575. Cases since *Cort* have similarly emphasized that the court's conclusion "must ultimately rest on congressional intent," *Virginia Bankshare*, 501 U.S. at 1102, that "[s]tatutory intent . . . is determinative," *Alexander*, 532 U.S. at 286, and that the dispositive factor is "the intent of Congress," *Texas Industries*, 451 U.S. at 639. The court adheres to those cases and finds that no implied right of action is available to these Plaintiffs under Section 21083(a)(2)(A) and Section 21083(a)(5)(A)(i) of HAVA. To the extent a remedy *should* be available to certain private parties, "the Legislature is in the better position" than a federal court "to consider if the public interest would be served by imposing a new substantive legal liability." *Ziglar*, 582 U.S. at 136.

> b. HAVA does evince congressional intent that federal courts would resolve disputes over its interpretation.

The conclusion that neither of the HAVA provisions at issue here provide a private right of action is relevant to the question of whether Count One presents a substantial federal question, but it is not dispositive. *Merrell Dow*, 478 U.S. at 814; *Grable*, 545 U.S. at 318. And the court finds that the absence of a private cause of action is at least partially counterbalanced by Section 21111, which authorizes "[t]he Attorney General [to] bring a civil action against any State or jurisdiction in an appropriate United States District Court" to remedy violations of Section "21083 of this title." 52 U.S.C. § 21111. At a minimum, then, Congress contemplated that federal courts would be responsible for resolving questions of statutory interpretation, even if not in actions brought by these Plaintiffs.

At bottom, the court finds that Count One raises a substantial question of federal law: does a state contravene its obligation to maintain voter registration lists under HAVA when it declines to remove voters for a basis not enunciated in the NVRA? That question of federal law is "not collateral, peripheral or remote." *Textile Workers*, 353 U.S. at 470 (Frankfurter, J., dissenting). It

is front and center, and is the critical legal or factual issue contested in the case. *Grable*, 545 U.S. at 315. And where the answer to that question may implicate the right to vote for North Carolinians in an imminent national election, and that right is "of the most fundamental significance under our constitutional structure," *Burdick*, 504 U.S. at 433, the court concludes that the duty of answering that question "sensibly belongs in a federal court," *Grable*, 545 U.S. 315.

### 4. *Federal-State Balance*

Lastly, the court has considered whether finding federal question jurisdiction over Count One would "disrupt[] the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. This is a practical, common-sense inquiry, which asks the court to project whether declaring the existence of subject matter jurisdiction over a particular state law claim will "attract[] a horde of original filings and removal cases raising other state claims" or "portend only a microscopic effect" on "the normal currents of litigation." *Grable*, 545 U.S. at 315, 318-19.

As far as the court can tell, no plaintiff has ever raised a direct claim under Section 163-82.11. According to a Westlaw search, the statute has only been cited in two previous court decisions, one of which was this court's order denying the North Carolina NAACP's motion to intervene. *Republican National Committee and North Carolina Republican Party v. North Carolina State Board of Elections et al.*, No. 5:24-CV-00547, 2024 WL 4349904 (E.D.N.C. Sept. 30, 2024). In the absence of evidence suggesting that plaintiffs are regularly bringing these sorts of claims in state court, the court suspects that its narrow holding (which applies only to this specific provision of North Carolina law) will "portend only a microscopic effect" on "the normal currents of litigation." *Grable*, 545 U.S. at 315, 319.

Moreover, the court finds that exercising subject matter jurisdiction over this claim would not disrupt any congressionally-contemplated allocation of authority between state and federal

**JA590**

32

courts. *See Gunn*, 568 U.S. at 258. Congress did grant states discretion in implementing HAVA. 52 U.S.C. § 21085. But implementation is distinct from interpretation, and consideration of the entire statutory scheme leads to the conclusion that Congress intended for federal courts to resolve core questions of statutory interpretation. *See* 52 U.S.C. § 21111. Although the court has no doubt that a state court could capably interpret the provisions of HAVA, there is no indication that Congress intended that outcome to the exclusion of federal court jurisdiction. "[I]f anything," then, "the removal [in this action] could best be said to have righted th[e] intended division" between state and federal courts. *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 288 (4th Cir. 2022).

In sum, the court finds that Count One necessarily raises a disputed and substantial issue of federal law, and that its resolution in federal court would not disrupt the federal-state balance approved by Congress. *Gunn*, 568 U.S. at 258. The court may therefore exercise subject matter jurisdiction over Count One (and supplemental jurisdiction over Count Two). 28 U.S.C. § 1331; 28 U.S.C. § 1367. Accordingly, removal was proper, 28 U.S.C. § 1441(a), and the motion to remand is denied.

### iii. Removal Jurisdiction under 28 U.S.C. § 1443(2)

Defendants also offer Section 1443(2) as an alternative basis for removal. *See* DE 1 at 2. As previously detailed, that provision permits removal for a civil action that involves "any act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). Defendants proceed under the second portion of Section 1443(2), known as the refusal clause. *Stephenson*, 180 F. Supp. 2d at 785 (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any

law providing for civil rights") (internal brackets and quotation marks omitted). According to

Defendants, "[t]o the extent [they] have indeed refused to take certain actions, their refusal was

based on their obligation to comply with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. §

20507(c)(2)(A)." DE 1 at 2. This refusal applies to each of Counts 1 and 2, because Defendants'

obligations under the NVRA constitute a defense to both claims.

       Section 20507(c)(2)(A) requires that a state complete any systematic removal of ineligible

voters "not later than 90 days prior to the date of a . . . general election." 52 U.S.C. §

20507(c)(2)(A). Section 10101(a)(2) has several sub-provisions but, relevant here, prohibits a

state official from "deny[ing] the right of any individual to vote in any election because of an error

or omission on any record or paper relating to any application, registration, or other act requisite

to voting," so long as that "error or omission is not material in determining whether such individual

is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Based on those

provisions, the court understands Defendants' theory to be that, if they were to grant Plaintiffs the

relief they seek, Defendants would violate certain provisions of the NVRA. *See* DE 1 at 2.

       The problem with this theory is that the "[t]he Supreme Court has limited the meaning of

a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming*,

10 F.4th at 309. The *Rachel* Court concluded that the statutory language "must be construed to

mean any law providing for specific civil rights *stated in terms of racial equality*." *Rachel*, 384

U.S. at 792 (emphasis added). Laws "phrased in terms of general application available to all

persons or citizens," and not in "specific language of racial equality," do not grant removal

jurisdiction under Section 1443. *Id.* Although "the plain text of the statute suggests a broader

interpretation," this court "must take the Supreme Court at its word and faithfully apply its

precedent." *Vlaming*, 10 F.4th at 310.

<div align="center">**JA592**</div>

34

Neither Section 20507(c)(2)(A) nor Section 10101(a)(2)(B) provide "for specific civil rights stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Section 20507(c)(2)(A) makes no mention of race and is "phrased in terms of general application available to all persons." *Id.*; *see also* 52 U.S.C. § 20507(c)(2)(A). And, although Section 10101(a)(2)(B) is contained in a provision entitled "Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers," *see* 52 U.S.C. § 10101(a), only Section 10101(a)(1) provides "for specific civil rights stated in terms of racial equality," *Rachel*, 384 U.S. at 792. *See also* 52 U.S.C. § 10101(a)(1) (providing that "All citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote . . ., without distinction of race, color, or previous condition of servitude").

Section 10101(a)(2)(B), the provision on which Defendants based their refusal to act, does not mention race and is "phrased in terms of general application available to all persons." *Rachel*, 384 U.S. at 792; *see also* 52 U.S.C. § 10101(a)(2)(B). The inclusion of "Race" and "color" in the title of the provision does not alter the court's conclusion because the title of a statute cannot modify its plain text. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). A statute's heading "is but a short-hand reference to the general subject matter involved." *Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528 (1947). And where, as here, the statute's title includes a series of semicolons, that use is intended to highlight "distinct" topics. *See Williams v. CDP, Inc.*, 474 F. App'x 316, 321 n.4 (4th Cir. 2012); *see also United States v. Waters*, 158 F.3d 933, 937 (6th Cir. 1998) (noting that semicolon in statute's title "strongly suggests" that provisions of statute address "separate areas"). Accordingly, the court must resort to the plain text to determine whether the relevant statutory provision mentions "specific civil rights stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Section 10101(a)(2)(B) does not.

Defendants and the DNC argue that the NVRA "indisputably has as one of its purposes the promotion of racial equality." DE 51 at 19; *see also* DE 49 at 9 (asserting that NVRA provides for civil rights in terms of racial equality). And the court acknowledges that one of the (several) congressional findings in the first chapter of the NVRA indicates that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). But Defendants' position and this general congressional finding, though true, would improperly reframe the pertinent test at too great a level of generality. The test is not whether Defendants refused to act on the basis of a provision of law that is contained within a larger statute that has several purposes, one of which being racial equality. The test is whether the refusal to act was based on a law that is "stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Because Section 1443(2) "constitute[s] a congressionally authorized encroachment by the federal court upon the sovereignty of the state courts," it must "be strictly construed." *People of State of N.Y. v. Mitchell*, 637 F. Supp. 1100, 1102 (S.D.N.Y. 1986); *see also Davis v. Glanton*, 107 F.3d 1044, 1047 (3d Cir. 1997) ("the jurisprudence" concerning Section 1443 "has made clear that Congress has crafted only a narrow exception to the rule that a state court action may be removed to a federal district court only if federal jurisdiction is evident on the face of the plaintiff's well-pleaded complaint").

A relevant analogue the court has identified in the case law involves attempted removal under Section 1443 where a defendant's counterclaim arises under the Fair Housing Act ("FHA"). The FHA does provide for civil rights expressed in terms of racial equality. *See* 42 U.S.C. § 3604(a). But FHA claims can also center on protected characteristics other than race. *See id.* And courts have routinely rejected removal of FHA counterclaims under Section 1443 when those

**JA594**

36

counterclaims do not implicate racial discrimination. *E.g.*, *Water's Edge Habitat, Inc. v. Pulipati*, 837 F. Supp. 501, 504–05 (E.D.N.Y. 1993) (citing *Rachel* and finding removal improper under Section 1443 because, although defendant cited to the FHA, a law providing for civil rights, the allegations supporting removal involved disparate treatment "based upon familial status"); *Henlopen Landing Homeowners Ass'n, Inc. v. Vester*, No. 12-CV-308, 2013 WL 1704889, at *5 (D. Del. Apr. 19, 2013) (for purposes of Section 1443, distinguishing between FHA "claim premised [] on acts of alleged race-based discrimination," which would support removal, and claims "premised on other forms of discrimination (such as that due to familial status or handicap)," which would not support removal), *recommendation adopted*, No. 12-CV-308, 2013 WL 10974212 (D. Del. May 14, 2013); *Sky Lake Gardens No. 3, Inc. v. Robinson*, No. 96-CV-1412, 1996 WL 944145, at *5 (S.D. Fla. July 24, 1996) (same).

Like the FHA, certain provisions of the NVRA are expressed in terms of racial equality. 52 U.S.C. § 10101(a)(1). But others are not. 52 U.S.C. § 10101(a)(2)(B); 52 U.S.C. § 20507(c)(2)(A). What the cases involving the FHA teach is that it is not enough for defendants to generally reference a law that provides for civil rights in terms of racial equality to establish removal jurisdiction under Section 1443. Rather, the defendants must show that their refusal to act would be inconsistent with a law providing for civil rights that is "stated in terms of racial equality." *Rachel*, 384 U.S. at 792; *see also* 28 U.S.C. § 1443(2); *cf. White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980) (holding that Section 1443(2) "may be invoked when the removing defendants make a colorable claim that they are being sued for not acting" in a manner that "would produce or perpetuate a racially discriminatory result"). Put another way, the party seeking removal must cite a civil rights statute that deals in terms racial equality *and* make some showing that their refusal to act actually involves considerations of racial equality or discrimination. *See*

**JA595**

37

*Davis*, 107 F.3d at 1049 (explaining that removal under Section 1443 on the basis of 42 U.S.C. §

1985(3) "would be improper" if removing defendants were "using the vehicle of a § 1985 claim

to protect their First Amendment rights," notwithstanding that Section 1985(3) also "protect[s]

specifically against race-based discrimination").

Here, Defendants' refusal to act was not based on any provision of federal law that employs

language concerning racial equality. Instead, Defendants base their refusal to act on 52 U.S.C. §

10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A). DE 1 at 2. Those statutory provisions do not mention

race and are "phrased in terms of general application available to all persons." *Rachel*, 384 U.S.

at 792.

In short, Defendants' refusal to act does not have "anything to do with racial equality which

is essential for removal under" Section 1443(2). *Shelly v. Com. of Pa.*, 451 F. Supp. 899, 900

(M.D. Pa. 1978). "[B]ecause [Defendants] ha[ve] not raised issues related to racial equality, the[y]

cannot remove this case pursuant to § 1443(2)." *Vlaming v. W. Point Sch. Bd.*, 480 F. Supp. 3d

711, 724 (E.D. Va. 2020), *aff'd*, 10 F.4th 300 (4th Cir. 2021); *see also Arizona v. $8,025.00 in

U.S. Currency*, No. 21-CV-01278, 2021 WL 5084187, at *4 (D. Ariz. Nov. 2, 2021) (explaining

that district courts are "bound [by *Rachel*] to limit" Section 1443 "to removal proceedings where

racial inequality is specifically at issue"); *Osborne v. Osborne*, 554 F. Supp. 566, 568 (D. Md.

1982) (reiterating that only allegations "based upon racial grounds merit § 1443 federal removal

jurisdiction").

If the court were ruling on a blank slate, it might reach a different conclusion. In that

regard, and like the Fourth Circuit, this court does not necessarily "endorse *Rachel's* reasoning or

conclusion," but it is "bound to apply it." *Vlaming*, 10 F.4th at 311. And after according due

weight to the principle that removal statutes are to be strictly construed, *Shamrock Oil*, 313 U.S.

**JA596**

38

at 109, the court adheres to *Rachel* and finds that Defendants have not met their burden in

establishing removal jurisdiction under Section 1443(2) because their refusal to act has nothing to

do with considerations of race. *See also Vlaming*, 10 F.4ᵗʰ at 309 (interpreting *Rachel* for

proposition that "racial equality [i]s the sole subject" of Section 1443). The court thus concludes

that it may only maintain subject matter jurisdiction over this action pursuant to Section 1331 and

Section 1441(a). With that jurisdictional posture in mind, the court turns to the merits.

### b. Motion to Dismiss

#### i. Count One

Defendants raise several arguments in support of dismissal of Count One. DE 31 at 12-21.

They argue that the claim is barred by laches. *Id.* at 12-16. They also argue that Plaintiffs fail to

state a claim for relief in part because Section 163-82.11 provides no private "cause of action." *Id.*

at 16. This latter argument has merit, so the court does not need to reach the former. *See Warner*

*v. Scotland Cnty. Soc. Servs.*, No. 1:22-CV-676, 2023 WL 2992423, at *1 (M.D.N.C. Mar. 22,

2023) ("A plaintiff fails to state a claim upon which relief may be granted when the complaint

cites as its basis a [] statute that confers no private right of action."), *recommendation adopted*,

No. 1:22-CV-676, 2023 WL 2990360 (M.D.N.C. Apr. 18, 2023); *see also Carey*, 957 F.3d at 483.

Although this private cause of action inquiry turns to a separate body of law than the court's

analysis related to HAVA, *see supra* at 26-31, it reaches the same conclusion. Section 163-82.11

does not expressly provide a private cause of action, and typically "a statute allows for a private

cause of action *only* where the legislature has expressly provided a private cause of action within

the statute." *Time Warner*, 228 N.C. App. at 516, 747 S.E.2d at 615 (emphasis added). Sometimes

a statute impliedly provides a private right of action, but state court decisions finding the existence

of one have based their holdings on clear statutory language that directs one party to take some

**JA597**

39

action for the benefit of an identified group. *Sugar Creek*, 195 N.C. App. at 357, 673 S.E.2d at 674; *Williams*, 128 N.C. App. at 604, 495 S.E.2d at 409.

Unlike in *Sugar Creek* and *Williams*, here Section 163-82.11 does not express any intent to provide a benefit to a discrete group (such as charter schools in *Sugar Creek*, or teachers in *Williams*). The statute is devoid of reference to voters, registrants, or applicants; it simply directs the NCSBE to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c). The statute "do[es] not enunciate an explicit or implicit intent on the part of the General Assembly to create a statutory protection for" a particular group; therefore, the court is not free to fashion an implied right of action. *Lea*, 156 N.C. App. at 509, 577 S.E.2d at 416.

The conclusion that Section 163-82.11 does not confer a private right of action is further supported by an existing administrative enforcement regime made available under state law. North Carolina has enacted a HAVA complaint procedure, N.C.G.S. § 163-91(a), and the concerned citizen took advantage of this procedure, DE 1-3 at 12-14. The existence of this separate enforcement process indicates that there is "no legislative implication" that the statute "allow[s] for enforcement [in court] by a private party." *Sykes*, 372 N.C. at 338, 828 S.E.2d at 474–75; *see also Cobb*, 215 N.C. App. at 281, 715 S.E.2d at 552.

Under North Carolina law, "implied rights of action are disfavored and will not be found in the absence of clear legislative intent." *Long*, 145 N.C. App. at 188, 548 S.E.2d at 834. With regard to Section 163-82.11, that clear legislative intent is lacking, and the court acknowledges that "[t]he regulation of access to the courts is largely a legislative task and one that courts should hesitate to undertake." *Id.* Staying true to those principles, the court finds that Section 163-82.11 confers no private cause of action.

**JA598**

40

The court further finds that Plaintiffs' styling of Count One as a claim seeking a "writ of mandamus" cannot save the claim in the absence of a private right of action. A writ of mandamus is "an extraordinary court order" that will only issue where a plaintiff can demonstrate "a clear legal right" to relief. *Graham Cnty. Bd. of Elections v. Graham Cnty. Bd. of Comm'rs*, 212 N.C. App. 313, 322, 712 S.E.2d 372, 379 (2011). Where, as here, Section 163-82.11(c) does not confer a private right of action, Plaintiffs cannot show a clear legal right to relief. *In re T.H.T.*, 362 N.C. 446, 453, 665 S.E.2d 54, 59 (2008) (emphasizing that "courts may only issue mandamus to enforce established rights, not to create new rights").

In addition, "mandamus is not a proper instrument to review or reverse an administrative board which has taken final action on a matter within its jurisdiction." *Warren v. Maxwell*, 223 N.C. 604, 608, 27 S.E.2d 721, 724 (1943). In the present case, the concerned citizen raised a complaint to the NCSBE in a manner contemplated by state law. DE 1-3 at 12-14; N.C.G.S. § 163-91(a). Defendants rendered a final decision in response to that complaint, and "[a]n action for mandamus may not be used as a substitute for an appeal." *Snow v. N. Carolina Bd. of Architecture*, 273 N.C. 559, 570, 160 S.E.2d 719, 727 (1968).[7] To the extent "the statute provides no appeal-the proper method of review is by certiorari." *Warren*, 223 N.C. at 608, 27 S.E.2d at 724. The court thus finds that mandamus is unavailable to Plaintiffs under the circumstances.

Plaintiffs make two arguments in response, but neither is availing. First, they contend that mandamus is available, citing the recent North Carolina Supreme Court decision in *Committee to Elect Dan Forest v. Employees Political Action Committee*. DE 50 at 10-12. But the question presented in that case was whether the plaintiff had suffered an injury in fact sufficient to "have

---

[7] The court notes that Plaintiffs were not a party to the administrative complaint to the NCSBE. This creates a two-fold mandamus problem for Plaintiffs because, in essence, they are appealing a decision they did not solicit and are seeking a court order that Defendants do something that Plaintiffs never requested of them in the first instance.

**JA599**

41

standing to sue under the North Carolina Constitution." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 563, 853 S.E.2d 698, 704 (2021). There, unlike here, the statute in question "included a notable enforcement mechanism," which expressly granted a private right of action to certain parties. *Id.* at 560, 702-03 (citing N.C.G.S. § 163-278.39A(f)). Accordingly, the Court's discussion regarding writs of mandamus, along with the acknowledgement that such writs may be available to "vindicat[e] public rights common to all citizens," *Id.* at 575, 712, is irrelevant here because Section 163-82.11 does not grant (expressly or impliedly) a cause of action to private parties.[8]

Alternatively, Plaintiffs assert that *Pullman* abstention is warranted. DE 50 at 4-5. But that "extraordinary and narrow" doctrine of constitutional avoidance is inapposite. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996). "To apply the *Pullman* doctrine, at a minimum it must appear that there is (1) an unclear issue of state law presented for decision" and that resolution of the state law issue (2) "may moot or present in a different posture the *federal* constitutional issue such that the state law issue is potentially dispositive." *Educational Servs., Inc. v. Maryland State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (emphasis added).

Count One does not meet either prong of *Pullman*. Nothing in Section 163-82.11 is "unclear or ambiguous," *North Carolina State Conf. of NAACP v. Cooper*, 397 F. Supp. 3d 786, 795 (M.D.N.C. 2019), and "abstention is not indicated if the state law is clear on its face," 17A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4242, at 331–32 (3d ed. 2007). *See also Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) ("Where there is no

---

[8] Contrary to Plaintiffs' position that *Committee to Elect Dan Forest* loosened the standards for obtaining mandamus relief in North Carolina state courts, the year after that decision the North Carolina Supreme Court reaffirmed that mandamus relief is only available where "the petitioner possesses a clear and established legal right to the act to be commanded." *State v. Diaz-Tomas*, 382 N.C. 640, 652, 888 S.E.2d 368, 378 (2022).

ambiguity in the state statute, the federal court should not abstain."). Moreover, there is no federal constitutional issue presented in this action. *Pullman* doesn't apply.

In reaching its conclusion that Count One fails on the merits, the court is not insensitive to Plaintiffs' concerns about election integrity and voter disenfranchisement. Nor is its decision in any way a stamp of approval on Defendants' conduct. But "[r]aising up causes of action where a statute has not created them" is "for common-law courts," not this "federal tribunal[]." *Lampf*, 501 U.S. at 365 (Scalia, J., concurring). In the absence of any indication that North Carolina's General Assembly intended for private litigants to enforce the provisions of Section 163-82.11, this court may not appoint itself as "oversee[r]" of "executive action," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), which "would significantly alter the allocation of power . . . away from a democratic form of government," *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring). Defendants' motion to dismiss is granted as to Count One in the Complaint.

ii. Count Two

Defendants also move to dismiss Count Two, which raises a direct claim under the North Carolina Constitution. DE 31 at 21-25. At this point, Count Two is the only remaining claim, so it "substantially predominates" in this action; the court "has dismissed all claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(1) & (c)(3). In addition, the claim raises a "novel" issue of North Carolina law (whether the State's noncompliance with state and federal election law can give rise to state constitutional injury). 28 U.S.C. § 1367(c)(2). The court further finds "compelling [federalism] reasons for declining" to exercise supplemental jurisdiction over Count Two, namely that state courts should decide the scope and extent of state constitutional rights. 28 U.S.C. § 1367(c)(4); *National Tea*, 309 U.S. at 557 (recognizing that "state courts" must

**JA601**

43

"be left free and unfettered by [federal courts] in interpreting their state constitutions"). Accordingly, the court declines to exercise supplemental jurisdiction over Count Two and remands that claim to state court, which will "best promote the values of economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988) (recognizing district court's "wide discretion" to remand previously-removed state law claims to state court after dismissal of federal claims); *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) (affirming decision to remand where remaining state claims involved "complex" issues for which "there was no State precedent").

## IV.   CONCLUSION

Plaintiffs' emergency motion to remand [DE 37] is DENIED. Defendants' motion to dismiss [DE 30] is GRANTED IN PART. Count One is DISMISSED WITH PREJUDICE, and the court exercises its inherent authority to REMAND Count Two to state court. The court's remand order is STAYED until October 22, 2024, so that the parties may seek an appeal if they so choose.

SO ORDERED this **17th** day of October, 2024.

_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

**JA602**

44

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al., | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **JUDGMENT** **5:24-CV-547-M-RJ** |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | ) ) ) | |
| Defendants. | ) | |

**Decision by Court.**

**This action came before the Honorable Richard E. Myers II, Chief United States District Judge, for ruling as follows:**

**IT IS ORDERED, ADJUDGED, AND DECREED** that in accordance with the court's Order entered on October 17, 2024 [DE 58], Count One is DISMISSED WITH PREJUDICE, and the court exercises its inherent authority to REMAND Count Two to state court.

This Judgment filed and entered on October 17, 2024, and copies to:
Counsel of record for the parties (via CM/ECF Electronic Notification)

October 17, 2024

Peter A. Moore, Jr.
Clerk of Court

By: /s/ Kimberly R. McNally
Deputy Clerk

**JA603**

```
                  UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
                       WESTERN DIVISION

    ---------------------------------------------------------

    REPUBLICAN NATIONAL COMMITTEE
    and NORTH CAROLINA REPUBLICAN
    PARTY,

                Plaintiffs,

         -vs-                        Case No. 5:24-CV-547-M-RJ


    NORTH CAROLINA STATE BOARD OF
    ELECTIONS, et al.,

                Defendants,

           and

    DEMOCRATIC NATIONAL
    COMMITTEE,

           Intervenor-Defendant.

    ---------------------------------------------------------

                      MOTION HEARING
                    OCTOBER 17, 2024
      THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
                UNITED STATES DISTRICT JUDGE
```

```
                Risa Kramer, RMR, CRR
                 Official Court Reporter
              United States District Court
               Wilmington, North Carolina
```

**JA604**

```
 1                     A P P E A R A N C E S

 2

 3     On Behalf of the Plaintiffs

 4
       PHILLIP J. STRACH and JORDAN ALEXANDER KOONTS
 5     Nelson Mullins Riley and Scarborough LLP
       301 Hillsborough Street, Suite 1400
 6     Raleigh, North Carolina 27603

 7
       THOMAS G. HOOPER
 8     Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
       101 South Tryon Street, Suite 3600
 9     Charlotte, North Carolina 28280

10     On Behalf of the Defendant

11
12     SARAH G. BOYCE and SOUTH A. MOORE
       North Carolina Department of Justice
13     114 West Edenton Street
       Raleigh, North Carolina 27603
14

15     On Behalf of Intervenor-Defendant

16
17     SETH P. WAXMAN
       Wilmer Cutler Pickering Hale and Dorr LLP
18     2100 Pennsylvania Avenue N.W.
       Washington, D.C. 20037
19

20     JIM W. PHILLIPS JR.
       Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
21     230 North Elm Street
       2000 Renaissance Plaza
22     Greensboro, North Carolina 27401

23
       SHANA L. FULTON
24     Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
       150 Fayetteville Street, Suite 1700
25     Raleigh, North Carolina 27601
```

**JA605**

```
 1                   TRANSCRIPT OF PROCEEDINGS
 2               (Proceedings commenced at 10:02 a.m.)
 3               THE COURT:  All right.  If the clerk would
 4    please call the case.
 5               THE CLERK:  Republican National Committee
 6    et al. versus North Carolina State Board of Elections.
 7               THE COURT:  Counsel, please state your
 8    appearance for the record.
 9               MR. STRACH:  Good morning, Your Honor.
10    Phil Strach, Nelson Mullins, here for the plaintiffs,
11    along with my colleague, Jordan Koonts.
12               MR. HOOPER:  Good morning, Your Honor.  Tom
13    Hooper here on behalf of plaintiffs as well from the law
14    firm of Baker Donelson.
15               MS. BOYCE:  Good morning, Your Honor.  My
16    name is Sarah Boyce.  I'm here on behalf of the State
17    Board of Elections and the other State defendants.
18               MR. MOORE:  Good morning, Your Honor.
19    South Moore also on behalf of the State Board of
20    Elections and other defendants.
21               MR. WAXMAN:  Good morning, Your Honor.  I'm
22    Seth Waxman.  I'm here on behalf of the intervenor
23    defendants.
24               THE COURT:  All right.
25               MR. PHILLIPS:  Your Honor, Jim Phillips with
```

**JA606**

1    the Brooks Pierce law firm in Greensboro here on behalf

2    of the intervenor defendants.

3                THE MS. FULTON:  Shana Fulton, also Brooks

4    Pierce, Raleigh office, on behalf of the intervenor

5    defendants.

6                THE COURT:  Okay.  I'm checking my map here

7    to make sure who everyone is.  Thank you.

8                All right.  We're here today on two motions,

9    the plaintiffs' emergency motion to remand this matter

10   to state court at docket entry 37 and the defendants'

11   motion to dismiss at docket entry 30.

12               So we'll start with the motion to remand

13   because we need to make sure that I have jurisdiction.

14   So we'll start with that.  And the Court's

15   understanding, there -- two bases for removal in the

16   notice for removal:  Title 28, United States Code,

17   1441(a) and Title 28, United States Code, 1443(2).

18               The defendants bear the burden as the party

19   invoking the Court's subject-matter jurisdiction.  So

20   let's start with 1441(a).  I'll tell you tentatively

21   where I am so everybody knows what we're trying to talk

22   about.

23               So we're trying to figure out if I've got

24   original subject-matter jurisdiction over the

25   constitutional claim.  So the parties agree that this is

**JA607**

1    the Merrell Dow, Grable, and Gunn framework that we're

2    working with here.  So we're trying to figure out --

3    it's a state law statute.  The state law statute

4    provides that we will follow federal law.  So the

5    federal claim is necessarily implicated because we're

6    gonna have to understand the federal statute to enforce

7    the state statute.  So we have to figure out what the

8    relationship is between two of those.  So a question of

9    federal law is necessarily implicated there.

10           The State Board of Elections shall update

11   the statewide computerized voter registration list and

12   database to meet the requirements of Section 303 of the

13   Help America Vote Act of 2002 and reflect those changes

14   when citizenship rights are restored under General

15   Statute 13-1.

16           So we have the questions of:  Is it

17   necessarily raised?  Is it disputed?  Is it substantial?

18   And does it affect the federal-state balance?

19           The parties agree it's necessarily raised.

20   You have to interpret federal law to apply the state

21   statute.  The plaintiffs say there's no dispute here

22   because the federal law is not disputed because there's

23   an admission on the part of the Board that the voter

24   registration form did not comport with HAVA.  I think

25   the substance underneath it is there's some percentage

**JA608**

1    of voters who are eligible and registered but did so on

2    a form that doesn't meet the -- meet HAVA because the

3    driver's license or the Social Security number digits

4    were not necessarily required by the way the

5    computerized registration form worked.  That is, you

6    could register under the State's computer system without

7    complying with HAVA.  And so some percentage of voters

8    will have supplied it voluntarily, just gone ahead and

9    filled it out on the form.  Some percentage will have

10   left it out altogether.

11            Some percentage of those who left it out

12   altogether are eligible voters.  And the concern is that

13   some percentage of the folks who filled it out were not

14   eligible voters and they didn't provide that.  So we

15   have some percentage unknown of ineligible voters who

16   are registrants under the system.  The question then

17   becomes, "Well, what's our remedy?  Do we remove those

18   voters from the system or not?  And would doing so, at

19   this point, violate the NVRA?"

20            And so there's a question as to whether or

21   not there's a defense, ultimately, under the NVRA that

22   would affect what we can do at this point in the game.

23            Have I fairly stated where we are

24   substantively?

25            MS. BOYCE:  I think more or less, Your

**JA609**

1    Honor, yes.

2              THE COURT:  Okay.  So there are at least

3    five statutory provisions interacting here that we're

4    trying to sort out.  And so that's where we are today.

5              And then the state constitutional claim is a

6    state constitutional claim that -- I will tell you that

7    I am particularly cautious of exercising supplemental

8    jurisdiction over a state law claim in the first

9    instance because I'm concerned about the federal-state

10   balance, appropriately -- appropriately so, I think.

11             I am -- so my tentative conclusion is that

12   there's no federal question as to count 2, the state

13   constitutional law claim.  But I think there is a

14   federal question as to count 1 under the Merrell Dow

15   provisions, the way they all operate together.  That

16   means I can get to original jurisdiction over count 1 as

17   a matter of jurisdiction.  Then there's a separate

18   question of whether or not there's a private cause of

19   action as to count 1 that's intended to operate under

20   the statute that I'm supposed to use.  And if that falls

21   away on that basis, then I've got a supplemental

22   jurisdiction claim over count 2 that -- I'm concerned

23   about exercising supplemental jurisdiction if I find no

24   private cause of action.  And I would find no private

25   cause of action in federal court and send -- say count 1

**JA610**

 1   isn't here, send count 2 back to state court to be

 2   exercised, is where I'm leaning, having read everything,

 3   having thought about everything, and trying to think

 4   about how it all fits together.

 5          The merits of the private right of action

 6   part actually matter because it helps figure out if

 7   there's a federal question that's intended to be there.

 8   So "Does HAVA provide a private right of action?  Does a

 9   state statute provide a private right of action?" I

10   think we have to think through also.  But I think those

11   are implicated but are in the -- in the jurisdictional

12   question, but they're not dispositive.  The jurisdiction

13   question requires me to engage with that question.

14          I think I have jurisdiction over count 1.

15   Then to the extent I would have it over the second, it

16   would be as a result of supplemental jurisdiction.

17          But I'm concerned about the private cause of

18   action as to whether or not plaintiffs have a right to

19   be here on count 1.  If they don't have a right to be

20   here on count 1, then I shouldn't keep count 2.  That's

21   where I am.

22          So everybody now understands what the judge

23   thinks, and so you know what you're talking to me about.

24          So the defendants are invoking removal of

25   jurisdiction.  I'll have you talk to me about -- so I

**JA611**

 1  think you're with me on my -- on part of my reasoning

 2  and probably concerned about the second part of my

 3  reasoning; and, I think, vice versa.  So we'll start

 4  with -- we'll start with the plaintiffs, and then we'll

 5  -- on jurisdiction.  Then we'll flip it and start with

 6  the -- we'll start with the defendants on jurisdiction.

 7  Then we'll flip it and start with plaintiffs on private

 8  right of action.  So I'll start with y'all.

 9              MR. MOORE:  Thank you, Your Honor.

10              I will skip, then, right to count 2.  I

11  think for two reasons, you could have jurisdiction over

12  count 2 without needing to exercise supplemental

13  jurisdiction.

14              The first is -- I believe that count 2 also

15  necessarily raises the same federal question as count 1.

16  The way I understand plaintiffs' constitutional claim is

17  that they only have a claim under the North Carolina

18  Constitution if these voters must be removed under HAVA.

19  And so to determine, obviously, whether HAVA requires

20  the removal of those voters, you must construe HAVA so

21  it is necessarily raised.  It is still actually

22  disputed.  The State Board and plaintiffs disagree over

23  whether HAVA requires the State Board to remove the

24  voters who registered using this prior form but did not

25  provide a driver's license or Social Security number.

**JA612**

1    And for the same reasons that that question is

2    substantial as it relates to count 1, it is substantial

3    as it relates to count 2, that being this is a federal

4    election, that -- that HAVA -- Congress enacted HAVA to

5    impose uniformity among the minimum standards for

6    election administration, and also that the Attorney

7    General -- the United States enforces HAVA, so there's a

8    federal interest in having federal courts construe the

9    statute.

10           I hear your concerns about the federal-state

11   balance as it relates to a state constitutional claim.

12   But I don't think here that should compel remand, or at

13   least compel the determination that there is no federal

14   question jurisdiction over the state constitutional

15   claim.  For one thing, you know, I think plaintiffs have

16   spoken a lot about Pullman abstention.  But Pullman

17   abstention only applies when there is a federal

18   constitutional claim.  There isn't a federal

19   constitutional claim here.  So if you have federal

20   question jurisdiction, as I assert you do, you don't

21   have a basis to abstain from exercising that

22   jurisdiction.

23           I'm happy to answer other questions about

24   1441 as it relates to the count 2.  But if not, I'm

25   happy to move on to why I think 1443 also provides you

**JA613**

 1  jurisdiction over count 2.

 2            THE COURT:  So you're applying the same

 3  Merrell Dow factors and just saying the state

 4  constitutional question is so inextricably intertwined

 5  with federal law that those -- that it becomes a federal

 6  question under Merrell Dow and its progeny.

 7            MR. MOORE:  Yes, Your Honor.  The way I read

 8  their complaint, they do not have an Article 1, Section

 9  19 claim unless HAVA requires the State Board to remove

10  these voters.  And determining that turns on, obviously,

11  a construction of HAVA, not North Carolina law.

12            THE COURT:  Okay.  All right.  Thank you.

13            MR. MOORE:  Okay.

14            And then, you know, I also think 1443(2)

15  provides a distinct and independent basis for this Court

16  to exercise jurisdiction over plaintiffs' state

17  constitutional claim.  Plaintiffs seek, as their remedy

18  for the state constitutional claim, an injunction

19  ordering the State Board to remove these voters.  The

20  State Board is refusing to do that because doing so

21  would violate the National Voter Registration Act, and

22  that is a federal civil rights law.

23            THE COURT:  All right.  This is where I have

24  some concerns.  After Vlaming, the Fourth Circuit case

25  that interprets Rachel, that -- where we say it has to

**JA614**

1  explicitly be stated in terms of race.  So civil rights

2  law in this context is actually a much narrower

3  interpretation of civil rights law than the plain

4  language would state.  Now, you're talking to somebody

5  who likes to start with the plain text, but that's not

6  permitted.  I'm precluded under Vlaming from doing just

7  a straight initial texture analysis because Vlaming said

8  we take Rachel, we then follow Vlaming -- Vlaming has

9  adopted Rachel in terms of the second clause as well.

10 1443(2) applies it there as well.  And so because it's

11 not explicitly stated in terms of race, it's not a civil

12 rights law within the context of 1443(2)'s determination

13 of what constitutes a civil rights law.

14         So you're gonna have to work me -- you're

15 gonna have to talk me through that to tell me why this

16 is a racially explicit law that covers it where -- so

17 there's a heading somewhere that says "For all the

18 following reasons, it's important."  But we actually

19 look at it, it's not racially explicit.  And civil

20 rights is very narrow in this context, not broad, after

21 Vlaming.  So I'm trying to sort through that.

22         MR. MOORE:  Of course, Your Honor.

23         So of course I agree that Vlaming requires

24 that the civil rights law be one intended to address

25 racial discrimination.  And I think, as you just

**JA615**

referenced, there is a statute in the plain text of the
NVRA that says one of the purposes of the NVRA is to
eliminate close-to-election voter purges because those
purges tended to be racially discriminatory.

So I take your point that that is sort of at
the beginning of the statute, and the actual prohibition
the NVRA imposes on purging voters does not come until
several sections later, 20507. But the two are directly
related. It is the voter purge provision of the NVRA,
the provision that Congress said was necessary to
eliminate racially discriminatory voter purges, that we
are saying prohibits the State Board from taking the
actions that plaintiffs request.

I do want to emphasize that it is important
that the -- it be the -- the civil rights law be the one
intended to address racial discrimination. I think
plaintiffs have suggested that 1443(2) requires that the
state law be racially discriminatory. And I do not
think that is the correct reading of the text of 1443.

THE COURT: Now, when I read Rachel, Rachel
said to be able to determine it in the first instance --
now it's in a different context; it's in 1443(1), not
(2). But Rachel said to be able to tell ex ante if
there is a racial concern, it has to be that state law
on its face is racially discriminatory. That is, there

**JA616**

```
 1  has to be a racially discriminatory component.  It's not
 2  gonna be as applied.  It has to be that the state law
 3  that we're concerned about that the civil rights law is
 4  addressing is racially discriminatory.  That's what
 5  Justice Stewart is sort of talking about, working his
 6  way through in Rachel, right?  So he's working his way
 7  through "How do I know in advance if race is
 8  implicated?"  Well, is the state law racially
 9  discriminatory?  Then a state law that is racially
10  discriminatory in its face can then -- somebody can then
11  remove it to say, "You're gonna enforce a law against me
12  that's discriminatory."
13          This is sort of the opposite context because
14  it's section 2, and so we're sort of thinking slightly
15  differently about what we're trying to fix.  But what's
16  the relationship between whether or not the state law is
17  racially discriminatory?  And the right to remove it --
18  that is, the whole question is can I get a fair -- "Can
19  I get fair treatment in the state courts," is what
20  1443(2) is about, is "Will the state courts either
21  violate federal law predictably because their statute is
22  inconsistent with antidiscrimination laws?  Or will they
23  refuse to give me the remedy that I have a right to when
24  I come to federal" -- "when I go to state court, so I
25  have to take it to federal court" -- we're supposed to
```

**JA617**

```
 1   interpret our removal statutes narrowly.  I've got
 2   Vlaming.  I've got Rachel.  I'm trying to figure out how
 3   discriminatory do I have to -- how much am I casting
 4   aspersion on the state court by saying there's a
 5   discriminatory concern for 1443(2) to be the basis when
 6   it's not clear to me that there is a explicit racial
 7   focus of the NVRA as opposed to we want to protect
 8   everybody for all reasons.  It goes -- it has one -- one
 9   basis, but then it has so many others that it ultimately
10   says, "We protect all voters, not just voters who are
11   being discriminated against on the basis of race,"
12   right?  It's hortatory at the beginning.  It's an early
13   paragraph.  But it has multiple bases.  And so the
14   question is, is it -- is the one mention enough to make
15   this explicitly racial under Vlaming or not?
16            MR. MOORE:  So there are a few things in
17   there, Your Honor, so I'll try to take them in pieces.
18            First, I don't think the text of 1443(2)
19   requires you to cast any aspersions on North Carolina
20   state courts, and we are not casting those aspersions
21   either by removing this case.
22            I agree that Rachel does talk about, in
23   relation to a different part of 1443, a concern that
24   state courts might not enforce federal civil rights
25   laws.  But 1443(2) is actually about ensuring that there
```

**JA618**

1   is a federal venue for the federal civil rights law

2   Congress passes to address racial discrimination.  And

3   the NVRA is just such a statute.

4          I mean, I want to read you directly the

5   provision right at the beginning.  It says that the NVRA

6   was enacted to eliminate, quote, "discriminatory and

7   unfair registration laws and procedures that have a

8   direct and damaging effect on voter participation in

9   elections for federal office and disproportionately harm

10   voter participation by various groups, including racial

11   minorities."  The NVRA was explicitly thinking about

12   eliminating racial discrimination when it enacted things

13   like this purge -- or ban on the purge of voters fewer

14   than 90 days before an election.  And I think you also

15   said there was just this one provision, but there's also

16   legislative history supporting this view of the NVRA.

17          In the Senate report, there's a discussion

18   about how despite the great progress that the United

19   States has made in eliminating racial discrimination in

20   voting because of laws like the Voting Rights Act, these

21   late-in-time voter purges are still resulting in racial

22   discrimination, and the National Voter Registration Act

23   is necessary to eliminate that racial discrimination.

24          THE COURT:  Okay.

25          MR. MOORE:  I'm happy to answer any other

**JA619**

1    questions the Court has.  If there are no further

2    questions, I would just close with two points.

3              First, again, I think you should exercise

4    both -- or either federal question jurisdiction, our

5    civil rights removal jurisdiction, over both of

6    plaintiffs' claims.

7              I would also ask that if you are inclined to

8    enter a remand order, we, of course, do not believe you

9    should, but I would ask you to enter some sort of

10   reasonable stay of that order to allow the State Board

11   time to appeal, as the State Board has the right to

12   appeal because of 1447(d).

13             THE COURT:  All right.  Thank you, counsel.

14             MR. MOORE:  Thank you, Your Honor.

15             MR. WAXMAN:  Your Honor, I have just a few

16   points to add.

17             Obviously we agree with the State Board on

18   this issue.  We certainly agree with your tentative

19   views about count 1.  And I don't want to waste the

20   Court's time by quibbling with a few of the things that

21   you said or assume that I think are perhaps incorrect.

22             THE COURT:  Quibble away.  I want to get

23   this right, so if you think I'm getting something wrong,

24   tell me.

25             MR. WAXMAN:  Well, number one:  Although I

**JA620**

1  don't think anything in this lawsuit turns on whether

2  the prior form did or didn't violate HAVA, our position

3  is that it certainly did not violate HAVA.  The State

4  Board in its December 6th ruling did not say it.  It

5  said that the use of the prior form may have permitted

6  some violations of HAVA, although I'm not sure why.  And

7  our view is, look, the form, which you have -- we

8  printed in the briefs -- has it -- you know, has a place

9  to put in both the driver's license and the last four

10  digits of the Social Security number.  And it also has a

11  box, which says in plain terms, you should -- you know,

12  you should fill out or you must include your driver's

13  license number, and if you don't have it, the last four

14  digits of your Social Security number, and if you don't

15  have either, you must provide HAVA-compliant ID when you

16  come to vote.

17          The Board was convinced that the form could

18  have been more clear, but that is not a finding that the

19  prior form violated HAVA.  And we would dispute that.

20  But in any event, my bottom-line point is nothing turns

21  on this because this is a cause of action in mandamus.

22  And the point of mandamus is not whether there was some

23  prior form that's no longer being used.  That's not what

24  the mandamus remedy is.  This is a mandamus argument

25  that basically says you have a ministerial,

**JA621**

1    nondiscretionary duty to either deregister these 225,000

2    voters or require them to vote provisionally when they

3    show up and present, as federal and state law require,

4    both HAVA-compliant identification and photo

5    identification.

6            This isn't a question of we're arguing about

7    a remedy.  Their claim in mandamus is that we are

8    required, without any doubt whatsoever, to do one of

9    these two things.  And so this isn't a defense.

10           Now, just going -- those are the only

11   quibbles that I had with your articulation.

12           With respect to the count 2, there's no

13   question that the Grable-Gunn test, you know, applies

14   with respect to count 2 as it does with respect to count

15   1.  It doesn't distinguish between state statutory

16   claims and state constitutional claims.  This

17   constitutional claim, to the extent that one can

18   understand anything about what it is, in the very first

19   paragraph under count 2, paragraph 90 -- I mean,

20   paragraph 89 says the following paragraphs are

21   incorporated by reference.

22           90 says that we have a nondiscretionary duty

23   to maintain the state's voter rolls in a manner

24   compliant with Section 303 of HAVA.  And by the way,

25   incorporating all of the other paragraphs of this

**JA622**

1  complaint, this is a complaint which, from paragraph 3
2  until the very end of paragraph 20 -- paragraph 3
3  basically says this is a lawsuit about compliance with
4  Section 303.  All of the -- even the addendum -- the
5  remedy provisions reference it.  In 20 pages, this
6  complaint cites HAVA 55 times, including with respect to
7  the constitutional claim, both by incorporation and
8  expressly in paragraph 90.
9        And so the -- it just seems to me the same
10  analysis applies.  And with respect to -- I think
11  that's -- that's basically -- that's our point with
12  respect to the constitutional claim.
13       This complaint, from start to finish,
14  including the constitutional claim, whatever the
15  constitutional violation is, expressly turns on
16  establishing that there is a fundamental failure to
17  comply with HAVA Section 303.  And therefore, the same
18  section 1331, 1441 provisions apply equally.
19       Now, with respect to 1443(2), I certainly --
20  to me, this is a -- I think this is the heartland of
21  what paragraph -- subsection (2), as opposed to
22  subsection (1), is designed to get at.  This doesn't
23  depend, you know, on any aspersion about state courts,
24  and it doesn't depend on the text of the state law
25  itself.  The state law itself doesn't -- I mean, I'm not

**JA623**

1    sure there are any extant state laws anywhere in this

2    country that make distinctions based on race.  They

3    would be manifestly unconstitutional.  But the question

4    is -- the issue in this case under subsection (2) is was

5    there a refusal to comply with that state law based on,

6    you know, the text that we're all familiar with in -- in

7    subsection (2).

8            And, you know, in this case, there is a

9    manifest refusal based on the NVRA's 90-day removal ban,

10   which is incorporated by reference into HAVA, which

11   is -- as was said, is a law that provides for the

12   fundamental right to vote and prohibits expressly, in

13   the relevant provision, discrimination and unfair

14   registration laws and procedures, which the Congress has

15   found disproportionately harm racial minorities.

16           So, you know, taking, you know, Rachel for

17   all of its worth and saying notwithstanding the actual

18   text that talks about equal rights, this requires a

19   state court -- a state refusal to comply with state law

20   because of a -- because it -- the state official

21   believes it is prohibited by a law that was enacted to

22   protect equal rights and -- against discrimination

23   against racial minorities.

24           You asked a question about a private right

25   of action.  And I don't -- I'm not sure if...

**JA624**

```
1                    THE COURT:  Well, I think --
2                    MR. WAXMAN:  -- my colleague addressed it,
3        but I'm happy to since --
4                    THE COURT:  Well, I think we're gonna come
5        back to it in a moment when we flip directions.  Right
6        now I'm making sure I have jurisdiction and that I'm
7        supposed to hear the case.
8                    MR. WAXMAN:  Right.  All I was gonna say is
9        whether there is or isn't a private right of action is a
10       reason -- is dependent on whether you dismiss or not.
11       It's not relevant to whether there is jurisdiction under
12       1441 or 1433.  Thank you.
13                   THE COURT:  All right.
14                   MR. STRACH:  Thank you, Your Honor.  Good
15       morning.
16                   So trying to address the Court's thinking,
17       where you're headed with this -- so I'll kind of throw
18       my notes out, so we'll see how it goes.
19                   THE COURT:  Well, you can -- you do whatever
20       your best argument is.  If I'm wrong, tell me.  That's
21       what I'm trying to figure out.
22                   MR. STRACH:  I don't like arguing the briefs
23       because it's pointless.
24                   So I think, to be clear, this is not a HAVA
25       lawsuit.  Okay?  I want that to be very crystal clear.
```

**JA625**

1   HAVA provides an important background for understanding

2   what has to happen, but HAVA's not the basis for the

3   lawsuit.  Had it been, we could have easily pled that.

4           There are several state statutes that

5   require the Board to maintain and to request the

6   driver's license number or the last four.  There's the

7   one that's been cited, 163-82.11.  There's also

8   163-82.4(a)(11), which specifically says that the form

9   shall request this information.  It didn't do that for a

10  long time.  And the Board effectively admitted that when

11  they considered the complaint that they considered in

12  December of last year.

13          The question now is what do we do about

14  that?  What do you do?  And, Judge, I think you're

15  exactly right.  I think there are buckets of people in

16  this situation, some who may be eligible, some who may

17  not be, some who provided the information, some who

18  didn't and aren't eligible.  When this was pending in

19  state court, we submitted discovery requests and asked

20  them to expedite the response to get at that very

21  question, to see what are the buckets of people that

22  we're talking about so that the courts can know what to

23  do.

24          But this is a state court action.  This is

25  based on state statutes that require the collection of

**JA626**

1    this information.  It wasn't done.  The state courts now

2    get to decide what the remedy is.

3              Now, if the Board says, "Well, whatever

4    remedy you're asking for will violate federal law,"

5    that's a defense.  They can raise that in the state

6    court.  I'm sure the state court will take due notice of

7    it.  And the state court can craft something to make

8    sure that only eligible voters vote in the election.

9    That's a quintessentially state court thing to do.

10             So it's not a HAVA lawsuit.  Whether there's

11   a private right of action under HAVA, there's probably

12   not.  And if that's a basis for kicking it back, then I

13   would agree with that.  But we haven't raised a HAVA

14   lawsuit.

15             THE COURT:  What do you say to the concern

16   -- the 1443(2) concern?  That is, this is, in fact, a

17   civil rights statute.  We have a right to removal under

18   it because the State Board is saying, "We're not going

19   to do it."  That is, the NVRA is a civil rights statute.

20   "We are refusing to do any act on the ground that it

21   would be inconsistent with such law, so we have a right

22   to removal under 1443(2)."

23             MR. STRACH:  I think that's just incorrect,

24   number one.  I've not seen a case cited yet that says

25   NVRA or HAVA are racial discrimination statutes.  So

**JA627**

1   that's, at best, an open question.  And it seems pretty

2   clear to me that they're not.  It's certainly not the

3   Voting Rights Act.

4           This Court, couple two, three years ago,

5   remanded a case that, frankly, I removed that was based

6   on allegations that state officials would have to

7   violate the Voting Rights Act.  That got kicked back

8   down under 1443(2), affirmed by the Fourth Circuit.

9           I've not seen a case yet that says that

10  would come anywhere close to talking about the NVRA

11  being a racial discrimination statute.  And not even the

12  Congressional findings that my colleagues cite really

13  say that explicitly.

14          And so I think once you're looking at

15  Congressional findings to support a basis for removal,

16  you're already out on thin ice.  And clearly, the

17  findings that were in this law wouldn't support it

18  anyway.

19          The other thing, though, Your Honor, just

20  about the substance of the claim they're making, is

21  they're assuming that a state court is gonna require

22  them to violate federal law.  They're just making that

23  assumption.  We have no idea.  What we've asked for in

24  our complaint is to remove voters if it's consistent

25  with federal law.  We haven't asked the state court to

**JA628**

1    do anything inconsistent with federal law.  We've asked

2    them alternatively to require folks to vote

3    provisionally so that the information can be collected.

4    So we haven't asked them to do -- and of course

5    provisional voting is expressly allowed by HAVA, and

6    sometimes required by HAVA.  So we haven't asked the

7    state courts to do anything.  This is just pure

8    speculation on their part.

9              So I think they've put the cart before the

10   horse in many respects on this issue.

11             THE COURT:  So the timing of the refusal is

12   critical here.  Right?  If 1443(2) grants jurisdiction

13   once the refusal has taken place, not when it's

14   prospective.

15             MR. STRACH:  That's right.  And there's been

16   no such thing here.

17             Now, if the state court comes along and

18   says, "You have to do X, Y, and Z," and the Board says,

19   "Well, we can't do that," then we're taking it back.

20   Okay.  You know, at least now you've been ordered to do

21   something.  You're refusing that order.  You're taking

22   it up.

23             Right now, there's been no order to do

24   anything.  That's what we're just trying to get to.  And

25   we think the state courts have the right to do that.

**JA629**

1          And, Your Honor, I would just point out too,

2    to the extent that the state courts require the Board to

3    have these folks vote provisionally, this is nothing

4    new.  We're not asking anything earth-shattering.  If

5    Your Honor -- if you go to vote and you don't bring your

6    ID, and you don't find -- sign the reasonable impediment

7    form, you're gonna vote provisionally.  And they're

8    gonna say, "Hey, come back to the Board, bring your ID,

9    and your vote's gonna count."

10          This is no different from that.  This is

11   simply saying we're asking the state courts -- have them

12   vote provisionally, let them know why they're voting

13   provisionally, tell them they got to bring this

14   information back to the Board or to the elections

15   officials, and boom, the vote will count.  It will be no

16   different than many other types of situations.

17          So much of this is just being sort of blown

18   out of proportion about what we're seeking.  We're not

19   asking to just wholesale remove people.  We want to find

20   out from the Board, through discovery, what the buckets

21   are.  And then we want to ask the state court to come up

22   with the right remedy under state law.  That's either

23   through a mandamus or through state constitutional

24   provision.  But all of that can be done under state law.

25   I know that because I've done it recently, and I've done

**JA630**

1    it before.

2              So absent the fact that the complaint talks

3    about HAVA, no one would ever be thinking that this was

4    a federal case because, to the extent the federal laws

5    apply, they're defenses to whatever the state court

6    might do as we get the case further down the road in

7    state court.

8              THE COURT:  So is it your position, then,

9    that HAVA provides, really, content that's hiding in the

10   background?  That's being imported into the state

11   statute?  So we don't have to interpret HAVA.  We just

12   have to say HAVA constitutes part of the content by

13   reference.

14             MR. STRACH:  It's clearly background.  It's

15   clearly important background.  But the state statutes

16   independently require the Board to collect this

17   information.

18             Now, if they -- if the state courts say,

19   "You didn't do it; here's what we're gonna do about it,"

20   and they say, "Oop, that violates HAVA," that's a

21   defense.  They can raise that.  But it is not -- HAVA

22   itself is background, at best.

23             Now, did they pass these statutes probably

24   because HAVA says this?  Probably.  They didn't have to.

25   The legislature didn't have to promulgate these statutes

**JA631**

1   that says, "Hey, collect this information."  They could

2   have just relied on HAVA.  And if they didn't do it,

3   somebody could sue under HAVA.  But the legislature

4   thought it important enough to independently promulgate

5   these directions.  That's what we're suing under.  We're

6   just suing under those directions.

7           And if HAVA ends up being a defense down the

8   road, fine.  Deal with that.  But it has nothing to do

9   with the claims we brought.

10          THE COURT:  All right.  And is it possible

11  to violate 163-82.11 without violating HAVA?  If the

12  statute says, "Comply," and the violation is you failed

13  to comply, you have to have violated both, right?

14          MR. STRACH:  I think you clearly would have

15  violated the state statute, and query whether someone

16  would have a cause of action under HAVA too.  But that

17  would be separate.  The one does not require the other,

18  going either way.  I think that you -- again, if the

19  legislature had just not put this in the statute, your

20  only basis would be HAVA.

21          THE COURT:  I understand.  But what the

22  legislature did do was say, "Comply with HAVA."  Right?

23  Said, "Comply with Section 303(a)."  So to determine if

24  there's been a violation -- I have to interpret the

25  federal law to determine if there's been a violation of

**JA632**

```
 1   the state law, right?
 2            MR. STRACH:  No because the information was
 3   clearly not collected.  That's a -- that's a known fact.
 4   We don't know how many people that applies to.  We know
 5   that information wasn't collected.
 6            So the issue now is the remedy.  And to the
 7   extent that the -- if some court has to fashion a
 8   remedy, HAVA is a defense.  It's not -- it does not have
 9   to be construed as an independent claim.
10            THE COURT:  Okay.  But to violate the state
11   statute, you have to say, "Did you follow the" -- the
12   registration form and requirements come from HAVA and
13   are imported into state law, right?
14            MR. STRACH:  Well, that's under 82.11.  But
15   under the other statute I cited, 82.4(a)(11), there's --
16   the legislature separately said that the form has to
17   collect the specific information.  So --
18            THE COURT:  But there are two fonts.  But
19   one font is one that relies on federal law, right?
20            MR. STRACH:  I'm sorry, Your Honor?
21            THE COURT:  There are two fonts of that --
22   there are two bases for that collection requirement.
23   There's a pure state law simpliciter basis, and then
24   there's the incorporation of federal law basis, right?
25   They're both in the state statute.
```

**JA633**

 1                MR. STRACH:  I might quibble with whether

 2      you say it incorporated federal law.  It referenced it.

 3                THE COURT:  Fair enough.

 4                MR. STRACH:  But clearly they cite HAVA in

 5      the second one.

 6                THE COURT:  Okay.

 7                MR. STRACH:  But yes.  On the first one, it

 8      just says, "Hey, you got to collect this information."

 9      They didn't do it.

10                THE COURT:  All right.  Thank you.

11                All right.  The motion to dismiss asks a

12      couple of questions.  One is laches, which I think I can

13      resolve from the papers.  But if the parties feel they

14      wish to argue it, I'll listen to it.

15                Then there's the question of whether or not

16      there is a private right of action under either the

17      state or the federal law.  So North Carolina law says

18      implied rights of action are disfavored and will not be

19      found in the absence of clear legislative intent, and

20      that the intent must be to create a statutory protection

21      for a particular group.  So there's a question of

22      whether or not there's a private right of action under

23      North Carolina law because this -- you're the master of

24      your complaint.  It's a North Carolina complaint.  So

25      the question is does the statute that you're seeking to

**JA634**

1    enforce actually create the private right of action?

2    We'll want to talk about that.  So does -- it doesn't do

3    it expressly.  It doesn't say "and there shall be a

4    private right of action," or "This shall be enforceable

5    by."  It's silent.

6              So the question is, I guess, what in the

7    statute demonstrates a legislative intent to impliedly

8    confer the private right of action?

9              MR. STRACH:  Your Honor, it's an election

10   law, and there are many times that people come in

11   through a mandamus action to enforce election law.

12   That's the -- that's the right of action.  It's common

13   law right of action.  The legislatures recognized it.

14   We've cited the statute.  So it's not federal common

15   law.  It's state common law.  And we've used it -- in

16   fact, we've used it recently to compel the Board of

17   Elections to comply with state election law.  And it's

18   used routinely.

19             So no, you're correct.  There's nothing that

20   says it creates a nice, little, neat little package of a

21   private right of action.  But our contention is that the

22   mandamus action allows that.

23             As to the laches piece, Your Honor, let me

24   just mention a couple dates to you so I make sure that

25   the Court understands the timeline.  On June 19th of

**JA635**

1  this year, the State Board denied the request for relief

2  violating a Carol Snow.  And she was asking for them to

3  remedy the fact that the form had not collected this

4  information or required the collection of this

5  information.  So there was no -- no -- no way for anyone

6  to know, until at least June 19th, what the Board was

7  gonna do about this situation.

8              We sent a letter on July 10th of this year.

9  The Board blew that letter off.  They literally just

10  didn't respond to it.  And so we filed the lawsuit on

11  August 23rd, about a month or so after.  So our

12  contention is that is in no way anything close to

13  laches.  We knew what their position was gonna be.  We

14  wrote them a letter giving them a chance to change the

15  position.  They didn't do it.  They blew it off, filed

16  the lawsuit.  All of it happened pretty quickly.

17              Only reason we're here right now, close to

18  the election, is because they removed the case.  I think

19  this case would have already been resolved by now by the

20  state courts had we been back in state court.

21              THE COURT:  And have you got a citation for

22  me?  Is that the Graham County -- what case am I

23  supposed to be looking for, for the relationship between

24  mandamus and private right of action?

25              MR. STRACH:  It's the general mandamus --

**JA636**

1  let's see.  Yeah.  We've cited the cases, Your Honor,

2  that talks about the common law of North Carolina.

3           THE COURT:  Right.

4           MR. STRACH:  And then we did cite a -- oh.

5  N.C. Gen. Stat. 4-1, which expressly, by statute,

6  incorporates the common law into the law of North

7  Carolina.

8           THE COURT:  And that's a question of state

9  law that you say you've successfully litigated in a

10 different case?

11          MR. STRACH:  Yes.  Well, we've brought

12 mandamus actions to enforce election laws.

13          THE COURT:  Right.

14          MR. STRACH:  And we -- nobody removed the

15 case.  Nobody said we didn't have a claim.

16          THE COURT:  Okay.  So it wasn't a contested

17 part of that case.  It's just been successfully done by

18 the North Carolina courts.

19          MR. STRACH:  That's correct.

20          THE COURT:  All right.  Thank you.

21          MS. BOYCE:  Hi, Your Honor.

22          So I'll go quickly in turn to respond.  And

23 I'll start with the private right of action question and

24 then touch on laches, and then one other issue that I

25 think needs a little bit of attention.

**JA637**

 1          First, with respect to the private right of
 2   action, you asked about both the federal right of action
 3   and the state right of action.  I heard my colleague,
 4   Mr. Strach, to effectively concede that there is no
 5   federal right of action here under HAVA in his remarks
 6   earlier, so I won't waste your time with that.
 7          With respect to the state cause of action,
 8   we agree with Your Honor that there is not a state cause
 9   of action here underneath this particular statute that
10   they've cited, 82.11(c).
11          The way that I think about their claim,
12   though, is that Mr. Strach is correct that they have a
13   right to bring a mandamus claim.  We have not contested
14   their ability to bring the mandamus claim.  Where the
15   question of the right of action under state law becomes
16   relevant is on the first prong of the mandamus test,
17   which is whether they have a clear right to the remedy
18   they seek.  That question seems to necessarily bootstrap
19   in an inquiry of whether state law contemplates a
20   private citizen being able to bring some kind of claim
21   and seek the relief that they're asking for.  And that,
22   I think, is where your question is implicated about
23   whether 163-82.11(c) grants a private right of action.
24          I think you quoted precisely exactly what
25   the test is.  Was the legislature intending to confer a

**JA638**

1  right upon this particular group of individuals?  I
2  think state law also looks to whether the General
3  Assembly has directed other administrative remedies to
4  be put in place.  And here, consistent with HAVA, the
5  State Board has been directed to establish an
6  administrative procedure, which it has done, which
7  further underscores the fact that Congress seem to
8  believe that the appropriate remedy and the appropriate
9  cause of action here was through an administrative route
10 except, of course, for the Attorney General.
11         So we agree with Your Honor there is no
12 state cause of action.  We just think that that is more
13 relevant to the question of whether the mandamus claim
14 can survive, not necessarily a ground for saying that
15 they couldn't bring a mandamus claim in the first place,
16 consistent with what Mr. Strach was saying.
17         THE COURT:  All right.  So mandamus is
18 proper.  The question is "A right to what?"
19         MS. BOYCE:  Precisely.  Yeah.  If you lack a
20 private right of action, then you're hard-pressed to
21 establish that first prong, that you have a clear right
22 to the specific relief that you have requested.  That
23 would be the State Board's position.
24         With respect to laches, just two quick
25 points there, Your Honor.  I still haven't heard any

**JA639**

1    clear representation from my colleagues on the other

2    side as to when they actually found out about the issues

3    they're talking about here.  I would point out both that

4    this -- everyone seems to agree that the state form has

5    existed for decades now.  And so to the extent that the

6    issue arises from a problem with the form, that has --

7    that has, you know, persisted for many, many more years,

8    certainly far before June.

9            With respect to the question of when they

10   realized that the State Board was not going to remove

11   these voters from the roll or follow up to get more

12   information, that decision was announced in December of

13   last year.  It was announced in a public meeting.  I

14   would invite the Court to ask my colleagues on the other

15   side when they learned about that decision, and

16   specifically whether they had representatives at that

17   meeting.  It is our strong belief that they did.

18           So our position would be that they have

19   known about this claim since at least December and

20   should have brought this long before the eve of an

21   election and now with voting already ongoing.

22           THE COURT:  Well, now, this problem persists

23   past this election, right?  So there's the "Can this be

24   fixed before November?"  And there's will this --

25   elections will continue, and the voter rolls that have

**JA640**

1   people on them who may have problems -- the buckets

2   issue persists past November.  So this is a problem that

3   remains if to the extent it is -- that otherwise

4   ineligible voters were registered because the material

5   was not properly collected, that problem persists.  And

6   the question is how and when that's fixed.  That

7   persists past November.

8           So if we say it's administratively

9   impractical and would cause people to be removed doesn't

10  mean you don't have an obligation to fix it potentially,

11  because there's another election coming after that and

12  another one coming after that, right?  I hope.  Right?

13  We certainly believe that elections will persist.

14          MS. BOYCE:  Yes, Your Honor.

15          So, I guess, again, two points in response

16  to that.  First, insofar as the alleged problem was the

17  form and the problem was that the State Board was

18  registering voters without making it absolutely crystal

19  clear on the face of the form that this information was

20  required if you had it, that has been fixed.  That is

21  not going to occur, moving forward.

22          With respect to the question of whether

23  there are ineligible voters on the roll and how we deal

24  with that problem, I just want to take that premise

25  head-on.  We strongly disagree with the notion that what

**JA641**

1    happened here has any chance of resulting in ineligible

2    voters being on the rolls.  We know from HAVA -- and

3    nothing in state law says otherwise -- that a driver's

4    license and Social Security are not a prerequisite to

5    voting.  The simple fact that you don't have them does

6    not mean you're ineligible to vote.  Those numbers are

7    important because they help verify the identity of the

8    person who submitted a form.  And the reason, of course,

9    that the State Board permits you to check a box saying

10   that you don't have one and then to submit alternate

11   supplementary identification is because that also works

12   as a means of confirming that you're the person who

13   registered and you're the person who intends to vote.

14          So we just fundamentally disagree that the

15   failure to provide a driver's license or Social Security

16   number renders you ineligible.  And I think we've talked

17   at great length in our briefs about the many, many

18   safeguards that are in place to ensure that no voter

19   shows up to cast a ballot without providing some form of

20   verification that they are the person that they say they

21   are and that they are qualified to vote.

22          Now, of course, North Carolina has two ways

23   of doing that, both through the requirement of providing

24   HAVA ID and through our photo ID requirement.  But there

25   is no contention here, and it would be false to suggest

**JA642**

1    that any voter has managed to get on the rolls and then

2    vote without showing some form of identification, just

3    as HAVA requires.

4              So to your point, yes, this will continue to

5    -- people will continue to vote.  These people will

6    continue to be on the rolls.  But they will never be

7    permitted to vote without providing the identification

8    that HAVA requires under federal law.  They will have to

9    either show a photo identification or a government

10    identification document.  And then once they have done

11    that, just as HAVA says, they will be permitted to cast

12    a regular ballot.  If they fail to do that, then this

13    provisional ballot kicks in.  But otherwise, federal law

14    makes quite clear that they are eligible voters who

15    should be permitted to cast a vote.

16              The only other thing that I wanted to

17    respond to quickly, if I may, is this new reference to

18    163-82.4.  That has, of course, not been a basis of the

19    complaint at all.  We have been focused on 82.11(c).

20    But in any event, all 82.4 says is that the form has to

21    include this information.  Doesn't say what happens if

22    it doesn't.  It doesn't say you can't register if they

23    don't provide it.  And so to the extent there was any

24    issue with that state law, it has been corrected now

25    that the form does include that information.

**JA643**

1          THE COURT:  All right.  Now, Mr. Waxman,

2     speaking on behalf of the Board, says that there was no

3     -- that -- at least the Democratic party doesn't concede

4     a violation.  Does the Board agree that -- do you agree

5     with his position that you don't concede a violation

6     occurred?

7          MS. BOYCE:  I believe that the way that the

8     State Board framed it in its order is to concede that it

9     made it possible a HAVA violation could occur, to have

10    this form.  They agree that the form could be improved.

11    They agree that the best way to communicate to voters

12    that this information was important, if they had it, was

13    to alter the form and change the font.  I don't think

14    that they outright conceded that the form itself was a

15    HAVA violation.  And I think that's in part based on

16    what Mr. Waxman said about the fact that it seemed to

17    contradict itself in some ways.  It was not highlighted

18    in red to show that it was mandatory, but it did

19    nevertheless have an instruction immediately under that

20    on the face of the form that said, "If you have this

21    information, you have to provide it."

22          THE COURT:  So the error, to the extent the

23    error exists, is the failure to place it in red.  The

24    form -- if you --

25          MS. BOYCE:  That's right.

**JA644**

```
1                    THE COURT:  -- take the colors away...
2                    MS. BOYCE:  If you were color-blind -- yes.
3       You would not -- there would be a different matter.
4       Perhaps.  Perhaps, Your Honor.
5                    THE COURT:  So the risk of -- the risk of
6       confusion comes from the absence of the red shading on
7       those boxes.
8                    MS. BOYCE:  That's right.  Yes.  And of
9       course, Your Honor, this might be a completely different
10      case if what they were asking for was for us to change
11      this form.
12                   THE COURT:  That's already happened.
13                   MS. BOYCE:  We could fight about that.  That
14      has already happened, though.  They could make an
15      argument that there is a clear right underneath federal
16      and state law to a form that has this information.  We
17      might disagree with that, but they could certainly argue
18      that, and maybe it would be a closer question.  But that
19      has already happened, as Your Honor has pointed out.
20                   The question here is whether state and
21      federal law provide them a relief to either kick people
22      off the rolls or demand that those people cast
23      provisional ballots instead of regular ones.  And that's
24      simply nowhere to be found in federal or state law.  You
25      can piece things together and, you know, guess that
```

**JA645**

1  perhaps that is required.  But we would argue that that

2  conflicts with HAVA.  And in any event, mandamus

3  requires it to be a clear duty.  If it's ambiguous, then

4  the mandamus claim automatically fails.

5          THE COURT:  All right.

6          MR. STRACH:  And, Your Honor, if I may, just

7  to that point, the point that my colleague just made is

8  the point.  The state courts may very well say, "Yes,

9  there is a clear right here."  So whether you get there

10  because it's not a substantial federal question and

11  because it's really a defense to that, or whether you

12  get there because of something like Pullman abstention,

13  because these are statutes that the state courts in the

14  first instance are gonna have to construe and interpret

15  to say whether there is this clear right or not, it

16  wouldn't be for this Court to say that, of course.  It

17  would be up to them to say whether that is.

18          That's where we're trying to get.

19          THE COURT:  Okay.  Now, the abstention

20  doctrines don't allow me to abstain if there's a 1442

21  right, correct?

22          MR. STRACH:  You mean if there's a right to

23  removal?

24          THE COURT:  Yeah.  Under 1442, if they have

25  a right to removal, then the abstention doctrines don't

**JA646**

 1  get me anywhere, right?  I've got to remove under that
 2  -- to the extent that statute applies, I have to remove.
 3          MR. STRACH:  You may be right.  I actually
 4  don't know the answer to that off the top of my head.
 5  Mr. Waxman probably does.
 6          MR. WAXMAN:  I'm gonna help my friend,
 7  Mr. Strach, just by saying the various -- the panoply of
 8  preemption doctrines don't go to the question of federal
 9  jurisdiction or removal of jurisdiction.  They go to the
10  question of is a federal court saying, "Okay.  I've got
11  this case, but one of these abstention doctrines
12  applies, so I'm just gonna hold onto the case," which is
13  what happens, "and certify this particular question of
14  state law to the state court."
15          Now, none of these abstention -- the only
16  abstention doctrine they've cited is Pullman.  And as my
17  friend on this side of the table said, Pullman
18  abstention applies only -- only in a case where
19  abstaining -- getting a state court ruling would avoid a
20  federal court having to rule on a federal constitutional
21  question, which is not in this case.
22          THE COURT:  Right.  It'd be Pullman
23  adjacent.  It'd be avoiding a ruling on a state --
24          MR. WAXMAN:  Right.
25          THE COURT:  -- constitutional question

**JA647**

1    first.  So it would be a different form -- it's not

2    Pullman abstention qua Pullman abstention, but it's

3    adjacent.  It's avoiding making a state constitutional

4    ruling as a matter of first --

5              MR. WAXMAN:  I mean, there -- it wouldn't be

6    Pullman abstention.  You're right.  But a federal court

7    could say, "My resolution of this federal question

8    presented to me turns on how the state courts" -- "the

9    state Supreme Court would interpret this ambiguous state

10   law."  And there's no issue here.  I will -- if I can

11   just beg the Court's indulgence to make, I think, three

12   points in response to --

13             THE COURT:  Well, I was about to ask.  I was

14   gonna say, now, if there's anything you think we've

15   missed in our conversation, please do.  So you have my

16   indulgence.

17             MR. WAXMAN:  Okay.

18             With respect to the removal, remand issue,

19   the plaintiffs, in their briefing, don't mention

20   anything whatsoever about supplemental jurisdiction.

21   And we're not urging removal -- if this case is properly

22   removed, that any supplemental jurisdiction be exercised

23   because we think that the 1441 question and the 1433

24   question apply equally to counts 1 and count 2, as I've

25   said.

**JA648**

 1          But Your Honor did say that, look,
 2  supplemental jurisdiction should be ordinarily entered
 3  narrowly under the -- you know, under the circumstances.
 4  The circumstances here -- if supplemental jurisdiction
 5  were at issue, the circumstances here decidedly point in
 6  the opposite direction.  And indeed, I think that
 7  exercising supplemental jurisdiction, if you found that
 8  there wasn't federal removal jurisdiction under count 2,
 9  would be necessary and proper.
10          You know, on my -- there are probably at
11  least tens of thousands and probably hundreds of
12  thousands of North Carolina citizens who have already
13  voted.  On my way to the courthouse today from my hotel,
14  I passed a long line of people waiting to do early
15  voting in person.  And this is a situation that cries
16  out for an immediate resolution of this issue.
17          Secondly, my friend said, well -- and I
18  guess this relates to laches -- that, you know, laches
19  only applies -- the time clock only started running when
20  there was, quote, a refusal of the State Board to do
21  what's being asked here.
22          There was such a plain refusal in the
23  Board's published December order.  And, you know, I too
24  would challenge Mr. Strach to represent here, with
25  respect to laches, that his client was not actually

**JA649**

1  aware of the complaint filed by Ms. Snow in October and
2  discussed at a hearing in November.  It's not in the
3  record in this case.  But it is a public record
4  susceptible to judicial notice that a representative of
5  the Republican -- the Republican party of North Carolina
6  and a representative of the Democratic party of North
7  Carolina were at that meeting.  So we're talking about a
8  delay of a year, 11 months, since the Board said, "We
9  are not providing the additional prospective relief
10  because we conclude that federal law neither requires
11  nor allows us to do what it is that Ms. Snow and now the
12  plaintiffs are saying."
13         The notion that, "Well, you know,
14  provisional voting is common in North Carolina,
15  everybody knows how to do it, and what's the big deal if
16  these 225,000 people are somehow contacted and they
17  haven't voted already and told they're gonna have to
18  vote provisionally" -- provisional voting is absolutely
19  prohibited to be required under both federal law and
20  state law to a person who is eligible to vote and
21  provides the requisite identification that federal and
22  state law require at the time that she or he votes.  And
23  that only makes sense because what is it that they're
24  supposed to cure after they do that?  These people show
25  up and say, "I'm on the registered rolls."  Or "You just

**JA650**

1   told me that I wasn't somehow on the registered rolls,

2   but here is my HAVA ID.  Here is my photo ID."  And

3   they're told, "No, you have to vote provisionally, and

4   you've got to cure some question before the" -- you

5   know, at least the day before the state canvass.  The

6   question is gonna be, "What do I have to do?  I mean,

7   I've already provided both HAVA ID and state-required

8   photo ID."

9            Now, I can cite Your Honor the provisions

10  both in federal law and state law that preclude

11  requiring these people to vote provisionally.

12           The notion that the cited statute -- the

13  cited state statute in count 1 has, quote, only as

14  background, a background principle, Section 303 of HAVA,

15  is -- I mean, it's -- it's breathtaking.  The title of

16  the statute is "Compliance With Federal Law."  And the

17  only thing that -- the only content of the statute is

18  "You have to do this consistent with HAVA 303."

19           Now, Mr. Strach cited to the Court another

20  section, 163-82.4(a)(11).  I could be wrong, but I don't

21  believe that that statute was cited anywhere in the

22  complaint in this case.  And in any event, that

23  provision, which just lists out what has to be on the

24  form, is entirely derivative of HAVA 303 -- Section

25  303's requirements.

**JA651**

1          THE COURT:  It's not in the complaint.  I
2   looked earlier today.
3          MR. WAXMAN:  Okay.  So -- phew.
4          On the question of the motion to dismiss,
5   I'll address first the private right of action, and then
6   laches and <u>Purcell</u>, which is, I think, the only things
7   that have been discussed, and then explain why I think
8   the most fundamental problem here is that the complaint
9   fails to state -- plausibly allege any federal or state
10  violation, and that the mandamus sought, either a purge
11  of all of these people from the voter rolls or a
12  requirement that they provisionally vote, are absolutely
13  prohibited by federal and state law.
14          With respect to the private right of action,
15  I take it that we're arguing only whether there is a
16  state law, whether state law has some implied private
17  right of action.
18          THE COURT:  Yeah.  The case law is against
19  having any federal -- the Attorney General gets to do it
20  under federal law.
21          MR. WAXMAN:  That's right.  I mean, even if
22  there were some implied -- there were some general
23  common law rule implying private rights of action or
24  allowing mandamus, the application of that general rule
25  to an alleged violation of HAVA -- in essence, an

**JA652**

1   alleged HAVA violation -- would be preempted.  I mean,

2   we're talking here about a federal statute that was --

3   not only Congress is authorized to promulgate and

4   require national compliance with, it is actually the

5   effectuation of a particular constitutional provision in

6   Article 1 that says that if Congress acts, it shall

7   dictate the time, place, and manner for holding

8   elections.

9          And Congress made the determination that

10  there is -- that these -- that alleged violations of

11  this law with respect to registration are to be enforced

12  either by the Attorney General or in an administrative

13  proceeding that each state must establish.  And neither

14  of those things is true.  And the notion that state law

15  can then add on a private right of action when --

16  assuming what we're assuming, for purposes of this case,

17  that there is no -- it did not provide a federal right

18  of action to enforce Section 303 or any other provision

19  of HAVA -- a state rule to the contrary, even if it were

20  in a state statute, would be preempted.

21          Now, with respect to -- I think I've said

22  what there is to be said with respect to laches except

23  that, in the first place, they have -- they have been on

24  actual notice about the State Board's declination to

25  require either of the forms of relief that they are

**JA653**

```
 1    asking for in their complaint and that -- and they also
 2    knew very, very well, as we -- as our own party know
 3    very, very well, the 90-day prohibition on registration
 4    removal.
 5              And even if this were, as Mr. Strach says,
 6    "Well, we didn't really know about it until they" -- you
 7    know -- "they ruled on Ms. Snow's complaint in" --
 8    "supplemental complaint in June," both the Supreme Court
 9    and the federal circuit have applied laches in the
10    election context when the delay has been a matter of
11    days in the eve of the election, not just a matter of
12    months, as it was, even under their telling here.
13              I think if laches weren't enough, this is a
14    manifest case for the application of the Purcell
15    principle. Purcell basically has cautioned -- and its
16    progeny -- federal courts not to adjudicate, not to
17    countenance claims that would disrupt -- in the eve of
18    an election or near an election -- claims that would
19    disrupt the established rules of voting, voting
20    registration, et cetera, et cetera. That's exactly what
21    this does.
22              And indeed, in a very, very analogous case
23    in federal court in Arizona, in which there was a --
24    Maricopa County discovered that there were over 100,000
25    people who had registered under some prior form, and
```

**JA654**

1    looking back on it, it really wasn't clear whether that

2    complied with state or federal law, the Republican party

3    participated in that litigation, urged the Court under

4    Purcell and other grounds not to deregister or in any

5    way burden those particular voters, and succeeded.

6           And that was a -- that was litigation that

7    was filed, I think -- certainly at least a month ago,

8    and I think before the 90-day removal period.  And so

9    either Purcell or laches would apply.  But I would urge

10   the Court to dismiss this complaint in the first

11   instance because it -- you know, number one, it fails to

12   plausibly allege any violation of federal-state law.

13   The targeted voters in this case, the 225,000, have

14   attested under penalty of perjury that they are U.S.

15   citizens who meet the eligibility requirements to vote.

16   They're required to do that, and they all did.

17          County Boards of Election have evaluated and

18   confirmed their eligibility as required by federal and

19   state law.  Those voters who registered by mail are

20   gonna be required to present -- well, all of these

21   voters will be required to present both HAVA and photo

22   ID.  And even as of this date, with the election already

23   ongoing, the plaintiffs have not alleged and are not

24   prepared to allege that even a single one of these

25   225,000 voters, contrary to the record in this case, as

**JA655**

1   I've just articulated, is not, in fact, eligible to

2   vote.  I mean, that makes their constitutional claim,

3   whatever the content of it is, particularly

4   breathtaking.

5              Secondly, on the merits, granting their

6   requested relief would violate, as I said, black-letter

7   federal and state election law.  The NVRA prohibits

8   systematically purging voters within 90 days of a

9   federal election, and removal from a roll without notice

10  or an opportunity to be heard and to cure violates both

11  North Carolina statutory law and the due process clauses

12  of both the North Carolina and the federal

13  Constitutions.

14             Their alternate contention that HAVA, you

15  know, permits only provisional balloting, is refuted

16  again by both federal and state law.  Requiring a

17  provisional ballot from a voter who is qualified to vote

18  violates HAVA, which incorporates the NV- -- the Voting

19  Rights Act.  And North Carolina law specifically

20  provides that there is no provisional balloting required

21  if an appropriate identification is presented at the

22  time of voting.

23             And I think that's all --

24             THE COURT:  I have a question -- well, I

25  have a question about what constitutes a properly

**JA656**

1   registered voter.  That is, when the person -- if a

2   person filled out non-HAVA-compliant form, didn't

3   provide the necessary materials to comply with HAVA, are

4   they a properly registered voter who's being removed?

5   Or are they not a properly registered voter in the first

6   instance?

7          MR. WAXMAN:  They are a properly registered

8   voter if, following an evaluation of the registration

9   form, the State authorities -- in this case, the State

10  Board's authority delegated to the County Boards of

11  Elections -- evaluates it and determines that they are.

12  And in that instance, state law, you know, absolutely

13  prohibits their removal except under certain irrelevant,

14  nonspecified statutory circumstances, like they died,

15  they moved out of the state, they've become mentally

16  incompetent, or they've been convicted of a felony and

17  not reinstated.

18          And I would also, I think, with respect,

19  quibble with the premise of your question, which is that

20  they didn't provide the information that is required.

21  The federal --

22          THE COURT:  That's the -- I think that's the

23  crux of the matter, right?  The Republican party here

24  says, "We don't know, and we want to get the buckets

25  sorted out so we can figure out who is, in fact,

**JA657**

1   eligible and properly registered."

2         Now, figuring out how to go about sorting

3   that and remedying it -- and if it's not for this

4   election because it's too close and we're in Purcell

5   doesn't mean that we can't have something that fixes it

6   for the next election where we're nowhere near Purcell

7   and any, you know, remedy is for the next election, not

8   this one.

9         MR. WAXMAN:  Right.  So I -- I guess what I

10   would say is, first of all, it is their pleading

11   obligation to at least assert on information and belief

12   that there are, in fact, voters among the 225,000 they

13   want to purge that are ineligible.

14         Now, Mr. Strach mentioned a discovery

15   request that was made to the State Board, and I will

16   stand corrected if I'm wrong.  But my reading of the

17   discovery request was not "Please identify people on

18   this" -- "of the 225,000 that are, in fact, ineligible."

19   It said, "Please tell us what you have done to verify

20   eligibility."

21         And it is their pleading burden to come

22   forward and say, "There are ineligible" -- "There are

23   voters who are going to vote or who are on this list

24   that are, in fact, ineligible to vote."  And HAVA --

25   neither HAVA nor the state statute that incorporates it

**JA658**

1    require that you provide one of these two numbers.  What

2    the state statute says and the form -- the old form

3    itself said was "If you don't have either of these two

4    numbers, you must do the following."  And HAVA and state

5    law provide that somebody who doesn't have either of

6    these numbers, the State must, A, provide them with a

7    unique identifier in their registration, assuming

8    they're determined to be eligible, and require

9    HAVA-compliant ID when they appear to vote.  And the

10   State has represented in its papers here that it has

11   done both of those things.

12           So I don't think that they are improperly

13   registered, and neither did the county boards that had

14   the responsibility of ascertaining their eligibility.

15           THE COURT:  Okay.  Now, paragraph 68 of the

16   complaint says, "Upon information and belief,

17   Defendants' violations of HAVA allowed non-citizens to

18   register to vote in North Carolina, in direct

19   contravention of both federal and state law."  So they

20   did make that allegation.  And then paragraph 69 says,

21   "By allowing ineligible voters to register and then

22   remain on the North Carolina voter rolls, Defendants

23   have brought the security and validity of the state's

24   elections into question."

25           So they have alleged it, right?  The

**JA659**

1  question is not have they -- that's their information

2  and belief.  "We think that is true.  We want that

3  bucketed out."

4        MR. WAXMAN:  You know, I fully credit my

5  friend Mr. Strach's professionalism, truly.  But if

6  there -- I would like to know what the information and

7  belief is that there are people on these rolls who, even

8  though their eligibility has been examined by the State

9  Board, and they have sworn under penalty of perjury that

10 they are, in fact, eligible, what the basis is for

11 information and belief that -- I guess he's only saying

12 that they allowed noncitizens to register, not that

13 there were, in fact, any noncitizens who registered.  I

14 think the predicate is wrong.

15        But my point, I think, still stands, which

16 is they are coming to this Court and seeking wholesale

17 relief, on the eve of an election -- well, in the middle

18 of an election -- without identifying a single

19 ineligible voter in the face of a state and federal

20 scheme which makes it essentially impossible for an

21 ineligible voter to vote because they are all required

22 to present HAVA ID and, in North Carolina, a photo ID

23 before they are allowed to vote.  I don't understand the

24 premise under which there could be an argument that

25 ineligible voters among these 225,000 people are voting.

**JA660**

1    Maybe there's some argument that somebody who did fill

2    out this -- there's somebody who did fill out this form

3    with their driver's license number but is not, in fact,

4    eligible to vote but presents some form of photo ID is

5    not, in fact, eligible.  But it certainly doesn't apply

6    to these 225,000 who are particularly required to

7    present HAVA-compliant identification at the time they

8    vote.

9              THE COURT:  All right.  I understand the

10   position.

11             MR. WAXMAN:  Okay.

12             THE COURT:  I understand the position.

13             MR. WAXMAN:  Thank you, Your Honor.

14             THE COURT:  Anything that the plaintiffs

15   wish to bring to the Court?

16             MR. STRACH:  Your Honor, very briefly.  I

17   think I've said most of what I need to say.

18             On the question that Your Honor had about

19   are they registered or not, are they registered and

20   we're removing them, or were they never registered

21   before, I would note that if the Board did register

22   people who did not provide those numbers, then they

23   would be in violation of HAVA because HAVA says that an

24   application for voter registration for an election for

25   federal office may not be accepted or processed by a

**JA661**

1   State unless the application includes the numbers.

2          THE COURT:  And that was my -- that was my

3   understanding when I went through it, trying to figure

4   out -- so if there's somebody who hasn't presented one

5   of those -- now, we're sort of at the -- there are three

6   layers of speculation here, right?  One is the

7   instructions say to give this to us.  The colors are

8   misleading.  So does the computer program accept those

9   registrations that lack those numbers?  Are they then

10   forwarded to the State Board of Election?  Are they then

11   processed and the person is registered in the absence of

12   the ID or the number?  Right?  So there are supposed to

13   be some checks and balances along the way.

14          So when the procedure that Mr. Waxman

15   describes, where it gets to the County and the County

16   Board says, "We registered these people," we're making

17   some assumptions that they have checked to make sure

18   that the required forms were provided or the required

19   number is provided.  So what we're at the -- we're at

20   the "We think this is possible, and we don't know, and

21   this could have gone wrong at each step, and we're

22   trying to find out."  That's reasonable.  It's

23   reasonable to want to find out what actually happened.

24   That's -- we want to know.  Are -- did this person get

25   through this process without ever providing the

**JA662**

1    HAVA-required materials?  And if they did, there's a

2    question as to whether or not they're a properly

3    registered voter if they registered -- were accepted by

4    a functionary in violation of the law, whether or not

5    they're properly registered in the first instance.

6           So I was reading it, trying to figure that

7    piece out because whether or not you remove a registered

8    voter depends on that person being registered.  So I

9    have to figure out what "registered" means in this

10   context.  So I was trying to work my way through that

11   with all of the materials to figure out who are we

12   talking about?  What's the class?  How big is it?  How

13   likely is it we're gonna affect multiple people,

14   assuming that this case is properly before me, thinking

15   about how and when we can apply any appropriate remedy?

16          So the question of what constitutes a

17   registered voter makes a difference in terms of figuring

18   out what remedy, if any, might even be appropriate.  So

19   that's why I was asking the question.

20          MR. STRACH:  Yeah.  And we think that's

21   clearly correct.  And that's what the discovery requests

22   that we propounded were designed to start to figure out,

23   which is, what are the buckets?  What process did people

24   go through?  Did they become improperly registered?  And

25   what's the universe of that look like?  That's what the

**JA663**

1  discovery process is designed to do, and that's what

2  we're trying to do.

3           And we think that some of these questions,

4  Your Honor, are, you know, gonna be answered by state

5  law, and so even less of a reason for this Court to jump

6  into a fray that's gonna involve a lot of difficult

7  questions of state law.

8           MR. WAXMAN:  Your Honor, with respect, I

9  have one and a half points to make in response to my

10  friend's representations.

11           Number one.  In direct answer to your

12  question, it is not, in fact -- notwithstanding the

13  language that was quoted -- it is not, in fact, a

14  federal law requirement that you provide either of these

15  numbers in order to be registered.  Federal law

16  specifically provides -- and this is 52 U.S. -- well,

17  this is Section 303(a)(2) -- little "i," I think --

18  (a)(2)(5) little "i" -- which says that if an applicant

19  for registration for an election to federal office

20  doesn't have either of these numbers, the State shall --

21  it doesn't say that's the ball game.  It says, "the

22  State shall assign the applicant a number which will

23  serve to identify the applicant for voter registration

24  purposes."

25           And, in fact, it seems to me that the, you

**JA664**

1  know -- what provides the -- maybe the thirteenth chime

2  of the clock is a provision of North Carolina law.  It's

3  section 163-166.12(d), which is entitled "Voting When

4  Identification Numbers Don't Match."

5           This is a situation in which the form is

6  filled out.  One or both of the numbers is provided.  It

7  goes to the responsible state officials for an

8  ascertainment whether you can or cannot properly

9  register.  And the numbers actually don't match the

10  government's records.  And what this provision says is

11  that if that happens, you are -- the voter is

12  nonetheless still entitled to vote provided that he

13  submits the ballot with the form of identification

14  described in the previous subsections, which are the

15  HAVA requirements.

16           And so even when somebody falsely fills out

17  a -- or mistakenly fills out a number, state law and

18  federal law require that that voter be allowed to vote

19  upon provision of HAVA-compliant information.

20           Thank you.

21           (Discussion off the record between defense

22  counsel.)

23           MR. WAXMAN:  Yeah.  And only if they fail do

24  they -- are they required to vote a provisional ballot.

25           THE COURT:  Okay.  Yes, ma'am.

**JA665**

1          MS. BOYCE:  Your Honor, I think it's totally

2    fair for you to be honing in on the fact that, to some

3    extent, this can all become quite circular.  But I do

4    think it's important to distinguish between the question

5    of eligibility and proper registration.  Even taking

6    everything that my colleague over here says as true,

7    that the State Board should not have processed these

8    registrations, that would, I think, take us to a

9    conclusion that they were improperly registered.  But it

10   would not necessarily take us to a conclusion that these

11   voters are ineligible.

12          THE COURT:  I agree.  The question is the

13   purging statutes talk about registered voters.  And so

14   figuring out who we can remove is somebody who is

15   registered; and to be a registered voter is a separate

16   question from an eligible voter.

17          MS. BOYCE:  I agree with that.  The way that

18   I think about it is that you are registered in North

19   Carolina if you look up the person in the database and

20   they appear on the voter rolls.  And then North Carolina

21   is quite clear that you may only be removed from those

22   rolls if, in fact, certain things are triggered and

23   essentially it is proven that you are ineligible.  And

24   again, just stepping up -- or, you know, zooming out to

25   10,000 feet, I do think it matters here that these

**JA666**

 1    voters did everything right on the face of the form.

 2    They provided the right information that the form said

 3    was required.  They will show up to vote.  They will

 4    provide HAVA ID.  So Your Honor is faced with a question

 5    of what to do when voters have checked every box that

 6    they have been told they needed to check.

 7              THE COURT:  We certainly can't be

 8    disenfranchising people who did what they were told to

 9    do who are eligible voters.  Right?  HAVA is supposed to

10    help us make sure that only -- that every eligible voter

11    who wants to register does so in a way that is good and

12    uniform, and we get there, and we can check them against

13    our other disenfranchising requirements, and only

14    eligible registered -- only eligible voters register.

15              So we're supposed to help everyone who can

16    vote, and should vote, vote.

17              We're also supposed to make sure that people

18    who can't vote, and shouldn't vote, don't vote, right?

19              MS. BOYCE:  Right.

20              THE COURT:  We try to figure out the on/off

21    switch.

22              MS. BOYCE:  That's right, Your Honor.  But I

23    do think that the two key points in response to that

24    are, number one, as my colleague has said, federal law

25    makes clear that having the driver's license and the

**JA667**

1   Social Security number is not important to that

2   particular question.  You can not have one and you can

3   still vote.  So that's one --

4                THE COURT:  Understood.  Understood.

5                MS. BOYCE:  That's one factor here.

6                And two.  I think we all agree that the

7   purpose here is to force the voter to confirm their

8   identity.  And again, these are voters who will not be

9   permitted to vote until they confirm their identity in

10  one of the ways that both state and federal law require.

11               So in that circumstance where the voter has

12  done nothing wrong, and they're going to jump through

13  every hoop to provide the information that is actually

14  absolutely required, you know, we would submit that

15  there's no question but that federal law -- federal and

16  state law do not permit those voters to be

17  disenfranchised, nor does it permit them to be required

18  to cast a provisional ballot.

19               THE COURT:  That was my understanding of the

20  positions.  I think the provisional ballot question was

21  how do we make sure -- I think that's the outermost ask.

22  I'm not sure where it's -- where the plaintiffs expected

23  to land.  What they want to do is say, "Can we get

24  discovery to figure out how big the buckets are?  And

25  when we figure out the bucket of people who shouldn't be

**JA668**

 1   allowed to vote, can we figure out where and how we're
 2   gonna stop that?"  I think that's ultimately what this
 3   case is about.
 4          MR. STRACH:  Correct.
 5          THE COURT:  It's framed as a complaint, way
 6   out here, intended to land at the -- figuring out the
 7   small bucket and keeping the small bucket from voting.
 8   That's how I read it.
 9          MR. STRACH:  We've been -- we've been moving
10   in that direction the whole time as best we could.
11   That's the direction we're heading in.  We think that
12   the Court is right.  All eligible voters should vote.
13   Ineligible voters shouldn't.  And that's -- this lawsuit
14   deals with the second piece of that.
15          And I would just point out real quick, to
16   one of the points my colleagues made, the -- HAVA and
17   state laws say that if you don't have driver's license
18   number or last four, then they have to create a number
19   for you, that you can be tracked.  And then you have to
20   vote using a HAVA document or a photo ID, whatever.
21   That's if you were asked and did not have it.  We're
22   talking about people who weren't even asked properly and
23   may have it and did not provide it.  That's a whole
24   different ball game than what they were just talking
25   about.

**JA669**

```
 1              THE COURT:  I understand -- I understand
 2   where we are in terms of figuring it out, right?  I
 3   don't think the parties fundamentally disagree on we
 4   want eligible voters to vote and we want ineligible
 5   voters to not vote.  The question is just how do we get
 6   from where we now stand where there may or may not have
 7   been a problem with the form?  I think we're not even
 8   sure we agree on that.
 9              But the form has been fixed to where there's
10   clearly no problem.  How do we get from the possibility
11   that there are some registered voters who are actually
12   ineligible voters?  How do we find those people if they
13   exist?  And the big ask is "Let's have everybody vote
14   provisional and we'll sort it on the back end."  That's
15   not practical or, I think, susceptible to a canvass that
16   works.
17              So the question is how do we have something
18   that works inside of that that sorts it?  To the extent
19   that it's doable now at all -- and with Purcell, it may
20   not be doable for this election.  It doesn't mean that
21   it's not doable prospectively.  And so we'll -- I'll
22   take all of this under advisement.  I've got a lot of
23   thinking and writing to do to decide if this is my case
24   to decide, and then move from there.
25              But I'll get something out to the -- I know
```

**JA670**

```
 1  time is of the essence.
 2            All right.  Final words.
 3            MS. BOYCE:  I just have one small point,
 4  Your Honor.  And now that it seems like we are all
 5  coalescing around provisional ballots, I just want to
 6  make as crystal clear as I can what I think the dispute
 7  is.
 8            The status quo today is that all of these
 9  voters will cast a provisional ballot if they don't show
10  up and present HAVA ID.  That's already the status quo.
11  All of them will have to do that.  What they're asking
12  for is specifically that these voters be required to
13  show up and provide a driver's license or a Social
14  Security number, and if they have HAVA ID, that's not
15  enough.  So I think that really is where we've landed.
16            And our position, of course, is that federal
17  law makes clear that the HAVA ID should be enough, and
18  they say, "No, no, no.  You actually need to demand that
19  these people provide a driver's license and Social
20  Security number if they have one."  But I think we have
21  -- assuming we are now coalescing around provisional
22  ballots -- which, again, we disagree that, you know --
23  all the premises that go there.  I think that's where we
24  have landed.  And I just wanted to make crystal clear
25  that we are already in a situation where if you can't
```

**JA671**

 1  provide HAVA ID, you are voting a provisional ballot.

 2  That's the world we already live in now.

 3           THE COURT:  Right.  And I think we're -- I

 4  don't want to get ahead of this case, but time is of the

 5  essence, right?  I have to figure out do I own it?  If I

 6  own it, what stays here?  If I don't own it, what gets

 7  sent back?  And then I have to figure out how are we

 8  going to get through whatever discovery is necessary and

 9  appropriate in an expedited fashion given Purcell,

10  whether or not that's anything that applies to this

11  election, or we just say we're off the books for this

12  election, do I retain it, knowing that there's another

13  election in two years that will be affected by these

14  same voter rolls and that will give us time to sort that

15  out?  There are questions to think through.  I will

16  think through them as fast as I can, and we will figure

17  out where we stand with regard to this Court, this suit,

18  and the next steps.

19           MR. WAXMAN:  Can I just provide Your Honor

20  the citations for -- I stated a -- the broad

21  proposition that requiring these people to vote

22  provisionally would be prohibited both by federal law

23  and state law.

24           First of all, the voting -- requiring a

25  provisional ballot from a voter who is either, quote,

**JA672**

1  entitled to or, quote, otherwise qualified to vote,

2  violates the Federal Voting Rights Act.  That's

3  52 U.S.C. 10307(a).

4          Section 163-166.12(e) of the North Carolina

5  statutes provides that essentially there is no

6  provisional voting if requisite ID is presented at the

7  time.  And that is also replicated in federal law.  It's

8  52 U.S.C. 21083(b)(2)(B) and 52 U.S.C. 21082(a).

9          And as I said, if we are all coalescing

10  around the fact that what this lawsuit is about is

11  keeping -- if there are any -- ineligible voters among

12  these 225,000 to be able to vote, number one, this --

13  the request in the mandamus petition, and therefore in

14  the constitutional argument, is vastly overbroad and

15  inappropriate.  And in any event, we have a mechanism

16  for doing that, which is the federal and state

17  requirement that every single one of these voters

18  provide HAVA-compliant ID and also photo ID at the time

19  they vote, which is the only thing they would be

20  required to do if it were not -- if they -- if they were

21  somehow required to vote provisionally.  Thank you.

22          THE COURT:  All right.  Thank you,

23  everybody.  We'll be in recess.

24          (Proceedings concluded at 11:40 a.m.)

25

**JA673**

1 **C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct

4 transcript from the record of proceedings in the

5 above-entitled matter.

6

7 /s/Risa A. Kramer                    10/20/2024

8 Risa A. Kramer, RMR, CRR              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA674**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-547

REPUBLICAN NATIONAL COMMITTEE; and )
NORTH CAROLINA REPUBLICAN PARTY, )
                                  )
              Plaintiffs,         )
                                  )
v.                                )
                                  )
NORTH CAROLINA STATE BOARD OF     )
ELECTIONS; KAREN BRINSON BELL, in )
her official capacity as Executive Director of )
the North Carolina State Board of Elections; )
ALAN HIRSCH, in his official capacity as )
Chair of the North Carolina State Board   )   **STATE BOARD DEFENDANTS'**
of Elections; JEFF CARMON, in his official )   **NOTICE OF APPEAL**
capacity as Secretary of the North Carolina )
State Board of Elections; STACY EGGERS )
IV, KEVIN N. LEWIS, and SIOBHAN )
O'DUFFY MILLEN, in their official capacities )
as members of the North Carolina State Board )
of Elections,                     )
                                  )
              Defendants,          )
                                  )
and                               )
                                  )
THE DEMOCRATIC NATIONAL COMMITTEE, )
                                  )
              Intervenor-Defendant. )

        Defendants the North Carolina State Board of Elections, its members, and its Executive

Director, hereby give notice of their appeal to the United States Court of Appeals for the Fourth

Circuit from the Judgment entered on October 17, 2024 (D.E. 59), and the Order entered that

same day (D.E. 58).

**JA675**

Respectfully submitted this the 18th day of October, 2024.

/s/Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar 56896
SBoyce@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants*

**JA676**

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys:

John E. Branch III
Thomas G. Hooper
Baker Donelson Bearman, Caldwell Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
(984) 844-7900
jbranch@bakerdonelson.com
thooper@bakerdonelson.com

Phillip J. Strach
Jordan A. Koonts
Nelson Mullins Riley Scarborough LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3800
phil.strach@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Plaintiffs*

Jim W. Phillips, Jr.
Shana L. Fulton
William A. Robertson
James W. Whalen
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
(919) 839-0300
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

Seth P. Waxman
Daniel Volchok
Christopher E. Babbitt
Gary M. Fox
Joseph M. Meyer
Jane Kessner
Nitisha Baronia
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for Intervenor-Defendant Democratic National Committee*

This the 18th day of October, 2024.

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General and General Counsel

**JA677**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE and NORTH CAROLINA REPUBLICAN PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections, <br><br> *Defendants*, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant*. | Case No. 5:24-cv-547-M-RJ |

**INTERVENOR-DEFENDANT DEMOCRATIC NATIONAL COMMITTEE'S
NOTICE OF APPEAL**

Pursuant to Rule 3 of the Federal Rules of Appellate Procedure, Intervenor-

Defendant Democratic National Committee appeals to the United States Court of Appeals

for the Fourth Circuit from the respective portions of this Court's Order (DE 58) and

Judgment (DE 59), both entered on October 17, 2024, to remand Count Two of Plaintiffs'

**JA678**

1

Complaint to the North Carolina state court predicated on the Court's decision to exercise its inherent authority to do so.

October 18, 2024

/s/ Seth P. Waxman
SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
GARY M. FOX[*]
JOSEPH M. MEYER[*]
JANE KESSNER[*]
NITISHA BARONIA[*]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C.  20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
joseph.meyer@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com

[*] Local Rule 83.1(e) special
  appearance.

Respectfully submitted,

/s/ Jim W. Phillips, Jr.
JIM W. PHILLIPS, JR.
N.C. BAR NO. 12516
SHANA L. FULTON
N.C. BAR NO. 27836
ERIC M. DAVID
N.C. BAR NO. 38118
WILLIAM A. ROBERTSON
N.C. BAR NO. 53589
JAMES W. WHALEN
N.C. BAR NO. 58477
BROOKS, PIERCE, MCLENDON
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C.  27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
edavid@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

**JA679**

2

## CERTIFICATE OF SERVICE

On this 23rd day of October, 2024, I electronically filed the foregoing using

the Court's appellate CM/ECF system.  Counsel for all parties to the case are

registered CM/ECF users and will be served by that system.


/s/ Seth P. Waxman
SETH P. WAXMAN