Nos. 24-2044, 24-2045

In the United States Court of Appeals
for the Fourth Circuit

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Plaintiffs-Appellees*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of North Carolina

## DEFENDANTS-APPELLANTS' OPENING BRIEF

Sarah G. Boyce
Deputy Attorney General and
General Counsel

Sripriya Narasimhan
Deputy General Counsel

Mary Carla Babb
Special Deputy Attorney General

Terence Steed
Special Deputy Attorney General

South A. Moore
Deputy General Counsel

Marc D. Brunton
General Counsel Fellow

N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400
Counsel for Defendants-Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTIONAL STATEMENT .............................................. 1

ISSUES PRESENTED ................................................................. 2

INTRODUCTION ........................................................................ 3

STATEMENT OF THE CASE ...................................................... 7

    A.    HAVA establishes rules for voter registration, voter identification, and voter-list maintenance, which North Carolina law incorporates by reference. ....... 7

    B.    The National Voter Registration Act forbids the systematic removal of ineligible voters within 90 days of an election. ...................................... 10

    C.    A voter challenges the State's registration form. ............. 12

    D.    Fewer than 90 days before the 2024 general election, Plaintiffs sue. ...................................... 13

    E.    The district court dismisses Count One of Plaintiffs' complaint and declines to exercise supplemental jurisdiction over Count Two. ..................... 14

SUMMARY OF ARGUMENT ..................................................... 19

ARGUMENT ............................................................................ 22

Standard of Review .................................................................. 22

Discussion ............................................................................... 22

I.      This Court Has Appellate Jurisdiction To Consider
        Whether the District Court Had Original Jurisdiction
        Over Count Two. ........................................................... 23

        A.      This Court has appellate jurisdiction over the
                entire remand order under § 1447(d). ............................ 23

        B.      This Court has appellate jurisdiction under
                28 U.S.C. § 1291. ............................................... 27

II.     The District Court Wrongly Held That Count Two
        Did Not Arise Under Federal Law............................................ 30

        A.      Count Two necessarily raises a disputed and
                substantial federal question that should be
                resolved by a federal court. ................................... 32

        B.      The district court erred by concluding that
                resolving Count Two would disrupt the balance
                between state and federal courts. ............................. 37

III.    The District Court Wrongly Held That the Civil-Rights
        Removal Statute Does Not Apply. ........................................... 41

        A.      The State Board properly removed Count Two
                under the civil-rights removal statute............................ 41

        B.      The district court's narrow reading of the
                civil-rights removal statute is not supported
                by law. ....................................................... 45

IV.     The District Court Abused Its Discretion by
        Declining to Exercise Supplemental Jurisdiction. ..................... 51

CONCLUSION .................................................................... 54

CERTIFICATE OF COMPLIANCE............................................. 56

CERTIFICATE OF SERVICE................................................. 57

ADDENDUM .........................................................ADDENDUM-1

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014) ........................................... 42

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
  489 U.S. 141 (1989) ............................................................ 34

*BP P.L.C. v. Mayor of Balt.,*
  593 U.S. 230 (2021) ............................................ 1, 19, 24, 25

*Carlsbad Tech. Inc. v. HIF Bio, Inc.,*
  556 U.S. 635 (2009) ........................................ 20, 26, 27, 28, 29

*Carnegie-Mellon Univ. v. Cohill,*
  484 U.S. 343 (1988) ............................................................ 51

*City of Greenwood v. Peacock,*
  384 U.S. 808 (1966) .................................................. 46, 47, 50

*Empire Healthchoice Assur. Inc. v. McVeigh,*
  547 U.S. 677 (2006) ...................................................... 14, 15

*Georgia v. Rachel,*
  384 U.S. 780 (1966) .................................................. 43, 46, 47

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,*
  545 U.S. 308 (2005) ...................................................... *passim*

*Gunn v. Minton,*
  568 U.S. 251 (2013) .......................................... 15, 31, 33, 34

*Harper v. Hall,*
  886 S.E.2d 393, 364 (N.C. 2023) ...................................... 38

*Henderson v. Harmon,*
  102 F.4th 242 (4th Cir. 2024) ........................................... 22

*In re Blackwater Sec. Consulting,*
  460 F.3d 576 (4th Cir. 2006) ........................................... 27

*Isaac v. N.C. Dep't of Transp.*,
  192 F. App'x 197 (4th Cir. 2006) ........................................ 39

*Johnson v. Mississippi*,
  421 U.S. 213 (1975) ............................................................ 48

*Ketema v. Midwest Stamping, Inc.*,
  180 F. App'x 427 (4th Cir. 2006) ........................................ 51

*N.C. State Conf. NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*,
  No. 1:16-cv-1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) .......... 42

*New Haven Firefighters Loc. 825 v. City of New Haven*,
  120 F. Supp. 3d 178 (D. Conn. 2015) ...................................... 43, 47, 48

*O'Keefe v. N.Y.C. Bd. of Elections*,
  246 F. Supp. 978 (S.D.N.Y. 1965) ........................................ 48, 50

*Old Dominion Elec. Coop. v. PJM Interconnection, LLC*,
  24 F.4th 271 (4th Cir. 2022) .............................................. 22, 30, 31, 32

*Peter Farrell Supercars, Inc. v. Monsen*,
  82 F. App'x 293 (4th Cir. 2003) ......................................... 52

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257, 264 (4th Cir. 2021) ....................................... 44

*Shanaghan v. Cahill*,
  58 F.3d 106 (4th Cir. 1995) ............................................... 51, 52

*Thermtron Prods., Inc. v. Hermansdorfer*,
  423 U.S. 336 (1976) ......................................................... 26, 27, 28

*Things Remembered, Inc. v. Petrarca*,
  516 U.S. 124, 129 (1995) ................................................... 27

*Vlaming v. W. Point Sch. Bd.*,
  10 F.4th 300 (4th Cir. 2021) .............................................. 25, 49

*Whatley v. City of Vidalia*,
  399 F.2d 521 (5th Cir. 1968) .............................................. 43, 47

# Statutes

28 U.S.C. § 1291 ............................................................. 1, 20, 26

28 U.S.C. § 1331 ............................................................. 1, 30

28 U.S.C. § 1367 ............................................................. 1, 51

28 U.S.C. § 1441 ............................................................. 1, 28, 30

28 U.S.C. § 1443 ............................................................. *passim*

28 U.S.C. § 1447 ............................................................. *passim*

42 U.S.C. § 2000e-3 ........................................................ 44

52 U.S.C. § 10101 ........................................................... 46, 47, 48

52 U.S.C. § 20501 ........................................................... 10, 44

52 U.S.C. § 20507 ........................................................... 11, 40, 42, 49

52 U.S.C. § 21083 ........................................................... 7, 8, 10, 33, 36

52 U.S.C. § 21111 ........................................................... 35

N.C. Gen. Stat. § 163-82.11 ............................................. *passim*

N.C. Gen. Stat. § 163-82.14 ............................................. 10

N.C. Gen. Stat. § 163-166.12 ........................................... 9

N.C. Gen. Stat. § 163-166.16 ........................................... 9, 10

N.C. Gen. Stat. § 163-166.40 ........................................... 9

N.C. Gen. Stat. § 163-230.1 ............................................. 9

**Session Laws**

Help America Vote Act of 2002,
Pub. L. No. 107-252, 116 Stat. 1666 ......................................................3

National Voter Registration Act of 1993,
Pub. L. No. 103-31, 107 Stat. 77 .............................................................3

**Constitutional Provision**

N.C. Const., Art. I, § 19 .................................................................. 13, 32

**Other Authorities**

Help America Vote Act,
United States Election Assistance Commission (June 7, 2023) ...........7

S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993,
1993 WL 54278 (Leg. Hist.) ............................................. 10, 11, 44, 49

*State Board Certifies Supreme Court Contest,*
*Removes County Board Member During Final Meeting of 2020,*
N.C. State Bd. of Elections (Dec. 18, 2020) ........................................33

## JURISDICTIONAL STATEMENT

The State Board Defendants removed Plaintiffs' complaint under 28 U.S.C. §§ 1331, 1441, 1443, and 1367. The district court had jurisdiction under 28 U.S.C. §§ 1441(a) and 1443(2). Because the district court entered a final judgment, J.A. 603, this Court has jurisdiction under 28 U.S.C. § 1291. Additionally, the entire order remanding to state court a case removed under 28 U.S.C. § 1443 is appealable as of right under 28 U.S.C. § 1447(d). *BP P.L.C. v. Mayor of Balt.*, 593 U.S. 230, 237, 239, 246 (2021).

# ISSUES PRESENTED

1.  Whether this Court has appellate jurisdiction to consider whether the district court possessed original jurisdiction over Count Two under 28 U.S.C. § 1331.

2.  Whether the district court erred in concluding that 28 U.S.C. § 1441(a) did not provide a proper basis for removing Count Two.

3.  Whether the district court erred in concluding that 28 U.S.C. § 1443(2) did not provide a proper basis for removing Count Two.

4.  Whether the district court abused its discretion by declining to exercise supplemental jurisdiction over Count Two.

# INTRODUCTION

With voting in North Carolina already one month underway and more than a million votes already cast, the Republican National Committee and the North Carolina Republican Party seek an order compelling the North Carolina State Board of Elections to purge nearly a quarter-million voters from the State's voter rolls. Plaintiffs seek this extraordinary relief on the theory that the State Board has violated state law by failing to comply with a *federal* statute, the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666. The State Board, for its part, disagrees with Plaintiffs' interpretation and has refused to implement a mass purge, in part because doing so would violate *another* federal statute, the National Voter Registration Act of 1993 ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77. This case belongs in federal court, and the district court's contrary decision should be reversed.

Plaintiffs' complaint asserted two claims. In Count One, Plaintiffs alleged that the State Board violated N.C. Gen. Stat. § 163-82.11(c)—a provision titled "Compliance With Federal Law" that requires the State Board to maintain its voter list in compliance with Section 303 of HAVA. More specifically, Plaintiffs alleged that the State Board violated the law

when it refused to remove from the rolls voters who registered using an old registration form that did not clearly require a driver's license number or the last four digits of a voter's social-security number. Plaintiffs sought a writ of mandamus ordering the State Board to remove any voter who registered using the old form and did not provide a driver's license or social-security number when doing so.

In Count Two, Plaintiffs alleged that the State Board violated the North Carolina Constitution. Plaintiffs alleged that the State Board's failure to remove these voters—that is, the State Board's alleged violation of HAVA—would dilute the votes of registered voters. On this claim too, Plaintiffs sought an order requiring the State Board to conduct a mass purge.

Each of these claims turns entirely on the meaning of a federal statute—HAVA—and whether it requires the State Board to remove a whole tranche of voters from the rolls even as votes are already being cast. In addition, by seeking the systematic removal of voters from the rolls fewer than 90 days before an election, both claims seek relief that would violate a federal civil-rights statute, the NVRA. The State Board therefore removed these claims to federal court.

Following expedited briefing and a hearing last week, the district court correctly held that Plaintiffs' first claim arose under federal law because determining whether the State Board violated N.C. Gen. Stat. § 163-82.11(c) necessarily required the district court to construe HAVA. The district court then correctly dismissed Count One with prejudice.

As for Plaintiff's second claim, the district court conceded that the State Board had "persuasively argued" that this claim "involves the same disputed issues pertaining to HAVA" as Plaintiff's first claim, over which the court had already exercised jurisdiction. Yet the court nonetheless held that removal was improper. The court also declined to exercise supplemental jurisdiction over Count Two. Instead, the court remanded the claim to state court.

That was error. Two different statutes provide independent grounds for removal here. First, removal of Count Two was proper for the same reason that removal of Count One was proper: the claim necessarily turns on a disputed and substantial question of federal law. The district court thus had federal-question jurisdiction over Count Two, just as it did for Count One, and the State Board was entitled to removal under 28 U.S.C. § 1441(a).

Alternatively, removal was available under the civil-rights removal statute, 28 U.S.C. § 1443(2). That statute permits state officials to remove to federal court any suit brought against them for refusing to take an act that is inconsistent with a "law providing for equal rights." Here, Plaintiffs sued the State Board for refusing to purge voters just before an election, an act that Congress outlawed in the NVRA as part of a legislative effort to crack down on racially discriminatory election-administration practices.

Finally, even if the district court did not have mandatory jurisdiction over Count Two, it certainly had supplemental jurisdiction over it. Given the need for expeditious resolution of this litigation and the fact that the district court is most familiar with the issues raised, it should have retained jurisdiction.

For these reasons, this Court should reverse the district court's remand order and send this case back to the district court to address the merits of Count Two.

## STATEMENT OF THE CASE

**A.** **HAVA establishes rules for voter registration, voter identification, and voter-list maintenance, which North Carolina law incorporates by reference.**

The Help America Vote Act of 2002 (HAVA) made significant reforms to the nation's voting processes by enacting "improvements to voting systems and voter access that were identified following the 2000 election."[1] Among those reforms were changes to the systems for voter registration, voter identification, and voter-list maintenance.

Section 303 of HAVA instructs States to gather certain identification information before individuals are registered to vote. 52 U.S.C. § 21083(a)(4)(A), (a)(5)(A). As just one example, States are not to "accept[] or process[]" a voter-registration application unless the application includes either the individual's driver's license number or the last four digits of her social-security number. *Id.* § 21083(a)(5)(A)(i). If an individual does not have a driver's license or social-security number, States must assign the individual a special identification number for voting purposes. *Id.* § 21083(a)(5)(A)(ii).

---

[1] Help America Vote Act, United States Election Assistance Commission (June 7, 2023), *available at* https://www.eac.gov/about/help_america_vote_act.aspx (last accessed Oct. 20, 2024).

When voters register by mail, HAVA imposes additional requirements the first time they vote in a federal election. Whether they vote by mail or in person, voters must provide either "current and valid photo identification" or a current official document like a bank statement that shows the voter's name and address. *Id.* § 21083(b)(2)(A)(i)-(ii). Voters who register with their driver's license or social-security number are exempt from this requirement, so long as the State is able to validate the number they provide. *Id.* § 21083(b)(3)(B).

Finally, HAVA tasks the "chief State election official" in each State with "implement[ing], in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." *Id.* § 21083(a)(1)(A). And state elections officials are required to "perform list maintenance . . . on a regular basis." *Id.* § 21083(a)(2)(A). HAVA limits the circumstances under which state elections officials may remove voters from the rolls while performing list maintenance, including by requiring that: (1) "only voters who are not registered or who are not eligible to vote are removed" and (2) removals must be in accordance with the provisions of the NVRA. *Id.* §§ 21083(a)(2)(A), (B).

North Carolina law incorporates these requirements. Section 163-82.11 requires the State Board to "update" the voter registration list to "meet the requirements of section 303(a)" of HAVA. N.C. Gen. Stat. § 163-82.11(c). Like HAVA's federal-law requirements, North Carolina law also requires voters who register by mail to present either a photo ID or another government document when they vote for the first time unless the State is able to validate their driver's license or social-security number beforehand. *Id.* § 163-166.12(a). Finally, state law directs the State Board to perform list maintenance and remove registered voters only in certain limited circumstances: (1) when the registrant requests, in writing, to the county board of elections to be removed; (2) when the registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or (3) when the county board of elections determines, through a separate statutory process, that it can no longer confirm where the voter resides. *Id.* § 163-82.1(c).

Starting with the 2023 municipal elections, North Carolina has imposed one further identification requirement on voters who seek to cast a ballot: At the time of voting, North Carolinians are required to present current and valid photo ID. *Id.* §§ 163-166.16, -166.40(c)(3), -230.1(f1). One

such acceptable photo ID is a North Carolina driver's license, but voters can also use passports, student ID cards, or military ID cards, among others. *Id.* § 163-166.16(a). If voters do not present a valid photo ID when voting, they may cast a provisional ballot, which is counted only if the registered voter fills out an ID-exception form or brings an acceptable form of photograph identification to the county board of elections prior to the board's canvass of the votes. *Id.* § 163-166.16(c)-(f).

## B. The National Voter Registration Act forbids the systematic removal of ineligible voters within 90 days of an election.

Both HAVA and North Carolina law require any list maintenance to be performed in accordance with the NVRA. 52 U.S.C. § 21083(a)(2)(A); N.C. Gen. Stat. § 163-82.14. Congress enacted the NVRA to eliminate "discriminatory and unfair registration laws and procedures" that have "a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3); *see also* S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278, at *3 (Leg. Hist.) (noting that the statute was necessary to combat "discriminatory and

unfair practices" that persisted in election administration notwithstanding the Voting Rights Act of 1965).

Consistent with those objectives, the NVRA provides for the removal of ineligible voters from the rolls, but demands that any systemic removals be completed "not later than 90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2)(A). After that date, voters may be removed only in limited circumstances: if the registrant requests to be removed, if State law requires removal due to "criminal conviction or mental incapacity," if the registrant dies, or to correct a registration record. *Id.* § 20507(a)(3)(A); -(a)(3)(B); -(a)(4)(A); -(c)(2)(B). This 90-day bar on systemic voter removals was enacted specifically to remedy the Nation's history of racially discriminatory voter purges. S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278, at *18 (Leg. Hist.) (noting that the process of voter removal "must be scrutinized" and "structured to prevent abuse which has a disparate impact on minority communities" to address the "long history of such list cleaning mechanisms [being] used to violate the basic rights of citizens").

## C.    A voter challenges the State's registration form.

For nearly two decades, the State Board used a voter-registration form that instructed applicants to provide their driver's license or social-security number, but did not clearly indicate that this information was required. J.A. 32.

On October 6, 2023, a voter raised this issue in a complaint filed with the State Board. The State Board subsequently ordered that the form be changed to indicate that voters must provide a driver's license or social-security number on the registration form, or check a box indicating that they do not have such numbers. J.A. 30, J.A. 32-33. The State Board declined, however, to take any action with respect to voters who had already been registered using the old form. J.A. 34. The State Board noted that, consistent with HAVA, "any voter who did not provide a driver's license number or the last four digits of a Social Security number" would have to provide additional documentation in the form of a current photo ID or other official document bearing their name and address. J.A. 33 n.4 (linking to the State Board's Dec. 2023 Order at 4-5); J.A. 174 (quoting this portion of the Order). As a result, the State Board explained, using the old form would not result in ineligible voters voting. J.A. 33 n.4 (linking to the

Dec. 2023 Order). And in any event, the State Board further explained, HAVA did not authorize, much less require, action to remove eligible voters. J.A. 33 n.4 (linking to the Dec. 2023 Order).

**D. Fewer than 90 days before the 2024 general election, Plaintiffs sue.**

Nearly a year after the voter raised this issue with the State Board—and more than two weeks after the NVRA deadline for the systematic removal of voters had passed—Plaintiffs filed this lawsuit in Wake County Superior Court on August 23, 2024.

Plaintiffs' lawsuit alleged that the State Board violated HAVA when it registered voters without their driver's license or social-security numbers and then failed to remove those voters from the rolls. Plaintiffs alleged violations of N.C. Gen. Stat. § 163-82.11(c) and Article I, Section 19 of the North Carolina Constitution. Plaintiffs sought a writ of mandamus and a mandatory injunction directing the State Board to "identify[] all ineligible registrants and remov[e] them from the state's voter registration lists." J.A. 40. In the alternative, if "such removal [was] not feasible" before September 6, 2024, Plaintiffs sought an order directing the State Board to require all individuals who filled out an application form without a driver's license or social-security number "to cast a provisional ballot in upcoming elections

pending Defendants' receipt and confirmation" of this information. J.A. 40-41.

### E. The district court dismisses Count One of Plaintiffs' complaint and declines to exercise supplemental jurisdiction over Count Two.

On September 23, the State Board removed this case from the state trial court to the U.S. District Court for the Eastern District of North Carolina. J.A. 7-13. The State Board then moved to dismiss the lawsuit for failure to state a claim under Fed. R. Civ. P. 12(b)(6). J.A. 307-309. Plaintiffs opposed the motion to dismiss and moved to remand the case back to state court. J.A. 485-500, J.A. 352-354.

On October 17—the first day of in-person early voting in North Carolina—the district court held a hearing and, later that day, issued an opinion resolving both motions. J.A. 559-602; *see* J.A. 5 (minute entry for October 17 hearing at docket number 57).

The district court began by setting out the "two possible paths to establishing subject matter jurisdiction in this action." J.A. 562. First, if Plaintiffs' claims raised a federal question under 28 U.S.C. § 1331, the State Board could remove the action to federal court under 28 U.S.C. § 1441(a). Second, the State Board could also remove if Plaintiffs' claims concerned the State Board's refusal "to do any act on the ground that it

would be inconsistent with" "any law providing for equal rights." 28 U.S.C.

§ 1443(2).

The district court started with arising-under jurisdiction. As the court explained, although Plaintiffs brought state-law claims, the Supreme Court has identified a "'special and small category' of state law claims that present a substantial question of federal law." J.A. 581 (quoting *Empire Healthchoice Assur. Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). Specifically, to establish federal jurisdiction over a state-law claim, a court must find that a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." J.A. 574 (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013))

The district court applied this framework to Plaintiffs' claims. The court held that Count One of Plaintiffs' complaint arose under federal law.

First, the court found that the "claim necessarily raise[d] an issue of federal law" because "'[t]o prevail on [their] claim, Plaintiffs 'must show that' Defendants failed to comply with Section 303(a) of HAVA." J.A. 577 (quoting *Gunn v. Minton*, 568 U.S. 251, 259 (2013)). The district court therefore held that "HAVA is 'an essential element' of Plaintiffs' state law

claim." J.A. 577 (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315 (2005)).

Second, the district court held that a federal issue was "actually disputed." Specifically, the court held that the disputed federal issue here was whether HAVA required the State Board to remove voters who registered without providing a driver's license or social-security number. J.A. 578-581.

Third, the district court held that this federal issue was substantial. Because the case implicated "an individual's capability to cast a vote, a fundamental right secured by the Fourteenth Amendment," the court found that "the federal interest is near its zenith." J.A. 583. In addition, the district court explained, Congress intended for HAVA to set uniform minimum election administration standards. J.A. 583. "[S]tate by state variations of interpretation about the scope of a state's obligations under HAVA" would undermine that uniformity. J.A. 583 (cleaned up). For that reason, the district court concluded that Count One "sensibly belongs in a federal court." J.A. 583 (citing *Grable*, 545 U.S. at 315).

Fourth, the district court held that exercising jurisdiction over Count One "would not disrupt the federal-state balance approved by Congress."

J.A. 591. The court reasoned that, because "Congress intended for federal courts to resolve core questions of statutory interpretation" involving HAVA, removal—rather than remand—best served Congress's intended division of labor between state and federal courts. J.A. 591.[2]

The district court reached a different conclusion with respect to Count Two, however. The district court acknowledged that "Defendants and the DNC [had] persuasive argued" that this claim raised the same disputed federal-law issue as Count One. J.A. 575 n.2. Nevertheless, the district concluded that it lacked federal question jurisdiction over the claim because exercising that jurisdiction would disrupt the division of labor between federal and state courts. J.A. 575. Specifically, the district court worried that exercising jurisdiction over Count Two would impair comity and force federal courts to regularly adjudicate disputes involving state constitutional provisions. J.A. 576-577.

---

[2]     Having concluded that it could exercise jurisdiction over Count One, the district court proceeded to reach the merits and dismiss for failure to state a claim.  First, the district court held that § 163-82.11(c) provided Plaintiffs with no private right of action.  J.A. 598.  Second, the court held that a mandamus remedy was unavailable to Plaintiffs because, among other things, mandamus requires "a clear legal right to relief" and, absent a private right of action, Plaintiffs could not make that showing.  J.A. 599.

The district court held that it did not have jurisdiction over Count Two under 28 U.S.C. § 1443(2) either. J.A. 597. That statute allows a state defendant to remove claims to federal court when the claims concern a state defendant's refusal "to do any act on the ground that it would be inconsistent" with "any law providing for equal rights." 28 U.S.C. § 1443(2). The State Board argued that Plaintiffs' requested relief—removing voters from the rolls less than 90 days before Election Day—would violate the NVRA. The court held that removal under § 1443(2) was available only if the *specific provision* of federal law that the State Board based its refusal on was "stated in terms of racial equality." J.A. 594 (quotation omitted). Because Section 20507(c)(2)(A)—the 90-day provision of the NVRA at issue here—"do[es] not mention race," the district court concluded, it was not a law "providing for equal rights" and therefore could not serve as a ground for removal under section 1443(2). J.A. 595-96.

Finally, the district court acknowledged that, because it had jurisdiction over Count One, it could have exercised supplemental jurisdiction under 28 U.S.C. § 1367 over Count Two. J.A. 591. But the district court declined to exercise supplemental jurisdiction over the claim

because "state courts should decide the scope and extent of state constitutional rights." J.A. 601-602.

Accordingly, the district court remanded Count Two to state court. J.A. 602. The district court stayed its remand order until October 22 to permit the parties time to appeal. J.A. 602.

The next day, on October 18, the State Board and the DNC appealed the district court's remand order. J.A. 675-677; J.A. 678-679. This Court consolidated the appeals, and the State Board and the DNC moved for a stay pending appeal. Dkts. 4, 5, 6. On October 21, this Court granted an administrative stay of the district court's order through noon on October 25. Dkt. 33. The Court later extended that stay through October 28. Dkts. 41. The Court has also entered an accelerated briefing schedule and set this case for argument on October 28. Dkt. 37.

## SUMMARY OF ARGUMENT

The district court erred in remanding Count Two of Plaintiffs' complaint to state court.

To begin, this Court has appellate jurisdiction to review the district court's entire remand order. Section 1447(d) ordinarily bars appellate review of remand orders. But when, as here, a defendant removes a case

under § 1443, an appellate court has jurisdiction to review "the whole" of a "district court's remand order—without any further qualification." *Mayor of Balt.*, 593 U.S. at 238-39; *see* 28 U.S.C. § 1447(d). The Court can therefore consider *both* the district court's conclusion that removal of Count Two was improper under § 1441(a) and its conclusion that removal was improper under the civil-rights removal statute, § 1443(2).

In the alternative, this Court has appellate jurisdiction because the district court expressly held that it had "original jurisdiction over" Count One and thus that it could exercise "supplemental jurisdiction over Count Two," if it so chose. J.A. 575. Section 1447(d) does not bar appellate review under these circumstances, so the full remand order is reviewable under § 1291. *See Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 640-41 (2009).

Exercising its appellate jurisdiction, this Court should reverse. Removal of Count Two was proper under two statutes.

First, Count Two arises under federal law and was therefore removable under § 1441(a). Count Two necessarily raises a disputed and substantial federal question about the interpretation of a federal statute, HAVA. The district court cited only one ground for rejecting removal under

§ 1441(a): that exercising federal-question jurisdiction over a state constitutional claim would disrespect state courts. But that gets the analysis backwards: it is *Congress's* intent regarding which courts should hear particular claims that a district court must respect. As the district court recognized when it concluded that Count One raised a federal question, Congress intended for federal courts to interpret HAVA. Thus, retaining jurisdiction over Count Two, which also requires construing HAVA, best respects Congress's intent.

Second, the civil-rights removal statute, § 1443(2), independently supplied the district court with jurisdiction over Count Two. When state officials are sued for refusing to take an action, and their refusal is based on a "law providing for equal rights," § 1443(2) allows the officials to remove the suit to federal court. Plaintiffs sued the State Board for refusing to purge hundreds-of-thousands of voters in the middle of an election. The NVRA, however, prohibits systematic voter purges fewer than 90 days before an election. Congress enacted that prohibition to eliminate racially discriminatory voter purges on the eve of an election. Thus, the State Board's refusal was based on a law providing for equal rights, and removal under § 1443(2) was proper.

Finally, even if the district court were correct that it lacked subject-matter jurisdiction over Count Two, it indisputably had supplemental jurisdiction over the claim. The district court's decision not to exercise that jurisdiction was an abuse of discretion, because the court failed to consider how resolving Count Two would promote judicial economy and allow expeditious resolution of this time-sensitive litigation.

For any of the reasons stated above, the district court should have retained jurisdiction over Count Two rather than remanding it to state court. This Court should reverse the district court's remand order.

## ARGUMENT

### Standard of Review

This Court reviews issues of subject-matter jurisdiction, including removal, de novo. *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 279 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 87 (2022).

This Court "review[s] a district court's decision to decline to exercise supplemental jurisdiction over state-law claims for abuse of discretion." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024).

### Discussion

This Court has appellate jurisdiction to review the district court's entire remand order, including the court's conclusion that it lacked original

jurisdiction over Count Two of Plaintiffs' complaint. Exercising that jurisdiction, this Court should reverse.

The State Board properly removed Count Two on two independent grounds. First, because that claim necessarily raises a substantial and disputed federal question, removal was proper under § 1441(a). Second, because Plaintiffs sued the State Board for refusing to take an act inconsistent with a civil-rights statute, the State Board properly removed under § 1443(2). Because the district court erroneously rejected removal under both statutes, this Court should reverse the district court's remand order and direct the court below to decide the motion to dismiss Count Two.

## I. This Court Has Appellate Jurisdiction To Consider Whether the District Court Had Original Jurisdiction Over Count Two.

This Court asked the parties to address whether it has "jurisdiction to consider whether the district court possessed original jurisdiction" over Count Two under 28 U.S.C. § 1331. It does, for two independent reasons.

### A. This Court has appellate jurisdiction over the entire remand order under § 1447(d).

First, although remand orders are typically not appealable, § 1447(d) establishes a clear exception. That provision reads:

> An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was

removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

28 U.S.C. § 1447(d). The Supreme Court has explained that § 1447(d) "allow[s] appellate review for cases 'removed pursuant to' 28 U.S.C. § 1443." *Mayor of Balt.*, 593 U.S. at 235 (quoting 28 U.S.C. § 1447(d)).

The order at issue here plainly falls within the scope of this exception: It is a "formal command" "remanding a case to the State court from which it was removed." *Mayor of Balt.*, 593 U.S. at 237; 28 U.S.C. § 1447(d); J.A. 602 ("[T]he court exercises its inherent authority to REMAND Count Two to state court."). And the State Board removed the case pursuant to § 1443, as it explained in its removal petition and other papers below. *Mayor of Balt.*, 593 U.S. at 237; J.A. 8; J.A. 591 ("Defendants also offer Section 1443(2) as an alternative basis for removal."). Under the plain terms of § 1447(d), then, this Court has appellate jurisdiction to review the remand order below.

That appellate review, moreover, can extend to "each and every one" of the Board's original "grounds for removal." *Mayor of Balt.*, 593 U.S. at 237. That was the key lesson the Supreme Court imparted in *Mayor of Baltimore*. There, the defendant energy companies had removed a case from state court pursuant to several different federal statutes. *Id.* at 234-

24

35. One of those statutes was 28 U.S.C. § 1442, the other removal statute that—in addition to § 1443—triggers § 1447(d)'s appellate exception. *Mayor of Balt.*, 593 U.S. at 234-35; 28 U.S.C. § 1447(d). After the district court remanded, the energy companies appealed. "[T]his much everyone seemed to agree they were free to do," given the clear exception set forth in § 1447(d)'s plain text. *Mayor of Balt.*, 593 U.S. at 236. But the parties disagreed about the scope of the companies' appeal—and, more specifically, whether an appellate court could review "only the *part* of the district court's remand order discussing § 1442," or rather the entire order. *Id.* The Supreme Court held the latter. *Id.* at 246-47. As that Court explained, § 1447(d) "does not contain any . . . language . . . limiting appellate review *solely* to issues under § 1442 or § 1443." *Id.* at 238-39. Thus, the Court held, when a defendant removes a case under § 1442 or § 1443, "§ 1447(d) permits appellate review" of "the whole" of a "district court's remand order—without any further qualification." *Id.*

Applied here, the *Baltimore* rule makes clear that this Court has appellate jurisdiction to review the *entire* remand order. *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 306 (4th Cir. 2021) (under *Baltimore*, this Court has "jurisdiction to review the entire remand order and can consider

all of the [defendant's] arguments supporting jurisdiction that were addressed in that order"). Thus, if the district court erred in analyzing whether either § 1441 *or* § 1443 provides an appropriate basis for removal, this Court can and should reverse.

The fact that the remand order was also based, in part, on the trial court's decision not to exercise supplemental jurisdiction does not change this conclusion. Section 1447(d) permits appeal from *any* "order remanding a case," so long as § 1443 was one of the defendant's grounds for removal. In other words, the statute is agnostic about why the case is *remanded*. It matters only why the case was *removed*.[3] Here, because the State Board cited § 1443 as one of its grounds for removal, this case falls within the exception set forth in § 1447(d), and this Court has appellate jurisdiction to consider the remand order in full.

---

[3] This approach makes sense. The whole point of § 1443(2) is to ensure a federal forum is available to protect against civil-rights violations. Section 1447(d), in turn, is intended to bolster that protection, by ensuring that when district courts reject a § 1443(2) removal, their decisions can be reviewed. Immunizing any remand order that involves a declination to exercise supplemental jurisdiction would dramatically narrow the scope of these protections, a result Congress surely could not have intended.

## B. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

This Court has jurisdiction for a separate and independent reason. Although the first clause of § 1447(d) seems to impose a broad prohibition against appellate review of remand orders, the Supreme Court has construed the clause more narrowly. In *Thermtron Products, Inc. v. Hermansdorfer*, the Supreme Court explained that § 1447(d) must be read "in pari materia" with the preceding subsection, § 1447(c). 423 U.S. 336, 345-46 (1976); *see also Carlsbad*, 556 U.S. at 638. Interpreted in that light, the Court said, the prohibition in § 1447(d) could be understood to bar appellate review only when a remand order is premised on one of the grounds set forth in § 1447(c). *Thermtron Prods.*, 423 U.S. at 349-52.

The primary ground identified in § 1447(c) is a lack of subject-matter jurisdiction.[4] Hence, under *Thermtron*, if a federal court remands a case to state court for lack of subject-matter jurisdiction, that remand order is not subject to appeal. *See* 423 U.S. at 345-46; *Carlsbad*, 556 U.S. at 638. If,

---

[4]    Section 1447(c) also permits remand for procedural defects identified within 30 days of removal. Section 1447(d) thus precludes appellate review of orders remanding for procedural defects as well. *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 129 (1995). But that basis has no relevance to this case because the district court did not remand Count Two because of procedural defects (nor have Plaintiffs identified any).

however, a federal court concludes that it *has* subject-matter jurisdiction, but remands for some other reason, *Thermtron* teaches that the appellate prohibition set forth in § 1447(d) simply does not apply. 423 U.S. at 346; *see also In re Blackwater Sec. Consulting*, 460 F.3d 576, 583 (4th Cir. 2006) ("[T]he Supreme Court has interpreted § 1447(d) to prohibit review only when the order of remand was based upon § 1447(c), which requires remand when the district court determines that it lacks subject matter jurisdiction.").

The Supreme Court illustrated this rule in application in *Carlsbad*. There, the plaintiff filed a lawsuit, alleging that the defendant "had violated state and federal law in connection with a patent dispute." *Carlsbad*, 556 U.S. at 636. The defendant removed the case on the basis that it included "at least one claim over which the federal district court ha[d] original jurisdiction." *Id.* (citing 28 U.S.C. § 1441(c)). The district court agreed with the defendant and found that it had original jurisdiction over the sole federal claim. *Id.* But the district court went on to dismiss the single federal claim under Rule 12(b)(6). *Id.* at 637. Having dismissed the sole federal claim, the district court declined to exercise supplemental

jurisdiction over the remaining state law claims and remanded those claims to state court. *Id.*

Applying *Thermtron*, the Supreme Court held that appellate review of the remand order was available. *Id.* at 638, 641. Because the district court had indisputably found that it had subject-matter jurisdiction over the federal claim prior to dismissing it, the remand order could not be understood to be "based on a lack of subject-matter jurisdiction." *Id.* at 640-41. Rather, the remand order reflected the court's "discretionary choice not to hear the [state-law] claims despite its subject-matter jurisdiction over them." *Id.* at 640. Such an order, the Supreme Court held, did not fall within the appellate prohibition set forth in § 1447(d). *Id.* at 641.

The same analysis applies in this case and confirms this Court's appellate jurisdiction. The court below expressly held that it had "original jurisdiction over" Count One and thus that it could exercise "supplemental jurisdiction over Count Two." J.A. 575. The district court simply decided, in its discretion, not to do so. That discretionary decision does not trigger "the bar to appellate review created by §§ 1447(c) and (d)." *Carlsbad*, 556 U.S. at 641.

The upshot of all of this is that even if the State Board's removal of this case were not based on § 1443, this Court would still have appellate jurisdiction to review the remand order below. Because the district court found that Count One involved a federal question, its remand order, by definition, was not premised on any lack of subject-matter jurisdiction. Under Supreme Court precedent, that means that the remand order is treated just like any other final order under 28 U.S.C. § 1291 and can be appealed immediately upon entry. *See Carlsbad*, 556 U.S. at 638-39.

*       *       *

In sum, 28 U.S.C. § 1447(d) does not preclude—and in fact permits—this Court's review of the district court's entire remand order, including that court's determination that it lacked original jurisdiction over Count Two under 28 U.S.C. § 1331.

## II. The District Court Wrongly Held That Count Two Did Not Arise Under Federal Law.

The State Board properly removed Count Two under 28 U.S.C. § 1441(a) because the claim arises under federal law. Generally, § 1441(a) allows a defendant to remove any claim over which a federal district court would have original jurisdiction. Congress gave federal courts original

jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* § 1331.

Claims most often arise under federal law when federal law supplies the plaintiff's cause of action. *Old Dominion*, 24 F.4th at 279. But a suit that contains only state-law claims can also "arise under" federal law, so long as vindication of the alleged state-law right "turn[s] on some construction of federal law." *Id.* at 280 (alteration in original). This doctrine "captures the commonsense notion that a federal court ought to be able to hear claims" that raise substantial federal questions that would likely benefit from "the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

In *Gunn v. Minton*, 568 U.S. 251 (2013), the Supreme Court held that a state-law claim "arises under" federal law if it raises a federal issue that meets four requirements. Specifically, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal state balance approved by Congress." *Old Dominion*, 24 F.4th at 280 (quoting *Gunn*, 568 U.S. at 258). Applying that

test here, Count Two plainly arises under federal law. The district court

erred in concluding otherwise.

**A.    Count Two necessarily raises a disputed and substantial federal question that should be resolved by a federal court.**

Although Plaintiffs bring Count Two under the North Carolina

Constitution, the claim nevertheless arises under federal law. It satisfies

all four elements under *Gunn*.

*First*, Count Two necessarily raises a federal issue. *See* J.A. 575 n.2

("At the October 17 hearing, Defendants and the DNC persuasively argued

that Count 2 involves the same disputed issues pertaining to HAVA as

Count One."). A claim necessarily raises a federal issue when one or more

of its elements of the claim "rise[s] or fall[s] on the resolution of a question

of federal law." *Old Dominion*, 24 F.4th at 280 (citation omitted).

Plaintiffs' second claim under Article I, section 19 of the North

Carolina Constitution necessarily turns on a construction of HAVA.

Plaintiffs allege, that the State Board failed to "maintain the state's voter

rolls in a manner compliant with Section 303(a) of HAVA" by refusing to

remove voters who registered using a form that did not clearly require their

driver's license or social-security number. J.A. 39-40. According to

Plaintiffs, the State Board's failure to remove those voters means that hundreds of thousands of illegitimate voters remain on the State's rolls, diluting the power of Plaintiffs' voters and violating the North Carolina Constitution. J.A. 39-40. But the State Board's refusal to remove those voters is unlawful *only if* Plaintiffs are correct that HAVA requires it. Thus, whatever court ultimately evaluates Plaintiffs' constitutional claim will necessarily first have to construe HAVA.

*Second*, the federal question that Count Two raises—whether HAVA requires the State Board to remove the voters at issue or require them to submit a provisional ballot—is actually disputed. *See* J.A. 575 n.2. Plaintiffs believe that HAVA requires the State Board to remove those voters. But, as Plaintiffs acknowledge, the State Board has consistently taken the position that HAVA neither requires nor authorizes such action. *See* J.A. 34. Instead, HAVA allows voters who register without providing a driver's license or social-security number to lawfully vote, so long as they provide poll workers "a current and valid photo identification" or current official document bearing their name and address. *See* 52 U.S.C. § 21083(b). Because the State Board maintains that HAVA does not require purging voters from the rolls or demanding provisional ballots from these

eligible voters, the key federal question raised by this suit is actually disputed.

*Third*, this disputed federal question is "importan[t] . . . to the federal system as a whole" and therefore substantial. *Gunn*, 568 U.S. at 260. To start, as the district court recognized, resolution of this issue will have considerable impact on federal elections in North Carolina and, potentially, elsewhere. J.A. 583. Here in North Carolina, where statewide races have been decided by mere *hundreds* of votes,[5] a decision to kick nearly a quarter-of-a-million North Carolinians off the rolls could have stark consequences. And it could also influence whether other States are required to remove voters from their rolls for similar reasons. An issue with such a wide-ranging impact on the "fundamental right[s]" of voters across the country is "substantial" under any conventional understanding of that word. J.A. 583. Indeed, as the district court rightly put it, because of the magnitude of the "federal interest in protecting the right to vote *and* in

---

[5]     *State Board Certifies Supreme Court Contest, Removes County Board Member During Final Meeting of 2020*, N.C. State Bd. of Elections (Dec. 18, 2020), *available at* https://www.ncsbe.gov/news/press-releases/2020/12/18/state-board-certifies-supreme-court-contest-removes-county-board-member-during-final-meeting-2020.

ensuring the integrity of elections," the federal interest in this case "is near its zenith." J.A. 583.

The question is "substantial" for at least two more reasons. One is that it concerns the interpretation of a federal statute designed to promote national uniformity. *See Gunn*, 568 U.S. at 261 (explaining that a federal issue embedded in a legal malpractice claim involving a patent was not substantial because the question did not "undermine 'the development of a uniform body of [patent] law'" (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989)) (alteration in original)). Uniformity is the entire point of Section 303 of HAVA. In fact, Section 303 is located within Title III of HAVA, which is titled "Uniform and Nondiscriminatory Election Technology and Administration Requirements." *See* Help America Vote Act of 2002, Pub. L. No. 107-252, § 303, 116 Stat. 1666, 1704, 1708 (2002). Congress's desire for uniform minimum standards in election administration makes construction of those standards a substantial federal question. *See* J.A. 583 (explaining that "state by state variations of interpretation about the scope of a state's obligations under HAVA and the NVRA creates the risk of horizontal disuniformity and would thereby undermine the very devices that Congress created to ensure a uniform

national system of voter registration and election administration" (cleaned up).

The other is that any interpretation of HAVA may impact actions brought by federal enforcers. *See Grable*, 545 U.S. at 315 (holding that the proper interpretation of federal tax law was a substantial federal question because "[t]he [federal] Government . . . has a direct interest in the availability of a federal forum to vindicate its own administrative action"). How the courts construe HAVA will undoubtedly impact federal enforcement actions, given that it is the U.S. Attorney General who is tasked with enforcing the very section of HAVA about which Plaintiffs and the State Board disagree. 52 U.S.C. § 21111 (giving the Attorney General authority to enforce the requirements of 52 U.S.C. § 21083); J.A. 34 (alleging the State Board violated § 21083(a)(2)).

*Fourth*, exercising federal jurisdiction here would not upset Congress's approved balance between state and federal courts. This prong requires asking whether there is a good reason for a district court to "shirk from federal jurisdiction"—for instance, because Congress evidenced an intent for the removed claims to be heard in state court or because extending federal jurisdiction to the claim would open federal jurisdiction

to a "horde of original filings and removal cases" involving state-law claims. *Grable*, 545 U.S. at 318-19, 320.

There is no reason for the district court to "shirk" its jurisdiction here. As the district court correctly noted when recognizing its jurisdiction over Count One, Congress intended for federal courts to interpret HAVA. J.A. 591 (highlighting that HAVA directs enforcement claims brought by the Attorney General to federal court). Thus, resolving this case in a federal forum best respects Congress's intended division of labor between state and federal courts. Recognizing jurisdiction in this case would not threaten to open the floodgates to removal cases involving state-law claims either. After all, few state claims—particularly state-constitutional claims—turn on such an explicit and exclusive invocation of federal law.

In short, for all the same reasons the district court found removal of Count One to be proper under § 1441(a), removal of Count Two was proper as well.

## B. The district court erred by concluding that resolving Count Two would disrupt the balance between state and federal courts.

The district court acknowledged that the State Board "persuasively argued that Count 2 involves the same disputed issues pertaining to HAVA

as Count One." *See* J.A. 575 n.2. But it nevertheless found that it lacked jurisdiction because it believed that exercising federal jurisdiction over a state-constitutional claim would disrupt Congress's preferred balance between state and federal courts. That is not correct.

First, the district court was wrong to suggest that federal question jurisdiction can *never* lie when a plaintiff brings a state-constitutional claim. No decision by the Supreme Court or this Court compels that conclusion. To the contrary, federal question jurisdiction may exist, for example, over state-constitutional claims that turn on constructions of federal law. *See Bracey v. Bd. of Educ.*, 368 F.3d 108, 116 (2d Cir. 2004) ("Whether [Plaintiff] recovered because the Board violated his right . . . under the United States Constitution or the Connecticut Constitution, or both . . . does not matter. In any case, a federal question was implicated").

Of course, a district court should take seriously principles of comity and federalism. But the district court would not have threatened those principles by resolving Count Two. For one thing, resolving Count Two might not even require resort to North Carolina law. As the district court acknowledged, Count Two hinges on HAVA. If HAVA does not require the State Board to remove voters who registered without a driver's license or

social-security number, Count Two fails before the court ever gets to the North Carolina Constitution. In fact, the allegation that the State Board violated HAVA is the *only* concrete element of Count Two. Although two months have passed since Plaintiffs filed their complaint, they have yet to actually articulate a theory supporting a constitutional violation. If their theory really is vote dilution, the North Carolina Supreme Court has already ruled that claim fails. *Harper v. Hall*, 886 S.E.2d 393, 364 (N.C. 2023) ("Under our constitution, a claim of vote dilution allegedly based on one's affiliation with a political party does not raise a claim under our equal protection clause.") And that leads to a final point: even if the district court did have to interpret Article I, section 19, that provision is "not a new or obscure one." *Isaac v. N.C. Dep't of Transp.*, 192 F. App'x 197, 199 (4th Cir. 2006). To the contrary, "North Carolina courts have repeatedly interpreted it." *Id.* at 199-200.

Second, the district court ignored Congress's intent that federal courts interpret HAVA—even though the district court relied on that intent to conclude that Count One belonged in federal court. The district court acknowledged that HAVA's text evinced Congress' intent that "federal courts . . . resolve core questions of statutory interpretation" involving

HAVA. J.A. 591. But for reasons the district court never explained, it gave that intent no weight in the context of Count Two.

Finally, the district court misapplied *Grable* when assessing the likelihood that recognizing jurisdiction over Count Two would result in "a horde" of new removal cases. The district court feared that, because parties often bring state constitutional claims, resolving Count Two would make federal courts susceptible to a flood of new suits. But *Grable* did not ask whether the plaintiff's state-law cause of action was frequently brought. Rather, it asked whether the plaintiff's state-law cause of action would frequently "involve[] contested issues of federal law." 545 U.S. at 319 ("[I]t is the rare state quiet title action that involves contested issues of federal law.").

Properly framed, it is apparent that resolving Count Two would not threaten "the normal currents of litigation." *Id.* Although state-constitutional claims are common, state-constitutional claims based on violation of a statute that so completely and exclusively invokes federal law are exceptionally rare.

## III. The District Court Wrongly Held That the Civil-Rights Removal Statute Does Not Apply.

The State Board also properly removed Count Two under the civil-rights removal statute, 28 U.S.C. § 1443(2). That statute permits a state official to remove to federal court any suit brought against the official "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." 28 U.S.C. § 1443(2). Here, Plaintiffs demand that the State Board remove hundreds of thousands of eligible voters from the State's voter rolls in the middle of a general election. The State Board has refused to do that, in part because Congress has banned the systematic removal of registered voters fewer than 90 days before a federal election, after recognizing such purges often have a racially discriminatory effect. *See* 52 U.S.C. § 20507(c)(2)(A). Under these circumstances, removal under § 1443(2) is proper. The district court erred in concluding otherwise.

### A. The State Board properly removed Count Two under the civil-rights removal statute.

There is no dispute over most of the elements for § 1443(2) removal. Plaintiffs concede that the State Board's members are state officials who enforce state election laws. *See* J.A. 27 ("[The State Board] is tasked with ensuring that elections in North Carolina comply with all relevant state

and federal laws . . . ."); J.A. 27-28 (suing State Board's members and Executive Director "in [their] official capacity"). And Plaintiffs further acknowledge that the State Board is refusing to purge voters from the State's voter rolls, as Plaintiffs would have them do. *See* J.A. 23-24, J.A. 26, J.A.35-36, J.A. 38-40.

The only disputed question, then, is whether the State Board has refused to purge voters "on the ground that it would be inconsistent" with a "law providing for equal rights." 28 U.S.C. § 1443(2). The answer is yes.

The State Board's refusal to engage in a mass voter purge in the middle of a federal election is grounded in the agency's view that any such purge would violate the NVRA. The NVRA requires the State Board to carry out any plan to "systematically remove" ineligible voters from the rolls "not later than 90 days prior to the date of a primary or general election." 52 U.S.C. § 20507(c)(2)(A). Congress imposed this "quiet period" because "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Congress thus has barred late-breaking removals that are not based on "individual correspondence or rigorous individualized inquiry," because the period

right before an election is "when the risk of disenfranchising eligible voters is the greatest." *Id.* at 1346; *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *6 (M.D.N.C. Aug. 7, 2018).

Removing hundreds of thousands of voters en masse, as Plaintiffs propose here, would undoubtedly constitute a systematic removal. *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *6 (M.D.N.C. Aug. 7, 2018); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) (holding that proposed removal, coupled with notice to voter, was not an individualized inquiry). This year, the NVRA cutoff was August 7, more than two weeks before Plaintiffs filed their Complaint. Thus, even if HAVA would ordinarily require the State Board to remove the voters that Plaintiffs have identified from the rolls (a reading of HAVA the State Board disputes), the NVRA would nevertheless bar the State Board from doing so until after the election.

All that remains, then, is resolving whether the NVRA is a "law providing for equal rights." 28 U.S.C. § 1443(2). It is. For purposes of § 1443(2), a "law providing for equal rights" is a law that concerns racial

equality. *Vlaming*, 10 F.4th at 309 (citing *Georgia v. Rachel*, 384 U.S. 780, 792 (1966)). As long as one of the core objectives of the relevant Act is to advance racial equality, § 1443(2) removal is available, even if the specific statutory provision that motivated the state official's refusal does not expressly discuss race. *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (permitting § 1443 removal where defendants relied on the Voting Rights Act provisions that protect those assisting others in registering to vote); *O'Keefe v. N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 979-80 (S.D.N.Y. 1965) (permitting § 1443(2) removal where defendant refused to reinstate a literacy test because doing so would violate the Voting Rights Act); *New Haven Firefighters Loc. 825 v. City of New Haven*, 120 F. Supp. 3d 178, 183-84, 205-06 (D. Conn. 2015) (permitting § 1443 removal of a claim based on Title VII's provision barring retaliation against employees who "opposed . . . unlawful employment practice[s]") (quoting 42 U.S.C. § 2000e-3(a)).

One of the central purposes of the NVRA is to promote racial equality. Its opening provisions expressly state that the law was enacted to eliminate "discriminatory and unfair registration laws and procedures" that "have a direct and damaging effect on voter participation in elections

for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). The NVRA's legislative history confirms that Congress enacted the statute to combat racial discrimination. The statute's Senate Report[6] explained that the legislation was necessary in part because some "discriminatory and unfair practices" persisted in election administration, notwithstanding the Voting Rights Act of 1965. S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278 at *3 (Leg. Hist.).

Accordingly, the NVRA—including the 90-day quiet-period provision—is a law providing for equal rights that supports this case's removal.

### B. The district court's narrow reading of the civil-rights removal statute is not supported by law.

The district court denied removal under 28 U.S.C. § 1443(2) notwithstanding the fact that one of the NVRA's purposes was to eliminate racially discriminatory election-administration practices. According to the district court, a state official cannot invoke the civil-rights removal statute

---

[6] This Court has previously turned to the NVRA's Senate Report for guidance about the statute's meaning. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021).

unless the specific subsection on which the official relies is explicitly "stated in terms of racial equality." That conclusion was mistaken for two reasons.

First, the district court's cramped reading of § 1443(2) is not supported by law. To start, it is atextual. Section 1443 allows state officials to remove claims when they have refused to act on the ground that acting would be inconsistent with "*any law* providing for equal rights." 28 U.S.C. § 1443 (emphasis added). That language is broad. "Any law" could just as plausibly be understood to refer to the NVRA as a whole as to the specific systematic-removal provision. In other words, nothing in the text of § 1443(2) seems to require a state official to invoke a specific civil-rights provision within a civil-rights act, as opposed to invoking the civil-rights act more generally.

The district court held otherwise because it understood the Supreme Court's decision in *Georgia v. Rachel* to require that a state official's refusal be based on a specific subsection that is "stated in terms of racial equality." J.A. 595. Respectfully, that is not what *Rachel* says. To be sure, *Rachel* rejected removal based on civil-rights laws that have nothing to do with racial equality. 384 U.S at 792. But *Rachel* did not hold that the specific

provision that prohibits a state official from taking an act must expressly mention race for removal under § 1443(2) to be proper. Instead, it merely required that the "basis for removal" be a law addressing *racial* equality, as opposed to some other form of equality. *Id.* at 792-93 (internal quotations omitted).

*City of Greenwood v. Peacock*, which the Supreme Court decided on the same day as *Rachel*, confirms as much. There, the Supreme Court concluded that 52 U.S.C. § 10101(b)—a provision within the Civil Rights Act—was a law concerning racial equality that supported removal to federal court under § 1443. 384 U.S. 808, 825 & nn. 3 & 24 (1966) (citing 42 U.S.C. § 1971(b), the prior location in the U.S. Code of that provision). That provision reads, "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose." *Id.* (quoting 52 U.S.C. § 10101(b)). Like the systematic-removal provision, this specific provision makes no mention of racial equality. But that was of little moment to the Supreme Court. Because the Civil Rights Act, as a whole, is a law that concerns racial equality, § 10101(b) can qualify as a "law

providing for equal rights." This conclusion disproves the district court's theory. If *Rachel* meant to circumscribe § 1443 to just those statutory provisions expressly mentioning race, the Court's decision in *Peacock* would make little sense.

The district court's reading has also been rejected by several other courts. In *Whatley*, for instance, the Fifth Circuit followed the analysis in *Peacock* and found removal to be proper under § 1443 where the defendants also invoked 52 U.S.C. § 10101(b). 399 F.2d at 524, 526 (holding that § 10101(b) is "a right under a law providing for equal civil rights."). Likewise, in *New Haven Firefighters Local 825*, the district court permitted removal under § 1443 based on a provision of the Civil Rights Act that forbids employment retaliation generally, but does not explicitly provide for racial equality. 120 F. Supp. 3d at 183-84, 205-06.

Finally, adopting the district court's reading would produce incongruous results. Consider literacy tests. Federal law prohibits the use of "any literacy test as qualification for voting in any election" unless the test is in writing and given to all voters. 52 U.S.C. § 10101(a)(2)(C). The prohibition on literacy tests is framed in generally applicable terms, not "stated in terms of racial equality." *New Haven Firefighters*, 120 F. Supp.

3d at 183-84 (quoting *Johnson v. Mississippi*, 421 U.S. 213, 219 (1975)).

The specific statutory provision prohibiting literacy tests is housed in a

section titled "Race, color, or previous condition not to affect right to vote."

52 U.S.C. § 10101(a). But under the district court's analysis, that

overarching purpose would be insufficient to support § 1443 removal. J.A.

593. Thus, under the district court's framework, federal law's prohibition

on literacy tests—among the most famous of laws advancing racial

equality, at least in the elections context—would not be a "law providing for

equal rights" for purposes of § 1443. That simply cannot be the case, as at

least one court to have considered the issue concluded. *See O'Keefe v.

N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 979-80 (S.D.N.Y. 1965)

(permitting § 1443(2) removal where defendant refused to reinstate a

literacy test requirement because doing so would violate the Voting Rights

Act).

Second, even if the district court were correct that the specific

statutory provision, rather than the law at large, must address racial

discrimination, it still erred in concluding that § 20507(c)(2)(A) does not

satisfy that test. The district court ignored that Congress enacted the 90-

day quiet period specifically to remedy our Nation's abhorrent history of

racially discriminatory voter purges. The NVRA's Senate Report shows that Congress was aware that voter-list cleaning programs had a "long history" of being "used to violate the basic rights of citizens." S. Rep. 103-6, S. Rep. No. 6, 103rd Cong., 1st Sess. 1993, 1993 WL 54278 at *18 (Leg. Hist.). For that reason, Congress believed it was necessary to "scrutinize[]" removal procedures to ensure they are "structured to prevent abuse which has a disparate impact on minority communities." *Id.* The NVRA—and the 90-day quiet period in particular—are unequivocally laws intended to promote racial equality.

Third, the district court was wrong to hold that, because the NVRA has many purposes—only one of which is the promotion of racial equality—it cannot form a proper basis for § 1443 removal. J.A. 594. Neither the Supreme Court, nor any other court, has required that the basis for removal must be a statute that has no purpose other than racial equality. In fact, the courts that have allowed removal under § 1443 have done so based on provisions of the Voting Rights Act and the Civil Rights Act, which each have many purposes beyond the promotion of racial equality alone. *See, e.g.*, *Peacock*, 384 U.S. at 825; *O'Keefe*, 246 F. Supp. at 979-80.

That characteristic has never prevented those seminal civil-rights laws from forming the basis for § 1443 removal.

## IV. The District Court Abused Its Discretion by Declining to Exercise Supplemental Jurisdiction.

Even if the district court lacked original jurisdiction over Count Two, remand was nevertheless improper. Instead, the district court should have exercised supplemental jurisdiction over that claim. While district courts normally enjoy wide latitude to decide whether to exercise supplemental jurisdiction, this case presents the unusual circumstance where this Court should reverse the district court's decision not to do so.

When a district court has original jurisdiction over one or more claims in an action, it has supplemental jurisdiction over any other claim that "form[s] part of the same case or controversy" as the claim over which the district court has original jurisdiction. 28 U.S.C. § 1367(a). A district court may decline supplemental jurisdiction over a claim that (1) "raises a novel or complex issue of State law," (2) "substantially predominates over" the federal claims, (3) is the only claim remaining, or (4) poses other exceptionally compelling reasons for declining jurisdiction. *Id.* § 1367(c). But when deciding whether to decline jurisdiction, the district court should consider whether "the values of judicial economy, convenience, fairness,

and comity" favor retaining jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Here, the district court was wrong to remand the second claim where it had already exercised jurisdiction over a federal-law claim and judicial economy and convenience to the parties favored retaining jurisdiction. Even if the court were correct that it did not have original jurisdiction over the state equal-protection claim, that claim is so intertwined with the facts and legal issues raised in the first, that considerations of judicial economy should have compelled the court to exercise jurisdiction over that claim. *See Ketema v. Midwest Stamping, Inc.*, 180 F. App'x 427, 428 (4th Cir. 2006) (vacating dismissal of state-law claims, in part, because it would be a waste of judicial resources to refile a suit based on same facts in state court); *see also Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (exercising jurisdiction was appropriate where the pendent claim was based on same set of facts but did not meet the federal amount-in-controversy requirements). Indeed, the district court itself acknowledged that Count Two likely "involves the same disputed issues pertaining to HAVA as Count One." J.A. 575 n.2.

Judicial economy especially favors retaining jurisdiction here, where the federal district court is the only court that has *any* familiarity with the case. *See Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 297 (4th Cir. 2003) (district court was correct to keep state-law claims after federal claims had been dismissed because the court was already familiar with the facts and issues); *Shanaghan*, 58 F.3d at 112 (taking into consideration the time the district court had spent on the issues to find exercise of jurisdiction appropriate). North Carolina's state courts have no familiarity with this matter because although Plaintiffs filed this case in state court at the end of August, they did nothing to engage the state court on the substance of the claims. In these circumstances, where the federal court has the most familiarity with the claims raised, even if they arise under state law, it is appropriate for the federal court to retain jurisdiction.

The interests in judicial economy are even more urgent in this case because of the ongoing election. Plaintiffs have leveled belated and baseless—but extremely serious—allegations against the State Board, mere weeks before Election Day. *See* Dkt. 6 at 12. The public interest demands swift resolution of the issues so that North Carolina voters can confidently cast their ballots. The district court recognized as much when it

granted the State Board's motion to expedite its motion to dismiss. J.A. 350-351. Retaining jurisdiction would be most efficient under normal circumstances; here, it is imperative.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court's order remanding Count Two to state court and direct the district court to promptly resolve the State Board's motion to dismiss that claim.

Respectfully submitted,

/s/ Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General & General Counsel
N.C. State Bar No. 56896
SBoyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar No. 57032
SNarasimhan@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar No. 55175
SMoore@ncdoj.gov

Marc D. Brunton
General Counsel Fellow
N.C. State Bar No. 60789
MBrunton@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for State Board Defendants-Appellants*

October 23, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) in that it contains no more than 13,000 words as indicated by Word, the program used to prepare the brief. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a 14-point, proportionally spaced typeface.

/s/ Sarah G. Boyce
Sarah G. Boyce

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

/s/ Sarah G. Boyce
Sarah G. Boyce

**ADDENDUM**

**Addendum Page(s)**

28 U.S.C. § 1441 ........................................................Addendum-2

28 U.S.C. § 1443 ........................................................Addendum-3

28 U.S.C. § 1447 ........................................................Addendum-4

52 U.S.C. § 20501 ......................................................Addendum-6

52 U.S.C. § 20507 ......................................................Addendum-7

52 U.S.C. § 21083 ......................................................Addendum-10

N.C. Gen. Stat. § 163-82.11 ......................................Addendum 15

# United States Code

## Title 28.

## Judiciary and Judicial Procedure.

## Part IV.

## Jurisdiction and Venue.

## Chapter 89.

## District Courts; Removal of Cases from State Courts.

### § 1441.  Removal of civil actions

(a)    Generally

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

. . .

# United States Code

## Title 28.

## Judiciary and Judicial Procedure.

## Part IV.

## Jurisdiction and Venue.

## Chapter 89.

## District Courts; Removal of Cases from State Courts.

### § 1443.  Civil rights cases

Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

(1)    Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

(2)    For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law.

# United States Code

## Title 28.

## Judiciary and Judicial Procedure.

## Part IV.

## Jurisdiction and Venue.

## Chapter 89.

## District Courts; Removal of Cases from State Courts.

### § 1447.  Procedure after removal generally

(a)    In any case removed from a State court, the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise.

(b)    It may require the removing party to file with its clerk copies of all records and proceedings in such State court or may cause the same to be brought before it by writ of certiorari issued to such State court.

(c)    A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the

clerk to the clerk of the State court. The State court may thereupon proceed with such case.

(d)     An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

(e)     If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

# United States Code

## Title 52.

## Voting and Elections.

## Subtitle II.

## Voting Assistance and Election Administration.

## Chapter 205.

## National Voter Registration.


### § 20501.  Findings and purposes

(a)    Findings

The Congress finds that--

(1)    the right of citizens of the United States to vote is a fundamental right;

(2)    it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3)    discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

. . .

# United States Code

## Title 52.

## Voting and Elections.

## Subtitle II.

## Voting Assistance and Election Administration.

## Chapter 205.

## National Voter Registration.

**§ 20507. Requirements with respect to administration of voter registration**

   (a)   In general

      In the administration of voter registration for elections for Federal office, each State shall--

      . . .

      (3)   provide that the name of a registrant may not be removed from the official list of eligible voters except--

            (A)   at the request of the registrant;

            (B)   as provided by State law, by reason of criminal conviction or mental incapacity; or

            (C)   as provided under paragraph (4);

      (4)   conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

(A)   the death of the registrant; or

(B)   a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

. . .

. . .

(c)

(1)   A State may meet the requirement of subsection (a)(4) by establishing a program under which--

(A)   change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B)   if it appears from information provided by the Postal Service that--

(i)   a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii)   the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)

    (A)    A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

    (B)    Subparagraph (A) shall not be construed to preclude--

        (i)    the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

        (ii)    correction of registration records pursuant to this chapter.

. . .

# United States Code

## Title 52.

## Voting and Elections.

## Subtitle II.

## Voting Assistance and Election Administration.

## Chapter 209.

## Election Administration Improvement.

## Subchapter III.

## Uniform and Nondiscriminatory Election Technology and Administration Requirements.

## Part A.

## Requirements.

§ 21083.  **Computerized statewide voter registration list requirements and requirements for voters who register by mail**

(a)    Computerized statewide voter registration list requirements

. . .

(5)    Verification of voter registration information

(A)    Requiring provision of certain information by applicants

(i)    In general

Except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes--

(I)     in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or

(II)    in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

(ii)    Special rule for applicants without driver's license or social security number

If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list.

(iii)   Determination of validity of numbers provided

The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.

. . .

(b)     Requirements for voters who register by mail

(1)     In general

Notwithstanding section 6(c) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4(c)) and subject to paragraph (3), a State shall, in a uniform and nondiscriminatory manner, require an individual to meet the requirements of paragraph (2) if--

(A)     the individual registered to vote in a jurisdiction by mail; and

(B)

(i)     the individual has not previously voted in an election for Federal office in the State; or

(ii)     the individual has not previously voted in such an election in the jurisdiction and the jurisdiction is located in a State that does not have a computerized list that complies with the requirements of subsection (a).

(2)     Requirements

(A)     In general

An individual meets the requirements of this paragraph if the individual--

(i)    in the case of an individual who votes in person--

    (I)    presents to the appropriate State or local election official a current and valid photo identification; or

    (II)    presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

(ii)    in the case of an individual who votes by mail, submits with the ballot--

    (I)    a copy of a current and valid photo identification; or

    (II)    a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.

. . .

(3)    Inapplicability

Paragraph (1) shall not apply in the case of a person--

. . .

(B)

      (i)     who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4) and submits with such registration either--

           (I)     a driver's license number; or

           (II)     at least the last 4 digits of the individual's social security number; and

      (ii)     with respect to whom a State or local election official matches the information submitted under clause (i) with an existing State identification record bearing the same number, name and date of birth as provided in such registration; or

. . .

. . .

. . .

# North Carolina General Statutes

## Chapter 163

## Elections and Election Laws.

## Subchapter III.

## Qualifying to Vote.

## Article 7a.

## Registration of Voters.


## § 163-82.11.  Establishment of statewide computerized voter registration

(a)   Statewide System as Official List

The State Board of Elections shall develop and implement a statewide computerized voter registration system to facilitate voter registration and to provide a central database containing voter registration information for each county. The system shall serve as the single system for storing and managing the official list of registered voters in the State. The system shall serve as the official voter registration list for the conduct of all elections in the State. The system shall encompass both software development and purchasing of the necessary hardware for the central and distributed-network systems.

(b)   Uses of Statewide System

The State Board of Elections shall develop and implement the system so that each county board of elections can do all the following:

(1)    Verify that an applicant to register in its county is not also registered in another county.

(2)    Be notified automatically that a registered voter in its county has registered to vote in another county.

(3)    Receive automatically data about a person who has applied to vote at a drivers license office or at another public agency that is authorized to accept voter registration applications.

(c)    Compliance With Federal Law

The State Board of Elections shall update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002 and to reflect changes when citizenship rights are restored under G.S. 13-1.

(d)    Role of County and State Boards of Elections

Each county board of elections shall be responsible for registering voters within its county according to law. Each county board of elections shall maintain its records by using the statewide computerized voter registration system in accordance with rules promulgated by the State Board of Elections. Each county board of elections shall enter through the computer system all additions, deletions, and changes in its list of registered voters promptly to the statewide computer system.

(e)    Cooperation on List for Jury Commission

The State Board of Elections shall assist the Division of Motor Vehicles in providing to the county jury commission of each county, as required by G.S. 20-43.4, a list of all

registered voters in the county and all persons in the county with drivers license records. The list of registered voters provided by the State Board of Elections shall not include any registered voter who has been inactive for eight years or more.